# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| **GREGORY THOMAS BERRY**, *et al.* | : |
| **Plaintiffs**, | : |
| | : CASE NO. 3:11-CV-754 |
| **v.** | : (Judge James R. Spencer) |
| | : |
| **LEXISNEXIS RISK & INFORMATION** | : |
| **ANALYTICS GROUP, INC.,** *et al.* | : |
| **Defendants**. | : |

## DECLARATION OF PROFESSOR NEIL M. RICHARDS

1. I am a Professor of Law at Washington University School of Law in St. Louis, Missouri, where I have taught for over nine years. I have been retained to provide an expert opinion on whether the business practice changes enforceable by the injunctive relief in the Proposed Settlement would (1) benefit consumers and be consistent with (2) the guiding principles of the Fair Credit Reporting Act, and (3) the best practices of privacy professionals.

## SUMMARY OF OPINION

2. According to both the guiding principles of the Fair Credit Reporting Act and the best practices of privacy professionals, the injunctive relief portion of the Proposed Settlement would provide a substantial benefit for consumers. First, the Defendants' agreement to bring its Accurint Collections Decisioning suite of products and services into full FCRA compliance squarely remedies the conduct targeted in the litigation. American consumers will be given the full range of FCRA protections for certain Accurint Collections products and services that had been previously treated as non-covered. Second, Defendants have agreed to extend certain FCRA-like consumer rights to its non-FCRA product, Contact and Locate, which would not be required by federal law, but which would be enforceable through the injunction. Third, the general approach that Defendants have taken in the Proposed Settlement embodies both the traditional information privacy law standard of the Fair Information Principles, as well as the rising industry best practice of Privacy by Design. The Proposed Settlement also represents a significant shift in the practices of the data broker industry—an industry which currently is subject to minimal regulation in its treatment of personal data. This major shift in business practices by one of the industry's leaders is likely to stimulate similar movements by other industry members. Fourth, the presence of a judicially enforceable injunction results in a real benefit to consumers since this is a remedy that consumers cannot obtain to enforce the FCRA under current law.

1

**QUALIFICATIONS AND BACKGROUND**

3. *Expertise.* I am a nationally- and internationally-regarded expert in the field of information privacy law.

4. *Education and clerkships.* I am a 1997 graduate of the University of Virginia School of Law, from which I also graduated with a Master's Degree in Legal History. In law school, I was the Executive Editor of the *Virginia Law Review*, and was awarded several academic prizes, including the Order of the Coif. Following law school, I clerked twice for federal judges, first for Judge Paul V. Niemeyer of the United States Court of Appeals for the Fourth Circuit, and then for Chief Justice of the United States William H. Rehnquist. Following my clerkships, I was the inaugural Hugo Black Fellow at the University of Alabama Law School, and then a Temple Bar Fellow with the Inns of Court in London. I then practiced law for several years with Wilmer, Cutler, and Pickering, in their Washington, DC Office. At Wilmer, my practice was split between privacy law and litigation.

5. *Professional experience.* Since I entered the academy, I have remained active in professional activities relating to privacy and technology law. I am a member of the Advisory Board of the Future of Privacy Forum, a Washington, DC-based think-tank composed of privacy law experts in industry and the academy that seeks to advance responsible data practices. I have also consulted with law firms and companies about real-world privacy issues. I am the co-organizer of the annual International Privacy Law Conference, which brings together the leading international scholars at the University of Cambridge in the United Kingdom. Earlier this year, I was one of a handful of privacy law experts invited by the American Law Institute to consider whether the ALI should revisit privacy law and produce a restatement or other law reform project. More recently, I spoke at a major Federal Trade Commission workshop to advise FTC Commissioners and staff on policy issues related to the collection of comprehensive data about consumers by data and Internet companies. Given my expertise, I was specifically asked by the FTC staff to speak about the real and potential harms to consumers raised by companies trading in their personal data.

6. *Scholarship.* My written scholarship has been devoted almost entirely to questions of information privacy law. I am the author of approximately twenty articles and numerous smaller essays, and my scholarship has appeared in many of the leading law reviews, including the *Harvard Law Review, Columbia Law Review, Virginia Law Review, California Law Review,* and the *Georgetown Law Journal.* I have been cited almost three hundred times in law review articles. I am also currently writing a book manuscript on privacy law, entitled *Intellectual Privacy,* that is under contract with Oxford University Press, and is scheduled to be published in 2014.

7. *Media.* I regularly appear in the media giving expert commentary on a wide range of consumer privacy and Internet law issues. I have appeared as a guest on television and radio programs, including CNN, National Public Radio, and Fox News, and have been quoted as an expert on privacy and constitutional law in newspapers such as the

2

*Washington Post*, *Wall Street Journal*, *The Guardian (U.K.)*, the *Chicago Tribune*, and the *Boston Globe*.

8. My resume is included as Appendix A of this Declaration.

## MATERIALS REVIEWED

9. In preparing this opinion, I have reviewed an extensive set of materials pertinent to this case, including but not limited to (1) Complaint in *Berry v. LexisNexis Risk & Information Analytics Group, Inc.*, (hereinafter "*Berry v. LexisNexis*"), dated November 14, 2011; (2) Stipulated Protective Order in *Berry v. LexisNexis*, dated August 13, 2012; (3) LexisNexis Mediation Statement in *Berry v. LexisNexis*, undated; (4) LexisNexis Mediation Statement Exhibits in *Berry v. LexisNexis*, undated; (5) LexisNexis Draft Memorandum in Support of Motion to Dismiss in *Berry v. LexisNexis*, undated; (6) LexisNexis Settlement Proposal in *Berry v. LexisNexis*, dated July 18, 2012; (7) First Amended Complaint in *Graham v. LexisNexis Risk & Information Analytics Management Group, Inc.*, dated January 22, 2010; (8) Second Amendment Complaint in *Adams v. LexisNexis Risk & Information Analytics Management Group, Inc.*, dated January 22, 2010; (9) Defendant's Motion for Judgment on the Pleadings in *Adams v. LexisNexis*, and exhibits, Case No. 08-04708-RMB-KMW, (D.N.J. Nov. 18, 2009); (10) Plaintiffs' Brief in Opposition to Defendant's Motion for Judgment on the Pleadings in *Adams v. LexisNexis*, and exhibits, Case No. 08-04708-RMB-KMW, (D.N.J. Nov. 18, 2009); (11) the District of New Jersey's decision addressing the Defendants' Motion for Judgment on the Pleadings in *Adams v. Lexis*; (12) LexisNexis PowerPoint Presentation in *Berry v. LexisNexis*, dated November 26, 2012.

