```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                     RICHMOND DIVISION

3   -----------------------------------------

4   GREGORY THOMAS BERRY, et al.,

5
                              Plaintiffs;
6   v.                                   Criminal Action

7                                  3:11CV754

8   LEXISNEXIS RISK & INFORMATION
    ANALYTICS GROUP, INC., et al,
9

10                           Defendants.

11  -----------------------------------------

12                     April 19, 2013
                      Richmond, Virginia
13                      10:00 a.m.

14        PRELIMINARY APPROVAL OF SETTLEMENT HEARING

15  BEFORE:        HONORABLE JAMES R. SPENCER
                   Chief United States District Judge
16

17  APPEARANCES:   LEONARD A. BENNETT, ESQ.
                   MICHAEL A. CADDELL, ESQ.
18                 JAMES A. FRANCIS, ESQ.
                   DALE W. PITTMAN, ESQ.
19                 CYNTHIA B. CHAPMAN, ESQ.
                   MATTHEW J. ERAUSQUIN, ESQ.
20                      Counsel for Plaintiffs;

21                 RONALD I. RAETHER, JR., ESQ.
                   JAMES F. McCABE, ESQ.
22                 DAVID N. ANTHONY, ESQ.
                        Counsel for Defendants.

23

24

25                    JEFFREY B. KULL
                   OFFICIAL COURT REPORTER
```

```
1              P-R-O-C-E-E-D-I-N-G-S
2              THE CLERK:  Case Number 3:11CV754:  Gregory
3    Thomas Berry, et al., versus LexisNexis Risk & Information
4    Analytics Group, Inc., et al.  The plaintiffs are
5    represented by Leonard Bennett, Michael Caddell, James
6    Francis, Dale Pittman, Cynthia Chapman, and Matthew
7    Erausquin.  LexisNexis is represented by Anthony Raether,
8    James McCabe, and David Anthony.  Are counsel ready to
9    proceed?
10             MR. BENNETT:  Plaintiffs are, Your Honor.
11             MR. ANTHONY:  Defendants are, Your Honor.
12             THE COURT:  All right.  We are here on a joint
13   motion for preliminary approval of the proposed
14   settlement.  I'll hear from the parties in any order that
15   you prefer.
16             MR. BENNETT:  Good morning, Your Honor.  May it
17   please the Court.  If the Court please, the plaintiffs'
18   preference, and I think the parties' preference, would be
19   I would provide just a brief overview, our co-lead
20   counsel, Michael Caddell, would carry the heaviest weight
21   of the presentation for the plaintiffs thereafter, and
22   then I understand the defendants also wish to speak.
23             THE COURT:  Sure.
24             MR. BENNETT:  Judge, this is a settlement under
25   the Federal Fair Credit Reporting Act.  It is, and I have
```

1   had a lot of opportunities to settle, it is uncommon that

2   I can do more than just pass money to my clients.  In a

3   circumstance like this, we have done that, but I think to

4   a degree that professionally is what I hope one of my

5   greatest accomplishments is being part of a team that has

6   negotiated a seachange in the industry-leading product, a

7   product that had, until the settlement, fought ferociously

8   to avoid governance by the Fair Credit Reporting Act.  It

9   is the dominant, the mark leader in this space which is

10  providing personal non-credit information on all of us.

11  Every one of us in this courtroom, were we not excluded by

12  the class definition like lawyers and judges are, would be

13  a class member and would benefit from this change.

14          We now will be able to learn at no cost to us

15  what is kept in our files.  We will be able to dispute

16  what we think to be very often extensively-used

17  information.  It is used by debt collectors, used in the

18  insurance industry.  It is used if you go to a cash

19  register and try to use a credit card.  Often,

20  information, although you don't know it, is being used to

21  verify your identity.  And the remarkable part of this is

22  not simply that it will now be governed by provisions

23  under the Fair Credit Reporting Act regarding accuracy,

24  your right to make disputes and that type of thing, but I

25  think the most important, it is for free.  All of the

1    class members and all of us will be able to learn exactly

2    what is maintained about us.  We will be able to influence

3    the database in a way that previously we could not.  I

4    cannot understate how prevalent the Accurint product is in

5    the industry.  It is by far the largest, most heavily-used

6    in almost all aspects of our life system.

