ORIGINAL

1   Michael W. Sobol (State Bar No. 194857)
    (msobol@lchb.com)
2   Paul A. Moore (State Bar No. 241157)
    (pmoore@lchb.com)
3   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 30th Floor
4   San Francisco, CA 94111-3339
    Telephone: (415) 956-1000
5   Facsimile: (415) 956-1008

6   Michael A. Caddell (admitted *pro hac vice*)
    (mac@caddellchapman.com)
7   Cynthia B. Chapman (State Bar No. 164471)
    (cbc@caddellchapman.com)
8   George Y. Niño (State Bar No. 146623)
    (gyn@caddellchapman.com)
9   CADDELL & CHAPMAN
    1331 Lamar, Suite 1070
10  Houston, TX 77010
    Telephone: (713) 751-0400
11  Facsimile: (713) 751-0906

12  *Attorneys for Plaintiffs*

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

DEC 15 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

BY FAX

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15                    (Southern Division)

16

17  JOSE L. ACOSTA, *et al.*,          Case No. 06-cv-5060 DOC (MLG)

18            Plaintiffs,              *WHITE/HERNANDEZ*
                                       PLAINTIFFS' MEMORANDUM IN
19       v.                            SUPPORT OF OPPOSITION TO
                                       *ACOSTA/PIKE* PLAINTIFFS'
20  TRANS UNION, LLC, *et al.*,        MOTION FOR AN ORDER
                                       GRANTING PRELIMINARY
21            Defendants.              APPROVAL

22                                     Date:    January 22, 2007
                                       Time:    8:30 a.m.
23                                     Place:   Courtroom 9D
                                       Judge:   Honorable David O. Carter
24

25  DOCKETED ON CM

26  DEC 20 2006

27  BY

28

    581445.1

1

# **TABLE OF CONTENTS**

2

**Page**

INTRODUCTION ................................................................................................. 1

SUPPORTING DOCUMENTATION ................................................................. 3

STATEMENT OF FACTS ................................................................................... 3

STANDARD OF REVIEW ................................................................................ 20

ARGUMENT ...................................................................................................... 22

I.     THE SETTLEMENT IS FATALLY DEFECTIVE BECAUSE IT COMPROMISES THE CLAIMS OF MILLIONS OF CLASS MEMBERS WITHOUT GIVING THEM ANYTHING IN RETURN ........................................................................... 23

    A.     The Settlement Would Arbitrarily Deny All Economic Relief To As Much As 70% Of The Class. ..................... 23

    B.     Nearly Two-Thirds Of The Class Members Who Would Be Denied Economic Relief Under The Settlement Would Derive No Benefit From Its Provisions For Injunctive Relief. ........................................................................... 27

    C.     The Settlement Gives The Least Effective Notice To The Millions Of Class Members Who Stand To Lose The Most In Violation Of Their Due Process Rights. ..................... 28

II.     THE SETTLEMENT IS FATALLY DEFECTIVE BECAUSE FAR FROM GRANTING MEANINGFUL INJUNCTIVE RELIEF, IT WOULD GIVE DEFENDANTS AN UNRESTRAINED LICENSE TO PROCEED WITH THEIR UNLAWFUL REPORTING PRACTICES ..................................... 29

III.     THE SETTLEMENT COMES NOWHERE NEAR THE RANGE OF POSSIBLE APPROVAL BECAUSE THE VALUE OF THE RELIEF IT AFFORDS THE CLASSES DOES NOT EVEN BEGIN TO APPROXIMATE THE LITIGATION VALUE OF THESE CASES ................................... 34

    A.     The Relief The Settlement Affords To The Minority Of Class Members Who Could Benefit From It Ranges From Illusory To Woefully Inadequate. .................................... 35

    B.     In The Absence Of Any Meaningful Discovery In These Cases, There Is No Basis For Assigning A Litigation Value To Them Of Less Than Two Or Three Hundred Million Dollars. ........................................................................ 43

    C.     The Availability Of Opt Out Rights Does Not Make Up For The Settlement's Woefully Inadequate Economic Relief. ............................................................................ 52

IV.     THE PROVISION FOR A FEE AWARD THAT IS OUT OF ALL PROPORTION TO THE VALUE OF THE SETTLEMENT ALSO PLACES IT OUTSIDE THE RANGE OF POSSIBLE APPROVAL .................................................... 54

1

## TABLE OF CONTENTS

2

(continued)

Page

3  V. THE SETTLEMENT IS THE PRODUCT OF A HIGHLY
SUSPECT NEGOTIATING PROCESS IN WHICH THE
4  SHERMAN TEAM'S FINANCIAL INTERESTS WERE THE
PARAMOUNT CONCERN ................................................................. 56

5  VI. THE ACOSTA/PIKE PLAINTIFFS CANNOT SATISFY THE
THRESHOLD REQUIREMENTS FOR CLASS
6  CERTIFICATION ............................................................................... 62

7  A. The Conduct Of The Sherman Team Shows That They
Are Incapable Of Adequately Representing The Interests
8  Of The Putative Classes. ............................................................ 62

9  B. Neither The Named Plaintiffs In Acosta Nor Pike Are
Capable Of Adequately Representing The Interests Of
10  The Putative Classes. ................................................................. 70

CONCLUSION .................................................................................................... 73
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*WHITE/HERNANDEZ* PLAINTIFFS' MEM: ISO OPP. TO
*ACOSTA/PIKE* PLAINTIFFS' MOTION FOR ORDER
*Acosta V. Trans Union* – *Case No. CV 06-05060 DOC (MLG)*

**TABLE OF AUTHORITIES**

**Page**

CASES

*Alexander v. Moore & Assocs., Inc.,*
553 F. Supp. 948 (D. Haw. 1982)..................................................47

*Amchem Products, Inc. v. Windsor,*
521 U.S. 591 (1997)....................................................................72

*Andrews v. Bechtel Power Corp,*
780 F.2d 124 (1st Cir 1985).........................................................67

*Andrews v. Trans Union Corp.,*
7 F. Supp.2d 1056 (C.D. Cal. 1998),
*aff'd in part and rev'd in part on other grounds,*
225 F.3d 1063 (9th Cir. 2000), *rev'd on other grounds,*
534 U.S. 19 (2002).....................................................................47

*Armstrong v. Board of School Directors,*
616 F.2d 305 (7th Cir. 1980).......................................................21

*Ashby v. Farmers Ins. Co.,*
2004 U.S. Dist. LEXIS 21053 (D. Ore., Oct. 18, 2004)....................45

*Bonner v. Home123 Corp.,*
2006 U.S. Dist. LEXIS 54418 (N.D. Ind. Aug. 4, 2006)...................44

*Braxton v. Farmer's Ins. Gp.,*
209 F.R.D. 654 (N.D. Ala. 2002)..................................................53

*BTZ, Inc. v. Great Northern Nekoosa Corp.,*
47 F.3d 463 (1st Cir. 1995)..........................................................55

*Buchet v. ITT Consumer Fin. Corp.,*
845 F. Supp. 684 (D. Minn. 1994).................................................39

*Carnegie v. Household Int'l, Inc.,*
371 F. Supp.2d 954 (N.D. Ill. 2005)..............................35, 52, 60, 62

*Cassara v. DSC Servs., Inc.,*
276 F.3d 1210 (10th Cir. 2002)....................................................31

*Cisneros v. U.D. Registry, Inc.,*
39 Cal.App.4th 548 (1995)..........................................................47

*Clement v. American Honda Finance Corp.,*
176 F.R.D. 15 (D. Conn, 1997)..................................................38, 39

*Coltrain, et al. v. Commonwealth Energy, et al.,*
No 03-CV-08560.........................................................................69

*Crawford v. Equifax Payment Services, Inc.,*
201 F.3d 877 (7th Cir. 2000)...........................28, 48, 53, 56

*Dalton v. Capital Ass'n Indus.,*
275 F.3d 409 (4th Cir. 2001).......................................................47

*Diprinzio v. MBNA America Bank, BANK, N.A.,*
2005 U.S. Dist. LEXIS 18002 (E.D. Pa. Aug. 4, 2005).....................47

*Dunnigan v. Metro Life Ins.,*
214 F.R.D. 125 (S.D.N.Y. 2003)...................................................46

581445.1
- iii -

*WHITE/HERNANDEZ PLAINTIFFS' MEM. ISO OPP. TO
ACOSTA/PIKE PLAINTIFFS' MOTION FOR ORDER.
Acosta V. Trans Union – Case No. CV 06-05060 DOC (MLG)*

**TABLE OF AUTHORITIES**
(continued)

Page

*Evans v. Jeff D.,*
  475 U.S. 717 (1986)...................................................................54, 65, 66

*Franks v. Kroger Co.,*
  649 F.2d 1216 (6th Cir. 1981) ..........................................................42

*Geico Gen. Ins. Co. v. Edo,*
  2006 U.S. Dist. LEXIS 5421 (Sept. 26, 2006) ..............................49, 50

*Greer v. Shapiro & Kreisman,*
  2001 U.S. Dist. LEXIS 21114 (E.D. Pa. Dec. 18, 2001) .....................71

*Guimond v. Trans Union Credit Info. Co.,*
  45 F.3d 1329 (9th Cir. 1995) ...............................................................7

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998)....................................................20, 22, 54

*Hernandez v. Midland Credit Mgmt.,*
  236 F.R.D. 406 (N.D. Ill. 2006) .........................................................44

*Hughes Aircraft Co. v. United States ex rel. Schumer,*
  520 U.S. 939 (1997)............................................................................26

*In re Cal. Micro Devices Secs. Litig.,*
  1995 U.S. Dist. LEXIS 11587 (N.D. Cal. Aug. 8, 2005)....................63

*In re California Micro Devices Sec. Litig.,*
  168 F.R.D. 257 (N.D. Cal. 1996) ...................................................70, 71

*In re Compact Disc Minimum Advertised Price*
  *Antitrust Litig.,*
  292 F. Supp. 2d 184 (D. Me. 2003) ....................................................37

*In re Domestic Air Transp. Antitrust Litig.,*
  148 F.R.D. 297 (N.D. Ga. 1993) ........................................................37

*In re Elec. Data Sys. Corp. "ERISA" Litig.,*
  2005 U.S. Dist. LEXIS 17457 (E.D. Tex. June 30, 2005) ..................56

*In re Farmers Ins. Co., FCRA Litig.,*
  2006 U.S. Dist. LEXIS 27290 (W.D. Okla. Apr. 13, 2006) ...............44

*In re Ford Motor Co. Bronco II Products Liability Litigation,*
  1995 U.S. Dist. LEXIS 3507 (E.D. La. 1995)....................................42

*In re General Motors Corp. Engine Interchange Litig.*
  *["In re GMC Engine"],*
  594 F.2d 1106 (7th Cir. 1979)....................................................57, 59, 61

*In re General Motors Corp. Pick-Up Truck*
  *Fuel Tank Products Liab. Litig. ["In re*
  *GMC Pick-Up"],*
  55 F.3d 768 (3d Cir. 1995) ...........................................................passim

*In re IKON Office Solutions Secs. Litig.,*
  209 F.R.D. 94 (E.D. Pa. 2002) ......................................................35, 36

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,*
  *209 F.R.D. 323 (S.D.N.Y. 2002)*........................................................46

## TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Mexico Money Transfer Litig.*,
   267 F.3d 743 (7th Cir. 2001) ................................................................35, 37

*In re Microstrategy, Inc. Secs. Litig.*,
   148 F. Supp.2d 654 (E.D. Va. 2001) ...............................................................36

*In re Mid-Atlantic Toyota Antitrust Litig.*,
   564 F. Supp. 1379 (D. Md. 1983) ...................................................................21

*In re Nasdaq Market-Makers Antitrust Litig.*,
   176 F.R.D. 99 (S.D.N.Y. 1997) ......................................................................21

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   236 F.R.D. 53 (D. Me. 2006) ..........................................................................21

*In re Oracle Securities Litigation*,
   132 F.R.D. 538 (N.D. Cal. 1990) ...................................................................35

*In re Western Union Money Transfer Litig.*,
   2004 U.S. Dist. LEXIS 29377 (E.D.N.Y. Oct. 19, 2004) ..............................39

*Koropoulos v. The Credit Bureau*,
   734 F.2d 37 (D.C.Cir. 1984) ...........................................................................47

*Leesa Westwood, et al. v. Equifax, et al.*,
   03-CV-00720 ...................................................................................................69

*Levell v. Monsanto Research Corp.*,
   191 F.R.D. 543 (S.D. Ohio 2000) ...................................................................42

*Lobatz v. U.S. West Cellular*,
   222 F.3d 1142 (9th Cir. 2000) ........................................................................56

*Local Joint Executive Bd v. Las Vegas Sands, Inc.*,
   244 F.3d 1152 (9th Cir 2001) .........................................................................72

*Local No. 93, Int'l Assoc. of Firefighters v. City of Cleveland*,
   478 U.S. 501 (1986) ........................................................................................34

*Malchman v. Davis*,
   706 F.2d 426 (2nd Cir. 1983) .........................................................................22

*Malchman v. Davis*,
   761 F.2d 893 (2d Cir. 1985) .....................................................................55, 56

*McDonald v. Washington Mutual Bank, FA*,
   2000 U.S. Dist. LEXIS 11496 (N.D. Ill. June 26, 2000) ...............................45

*Mirfasihi v. Fleet Mortgage Corp.*,
   356 F.3d 781 (7th Cir. 2003) ..............................................................21, 25, 73

*Molski v. Gleich*,
   318 F.3d 937 (9th Cir. Cal. 2003)............................................................passim

*Moore v. Halliburton Co.*,
   2004 U.S. Dist. LEXIS 18187 (N.D. Tex. Sept. 9, 2004) ..............................22

*Munoz v. Arizona State Univ.*,
   80 F.R.D. 670 (D. Ariz. 1978) ........................................................................66

*Murray v. GMAC Mortgage Corp.*,
   434 F.3d 948 (7th Cir. 2006) .....................................................................44, 53

581445.1                                    - v -

*WHITE/HERNANDEZ PLAINTIFFS' MEM. ISO OPP. TO*
*ACOSTA/PIKE PLAINTIFFS' MOTION FOR ORDER*
*Acosta V. Trans Union – Case No. CV 96-05060 DOC (MLG)*

## TABLE OF AUTHORITIES
### (continued)

Page

*National Super Spuds, Inc. v. New York Mercantile Exchange,*
660 F.2d 9 (2d Cir. 1981) ........................................................23

*Odon USA Meats v. Ford Motor Credit Corp.,*
1994 U.S. Dist. LEXIS 13723 (N.D. Ill. Sept. 27, 1994) ...........21, 51

*Petruzzi's, Inc. v. Darling-Delaware Co.,*
880 F. Supp. 292 (W.D. Pa. 1995) ...........................................23, 24, 25

*Plummer v. Chemical Bank,*
668 F.2d 654 (2d Cir. 1982) .....................................................22, 62

*Polar International Brokerage Corp. v. Reeve,*
187 F.R.D. 108 (S.D.N.Y. 1999) ...............................................passim

*Rannis v. Recchia, et al.,*
ED CV 06-00373 .......................................................................69

*Reich v. Walter W. King Heating and Plumbing Contractor, Inc.,*
98 F.3d 147, 151 (4th Cir. 1996) ..............................................42

*Reynolds v. Beneficial Nat'l Bank,*
260 F. Supp. 2d 680 (N.D. Ill. 2003) .......................................62, 64

*Reynolds v. Beneficial National Bank,*
288 F.3d 277 (7th Cir. 2002) ....................................................43, 57

*Reynolds v. Hartford Financial Servs. Group, Inc.,*
435 F.3d 1081 (9th Cir. 2006) ..................................................49

*Schering Corp. v. Illinois Antibiotics Co.,*
62 F.3d 903 (7th Cir. 1996) ......................................................34

*Schwartz v. Upper Deck Co.,*
183 F.R.D. 672 (S.D. Cal. 1999) ..............................................46

*Sepulvado v. CSC Credit Servs.,*
158 F.3d 890 (5th Cir. 1998) ....................................................47

*Six (6) Mexican Worker v. Arizona Citrus Growers,*
904 F.2d 1301 (9th Cir. 1990) ..................................................44

*Sorensen v. Household Finance Corp.,*
2006 Cal. App. Unpub. LEXIS 10091 (Nov. 6, 2006) ...............45

*Spellman v. Experian Info. Solutions, Inc.,*
2002 U.S. Dist. LEXIS 7563 (D. Nev. Jan. 9, 2002) ................47

*Staton v. Boeing Co.,*
327 F.3d 938 (9th Cir 2003) .....................................................passim

*Sullivan v. Fair Isaac Corporation, et al.,*
06-CV-00207 .............................................................................69

*Sullivan v. The Ritz-Carlton Hotel, et al.,*
03-CV-01051 .............................................................................69

*Sweet v. Pfizer,*
232 F.R.D. 360 (C.D. Cal. 2005) .............................................67

*Sylvester v. CIGNA Corp.,*
369 F. Supp.2d 34 (D. Me. 2005) ............................................41

## TABLE OF AUTHORITIES
### (continued)

Page

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,*
  463 F.3d 646 (7th Cir. 2006) ..................................................36, 37

*TRW, Inc. v. Andrews,*
  534 U.S. 19 (2001) ..........................................................26

*Turner v. J.V.D.B. & Assocs., Inc.,*
  330 F.3d 991 (7th Cir. 2003) ...............................................47

*Washington v. CSC Credit Services, Inc.,*
  199 F.3d 263 (5th Cir. 2000) ...............................................48

*Weinberger v. Great Northern Nekoosa Corp.,*
  925 F.2d 518 (1st Cir. 1991)......................................54, 55, 56

*Welling v. Alexy,*
  155 F.R.D. 654 (ND Cal 1994) ............................................70

*Westways World Travel, Inc. v. AMR Corp.,*
  218 F.R.D. 223 (C.D. Cal. 2003) .........................................67

*White v. Alabama,*
  74 F.3d 1058 (11th Cir. 1996) .............................................34

*White v. E-Loan, Inc.,*
  2006 U.S. Dist. LEXIS 62654 (N.D. Cal. Aug. 18, 2006)...............53

*White v. First American Registry, Inc.,*
  378 F. Supp.2d 423 (S.D.N.Y. 2005) ....................................48

*White v. Trans Union, LLC,*
  2006 U.S. Dist. LEXIS 80584 (C.D. Cal. Oct. 13, 2006) .....31, 46, 47

*Young v. Polo Retail, LLC,*
  2006 U.S. Dist. LEXIS 81077 (N.D. Cal Oct. 25, 2006) ................21

## STATUTES

15 U.S.C. § 1681(b)..............................................................4

15 U.S.C. § 1681a...............................................................4

15 U.S.C. § 1681c(e) ..........................................................27

15 U.S.C. § 1681e(b) ......................................................46, 49

15 U.S.C. § 1681j(a) ...........................................................37

15 U.S.C. § 1681p...............................................................26

15 U.S.C. §1681s-2(c) ...........................................................5

Cal. Civ. Code § 1785.31(b)..................................................48

Fair Credit Reporting Act, N.Y. Gen. Bus. L. §§ 380-380t ...............48

## RULES

Fed. R. Civ. P. 23(a)(4).....................................................70, 72

Fed. R. Civ. P. 23(b)(2)....................................................30, 31

Fed. R. Civ. P. 23(c)(2)........................................................29

Fed. R. Civ. P. 23(e) ..........................................................54

## TABLE OF AUTHORITIES
### (continued)

**Page**

**TREATISES**

Manual for Complex Litigation 2d § 30.45 (3d Ed. 1995)...............................59, 62

**REGULATIONS**

16 C.F.R. Part 600 App., 607.3 (2000)........................................................................6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

581445.1

- viii -

*WHITE/HERNANDEZ* PLAINTIFFS' MEM . ISO OPP. TO
*ACOSTA/PIKE* PLAINTIFFS' MOTION FOR ORDER
*Acosta V. Trans Union – Case No. CV 06-05060 DOC (MLG)*

**INTRODUCTION**

Plaintiffs in the related *White/Hernandez* cases[1] hereby submit their comprehensive opposition to the Motion of plaintiffs in the *Acosta/Pike* cases[2] for an Order Granting Preliminary Approval of the Settlement they concluded with defendants Trans Union, LLC ("Trans Union") and Equifax Information Services, LLC ("Equifax").[3]

The *White/Hernandez* plaintiffs' opposition, supported by expert declarations from preeminent scholars in the fields of civil procedure, bankruptcy, and fair credit reporting, establishes that the proposed settlement (the "Settlement") advanced by the *Acosta/Pike* plaintiffs is the product of a negotiation process that was not adversarial and not at arm's-length. The result is an agreement that releases the claims of great swaths of the class who are not even eligible under the Settlement to receive benefits, and who are to be provided the least effective notice. The Settlement's provisions that purport to provide injunctive relief to the entire class actually give license to defendants to continue the unlawful conduct they are alleged to have committed, thereby stripping class members of their existing statutory rights. It also arbitrarily denies all economic relief to the substantial majority of the class. What little relief that would actually make its way to the tiny minority of class members is illusory because defendants would, for the most part, provide only copies of credit reports that are already available to the class, for free, as a matter of law. And though the proposed settlement nominally provides for some cash payments to the class, they are subject to criteria and a claims' process—

---

[1] *White, et al. v. Trans Union, LLC*, C.D. Cal. case no. 05-CV-1073-DOC (MLGx) and *White, et al. v. Equifax Information Services, LLC*, C.D. Cal. case no. 05-CV-7821-DOC (MLGx).

[2] *Acosta, et al. v. Trans Union, LLC*, C.D. Cal. case no. 06-CV-5060-DOC (MLGx) and *Pike v. Equifax Information Services, LLC*, C.D. Cal. case no. 05-CV-1172-DOC (MLGx).

[3] This memorandum is also in opposition to all the other matters listed moved for in the Notice of Motion, *i.e.*, approval of the stipulated plaintiff class, approval of class action settlement, appointment of class representatives, appointment of class counsel, approval of notice and claim forms, scheduling of the final fairness hearing, and consolidation of *Acosta* and *Pike* for settlement.

1  which plaintiffs' counsel offered in his opening demand as "a significant benefit to

2  Trans Union [that] would likely allow Trans Union to resolve this matter for a small

3  fraction of its total exposure."[4] This makes clear that the Settlement was designed

4  to ensure that the actual monetary relief delivered will be miniscule and go but to a

5  spec of the class.