## PURPOSES OF THE FCRA AND THE FAIR INFORMATION PRACTICES

10. In developing my opinion about the benefit to consumers of the proposed injunctive relief in this case, I have been guided by the purposes of the Fair Credit Reporting Act as revealed by its structure and by the Federal Trade Commission's experience in enforcing the FCRA over the past four decades, as embodied in the report *Forty Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations* (July 2011), *available at* http://www.ftc.gov/os/2011/07/110720fcrareport.pdf (hereinafter "FTC FCRA Report").

11. The FCRA was enacted to protect consumer financial information, to ensure that only the limited class of recipients with an actual need for such information could receive it, and to ensure that consumers had a meaningful opportunity to access and correct databases containing their financial information.   Daniel J. Solove & Paul M. Schwartz, *Information Privacy Law* 758 (4th ed. 2011).

12. The FTC clearly enumerates the purposes of the FCRA as follows: "The FCRA was enacted to (1) prevent the misuse of sensitive consumer information by limiting recipients to those who have a legitimate need for it; (2) improve the accuracy and integrity of

consumer reports; and (3) promote the efficiency of the nation's banking and consumer credit systems." FTC FCRA Report at 1.

13. The FCRA applies to "consumer reporting agencies," which are entities that furnish "consumer reports." 15 U.S.C. § 1681b. Its intricate procedures do not cover entities that do not engage in the furnishing of consumer reports.

14. A "consumer report" is the communication of information about consumers for any of seven purposes specified by the FCRA. The Act defines a "consumer report" as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's [1] credit worthiness, [2] credit standing, [3] credit capacity, [4] character, [5] general reputation, [6] personal characteristics, or [7] mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—(A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title." 15 U.S.C. § 1681a(d) (bracketed numbering added).

15. The FTC has clarified that the definition of a consumer report has two elements, both of which must be satisfied for a report to be a "consumer report" within the meaning of the Act. First, the information contained in the report must have a "bearing on" one of the seven FCRA purposes. Second, the report must also "be used or expected to be used" to determine the consumer's eligibility for "credit," "insurance" or "any other" FCRA purpose. *See* FTC FCRA Report, at 20. Relevant to this litigation, the FTC illustrates this requirement with the following example: "For example, a 'skip tracer' report of prior addresses used solely to locate an uninsured automobile driver is not an investigative or other 'consumer report' if it would not be used to determine eligibility for credit, employment, insurance, or other permissible business purposes allowed by the FCRA." *Id.*

16. Companies found liable for willfully violating consumers' rights under the FCRA are subject to damages measured "in an amount equal to the sum . . . of any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000 . . . ." 15 U.S.C. § 1681n(a)(1)(A). By recognizing that "actual" provable damages might not adequately vindicate the consumer interest in fair credit practices, nor adequately deter companies from engaging in those practices, Congress established a statutory measure of the value for the fair handling of consumer financial data.

17. Although the FCRA provides for money damages, injunctive relief has generally been held to be unavailable to private litigants by courts that have been presented with the question. *See Freeman v. Equifax, Inc.*, No. 6:12–845–HMH, 2012 WL 2502693, at *3 (D.S.C. June 28, 2012) ("Although the Fourth Circuit has not addressed this issue, the clear weight of authority holds that injunctive relief is available under the FCRA only in suits brought by the Federal Trade Commission."); *Baumgardner v. Lite Cellular, Inc.*, 996 F. Supp. 525, 527 (E.D. Va. 1998) ("While the FCRA does not expressly prohibit

injunctive relief, Congress's failure to include injunctive relief as a potential remedy, combined with Congress's express delegation of enforcement of the FCRA to the FTC, clearly indicates that Congress did not intend injunctive relief as a remedy."). Thus, while the FCRA may be a useful statutory tool for remedying *past* violations of unreasonable practices concerning the dissemination of consumer reports, private actions under the statute have generally been less useful in shaping *future* practices concerning such reports, or of encouraging companies trading in personal data to follow privacy best practices.

18. The FCRA is an example of a statute that embodies the so-called "Fair Information Practices" principles, or "FIPS." These are statutory schemes that regulate the collection, use, and disclosure of certain kinds of information. *See* Neil M. Richards, *The Perils of Social Reading*, GEO. L.J. (forthcoming 2013), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2031307. The first Fair Information Practices were developed by the federal government in the early 1970s to deal with the problem of government databases. The idea became highly influential and has been used as the basis for data privacy laws around the world, including the FCRA, as well as the EU Directive that governs all data processing in Europe. Council Directive 95/46, art. 8, 1995 O.J. (L 281) 38 (EC), *available at* http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:1995:281:0031:0050:EN:PDF.

19. The FIPS are also an idea that retains vitality: In February 2012, President Obama called for a "Privacy Bill of Rights," an enforceable code of conduct for consumer data directly modeled on the Fair Information Practices tradition. Executive Office of the President, Consumer Data Privacy in a Networked World: A Framework For Protecting Privacy And Promoting Innovation in the Global Digital Economy 9 (2012), *available at* http://www.whitehouse.gov/sites/default/files/privacy-final.pdf (acknowledging the importance of fair information practices).

20. Most scholars agree that there is a global consensus on the key Fair Information Practices. Joel Reidenberg summarizes this consensus as having four elements: (1) *data quality standards*, which ensure that data is acquired legitimately and is used in a manner consistent with the purpose for which it was acquired; (2) *transparency standards*, such as giving individuals meaningful notice regarding how their information is being used, the ability to access their data, and correct it where it is inaccurate; (3) *special protections for sensitive data*, such as requiring affirmative consent before such data (including financial data) may be used or disclosed and ensuring that it is held securely; and (4) *enforcement* of the standards. Joel R. Reidenberg, *Setting Standards for Fair Information Practice in the U.S. Private Sector*, 80 IOWA L. REV. 497, 514–15 (1995).

## PRIVACY BY DESIGN

21. Privacy by Design is the leading current idea of how privacy best practices should operate in the business environment.

22. The basic idea of Privacy by Design is that privacy cannot be ensured solely by regulatory oversight by government agencies; instead, effective protection of privacy also requires companies to respect the privacy of individuals by making privacy protection an ordinary but integral part of the way they do business.

23. The term "Privacy by Design" was first articulated in the 1990's by Dr. Ann Cavoukian, the Information and Privacy Commissioner of Ontario, Canada.  Privacy by Design's objectives -- protecting privacy, ensuring individuals have control over their data, and giving companies a sustainable competitive advantage by making privacy a market differentiator – have been reduced to seven "Foundational Principles."