7              The team that we have put together, just to tell

8    Your Honor, while we tend in our firm to litigate more

9    lean than some, this is a case, however, where this is

10   the -- you just sort of have the top of the pyramid of

11   lawyers that have worked the case.  There have been

12   probably three times this number that have actually worked

13   for the plaintiffs.  And it occurred, much like this

14   litigation occurred, because of the unification of

15   multiple cases into your docket, into this case at this

16   time with this unified team.  Three different teams,

17   multiple cases in multiple venues that have been

18   litigating this issue since 2008.  Your Honor actually had

19   in the GRAHAM v. LEXISNEXIS cases a couple of years ago

20   Judge Dohnal's attempt to work out and resolve that case,

21   then unsuccessfully.

22             But you have for our team, Your Honor, my firm:

23   Mr. Erausquin from our Alexandria office, my partner is

24   here as I'm here.  You have from Caddell & Chapman in

25   Texas the two named partners, Michael Caddell and Cynthia

1    Chapman, who are in this field All Stars.  Jim Francis,

2    his team in Philadelphia would be, I don't want to

3    disparage him by saying this, but he would be comparable

4    to our firm in the magnitude of the litigation they do out

5    of Philadelphia.  In this circumstance, Judge, you have,

6    putting this case aside, of the top ten Fair Credit

7    Reporting Act class outcomes in the country, I think you

8    have about seven or eight out of the ten covered with the

9    lead counsel in those respective cases.  And we think it

10   is a formidable, it is an informed team, and I think, very

11   importantly, it is a very principled team.

12          Second, Judge, the other point in overview is

13   just to provide the Court a highlight, as we did in the

14   papers, of the path through mediation.  This Court, our

15   docket generally, depends on good faith efforts by the

16   parties to try to resolve a case.  And that has been the

17   effort on the part of the plaintiff.  And based on the

18   history of the litigation, and often not personal

19   relationships, but the litigation relationships were very

20   contentious between the parties, but both sides have been

21   trying to resolve the case for a while.

22          It began in 2009 with a presentation of a very

23   detailed PowerPoint when LexisNexis general counsel and

24   chief litigation in-house counsel flew into Newport News

25   and we sat and worked in the afternoon to try to outline

1    for them the injunctive concerns that we then had.  We

2    discussed this briefly at a lunch up in Washington prior

3    to that.  It then followed with an all-attorney meeting

4    with Mr. McCabe from the San Francisco office of Morrison

5    & Foerster and all of this team meeting in Philadelphia,

6    again discussing the practice changes, the procedure

7    changes, and our substantive arguments as to why they

8    should be Fair Credit Reporting Act-governed.  That was

9    followed with an all-hands-on-deck meeting in New York

10   City at Morrison & Foerster's office in New York with all

11   the primary management of LexisNexis there and again this

12   same team on the side of the plaintiffs and the

13   defendants.

14         After that, Judge, we were unable to resolve the

15   practice changes.  Those were the biggest obstacles.  And

16   we filed the newest of these cases, which is this 2011

17   docket that's before you now.  Your Honor assigned it to

18   Judge Lauck who oversaw the settlement process.  But in

19   that interim, she oversaw two mediators who were involved:

20   Judge Dohnal, who worked some of the local mediation work,

21   and one of the nation's top mediators, a gentleman named

22   Randy Wulff, in Oakland.  He is at that stage of his

23   career where he does not have to travel.  So we all had to

24   travel to him, which we did.  We did that on three or four

25   occasions in Oakland, multi-day mediations, again, all

1   hands on deck, and we worked through as much as we could.

2           We still had obstacles.  Again, the problem, I

3   think the defendant would have paid the dollars.  That's

4   not an issue.  It was the defendants' resistance to the

5   practice changes that we think are at the core of this

6   outcome.  And Judge Lauck then oversaw that throughout the

7   fall and late summer of 2012.  We then met in Houston,

8   then also Mr. Anthony and I flew down to Ft. Lauderdale or

9   nearby, and we went straight to the hotel and worked

10  through a number of these additional changes with some of

11  the management of LexisNexis and the lawyers as well.

12          That was followed, once we believed that we had

13  reached a deal, with our efforts to mediate and vet this

14  outcome thoroughly before Magistrate Judge, Judge Lauck,

15  who had been charged with overseeing this mediation

16  process.  These parties all put together their PowerPoint

17  presentations, a couple of boxes, bankers' boxes of the

18  records and documents and pleadings in the case to Judge

19  Lauck, who did, and the Court obviously has great respect

20  for Judge Lauck, but this one should earn some notches in

21  her belt.  She certainly earned some battle scars with

22  this effort.  She analyzed the settlement.  It was put on

23  with evidence, with declarations, with the full detail of

24  what the changes were to be, with the detail of the cash

25  and the structure of the settlement, even the fees issues,

1    all presented to Judge Lauck over a long afternoon, and

2    she patiently went through it from the bench with the

3    parties essentially running a dry run of what would be

4    this hearing.