6          The Settlement represents a blatant abuse of the class action

7  mechanism, designed to avoid liability for the defendants and to enrich counsel for

8  plaintiffs, all at the expense of the class. Defendants have unquestionably

9  engineered, with the witting or unwitting complicity of the *Acosta/Pike* plaintiffs'

10 counsel ("the Sherman team"), the quintessential "reverse auction." As such, the

11 Sherman team negotiated a settlement for claims they did not bring, for a class they

12 did not assert, and for the express purpose of fulfilling defendants' wishes to

13 extinguish the claims raised in *White/Hernandez*, all the while deliberately

14 excluding the involvement of the *White/Hernandez* plaintiffs' counsel ("the

15 Lieff/Caddell team"). It is demonstrably apparent that the Sherman team did so

16 without sufficient discovery or understanding of the claims they were settling, and

17 without the resources and commitment to represent the nationwide class through to

18 trial if necessary. The Sherman team's complicity allowed defendants significant

19 bargaining leverage to effect a woefully inadequate settlement to the detriment of

20 the class. The Sherman team's counsel attempted to whitewash the character of this

21 "reverse auction" settlement by falsely implying that it had the imprimatur of their

22 mediator, Justice John K. Trotter (Ret.). But the false statement contained in a

23 declaration of the Sherman team's lead attorney that it was Justice Trotter's

24 suggestion to effect a settlement of *White/Hernandez* through this process was later

25 contradicted in a declaration from Justice Trotter himself, which was only filed at

26 his urging, and has yet to be brought to the attention of this Court.

27

28 [4] Those are the precise words written by *Acosta/Pike* plaintiffs' counsel, Lee
   Sherman, in his first demand letter to Trans Union, dated January 20, 2006.

581445.1

- 2 -

*WHITE/HERNANDEZ* PLAINTIFFS' MEM. ISO OPP. TO
*ACOSTA/PIKE* PLAINTIFFS' MOTION FOR ORDER
*Acosta V. Trans Union – Case No. CV 06-05060 DOC (MLG)*

1   The Settlement advanced by the *Acosta/Pike* plaintiffs, along with

2   defendants Trans Union and Equifax, would put the class in a worse position than

3   having no settlement at all.  That's because the class gets virtually nothing, but has

4   to give up everything.  By its terms, the Settlement is unfair to the class.  It was

5   manufactured in a manner that offends the decency and purpose of the class action

6   process.  It is not even remotely within the range of adequacy or reasonableness.

7   Accordingly, this Court should deny the Motion for an Order Granting

8   Preliminary Approval of Settlement.

9   **SUPPORTING DOCUMENTATION**

10   The *White/Hernandez* plaintiffs submit herewith the following

11   supporting declarations in opposition to the *Acosta/Pike* plaintiffs' motion for

12   preliminary approval (cited herein with reference to the surname of the declarant):

13   Expert Declarations

14   Geoffrey C. Hazard, Jr.

15   Geoffrey Miller

16   John Ulzheimer

17   David A. Szwak

18   Jay L. Westbrook

19   Dianne Karpman

20   Counsel Declarations

21   Charles Juntikka

22   George Y. Niño

23   Michael W. Sobol

24   **STATEMENT OF FACTS**

25   ***Defendants' unlawful credit reporting procedures.***  Trans Union and

26   Equifax are two of the nation's three major national repositories for consumer

27   credit information.  As such, they are engaged in the business of gathering and

28   assembling consumer credit information for the purpose of furnishing to third

1    parties reports of consumers' credit histories, commonly referred to as "credit

2    reports," and defined as "consumer reports" under 15 U.S.C. § 1681a (hereinafter,

3    "credit reports").

4          The conduct of credit reporting agencies like Trans Union and Equifax

5    is governed by the Fair Credit Reporting Act, 15 U.S.C. §§ 1601 *et seq.* (the

6    "FCRA"), principal purposes of which are to preserve the integrity of the consumer

7    banking system and to protect the right of consumers to fairness and accuracy in the

8    reporting of information about their financial affairs.  15 U.S.C. § 1681(a) and (b).

9    To serve those purposes, the FCRA imposes upon credit reporting agencies the

10   obligation to follow "reasonable procedures to assure maximum possible accuracy"

11   in their credit reporting.  15 U.S.C. § 1681e(b).

12         In keeping with their responsibilities under the FCRA, Trans Union

13   and Equifax constantly monitor the computerized reporting service known as

14   PACER for updates on legal proceedings that may be relevant to an individual's

15   credit worthiness, including, in particular, the existence and outcome of any

16   bankruptcy proceedings under Chapter 7 of the U.S. Bankruptcy Code.  As a result

17   of such diligence, Trans Union and Equifax have access to each and every

18   discharge order issued by a U.S. bankruptcy court and routinely record those orders

19   in the public records section of their credit reports relating to the consumers about

20   whom they maintain files.

21         Unfortunately, the diligence that defendants exercise in recording

22   Chapter 7 discharge orders in their credit reports is not matched in their reporting of

23   the impact of those orders on the status of a consumer's pre-bankruptcy debts.  The

24   purpose of bankruptcy is to give debtors a "fresh start" and, in keeping with that

25   purpose, the effect of a Chapter 7 discharge order is to fully and completely

26   discharge the vast majority of a debtor's pre-bankruptcy debts.  Westbrook Decl. at

27   ¶ 9.  However, though Trans Union and Equifax are well aware of both the legal

28   and practical effect of such an order, they employ procedures for reporting

1   discharged debts that inaccurately record the status of those debts with alarming

2   frequency. Indeed, an examination of 960 credit reports issued by Trans Union

3   shows that in about *64%* of all cases, Trans Union erroneously listed one or more of

4   the discharged debts as due and owing. Juntikka Decl. at ¶ 18. Likewise, an

5   examination of 900 credit reports issued by Equifax shows an error rate of about

6   *66%*. *Id.* at ¶ 19. In other words, defendants are generating twice as many

7   erroneous reports as they are accurate ones.[5]

8         The explanation for this astonishingly high error rate lies in

9   defendants' reporting procedures. Rather than using the information available from

10  public court records to update the history on the pre-bankruptcy debts they are

11  reporting, Trans Union and Equifax ignore that information and, instead,

12  inexplicably rely solely on a debtor's creditors to voluntarily update the status of

13  the accounts they maintain on consumers who are beneficiaries of Chapter 7

14  discharge orders. Ulzheimer Decl. ¶ 15. These creditors, however, have no

15  statutory obligation to update past reporting and what duty they have to update

16  account status in future reporting is effectively limited as there is no private cause

17  of action against creditors should they be neglectful in their discharge of that duty.

18  15 U.S.C. §1681s-2(c).

19        Trans Union and Equifax have both long been aware that their

20  reporting procedures generate erroneous information regarding the status of pre-

21  bankruptcy debts with alarming frequency. Ulzheimer Decl. at ¶ 15. Since the

22  early 1990s, if not earlier, thousands upon thousands of consumers have contacted

23  them every year, disputing entries in their credit reports that inaccurately describe

24  their discharged debts as due and owing in one form or another. *Id.* at ¶ 14;

25  Juntikka Decl. at ¶ 17. And, over the past several years, dozens of these aggrieved

26  consumers have filed lawsuits against them complaining about the erroneous

27

28  [5] For both defendants, the average number of such inaccurately listed debts is between three and four per report and, in some cases, the number of such errors was ten or more. *Id.* at ¶¶ 18-19.

1   bankruptcy-related information in their reports and seeking damages for the injuries

2   it has caused them.  Szwak Decl. at ¶ 43; Juntikka Decl. at ¶ 16; Proposed Order

3   Certifying Preliminarily Approving Settlement and Providing For Notice, Ex. A.

4          However, despite their knowledge that their procedures for reporting

5   pre-bankruptcy debts generate systemic and repetitive errors in the credit reports of

6   the hundreds of thousands of individuals who file for bankruptcy each year, Trans

7   Union and Equifax have willfully decided not to address the problem.  Such failure

8   is in direct conflict with applicable FTC regulations, which require a credit

9   reporting agency: (a) "to review its procedures for assuring accuracy" whenever it

10  "learns or should reasonably be aware of errors in its reports that may indicate

11  systematic problems (by virtue of information from consumers, report users, from

12  periodic review of its reporting system, or otherwise);" and (b) to take "steps . . . to

13  improve the accuracy of its reports" if the agency's review shows the availability of

14  such steps and if they can be implemented at a "reasonable cost."  16 C.F.R. Part

15  600 App., 607.3 (2000).

16         Here, Trans Union and Equifax have either never bothered to conduct

17  the required review or, if they did, have failed to take the required measures to

18  improve the accuracy of their reporting.  There is no question that such measures

19  are both available and cost-effective.  Ulzheimer Decl. at ¶¶ 26-31.  For example,

20  defendants could improve the accuracy of their reporting simply by changing the

21  default under which they have been operating.  Id. at ¶¶ 31-32.  In other words,

22  rather than leaving pre-bankruptcy debts on the reports relating to consumers with

23  Chapter 7 discharge orders unless notified by creditors, they could operate on the

24  assumption that bankruptcy does what it is intended to do—namely, to give debtors

25  a fresh start—and treat pre-bankruptcy debts as discharged until notified by a

26  creditor that the debt that is owed it is non-dischargeable.  Id.  Inasmuch as a

27  discharge order reaches the vast majority of pre-bankruptcy debts, Trans Union and

28  Equifax's adoption of this common sense procedure would have dramatically

1   reduced their respective error rates. *Id.* at ¶ 32; Westbrook Decl. at ¶ 9.

2          As an alternative or supplemental way of reducing those error rates,

3   Trans Union and Equifax could program their computers to identify all pre-

4   bankruptcy debts of anyone with a Chapter 7 discharge order, separate out those

5   that are non-dischargeable debts, and then automatically record the notation on all

6   of those that remain to "discharged" or "included in bankruptcy." Ulzheimer Decl.

7   at ¶¶ 26-31. Trans Union and Equifax have the ability to do this because all

8   dischargeable debts fall into one of three categories: (1) those that are statutorily

9   dischargeable by nature (principally, student loans, domestic support obligations

10  and recent tax liens); (2) those that are reaffirmed in a reaffirmation agreement; and

11  (3) those that are the subject of a successful adversary proceeding. Westbrook

12  Decl. at ¶ 10. Defendants can identify the vast majority of pre-bankruptcy debts

13  that fall within the first category because they are coded by type in their databases.

14  Szwak Decl. at ¶¶ 14-17; Ulzheimer Decl. at ¶ 30. They can identify almost all

15  those that fall in the latter two categories because they are listed on the bankruptcy

16  court's docket sheet, which is available in a computer readable format on

17  PACER—the same service that they use to find out about the existence of a

18  discharge order in the first place. Ulzheimer Decl. at ¶ 31.

19          Using these two procedures—either alone or in tandem—Trans Union

20  and Equifax could have dramatically improved their accuracy in reporting the status

21  of pre-bankruptcy debts. Ulzheimer Decl. at ¶¶ 29 & 32. Yet, despite the fact that

22  these procedures are both readily available and cost-effective, Trans Union and

23  Equifax have willfully refused to implement them in conscious disregard of their

24  statutory obligation to ensure "maximum possible accuracy," 15 U.S.C. § 1681e(b),

25  and of the rights of consumers to protection from the transmission of inaccurate

26  information. *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th

27  Cir. 1995).

28          As a direct consequence of defendants' grossly inadequate and

1   inaccurate reporting and procedures, millions of consumers across the country have
2   been effectively denied the fresh start that the bankruptcy laws promise. The
3   inaccurate recording of their discharged debts on their credit reports has reduced
4   their credit scores and made it far more difficult for them to rebuild and re-establish
5   their credit. Ulzheimer Decl. at ¶ 23. For certain individuals, this has meant the
6   denial of mortgages, auto loans and apartment leases (Juntikka Decl. at ¶ 6.), while
7   for the class as a whole, the cumulative cost has been literally hundreds of million
8   of dollars a year in credit card finance charges alone. Ulzheimer Decl. at ¶ 25.

9       *The genesis and filing of the White and Hernandez class actions.*
10  Over time, the real world effects of defendants' systemically flawed reporting
11  procedures came to the attention of Charles Juntikka—a New York City bankruptcy
12  lawyer who heads up the largest personal bankruptcy firm in the New York
13  metropolitan area and who is a member of the Lieff/Caddell team. Juntikka Decl.
14  at ¶ 3. For several years, Mr. Juntikka had been receiving about a half a dozen
15  complaints a week from his clients who informed him that their credit reports were
16  still showing discharged debts as due and owing. *Id.* at ¶ 5. In 2004, after
17  attending a national bankruptcy conference at which he learned that the problem
18  was much larger than he had thought, Mr. Juntikka realized that a large proportion
19  of his clients had not been getting the "fresh start" he had promised them and
20  decided that, in response, he would contact all of his clients that he could and invite
21  them to come to his office so that he could address any bankruptcy-related
22  problems with their credit reports *free of charge. Id.* at ¶¶ 8 & 10-11.

23      Over the next year, Mr. Juntikka and a staff of four attorneys and
24  paralegals met with more than 2,000 of his clients, initiated requests for and
25  reviewed over 3,000 consumer reports, prepared approximately 800 reinvestigation
26  requests, and assembled a database from which Mr. Juntikka was able to quantify
27  the alarming scope of the problem he was confronting. *Id.* at ¶¶ 12 & 17. As the
28  three reporting agencies frequently continued to inaccurately report the status of the

1  debts even after the dispute had been made (and despite their having been furnished

2  with court records showing those debts had been discharged),[6] Mr. Juntikka filed

3  approximately 40 individual lawsuits against them in federal court in an effort to

4  vindicate his clients' rights. *Id.* at ¶ 16. With the agencies aggressively fighting

5  most of these cases, the costs of individual litigation became too great to bear. *Id.*

6  at ¶¶ 15-16. Accordingly, Mr. Juntikka contacted his long-time colleague, Daniel

7  Wolf, and together they associated with Lieff, Cabraser, Heimann & Bernstein,

8  LLP, to address the problem through the use of the more effective and superior

9  class action mechanism. *Id.* at ¶ 16.

10        In the meantime, a leading FCRA practitioner, Leonard Bennett, had

11  likewise become concerned with the ongoing effects of the continued failure of the

12  credit reporting agencies to address their defective reporting of debts discharged in

13  bankruptcy. Realizing that the only effective away of addressing this problem was

14  through the class action device, he associated with Caddell & Chapman, a leading

15  Texas class action trial firm (and their colleague Mitchell Toups).

16        As chance would have it, the two legal teams filed class action suits

17  against Trans Union and Equifax (as well as Experian Information Solutions, Inc.)

18  within one month of each other. First, on October 3, 2005, the Caddell team,

19  representing plaintiff Jose Hernandez, filed a single class action suit against all

20  three of the credit reporting agencies in the Northern District of California.

21  Subsequently, on November 2, 2005, the Lieff team, on behalf of plaintiffs Terri N.

22  White, Robert Radcliffe, Chester Carter, Maria Falcon, and Alex Gidi, filed

23  separate class actions against Trans Union, Equifax and Experian in this District.

24  Upon learning of the existence of each other's filings, the Lieff and Caddell teams

25  agreed to jointly prosecute their cases with the assistance of the National Consumer

26

27  [6] In 17% and 22% of all cases, Trans Union and Equifax, respectively, failed to
correct the credit reports of Mr. Juntikka's clients, despite their having been sent

28  dispute letters, which included a copy of public court records showing their debts
had been discharged. Juntikka Decl. at ¶¶ 18-19.

1   Law Center.  After concluding this agreement, plaintiff Hernandez sought and
2   obtained an order transferring his case to this District, whereupon it was
3   consolidated with the *White* case.

4         The *White/Hernandez* plaintiffs are individual consumers who have
5   previously filed petitions for bankruptcy and obtained discharge orders pursuant to
6   Chapter 7 of the U.S. Bankruptcy Code, but whose credit reports still show one or
7   more of their discharged debts as due and owing.  They have brought their claims
8   on behalf of a nationwide class of similarly situated consumers alleging, *inter alia*,
9   that defendants' procedures for reporting the status of pre-bankruptcy debts are not
10  reasonably designed "to assure maximum possible accuracy" in willful violation of
11  their obligations under section 1681 of the FCRA, 15 U.S.C. § 1681e(b) and section
12  1785.14(b) of its California equivalent, the Consumer Credit Reporting Agencies
13  Act ("CCRAA"). Cal. Civ. Code § 1785.14(b).  They seek damages and injunctive
14  relief to vindicate their rights and those of the class members they seek to represent
15  to have financial information about them reported accurately so that they can finally
16  obtain the "fresh start" to which they are entitled.

17        *The filing of the Acosta and Pike California-only State court class*
18  *action cases.*  On May 12, 2003, Peter Recchia, a solo practitioner from California,
19  filed the *Acosta v. Trans Union* action in California Superior Court on behalf of a
20  class of California-only residents.  Like the *White/Hernandez* plaintiffs, plaintiff
21  Acosta is the beneficiary of a Chapter 7 discharge order who challenges Trans
22  Union's procedures for reporting the status of pre-bankruptcy debts.  Unlike the
23  *White/Hernandez* plaintiffs, however, plaintiff Acosta brought his claims only
24  under California law—specifically, the CCRAA—and only on behalf of a
25  California state-wide class.  During the three years that the *Acosta* action has been
26  pending, the Sherman team has taken just two depositions of Trans Union witnesses
27  (neither of whom has relevant knowledge) and has obtained documents that relate
28  *solely* to the credit histories of the individual named plaintiffs.  Szwak Decl. at

1 ¶¶ 29-38. They have filed a motion for class certification, but asked that the action

2 be stayed pending the outcome of settlement discussions before any hearing on that

3 motion could take place. Finally, with the exception of a brief engagement with

4 Mr. Evan Hendricks, which involved all of two hours of his time, the Sherman team

5 did not retain a single expert to advise them in the *Acosta* case until after they had

6 reached agreement with Trans Union on the terms of the settlement that is the

7 subject of this motion. *See* note 29 *infra.*

8          On October 14, 2005, Mr. Recchia filed the *Pike v. Equifax* action also

9 in California Superior Court, which he likewise brought on behalf of a California-

10 only class and which he likewise limited to claims under the CCRAA. There has

11 been no motion practice and no discovery in the *Pike* case, whatsoever.

12          In both the *Acosta* and *Pike* actions, the pleadings reflect a deliberate

13 decision to limit the classes to California residents and limit the claims to the

14 CCRAA. In both cases, plaintiffs made efforts to stay out of federal court. For

15 instance, following the removal of the *Acosta* matter to this District (Judge Stotler)

16 on June 20, 2003, plaintiff Acosta successfully sought an order remanding the case

17 back to state court, where it has been pending since December 17, 2003. Like the

18 *Acosta* case, the *Pike* case was also originally filed in California Superior Court and

19 removed to federal court, whereupon plaintiff Acosta filed a notice of voluntary

20 dismissal only to re-file in California Superior Court. Equifax then dutifully

21 removed it to this Court once again, where it remains pending.

22          ***Mr. Recchia's initial efforts to settle the Acosta case.*** On two

23 occasions in 2003, plaintiff Acosta's then sole counsel, Mr. Recchia, attempted to

24 settle the *Acosta* lawsuit—not on behalf of the class he sought to represent—but

25 just on behalf of Mr. Acosta himself. First, on June 24, 2003, Mr. Recchia tried to

26 settle Mr. Acosta's individual claim for $250,000 and for Trans Union "assurances"

27 that it would comply with the California Civil Code in its "future dealings with

28 California consumers consistent with the injunctive relief prayed for in Recchia's

1  complaint." Sobol Decl., Ex. C. Two months later, on August 18, 2003,

2  Mr. Recchia's offer to abandon the class and reach an individual settlement went

3  down to $75,000. *Id.*, Ex. D.

4      ***Trans Union's successful effort to engineer a reverse auction.*** In

5  January 2006, just a couple of months after the filing of the *White* and *Hernandez*

6  cases, Trans Union launched an effort to settle the long stagnant *Acosta* case.

7  Though they had not represented Trans Union in that matter up to that point,

8  Stroock & Stroock & Lavan, Trans Union's counsel in the *White* and *Hernandez*

9  cases, approached Mr. Lee Sherman (who had associated with Mr. Recchia

10  sometime earlier) out-of-the-blue, soliciting him for a settlement demand in the

11  *Acosta* matter.  Sobol Decl., Ex. E (Sherman Decl. at ¶ 9). It appears, however, that

12  counsel for Trans Union's willingness to entertain such a bid was contingent on one

13  indispensable caveat: As Mr. Sherman explained in his declaration, "Trans Union

14  would not settle the *Acosta* case unless it included a settlement of all claims,

15  including those based on the Federal Fair Credit Reporting Act asserted in

16  [*White/Hernandez*]." *Id.*, Ex. E (Sherman Decl. at ¶ 16).

17      On January 20, 2006, Mr. Sherman responded to Trans Union's

18  initiative, sending Trans Union's counsel his *initial* settlement demand, which

19  contained what he characterized as a "critical[]" concession, namely that "Plaintiff

20  is willing to allow the settlement to proceed on a claims made basis." *Id.*, Ex. I.

21  Mr. Sherman described the significance of this concession as follows:

22
23      Any class member that does not opt out of the settlement and does not

24      timely submit a valid claim form will be bound by the settlement and

25      release agreement, but will not be eligible to receive the payment from

26      Trans Union. . . . As you are no doubt aware, the claims made

27      element of this proposed resolution is a significant benefit to Trans

28      Union and would likely allow Trans Union to resolve this matter for a

**small fraction** of its total exposure. *Id.* (emphasis added).

1         Subsequently, the parties arranged to mediate the matter before Justice

2   John K. Trotter and scheduled a preliminary conference with him in March 2006.

3   *Id.*, Ex. W.  In advance of that conference, Trans Union's counsel submitted its

4   settlement position to Judge Trotter, which emphasized that the *White/Hernandez*

5   case stood as an obstacle to the settlement of *Acosta*.  Sobol Decl., Ex. Z.