24. The seven Privacy by Design principles are:

(1) *Proactive Privacy* – that privacy protection should anticipate potential problems and not be merely reactive;

(2) *Privacy by Default* – that privacy should be the default setting for business processes, rather than an exception to a general rule of non-privacy;

(3) *Embedded Privacy* – that privacy should be embedded into the design of technologies and business practices;

(4) *Positive-Sum Privacy* – that privacy can produce a positive-sum outcome for companies, and is not something that must always be traded off against other values like security or profitability;

(5) *End-to-End Security* – that privacy protection should extend from the creation of a record throughout that record's life cycle until it is destroyed securely, in a timely fashion;

(6) *Transparency* – that business practices or technologies that implicate privacy are subject to independent oversight to ensure they are operating according to their stated premises; and

(7) *Respect for Users* – that engineers and operators of personal data systems protect the interests of individuals by empowering individuals with respect to their data and keeping the system "user-centric."

*See generally* Ann Cavoukian, *Privacy By Design: The Seven Foundational Principles* (2011), *available at* http://www.ipc.on.ca/images/Resources/7foundationalprinciples.pdf; *see also* www.privacybydesign.ca/about/principles.

25. Privacy by Design has become a leading best practice of privacy professionals in government, the academy, and industry.

26. The recent privacy white papers by the White House and the Federal Trade Commission each embrace Privacy by Design as part of their commitment to protect individual privacy in the twenty-first century.   In March 2012, The FTC expressly embraced Privacy by Design as one of the four principal elements of its desired framework for the protection of consumer privacy, along with reasonable scope of information collection, simplified consumer choice, and transparency.   *See* Federal Trade Commission, *Protecting Consumer Privacy in an Era of Rapid Change: Recommendations for Businesses and Policymakers*, March 2012, *available at* http://www.ftc.gov/os/2012/03/120326privacyreport.pdf.   The White House "Privacy Bill of Rights" report published in February 2012 does not use the terminology "Privacy by Design," but its framework is fully consistent with the Privacy by Design principles, specifically its call for accountability, in which it declares that "Consumers have a right to have personal data handled by companies with appropriate measures in place to assure they adhere to the Consumer Privacy Bill of Rights. Companies should be accountable to enforcement authorities and consumers for adhering to these principles. Companies also should hold employees responsible for adhering to these principles. To achieve this end, companies should train their employees as appropriate to handle personal data consistently with these principles and regularly evaluate their performance in this regard." The White House, *Consumer Data Privacy in a Networked World: A Framework for Protecting Privacy and Promoting Innovation in the Global Digital Economy* at 48 (Feb. 2012), *available at* http://www.whitehouse.gov/sites/default/files/privacy-final.pdf.

27. Leading scholars of privacy law have also embraced Privacy by Design as an effective means of guaranteeing privacy in practice.   The concept is regularly discussed at gatherings of privacy law scholars, and the concept has begun to appear in the law review literature in articles authored by some of the most prominent scholars in the field. *E.g.*, Peter Swire, *Social Networks, Privacy, and Freedom of Association: Data Protection vs. Data Empowerment*, 90 N.C. L. REV. 1371 (2012); Deirdre Mulligan & Jennifer King, *Bridging the Gap Between Privacy and Design*, 14 U. PA. J. CONST. L. 989 (2012); M. Ryan Calo, *Against Notice Skepticism in Privacy (And Elsewhere)*, 87 NOTRE DAME L. REV. 1027 (2012); Ira S. Rubenstein, *Regulating Privacy By Design*, 26 BERKELEY TECH. L. J. 1409 (2011).

28. Privacy by Design is also accepted as an industry best practice.   It is endorsed by companies which are thought leaders in privacy protection such as Intel, Inc. *See* FTC Report at 22.  It has also been embraced by prominent trade and industry groups.  For example, the Future of Privacy Forum, a privacy think tank that brings together practitioners, companies, and academics, has launched a Privacy by Design initiative called "Design for Trust." *See, e.g.*, http://www.futureofprivacy.org/privacy-by-design/; http://www.futureofprivacy.org/design-for-trust/.

## FINDINGS ABOUT THE PROPOSED INJUNCTIVE RELIEF

29. Under the terms of the Proposed Settlement as I understand them, the injunctive relief component has three principal elements: (1) Defendants will, for the first time, acknowledge responsibility as a consumer reporting agency as it pertains to certain

Accurint products and services, and agree to bring its Accurint Collections Decisioning suite of products and services into full FCRA compliance; (2) Defendants will agree to extend to consumers certain FCRA-like consumer rights, such as access and limited correction rights for its non-FCRA Contact and Locate product, even though these rights are not required by the FCRA; (3) Defendants will provide additional training and education for employees and customers and other modifications relating to these new products.

30. Because the details of the new products are confidential, I have described them separately in Exhibit B of this Declaration. The discussion which follows incorporates that description by reference, but they have been placed in a separate document so that they can be easily redacted from publicly-available versions of this Declaration.

## BENEFIT AND VALUE TO CONSUMERS OF THE SETTLEMENT

31. In this section of my declaration, I will discuss the benefits of the settlement that I have identified and the general value of each of them. I will first describe the specific benefits that the proposed injunction would generate for individual consumers, and then identify some more general benefits that would accrue to consumers as a whole.

32. *Defendants' Acknowledgment of FCRA Responsibility.* Under the terms of the Proposed Settlement, Defendants have agreed that their affiliate operating the Accurint product is a Credit Reporting Agency, and thus to extend full FCRA rights to consumers profiled by the Accurint product. This provides substantial benefit to consumers in several different ways. By accepting coverage and responsibility as a CRA, the LexisNexis affiliate will be assuming the serious responsibilities imposed by the FCRA, which requires them, among other things, (1) to employ and maintain procedures to assure the maximum possible accuracy of the Accurint-related information it sells; (2) to assure that Accurint information about consumers is only sold for certain limited permissible purposes; (3) to provide consumers with full file access and disclosure, required to be free of charge under certain circumstances; and (4) to conduct investigations of consumer disputes of inaccurate information being reported about them, and delete information found to be inaccurate or unverifiable. As a result of Defendants' agreement to bring Accurint into full FCRA compliance, consumers will have the right to see what information LexisNexis is reporting about them to the debt collection industry, dispute it if they believe it to be incorrect, and be provided with a private cause of action under the FCRA in the event of a breach of its duties. This also gives consumers the right to obtain actual or statutory all damages for FCRA violations, as well attorneys' fees and costs. This change represents a serious advancement of consumer rights by a dominant member of the data broker industry.