5           And at the end of that, after extensive

6    questioning, analysis, and discussion, she rendered her

7    opinion.  It was not an R&R.  This Court is not bound by

8    that at all.  But as Magistrate Judge in charge of the

9    settlement process.  And we put her, the text of her words

10   in the settlement papers.  She supported the same

11   conclusion that this was a fair and adequate settlement

12   reached through the efforts of the parties.

13          Mr. Caddell will provide, and there really are

14   two settlements and they are both complex, one is

15   conventional, what you would normally see: cash, $400 or

16   $500 a class member, no claims, you would just get a

17   check.  At the end of that day we would be asking for a

18   percentage fee.  There is nothing unusual about that,

19   except it is a pretty large amount of money for class

20   members.  Then you have injunctive relief that releases no

21   actual damages.  It is the sea change we talked about,

22   implements a lot of these rights.  The fee that was

23   negotiated there was after all of the settlement

24   discussions with respect to the class and would be paid

25   entirely by the defendant, a rough estimate in the

1    settlement negotiations of the fee.

2           I've been before Your Honor other times, been

3    before other judges, and my brand is not to come before

4    one of my judges and try to ask for a percentage of making

5    the world a better place.  And so while 200-some-million

6    people now can get a free annual report and wouldn't have

7    to pay the $11.50 that the Federal Trade Commission and

8    now CFPB would now permit to be charged, while there

9    certainly is economic value of a ridiculous order of

10   magnitude, it is not my brand to come before Your Honor

11   and ask for a percentage of something other than cash.  In

12   this instance, therefore, we negotiated for the defendant

13   to pay fees for the injunctive relief settlement, and

14   that's what you have before you.

15          Mr. Caddell would be, he is frankly more

16   seasoned than I am, Your Honor, and has come in from, as

17   did all of the non-Virginia lawyers, have come in from out

18   of town.  I would suggest that Mr. Caddell is from the

19   University of Virginia, so he has at least some roots

20   here.

21          THE COURT:  All right.  Mr. Caddell?

22          MR. CADDELL:  Thank you, Your Honor.  I suppose

23   being more seasoned simply is a polite way of saying I'm a

24   lot older than Len.

25          Judge Spencer, this is really a proud moment for

1    all of us representing the putative classes in this case.

2    This is the culmination of five-and-a-half years of

3    pursuing a goal that at times we thought was unachievable.

4    The numbers that Len spoke of briefly, I think, bear

5    repeating.  LexisNexis has records, files, on over 200

6    million consumers in the United States.  Within the period

7    encompassed by the class since 2006 to the present,

8    LexisNexis has issued collections reports on over 100

9    million consumers in the United States.  And that was done

10   without any notice to the consumers, without any

11   opportunity, at least easy opportunity, to obtain copies

12   of their files.  For a while there they were charging --

13   if you requested a copy of your file, you would be charged

14   $8, without any opportunity to dispute any information in

15   your file.

16          And to further place that in context, when I say

17   reports were issued on over 100 million consumers, the

18   total number of reports, of course, was much greater than

19   100 million, because many consumers were the subject of

20   more than one report.  So we are literally talking about

21   something that will affect going forward over 200 million

22   individuals in the United States, and literally will

23   affect hundreds of millions of reports that will be issued

24   over the next few years.

25          It is a remarkable achievement.  And it is

1  something that we pursued since 2008.  We pursued it first

2  separately, and by separately, I mean Mr. Francis's firm,

3  Francis & Mailman in Philadelphia, they had filed an

4  action there, the ADAMS case.  Our firm working with

5  Mr. Bennett had filed the GRAHAM case here in Richmond.

6  We then joined forces to work together and to pursue this

7  goal jointly.  It has taken, as Len recited, and I won't

8  go over that again, but it has been five-and-a-half years,

9  multiple, multiple meetings, mediation sessions.  We have

10  had the assistance of a nationally-known mediator,

11  Mr. Wulff, who mediated all the property damage claims,

12  for example, arising out of 9-11 and the World Trade

13  Center bombing.  It is remarkable.

14         Without going into too much detail, it is in the

15  papers, and of course we are here to answer any questions

16  the Court may have, but the overview is that on the

17  injunctive relief, the collections reports that LexisNexis

18  issued in the past, and that LexisNexis took the position

19  were not covered by the Fair Credit Reporting Act, will be

20  subject to the provisions of the Fair Credit Reporting

21  Act.  So the report that will be issued in the future

22  that's called collections decisioning will have all of the

23  rights afforded by the Fair Credit Reporting Act

24  applicable to those reports.  Consumers will be able to

25  access their file once a year for free.  Consumers will be

1    able to dispute issues in their file and have a

2    reinvestigation done of their file.  It is remarkable.