6         It appears that the March conference might have been postponed and that, at

7   any rate, substantive discussions before Judge Trotter did not begin until some time

8   in April or May at the earliest.  *Id.*, Ex. R.  After they finally did get started, the

9   issue of how to deal with "the obstacle" posed by the *White/Hernandez* case

10  became a major focal point of the talks.  *Id.*, Ex. E (Sherman Decl. at ¶ 16).  As

11  Mr. Sherman swore in his declaration:

12      "During mediation, various options to deal with this issue were

13      discussed and ultimately, ***Justice [John K.] Trotter [Ret.] suggested***

14      that in order to facilitate settlement, the parties should consider a

15      procedural framework for settlement that included a settlement of all

16      claims, a stay of the *Acosta v. Trans Union, LLC* California action and

17      the filing of a new Federal case that would be filed in conjunction

18      with a notice of related cases to the existing Federal cases, so that

19      Judge Carter could oversee the approval process for this settlement

20      since he was presiding over the newly filed and consolidated similar

21      Federal cases [*i.e.*, the *White/Hernandez* matters]."  *Id.*, Ex. E

22      (Sherman Decl. at ¶ 17, emphasis added).

23

24        Mr. Sherman's declaration accurately describes the procedural

25  framework that was followed to deal with the *White/Hernandez* "obstacle," but his

26  statement is inaccurate in one key particular: the idea for the procedural framework

27  was ***Trans Union's counsel's suggestion***—not Justice Trotter's.  Subsequently,

28  upon learning that Mr. Sherman had misrepresented how he had exercised his role

1   at the mediation, Justice Trotter executed a declaration correcting the error and

2   instructing Mr. Sherman to file it in this Court. Sobol Decl., Ex. F.[7] Justice Trotter

3   clarified that the procedural framework described above was not his suggestion, but

4   rather an idea that originated by Trans Union that he simply communicated to the

5   *Acosta* plaintiffs. *Id.*, Ex. F (Trotter Decl. at ¶¶ 5-6).

6         At any rate, the procedural framework that was adopted during the

7   settlement had two other essential features, at least one of which appears to have

8   originated from neither Justice Trotter nor Trans Union's counsel, but from Mr.

9   Sherman himself. In the event this Court were to deny approval of the anticipated

10  settlement, the Sherman team would drop their federal claims, abandon the

11  nationwide class and scurry back to state court. *Id.*, Ex. E (Sherman Decl. at ¶ 20).

12        The other essential procedural feature of the settlement talks likely

13  originated from no one, but was rather taken for granted by both parties throughout

14  the process, namely that the talks should be kept secret from both the Lieff/Caddell

15  team and this Court. Indeed, as their conduct throughout the mediation process

16  demonstrates, the Sherman team and Trans Union's counsel would stop at nothing

17  short of active concealment and deliberately misleading representations to keep

18  word of the existence of that process from leaking out.

19        Thus, for example, on April 3, 2006—just three days before Trans

20  Union was about to appear at a mediation session before Justice Trotter (*id.*,

21  Ex. R)—Trans Union's counsel, Julia B. Strickland, signed a Rule 26(F) Joint

22  Report in *White*, which included a statement that "to date, no settlement discussions

23  have taken place, and the parties believe that such discussions are premature." *See*

24  Rule 26(f) Joint Report, dated April 3, 2006, at ¶ 10. Three weeks later, on

25  April 24, Trans Union appeared for a status conference in the *White* case, as did

26

---

27  [7] Mr. Sherman did not file Justice Trotter's declaration with this Court until
    October 4, 2006, fifteen days after Justice Trotter signed it and only after Justice
    Trotter, upon learning that his declaration had not been filed, insisted that

28  Mr. Sherman do so to correct the Court's record. Even then, Mr. Sherman filed the
    declaration without identifying for the Court why he was doing so.

1   Mr. Recchia, but was careful to make no mention to this Court or the Lieff team of

2   the existence of talks that were intended to resolve the class-wide claims that were

3   the subject of that litigation.  Later that same day, Trans Union's counsel e-mailed

4   Mr. Sherman to report on the status conference, informing him that the Court would

5   be setting a comprehensive schedule at the next conference.  Sobol Decl., Ex. G.

6         During the weeks that followed, Trans Union's counsel negotiated a

7   schedule with the Lieff team as if he knew of no other parallel class action litigation

8   that might disrupt that schedule or influence what the Lieff team might agree to.

9   But, all along, delay in the progress of the *White* matter was serving Trans Union's

10  interests in ways that the Lieff team could not have imagined.  On June 6, 2006, for

11  example, in response to an email from Trans Union informing him of the recent

12  continuation of the *White* status conference (*id.*, Ex. H), Mr. Sherman replied

13  stating that:

14      I had not heard, but thank you for the update.  Clearly, this is good

15      news to us and fits with our scheduling.  However, I remain somewhat

16      concerned about the No. Cal case [*i.e., Hernandez*].  *Id.*

17  Allaying Mr. Sherman's concern, counsel for Trans Union e-mailed him back,

18  informing him that *Hernandez* had been transferred from the Northern to the

19  Central District.  *Id.*

20        Two months later, on August 14, 2006, the clandestine negotiating

21  process in *Acosta* culminated with counsel for Trans Union's announcement at a

22  *White/Hernandez* status conference that Trans Union and the *Acosta* plaintiffs had

23  reached a Memorandum of Understanding ("MOU") in which they had settled all of

24  the class-wide claims being asserted in the *White/Hernandez* case against Trans

25  Union.  This announcement marked the first time that the Lieff/Caddell team

26  became aware of the existence of the *Acosta* matter or of the months-long

27  discussions aimed at settling the claims of the class members they were seeking to

28  represent.  As Trans Union's counsel remarked three days later in an email in which

1  he informed Mr. Sherman that he had no objection to his filing the MOU with this

2  Court, "[t]he cat" was finally "out of the bag." Sobol Decl, Ex. Y.

3      During the August 14 status hearing, Mr. Sherman, who had showed

4  up along with Mr. Recchia stated that, at Trans Union's request and to effect the

5  settlement, plaintiffs in *Acosta* had: (1) prepared a federal complaint on behalf of a

6  nationwide class which they intended to (and did) file later that day; and

7  (2) included additional federal claims in their federal complaint to facilitate a forced

8  disposition of all pending federal claims. Upon learning of the MOU purporting to

9  settle the claims that were before it, this Court suggested that all parties in

10  *White/Hernandez* and *Acosta/Pike* proceed to a further mediation before Justice

11  Trotter as a process for determining whether the competing positions of all the

12  parties, including Equifax and Experian, could be reconciled. The parties agreed

13  and, soon thereafter, scheduled a mediation with Justice Trotter for September 14,

14  2006.

15      ***The terms of the proposed settlement:*** Upon reviewing the MOU, the

16  Lieff/Caddell team was astonished by the lopsided nature of the terms that the

17  *Acosta* plaintiffs had agreed to. While the MOU contained provisions that spoke of

18  injunctive and economic relief for class members, the reality is that it gave them

19  little or none of either. The MOU purported to provide for revised reporting and

20  reinvestigation procedures, but the reporting procedures were nothing more than a

21  promise by Trans Union to use its "best efforts" to improve the accuracy of its

22  reporting procedures and the revised reinvestigation procedures were nothing more

23  than a restatement of Trans Union's existing procedures. Sobol Decl., at Exs. K &

24  Q; Szwak Decl. at ¶ 26; Ulzheimer Decl. at ¶ 15.

25      As for its economic relief provisions, the MOU drew a line between

26  those class members who would and would not be entitled to such relief based on

27  the date they obtained their discharge orders—an arbitrary and bizarre distinction,

28  which had the effect of denying any compensation whatever to approximately 70%

of all class members.  Sobol Decl., Ex. K; *see also* Point I *infra*.  The MOU
contained a matrix under which class members with more recent discharge orders
would be eligible for varying levels of relief ranging from a minimum of a free
credit report to a maximum of $300 plus a free credit report.  Sobol Decl., Ex. K.
A cursory examination of these criteria, however, quickly revealed that the
threshold for obtaining any cash relief (which would be determined by reference to
the adverse effect that the presence of a select class of credit card debts was having
on their credit scores) was so demanding that, at most, only a small fraction of the
class would be eligible for the MOU'S minimum cash award of $50 and that
virtually no one would be eligible for the higher amounts.  *See* Point III.A.2 *infra*.
All subclass members would qualify for a free credit report, but that relief was
meaningless because all consumers are statutorily entitled to a free credit report
from each of the three reporting agencies each year anyway.  *See* Point III.A.1
*infra*.  Finally, true to Mr. Sherman's word, the agreement contained a claims-made
process for applying for relief, which ensured that only the "small fraction" of the
small fraction who might be eligible for the minimum $50 cash awards would
actually obtain them.  Sobol Decl., Ex. K.  In exchange, the MOU gave Trans
Union a complete release from all damages and injunctive relief claims and the
Sherman team received $5,484,000 in attorneys' fees.  *Id.*

Finally, the MOU contained a provision memorializing the Sherman
team's intention to represent the nationwide class only for purposes of effecting the
settlement.  Specifically, the MOU provided that in the event "Settlement is not
finally approved, the new claims asserted in the Federal Action will be dismissed
without prejudice."  Sobol Decl., Ex. K (MOU at ¶ 4.).  It further provided for a
return to the "*status quo ante*," whereby the *Acosta* state court action would be
resumed in its original California-only claims, California-only class state.  *Id.*

***Equifax's decision to hop on the bandwagon:***  On July 14, 2006,
Mr. Sherman sent Equifax's counsel a letter forwarding his power-point

1   presentation made during his mediation with Trans Union. Sobol Decl., Ex. J.

2   Subsequently, on August 1, 2006, counsel for Equifax appeared at a mediation

3   session with the Sherman team and counsel for Trans Union. A month later, the

4   Sherman team contacted Equifax and provided it with a settlement demand—once

5   again keeping the Lieff/Caddell team in the dark and in an apparent effort to create

6   a *fait accompli* at the upcoming mediation before Justice Trotter. *Id.*, Ex. L. The

7   demand had two elements: (1) the dollar amounts that were theoretically available

8   under the matrix were increased by 50 percent; and (2) the Sherman team's fee

9   award was increased by $2.5 million to a total of $5.985 million. *Id.* Five days

10  later, on September 6, 2006, Mr. Sherman informed his expert, Prof. Ronald Mann,

11  that he had "possibly" settled with Equifax, "though that is not finalized yet." *Id.*,

12  Ex. M.

13          *The September 14 mediation session and the finalization of*

14  *settlement terms*. Unaware of the deal or near deal between the Sherman team and

15  Equifax, the Lieff/Caddell team attended the September 14th mediation with Justice

16  Trotter. Not surprisingly, during the course of that mediation, Equifax announced

17  that it had reached an agreement with the Sherman team in which it agreed to pay

18  the Sherman team an additional $2,015,000 in attorneys' fees and to certain

19  revisions in the matrix, which, as set forth below, actually ended up sweetening the

20  deal for both it and Trans Union even more.

21          During the mediation, the Lieff/Caddell team informed the Sherman

22  team of certain serious defects in the proposed settlement and suggested that the

23  two teams work together to come up with a better solution for the putative classes.

24  The Sherman team rejected that proposal.

25          Among the criticisms the Lieff/Caddell team leveled at the settlement

26  was the fact that its injunctive relief provisions were entirely illusory and, in

27  particular, that they failed to correct any of the erroneous entries (a process dubbed

28  "scrubbing of the files") in any of Trans Union's files relating to existing class

1    members. The Sherman team publicly stated that they disagreed that the MOU

2    failed to provide such relief, revealing their own misunderstanding of the very

3    document they had "negotiated." Trans Union and Equifax, on the other hand,

4    recognized how this shortcoming could pose a formidable barrier to court approval

5    of the settlement. Thus despite Trans Union's "straightforward" pre-mediation

6    position that it had "settled all of these claims," would "offer no more money" and

7    would "not expand the scope of injunctive relief" (Sobol Decl, Ex. X), both it and

8    Equifax decided to go back to the drawing board and came up with the injunctive

9    relief provisions that the Sherman team is now lauding as "its" finest achievement

10   on behalf of existing class members. *Id.*, Exs. L and N.

11         The other significant revision to the MOU, which was agreed to by

12   both Trans Union and Equifax during the September 14 mediation, involved the

13   matrix for determining cash award eligibility. But rather than improving the deal

14   for class members, this revision actually made the supplemental MOU less

15   advantageous for them than did the original one. Although by definition, each

16   defendant has injured a separate, identifiable class of consumers, the supplemental

17   MOU treats the two separate classes as one for purposes of providing relief.[8] With

18   the addition of Equifax to the settlement, the MOU was supplemented to "enhance

19   by 50%" the "total economic relief" to the class (as reflected in the matrix), rather

20   than *doubling* the relief. Thus, Trans Union and Equifax are each required to pay

21   *less* in potential economic relief to class members than Trans Union agreed to pay

22   under the original MOU.[9]

23         On September 29, 2006, the Sherman team sought to effectuate the

[8] The "Settlement Class" as defined in the ultimate Settlement Agreement includes
two separate classes with two separate claims—"all consumers…for whom Trans
Union and/or Equifax maintain a file." *See* Sobol Decl., Ex. O (Settlement
Agreement at ¶1.31).
[9] For example, under the MOU, Trans Union agreed to provide a free credit report,
score and $50 for a score increase between 51 and 100 points in the Subprime to
Subprime category. Under the new damage matrix, a Trans Union/Equifax class
member in this category receives $75, so Trans Union now will only pay this class
member $37.50.

1  agreement they had reached with Equifax by amending their complaint in the *Pike*

2  case to include, for the first time, federal claims and a nationwide class.

3  Subsequently, on October 31, 2006, the Lieff/Caddell team and the parties to the

4  *Acosta/Pike* MOU agreed to a stipulation under which the *White/Hernandez* cases

5  against Trans Union and Equifax were stayed and a process was established for

6  presenting the *White/Hernandez* plaintiffs' objections to the proposed settlement.

7  Pursuant to that agreement, on November 17, 2006, the *Acosta/Pike* parties

8  submitted their proposed Settlement, which contains essentially the same terms as

9  the final version of the MOU, to this Court in connection with their present motion

10  for preliminary approval.

11  ## STANDARD OF REVIEW

12         By its terms, "Fed. R. Civ. P. 23(e) requires the district court to

13  determine whether a settlement is fundamentally fair, adequate, and reasonable.'"

14  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also Staton v.*

15  *Boeing Co.*, 327 F.3d 938, 952 (9th Cir 2003).  Under this rule, "the district court

16  acts as a fiduciary who must serve as a guardian of the rights of absent class

17  members." *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab.*

18  *Litig. ["In re GMC Pick-Up"]*, 55 F.3d 768, 785 (3d Cir. 1995).  Thus, in

19  determining whether a "settlement is in the best interest of those whose claims will

20  be extinguished,'" the district court is obligated to "'independently and objectively

21  analyze the evidence and circumstances before it.'" *Id.*

22         The court's evaluation of the adequacy of a settlement involves a two-

23  part process—"a substantive inquiry into the terms of the settlement relative to the

24  likely rewards of litigation and a procedural inquiry into the negotiation process."

25  *In re GMC Pick-Up*, 55 F.3d at 796; *see also Polar International Brokerage Corp.*

26  *v. Reeve*, 187 F.R.D. 108, 112 (S.D.N.Y. 1999).  The procedural inquiry involves

27  examination of the extent to which the negotiations were conducted at "arms-

28  length" and whether plaintiffs' counsel "'have engaged in the discovery, necessary

1    to effective representation of the class's interests.'" *Polar*, 187 F.R.D. at 112.  The

2    substantive inquiry calls upon the court "to estimate the litigation value of the

3    claims of the class and determine whether the settlement is a reasonable

4    approximation of that value." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781,

5    786 (7th Cir. 2003).

6         At the preliminary approval stage, the district court is called upon "to

7    ascertain whether there is any reason to notify the class members of the proposed

8    settlement and to proceed with a fairness hearing." *Armstrong v. Board of School

9    Directors*, 616 F.2d 305, 314 (7th Cir. 1980).  There is "no point" in doing so when

10   a settlement is so fundamentally flawed that disapproval becomes a foregone

11   conclusion. *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D.

12   Md. 1983); *see also In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 236

13   F.R.D. 53, 55-56 (D. Me. 2006).  Accordingly, this Court should not preliminarily

14   approve the Settlement unless it is able to satisfy itself that it was "'the product of

15   serious, informed, non-collusive negotiations, has no obvious deficiencies, does not

16   improperly grant preliminary preferential treatment to class representatives or

17   segments of the class, and falls within the range of possible [judicial] approval.'"

18   *Young v. Polo Retail, LLC*, 2006 U.S. Dist. LEXIS 81077, at *13 (N.D. Cal Oct. 25,

19   2006) (citing Manual for Complex Litigation, Second § 30.44 (1985)); *see also In

20   re Nasdaq Market-Makers Antitrust Litig*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997)

21   (same).

22        In evaluating these criteria for preliminary approval in a matter such as

23   this one, which has "proceeded to settlement without first proceeding through

24   formal class certification," the courts are "compelled to subject the proposed

25   settlement to more careful scrutiny than [they] otherwise would." *Odon USA Meats

26   v. Ford Motor Credit Corp.*, 1994 U.S. Dist. LEXIS 13723, at *21 (N.D. Ill. Sept.

27   27, 1994).  Indeed, the circuit courts have consistently cautioned the lower courts to

28   "be doubly careful in evaluating the fairness" of such pre-certification settlements.

1  *Malchman v. Davis*, 706 F.2d 426, 432 (2nd Cir. 1983); *see also Molski v. Gleich*,

2  318 F.3d 937, 953 (9th Cir. Cal. 2003); *Staton*, 327 F.3d at 952; *Hanlon*, 150 F.3d

3  at 1026. The less discovery that been taken prior to concluding the settlement, the

4  more probing the scrutiny must be, for in the absence of an investigation of the

5  facts sufficient to enable the court to "intelligently make . . . an appraisal," it cannot

6  be approved. *Plummer v. Chemical Bank*, 668 F.2d 654, 660 (2d Cir. 1982); *Moore*

7  *v. Halliburton Co.*, 2004 U.S. Dist. LEXIS 18187, at *31 (N.D. Tex. Sept. 9, 2004)

8  (noting that, "absence of any adversarial discovery is a negative factor in

9  persuading the Court of the wisdom of settlement"); *Polar*, 187 F.R.D. at 814.

10  ## ARGUMENT

11  As set forth below, the Settlement does not meet even the minimum

12  requirements for preliminary approval. First, the Settlement is structurally and

13  fatally flawed because it arbitrarily divides the classes into two groups: giving

14  preferential treatment to two minority subclasses that are theoretically entitled to

15  economic relief and selling out the rights of everyone else who, in exchange for a

16  complete release of their claims, get literally nothing in return. Second, the

17  injunctive relief provisions in the Settlement are actually a net negative for the

18  class; they will leave inaccurate entries in 90% of the credit reports about which

19  plaintiffs are complaining while giving Trans Union and Equifax an unrestrained

20  license to continue reporting those inaccuracies in violation of their statutory

21  obligations. Third, the economic relief provisions of the Settlement are so woefully

22  inadequate that they do not come anywhere close to "the range of possible

23  approval"; they give nothing of real value to more than 99% of the subclass

24  members they are supposed to benefit and a maximum of $75 each to the remaining

25  few. This fatally flawed settlement was the product of an extremely suspect

26  negotiating process in which the Sherman team abused the class action device so as

27  to put their own financial interests ahead of those of the classes they purport to

28  represent. In short, exploiting the Sherman team's self-interest and their lack of

1   familiarity with credit reporting and scoring, Trans Union and Equifax lulled the
2   Sherman team into a lopsided deal structured to ensure that they would pay
3   essentially nothing other than the cost of attorneys' fees and notice. In exchange,
4   defendants would win permanent immunity from liability for practices that have
5   deprived and will continue to deprive millions of consumers of their statutory right
6   to have important financial information about them accurately reported and that
7   cost them hundreds of millions of dollars in damages every year.

8   **I.    THE SETTLEMENT IS FATALLY DEFECTIVE BECAUSE IT
        COMPROMISES THE CLAIMS OF MILLIONS OF CLASS
9       MEMBERS WITHOUT GIVING THEM ANYTHING IN RETURN**

10          In examining the propriety of a class settlement, one of the most
11  important things for the district court to focus on is its "distribution terms (or those
12  sought) to detect situations where some class members' interests diverge from those
13  of others in the class." *In re GMC Pick-Up*, 55 F.3d at 797. The reason for the
14  need for vigilance in this area is to guard against settlements that may be "trading
15  the claims" of one group "in order to enrich" another. *Id.* As Judge Friendly put it
16  in *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d
17  Cir. 1981), "'an advantage to the class, no matter how great, simply cannot be
18  bought by the uncompensated sacrifice of claims of [class] members.'" *Id.* at 16;
19  *see also Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 300 (W.D. Pa.
20  1995). That, however, is exactly what the Settlement would do.

21          **A.    The Settlement Would Arbitrarily Deny All Economic Relief To
                As Much As 70% Of The Class.**
22
            The Settlement (at §§ 1.6 & 1.19) divides the class into two separate
23
    groups: (1) a group of about 2.6 million class members who obtained their
24
    discharge orders after October 3, 2003 (or, in the case of California residents, after
25
    May 12, 2001) and who would, therefore, be entitled to economic relief (the
26
    "economic relief subclass"); and (2) a much larger group of as many as 6.5 million
27
    class members who obtained their discharge orders prior to those dates (but after
28

1    April 1, 1996) and who would, therefore, be ineligible for such relief.[10] As set forth

2    below, that distinction cannot be justified by reference to the FCRA's statute of

3    limitations since the date of a bankruptcy discharge order has nothing to do with

4    when the limitations period begins to run.  As such, the Settlement arbitrarily

5    divides the class into two different segments, providing relief for one and denying it

6    to the other.  Such a settlement is fatally defective *as a matter of law* and, hence,

7    cannot pass the threshold for preliminary approval.

8           The district court's decision in *Petruzzi's, Inc. v. Darling-Delaware

9    Co.*—an anti-trust case involving an alleged conspiracy to allocate customers in the

10   fat and bone rendering industry—is squarely on point.  Under the terms of the

11   settlement in that case, those class members who had accounts with the settling

12   defendant were eligible to receive an award of "premium certificates" on future

13   purchases.  The class members who were not customers of the defendant

14   (approximately one half of the total) were not eligible for any economic relief, but

15   their claims were nonetheless discharged—just like those of the pre-cutoff date

16   class members here.  880 F. Supp. at 299.