33. *Consumer Access to Free Copies of Contact and Locate Reports.* The FCRA gives consumers a right to receive a free copy of their consumer report from consumer reporting agencies. 15 U.S.C. §1681j. This is an important right that empowers consumers against the companies that collect, use, and disclose their financial and other personal information. If a consumer cannot know what information is contained in their

8

consumer report, it cannot dispute or correct information that might be incomplete, misleading, or even false. But this statutory right only applies to "consumer reports" within the meaning of the FCRA. Because companies like LexisNexis maintain that dedicated debt collection location reports like the proposed "Contact and Locate" reports would not fall within this definition, they provide consumers with no ready right to obtain copies (free or otherwise) of these reports. The proposed injunction would give consumers the meaningful right to inspect these important records about them for free, regardless of any interpretation of the FCRA.

34. *Consumer Right to Comment on Their Contact and Locate Reports.* The FCRA also gives consumers a right to dispute with a consumer reporting agency the accuracy or completeness of any information in their consumer report. 15 U.S.C. §1681i. This is another important right because inaccurate consumer credit information threatens the FCRA's goals of consumer empowerment and also the efficiency and accuracy of marketplace decisions about consumer creditworthiness. But like the right to free copies of consumer reports, this statutory right only applies to "consumer reports" within the meaning of the FCRA. Because LexisNexis argues that dedicated debt collection location reports like the "Contact and Locate" reports proposed under this settlement would not fall within this definition, consumers currently have no ready right to correct incomplete, misleading, or false information in what the database and collections industries call their "skip and locate" reports such as the "Contact and Locate" product under development by LexisNexis. The proposed injunction would give them this right, regardless of any interpretation of the FCRA. Consumers would still not have the right to *correct* errors, but would merely have the right to *dispute* them by placing up to 100 words on search pages in the product that would display the disputed information. Nevertheless, this is still a substantial increase in the ability of consumers to meaningfully participate in the processing of information about them than exists under current law.

35. *Advantages of Injunctive Relief.* Injunctive relief is unavailable as a general matter under the FCRA, and is only available (for instance) to remedy unlawful disclosures to the FBI for counterintelligence purposes. 15 U.S.C. § 1681u. It is not available in cases of the sort that are the subject of this litigation (*see supra* ¶ 14). The Proposed Settlement would thus allow legally binding, prospective injunctive relief of the sort that is unavailable to consumers as a matter of right under existing federal credit privacy law. While the FCRA's statutory damages provision certainly creates incentives for CRAs to change their practices especially where, as here, such a large group of consumers is affected, the injunctive relief proposed here is arguably a superior result to money damages. The intent of this litigation is to cause the Defendants to change their conduct and the treatment of data, and the injunctive relief allows this result through a negotiated agreement by the parties. In this context, the threat of statutory damages has played its role to motivate a change in business practices in a consumer-protective direction enforceable through the injunctive relief.

36. *Expansion of the FIPs to non-FCRA data.* A more general benefit of the Proposed Settlement is that it extends some of the Fair Information Principles beyond FCRA-

governed credit reporting data to data used for collections, which many CRAs view as not covered by the FCRA. The Proposed Settlement does not use the term "Fair Information Principles," but much of its substance tracks the FIPs. As discussed above in ¶ 18, the FIPs are a long-standing global consensus of a baseline set of protections for personal data. In addition to the FCRA, a number of other federal privacy statutes embody the FIPs, including for example the Federal Privacy Act of 1974, 5 U.S.C. § 552a, the Right to Financial Privacy Act (RFPA) (12 U.S.C. § 3401 *et seq.,* the Electronic Communications Privacy Act of 1986 18 U.S.C. §§ 2510–2522, and the Video Privacy Protection Act, 18 U.S.C. § 2710. But unlike virtually all other Western democracies, the United States does not have a comprehensive privacy law that applies the FIPs to all personal information (or even all sensitive information). The White House Privacy Guidelines discussed above assert a "Privacy Bill of Rights" over all consumer information which embodies the FIPs, and the FTC enforces a variant of the FIPs in its policing of Internet privacy policies for compliance with the prohibition on unfair or deceptive trade practices. However, both of these are to some extent voluntary on the part of companies like LexisNexis, and provide only a diminished requirement of accountability. The Proposed Settlement would extend some of the FIPs protections to the Contact and Locate databases. Specifically, (1) the additional security procedures separating Collections Decisioning data from Contact and Locate data would contribute both to the *data quality* and the *security* of the consumer reporting information covered by the FCRA, (2) giving consumers the ability to *access* and comment on their Contact and Locate data would contribute to the *transparency* of the collections data, and (3) the presence of injunctive relief binding the defendants would provide *enforcement* of the standards, ensuring greater compliance.

37. *Privacy by Design.* The proposed injunctive relief requires LexisNexis to adhere to Privacy by Design in its ordered relief. As with the FIPs, the injunction does not use the terminology "Privacy by Design," but it embodies each of the seven substantive principles of Privacy by Design in practice. First, much of the proposed changes to the Accurint Collections products are *Proactive*, and anticipate potential problems beyond the ones alleged in this litigation. Second, the elimination of potentially FCRA-covered information from the Contact and Locate product as well as the FCRA-imposed requirements applicable to Collections Decisioning illustrate *Privacy by Default,* the requirement that privacy should be the default setting for businesses and not the exception to a rule of easy information flow. Third, the design of the interfaces and data systems of the two new products illustrate *Embedded Privacy.* By making privacy certifications part of the computer code, and by color-coding the restricted FCRA databases a different color from the less-restricted Contact and Locate databases, LexisNexis appears to be building privacy-protective standards into the design of how it does business and how its customers can use the personal data contained in its databases. The embedding of privacy controls into the fabric of the Accurint computer systems seems to be the very essence of Privacy by Design, and an example of industry best practices. Fourth, LexisNexis appears to embrace at least a limited form of *Positive-Sum Privacy,* by creating and marketing privacy-protective products as a market differentiator. Fifth, the additional certifications that customers seeking to access the FCRA-covered data illustrate *End-to-End Security,* though LexisNexis does not yet appear to have

10

warranted that these procedures would persist throughout the life cycle of data in the Contact and Locate databases. Sixth, the injunctive relief and the ability of consumers to access their data would advance the goal of *Transparency* in Contact and Locate, allowing users to observe what the Defendants are doing with their personal data and to enforce deviations through the proposed injunctive relief. Finally, the proposed ability of both consumer access and commentary on their data demonstrates a *Respect for Users* by allowing them a meaningful degree of participation in their data.

## CONCLUSION – OPINION REGARDING FAIRNESS OF SETTLEMENT

38. My expert opinion is that the injunctive relief portion of the settlement provides a substantial benefit to consumers that is different in degree and in kind from the minimal rights that consumers had before the filing of this litigation. This benefit has several dimensions.