3    There will be notice given, publicized notice, public

4    notice, even though it is a (b)(2) settlement, and of

5    course Rule 23 provides that a (b)(2) settlement, the

6    Court may order notice.  We will have notice.  There will

7    be national, a national notice campaign, Internet

8    publications.  It is estimated by the notice provider,

9    which is Kinsella, the Court may be aware, Kinsella

10   Communications, they are one of the leading notice

11   providers in the country.  I've worked with them for some

12   20 years now on various national class settlements.  They

13   estimate that they will reach 75 percent of consumers in

14   the U.S. with this notice campaign, and of those 75

15   percent, virtually all of them will have seen the notice

16   at least twice.

17          So this is a remarkable achievement.  LexisNexis

18   will then take a portion of the information and create

19   another product called Contact & Locate.  And we agree,

20   the Court, I'm sure, is probably aware that the case law

21   makes it clear that the Fair Credit Reporting Act does not

22   apply to reports which don't have what are called the

23   seven characteristics.  And in general, the seven

24   characteristics are those which bear on a person's credit

25   worthiness, credit employment -- employment possibilities,

1    things of that nature.  So if you are simply identifying

2    someone with a name, address, and like a Social Security

3    Number so that you can simply locate that person, the

4    cases are pretty clear that that's not subject to the

5    provisions of the Fair Credit Reporting Act.  We have

6    achieved with LexisNexis, even though it is probably not

7    subject to the Fair Credit Reporting Act, we have achieved

8    some success even with respect to the Contact & Locate.

9    They will provide a copy of that report to consumers upon

10   request, even though they are not obligated to do so under

11   the Fair Credit Reporting Act, and if a consumer has a

12   concern or a dispute with the Contact & Locate Report,

13   they will allow the consumer to place a 100-word statement

14   in their file so that whenever someone pulls the Contact &

15   Locate Report, they will see the consumer's statement up

16   to 100 words in which the consumer can dispute that.

17          The easiest example of when that can be

18   important is when you have a mixed file and you have a

19   misidentification and you have an individual who is

20   associated with phone numbers that actually belong to

21   another individual that may have the same name and he is

22   getting calls, harassing calls or something of that

23   nature.  And this will allow that individual to put in his

24   file, "No, you don't understand, the number (505) 667-1212

25   is not my number, that belongs to John Doe in

1    Pennsylvania" or something like that.  So this is a right

2    that isn't afforded by the Fair Credit Reporting Act, but

3    we have been able to obtain through this settlement.

4         The Court's task, of course, today is not to

5    issue final approval of the settlement, but simply to

6    determine whether in fact this settlement is within the

7    range of settlements that the Court could possibly approve

8    at the final fairness hearing.  I think the injunctive

9    relief settlement is unquestionably within that range and

10   merits the Court's preliminary approval so that we can

11   provide notice and we can have the opportunity for the

12   Court to determine whether final approval should be

13   granted.

14        I would mention that with respect to the, while

15   it is characterized that there is only one settlement

16   agreement, there are actually two classes.  With respect

17   to the injunctive relief class, we have negotiated a fee

18   with LexisNexis of five-and-a-half million dollars.  That

19   represents the full compensation for the three law firms

20   that have been involved in this for five-and-a-half years,

21   that have devoted -- we have taken discovery, depositions,

22   reviewed documents.  It has been a very lengthy process.

23        The value to the class of the settlement, the

24   injunctive relief settlement, if it were put in economic

25   terms, it would be in the hundreds of millions if not

1  billions of dollars, truly.  And as Mr. Bennett said, this

2  is not a touchy-feely "I made the world a better place"

3  statement.  This is a real statement because of the rights

4  that are afforded under the Fair Credit Reporting Act,

5  which cost money.  Those have real quantifiable values.