17          In evaluating the adequacy of the settlement, the *Petruzzi* court noted

18   that neither it nor the parties were able to find "a single case that approves a

19   settlement that provides compensation to 50% of the class but requires the entire

20   class to release its claims against the settling defendant."  *Id.*  In the absence of any

21   justification for "[t]his disparate treatment of class members" by the proponents of

22

---

23   [10]  The Settlement itself counts these two groups as consisting of about 4 million
     and 10 million members, respectively.  Sobol Decl., Ex. B.  However, individuals
24   that have no inaccuracies in their reports cannot possibly have a claim.  As the
     Lieff/Caddell team's study estimates that this group accounts for about 35% of all
25   consumers with Chapter 7 discharge orders, Juntikka Decl. at ¶ 18, a much better
     estimate of the class size would be 2.6 million subclass members and 6.5 million
26   non-subclass members.  It should be borne in mind, however, that the size of the
     Equifax class is smaller than the Trans Union class by 3 million because they have
27   maintained files on only 11 million individuals who obtained Chapter 7 discharge
     orders since April 1, 1996.  For purposes of simplicity and since the Settlement
28   applies to both the Trans Union and Equifax classes, the calculations referenced in
     this memorandum are based on the 14 million number.

1  the settlement, the court concluded that an inequity of that magnitude "is sufficient
2  reason in and of itself to disapprove the proposed settlement." *Id.*

3  　　　　Similarly, in *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781 (7th Cir.
4  2003)—a case alleging that Fleet had transmitted private financial information
5  about consumers to certain telemarketing companies in violation of state and
6  federal consumer protection laws—the Seventh Circuit was confronted with a
7  settlement that provided economic relief only to those who purchased financial
8  services from those telemarketers. *Id.* at 782. Certain class members filed
9  objections to the settlement, focusing their challenge on the fact that those who did
10  not make any such purchases, "namely the pure information-sharing class, received
11  absolutely nothing, while surrendering all its members' claims against Fleet." *Id.* at
12  785. On appeal, the Seventh Circuit rejected the district court's decision approving
13  the settlement out-of-hand, rhetorically asking whether it would "be too cynical to
14  speculate that what may be going on here is that class counsel wanted a settlement
15  that would give them a generous fee and Fleet wanted a settlement that would
16  extinguish 1.4 million claims against it at no cost to itself?" *Id.* Answering that
17  question, Judge Posner stated that "the settlement the district judge approved sold
18  these 1.4 million claimants down the river. Only if they had no claim . . . did they
19  lose nothing by the settlement, and the judge made no [such] finding." *Id.*

20  　　　　As in the case of the settlements that were at issue in *Petruzzi* and
21  *Mirfasihi*, the distinction that the Settlement makes here between class members
22  who obtained a discharge after October 3, 2003 (or, for California residents, after
23  May 12, 2001) and those who obtained one before that date is indefensible.
24  Presumably, that distinction was intended to have something to do with the statute
25  of limitations since the *Hernandez* case against Trans Union and Equifax was filed
26  as a nationwide class action on October 3, 2005 (and since the Acosta case against
27  Trans Union was filed as a California class on May 12, 2003). The reality is,
28  however, that it does not. Prior to an amendment that became effective on March

1   31, 2004, 15 U.S.C. § 1681p, the statute of limitations on an FRCA claim was 2

2   years after *the date of the violation* forming the basis of liability, regardless of when

3   that violation was discovered. *TRW, Inc. v. Andrews*, 534 U.S. 19, 28-29 (2001).

4   As a result of that amendment, however, the limitations period was extended to the

5   earlier of "2 years after the date of the discovery of the violation" or "5 years after

6   the date on which" that violation occurred. 15 U.S.C. § 1681p.

7            Needless to say, a violation occurs in this case not when a bankruptcy

8   court enters a discharge order, but when a credit report containing erroneous

9   information about pre-bankruptcy debts is published. As the vast majority of class

10  members are unaware of such publications—or, indeed, even of the fact that the

11  information that is being maintained about them is erroneous—the limitations

12  period in this case would run back to October 3, 2000 (and all the way back to May

13  12, 1998 for California residents) by operation of the statute. Juntikka Decl. at

14  ¶ 13; Sobol Decl., Ex. P (transcript of deposition of Ronald Mann at p. 202, lines 5-

15  9.) However, because a limitations period cannot be construed retroactively to

16  resurrect stale claims "absen[t] a clear statutory expression of congressional intent,"

17  *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 951-52 (1997),

18  which does not exist here, the limitations period would actually run from March 31,

19  2002, that is, any claim based upon a publication of erroneous pre-bankruptcy

20  information would be timely if such publication occurred after that date.

21           Such timely claims would encompass literally millions of class

22  members who obtained their discharge orders prior to October 3, 2003. According

23  to Trans Union and Equifax, together they maintain credit information relating to

24  approximately 10 million individuals who obtained discharge orders between

25  April 1, 1996 and the October 3, 2003 cut off date for inclusion in the economic

26  relief subclasses. Sobol Decl., Ex. B. The only available evidence indicates that

27  for about 65% of these individuals, or a total of around 6.5 million, this credit

28  information will be inaccurate insofar as it relates to the status of one or more of

581445.1

- 26 -

*WHITE/HERNANDEZ* PLAINTIFFS' MEM. ISO OPP. TO
*ACOSTA/PIKE* PLAINTIFFS' MOTION FOR ORDER
*Acosta V. Trans Union – Case No. CV 06-05060 DOC (MLG)*

1   their pre-bankruptcy debts. Furthermore, as consumers will typically have at least
2   one credit report published about them during the course of any given year
3   (Ulzheimer Decl. at ¶ 16), the vast majority of these 6.5 million class members will
4   have claims that fall within the FCRA's five year statute of limitations for an
5   undiscovered violation (and most will also fall within the two year period for a
6   known one). Yet, the Settlement would deny economic relief to each and every one
7   of these individuals, despite their entitlement to such relief.

8          The only thing that distinguishes the claims of the millions of class
9   members who would be sold down the river by the Settlement is that their claims
10  are more valuable than those of the subclass members who would be eligible for
11  economic relief. That is true for two reasons. First, those whose discharge orders
12  are the oldest are the only ones who might have been able to obtain mainstream
13  credit had it not been for the erroneous reporting of their discharged debts as due
14  and owing. Ulzheimer Decl. at ¶ 17. And, second, those individuals have suffered
15  the consequences of that erroneous reporting for a longer period of time. *Id.*
16  Accordingly, the fact that the Settlement denies all economic relief to as many as
17  6.5 million class members is sufficient reason in and of itself to the reject it. *See In*
18  *re GMC Pick-Up*, 55 F.3d at 818 (disapproving settlement that "arguably afford[ed]
19  the least relief to those class members with the most valuable claims").

20  **B.    Nearly Two-Thirds Of The Class Members Who Would Be Denied
        Economic Relief Under The Settlement Would Derive No Benefit
21      From Its Provisions For Injunctive Relief.**

22         About two-thirds of all class members who will be ineligible for
23  economic relief under the terms of the Settlement will also have no use for the
24  injunctive relief provisions of that settlement. Under the FCRA, defendants are
25  prohibited from including most types of adverse information on a credit report that
26  antedate it by more than seven years, including past due debts and accounts that
27  have been placed for collection or charged off. 15 U.S.C. § 1681c(e). Accordingly,
28  in the case of the vast majority of class members, once they are seven years out of

1  bankruptcy, all of the erroneous entries about which plaintiffs are complaining will

2  automatically be removed from their credit reports. Ulzheimer Decl. at ¶ 16.

3       Under the terms of the Settlement (at §§ 4.6-4.7), Trans Union and

4  Equifax are not required to begin correcting the erroneous pre-bankruptcy

5  information contained in their databases until 6 months after the Settlement

6  becomes final and are not required to complete the process until another 6 months

7  after that. On the optimistic assumption that final approval were to be granted by

8  June 30, 2007 and that no appeal were taken, that means that they would not be

9  obligated to fix the problem until June 30, 2008. By that time, all of the erroneous

10  entries relating to the pre-bankruptcy debts of the vast majority of the more than 4

11  million some odd class members who had obtained discharge orders prior to June

12  30, 2001 would be gone anyway. Likewise, that will be the case for thousands

13  upon thousands of others who obtained discharge orders subsequent to June 30,

14  2001 and were able to get the erroneous entries in their credit reports removed as

15  the result of a successful dispute letter. Ulzheimer Decl. at ¶ 14. Defendants'

16  promise to alter their reporting practices prospectively will not benefit these

17  *millions* of class members one iota. Yet, they are precisely those who would be

18  excluded from any economic relief. Judge Easterbrook's comments about the

19  settlement at issue in *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877

20  (7th Cir. 2000), are no less apt here: for these class members, "only damages

21  matter, yet all the settlement does for (to?) them is cut them off at the knees. They

22  gain nothing, yet lose the right to the benefits of aggregation in a class." *Id.* at 882

23     **C.**   **The Settlement Gives The Least Effective Notice To The Millions**

24        **Of Class Members Who Stand To Lose The Most In Violation Of**
      **Their Due Process Rights.**

25       Under the Settlement (at § 7.1), *in exchange for getting zero economic*

26  *relief*, all of those class members whose discharges occurred prior to the October 3,

27  2003 and May 12, 2001 cut-off dates (including as many as 4 million of them who

28  would not benefit from injunctive relief) "shall conclusively be deemed to have

1  fully, finally and forever released, relinquished and discharged," all of their

2  damages claims, unless they *affirmatively opt out*. The proposition that class

3  members must opt out of a settlement that gives them nothing in order to preserve

4  their legal rights is outrageous on its face.

5       Incredibly, however, the Settlement would compound this outrage by

6  providing these class members with the notice least calculated to reach them.

7  Under section 3.2, defendants would only be required to mail notice of the

8  Settlement's existence to members of the economic relief subclasses. The millions

9  who are not subclass members would only learn of the Settlement if they were

10  fortunate enough to read it the one time it is printed "in each of two national

11  publications" and would then have to obtain an opt-out form from Trans Union or

12  Equifax in order to avoid waiver of their damages claims. Sobol Decl., Ex. O

13  (Settlement Agreement at § 3.5). The inevitable result will be that the

14  overwhelming majority of individuals who will receive nothing from this

15  Settlement will end up losing their right to pursue their individual damages claims

16  without ever having known they had an opportunity to preserve them. The failure

17  of the Settlement to give these individuals notice that is reasonably calculated to

18  reach them is a blatant violation of their due process rights and the requirements of

19  Fed. R. Civ. P. 23(e)(2). *Molski*, 318 F.3d at 952-53.

20  **II.   THE SETTLEMENT IS FATALLY DEFECTIVE BECAUSE FAR**
21  **FROM GRANTING MEANINGFUL INJUNCTIVE RELIEF, IT**
     **WOULD GIVE DEFENDANTS AN UNRESTRAINED LICENSE TO**
     **PROCEED WITH THEIR UNLAWFUL REPORTING PRACTICES**

22       By its terms, the Settlement (at §§ 1.5, 4.6 & 4.7) requires that Trans

23  Union and Equifax correct only those trade-lines that involve unsecured revolving

24  loans (*i.e.*, credit card accounts) and only when they have inaccurately reported

25  those discharged debts as "charged off" or "in collection." *See* Szwak Decl. at ¶ 21.

26  In other words, the Settlement does *not* require defendants to correct entries

27  involving medical bills, utility bills, phone bills, car notes, mortgages, installment

28  loans, accounts placed with a collection agency, judgments or any other non-credit

1  card debts that they have inaccurately reported as "charged off" or "in collection."

2  *Id.* at ¶ 20. Likewise, the Settlement does *not* require that defendants correct any

3  discharged debts, including credit card debts, that they have inaccurately reported

4  as late or not late, but with a balance due. *Id.* at ¶¶ 22-25. And, finally, the

5  Settlement's injunctive relief provisions to not reach any pre-bankruptcy credit card

6  debts that are noted as "charged-off" or "in collection" status until after the

7  bankruptcy filing. *Id.* at ¶ 24. The consequence of these omissions is that the

8  Settlement would only require Trans Union and Equifax to correct *a minority* of the

9  discharged debts that they are erroneously reporting as due and owing and would

10 leave *95%* of the class with credit reports that would still contain at least one or

11 more such inaccurate entries. Juntikka Decl. at ¶¶ 20-24; *see also* Szwak Decl. at

12 ¶¶ 15-16 (noting that Settlement will "leave uncorrected" pre-bankruptcy

13 information on the credit reports of "countless consumers").[11]

14         But it is actually much worse than that. Section 7.3 of the Settlement

15 provides that the injunctive relief claims of all class members would be certified

16 under Fed. R. Civ. P. 23(b)(2), and, hence, that none of them would be permitted to

17 "opt out any claim for injunctive or declaratory relief." Furthermore, under section

18 7.1 of the Settlement, all class members "will be deemed to have fully, finally and

19 forever released" defendants from all claims for injunctive and declaratory relief

20 that were alleged or that could have been alleged in the *Pike/Acosta* actions.

21         In other words, an order approving this Settlement would insulate

---

22 [11] The 95% figure comes from a study of 1,127 Trans Union and Equifax credit
23 reports stored in Mr. Juntikka files. Using the criteria employed in the Settlement,
   that study showed that erroneous entries would continue to appear on 545 out of
24 576 Trans Union reports and on 518 of 542 Equifax files. The breakdown of
   these uncorrected errors was as follows for Trans Union and Equifax, respectively:
25 (1) 174 and 149 for debts that were reported as a credit card account or account
   tradeline that are presently reported by collection agencies; (2) 91 and 164 for credit
26 card debts first noted as "charged off" or "in collection" status after the bankruptcy
   filing; (3) 163 and 200 for reports with credit card account tradelines that are
27 reported as installment loans, credit lines and mortgage deficiencies; (4) 223 and
   280 for revolving accounts with a past due derogatory status other than "charged
28 off" or "in collection"; and (5) 142 and 171 for dischargeable judgments. Juntikka
   Decl. at ¶¶ 22-23.

1   Trans Union and Equifax from legal challenge based on their employment of

2   reporting procedures that would continue to inaccurately report one or more

3   discharged debts as due and owing in the credit reports of 95% of all class

4   members. *Cf. Staton*, 327 F.3d at 947 ("The effect of this provision [providing for

5   certification of a Rule 23(b)(2) class] may be that no [class members] can obtain

6   *any* injunctive relief . . . even if he or she opts out of the class for purposes of

7   monetary relief and proves race discrimination in a separate action.")  Such an

8   order would, in effect, give defendants an unrestrained license to violate the law.

9   *See* Hazard Decl. at ¶ 11 (referring to release of prospective claims for injunctive

10  relief as an "immunity certificate").

11          This Court has already ruled that reporting procedures that

12  "repetitive[ly] and systemic[ally]" show discharged debts as due and owing in

13  credit reports would violate both the FRCA and the CCRRA if reasonable

14  procedures are available that would substantially reduce those errors. *White v.*

15  *Trans Union, LLC*, 2006 U.S. Dist. LEXIS 80584, at *9-10 (C.D. Cal. Oct. 13,

16  2006).  A study of some 900 credit reports has revealed that both Trans Union and

17  Equifax employ procedures that produce inaccurate reports about twice as

18  frequently as they do accurate ones (Juntikka Decl. at ¶¶ 18-19)—a figure which

19  the proponents of this Settlement have given this Court no reason to doubt.  Where

20  a credit reporting agency's existing procedures produce such "systematic

21  problems," the FCRA and the CCRAA command that if there are "steps it can take

22  to improve the accuracy of its reports at a reasonable cost, it *must take any such*

23  *steps.*" *Cassara v. DSC Servs., Inc.*, 276 F.3d 1210, 1226 (10th Cir. 2002) (quoting

24  16 C.F.R. Part 600 App., 607.3 (2000) (emphasis added)).

25          Unquestionably, steps that would dramatically improve the accuracy of

26  defendants' credit reporting exist here.  As Prof. Westbrook confirms in his

27  declaration, a discharge order in a Chapter 7 proceeding has the effect of

28  discharging all pre-bankruptcy debts except those "fall[ing] into one of two

1   classifications: (a) [i]t is a debt that is non-dischargeable automatically as a matter

2   of law [*e.g.*, taxes, student loans and domestic obligation]; or (b) "[t]here is a public

3   filing with the bankruptcy court that reveals the debt has been reaffirmed or its

4   discharge has been [successfully] challenged." Westbrook Decl. at ¶ 10. Thus, in

5   order to correctly report the status of debts discharged in bankruptcy, all defendants

6   have to do is run a computer program that would: (1) identify files containing

7   Chapter 7 discharge orders; (2) identify the pre-bankruptcy debts in those files that

8   are listed as due and owing; and (3) change the notation on all such debts to

9   indicate that they have been discharged in bankruptcy, exempting those among

10  them that were reaffirmed, that were subject to a successful adversary proceeding or

11  that are otherwise statutorily non-dischargeable. *See* Westbrook Decl. at ¶¶ 10-11.

12          Of these steps, defendants can only even try to argue that there is no

13  reasonable method of accomplishing the third—that is, that there is no cost-

14  effective way for it to identify which pre-bankruptcy debts are non-dischargeable.

15  But that is not true.

16          First, defendants can cost-effectively identify those debts, since they:

17  (1) can easily determine whether a debt has been reaffirmed or successfully

18  challenged, as that information is available in computer readable format on PACER

19  (Westbrook Decl. at ¶ 10); and (2) can even more easily determine whether a debt

20  falls into a non-dischargeable category (*e.g.*, student loans, child support payments,

21  recent tax obligations, *etc.*) since they code the great majority of those debts by

22  category in their databases. Ulzheimer Decl. at ¶¶ 27-31; *see also* Szwak Decl. at

23  ¶¶ 14-17.[12] Given that Trans Union and Equifax both have extremely sophisticated

24  computer systems that are able to track the credit records of some 200 million

25  individuals and that are able to manage billions of items of information on a daily

26  _____

27  [12] While section 523(a) of the Bankruptcy Code lists 19 grounds for discharge, all
    of the most common ones are identified in defendants' databases and those that are

28  not are so "highly specialized" (*e.g.*, wrongful conduct at a federal depository
    institution, violation of the federal securities laws, *etc.*) that they only "rarely arise"
    in a Chapter 7 bankruptcy proceeding. Westbrook Decl. at ¶ 9.

581445.1                                    - 32 -

*WHITE/HERNANDEZ* PLAINTIFFS' MEM. ISO OPP. TO
*ACOSTA/PIKE* PLAINTIFFS' MOTION FOR ORDER
*Acosta V. Trans Union – Case No. CV 06-05060 DOC (MLG)*

1  basis, any contention that they are unable to sort out these non-dischargeable debts
2  from the rest is simply not credible. Ulzheimer Decl. at ¶ 27; Szwak Decl. at ¶¶ 14
3  & 17. At any rate, the proponents of the Settlement have given this Court no basis
4  upon which to conclude otherwise, as (1) neither Trans Union nor Equifax have put
5  anything in the record to back-up any claim they might make that implementation
6  of these procedures would carry an unreasonable price tag; and (2) the *Acosta/Pike*
7  plaintiffs never obtained any information that would have enabled them to test or
8  challenge that claim.

9         Second, even if Trans Union and Equifax did not have easy access to
10  information about the non-dischargeable status of pre-bankruptcy debts, their credit
11  reports would be far more accurate than their present ones if they simply reversed
12  the default under which they now operate. Ulzheimer Decl. at ¶¶ 31-32. In other
13  words, instead of presuming that bankruptcy does not discharge any debts until the
14  furnishers inform it that they have been, Trans Union and Equifax could simply
15  presume that bankruptcy does what it is intended to do—namely, that it wipes the
16  slate clean by discharging all pre-bankruptcy debts—and shift the burden to the
17  furnishers to provide information showing that a particular debt has not been
18  discharged. *Id.* at ¶ 32. This will result in far greater accuracy than defendants'
19  existing procedures because: (1) in the words of the *Acosta/Pike* plaintiffs' expert,
20  "the discharge reaches the great majority—perhaps the overwhelming majority—of
21  [pre-bankruptcy] debts" (Mann Aff. at ¶ 12; *see also* Westbrook Decl. at ¶ 9 ("The
22  consensus among experts is that the vast majority of debts are discharged."); and
23  (2) the furnishers' incentive to inform defendants that pre-bankruptcy debts remain
24  due and owing is much greater than their incentive to inform them that they have
25  been discharged. Indeed, Trans Union and Equifax can hardly take issue with the
26  validity of this procedure, as it is precisely the procedure that both currently employ
27  for purposes of resolving reinvestigation claims concerning the reporting of pre-
28  bankruptcy debts. Ulzheimer Decl. at ¶ 15; Szwak Decl. at ¶ 26; Sobol Decl.,

581445.1                                     - 33 -

*WHITE/HERNANDEZ* PLAINTIFFS' MEM. ISO OPP. TO
*ACOSTA/PIKE* PLAINTIFFS' MOTION FOR ORDER
*Acosta V. Trans Union – Case No. CV 06-05060 DOC (MLG)*

1  Ex. Q.

2          At a minimum, even if it were unclear whether reasonable procedures

3  are available that would resolve or substantially mitigate the systemic inaccuracy

4  problem, there is no basis whatever for concluding that they are not because the

5  *Acosta/Pike* plaintiffs' discovery is wholly inadequate on this subject. Yet, under

6  the terms of the Settlement, that would make no difference. Class members would

7  be forever barred from challenging defendants' revised reporting procedures and,

8  hence, they would both be free to employ them even if, in fact, those procedures do

9  not comply with the requirements set forth in the FCRA and the CCRAA. As the

10  case law makes made clear, however, the district courts cannot approve such a

11  settlement. *Schering Corp. v. Illinois Antibiotics Co.*, 62 F.3d 903, 907 (7th Cir.

12  1996). "Judges are not authorized to disobey the law in issuing an injunction, let

13  alone to issue injunctions that authorize or direct people to violate valid federal

14  statutes." *Id.; see also Local No. 93, Int'l Assoc. of Firefighters v. City of

15  Cleveland*, 478 U.S. 501, 526 (1986) (noting that parties to a settlement may not

16  "agree to take action that conflicts with or violates the statute upon which the

17  complaint was based"); *White v. Alabama*, 74 F.3d 1058, 1074-75 & n.52 (11th Cir.

18  1996).

19          Accordingly, insofar as the present Settlement is concerned, this Court

20  has no discretion. It cannot approve an injunctive decree that would foreclose a

21  subsequent challenge by class members without finding that the reporting

22  procedures it is sanctioning are reasonably designed to ensure maximum possible

23  accuracy; for the alternative would be to give defendants *carte blanche* to continue

24  engaging in conduct that violates both the FCRA and the CCRAA.