39. First, the Defendants' agreement to bring its Accurint Collections Decisioning suite of products and services into full FCRA compliance remedies the unlawful conduct alleged in this litigation. Consumers will be given the full range of FCRA protections for Accurint products that had been previously treated as non-covered, and Defendants will recognize and accept full responsibility as a regulated consumer reporting agency as it pertains to such products. Specifically, this means that there is a reduced danger that sensitive information covered by an FCRA purpose could be used for an impermissible purpose, and it also allows consumers new access to the information LexisNexis sells about them. Further, as to the FCRA-covered product, consumers will be provided with the FCRA-granted rights of, for example, access to one yearly copy of their Collections Decisioning report, and the ability to dispute inaccurate data in those reports. *See* 15 U.S.C. §§ 1681g(a), 1681i(a). Currently, LexisNexis affords no FCRA rights at all to the subject of an Accurint Collections report, regardless of the user to whom it is sold. This substantial change would not only protect consumer rights, but would also advance the important public purposes of the FCRA, promoting the efficiency of the consumer credit market while at the same time protecting the privacy of consumers.

40. Second, the creation of the separate Contact and Locate product is also accompanied by the legally-binding guarantee of additional consumer rights with respect to that data – rights that would not exist without the proposed injunction. Most importantly, these are the consumer's right to obtain free copies of their Contact and Locate report and the limited ability to correct inaccurate or misleading data contained in those reports by providing a 100-word text commentary about the disputed data. The right of free access to the data is a substantial one, but the commentary right is more limited, since the system has not been built yet. (I have, however, been shown a confidential prototype of the system). It is still not clear how the commentary will be placed or appear, or to what extent defendants have the right or obligation to edit commentary. But the two rights together are a substantial benefit to consumers and better for consumers than the access right standing alone.

41. Third, the general approach that defendants have taken in the Proposed Settlement embodies both the traditional information privacy law standard of the FIPs, as well as the rising industry best practice of Privacy by Design. This is particularly significant in the context of the data broker industry, where the users of the information are not only different from the consumers whose personal information is being sold, but where the users are frequently in an adversarial relationship to the consumers. LexisNexis is a leader in this important and rapidly-changing field, and its adoption (even if it is implicit) of the FIPs and Privacy by Design is significant. While, in my opinion, more could be done to formally adopt the FIPs and Privacy by Design, the proposed injunction is close enough to the FIPs and Privacy Design without mentioning them by name for this to be an additional substantial benefit of the proposed injunctive relief.

42. Fourth, this form of relief—a court-enforceable injunction—is of great benefit to consumers because it is a remedy that consumers themselves cannot directly obtain under the FCRA. This is where the genuine value in this settlement lies. LexisNexis is agreeing to provide to millions of American consumers relief on a basis that could not be had were Plaintiffs to obtain a complete victory from their best day in court. The proposed injunction gives consumers newfound rights and protections in the collections context. It also prevents information that could arguably reflect upon the seven FCRA factors that define information as an FCRA "consumer report" from being used for purposes requiring FCRA protections or by those without proper FCRA credentialing. Such novel privacy protections in the collections context, spread across the millions of consumers who are the subjects of Accurint reports every year, is of tremendous benefit to those consumers, as it ensures proper FCRA security over information where currently there is little or none. The injunctive relief is, therefore, a very important result for consumers.

43. Lastly, if I were to estimate the monetary value of the settlement to consumers, it would be in the billions of dollars. Consumer rights in general, and privacy rights in particular, are not always easy to quantify in monetary terms. But using any of the rough measures of value that we have shows that the Proposed Settlement has a substantial aggregate economic value for consumers. Congress recognized this fact when it passed the FCRA, providing that consumers may obtain from companies who violate their rights under the FCRA "an amount equal to the sum . . . of any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000 . . .." 15 U.S.C. § 1681n(a)-(a)(1)(A). The class of plaintiffs in this litigation – persons about whom LexisNexis sold an Accurint Report to a debt collector – is in the millions. For example, from confidential materials provided to me, it is safe to estimate that LexisNexis sold 100 million Accurint reports to debt collectors over a five year period, an average of about 20 million such sales per year. One of the allegations in the *Adams* case was that Defendant violated the rights of consumers by charging consumers $8 for a copy of their Accurint report (which still did not contain all of the information required by the FCRA). Assuming that each of the Accurint reports sold pertained to a unique consumer, and each of those consumers now has the right to obtain his or her Accurint report free of charge annually, the Defendant's compliance will save those consumers approximately $160 million annually. Moreover, while it is impossible to know the true value of the rights in the Proposed Settlement to an individual consumer, failing to

provide FCRA rights similar to those granted by the injunction here results in a presumed level of damages of between $100 and $1,000 per violation under the FCRA. If we were to use the lower $100 figure supplied by Congress as an economic measure of the value to consumers of their fair credit rights, the simple multiplication produces a figure of $2.2 billion. Even if we were to use a vastly lower figure than the one Congress has supplied – a nominal (and unreasonably low) amount of $1 per consumer, the value of this settlement to consumers is still in the range of at least tens of millions of dollars per year. My purpose in making this estimation is not to act as an economist, but merely to show that even for rights such as these that might be difficult to quantify, it is clear that the economic value of the Proposed Settlement to consumers is substantial beyond question.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 19, 2012.

/s/ Neil M. Richards
Neil M. Richards
Professor of Law
Washington University in St. Louis
One Brookings Drive
St. Louis MO 63130
(314) 935-4794
Fax (314) 935-5356

**Appendix A: Resume of Professor Neil M. Richards**

# NEIL M. RICHARDS

**Professor of Law**
**Washington University School of Law**
**One Brookings Drive**
**St. Louis, Missouri 63130**
**(314) 935-4794**
**nrichards@wustl.edu**

---

## EMPLOYMENT:

**Professor of Law**, Washington University School of Law, St. Louis, Missouri.  July 2003-present.

- Professor of Law with tenure July 2008-present.
- Associate Professor of Law, July 2003-July 2008.
- Awards
  - Voted Professor of the Year by student body, 2003-04 Academic Year.
  - Israel Treiman Faculty Fellow, 2005-06 Academic Year.
- Courses
  - First Amendment Law, First Amendment Theory, Privacy Law, Fourteenth Amendment Law, Constitutional Law, Law and Politics Colloquium, Property.
- Co-Organizer, Washington University-Cambridge University International Privacy Conference, Clare College, Cambridge, June 2012, June 2013.
- Co-Organizer, Washington University First Amendment Roundtable, March 2013.
- Institutional Service
  - Decanal Review Committee, Spring 2010.
  - Chair, Faculty Appointments, 2010-11.
  - Washington University Faculty Senate Council, Law School Elected Representative, 2008-2011.
  - Faculty Appointments Committee, 2004-05 and 2008-09.
  - Faculty Promotions Committee, 2012-13.
  - Faculty Advisor, *Washington University Law Review*, 2004-2010.
  - Faculty Clerkships Advisor, 2005-06 Academic Year, 2009-2011.
  - Clerkships Committee, 2003-04 Academic Year.
  - Curriculum Committee, 2006-07 and 2009-10 Academic Years.
  - Student Life Committee, 2011-12 Academic Year.
  - Liaison to Arts & Sciences, 2011-present.