6  And as a result, when we are talking about a class size of

7  over 200 million individuals, it is easy to understand how

8  the value would be in the hundreds of millions if not

9  billions of dollars.

10         The second settlement is a more straightforward,

11  somewhat more prosaic settlement.  And that is, we tried

12  to determine, and of course one of the pernicious problems

13  with having a file, a report that's issued and claiming

14  that it is not subject to the provisions of the Fair

15  Credit Reporting Act, is that the consumer doesn't know

16  that the report has been issued.  So actions can be taken

17  with respect to that consumer, adverse actions with

18  respect to that consumer, and there will never be a notice

19  given to the consumer because the position is taken that

20  this report is not covered by the Fair Credit Reporting

21  Act.  That will change.  But for the past seven years, the

22  seven or eight years covered by this settlement, we don't

23  have a list of anyone that can be determined to have been

24  injured or affected by this settlement in the past.  So we

25  thought and tried to come up with a way to identify

1    individuals who may have been affected by this practice in

2    the past.  And we hit on two separate types of

3    individuals:  Individuals who requested their file from

4    LexisNexis, and individuals who then disputed portions of

5    their file at LexisNexis.

6           It turns out that during the class period, there

7    were about 31,000 people who fit into those two

8    categories.  We think that's a very good proxy for people

9    who may have been damaged by this practice in the past,

10   because since no notice is given for you to have requested

11   your file from LexisNexis or to dispute any information in

12   your file, you must have received some indication, either

13   from a bill collector, prospective employer, someone must

14   have given you some information that led you to believe

15   that LexisNexis was issuing a report concerning your

16   credit worthiness or your assets and information.

17          And so for these 31,000 people, we obtained a

18   settlement, a total settlement of $13.5 million.  As

19   Mr. Bennett indicated, that will result in payments to

20   these individuals, even after attorneys' fees, and I'll

21   get to that in just a moment, of about $300 per person.

22   The reality is, because some people for whatever reason

23   will not cash checks or checks get lost and we have

24   provided for a remailing process to try and get money into

25   the hands of these individuals, the reality is that some

1   individuals will not receive payment and ultimately the

2   balance will go to cy pres.  But I think there is a good

3   chance that most of these individuals may get as much as

4   $400.  So somewhere in the range of $300 to $400 will go

5   to each of these individuals.  They won't have to file a

6   claim.  They won't have to fill out a claim form.  They

7   will receive notice of the settlement, and if the Court

8   does grant final approval of the settlement, they will get

9   a check.  It will be that straightforward.

10          Those are the only individuals, and I think this

11  is very important to note, those are the only individuals

12  that will release their actual, their claims for actual

13  damages as a result of the settlement.  So if you are not

14  getting money, you are not giving up your claim for actual

15  damages.  Those are the only individuals who will actually

16  give up their claims for actual damages.

17          The 200 million consumers that were covered by

18  the injunctive relief settlement will not give up their

19  claims for actual damages.  They will retain all of their

20  rights with respect to actual damages.  They will waive

21  only effectively two things:  As to the 200 million

22  consumers, they will waive the procedural right to proceed

23  as a class.  We feel that we have addressed the primary

24  class issue with respect to that group by obtaining the

25  injunctive relief and obtaining the new structure at

1    LexisNexis.  And they will also give up their rights to

2    punitive damages and statutory penalties, but they will

3    retain all of their rights with respect to their actual

4    damage claims.

5           Going back then to the $13.5 million settlement:

6    A request will be made, the agreement that we have with

7    LexisNexis permits us to ask for up to 30 percent of that

8    common fund as a fee.  I'll let the Court know, and I want

9    to put it on the record, that we have discussed this with

10   Judge Lauck and we advised Judge Lauck that we will not

11   ask for 30 percent; we will only ask for 25 percent.  And

12   I know that's in line with what courts in this district

13   and the circuit have approved in past cases.