25  **III.    THE SETTLEMENT COMES NOWHERE NEAR THE RANGE OF
        POSSIBLE APPROVAL BECAUSE THE VALUE OF THE RELIEF IT**

26  **AFFORDS THE CLASSES DOES NOT EVEN BEGIN TO
        APPROXIMATE THE LITIGATION VALUE OF THESE CASES**

27          At its core, the determination of whether a settlement is substantively

28  adequate involves a comparison of "the terms of the compromise with the likely

*WHITE/HERNANDEZ PLAINTIFFS' MEM. ISO OPP. TO
ACOSTA/PIKE PLAINTIFFS' MOTION FOR ORDER
Acosta. V. Trans Union – Case No. CV 06-05060 DOC (MLG)*

1    rewards of litigation." *Polar*, 187 F.R.D. at 112. "In formulaic terms," this means
2    balancing the value of the relief afforded by the settlement against "the present
3    value of the damages plaintiffs would likely recover if successful, appropriately
4    discounted for the risk of not prevailing." *In re GMC Pick-Up*, 55 F.3d at 805.

5    　　Without having been given any information from the Settlement's
6    proponents that would "enable [it] to make a reasonable assessment of the damages
7    to the plaintiffs, the evidence supporting and rebutting plaintiffs' claims, or the
8    [amount] each class member would recover if the settlement were approved," this
9    Court has no basis upon which to conclude that the Settlement reflects a reasonable
10   approximation of the litigation value of these cases and, hence, "to give preliminary
11   approval to [that] settlement." *Carnegie v. Household Int'l, Inc.*, 371 F. Supp.2d
12   954, 957 (N.D. Ill. 2005). As set forth below, however, the information provided
13   by the *White/Hernandez* plaintiffs gives this Court more than ample grounds to find
14   that it comes nowhere near the range of possible approval.

15       **A.    The Relief The Settlement Affords To The Minority Of Class
16            Members Who Could Benefit From It Ranges From Illusory To
             Woefully Inadequate.**

17   　　In reviewing class settlements for adequacy, the paramount concern of
18   the courts is to guard against the possibility of class and defendants' counsel
19   negotiating "a covert exchange of a cheap settlement for a high award of attorney's
20   fees." *In re GMC Pick-Up*, 55 F.3d at 802. The courts and commentators alike
21   "have identified settlements that afford only nonpecuniary relief to the class as
22   prime suspects of these cheap settlements." *Id.*; *In re Mexico Money Transfer
23   Litig.*, 267 F.3d 743, 748 (7th Cir. 2001); *In re IKON Office Solutions Secs. Litig.*,
24   209 F.R.D. 94, 99 (E.D. Pa. 2002); *In re Oracle Securities Litigation*, 132 F.R.D.
25   538, 544-45 (N.D. Cal. 1990) ("the classic manifestation of the problem in a class
26   action involves a non-pecuniary settlement (*e.g.*, injunctive relief), 'expert valued'
27   at some fictitious figure, together with arrangements to pay plaintiffs' lawyers their
28   fees"); Miller Decl. at ¶ 24. Accordingly, such non-cash settlements should be

1   examined with "an especially critical eye," *In re IKON*, 209 F.R.D. at 99, and be

2   subjected to "particularly close scrutiny to determine whether [they] represent[] a

3   verifiably fair and adequate" bargain. *In re Microstrategy, Inc. Secs. Litig.*, 148 F.

4   Supp.2d 654, 659 (E.D. Va. 2001); *see also Synfuel Techs., Inc. v. DHL Express

5   (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) ("Our confidence in the fairness of

6   the settlement is further undermined by the agreement's bias toward compensating

7   class members with pre-paid Letter Express envelopes instead of cash."); Miller

8   Decl. at ¶ 24.

9          This case provides a perfect illustration of why such "close scrutiny"

10   of non-cash settlements is so important. Under the terms of the Settlement, the

11   awards for which "economic relief" subclass members (that is, those who obtained

12   discharge orders after October 3, 2003 or, for those who are residents of California,

13   after May 12, 2001) are theoretically eligible range from a minimum of a free credit

14   report to a free credit report plus a cash award of between $75 and $450 (or $225

15   per defendant). Sobol Decl., Ex. O (Settlement Agreement at § 5.2). As set forth

16   below, the reality is, however, that a free credit report is worthless and that the

17   Settlement was designed in such a way as to ensure that only a minute fraction of

18   all subclass members would be eligible for even the $75 cash award. Furthermore,

19   the *Acosta/Pike* plaintiffs vastly exaggerate the benefits of the injunctive relief

20   provisions, which, at any rate, cannot be attributed any monetary value. In short,

21   the overall cash value of the Settlement to the large majority of eligible subclass

22   members is zero or near zero (to say nothing of what it would be worth to all non-

23   subclass members) and it will not cost defendants much more than that in the

24   aggregate (excluding what they would be required to pay for attorneys' fees and

25   class notice).

26          1.     *The value of the free credit report component of the Settlement.*

27   It goes without saying that "compensation in kind"—whether in the form of

28   discount coupons or free products—is "worth less than cash of the same nominal

1    value." *In re Mexico Money*, 267 F.3d at 748); *see also In re Domestic Air Transp.*

2    *Antitrust Litig.*, 148 F.R.D. 297, 321 (N.D. Ga. 1993) (ruling that "the economic

3    value of the certificates to the class" is not "the same as the face value of the

4    certificates"). Ignoring that basic principle, the *Acosta/Pike* plaintiffs assert (at 25

5    n.6) that the free credit report component of the Settlement "has a potential

6    economic impact" on the class of "tens of millions of dollars." Nothing could be

7    further from the truth.

8           First, the *Acosta/Pike* plaintiffs' estimate is based on the assumption

9    that the right to a free credit report has value to each and every class member,

10   regardless of whether they have any interest in one. As the case law makes clear,

11   however, the value of the free credit report component of the Settlement cannot

12   exceed the value of one such report multiplied by the number of class members

13   who actually take advantage of it.[13] That number will only be a minute fraction of

14   the class. Why?: because all consumers are statutorily entitled to at least free three

15   reports a year anyway (one each from Trans Union, Equifax and Experian). 15

16   U.S.C. § 1681j(a)(1)(A). Accordingly, the number of class members who will

17   derive any benefit from the one free report they get under the Settlement is

18   equivalent to the number of class members who would obtain a second report from

19   Trans Union and a second one from Equifax (free credit report numbers 4 and 5)

20   during the course of the year that the three free ones are made available to them.

21          Of the 220 million or so individuals about whom the major credit

22   reporting agencies prepare credit reports, it is exceedingly doubtful that as many as

23   _____

24   [13] *See, e.g., DHL Express (USA)*, 463 F.3d at 654 (holding that the "percentage of
     the pre-paid envelopes claimed by class members" that will not be used cannot be
     counted in determining the value of the settlement because they "will not constitute
25   a cost to Airborne."); *In re Mexico Money*, 267 F.3d at 748 (determining value of
     coupons as a function of how frequently they were likely to be used); *In re*
26   *Compact Disc Minimum Advertised Price Antitrust Litig.*, 292 F. Supp. 2d 184, 187
     (D. Me. 2003) ("the total value of the voucher program will be equal to the value
27   of the voucher multiplied by the number of vouchers actually used"); *In re*
     *Domestic Air*, 148 F.R.D. at 322 ("the true value of the certificates to the class
28   depends on when the certificates will be used; how they will be used, and who will
     be using them").

1  20 million at the very most, or even 10%, bother to take advantage of their right to

2  *one* free credit report from Trans Union and/or Equifax in any given year.

3  Obviously, the proportion of consumers who would have any interest in or use for a

4  second free report is certain to be much lower than that. However, even on the

5  absurd assumption that the proportion of those who desire a second free report from

6  a given credit reporting agency would be as high as the number who would seek

7  one, the number of subclass members for whom that benefit would have value

8  would be no more than 260,000 (*i.e.*, 10% of the 2.6 million subclass members).

9  Even for those who fall within that group, the value of such a second

10  free report is nowhere near the $15 to $20 amount that the Settlement's proponents

11  attribute to it (which amount actually exceeds the $9.95 and $10.00 retail price that

12  Trans Union and Equifax, respectively, charge for a credit report on their website).

13  However, the best measure of the value of in kind compensation to class members

14  is not the price that a defendant offers it to the general public for, but the price those

15  class members can sell it for on the secondary market.

16  In order for a product to have any value on the secondary market, it

17  must, of course, be transferable. Here, there is absolutely no prospect that a

18  secondary market would emerge for free credit reports given the idiosyncratic

19  nature of that product and the fact that it is available to anyone who wants one

20  (though not two) for free from each of the three major credit reporting agencies. In

21  the absence of any such market, a compelling argument can be made that the

22  Settlement's provision of a free credit report to anyone who qualifies has no value

23  at all. *See, e.g., Clement v. American Honda Finance Corp.*, 176 F.R.D. 15, 27 (D.

24  Conn. 1997) (distinguishing cases in which coupon settlements were approved,

25  which all involved coupons that "were all transferable to third parties and thus had

26  some potential cash value," from "the coupons in this case[, which] are not

27  transferable to third parties and thus have no cash value"); *In re Western Union*

28  *Money Transfer Litig.*, 2004 U.S. Dist. LEXIS 29377, at *38 (E.D.N.Y. Oct. 19,

1  2004) (noting that transferability is one of the "attributes of a well-designed,

2  valuable coupon settlement").

3  In the absence of any secondary market, an offer of a free product

4  could still have settlement value if the defendant would be willing: (1) to allow

5  class members to redeem their right to that product for a lesser amount of cash; or

6  (2) to guarantee some kind of minimum cash payout that would serve as a form of

7  alternative compensation for that segment of the class that has no interest in the

8  product. Such minimum payment schemes can provide a "benchmark for

9  evaluating" class settlements that rely on in kind compensation. *Buchet v. ITT*

10  *Consumer Fin. Corp.*, 845 F. Supp. 684, 696 (D. Minn. 1994).

11  Here, however, defendants are "unwilling[] to establish a bottom line."

12  *Buchet*, 845 F. Supp. at 696. As one federal district court has explained, it is

13  reasonable to assume that such a refusal to back up free or discounted product with

14  a "minimum cash contribution reflects the economic value" that a defendant places

15  on that product. *Id.* Thus, given the absence of "a transfer option or other guaranty

16  of some minimal cash payment" in this case, this Court could justifiably find that

17  the free credit report component of "the settlement will have absolutely no value to

18  the class." *Clement*, 176 F.R.D. at 28; *Buchet*, 845 F. Supp. at 696 (holding that

19  "defendant's failure to guarantee, as an alternative to the certificate, some minimum

20  cash payment to individual class members was fatal to the settlement approval").

21  One last way of valuing in kind compensation is by reference to its

22  cost to the defendant. Here, the cost to Trans Union and Equifax of offering class

23  members a free credit report is nothing or next to nothing. First, as set forth above,

24  any cost relating to sending out a credit report to class members who have not

25  already received their one free annual report must be regarded as zero because

26  defendants are legally obligated to bear that cost anyway. Accordingly, the only

27  cost that counts is the cost of sending out a second report to the small number of

28  class members who have use for it. That cost is negligible. For those who wish to

581445.1                                    - 39 -

*WHITE/HERNANDEZ* PLAINTIFFS' MEM. ISO OPP. TO
*ACOSTA/PIKE* PLAINTIFFS' MOTION FOR ORDER
*Acosta V. Trans Union* - *Case No. CV 06-05060 DOC (MLG)*

1   obtain their report over the internet, it is basically zero. For those who do not, it is
2   the minimal costs associated with the printing and mailing of the report.

3          2.      *The value of the cash component of the Settlement.* As no cash
4   value can be attributed to the free credit report component, the value of the
5   economic relief provisions in the Settlement depend entirely on how much cash is
6   likely to be paid out. It is telling—though not surprising—that the proponents of
7   the Settlement make no effort to estimate the size of that payment. Even under the
8   most optimistic scenarios, it is not likely to be much more than a pittance.

9          First, while an award of between $100 and $450 is theoretically
10  available to any class member whose credit score moves from sub-prime to prime
11  as a result of the revised reporting procedures set forth in the Settlement, the reality
12  is that virtually no one who is just three years out of bankruptcy is able to obtain
13  prime credit. Ulzheimer Decl. at ¶ 20. Thus, almost everyone in the economic
14  relief subclasses will be excluded from the largest range of cash awards.

15         Likewise, very few subclass members will qualify for the smaller cash
16  awards that the Settlement makes available to individuals with sub-prime credit.
17  Under the Settlement Agreement, those cash awards include a $187.50 award for
18  those whose scores would rise from 101 to 200 points as a result of the revised
19  reporting procedures and a $225 award to anyone whose score rose by more than
20  200 points. Sobol Decl., Ex. O (Settlement Agreement at Ex. 6). In fact, however,
21  even if Trans Union and Equifax removed all of the erroneous entries from the
22  credit reports of all subclass members, hardly anyone's score would increase by
23  more than 100 points so the larger awards are out of reach. Ulzheimer Decl. at
24  ¶ 22.)

25         That leaves only the $75 award (really, $37.50 each for Trans Union
26  and Equifax) that the Settlement makes available to subclass members with sub-
27  prime credit whose scores would rise from 51 to 100 points. Here, again, even if all
28  erroneous entries from their credit reports were removed, only about 10% of all

1    subclass members or about 260,000 individuals would see their credit reports

2    improve by that amount. Ulzheimer Decl. at ¶ 22.

3              In reality, however, that percentage will be far lower because the credit

4    score differential is based on revised reporting procedures that do so little to solve

5    the problem. As set forth above, those revised procedures will continue to leave

6    one or more of the pre-bankruptcy debts inaccurately reported as due and owing in

7    *95%* of all cases. Juntikka Decl. at ¶ 20. As a consequence, the percentage of

8    subclass members whose credit scores will rise above 50 points is likely to be in the

9    range of about 1 to 3% or fewer than 100,000 individuals at the most. *See*

10   Ulzheimer Decl. at ¶ 21 (comparing Settlement's approach of correcting certain

11   inaccurate entries, while leaving others remaining, to "fixing some of the leaks in a

12   boat but leaving others, you really haven't solved the overarching problem").

13             However, the number of subclass members who actually end up being

14   paid any money will be much lower. While the Settlement provides that class

15   members would lose their rights to pursue their individual damages claims unless

16   they affirmatively *opt-out*, it also provides for a "claims made" compensation

17   procedure under which they would have to affirmatively *opt-in* in order to get any

18   economic relief. Sobol Decl., Ex. O (Settlement Agreement at §§ 2.1 and 5.1).

19   Such "claims made" settlements "regularly yield response rates of 10 percent or

20   less." *Sylvester v. CIGNA Corp.*, 369 F. Supp.2d 34, 52 (D. Me. 2005). Here, the

21   response rate is likely to fall on the lowest range of the spectrum, because, rather

22   than sending subclass members a claims form, the Settlement requires them to get

23   one themselves—either through the internet or by telephone. *See also* Hazard Decl.

24   at ¶ 13.[14] Assuming, however, that the response rate reaches 10 percent, Trans

25

26   ───────────────
     [14] It is worth noting that, other than to reduce Trans Union and Equifax's pay out to

27   a "small fraction" of what it would otherwise be, Sobol Decl., Ex. I, there is
     absolutely no justification for using a claims-made award process in this case, since

28   literally all of the information requested (namely the claimant's name, address,
     social security number and whether he/her obtained a discharge order) is contained
     in defendants' databases. Sobol Decl., Ex. O (Settlement Agreement, Ex. 4).

1   Union and Equifax would each be required to pay out benefits to approximately

2   1,000 claimants. Thus, defendants would end up paying out a total of about

3   $750,000 between them, or about $375,000 each—not even *1/5th of 1%* of the

4   litigation value of these cases under the conservative scenario set forth in Point

5   III.B below. A deal that would settle a case for less than one five-hundredths of

6   what it is worth is about as far from reasonable, adequate and fair as you can get.

7        *3.    The value of the injunctive relief component of the Settlement.*

8   The *Acosta/Pike* plaintiffs tout the injunctive relief provisions of the Settlement as a

9   great victory for the plaintiff class. Yet, as set forth in Point II above, far from

10  benefiting the classes, those provisions are actually contrary to the interests of 95%

11  of all class members because they would authorize defendants to continue reporting

12  one or more of their discharged debts as due and owing while stripping them of

13  their right to seek legal redress on the ground that the practices that are producing

14  those errors violate state and federal law. Moreover, even as to the 5% of class

15  members for whom the revised reporting procedures will eliminate all of the

16  erroneous entries listed in their credit reports, the *Acosta/Pike* plaintiffs greatly

17  exaggerate the value of the injunctive relief the Settlement affords them.

18       Common sense dictates that, at least in all but the most unusual

19  circumstances, "a defendant's promise to do that which the law already requires is

20  not a valuable benefit." *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 554-

21  55 (S.D. Ohio 2000).[15] Accordingly, defendants' promise to revise their reporting

22  _____

[15] *See also Franks v. Kroger Co.*, 649 F.2d 1216, 224 (6th Cir. 1981) (rejecting
23  argument that injunctive relief provisions of proposed settlement, including a
    requirement to post notices of management openings and to promulgate a new fair
24  employment policy, conferred "additional 'benefits' to the class members" because
    they "only require the company to do what the law generally requires"); *Reich v.*
25  *Walter W. King Heating and Plumbing Contractor, Inc.*, 98 F.3d 147, 151 (4th Cir.
    1996) (holding that Secretary of Labor could not be regarded as "prevailing party"
26  entitled to attorney fees on basis of his obtaining a settlement wherein defendant
    "agreed not to engage in any future . . . transactions" prohibited by ERISA because
27  defendant had done nothing more than promise "to do what it was already legally
    required to do: adhere to ERISA"); *In re Ford Motor Co. Bronco II Products*
28  *Liability Litigation*, 1995 U.S. Dist. LEXIS 3507, at *17 (E.D. La. 1995) (holding
    that proposed settlement, which required Ford to provide the kind of safety

1  procedures constitutes meaningful consideration only to the extent of any
2  uncertainty that may exist surrounding their legal obligation to adopt those
3  procedures under the FCRA and the CCRRA.

4      The law is clear, however, that in the face of a reporting procedure that
5  routinely produces inaccurate reports, a credit reporting agency *must* take measures
6  to reduce that inaccuracy if it can do so at a reasonable cost. Accordingly,
7  *Acosta/Pike* plaintiffs can maintain that the revised procedures contained in the
8  Settlement have any significant value only if they can establish that Trans Union
9  and Equifax would have been able to make a credible showing that the costs
10  associated with those procedures would saddle them with an unreasonably heavy
11  burden. As their counsel have obtained no discovery on this issue whatsoever, the
12  *Acosta/Pike* plaintiffs are in no position to make that assertion. And, at any rate,
13  given the magnitude of the problem and, for the reasons set forth in Point II above,
14  they would be wrong if they did. Thus, even to the extent it would remedy some of
15  the inaccurate reporting about which plaintiffs complain, defendants' agreement to
16  revise their procedures does not constitute meaningful consideration for the putative
17  classes.

18  **B.**   **In The Absence Of Any Meaningful Discovery In These Cases,**
        **There Is No Basis For Assigning A Litigation Value To Them Of**
19      **Less Than Two Or Three Hundred Million Dollars.**

20      Any calculation of the litigation value of a class action case "require[s]
21  estimating the range of possible outcomes and ascribing a probability to each point
22  on the range." *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 285 (7th Cir.
23  2002). This, in turn involves calculating the amount of the potential recovery and
24  discounting that amount by the risk of not prevailing, including not only the risk of
25  losing on the merits, but also the risk of being unable to secure class certification
26  and the risk of non-collection. *See generally Staton*, 327 F.3d at 959; *Molski*, 318

27  _____

28  information for light truck owners that was "already required by the NHTSA . . .
    merely provides plaintiffs with information to which they were already entitled and
    confers no additional value in consideration for the release of plaintiffs' claims").

1   F.3d at 953. As set forth below, on any fair assessment of these factors, the

2   conclusion is inescapable that the value of these cases exceeds the value of the

3   Settlement by orders of magnitude.

4            *1.*     *The risk of failing to secure class certification.* As the Third

5   Circuit has correctly observed, the value of a class action "depends largely on the

6   certification of the class." *In re GMC Pick-Up*, 55 F.3d at 817. This is true both

7   because "the aggregation of the claims enlarge the value of the suit" and because

8   "the combination of the individual cases also pools litigation resources and may

9   facilitate proof on the merits." *Id.*

10          It is beyond dispute that the issue of defendants' liability for having

11   negligently and/or willfully violated the obligation to employ reporting practices

12   reasonably designed to ensure maximum possible accuracy is common to the class.

13   Accordingly, there should be no barrier to obtaining class certification on plaintiffs'

14   injunctive relief claims.

15          Furthermore, an award of statutory damages is not dependent on proof

16   of causation or any actual damage. *See, e.g., Murray v. GMAC Mortgage Corp.*,

17   434 F.3d 948, 953 (7th Cir. 2006); *Bonner v. Home123 Corp.*, 2006 U.S. Dist.

18   LEXIS 54418, at *19 (N.D. Ind. Aug. 4, 2006); *In re Farmers Ins. Co., FCRA*

19   *Litig.*, 2006 U.S. Dist. LEXIS 27290, at *38 (W.D. Okla. Apr. 13, 2006). Inasmuch

20   as "individual proof of injury from each class member" is not required to obtain

21   statutory damages, the issue of damages is no less common a question in these

22   cases than is the issue of liability. *Six (6) Mexican Worker v. Arizona Citrus*

23   *Growers*, 904 F.2d 1301, 1306 (9th Cir. 1990); *see also Bonner*, 2006 U.S. Dist.

24   Lexis, 54418, at *19; *Hernandez v. Midland Credit Mgmt.*, 236 F.R.D. 406, 412

25   (N.D. Ill. 2006); *In re Farmers Ins.*, 2006 U.S. Dist. LEXIS, at *39. Moreover, the

26   courts have consistently ruled that plaintiffs can obtain certification of a statutory

27   damages-only class, thereby obviating the need to make any individual

28   determinations regarding actual damage claims. *See, e.g., Murray*, 934 F.3d at 953

1   ("a representative plaintiff must be allowed to forego claims for compensatory

2   damages in order to achieve class certification"); *Ashby v. Farmers Ins. Co.,* 2004

3   U.S. Dist. LEXIS 21053, at *16-17 (D. Ore., Oct. 18, 2004); *McDonald v.*

4   *Washington Mutual Bank, FA,* 2000 U.S. Dist. LEXIS 11496, at *8 (N.D. Ill. June

5   26, 2000). Accordingly, it should be no less difficult to obtain certification of

6   plaintiffs' statutory damages claims than to obtain certification of their injunctive

7   relief claims.