**Visiting Professor of Law**, Utrecht University, the Netherlands, January 2012.

- Taught one-credit short course on Comparative Free Speech Law.

**Visiting Professor of Law**, University of Illinois College of Law, October 2010.

- Taught one-credit short course on Privacy and the First Amendment.

**Associate**, Wilmer, Cutler & Pickering, Washington, D.C. 2000-2003. Practice involved privacy, electronic commerce, and appellate litigation.

**Hugo Black Faculty Fellow**, University of Alabama School of Law, Tuscaloosa, Alabama. Academic Year 1999-2000; Spring Semester 2003. Inaugural research and teaching fellow in a visiting faculty program for former Supreme Court clerks. Courses: Property, Constitutional Law, First Amendment. Chaired Clerkships Committee, 1999-2000.

**Temple Bar Scholar**, American Inns of Court. London, England. October 2000.

**Law Clerk**, Hon. William H. Rehnquist, Chief Justice of the United States, United States Supreme Court, Washington, D.C. July 1998-July 1999. Served during the Supreme Court's 1998-99 Term and the 1999 Presidential Impeachment Trial.

**Law Clerk**, Hon. Paul V. Niemeyer, United States Court of Appeals for the Fourth Circuit, Baltimore, MD. August 1997-July 1998.

**Summer Associate**, Powell, Goldstein, Frazer & Murphy, Washington, D.C. Summers 1996-97.

**Research Assistant**, Professor A.E. Dick Howard, University of Virginia School of Law, Charlottesville, VA. 1995-1997.


## EDUCATION:

**University of Virginia School of Law**, J.D. May 1997. Class rank: 2/390.

> **Activities:** Executive Editor, *Virginia Law Review*. Teaching Assistant, First-Year Study Skills Workshop. Legal Education Project. Editorial Board, *Virginia Journal of International Law*.

> **Honors:** Order of the Coif. Slaughter Honor Prize. Davis Prize in Constitutional Law.

**University of Virginia**, M.A. Legal History. Secondary Field of Study in Early American History. May 1997.

> **Master's Thesis:** *Clio and the Court: A Reappraisal after Three Decades.*

**George Washington University**, B.A. History with Special Honors, *summa cum laude*, Phi Beta Kappa, University Honors Program. Minor in Economics, Secondary Field of Study in International Affairs. May 1994. GPA 3.93.

> **Honors Thesis:** The Last Days of the Horse: The U.S. Cavalry and Technology in the 20th Century.

> **Awards:** National Merit Scholar (1990). Hubbard Prize for best student of American history. Distinguished Academic Achievement Awards. Strasser Essay Prize. Presidential Honor Scholarship.


## PUBLICATIONS:

**Books:**

INTELLECTUAL PRIVACY: RETHINKING CIVIL LIBERTIES IN THE DIGITAL AGE (Oxford University Press, forthcoming 2013).

**Works in Progress:**

*The Dangers of Surveillance*, HARVARD LAW REVIEW (forthcoming 2013).

*The Perils of Social Reading*, 101 GEORGETOWN LAW JOURNAL, no. 1 (forthcoming March 2013).
- Selected for encore and regular discussion at the 2012 Berkeley-GW Privacy Law Scholars Conference.
- Awarded the 2012 University of Houston IPIL Sponsored Scholarship Grant.

"Privacy and Intellectual Freedom," in M. Alfino ed., THE HANDBOOK OF INTELLECTUAL FREEDOM (Unwin, forthcoming 2013).

*How Should the Law Think About Robots?* (with William Smart) (work in progress).
- Selected to open the first WeRobot law and robotics conference, April 2012.

*The Shadow First Amendment* (work in progress).

**Articles and Essays in Law Reviews:**

*The Limits of Tort Privacy*
9 J. TELECOM. & HIGH TECH. L. 357 (2011).
- Invited submission for Conference on "Privacy and the Press," Silicon Flatirons Center, University of Colorado School of Law, Dec. 3, 2010.

*Prosser's Privacy Law: A Mixed Legacy*
98 CALIFORNIA LAW REVIEW 1887 (2011) (with Daniel J. Solove).

*The Puzzle of Brandeis, Privacy, and Speech*
63 VANDERBILT LAW REVIEW 1295 (2010).
- Selected for discussion at the 2010 Berkeley-GW Privacy Law Scholars Conference.

*Rethinking Free Speech and Civil Liability* (with Daniel J. Solove)
109 COLUMBIA LAW REVIEW 1650 (2009).
- Selected for plenary discussion at the 2009 Berkeley-GW Privacy Law Scholars Conference.

*Privacy and the Limits of History*
21 YALE JOURNAL OF LAW AND THE HUMANITIES 165 (2009) (review essay discussing Lawrence Friedman, *Guarding Life's Dark Secrets: Legal and Social Controls over Reputation, Propriety, and Privacy* (2007)).

*Intellectual Privacy*
87 TEXAS LAW REVIEW 387 (2008).
- Selected for discussion at the 2008 Berkeley-GW Privacy Law Scholars Conference.

*Privacy's Other Path: Recovering the Law of Confidentiality*
  96 GEORGETOWN LAW JOURNAL 123 (2007) (with Daniel J. Solove).
  - Selected for the 2007 Michigan-Illinois Comparative Law Works-in-Progress Workshop.
  - Excerpted in Daniel J. Solove, Marc Rotenberg & Paul Schwartz, INFORMATION PRIVACY LAW (Aspen: 3d ed. 2008).

*The Information Privacy Law Project*
  94 GEORGETOWN LAW JOURNAL 1087 (2006) (essay).
  - Reprinted in Practising Law Institute, EIGHTH ANNUAL INSTITUTE ON PRIVACY AND SECURITY LAW: PATHWAYS TO COMPLIANCE IN A GLOBAL REGULATORY MAZE, 902 PLI/Pat 11 (July 2007).
  - Excerpted in Daniel J. Solove, Marc Rotenberg & Paul Schwartz, INFORMATION PRIVACY LAW (Aspen: 3d ed. 2008).