14           I want to mention one other thing, Your Honor,

15   in going back, and I apologize for sort of going back and

16   forth between the two classes.  Although again it is one

17   settlement, there are effectively two different

18   structures.  But on the injunctive relief settlement, one

19   other thing that I think bears mentioning is that this

20   comes at a significant cost to LexisNexis.  Not just the

21   future cost of providing the reports and reinvestigating

22   and changing files to correct errors, but it comes at a

23   significant institutional cost to LexisNexis because they

24   are changing the way they do business.  They are going to

25   have to train their customers in how to comply with the

1    Fair Credit Reporting Act.  Because LexisNexis is going to

2    make these reports, the collections decisioning reports,

3    subject to the provisions of the Fair Credit Reporting

4    Act, that imposes certain obligations on LexisNexis's

5    customers as well.  So they will have to be trained and

6    they will have to enter into new agreements that obligate

7    them to honor the provisions of the Fair Credit Reporting

8    Act.

9            There are computer changes, because changing

10   their reports and separating the data into two separate

11   reports is a mammoth task for LexisNexis.  You have in the

12   papers filed in the declaration of Tom Sizer, it was filed

13   under seal so I won't reference the precise information on

14   the record in open court like this, but suffice it to say

15   on the record that it will cost LexisNexis millions of

16   dollars in actual out-of-pocket costs to implement this

17   change.  That's a further measure of, I think, the benefit

18   that's being provided to consumers by this injunctive

19   relief change.

20           Your Honor, we have, if the Court agrees to

21   grant preliminary approval, which I think, as I've said,

22   given the standard, I believe is appropriate in this

23   instance, the parties have conferred on a potential

24   schedule.  And I think we could provide that to the Court

25   as late as -- I mean as early as this afternoon.

```
 1                    THE COURT:  All right.

 2                    MR. CADDELL:  Because we have to have sufficient

 3       time.  The notice campaign for the injunctive relief, as I

 4       said, will be by publication.  So it will take some time

 5       to purchase, make ad buys and set up websites and things

 6       like that.  So it will take some time before we can

 7       implement that.  And then given that the notice to the

 8       individuals, the 31,000 individuals, would be timed to

 9       coincide with the implementation of the notice campaign,

10       the publication notice leading up to then a joint final

11       approval hearing.  But as I said, I think we could confer

12       and I think we could give the Court, we've gotten some

13       information from Kinsella Communications concerning ad

14       buys and things of that nature.  So I think we could give

15       the Court a proposed schedule later today.

16                    THE COURT:  All right.  Thank you.

17                    MR. CADDELL:  Thank you.  Let me just check with

18       Mr. Bennett.  Thank you, Your Honor.

19                    THE COURT:  Thank you.

20                    MR. ANTHONY:  Good morning, Your Honor.  David

21       Anthony from Troutman Sanders.  I'm pleased to introduce

22       my co-counsel here, Ron Raether, who is to my immediate

23       right, with the Faruki firm out of Ohio, and to his right,

24       Jim McCabe with Morrison & Foerster in San Francisco.  I

25       have been very honored and pleased to work with these two
```

1    guys who with their firms are two of the preeminent

2    defense counsel firms on the FCRA on a class basis.

3    Mr. Bennett is correct; this litigation is hard fought.

4    Mr. Raether is going to speak to the substantive points,

5    but I wanted to mention two things.  Typically when we

6    have cases before the Court and the case gets settled you

7    get a simple call from the Magistrate Judge that says,

8    "The case is settled."  Obviously, in this situation,

9    Judge Lauck did a lot more than that.  I wanted to make

10   sure, and I know Mr. Bennett said that, but I wanted to

11   reiterate that, her significant efforts here.  It was a

12   very complicated case.  She was patient, inquisitive,

13   probing, constructive, sort of putting herself in your

14   shoes and asking the right questions to challenge this so

15   this process would go as smoothly as possible.  We

16   appreciate it and I want to make sure the Court is aware

17   of that appreciation because she really did yeoman's work

18   here.

19          The second thing, on a personal note, Your

20   Honor, we know the Court's schedule here.  We know you

21   gave us latitude.  We take that very seriously.  We

22   appreciate that this case was complicated.  We kept the

23   Court apprised of all of that.  The Court provided us with

24   some extensions on deadlines while we had to deal with

25   national mediators and all that kind of stuff.  We don't

1    ask for that every single time, but please note that every

2    time we do that we do it for a reason, and we know we have

3    the Court's trust and we appreciate it.

4              THE COURT:  I'll put on the record that Judge

5    Lauck was your champion.  I was the impatient one, but she

6    kept saying, "Things will be all right after a while," so

7    I went along with it.

8              MR. ANTHONY:  We appreciate it, Your Honor.

9    With that, I'll turn the floor over to Mr. Raether for

10   some comments.

11             THE COURT:  All right.

12             MR. RAETHER:  Good morning, Your Honor.

13             THE COURT:  Good morning.

14             MR. RAETHER:  I want to reiterate what

15   Mr. Anthony said and express my appreciation to the Court,

16   and especially Magistrate Judge Lauck, for her patience in

17   helping us to work through, I think, a very contentious as

18   well as having lots of equivalents to running a marathon,

19   not that personally I can say I've done that, but if I

20   thought what it would be like to run a marathon, I think

21   it would be somewhat like the process we have gone through

22   here.