8        The *Acosta/Pike* plaintiffs nonetheless assert (at 22) that class

9   certification is uncertain here in light of the California Court of Appeal's

10   unpublished decision in *Sorensen v. Household Finance Corp.,* 2006 Cal. App.

11   Unpub. LEXIS 10091 (Nov. 6, 2006). In that case, the plaintiff sought to certify a

12   class of consumers who alleged that Experian, relying on information provided it

13   by a collection agency, had inaccurately recorded the original delinquency dates on

14   certain charged-off debts. The Court of Appeal affirmed the trial court's denial of

15   certification on the ground that the class was not ascertainable because the plaintiff

16   did not dispute that the original delinquency dates were not available and failed to

17   identify any reliable means for identifying those dates, and hence, "for identifying

18   class members at the remedial stage." *Id.* at *30-34.

19        This case is easily distinguishable from *Sorensen.* First, regarding

20   plaintiffs' injunctive relief claim, identification of individual class members at the

21   remedial stage is irrelevant because the relief sought is a systemic revision of

22   defendants' reporting practices. As for plaintiffs' statutory damages claims,

23   *Sorensen* is entirely inapposite, because, as set forth above, Trans Union and

24   Equifax each have access to the information necessary to identify class members at

25   the remedial stage, namely (a) the date of their discharge order, and (b) the date of

26   one or more dischargeable debts on their credit report that is, or was at any time

27   during the liability period, inaccurately recorded as due and owing. *See* Ulzheimer

28   Decl. at ¶ 26. Indeed, if such information was not available to them, the Settlement

1   would be unworkable because they would be unable to determine which subclass

2   members would be eligible for economic relief and in what amounts.[16]

3           2.      *The risk of failing to establish liability for injunctive relief.*  As

4   set forth above, there is an extremely high likelihood that plaintiffs will be able to

5   establish that Trans Union and Equifax have failed to employ reasonable reporting

6   procedures in violation of the FCRA.  The *Acosta/Pike* plaintiffs nonetheless assert

7   (at 22) that the classes "would face a difficult burden of proving liability" because

8   defendants have strong arguments that: (1) the reporting of discharged debts as due

9   and owing is technically accurate; and (2) responsibility for any inaccurate

10  reporting of those debts lies with the creditors.  Neither of these arguments has any

11  merit whatever.

12          The *Acosta/Pike* plaintiffs' concern about a "technical accuracy"

13  argument overlooks this Court's denial of Trans Union's motion to dismiss in the

14  *White/Hernandez* case, as it could not have held that plaintiffs had properly alleged

15  a violation of 15 U.S.C. § 1681e(b)'s maximum possible accuracy standard if the

16  reporting upon which their complaint is based was legally accurate.  *White*, 2006

17  U.S. Dist. LEXIS 80584, at *9-10.  That ruling is plainly correct for two reasons.

18  First, as one of the nation's most pre-eminent experts on bankruptcy law confirms,

19  an assertion that discharged debts remain in "any sense due and owing" is "legally

20  incorrect," Westbrook Decl. at ¶ 4—a proposition that the controlling FTC

21  regulations themselves confirm.  *White*, 2006 U.S. Dist. LEXIS 80584, at *9 (citing

22  16 C.F.R. 600 app. § 607(b)(3)(F)(2) for proposition that a "consumer reporting

23  ─────────────────────────────────

24  [16] Apart from being distinguishable on the facts, *Sorensen* is wrong on the law.
    "An identifiable class exists if its members can be ascertained by reference to
    objective criteria," which the putative class members clearly can.  *Schwartz v.
25  Upper Deck Co.*, 183 F.R.D. 672, 679 (S.D. Cal. 1999).  To the extent it may be
    "administratively burdensome" to determine precisely who those individuals are,
26  that problem is primarily one of manageability, and not ascertainability."  *In re
    Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 337 n.20
27  (S.D.N.Y. 2002); *see also Dunnigan v. Metro Life Ins.*, 214 F.R.D. 125, 135
    (S.D.N.Y. 2003).  And, since all (or almost all) class members can be identified
28  through a computer search of Trans Union and Equifax's databases, the issue of
    manageability is no obstacle here.  Ulzheimer Decl. at ¶ 26.

1    agency . . . must accurately note the status of the debt (*e.g.*, discharged, voluntarily
2    repaid)"); *see also Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 995 (7th Cir.
3    2003) (stating that assertion that a person "owed a debt that no longer existed" by
4    virtue of its having been discharged is "on its face . . . false"). Second, even if the
5    representation that a discharged debt is due and owing is "technically accurate,"
6    that representation is nonetheless "'actionable [under the FCRA] because it is
7    misleading or materially incomplete.'" *Diprinzio v. MBNA America Bank, BANK,*
8    *N.A.*, 2005 U.S. Dist. LEXIS 18002, at *10 (E.D. Pa. Aug. 4, 2005).[17]

9         The argument that the responsibility for any inaccurate reporting lies
10   with the creditors is just as easily disposed of. That argument ignores plaintiffs'
11   theory of the case, namely that it is unreasonable for defendants to rely on creditor
12   information in this context because: (1) such reliance causes "nearly two thirds of
13   the Credit Reports [they] issue[] involving debts discharged through Chapter 7
14   bankruptcy proceedings to contain the same type of error"; and (2) "alternative
15   procedures" are available that could "dramatically enhance the accuracy" of those
16   reports. *White*, 2006 U.S. Dist. LEXIS 80584, at *9. This Court has already ruled
17   that "these allegations . . . make out a cognizable legal theory," *id.*, and, as set forth
18   above, plaintiffs will have little difficulty proving it.

19        The *Acosta/Pike* plaintiffs also argue (at 23) that the value of the
20   injunctive relief provisions in the Settlement is very significant when measured
21   against the risk of establishing liability because such relief is unavailable under the
22

23   [17] *See also Dalton v. Capital Ass'n, Indus.*, 275 F.3d 409, 415 (4th Cir. 2001) ("a
     technical truth . . . can be as misleading as an outright untruth where it paints a
24   misleading picture"); *Sepulvado v. CSC Credit Servs.*, 158 F.3d 890, 895 (5th Cir.
     1998); *Koropoulos v. The Credit Bureau*, 734 F.2d 37, 40 (D.C.Cir. 1984)
25   ("Reports containing factually correct information that nonetheless mislead their
     readers are neither maximally accurate nor fair to the consumer who is the subject
26   of the reports."); *Spellman v. Experian Info. Solutions, Inc.*, 2002 U.S. Dist. LEXIS
     7563, at *2-4 (D. Nev. Jan. 9, 2002); *Andrews v. Trans Union Corp.*, 7 F. Supp.2d
27   1056, 1074 (C.D. Cal. 1998), *aff'd in part and rev'd in part on other grounds*, 225
     F.3d 1063 (9th Cir. 2000), *rev'd on other grounds*, 534 U.S. 19 (2002); *Alexander*
28   *v. Moore & Assocs., Inc.*, 553 F. Supp. 948, 952 (D. Haw. 1982); *Cisneros v. U.D.*
     *Registry, Inc.*, 39 Cal.App.4th 548, 579 (1995).

1   FRCA and/or the CCRAA. To support this proposition, the *Acosta/Pike* plaintiffs

2   cite three cases, all of which hold that injunctive relief is unavailable under the

3   *FRCA* based on the absence of any provision in that statute granting that remedy to

4   private individuals coupled with a provision affirmatively granting the power to

5   pursue injunctive relief to the FTC. *See, e.g., Washington v. CSC Credit Services,*

6   *Inc.*, 199 F.3d 263, 268 (5th Cir. 2000).

7           While the *White/Hernandez* plaintiffs believe these cases are wrongly

8   decided, they do not dispute that their chances of persuading a court that injunctive

9   relief is available under the FCRA are low. But, unlike the FCRA, the CCRRA

10   expressly provides that "[i]njunctive relief shall be available to any consumer

11   aggrieved by a violation or a threatened violation" of that statute. Cal. Civ. Code §

12   1785.31(b). Accordingly, at a minimum, this Court can grant injunctive relief to all

13   California residents.[18] Moreover, as a practical matter, the availability or

14   unavailability of an injunctive remedy under the FCRA is irrelevant. If it is found

15   that defendants' existing reporting procedures are not reasonably designed to ensure

16   maximum possible accuracy, the practical effect will be the same as a nationwide

17   injunction, since their continued employment of those same procedures in the face

18   of such a finding would subject them to certain liability for statutory and punitive

19   damages to millions for willfully violating the FCRA. *See Crawford*, 201 F.3d at

20   882 (rejecting argument that "prospective part of the deal [was] valuable to the

21   class" since, [g]iven the litigation risk," it was "not apt to employ [the challenged

22   practices] again no matter what the settlement provide[d]").

23           3.    *The risk of failing to establish liability for statutory damages.*

24   Assuming that liability is established, the minimum exposure of both Trans Union

25   and Equifax is enormous. As set forth above, the true size of each of the two

26   classes is likely to be several million individuals. Under the FCRA, statutory

27   _____

28   [18] Likewise, this Court can grant injunctive relief to all residents of New York
    under that state's Fair Credit Reporting Act, N.Y. Gen. Bus. L. §§ 380-380t. *White
    v. First American Registry, Inc.*, 378 F. Supp.2d 423, 424-25 (S.D.N.Y. 2005).

1  damages range from a minimum of $100 to a maximum of $1,000 per person for a

2  credit reporting agency's willful failure to comply with its obligations.

3  Accordingly, if liability is found, Trans Union and Equifax's *minimum* exposure is

4  in the several hundred million dollar range.

5  　　　　Revealing a surprising lack of familiarity with the FCRA, the

6  *Acosta/Pike* plaintiffs assert (at 23) that there is a risk that defendants will be able to

7  defeat the classes' statutory damages claims by arguing that class members suffered

8  no actual damages and that, even if they did, those damages were caused by the

9  filing of the bankruptcy, rather than by the inaccurate reporting. As set forth above,

10  that argument overlooks a uniform body of case law, which holds that statutory

11  damages under the FTCA are not dependent on proof of either actual injury or

12  causation.

13  　　　　All plaintiffs need do to prevail on their statutory damages claim is

14  show that defendants' employed reporting procedures that were not reasonably

15  designed to ensure maximum possible accuracy in violation of 15 U.S.C. §

16  1681e(b) and that such violation was willful. As the likelihood of plaintiffs'

17  establishing that defendants' procedures do not meet that standard is uncommonly

18  high, the litigation risk associated with their statutory damages claim will largely be

19  a function of whether plaintiffs are able to establish willfulness. In *Reynolds v.*

20  *Hartford Financial Servs. Group, Inc.*, 435 F.3d 1081, 1099 (9th Cir. 2006), the

21  Ninth Circuit held that the willfulness standard is met by establishing that the

22  defendant "knowingly and intentionally performs an act that violates FCRA, either

23  knowing that the action violates the rights of consumers or in reckless disregard of

24  those rights."[19]

25  _____

26  [19]  Though *Reynolds* is presently before the Supreme Court on a writ of certiorari
from the Ninth Circuit's opinion, *Geico Gen. Ins. Co. v. Edo*, 2006 U.S. Dist.
LEXIS 5421 (Sept. 26, 2006), the chances that the Supreme Court will decide the

27  willfulness issue in a way that will adversely affect plaintiffs' ability to establish
defendants' liability are minimal. First, as the Solicitor General writes in his

28  *amicus* brief, the Ninth Circuit's endorsement of a recklessness standard under the
FCRA is consistent with "decades" of Supreme Court case law, which has

1    Plaintiffs should have little difficulty establishing that both Trans

2    Union and Equifax have long known that their reporting procedures produce a very

3    high error rate. According to John Ulzheimer, the White/Hernandez plaintiffs'

4    credit reporting expert and a former Equifax official, Equifax was aware that the

5    inaccurate reporting of "pre-bankruptcy debts was an extremely frequent and

6    reoccurring problem" when he worked for the company during the 1990s, but that

7    Equifax choose to do deal with that problem by revising their reinvestigation

8    procedures, rather than by making systemic revisions to their initial reporting

9    procedures. Ulzheimer Decl. at ¶ 15. And, if the existence of the problem was

10   obvious to Equifax, it is difficult to imagine how Trans Union could have known

11   nothing of it. Indeed, over the past few years, dozens of consumers have filed

12   lawsuits against Trans Union and Equifax based on their inaccurate reporting of

13   discharged debts (Szwak Decl. at ¶ 43) and thousands, if not tens of thousands, of

14   others (including approximately 800 clients of the Law Offices of Charles Juntikka)

15   have sent Trans Union and Equifax dispute letters complaining about the problem.

16   Juntikka Decl. at ¶ 12; Ulzheimer Decl. at ¶ 14.

17        However, even if plaintiffs are unable to establish that defendants were

18   aware that their procedures were causing the systemic over-reporting of discharged

19   debts as due and owing prior to the filing of the *White* complaint on November 3,

20   2005, that complaint clearly quantified the magnitude of that problem for them.

21   Yet, for the past year, they have done nothing to correct it and, instead, have just

22   continued producing inaccurate credit reports for millions of class members. The

23   existence of a pending lawsuit did not give Trans Union and Equifax a privilege to

24   retain procedures that generate twice as many inaccurate reports than they do

25   "repeatedly held that the term 'willfulness' in civil statutes encompasses not only
     knowing, but also reckless, disregard of the law or the rights of others." Brief of
26   United States as *Amicus Curiae* in *Geico Gen. Ins. Co. v. Edo*, Nos. 06-84 and 06-
     100, at 6 (U.S. Nov. 2006). Second, even if the Supreme Court were to construe
27   willfulness to require a knowing violation of the FCRA, that should have no impact
     on the present litigation since defendants' legal obligation under that statute is self-
28   explanatory: to employ reporting procedures that are reasonably designed to ensure
     maximum possible accuracy.

1   accurate ones if there were any other cost-effective procedures available to them

2   that could have substantially reduced that error rate.

3          On this evidence alone, there is a serious risk—if not a probability—of

4   Trans Union and Equifax being found liable for having knowingly and intentionally

5   employed reporting procedures that were not reasonably designed to ensure

6   maximum possible accuracy in knowing or reckless disregard for the rights of

7   consumers and their own statutory obligations.  Furthermore, having obtained not a

8   single document in the discovery process relating to either defendant's procedures

9   for reporting discharged debts, the frequency with which those procedures produce

10  errors, or their exploration of alternative procedures that might reduce those errors,

11  the *Acosta/Pike* plaintiffs did not at the time they agreed to the Settlement—and do

12  not now—have any evidentiary basis upon which they could rely in discounting

13  that risk.

14         In the absence of such evidence, there is simply no basis for

15  concluding that plaintiffs' chances of prevailing in this litigation are less than 50

16  percent.  *See, e.g., Odon USA Meats*, 1994 U.S. Dist. LEXIS 13723, at *26 (noting

17  that while court might have been "more inclined" to grant preliminary approval if

18  "[p]laintiffs' counsel had completed more extensive discovery prior to

19  compromising his putative clients' claims," it could not find that settlement was

20  "within the acceptable range" in the absence of such discovery).  At any rate, even

21  if those chances were as low as 20 percent, the litigation value of this case would

22  still run well over a hundred million dollars.

23         *4.    The ability of Trans Union and Equifax to withstand a greater

24  judgment.*  The question here is not whether defendants can withstand a greater

25  judgment than the one presently being contemplated.  That it can is not even

26  debatable.  The question is what is the maximum judgment they can afford to pay.

27         While the *Acosta/Pike* plaintiffs neglected to discover any information

28  about this issue, it is apparent that Trans Union and Equifax are both extremely

581445.1                                    - 51 -

*WHITE/HERNANDEZ* PLAINTIFFS' MEM. ISO OPP. TO
*ACOSTA/PIKE* PLAINTIFFS' MOTION FOR ORDER
*Acosta V. Trans Union – Case No. CV 06-05060 DOC (MLG)*

1   profitable companies. Equifax's net income for the first nine months of this year

2   alone was in excess of $211 million on revenues of $1.15 billion.

3   (http://biz.yahoo.com/e/061101/efx10-q.html). While income figures are

4   unavailable from Trans Union, its annual revenues in 2005 were in excess of $1.1

5   billion (www.biz/yahoo.com/99/99791.htm). On the reasonable assumption that

6   Trans Union operates at about the same profit margin as Equifax, its annual net

7   profit is likely to be somewhere in the neighborhood of $200 million. Moreover,

8   the amount of a judgment they could withstand would be greater if, as seems to be

9   the case, they could draw on their insurance coverage to pay a significant portion of

10  these claims. Sobol Decl, Ex. R (email from Lee Sherman to Stephen Newman,

11  dated May 18, 2006). Thus, it is apparent that both Trans Union and Equifax could

12  each withstand a judgment of as high as several hundred million dollars. In the

13  absence of any discovery on this issue, the *Acosta/Pike* plaintiffs again have no

14  basis for disputing this proposition. *Carnegie*, 371 F. Supp.2d at 957 (denying

15  preliminary approval where, among other things, plaintiffs' counsel told court

16  "nothing about what assets the defendants have beyond the insurance proceeds").

17  **C.   The Availability Of Opt Out Rights Does Not Make Up For The Settlement's Woefully Inadequate Economic Relief.**

18          While the proponents of the Settlement may argue that those who are

19  dissatisfied can always opt out and pursue their claims individually, that argument

20  "ignores the realities of pursuing small claims." *In re GMC Pick-Up*, 55 F.3d at

21  809. Under the terms of the Settlement, Trans Union and Equifax will "benefit by

22  receiving release from suit" and the Sherman team will "benefit in the most tangible

23  form—cash." *Polar*, 187 F.R.D. at 119. However, except for the tiny fraction

24  among them who might obtain a $75 cash payment (or $37.50 each from Trans

25  Union and Equifax), class members will receive nothing of "real value" in

26  exchange for which they will be forced to "relinquish[] their rights to maintain a

27  [class] suit." *Id.*

28          But, "[a]s courts have repeatedly recognized, the statutory damages

1   available under the FCRA are 'too slight to support individual suits.'" *White v. E-*
2   *Loan, Inc.*, 2006 U.S. Dist. LEXIS 62654, at *28 (N.D. Cal. Aug. 18, 2006); *see*
3   *also Murray*, 434 F.3d at 953; *Braxton v. Farmer's Ins. Gp.*, 209 F.R.D. 654, 662
4   (N.D. Ala. 2002) ("[T]he cost of investigating and trying these cases individually
5   likely exceeds the value of any statutory and/or punitive damage award that may be
6   due to any particular class claimant."). Accordingly, for the large majority of those
7   class members who are unable to prove that they suffered significant out-of-pocket
8   losses, giving up their rights to pursue class-wide relief means giving up any
9   prospect of relief at all. And for the small minority who do have significant
10  provable losses, the right to opt out is of little comfort if they do not receive notice
11  or do not know of the damaging information that defendants have published about
12  them at the time they do. The right to opt out, therefore, is hardly one that can
13  compensate for the numerous deficiencies in the Settlement.[20] And, "[a]t all events,
14  the right of parties to opt out does not relieve the court of its duty to safeguard the
15  interests of the class and to withhold approval from any settlement that creates
16  conflicts among the class." *In re GMC Pick-Up*, 55 F.3d at 809. This is especially
17  so in the present case, given that a large majority of class members are unlikely to
18  have the information they need to make an informed decision as to whether opting
19  out is in their interests—that is, most class members are unaware of the fact that
20  their discharged debts are being inaccurately recorded as due and owing on their
21  credit reports. Juntikka Decl. at ¶ 13.

22
23

24  [20] *See, e.g., Crawford*, 201 F.3d at 880 (disapproving class settlement under which
    class members in exchange for "receiv[ing] no relief for harms that may already
25  have been done," no "concession of liability that would facilitate individual suits"
    and an injunction that did nothing more than restrain Equifax from reinstating the
26  challenged practice, gave up "the possibility of any collective proceeding for
    damages," which in light of the "small-stakes" involved was "the best, and perhaps
27  the only, way to proceed"); *In re GMC Pick-Up*, 55 F.3d at 809 (holding that right
    to opt out did not save settlement that effectively denied economic relief to large
28  segments of the class, where "[i]t would cost considerably more to litigate
    individual claims than the litigant could recover"); Miller Decl. at ¶ 30.

## IV.   THE PROVISION FOR A FEE AWARD THAT IS OUT OF ALL PROPORTION TO THE VALUE OF THE SETTLEMENT ALSO PLACES IT OUTSIDE THE RANGE OF POSSIBLE APPROVAL

As part of its responsibility to determine whether a settlement is "fundamentally fair, adequate, and reasonable" under Fed. R. Civ. P. 23(e) and so as to ensure that the class members' interests were not compromised in favor of those of class counsel, "a district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." *Staton*, 327 F.3d at 965. In this case, even a cursory assessment of the fee provisions of the Settlement castes grave doubt on its adequacy.

In this Circuit, counsel for plaintiffs in a class action have two choices when seeking to have their fees paid in a case in which statutory fees are available such as this one. "First, the parties may negotiate and settle the amount of statutory fees along with the merits of the case, as permitted by *Evans* [*v. Jeff D.*, 475 U.S. 717 (1986)]." *Staton*, 327 F.3d at 972. Under the lodestar method employed in *Evans*, such statutory fees are calculated by multiplying "the number of hours reasonably expended by a reasonable hourly rate" and modified by "enhancements" as appropriate. *Hanlon*, 150 F.3d at 1029. "Alternatively, the parties may negotiate and agree to the value of a common fund . . . and provide that, subsequently, class counsel will apply to the court for an award from the fund, using common fund fee principles." *Staton*, 327 F.3d at 972.

In this case, the Sherman team (perhaps recognizing that the class would be getting nothing of any real value) opted to take the former route. They negotiated for a "clear sailing" agreement under which defendants agreed not to contest their application for a fee award of $5,485,000 ($3,485,000 and $2,000,000 for the *Acosta* and *Pike* cases, respectively). *See, e.g., Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 520 n. 1 (1st Cir. 1991). Having reached agreement on a fixed fee amount prior to obtaining approval of their Settlement, the Sherman team has eschewed common fund fees and, thus, must justify their fees

1   under the lodestar method. *Staton*, 327 F.3d at 972.[21] At the same time, by

2   stripping defendants of their right to challenge any such justification, the Sherman

3   team has deprived this Court "of the certainty of having the propriety of the fee

4   request tested in the adversary process." *Malchman v. Davis*, 761 F.2d 893, 907

5   (2d Cir. 1985) (Newman, J., concurring); *see also Weinberger*, 925 F.2d at 525.