*Reconciling Data Privacy and the First Amendment*
  52 U.C.L.A. LAW REVIEW 1145 (2005).
  - Excerpted in Daniel J. Solove, Marc Rotenberg & Paul Schwartz, INFORMATION PRIVACY LAW (Aspen: 3d ed. 2008).
  - Excerpted in Rodney Smolla, ed., THE FIRST AMENDMENT LAW HANDBOOK (Thompson West: 2006).

*"The Good War," the Jehovah's Witnesses, and the First Amendment*
  87 VIRGINIA LAW REVIEW 781 (2001) (book review).

*The Supreme Court Justice and "Boring" Cases*
  4 THE GREEN BAG 2D 401 (2001).

*Sallie Mae, The Gunderson Effect, and My Plumber*
  3 THE GREEN BAG 2D 251 (2000) (with Christopher P. Bowers).

*Clio and the Court: A Reassessment of the Supreme Court's Uses of History*
  13 JOURNAL OF LAW & POLITICS 809 (1998).

*U.S. Term Limits v. Thornton and Competing Notions of Federalism*
  12 JOURNAL OF LAW & POLITICS 521 (1996) (student note).

## Book Chapters:

"Tort Privacy and Free Speech," in D. Doerr & U. Fink, eds., THE RIGHT TO PRIVACY - PERSPECTIVES FROM THREE CONTINENTS (De Gruyter 2012).

## Other Writings:

*Keep Your Update to Yourself,* WIRED MAGAZINE, THE WIRED WORLD IN 2013 (**UK** Edition), 2012, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2172385.
*Choose Privacy Week 2012: The Perils of Social Reading,* PrivacyRevolution.org, May 2, 2012, available at http://www.privacyrevolution.org/index.php/comments/cpw_2012/.

*Rethinking Privacy in the Digital Age*, WASHINGTON UNIVERSITY LAW MAGAZINE, Spring 2012, at p. 47, available at http://law.wustl.edu/Magazine/spring2012/.

Regular Guest Blogger, ConcurringOpinions.com, 2007-present

Should Supreme Court Justices Continue to Have Life Tenure? (revised)

NEW YORK TIMES UPFRONT MAGAZINE, Sept. 21, 2009.

*William Hubbs Rehnquist*, in ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES (West: 2008).

*Missouri v. Holland*, in ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES (West: 2008).

*Foreword*: The Rehnquist Court and the First Amendment
    21 WASH. U. J. L. & POL. 1 (2006).

Griswold v. Connecticut, in The Encyclopedia of Privacy (William Staples et al. eds., 2006).

Should Supreme Court Justices Continue to Have Life Tenure?

NEW YORK TIMES UPFRONT MAGAZINE, March 7, 2005.

The Constitutionality of Federal and State Historic Preservation Grants to Religious Properties
    SJ053 ALI-ABA 873 (2004) (coauthor).

Ex Ante: Taxing Cases
    5 THE GREEN BAG 2D 2 (2001).

The Electronic Communications Privacy Act and Internet Privacy Litigation
    LIBEL DEFENSE RESOURCES COUNCIL CYBER SPACE PROJECT (2001).
    http://www.ldrc.com/Cyberspace/cyber11.html> (coauthor).

## ACADEMIC PRESENTATIONS:

"The Perils of Social Reading," Comparative Perspectives on Privacy Conference (conference co-organizer), Clare College, Cambridge University, Cambridge, England, June 27, 2012.

"The Perils of Social Reading," Berkeley-GW Privacy Law Scholars Conference, Washington, DC, June 8 & June 9 (encore session), 2012.

"The Perils of Social Reading," Washington University School of Law Faculty Workshop, May 2, 2012.

"How Should the Law Think About Robots?" WeRobot Conference, University of Miami, Coral Gables, Florida, April 22, 2012.

"The Perils of Social Reading," University of Maryland Law Faculty Workshop, March 23, 2012.

"Freedom of Assembly and Intellectual Privacy," Engaging *Liberty's Refuge* Conference, Washington University School of Law, March 2, 2012.

Google Fellow, Privacy Law Salon, Miami, Florida, February 2012

"Tort Privacy and Intellectual Privacy," University of Durham Law Faculty Workshop, Durham, England, September 2011.

"Tort Privacy and Intellectual Privacy," Society of Law Scholars, Downing College, University of Cambridge, England, September 2011.

"Intellectual Privacy: Rethinking Civil Liberties in the Digital Age," Washington University Faculty Workshop, July 2011.

"Free Speech and Tort Privacy," Privacy Discussion Forum, Mainz, Germany, June 2011.

"Tech Talk: Intellectual Privacy," Google Campus, Mountain View, California, June 6, 2011.

Discussant, Sandra Petronio, Privacy Perils: Deciding to Disclose or Protect Confidentialities, Berkeley-GW Privacy Law Scholars Conference, June 3, 2011.

Discussant, "What's Wrong with Spying?" Washington University Political Theory Workshop, April 15, 2011.

"The Limits of Tort Privacy," University of California Berkeley School of Law, March 31, 2011.

"The Limits of Tort Privacy," Notre Dame Law School Faculty Workshop, March 4, 2011.

Participant, "Workshop on Meeting the Challenge of Online Hate," Stanford Center for Internet and Society, January 14, 2011.

"The Limits of Tort Privacy," Conference on "Privacy and the Press," Silicon Flatirons Center, University of Colorado School of Law, Dec. 3, 2010.

"The Puzzle of Brandeis, Privacy, and Speech," University of California, Davis Faculty Workshop, November 9, 2010.

"Why Privacy Matters," ACLU of Eastern Missouri, September 21, 2010.

"Snyder v. Phelps and the First Amendment," Washington University School of Law Supreme Court Preview, September 20, 2010.

"The First Amendment in the 21st Century," Gephardt Center for Public Service, Washington University, September 17, 2010.

"The Puzzle of Brandeis, Privacy, and Speech," 2009 Berkeley-GW Privacy Law Scholars Conference, George Washington University School of Law, Washington, DC, June 4, 2010.

"The Puzzle of Brandeis, Privacy, and Speech," Washington University School of Law Faculty Research Seminar, February 24, 2010.

*Prosser's Privacy Law: A Mixed Legacy, California Law Review* Symposium on the 50th Anniversary of William Prosser's "Privacy" Article, GW Law School, Washington, DC, January 29, 2010.