23             Before I get into the items that I intended to

24   talk about, I wanted to make a few housekeeping points,

25   clarify a little bit of what plaintiffs' counsel may have

1  said in their presentation, but obviously the defendants

2  come here in support of this settlement.  We worked hard

3  on it.  We have applied, I think, creative thinking to try

4  to navigate our clients through what I think was a very

5  difficult and confusing maze, both with respect to the

6  facts as well as the law.  I guess first of all, when I

7  was originally introduced, and I apologize to the Court

8  and the Court's personnel that I didn't have a card with

9  me, I have to admit that not being able to bring my

10  electronics with me everywhere I go is somewhat

11  disconcerting for me being a tech nerd.  So I left my

12  cards along with my electronic devices outside the

13  courtroom.  So I was initially introduced as Anthony

14  Raether.  I take that as David's attempt to try to maybe

15  embed me with some of his credibility.  But I certainly

16  want to let the Court know that Mr. Anthony has been a

17  great benefit to those of us who don't ordinarily practice

18  in this Court.  And we have taken his advice and his

19  counsel at heart in everything that we have done.

20          I guess secondly, Mr. Bennett was talking about

21  the injunctive relief and the definition of the class.  I

22  can assure Your Honor as well as anyone who is not

23  included or may not be included in the class definition

24  that our client has not attempted to carve anyone out of

25  the benefits that are going to be provided by the

1   injunctive relief.  This is a massive change in terms of

2   how our client takes data, presents it, and makes it

3   available to its users.  So obviously, this injunctive

4   relief that our client has agreed to will benefit

5   everyone, not just those who are members of the class.

6           The third thing is, when Mr. Bennett and

7   Mr. Caddell were talking I was reminded of the Hundred

8   Years War.  And I won't try to say which side is France

9   and which side is England in that war, but certainly this

10  has been a long and hard fought battle.  We obviously

11  believe that the product that was offered by our client is

12  not a consumer report.  We feel that when you looked at

13  the circumstances of how it was marketed, sold, presented,

14  the warnings and prohibitions that we had, both within the

15  product as well as within the contracts, kept us out of

16  the definition of consumer report, which I'm sure as Your

17  Honor will recall from all the times we have been before

18  you and the papers that we have presented, that's the

19  heart of the issue that was to be litigated in this case

20  and that we have resolved with this settlement.  And I

21  think one point of note is that for the Court to recognize

22  that our client's product is used by law enforcement.  It

23  was used to quickly track down the Unabomber.  And I think

24  given the events that have happened in our country

25  recently, it is important to note that our client, while

1    sometimes, I think, wrongfully villified, does provide a

2    very important, timely, and useful service to society.

3    And I think that would -- and I think it did resonate

4    during our discussions with plaintiffs' counsel, the fact

5    that our product is used for that purpose.

6            The other point -- that's sort of part of the

7    maze, the factual aspect of it.  The legal aspect of it,

8    if you look at the definition of consumer report, even if

9    you were an English major, which I was not, and you try to

10   diagram out that definition, I think that it would take

11   you a long time.  It would take you a lot of Tylenol,

12   maybe Motrin, maybe something harder.  It is not a very

13   clear statute.  It is not very clearly written, especially

14   that aspect of the Fair Credit Reporting Act.  In fact,

15   the Third Circuit last -- just this last fall in FUGES, a

16   case pending before the Third Circuit, in fact, made that

17   statement specifically in their order, that the definition

18   of consumer report is not very clear.  In fact, in that

19   case, found for the defendant on the issue of willfulness,

20   you know, interpreting exactly the issue that the parties

21   were confronted with here in this case.

22           But I do want to talk about the compromise that

23   was reached because I think hopefully by now Your Honor

24   realizes this was a very contentious, heated negotiation.