6   This Court, however, should not need the benefit of the adversary

7   process to determine that the fee award the Sherman team has obtained for

8   themselves bears no relationship to the work they have done. That is patently

9   obvious. The *Pike* case has lay dormant since it was originally filed in October

10  2005; neither side has taken any discovery nor filed any dispositive motions. It

11  would be surprising if the Sherman team incurred $200,000 worth of even enhanced

12  billable time working on the case—much less $2,000,000. Likewise, given how

13  little discovery was taken in *Acosta*, it is exceedingly doubtful that the Sherman

14  team could justify a $3,485,000 fee award in that case based on the number of hours

15  reasonably expended.

16  To be sure, this Court does have the discretion to reduce the Sherman

17  team's fee award. But that would not solve the problem because the damage has

18  already been done. As the Ninth Circuit noted in *Staton*, "[a]bsent some unusual

19  explanation, a defendant would not agree in a class action settlement to pay out of

20  its own pocket fees measurably higher than it could conceivably have to pay were

21  the fee amount litigated, unless there was some non-fee benefit the defendant

22  received thereby." 327 F.3d at 966. Nor is it credible here that defendants

23  "gratuitously accede[d]" to the Sherman team's request that they consent to paying

24  that team nearly a $5.5 million fee award without having "obtain[ed] something in

25

26  [21] *See also BTZ, Inc. v. Great Northern Nekoosa Corp.*, 47 F.3d 463, 466 (1st Cir.

27  1995) (holding that plaintiffs' counsel "'abjured a claim for fees under the common benefit doctrine'" both by negotiating the 'clear sailing' agreement, which

28  neutralized [defendant's] capacity to challenge a fee award, and by relying on the 'clear sailing' agreement as the basis for its alleged fee entitlement"); *Weinberger*, 925 F.2d at 524 (same).

1  return." *Malchman*, 761 F.2d at 907 (Newman, J., concurring).[22]  Rather, in

2  exchange for giving the Sherman team such "red-carpet treatment on fees,"

3  *Weinberger*, 925 F.2d at 524, defendants were able to obtain enormously beneficial

4  concessions that: (1) require them to pay nothing to 70% of the class and next to

5  nothing to everyone; and (2) give them an unrestrained license to continue to

6  employ reporting procedures that would produce inaccurate credit reports for 95%

7  of the classes.  Such a transparently fee-driven settlement falls far outside the range

8  of possible approval.[23]

9  **V.  THE SETTLEMENT IS THE PRODUCT OF A HIGHLY SUSPECT**

10  **NEGOTIATING PROCESS IN WHICH THE SHERMAN TEAM'S**
    **FINANCIAL INTERESTS WERE THE PARAMOUNT CONCERN**

11        The extraordinarily one-sided terms in the Settlement did not come

12  about by accident.  Rather, they were the product of a classic "reverse auction" in

13  which the Sherman team subordinated the interests of the putative classes to their

14  own financial interests.

15        Inherent in any situation in which competing sets of counsel are vying

16

17  [22] *See also Weinberger*, 925 F.2d at 525 ("the very existence of a clear sailing
    provision increases the likelihood that class counsel will have bargained away

18  something of value to the class"); *Lobatz v. U.S. West Cellular*, 222 F.3d 1142,
    1148 (9th Cir. 2000) (warning that a clear sailing "agreement has the potential of

19  enabling a defendant to pay class counsel excessive fees and costs in exchange for
    counsel accepting an unfair settlement on behalf of the class.");

20  [23] *See, e.g., Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) (disapproving
    settlement which compensated named plaintiff for his injury, paid class counsel for

21  their time, required defendant to do little more than "meets its legal obligations,"
    and cut off absent class members "at the knees" by releasing almost all of the[ir]

22  claims with little or no compensation"); *Crawford*, 201 F.3d at 880-81 (same); *In re
    GMC Pick-Up*, 55 F.3d at 810 ("GM's apparent willingness to pay plaintiffs'

23  counsel close to $9.5 million [as part of a settlement that "offered no cash outlay to
    the class"] indicates that the party in perhaps the best position to evaluate the claim

24  may have thought the action . . . posed a significant enough threat to cause GM to
    strike a lucrative deal with plaintiffs' counsel."); *In re Elec. Data Sys. Corp.*

25  *"ERISA" Litig.*, 2005 U.S. Dist. LEXIS 17457, at *22-23 (E.D. Tex. June 30, 2005)
    (finding that "issuing a [class] notice and holding a final fairness hearing would be

26  an expensive and unjustifiable effort" and, hence, rejecting preliminary approval of
    settlement that might be "good . . . for Plaintiffs' counsel in that they would recoup

27  100% of their $5.0 million in attorneys' fees and expenses, and . . . a good
    settlement for [defendant] in that for a relatively nominal sum it would remove

28  whatever risk it has, but [was] not a fair settlement for the Plaintiff class who would
    only be receiving a few pennies on the dollar").

1  to represent the same putative class is the "danger of defendant 'attorney

2  shopping.'" *In re General Motors Corp. Engine Interchange Litig.* *["In re GMC*

3  *Engine"]*, 594 F.2d 1106, 1125 (7th Cir. 1979). Until such time as a court is able to

4  exercise its supervisory authority to appoint as lead counsel those who it believes

5  are best able to represent that class, a defendant can exploit the opportunity to

6  survey the field and "pick[] the most ineffectual class lawyers to negotiate a

7  settlement with in the hope that the district court will approve a weak settlement

8  that will preclude other claims." *Reynolds*, 288 F.3d at 282; *see also* Miller Decl. at

9  ¶ 20. As those lawyers would have little chance of persuading the court to select

10  them as class counsel in a competitive process, they will necessarily be negotiating

11  "from a position of weakness" and may be unable to resist the temptation to cut a

12  secret "deal with the defendants" in which they undersell[] the plaintiffs' claims

13  relative to other attorneys." *In re GMC Pick-Up*, 55 F.3d at 788; *see also* Miller

14  Decl. at ¶ 19. The conflicts inherent in this dubious practice, known as a "reverse

15  auction," warrant heightened "judicial scrutiny of unauthorized settlement

16  negotiations." *In re GMC Engine*, 594 F.2d at 1125.

17         In this case, even the most cursory scrutiny of those negotiations

18  would confirm that defense counsel succeeded in engineering a reverse auction to

19  perfection. Hazard Decl. at ¶¶ 2 & 6; Miller Decl. at ¶¶ 2, 18 & 32. For nearly two

20  and one half years prior to the filing of the *White/Hernandez* cases in the fall of

21  2005, the *Acosta* case against Trans Union had gone nowhere and was of such little

22  concern to Trans Union that it discarded plaintiffs' counsel's offers to settle it for as

23  little as $75,000. Sobol Decl., Ex. D (August 18, 2003, transcription of a voicemail

24  from Peter Recchia). When confronted with the threat of the *White/Hernandez*

25  cases, however, Trans Union changed its tune. In January 2006, their counsel in

26  *White/Hernandez* (who had previously had no role in *Acosta*) approached Mr.

27  Sherman indicating their desire to settle the matter, but only if it was broadened to

28  include "all claims . . . asserted in [*White/Hernandez*]." Sobol Decl., Ex. E

1  (Declaration of Lee Sherman at ¶ 16).  Seizing on this offer to turn their state-wide

2  class action into a nation-wide one and anxious to entice Trans Union into

3  concluding a deal, Mr. Sherman wrote back, making what he characterized as a

4  "[c]ritically" important offer "to allow the settlement to proceed on a claims made

5  basis," which would "likely allow Trans Union to resolve this matter for *a small*

6  *fraction* of its total exposure." Sobol Decl., Ex. I (emphasis added).

7          Several months later, in May 2006, the Sherman team and Trans

8  Union's counsel commenced their clandestine mediation concerning the terms of

9  the Settlement—leaving the *White/Hernandez* plaintiffs and this Court unaware of

10  their efforts until August 14, 2006, when Trans Union's counsel announced at a

11  *White/Hernandez* status conference that there had been "settlement" and plaintiffs'

12  class-wide claims were now moot. Sobol Decl., Ex. S (transcript of

13  *White/Hernandez* proceedings at p. 19).[24]  At the mediation that took place one

14  month later, Equifax, whose counsel had also been conducting secret negotiations

15  with the Sherman team, decided to join that settlement—again only upon the

16  Sherman team's consent to turn their California-only class into a nationwide one.

17  *Id.*, Ex. L.  As two of the nation's leading experts on class settlements and legal

18  ethics, respectively, confirm, these circumstances "present the classic conditions

19  for" (Miller Decl. at ¶19), and indeed "exemplify[,] a 'reverse auction.'"  Hazard

20  Decl. at ¶ 6.  In his declaration (at ¶ 21), Prof. Miller explains his cogent rationale

21  for this conclusion as follows:

22              Overall, th[e] course of dealing [between Trans Union

23              and the Sherman/Recchia team] raises concerns: it

24              suggests that Trans Union did not take the California-only

25

26  _____

27  [24]  Keeping the *White/Hernandez* plaintiffs in the dark and as far from the
mediation process as possible was a vital part of both sides approach to that

28  process—with counsel for Trans Union going so far as to execute a joint pre-trial
Statement in the *White* case representing that mediation with the *White* plaintiffs
would be "premature." Rule 26(f) Joint Report, dated April 3, 2006, at ¶ 10.

1   action seriously until the nationwide action was filed by
2   the Lieff/Caddell team; that Trans Unions' change of
3   attitude towards the California-only action occurred as a
4   response to the Lieff/Caddell filing, and that when the
5   Sherman/Recchia team responded to Trans Union's
6   invitation to submit a settlement proposal, they
7   volunteered a framework designed to create the
8   appearance but not the reality of generous relief for the
9   class. These facts indicate that the Sherman/Recchia team
10  may have been negotiating for their fees and little else –
11  an inference that is further supported by the
12  Sherman/Recchia team's later negotiations with Equifax,
13  in which they explicitly tied a significant enhancement to
14  their fee to the proposed merits settlement.

15       Even in the absence of the kind of reverse auctioneering that took
16  place here, the courts have approached pre-certification settlements with
17  considerable caution—primarily because they are generally reached before the
18  discovery required to make an informed judgment about their fairness and adequacy
19  has occurred. *In re GMC Pick-Up*, 55 F.3d at 788; *see also In re GMC Engine*, 594
20  F.2d at 1125; *Polar*, 187 F.R.D. at 113; Manual for Complex Litigation 2d § 30.45
21  (3d Ed. 1995); Miller Decl. at ¶¶ 22-23. These cases fall squarely within that
22  category.

23       Not surprisingly, the Sherman team contends otherwise. They say (at
24  26-27) they have "conducted extensive meaningful discovery" and have "carried
25  out extensive arms-length negotiations," but, as one federal district court remarked
26  when confronted with identical claims of counsel seeking preliminary approval of
27  their settlement, "these are simply conclusions. We have been given no
28  information (except conclusory statements) about the extent of discovery, what it

1   has disclosed as to the likelihood of recovery, or what defenses there might be."

2   *Carnegie*, 371 F. Supp.2d at 957.

3           The facts concerning the true extent of discovery are very different

4   than the Sherman team represents.  In *Pike*, the Sherman team settled with Equifax

5   without the benefit of any discovery whatever.[25]  As to *Acosta*, while some

6   discovery did take place, that discovery was woefully deficient.  Szwak Decl. at

7   ¶¶ 29-38.  Having *missed* the deadline to file a motion to compel, the Sherman team

8   did not obtain a *single document* relating to Trans Union's procedures or practices

9   regarding their reporting of pre-bankruptcy debts or of any other credit-related

10  information.  *Id.* at ¶ 41.[26]  Furthermore, the Sherman team took a grand total of just

11  two depositions of Trans Union officials, neither of whom have significant

12  knowledge of Trans Union's procedures, practices, capabilities and systems relating

13  to the reporting of credit information, in general, and bankruptcy related

14  information, in particular, and from whom no meaningful such information was

15  obtained.  *Id.* at ¶ 33.[27]  And while the Sherman teams touts the 26 declarations that

16  they proffered in support of their class certification motion, only one of those was

17  from anyone with any personal knowledge of Trans Union's reporting practices (all

18  [25]  The Sherman team contends (at 10) that discovery that had been conducted by
19  Peter Recchia in related individual cases against Equifax resulted in his amassing a
    "discovery bank of information," which gave them all of the information they
20  needed to assess the wisdom of the Settlement in the *Pike* case.  In reality, that
    discovery banks consists of such items as the trial transcript of a mixed file/identity
21  theft case, copies of various complaints from FCRA cases, uninformative
    interrogatory responses, certain plaintiff-specific documents relating to a parallel
22  case brought by plaintiff Pike's husband and various documents from the *Acosta*
    case.  None of these documents pertain to the reporting procedures that are at issue
23  in this case and only one of them—a basic manual for handling consumer disputes
    that was so heavily redacted as to render it essentially useless—pertains to
24  plaintiffs' reinvestigation claims.  Swack Decl. at ¶ 42.
    [26]  *All* of the documents Trans Union produced pertained only to plaintiff Acosta
25  himself and, hence, the Sherman team was never able to review even the "most
    basic credit reporting manuals" or even the "less sophisticated training manuals"
26  that Trans Union routinely produces in credit reporting litigation.  Szwak Decl. at
    ¶¶ 30-31.
27  [27]  The two officials, Diane Terry and Steve Reger, are both "professional
    witnesses" for Trans Union, who have provided testimony for Trans Union on
28  "countless occasions" and whose responsibilities (when they are not testifying) are
    largely limited to fraud and identity.  Szwak Decl. at ¶ 33.

1   of the others being from plaintiffs' counsel and their clients) and that declaration

2   concerned only its reinvestigation practices.  To make matters worse, the Sherman

3   team did not bother to consult an expert who might have been able to fill some of

4   the enormous gaps in their knowledge and been able to opine on the propriety of

5   what they were negotiating until after an agreement had been reached.[28]  In short,

6   the Sherman team's self-serving characterization of its discovery as "extensive"

7   notwithstanding, they never acquired any of the information essential to enable

8   them to make a meaningful evaluation of the merits of the class members' claims or

9   the benefits of the Settlement they were purporting to negotiate on their behalf.  *See*

10  Szwak Decl. at ¶ 29; Hazard Decl. at ¶ 9.[29]

11          In a case such as this one in which "[t]he integrity of the negotiating

12  process" has been corrupted by a tainted arrangement between putative class

13  counsel and the defendants, it is impossible to "tell whether a compromise found to

14  be "fair" might not have been "fairer" had the negotiating (attorney) possessed

15  better information or been animated by undivided loyalty to the cause of the class."

16  *In re GMC Engine*, 594 F.2d at 1125 n.24; *see also Reynolds v. Beneficial Nat'l*

17  [28] For instance, the Sherman team did not contact Mr. Hendricks to discuss
18  retaining him to opine on the *Acosta* settlement until August 15, 2006, Sobol Decl.,
    Ex. T, and only contacted Prof. Mann for the first time on September 6, 2006. *Id.*,
19  Ex. M.
    [29] An excellent illustration of this is the emphasis the Sherman team places on the
20  benefits provided by the Settlement's reinvestigation procedures. In their
    memorandum in support of preliminary approval, the Sherman team describes those
21  procedures (at 14-15), underscoring in bold Trans Union and Equifax's agreement
    to correct erroneous pre-bankruptcy trade-lines "*without requiring the consumer to*
22  *provide any documentation and without first seeking verification from the*
    *creditor furnisher*." The Sherman teams says (at 15) that as a result, "consumers
23  will no longer be at the mercy of creditors and will now be able to instantly update
    post-bankruptcy [sic] tradelines that were discharged." If the Sherman team had
24  conducted any meaningful discovery, they would have learned that what they
    describe as a major change in Trans Union and Equifax's reporting procedures
25  actually is nothing more than *a restatement of their existing procedures*—the
    problem with which is that they are seriously under-resourced. Szwak Decl. at ¶¶
26  22-24; Ulzheimer Decl. at ¶ 15; *see also* Sobol Decl., Ex. Q (Trans Union's
    Consumer Relations Center Dispute Training Guide, Revised Feb., 24, 1999.)
27  Likewise, had the Sherman team consulted an expert witness, they would have
    learned that, at most, only a minute fraction of subclass members would qualify for
28  any cash awards about the $75 minimum and only about 10 percent would be able
    to qualify even for that. Ulzheimer Decl. at ¶ 22.

*WHITE/HERNANDEZ PLAINTIFFS' MEM.  ISO OPP. TO*
*ACOSTA/PIKE PLAINTIFFS' MOTION FOR ORDER*
*Acosta V. Trans Union – Case No. CV 06-05060 DOC (MLG)*

1   *Bank*, 260 F. Supp. 2d 680 at 695 (N.D. Ill. 2003) (observing that "[w]ithout

2   adequate representation by plaintiffs' counsel, it is impossible to evaluate the

3   chances of plaintiffs obtaining a greater recovery than under [the proposed]

4   settlement"); Miller Decl. at ¶¶ 17, 23 & 32.  What is clear, however, is that a court

5   should never approve a settlement when the parties have not "engaged in sufficient

6   investigation of the facts to enable [it] to 'intelligently make . . . an appraisal' of

7   th[at] settlement." *Polar*, 187 F.R.D. at 814; *see also In re GMC Pick-Up*, 55 F.3d

8   at 814 (noting that there was insufficient information upon which to evaluate

9   settlement where the parties had failed to retain their own experts or depose a

10  significant number of witnesses); *Plummer*, 668 F.2d at 660; *Carnegie*, 371 F.

11  Supp.2d at 957; Manual for Complex Litigation 2d § 30.45.

12          Accordingly, the absence of a *bona fide* arms-length negotiation

13  between the Sherman team and defendants' counsel provides this Court with a basis

14  to reject this Settlement independent of any substantive inquiry into adequacy.  As

15  the Seventh Circuit has aptly noted, a court can reject a settlement that is

16  inadequate; it cannot undertake the partisan task of bargaining for better terms."

17  *Reynolds*, 260 F. Supp. 2d at 695.

18  **VI.   THE ACOSTA/PIKE PLAINTIFFS CANNOT SATISFY THE**
        **THRESHOLD REQUIREMENTS FOR CLASS CERTIFICATION**

19

20      **A.    The Conduct Of The Sherman Team Shows That They Are**
               **Incapable Of Adequately Representing The Interests Of The**
               **Putative Classes.**

21          By their conduct, the Sherman team has disqualified themselves from

22  representing the class on at least *seven* separate grounds: (1) at a time when they

23  knew the Lieff/Caddell team was vying to represent the classes, they succumbed to

24  defendants' offer to engage them in a "reverse auction" that they kept secret from

25  the Lieff/Caddell team and this Court until it had become a *fait accompli*; (2) they

26  concluded a settlement without having obtained sufficient information through

27  discovery or otherwise to determine whether it was in the best interest of the classes

28  whose interests they are bound to protect; (3) they negotiated for their fees before

they reached agreement on the terms of class-wide relief; (4) they ended up agreeing to terms that subordinated the interests of the classes to their desire to maximize their fees; (5) they included a provision in the Settlement that would have them abandon the claims of all non-California class members in the event it were not approved; (6) they had Trans Union and Equifax pay their own experts and have otherwise shown that they do not have the financial will or wherewithal to bear the costs of this litigation; and (7) they lack sufficient experience and, in the case of one member, may lack the integrity, to fulfill the demanding responsibilities of class counsel in these cases. Taken individually, each of these grounds provides either serious reason to question the Sherman team's ability to adequately represent the classes or sufficient reason to conclude that they cannot. Taken together, they establish an overwhelming mandate for their immediate disqualification.

1. *Acquiescence to a secret "reverse auction."* One of the most important ways in which a district court discharges its role as fiduciary of the absent class is though the approval of class counsel. *In re GMC Pick-Up*, 55 F.3d at 784. Inasmuch as pre-certification negotiations enable plaintiffs' counsel to assume the role of class counsel before the court has had an opportunity to discharge that responsibility, they can "raise questions about . . . the ability of plaintiffs' counsel to represent the interests of the entire class." *Polar*, 187 F.R.D. at 113. Where no other attorneys are vying to represent the class such questions can generally be addressed to a court's satisfaction. However, where, as here, one group of attorneys, purporting to act on behalf of a class, engages in secret and "unauthorized settlement negotiations" with defendants' counsel, the problem becomes much more serious. *In re Cal. Micro Devices Secs. Litig.*, 1995 U.S. Dist. LEXIS 11587, at *16 (N.D. Cal. Aug. 8, 2005). Plaintiffs' counsel who engage in such conduct frustrate the court's ability to select the legal team that is best able to represent the interests of the class and "to ensure that class counsel's terms of engagement are set competitively." *Id.* That is what happened in *Reynolds* and is

- 63 -

what led the district court on remand to rule that the bidders in the "reverse auction" in that case could not adequately represent the class. *Reynolds*, 260 F. Supp. 2d at 694-95. It is also precisely what the Sherman team has done here, as reflected most graphically in the Sherman team's opening bid to settle the *Acosta* matter for what would likely be just "a small fraction of [Trans Union's] total exposure." The Sherman team has, therefore, "proven themselves unfit for the task of class representation and should . . . be disqualified from acting as class counsel." *Reynolds*, 260 F. Supp. 2d at 694-95. Professor Hazard concurs with this conclusion and expresses his opinion that "the deficiencies in the process and proposal warrant the conclusion that [the *Acosta/Pike*] counsel proposing the Settlement have effectively abandoned the class and are inadequate to represent them." Hazard Decl. ¶ 3.

        *2. Conclusion of Settlement without sufficient information.* Putative class counsel who reach a settlement agreement without having obtained or even attempted to obtain "the discovery necessary to provides a serious analysis of the chances of recovery" are *ipso facto* "unqualified to act as representatives of the class." *Reynolds*, 260 F. Supp.2d at 694-95. As set forth above, that again is what happened here.

        Having failed to obtain virtually any meaningful discovery or to engage any expert to assist them, the Sherman team was unable to quantify the frequency of the erroneous reporting upon which their claims were based, had little or no information relating to either defendant's knowledge of those errors, was unable to determine how easy or difficult it would be for them to solve the problem, could not make any intelligent appraisal of the extent to which the injunctive relief provisions would or would not fix it, and had no way of calculating how much (or how little) Trans and Equifax would be required to pay class members under the Vantage-based matrix that would determine how much compensation they would

1  be eligible to receive.[30]  This utter abdication of the Sherman team's responsibility

2  to the classes they purport to represent is still another reason sufficient in and of

3  itself to disqualify them from serving as class counsel. Hazard Decl. at ¶ 9.