Panelist, "Constitutional Law, Pharmaceutical Regulation, and Commercial Speech," Section on Law, Medicine, and Health Care and Section on Constitutional Law, Association of American Law Schools Annual Meeting, New Orleans LA, January, 2010.

"Librarians, Privacy, and the First Amendment," Missouri Library Association Annual Meeting, Columbia MO, October 9, 2009.

"The Shadow First Amendment," Washington University School of Law Faculty Incubator Workshop, July 1, 2009.

"Rethinking Free Speech and Civil Liability," 2009 Berkeley-GW Privacy Law Scholars Conference, Berkeley School of Law, Berkeley CA, June 5, 2009.

Principal Commentator, Washington University Political Theory Workshop, Spring 2009 (discussing "Legal Realism" by Frank Lovett, Washington University Department of Political Science).

Rethinking Free Speech and Civil Liability," Washington University School of Law Faculty Research Seminar, April 2009.

"Brandeis, Privacy, and Speech," Washington University Political Theory Workshop, February 2009.

"Rethinking Free Speech and Civil Liability," Fordham Law School Center on Law and Information Policy Workshop, December 5, 2008.

"Intellectual Privacy," 2008 Berkeley-GW Privacy Law Scholars Conference, George Washington University School of Law, Washington, DC, June 13, 2008.

"Brandeis, Privacy and Speech," Oklahoma City College of Law Faculty Workshop, March 25, 2008.

"The Supreme Court," StreetLaw St. Louis Seminar, February 15, 2008.

"Intellectual Privacy," Loyola Los Angeles School of Law Faculty Workshop, January 31, 2008.

"Intellectual Privacy," Washington University Political Theory Workshop, January 25, 2008.

Principal Commentator, Washington University Political Theory Workshop, Nov. 16, 2007 (discussing "Bong Hits 4 Citizens?," by Ian MacMullen of the Washington University Department of Political Science).

"Branzburg v. Hayes and Intellectual Privacy," Conference on Branzburg v. Hayes, University of Oregon Schools of Law and Communications, Eugene, Oregon, October 5, 2007.

Panelist, Washington University Political Theory Conference, August 27, 2007.

"Intellectual Privacy," Washington University School of Law Faculty Research Seminar, August 15, 2006.

"Foundations, Trends, and Directions: Privacy and Security Law in 2007," PLI Eighth Annual Institute on Privacy Law, New York, NY, June 25, 2007.

"Intellectual Privacy," University of Illinois Law School Faculty Workshop Series, Champaign, IL, May 2, 2007.

"Intellectual Privacy," University of Missouri-Columbia Faculty Workshop Series, April 9, 2007.

"Intellectual Privacy," University of Nebraska Faculty Workshop Series, March 22, 2007.

"Privacy's Other Path," St. John's University Law School Faculty Workshop Series, Feb. 12, 2007.

"Privacy's Other Path," Invited Participant, Michigan-Illinois Works-in-Progress Workshop on Comparative Law, Champaign, IL, Feb. 8-10, 2007.

Panelist, "Information, Technology, and Privacy: What's Next?" Section on Defamation and Privacy Law, AALS Annual Meeting, Washington, D.C., Jan. 3, 2007.

Participant and Discussant, Workshop on Binding Corporate Rules, Fordham University School of Law, Nov. 13-14, 2006.

"Privacy without Confidentiality," Washington University School of Law Faculty Research Seminar, November 8, 2006.

"Privacy after September 11," Missouri Bar Association Annual Meeting, September 28, 2006.

"*Griswold*, Privacy, and the First Amendment," presented at the American Association of Law Librarians Annual Meeting, St. Louis, MO, July 11, 2006.

Conference Organizer, Welcoming Remarks, and Panel Moderator, Conference on the Rehnquist Court and the First Amendment, Washington University School of Law, November 18, 2005.

"The Historiographical Poverty of Information Privacy Law," Symposium on "Privacy Law in the New Millenium: A Tribute to Richard C. Turkington," Villanova Law School. October 28, 2005.

"The Information Privacy Law Project," Washington University School of Law Faculty Research Seminar. October 26, 2005.

"The Information Privacy Law Project," Works-In-Progress Intellectual Property Colloquium 2005, Washington University School of Law. October 8, 2005.

"The Nomination of John Roberts and the Future of the Supreme Court," Pomona College, Pomona, California, September 16, 2005.

"The Information Privacy Law Project," Whittier Law School. September 15, 2005.

"The Information Privacy Law Project and the Limits of Metaphor," 2005 Cardozo/Berkeley/ Stanford/DePaul IP Scholars Conference, Cardozo Law School, August 11, 2005.

Chair and Discussant, "*The Digital Person* and the Information Privacy Law Project," Law and Society Association Annual Meeting, Las Vegas, NV. June 2, 2005.

"Information Privacy, Free Speech, and *Lochner*," *Fordham Law Review* Symposium on Law and the Information Society. Fordham Law School, April 7, 2005.

"Brandeis, Privacy, and Speech," Washington University School of Law Faculty Research Seminar. March 31, 2005.

"The Constitutionality of Don't Ask, Don't Tell," Washington University School of Law. February 24, 2005.

"The War on Terror Cases and Separation of Powers," Washington University School of Law Student-Faculty Supreme Court Workshop. September 1, 2004.

"Journalism and the First Amendment," Bar Ass'n of Metropolitan St. Louis, July 24, 2004.

"Reconciling Data Privacy and the First Amendment," Washington University School of Law Faculty Research Seminar. July 14, 2004.

"Rehnquist Court" faculty conference, Northwestern University School of Law. April 23-24, 2004.

"*Lawrence v. Texas* and Privacy Law," Washington University School of Law Student-Faculty Supreme Court Workshop. October 1, 2003.

"Reconciling Data Privacy and the First Amendment," University of Alabama School of Law Faculty Workshop. April 14, 2003.

"Reconciling Data Privacy and the First Amendment," University of Virginia School of Law. October 10, 2002.

"The Lessons of Past Federal Privacy Regulation for the Contemporary Privacy Debate," University of Alabama Faculty Workshop. April 22, 2002.

"Family Law and the Supreme Court," delivered at Annual Meeting, Alabama State Bar Family Law Section. July 20, 2000.

"The Supreme Court Law Clerk: An Agent with Many Masters," delivered to The Federalist Society, Montgomery (Alabama) Lawyers Chapter. April 14, 2000.

21

## HONOR SOCIETIES:

Phi Beta Kappa, Order of the Coif, Phi Alpha Theta History Honor Society, Golden Key Honor Society, Phi Eta Sigma Honor Society.

**Appendix B**

**Filed under seal pursuant to March 14, 2013
Amendment to Protective Order [Dkt. No. 59]**