25   There was disagreement on the facts; there was

1    disagreement on the law.  But like in any settlement or

2    negotiations, you try to find common ground.  Fortunately,

3    we had the guidance of Magistrate Judge Lauck, as well as

4    Mediator Wulff, to help navigate the parties and show them

5    a possible path to resolving this complicated case.  And I

6    think when you look at what we have presented to Your

7    Honor in the settlement, you will see that we have

8    addressed the issues raised in the complaint.  And I think

9    plaintiffs' counsel did a good job of being able to

10   present what that issue was, and it was collections, use

11   of our client's product by the collection market.  And

12   that's in fact what we have addressed in the injunctive

13   relief.  Taking the product, and I think really providing

14   a shift in the paradigm of how this market has looked at

15   the data.  And I think, also, to the benefit of the

16   market, helping to start draw some lines in that gray area

17   of what is within or without the definition of consumer

18   report.  And I can tell you that our client and our side,

19   we are very proud of what we have been able to pull

20   together in terms of this injunctive relief.  And I know

21   our client is excited about being a market leader to help

22   its customers be more in compliance with the law.

23          As counsel for the plaintiffs in the putative

24   class mentioned, this is going to require an enormous

25   amount of effort.  I think that's important in two

1    respects. Mr. Caddell has talked about the cost. So not

2    just the capital, hard cost expenditures, but also the

3    soft costs, the potential issues within the market.

4    Because this is a shift, this is an earthquake within the

5    market. We think that we are on the right side of that

6    fault line. But it is a shift.

7           The other importance of it is the timing. So

8    there are some timing milestones within the settlement

9    agreement as to when events are scheduled to occur, and

10    that timing was well thought through in terms of what's

11    actually feasible, without being too conservative, but

12    those time frames were thought through, there is a reason

13    behind each of them. We negotiated that with plaintiffs'

14    counsel. I'm happy to answer any questions that Your

15    Honor might have about that.

16           I think finally, without question, the

17    settlement does confer a substantial benefit on the class.

18    I think class counsel did a good job both of explaining at

19    a high level what the injunctive relief accomplishes, why

20    we agreed to make a payment to those who submitted a

21    dispute, as well as those who requested a copy of their

22    Accurint report. I'm not going to repeat that. Of

23    course, when you put all that together, coming back to my

24    original point, I think this does address the issues

25    raised in the complaint.

1          I do think, Your Honor, that the settlement is

2     fair and reasonable and adequate.  Based on the work that

3     we have done, we think that Your Honor ought to approve

4     the settlement.  We have worked hard on the notice

5     program.  We think that meets the requirements of 23(e).

6     Your Honor, I'm here at your disposal to answer any

7     questions you might have.

8          THE COURT:  I had just a couple.  I noticed that

9     you indicated you all could withdraw from the settlement

10    if your insurance company didn't step up and make

11    payments.  You know, obviously, nobody wants this to be

12    fragile.  So can you tell me something about that, the

13    likelihood that your insurance company will not step up?

14         MR. CADDELL:  Certainly, Your Honor.  I can tell

15    you that that provision is typical and what we include in

16    class settlement agreements, mainly because of what's at

17    stake and what's at issue.  I can also tell you that in

18    going into the mediation, through the mediation as well as

19    at the conclusion of it, we spoke with both counsel as

20    well as representatives of the insurer for our client.

21    There have been no objections.  In fact, they gave us the

22    authority both for the negotiations as well as the

23    conclusion of the settlement.

24         THE COURT:  All right.  That's all I need to

25    know.  Thank you very so much.

1          MR. CADDELL:  Thank you, Your Honor.  I

2   appreciate your time.  Thank you.

3          MR. McCABE:  Nothing from me, Your Honor.

4          THE COURT:  All right.  Well, it is clear that

5   there has been a lot of work put into this.  I don't think

6   I have any problem with giving preliminary approval.  I

7   guess Mr. Caddell suggested that you could have a

8   schedule, a suggested schedule for me so that we can put a

9   date for the final hearing in the order.

10          MR. CADDELL:  Yes, Your Honor.  In fact, if I

11   might, if the Court would allow us, I think we might be

12   able to resolve that in about ten minutes, and we could

13   then leave it with your Clerk.

14          THE COURT:  Sure.  Sure.  If you all think you

15   can do it that quickly, that would be great.  And we might

16   be able to get this out today.  All right?  Sure.  I'll go

17   down and wait to hear from you all.  Thank you all very

18   much.

19          MR. CADDELL:  Thank you, Your Honor.

20          (Proceedings adjourned at 10:48 a.m.)

21                  CERTIFICATE OF REPORTER

22      I, Jeffrey B. Kull, Official Reporter, certify that

23   the foregoing is a correct transcript from the record of

24   proceedings in the above-entitled matter.

25



_____/s/_____

Jeffrey B. Kull,
Official Federal Reporter


_____/s/_____

Date