4      *3.  Simultaneous negotiation of fees and class relief.*  As its opening

5  demand for settlement in the *Pike* case, the Sherman team asked for a $2.5 million

6  fee award. Sobol Decl., Ex. L.  Such simultaneous negotiation of attorneys fees and

7  class relief generally "raise[s] a red flag" for purposes of determining whether the

8  interests of the class are putative class counsel's paramount concern. *In re GMC*

9  *Pick-Up*, 55 F.3d at 805; *see also* Miller Decl. at ¶ 25.

10     This is not to say that the contemporaneous negotiation of fees and

11  class relief is not appropriate in some circumstances. The Supreme Court's

12  decision in *Evans* established that it is. 475 U.S. at 734-35. But, where, as here,

13  the fees sought are not based on hours billed and where those fees account only for

14  a small proportion of the defendant's overall exposure, such simultaneous

15  negotiation is impermissible because the potential it creates for conflicts of interest

16

17  [30]  In this regard, the Sherman team's belated engagement of Prof. Mann to offer an
18  opinion blessing the Settlement (in an unsworn, fatally defective affidavit) filled no
     gaps. Prof Mann's views on the substantive fairness of that settlement are
19  conclusory, uninformed and deserving of no weight. Indeed, his exemplary
     credentials in his field notwithstanding Prof. Mann is unqualified to render the
20  opinion he did.  As he acknowledged in his deposition (Sobol Decl., Ex. P.), he has
     never litigated an FCRA case (pp. 158-59), has no background in credit reporting
21  (pp. 77-78, 139), has no knowledge of credit scoring (p. 41), has only seen two
     credit reports in his lifetime, including his own, (p. 138-39), has never taught class
22  action procedure (p. 11) or bankruptcy law (p. 14) and has admittedly limited class
     action experience (pp. 112 & 244).  He referenced no standard in evaluating the
23  adequacy of the settlement, other than "would the world be a better place?" (pp.
     234-35).  Accordingly, he never attempted to calculate the value of the settlement
24  (p. 179) or the litigation value of the case (pp. 246-47) and his opinion that success
     would be "neither easy nor reliable" was based on nothing more than his review of
25  defendants' answers (p. 52).  Lacking any knowledge of credit scoring, he could not
     estimate what proportion of the class would qualify for cash relief (pp. 214, 219 &
26  248).  Likewise, while he touted the Settlement's revised reporting procedures, he
     could not even begin to approximate the proportion of inaccurate pre-bankruptcy
27  entries those procedures would correct and admitted that "large numbers" would go
     uncorrected (p. 225-26). Demonstrating his lack of knowledge in the field, Prof.
28  Mann also said that, other than from what he was told by Mr. Sherman, he had no
     basis for concluding that the revised reinvestigation procedures were truly "revised"
     (p. 78).

1   is too great. *Staton*, 327 F.3d at 972; *see also Evans*, 475 U.S. at 734-35.

2   Accordingly, the Sherman team's insistence on a $2.5 million fee award at the

3   outset of the negotiations with Equifax was improper and should, at the very least,

4   heighten "concern about the adequacy of representation." *In re GMC Pick-Up*, 55

5   F.3d at 804; *see also* Miller Decl. at ¶ 25.

6       *4. Sacrificing of class members' interests for "red carpet" treatment*

7   *on attorneys' fees.* In the final analysis, the best evidence that the Sherman team is

8   unsuitable to represent these classes is their negotiation of a deal that sells them

9   down the river at the same time that it pays the Sherman team a handsome fee

10  award. Hazard Decl. at ¶¶ 12-13. That such a lopsided deal establishes their

11  inadequacy is apparent from the Ninth Circuit's decision in *Molski*, a case in which

12  the fee award of just $50,000 presented no concern at all. In that case, the Ninth

13  Circuit held that the district court "abused its discretion in finding that" plaintiffs'

14  counsel "fairly and adequately protect[ed] the interests of the class" based on their

15  having hastily constructed a settlement that "waived practically all of the class

16  members' claims without compensation and allowed the defendants to escape with

17  little penalty." If disqualification was warranted there, so too must that be true here

18  given that that the Sherman team negotiated an even worse settlement for the

19  classes whose interests they traded off to maximize their fees. *See, e.g., Munoz v.*

20  *Arizona State Univ.*, 80 F.R.D. 670, 672 (D. Ariz. 1978) (condemning as "an abuse

21  of the class action procedure" the practice whereby plaintiffs' counsel negotiate

22  back-pay for their clients and fees for themselves, but seek "only injunctive relief

23  for unnamed class members"); *see also* Miller Decl. at ¶ 21; Hazard Decl. at ¶¶ 12-

24  15.

25      *5. Intention to abandon the claims of non-California class members.*

26  By its terms, the Settlement provides that if it's not approved, the parties will return

27  to the "*status quo ante*" prior to August 1, 2006, meaning that the Sherman team

28  will abandon the *Acosta* federal action and, instead, proceed against Trans Union in

1    state court on behalf of a California-only class under only state law claims. In the
2    *Pike* action, they will likewise return to their respective positions prior to
3    September 13, 2006, when the Sherman team was pursuing claims limited to a
4    California-only class. In other words, the Sherman team seeks to represent non-
5    California class members for purposes of cashing in on a quick settlement and
6    would leave them withering in the wind if that settlement is defeated. In professing
7    their unwillingness to litigate the claims of these class members on the merits, the
8    Sherman team has essentially announced that they will not "vigorously conduct"
9    this litigation on their behalf, *Andrews v. Bechtel Power Corp*, 780 F.2d 124, 130
10   (1st Cir 1985), and, hence, should be disqualified from representing all non-
11   California class members on that basis. *See* Miller Decl. at ¶ 29.

12         *6. Lack of financial will or wherewithal to pay costs.* In evaluating
13   the qualifications of potential counsel for the class, the court should consider the
14   resources counsel is able and willing to commit to the action. *See, e.g., Sweet v.*
15   *Pfizer*, 232 F.R.D. 360, 366 (C.D. Cal. 2005); *Westways World Travel, Inc. v. AMR*
16   *Corp.*, 218 F.R.D. 223, 236 (C.D. Cal. 2003). The Sherman team has repeatedly
17   refused to pay the costs necessary to diligently prosecute this case.

18         At no time prior to reaching agreement on the Settlement in August
19   2006 did the Sherman team ever retain an expert witness to assist them in
20   connection with that settlement—a failure, which, as set forth above, left them
21   unable to effectively scrutinize its key terms. Indeed, to that point, the only expert
22   opinion the Sherman team had paid for during the entire course of the *Acosta/Pike*
23   litigation consisted of a 2-hour engagement with Evan Hendricks that cost all of
24   $500 and that they did not pay until 6 months later. Sobol Decl., Ex. R. Likewise,
25   instead of splitting the cost of mediation, the Sherman team agreed to let Trans
26   Union pay the entire cost.[31]

27
28   ───────────────────────────────
     [31] The Sherman team's refusal to make any significant outlays in these matter may
     be partially explained by the fact that two of that team's three attorneys who are
     seeking to serve as co-lead class counsel—Messrs. Recchia and Pietro—have

1          Unable or unwilling to make any significant expenditures themselves,

2  the Sherman team negotiated for an unusual provision in the MOU, which required

3  Trans Union to pay up to $40,000 of the *Acosta* plaintiffs' expert fees. Sobol Decl.,

4  Ex. N at ¶ 9A; *see* Miller Decl. at ¶ 29. It was only when that commitment was

5  firmly in hand—and when all that was needed was for someone to rubber-stamp

6  what they had already done—that the Sherman team began to search for experts in

7  earnest. The Sherman team's inability or unwillingness to devote financial

8  resources to these matters casts serious doubt on their ability adequately to defend

9  the interests of the putative classes. *See* Miller Decl. at ¶ 29.

10         *7. Lack of experience and questionable integrity.* The Sherman team

11  seeks appointment of Messrs. Lee Sherman, Gino Pietro and Peter Recchia as

12  interim lead class counsel. There are serious grounds for questioning whether the

13  team has the requisite experience and, in Mr. Recchia's case, the ethical integrity, to

14  serve in that role.

15         Of these three, only Mr. Sherman has any significant class action

16  experience and, contrary to his sworn statement, not even he has any experience

17  litigating "similar class actions." Motion at 27. Instead, virtually all of Mr.

18  Sherman's class action experience concerns employment matters (principally wage

19  and hour claims) involving classes of between 50 and 1300 employees. Sherman

20  Decl. at ¶ 6. Sherman has made no attempt to show how his experience with these

21  class actions or any others is "similar" to representing a nationwide class consisting

22  of millions of individuals under federal consumer protection laws.

23         As for Mr. Recchia, a PACER search reveals that, apart from the

24  instant cases, his class action experience appears to be limited to three cases in this

25  District, all of which he originally filed in California Superior Court, none of which

26

27  previously filed for bankruptcy under Chapter 7. Niño Decl., ¶ 3. Mr. Pietro received his discharge order just one year ago on December 29, 2005 and Mr.

28  Recchia, who has actually filed twice, received his most recent discharge order on April 12, 1999—making them both members of the classes they seek to represent. *Id.*

were ever certified and all of which were ultimately dismissed. Niño Decl., ¶ 4.[32]
Yet, despite his lack of experience, the Sherman team settled the *Pike* matter based
on no information other than that which Mr. Recchia managed to discover from
Equifax in a couple of individual cases he had filed against it. Motion at 10-11; *see
also* Recchia Decl. ¶ 9. Finally, as to Mr. Pietro, the Sherman team does not even
attempt to argue that he is qualified to serve as co-lead counsel for the class in their
motion nor even to disclose that they are seeking to have this Court execute a
proposed order that would assign him that role. That is understandable. A PACER
search shows that Mr. Pietro has only ever had involvement in a single class action
case, *Coltrain, et al. v. Commonwealth Energy, et al.,* No 03-CV-08560, which he
withdrew from less than one year after it was brought and before any certification
motion had been filed. Niño Decl., ¶ 5.

As a result of the Sherman team's lack of experience and initiative,
they stumbled through the *Acosta* matter—unable or unwilling to press Trans
Union to produce relevant documents or to produce knowledgeable witnesses for
deposition. Szwak Decl. at ¶ 41. They have therefore, proven themselves entirely
incapable of zealously and effectively representing the interests of the class. *Id.*

There are also serious ethical questions surrounding Mr. Recchia's
ability to serve as class counsel in these matters. On April 6, 2006, one of Mr.
Recchia's former clients filed a class action against him and his credit repair
business, Fair Credit Lawyers Inc., *Rannis v. Recchia, et al.,* ED CV 06-00373,
alleging that he had violated federal and state law concerning credit repair services.
Sobol Decl., Ex. U (complaint filed in *Rannis v. Recchia*). During his deposition in

---

[32] The three actions are: *Leesa Westwood, et al. v. Equifax, et al.,* 03-CV-00720; *Sullivan v. The Ritz-Carlton Hotel, et al.,* 03-CV-01051; and *Sullivan v. Fair Isaac Corporation, et al.,* 06-CV-00207. In each of these cases, the lead plaintiff was one of Mr. Recchia's own employees. In two of them, that employee was Gregory Sullivan, who resigned from the California Bar on August 9, 1997, while disciplinary charges were pending against him. Mr. Sullivan has been actively involved in the *Acosta* and *Pike* matters, using two e-mail addresses— gpsesq@yahoo.com and gpsesq@gmail.com—that suggest he may still be practicing as an "esquire." Niño Decl., ¶ 4.

1   that case, Mr. Recchia testified that the named plaintiffs in the *Acosta* and *Pike*

2   cases came to him through his credit repair business. Sobol Decl., Ex. V (Recchia's

3   deposition, pp. 187-88). As a result, Mr. Recchia finds himself in the awkward

4   position of representing named plaintiffs in these actions who are member of a

5   putative class in a class action against him. This situation would appear to create

6   the potential for a conflict of interest between Mr. Recchia and those plaintiffs—at

7   least in the absence of their waiving that potential conflict or their declaring their

8   intention to opt out if the *Rannis* class is certified.[33]

9   **B.   Neither The Named Plaintiffs In Acosta Nor Pike Are Capable Of
          Adequately Representing The Interests Of The Putative Classes.**

10              The single most important duty of a class representative is to monitor

11  the conduct of his or her counsel to ensure that they are properly fulfilling their

12  responsibility to the class. Those who shirk this responsibility cannot "satisfy the

13  requirement of FRCP 23(a)(4) that they be capable of 'fairly and adequately'

14  representing the class." *In re California Micro Devices Sec. Litig.*, 168 F.R.D. 257,

15  274 (N.D. Cal. 1996); *see also Welling v. Alexy*, 155 F.R.D. 654, 659 (ND Cal

16  1994).

17              In these cases, the named plaintiffs have allowed their counsel to

18  conclude a settlement prior to class certification and before they had obtained

19  virtually any information about the reporting practices that form the basis of their

20  claims. "Considered in light of the ultimate terms of [that settlement], which

21  waive[s] practically all of the class members' claims without compensation . . .,

22

23  _____

24  [33] The *Rannis* action is not the first time Mr. Recchia has faced allegations of
    misconduct. On at least three separate occasions, and as recently as 1997, he has
    been disciplined by the California Bar. In one of these proceedings, he was placed
25  on five-year probation and a five-year stayed suspension for what the Bar described
    as "multiple acts of concealment and dishonesty." Niño Decl., ¶ 7, Ex. A. In 1995
26  he was disciplined again and received another five-year probation and stayed
    suspension. *Id.* In February 1997, while in the second year of that probation, Mr.
27  Recchia received a one-year stayed suspension for carrying a firearm into the
    Orange County courthouse and also pled guilty to a misdemeanor regarding that
28  firearm. *Id.* A California ethics expert notes that these and other issues render
    *Acosta/Pike* plaintiffs' counsel inadequate to represent the class. Karpman Decl.

allow[s] the defendants to escape with little penalty" and gives them a license to continuing using systemically flawed reporting procedures, this fact compels the conclusion that "the named plaintiff[s] . . . 'failed to prosecute or defend the action with due diligence and reasonable prudence.'" *Molski*, 318 F.3d at 956. That none of these putative class members has come forward to explain what role they played, if any, in approving this Settlement or to even say whether they were informed of its essential terms before it was reached, only reinforces the conclusion that the Sherman team "is operating with little or no monitoring from the putative class representatives and has, therefore, effectively made [themselves] the class representative[s]." *In re California Micro Devices*, 168 F.R.D. at 274.

Also reinforcing that conclusion is the Settlement's provision for disproportionate incentive awards to each of the four named plaintiffs in the *Acosta* and *Pike* actions. Such excessive payments can tempt putative class representatives "'to accept sub-optimal settlements at the expense of the class members whose interests they are appointed to guard.'" *Staton*, 327 F.3d at 975. That is what happened here.

While the maximum that any absent class member is likely to be awarded under the Settlement is $75 plus a free credit report, it provides for the payment of incentive awards for the four named plaintiffs totaling up to $55,000 in the aggregate (or an average of $13,750 each)—a staggering 183 to 1 disparity. The named plaintiffs, three of whom did not even have to sit through a deposition, have proffered no facts whatever that would explain how they arrived at this $55,000 incentive award—information that "is needed for the Court to determine whether preferential treatment is being given" them. *Greer v. Shapiro & Kreisman*, 2001 U.S. Dist. LEXIS 21114, at *11 (E.D. Pa. Dec. 18, 2001) (denying preliminary approval motion with leave to renew upon furnishing of information justifying amount of incentive award).

Given their acquiescence to a settlement agreement that provides little

1   or nothing to the absent class members whose interests the *Acosta/Pike* plaintiffs

2   were bound to protect, it is a reasonable inference that they were "more concerned

3   with maximizing" incentive awards for themselves "than with judging the adequacy

4   of the settlement as it applies to class members at large." *Staton*, 327 F.3d at 977;

5   *see also* Miller Decl. at ¶ 26 (noting that size of incentive awards "raise the

6   possibility that the representative plaintiffs are being rewarded for passivity in the

7   face of an inadequate settlement"). That is the antithesis of adequate

8   representation.

9            Yet another factor establishing the inadequacy of the named plaintiffs

10  as class representatives is the lack of diligence and judgment they have shown in

11  choosing Mr. Recchia to represent them. As the Ninth Circuit has noted, "[t]he

12  competence of counsel seeking to represent a class"—to say nothing of his or her

13  ethics—is "an appropriate consideration under Rule 23(a)(4)" in governing

14  selection of lead plaintiffs. *Local Joint Executive Bd v. Las Vegas Sands, Inc*, 244

15  F.3d 1152, 1162 (9th Cir 2001). Given Mr. Recchia's record of questionable

16  ethical propriety and his lack of financial resources and class action experience, this

17  consideration plainly weighs in favor of finding a lack of adequacy here.

18           Even if they were adequate representatives of that segment of the

19  classes whose interests are aligned with their own, the named plaintiffs in both the

20  *Acosta* and *Pike* matters are clearly unable to adequately represent those segments

21  of the classes who are afforded substantially less favorable treatment under the

22  Settlement. In its landmark decision in *Amchem Products, Inc. v. Windsor*, 521

23  U.S. 591 (1997), the Supreme Court held that where "'differences among members

24  of a class are such that subclasses must be established,'" a district court may not

25  approve a settlement unless one or more of the named plaintiffs belong to "each

26  distinct subclass" and "understand that their role is to represent solely the

27  members" of those subclasses. *Id.* at 627 (quoting *In re Joint Eastern and Southern*

28  *Dist. Asbestos Litig.*, 982 F.2d 721, 742-43 (2d Cir. 1992).). In this case, all of the

named plaintiffs in the *Pike/Acosta* matters: (1) are California residents; (2) obtained their discharge orders after May 12, 2001 and, hence, are members of "economic relief" subclass "A"; and (3) have credit reports, which would all be completely corrected by the injunctive provisions of the Settlement because all of the inaccurately recorded pre-bankruptcy debts contained in them are unsecured revolving loans noted as "placed for collection" or "charged off."

Under *Amchem*, these named plaintiffs: (1) cannot represent non-California residents whose claims they are intending to abandon if this Settlement is not approved; (2) any class members who do not fall within "economic relief" subclass "A"; and (3) any class member whose credit reports inaccurately record discharged non-credit card debts and/or any discharged debts listed as "past due" or with a balance owing, which debts would not be corrected by the Settlement's revised reporting procedures.[34] Without suitable named plaintiffs to represent all segments of the proposed classes, those classes cannot be certified and the Settlement cannot be approved on that ground alone.

## CONCLUSION

Based upon the foregoing points and authorities, and based upon the evidence and expert opinion set forth in the declarations submitted in support of the *White/Hernandez* plaintiffs' opposition to the motion for preliminary approval, the *White/Hernandez* plaintiffs respectfully submit that the Court must deny the *Acosta/Pike* Plaintiffs' Motion for an Order Granting Preliminary Approval of Settlement and deny all relief requested therein.

//

//

---

[34] Even if plaintiffs who could represent those subclasses were put forward, having sold out the interests of those subclasses, the Sherman team has disabled itself from representing them. *See Mifashihi* 356 F.3d at 782 (characterizing as a "questionable feature" of proposed settlement the fact that one group of class members who received no economic relief "did not have counsel separate from the counsel for the favored" group who did).

Dated: December 15, 2006        Respectfully submitted,

By: _____
        Michael W. Sobol
        (msobol@lchb.com)
        Paul A. Moore
        (pmoore@lchb.com)
        LIEFF, CABRASER, HEIMANN
        & BERNSTEIN, LLP
        275 Battery Street, 30th Floor
        San Francisco, CA 94111-3339
        Telephone: (415) 956-1000

        Daniel Wolf
        (dan@danielwolflaw.com)
        LAW OFFICE OF DANIEL WOLF
        1220 N Street, N.W., Suite PH 2
        Washington, D.C. 20005
        Telephone: (202) 842-2170

        Charles W. Juntikka (cj4689)
        (charles@cjalaw.com)
        CHARLES JUNTIKKA & ASSOCIATES
        11 W. 42nd Street, 12th Floor
        New York, NY 10036
        Telephone: (212) 315-3755

        Stuart Rossman
        (srossman@nclc.org)
        Charles Delbaum
        (cdelbaum@nclc.org)
        NATIONAL CONSUMER LAW CENTER
        77 Summer Street, 10th Floor
        Boston, MA 02110
        Telephone: (617) 542-8010
        Facsimile: (617) 542-8028

        Michael A. Caddell (admitted *pro hac vice*)
        (mac@caddellchapman.com)
        Cynthia B. Chapman (State Bar No. 164471)
        (cbc@caddellchapman.com)
        George Y. Niño (State Bar No. 146623)
        (gyn@caddellchapman.com)
        CADDELL & CHAPMAN
        1331 Lamar, Suite 1070
        Houston, TX 77010
        Telephone: (713) 751-0400
        Facsimile: (713) 751-0906

581445.1                                    - 74 -

*WHITE/HERNANDEZ PLAINTIFFS' MEM. ISO OPP. TO
ACOSTA/PIKE PLAINTIFFS' MOTION FOR ORDER
Acosta V. Trans Union – Case No. CV 06-05060 DOC (MLG)*

1     Leonard A. Bennett (VSB No. 37523)
      (lenbennett@cavtel.net)
2     Matthew Erausquin  (VSB No. 65434)
      (matt@clalegal.com)
3     CONSUMER LITIGATION
      ASSOCIATES, P.C.
4     12515 Warwick Boulevard, Suite 201
      Newport News, Virginia 23606
5     Telephone:  (757) 930 3660
      Facsimile:  (757) 930-3662

6

7     Mitchell A. Toups (TSB No. 20151600)
      (matoups@wgttlaw.com)
8     WELLER, GREEN, TOUPS
      & TERRELL, L.L.P.
9     Bank of America Tower
      2615 Calder St., Suite 400
10    Beaumont Texas 77702
      Telephone:  (409) 838-0101
      Facsimile:  (409) 832-8577

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

581445.1

- 75 -

*WHITE/HERNANDEZ* PLAINTIFFS' MEM  ISO OPP  TO
*ACOSTA/PIKE* PLAINTIFFS' MOTION FOR ORDER
*Acosta  V. Trans Union – Case No. CV 06-05060 DOC (MLG)*