*In the*

# Court of Appeal

*of the*

# State of California

## SECOND APPELLATE DISTRICT
## DIVISION EIGHT

———————————————

**B214789**

NICHOLAS PAPADAKIS,

*Plaintiff,*

v.

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,

*Defendant-Respondent,*

v.

MICHAEL A. CADDELL, et al.,

*Objectors-Appellants.*

———————————————

APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY
HON. PETER D. LICHTMAN · NO. BC322788

## APPELLANT MICHAEL A. CADDELL'S OPENING BRIEF

CORY S. FEIN, ESQ. (250758)
CADDELL & CHAPMAN, P.C.
1331 Lamar Street, Suite 1070
Houston, Texas 77010
(713) 751-0400 Telephone
(713) 751-0906 Facsimile

*Attorney for Objector-Appellant,*
*Michael A. Caddell*

CP  COUNSEL PRESS · (800) 3-APPEAL                    PRINTED ON RECYCLED PAPER

# Court of Appeal

*of the*

# State of California

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

Court of Appeal Case No.: B214789

Case Name: Nicholas Papadakis et al. v. Northwestern Mutual Life Insurance Company

☐ There are no interested entities or parties to list in this Certificate per California Rules of Court, Rule 8.208(d)(3).

☑ Interested entities or parties are listed below:

| Name of Interested Entity or Person | Nature of Interest |
|---|---|
| 1. Michael A. Caddell | Appellant and Objector |
| 2. Nicholas Papadakis | Class Representative |
| 3. Northwestern Mutual Life Insurance Comp. | Class Defendant |
| 4. Jack O. Tomlinson Jr. | Appellant and Objector |
| 5. Russell Vandevelve | Appellant and Objector |
| 6. Marci R. Frenkel | Appellant and Objector |
| 7. Norma Hoffman | Appellant and Objector |
| 8. Paul M. Kaufman | Appellant and Objector |
| 9. Stuart Mintz | Appellant and Objector |
| 10. Steven Sindell | Appellant and Objector |

_Cory Fein_

Signature of Attorney/Party Submitting Form

Cory S. Fein
Printed Name

Caddell & Chapman
1331 Lamar, Suite 1070
Houston, TX 77010
Address

Party Represented: Michael A. Caddell
State Bar No.: 250758

**Page 1 of 3**

# Court of Appeal

*of the*

# State of California

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

Court of Appeal Case No.: B214789

Case Name: Nicholas Papadakis et al. v. Northwestern Mutual Life Insurance Company

☐ There are no interested entities or parties to list in this Certificate per California Rules of Court, Rule 8.208(d)(3).

☑ Interested entities or parties are listed below:

| Name of Interested Entity or Person | Nature of Interest |
|---|---|
| 1.  Kirk Stewart | Appellant and Objector |
| 2.  Eric Zigenhorn | Appellant and Objector |
| 3.  David Berardinelli | Appellant and Objector |
| 4.  Debra Ortiz Berardinelli | Appellant and Objector |
| 5.  Bryan A. Lopez | Appellant and Objector |
| 6.  Samantha V. Rodriguez | Appellant and Objector |
| 7.  Russell A. Rodriguez | Appellant and Objector |
| 8.  Jim Foyt | Appellant and Objector |
| 9.  Henry Washburn | Appellant and Objector |
| 10. All class members in Case No. BC322788 | Class Members |

*[signature]*

Signature of Attorney/Party Submitting Form

Cory S. Fein
Printed Name

Caddell & Chapman
1331 Lamar, Suite 1070
Houston, TX 77010
Address

Party Represented: Michael A. Caddell
State Bar No.: 250758

**Page 2 of 3**

# Court of Appeal

*of the*

# State of California

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

Court of Appeal Case No.: B214789

Case Name: Nicholas Papadakis et al. v. Northwestern Mutual Life Insurance Company

☐ There are no interested entities or parties to list in this Certificate per California Rules of Court, Rule 8.208(d)(3).

☑ Interested entities or parties are listed below:

| Name of Interested Entity or Person | Nature of Interest |
|---|---|
| 1. Mitchell A. Toups | Co-Counsel for Objector Michael A. Caddell |
| 2. Weller, Green, Toups & Terrell, L.L.P. | Co-Counsel for Objector Michael A. Caddell |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

*Cory Fein*

Signature of Attorney/Party Submitting Form

Cory S. Fein

Printed Name

Caddell & Chapman
1331 Lamar, Suite 1070
Houston, TX 77010

Address

Party Represented: Michael A. Caddell
State Bar No.: 250758

**Page 3 of 3**

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

I.    NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    RELIEF SOUGHT IN TRIAL COURT . . . . . . . . . . . . . . . . . . . . . . 2

III.    JUDGMENT AND ORDERS APPEALED FROM . . . . . . . . . . . . . 3

IV.    STATEMENT OF FINALITY OF JUDGMENT
AND APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V.    SUMMARY OF SIGNIFICANT FACTS . . . . . . . . . . . . . . . . . . . . 4

       A.    Class Certification and the Settlement . . . . . . . . . . . . . . . . . 4

       B.    The Disability Class's Claims Pertain Only to the
Dividend Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       C.    The Disability Class's Claims Are Released, Whether
or Not Related to the Dividend Issue . . . . . . . . . . . . . . . . . . 6

       D.    The Consideration for the Release of the Disability
Class's Claims Also Pertains Only to the Dividend
Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       E.    The Payments to the Non-Lawyer Consultant from
(1) the Settlement Fund and (2) Class Counsel . . . . . . . . . . 8

       F.    Caddell's Action in Response to the Settlement . . . . . . . . . . 8

VI.    STATEMENT OF THE ISSUES RAISED BY THIS
APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

i

A.     Whether a settlement agreement is fair when it gives
       100% of the monetary consideration to one class and
       releases claims (both related and unrelated to the subject
       matter of the lawsuit) of a second class for nothing
       beyond general dividend information, which has no
       value, monetary or otherwise ........................ 10

B.     Whether Class Counsel and the Class Representative
       were adequate representatives of the Disability Class
       when they were also the Class Counsel and Class
       Representative of the Term Life Class, and the
       Settlement Agreement greatly favored the Term Life
       Class over the Disability Class ..................... 10

C.     Whether the approval of payments to Class
       Counsel's non-lawyer consultant (one which shall be
       paid as an expense from the settlement fund, and
       the other which is an undisclosed contingent amount to
       be paid by Class Counsel) is proper .................. 10

VII.   STANDARD OF REVIEW ............................. 10

VIII.  LEGAL ARGUMENTS ................................ 11

A.     The Trial Court Erred in Approving the Settlement
       Because the Release Extinguishes Disability Class
       Members' Claims that Are Wholly Unrelated to the
       Lawsuit ...................................... 11

B.     The Trial Court Erred in Approving the Settlement
       Because Members of the Disability Class Release
       Valuable Claims—Unrelated to the Subject Matter
       of this Lawsuit—in Exchange for Valueless
       Consideration ................................. 17

       1.     The So-Called "Informational Pamphlet,"
              Limited to the Dividend Issue, is of No Value ..... 17

2.    Regardless of the Strength of the Disability Class's Claims, it is Untenable to Release Such Claims in Exchange for Valueless Consideration ............................ 19

3.    The Term Class's Receipt of $92 Million Cannot Justify the Disability Class's Receipt of Nothing ................................ 27

4.    The Settlement Provides Absolutely No Relief to Former Policy Holders ....................... 31

5.    The Opt-Out Right Is No Cure-All .............. 32

C.    The Trial Court Erred in Approving the Settlement Given An Incurable Conflict of Interest that Rendered Both the Class Representative and Class Counsel Inadequate ................................... 34

D.    The Trial Court Erred In Approving Payments to Plaintiff's Non-Lawyer Consultant from Class Counsel, As Well As From the Settlement Fund ............... 39

1.    California Law Prohibits a Non-Lawyer Consultant from Sharing in Class Counsel's Attorney's Fees ............................ 39

2.    The Hourly Award to Mr. Caliri from the Settlement Fund Was Excessive ............... 45

IX.    CONCLUSION ....................................... 47

CERTIFICATE OF COMPLIANCE ............................ 49

DECLARATION OF SERVICE

iii

## TABLE OF AUTHORITIES

PAGE

### CASES

*Acosta v. Trans Union* LLC
    (C.D. Cal. 2007) 243 F.R.D. 377 . . . . . . . . . . . . . . . . . 13, 27, 33, 34

*Amchem Prods., Inc. v. Windsor*
    (1997) 521 U.S. 591 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*
    (S.D. Fla. 2002) 211 F.R.D. 457 . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Buchet v. ITT Consumer Fin. Corp.*
    (D. Minn. 1994) 845 F. Supp. 684, *as amended*,
    858 F. Supp. 944 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Cho v. Seagate Tech. Holdings, Inc.*
    (2009) 177 Cal.App.4th 734 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Clement v. Am. Honda Fin. Corp.*
    (D. Conn. 1997) 176 F.R.D. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Crawford v. Equifax Payment Servs., Inc.*
    (7th Cir. 2000) 201 F.3d 877 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Cunningham Charter Corp. v. Learjet, Inc.*
    (S.D. Ill. 2009) 258 F.R.D. 320 . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Gassman v. State Bar*
    (1976) 18 Cal.3d 125 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Consumer Privacy Cases*
    (2009) 175 Cal.App.4th 545 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*In re Findley*
    (1993) 993 F.2d 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

iv

*In re Ford Motor Co. Bronco II Prod. Liab. Litig.*
(E. D. La. 1991) 981 F. Supp. 969 . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*
(3d Cir. 1995) 55 F.3d 768 . . . . . . . . . . . . . . . . . . . . . . . . 23, 33, 34

*In re Joint E. & S. Dist. Asbestos Litig.*
982 F.2d 721 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*In re Microsoft I-V Cases*
(2006) 135 Cal.App.4th 706 . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hill v. State Farm Mut. Auto. Ins. Co.*
(2008) 166 Cal. App. 4th 1438 . . . . . . . . . . . . . . . . . . 20, 21, 30, 31

*Hypertouch, Inc. v. Superior Court*
(2005) 128 Cal.App.4th 1527 . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Jones v. Goord*
(S.D.N.Y. 2006) 435 F. Supp. 2d 221 . . . . . . . . . . . . . . . . . . . . 37

*Kullar v. Foot Locker Retail, Inc.*
(2008) 168 Cal.App.4th 116 . . . . . . . . . . . . . . . . . . . . . . . . 11, 43

*McIntosh v. Mills*
(2004) 121 Cal.App.4th 333 . . . . . . . . . . . . . . . . . 39, 40, 41, 43, 44

*Mirfasihi v. Fleet Mort. Corp.*
(7th Cir. 2004) 356 F.3d 781 . . . . . . . . . . . . . . . . . . . 28, 30, 34, 37

*Mirfasihi v. Fleet Mort. Corp.*
(7th Cir. 2006) 450 F.3d 745 . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Molski v. Gleick*
(9th Cir. 2003) 318 F.3d 937 . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Nat'l Super Spuds, Inc. v. N. Y. Mercantile Exch.*
(2d Cir. 1981) 660 F.2d 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ojeda v. Sharp Cabrillo Hosp.*
       (1992) 8 Cal.App.4th 1 . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 43, 44

*Parker v. Time Warner Entm't Co., L.P.*
       (E.D.N.Y. 2007) 239 F.R.D. 318 . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*Ramos v. Countrywide Home Loans, Inc.*
       (2000) 82 Cal.App.4th 615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*
       (2d Cir. 2005) 396 F.3d 96 . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Wershba v. Apple Computer, Inc.*
       (2001) 91 Cal.App.4th 224 . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 27

## RULES

CODE CIV. PROC. § 904.1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

RULES PROF. CONDUCT, rule 1-320(A) . . . . . . . . . . . . . . . . . . . . . . . 39, 41

## STATUTES

28 U.S.C. § 1712(a)-(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## SECONDARY SOURCES

MANUAL FOR COMPLEX LITIGATION (FOURTH) (2008) . . . . . . . . . . . . 22, 37

4 HERBERT NEWBERG & ALBA CONTE,
       NEWBERG ON CLASS ACTIONS § 12:15 (4th ed. 2009) . . . . . . . . . . 16

Barbara J. Rothstein & Thomas E. Willging, MANAGING CLASS
       ACTION LITIGATION: A POCKET GUIDE FOR JUDGES
       (Federal Judicial Center 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Geoffrey P. Miller and Lori S. Singer,
    NONPECUNIARY CLASS ACTION SETTLEMENTS,
    60 Law & Contemp. Probs. 97 (Autumn 1997) . . . . . . . . . . . . . . . 23

## I.    NATURE OF THE ACTION

This appeal arises from the settlement of a nationwide class action involving approximately 3 million term policies and 1.2 million disability policies, with holders of each policy type comprising the two Classes. (Appx. II at APP472.)[1]  Both Classes were represented by the same, single Class Representative, Plaintiff Nicholas Papadakis, and the same Class Counsel, Tim Morris.  Mr. Papadakis held each type of policy at issue. (  *See* Appx. I at APP146.)    The two Classes cover approximately 27 years' worth of Northwestern Mutual ("Northwestern") customers, from 1983-2008. ( *See* Appx. I at APP140.)

The trial court approved a settlement under which (1) Northwestern, in consideration for the full release of the Term Class members' claims, pays $92 million into a settlement fund to be shared only by members of the Term Class (once fees, costs, and expenses are deducted), and (2) Northwestern, in consideration for the full release of the Disability Class members' claims (both asserted and *unasserted* in this lawsuit, and related and  *unrelated* to the subject matter of the lawsuit), pays nothing, but instead provides a single sheet of nonsubstantive, general information concerning only Northwestern's

---

[1]   Citations to the Record will be as follows: Appellant Caddell's Appendix: (Appx. [Vol. No.] at [Page No.].), and Reporter's Record: (RR at [Page No.].).

1

unfettered discretion to make dividend determinations—that is, no information is provided concerning other potential claims (unrelated to dividend issues) that were never asserted, let alone contemplated by this lawsuit, but are nevertheless extinguished by the release. (*See* Appx. II at APP472; Appx. I at APP236.)

The trial court awarded Class Counsel $27.8 million in attorney's fees, $326,000 in out-of-pocket attorney's costs, and $3.79 million to pay Class Counsel's non-lawyer consultant, Frank Caliri, all to be paid from the settlement fund. (Appx. V at 1147, 1158-59, 1161-62.) The trial court further approved an additional undisclosed contingent payment to be made by Class Counsel to Mr. Caliri. (Appx. V at 1161.)

## II.    RELIEF SOUGHT IN TRIAL COURT

After the trial court granted preliminary approval of the Settlement, Michael A. Caddell timely objected to three principal aspects of it: (1) the fact that Northwestern pays no money and provides nothing of value in consideration for a sweeping release of the Disability Class's claims, whether related or not to the subject matter of the lawsuit, (2) the conflict of interest created by having a single, same Class Representative and Class Counsel represent two separate classes treated so disparately under the settlement, and (3) the approval of payments to Class Counsel's non-lawyer consultant (Frank

2

Caliri), part of which the trial court approved to be paid as an expense from the settlement fund (based on Caliri's reported hourly rate) and part of which is an undisclosed contingent amount to be paid by Class Counsel. (Appx. III at APP604-08.) Caddell sought rejection of the settlement so that it could be reformed to address its defective aspects. The trial court overruled all objections in its Judgment of Final Settlement Approval. (Appx. VII at APP1765.) Caddell timely filed a notice of appeal. (Appx. IX at APP2135.)

When Caddell learned that the hourly rate Mr. Caliri represented to the trial court as his "normal" rate appeared to be an inflated rate, Caddell requested that the court exercise its continuing jurisdiction over the case and review Mr. Caliri's hourly rate (both because the trial court used this rate to calculate Mr. Caliri's $3.8 million fee and because such fee would be deducted from the Class settlement fund). (Appx. IX at APP2154.) The trial court denied this motion, asserting it was without the requisite jurisdiction since notices of appeal had already been filed.

## III.   JUDGMENT AND ORDERS APPEALED FROM

The trial court issued an order granting final approval of the settlement in this case. Caddell appeals from the trial court's:

(1)   Judgment of Final Settlement Approval (Appx. VII at APP1760);

3

(2)   Order Granting Final Approval to Class Action Settlement (Appx. VII at APP1597); and

(3)   Order Awarding Reasonable Attorneys' Fees and Litigation Expenses to Class Counsel, and Approving Incentive Award to Representative Plaintiff. (Appx. V at APP1115.)[2]

## IV.   STATEMENT OF FINALITY OF JUDGMENT AND APPEALABILITY

This is an appeal from a final, appealable judgment that finally disposes of all issues between the parties. CODE CIV. PROC. § 904.1(a)(1).

## V.   SUMMARY OF SIGNIFICANT FACTS

### A.   Class Certification and the Settlement

This case is a nationwide class action involving Northwestern's failure to properly pay dividends to its policyholders. (Appx. I at APP139.) In conjunction with approving the settlement, the trial court certified two classes, one consisting of term life insurance policyholders and one consisting of disability insurance policy holders. (Appx. VII at APP1654-55.) The court also appointed Plaintiff Nicholas Papadakis and his counsel to serve as the sole Class Representative and Class Counsel for both the Term Life and the Disability Classes. (Appx. I at APP6-7.)

---

[2] Although the Judgment of Final Settlement Approval incorporates by reference the Order Granting Final Approval to Class Action Settlement and the Order Awarding Reasonable Attorneys' Fees and Litigation Expenses to Class Counsel, and Approving Incentive Award to Representative Plaintiff, Caddell includes these Orders in this section out of an abundance of caution.

4

As approved by the trial court, the settlement provides that the Term Life Class Members receive a pro-rata share of a $92 million settlement fund (after the deduction of attorneys' fees, costs, and expenses), while the Disability Class Members, a class which necessarily includes *former* disability policy holders, receive an informational "pamphlet" (a single piece of paper) explaining only Northwestern's dividend-calculation process. (Appx. VII at APP1640-43.)

## B.   The Disability Class's Claims Pertain Only to the Dividend Issue

The Disability Class's claims were narrowly drawn, singularly and purposefully focusing on dividend issues. In the First Amended Complaint, Papadakis makes clear that the "nature of the action" centers on "disability insurance policies that were marketed as paying dividends upon an 'escalating percentage of premium' basis . . . ." (Appx. I at APP112.) Papadakis focuses all Disability Class allegations on how Northwestern improperly marketed and solicited its disability insurance policies by promising an "'escalating percentage of premium' dividend." (Appx. I at APP112-16; APP122-23.) Consistent with these allegations, the Disability class definition was also confined to the dividend issue: "The first class is comprised of NML [3]

---

[3] "NML" refers to Northwestern Mutual Life.

policyholders residing throughout the United States who purchased NML

Disability Insurance Contracts who have not received annual dividends from

NML calculated upon the escalating percentage of premium methodology (the

'Disability Insurance Class')." (Appx. I at APP119.)  As to the Disability

Class, nothing other than claims pertaining to the "escalating percentage of

premium dividend" issue was ever pleaded during the course of this lawsuit.

### C.    The Disability Class's Claims Are Released, Whether or Not Related to the Dividend Issue

Against the backdrop of the narrowly drawn Disability Class's claims,

the breadth of the release language is far reaching. (*See* Appx. I at APP193.)

The final sentence of the release explicitly provides that claims wholly

unrelated to the subject matter of the lawsuit shall be released:

> In order to avoid any doubt, Released Claims shall include, *but not be limited to, any and all claims connected with, related to, or arising from the Term Policies and/or the Disability Policies and one or more of the following*: (i) . . . decisions relating to surplus, divisible surplus, or the amount and/or allocation of dividends from the beginning of time up to and including the 2009 dividend scale, (ii) *any and all payments*, or failure to pay, dividends from the beginning of time up to and including the 2009 dividend scale; (iii) *any and all sales, marketing, illustrations, or advertising*.

(*Id.* (emphasis added).)  This language makes clear that the release extends

well beyond the subject matter of the lawsuit—dividend calculations and

payments.  While the First Amended Complaint asserted only two claims on

6

behalf of the Disability Class (fraud, and deceptive marketing and sales practices regarding only the issue of the "escalating percentage of premium dividend"), the release is wide-ranging, extending to any issue concerning a disability policy, including "any and all payments" and "any and all sales, marketing, illustrations, or advertising." (*See id*; *see also* Appx. I at APP86-87.)

Accordingly, for no consideration at all, Northwestern eliminated Disability policyholder claims that have no relationship with the subject matter of this lawsuit and, therefore, were neither discovered nor litigated. In fact, in the Settlement Agreement itself, the parties confirm that discovery exclusively focused on the dividend issue: "Class Counsel has obtained, through formal and informal discovery, information regarding Northwestern Mutual's *dividend allocation policies and practices*." (Appx. I at APP182 (emphasis added).) No mention is made regarding discovery of Northwestern's policies and practices concerning other potential issues relating to "payments" or "sales, marketing, illustrations, or advertising." (*See id.*)

## D. The Consideration for the Release of the Disability Class's Claims Also Pertains Only to the Dividend Issue

While the settlement releases the Disability Class's claims pertaining to various issues extending well beyond the parameters of dividends, the informational "pamphlet" provided to the Disability Class in exchange for the

7

broad release is narrowly tailored to Northwestern's discretionary dividend policies—the very subject matter of the lawsuit. (Appx. I at APP236.) No information is provided regarding other Disability policy issues. (*See id.*)

### E.    The Payments to the Non-Lawyer Consultant from (1) the Settlement Fund and (2) Class Counsel

The trial court also approved the payment of $3,792,250 to Class Counsel's non-lawyer, non-testifying consultant, Frank Caliri; this payment was calculated by multiplying the consultant's hourly rate of $550/hour by 6,895 hours worked. (Appx. V at APP1158-62.) Not only does Class Counsel's consultant receive this fee of almost $3.8 million, but he also receives an unknown contingent payment to be paid by Class Counsel. (Appx. V at APP1161.) Although the contingent payment is now characterized as a general obligation of Class Counsel's firm (Appx. V at APP1161), Class Counsel admits that he entered into a non-testifying contingency consulting agreement with Mr. Caliri because he otherwise could not afford to pay him during the course of the litigation (*see* Appx. II at 313-14).

### F.    Caddell's Action in Response to the Settlement

Caddell timely objected to the Final Approval of Settlement, raising three principal issues:  (1) that the trial court erred in approving a settlement that broadly released the Disability Class Members' claims, including claims unrelated to dividend issues, in exchange for valueless consideration, (2) that

8

Plaintiff Papadakis and his counsel were inadequate to represent both Classes simultaneously, and (3) that the payments to Class Counsel's non-lawyer consultant (one which shall be paid as an expense from the settlement fund, and the other which is an undisclosed contingent amount to be paid by Class Counsel) are improper. (Appx. III at APP604-08.) The trial court overruled these (and all) objections, and Caddell timely appealed those orders to this Court. (Appx. VII at APP1765; Appx. IX at APP2135-36.)

With respect to the award of a $3.8 million fee from the settlement fund to Mr. Caliri, after final approval, Caddell discovered that Mr. Caliri's regular hourly rate had apparently been overstated to the trial court. (Appx. IX at APP2154-55.) Specifically, Class Counsel represented to the trial court that Mr. Caliri's "normal" and "regular" hourly billing rate from 2004 through Final Approval was $550. ( *Id.*) In another case, however, Mr. Caliri reportedly stated that his 2005 hourly billing rate ranged from $325 to $375 per hour, depending on the complexity of the case. ( *Id.* at 2155.) After Caddell confronted Mr. Caliri with this discrepancy, Mr. Caliri stated that he charged the higher, $550 rate for cases involving complex financial analysis. (*Id.*) Thus, $550 was not—as Class Counsel represented to the trial court—Mr. Caliri's "normal," "regular" rate. When Caddell brought this discrepancy to the trial court's attention, the court declined to conduct any

9

additional investigation due to its conclusion that it no longer had jurisdiction

over a case that was on appeal (though no funds have been paid).

## VI.   STATEMENT OF THE ISSUES RAISED BY THIS APPEAL

A.   Whether a settlement agreement is fair when it gives 100% of the monetary consideration to one class and releases claims (both related and unrelated to the subject matter of the lawsuit) of a second class for nothing beyond general dividend information, which has no value, monetary or otherwise.

B.   Whether Class Counsel and the Class Representative were adequate representatives of the Disability Class when they were also the Class Counsel and Class Representative of the Term Life Class, and the Settlement Agreement greatly favored the Term Life Class over the Disability Class.

C.   Whether the approval of payments to Class Counsel's non-lawyer consultant (one which shall be paid as an expense from the settlement fund, and the other which is an undisclosed contingent amount to be paid by Class Counsel) is proper.

## VII.   STANDARD OF REVIEW

The Court reviews the fairness determination in a class action against

the abuse of discretion standard. *Cho v. Seagate Tech. Holdings, Inc.* (2009)

177 Cal.App.4th 734, 743. The review analysis changes to *de novo*, however,

"[t]o the extent the trial court's ruling is based on assertedly improper criteria

or incorrect legal assumptions." *Hypertouch, Inc. v. Superior Court* (2005)

128 Cal.App.4th 1527, 1537; *see also Wershba v. Apple Computer, Inc.* (2001)

91 Cal.App.4th 224, 234-35. In its role as the evaluator of a settlement, the

trial court "has a fiduciary responsibility as guardian of the rights of the

10

absentee class members when deciding whether to approve a settlement agreement." *Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116, 129. In its analysis, the trial court is duty-bound to conduct "an independent assessment of the adequacy of the settlement terms." *Id.* at 132; *see Wershba*, 91 Cal.App.4th at 245 ("The court must therefore scrutinize the proposed settlement agreement to the extent necessary to 'reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.'") (internal quotations omitted). The ultimate question, therefore, is whether the settlement is fair, reasonable, and adequate. *See In re Microsoft I-V Cases* (2006) 135 Cal.App.4th 706, 723.

## VIII.  LEGAL ARGUMENTS

### A.  The Trial Court Erred in Approving the Settlement Because the Release Extinguishes Disability Class Members' Claims That Are Wholly Unrelated to the Lawsuit

While broad releases are common in class action settlements and can be appropriate in situations where class members actually obtain valuable consideration in exchange for the release of their rights, a class settlement cannot release absent class members' claims unless the released claims share an "identical factual predicate" with the claims asserted and pursued in the underlying settled class action. *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A.*

11

*Inc.* (2d Cir. 2005) 396 F.3d 96, 107 ("Plaintiffs' authority to release claims is limited by the 'identical factual predicate' . . . doctrine[]."); *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.* (S.D. Fla. 2002) 211 F.R.D. 457, 471-72 (hereinafter "*ADAI*") (approving class release upon concluding that it was "clearly limited to claims based on the same factual predicate" as those raised in the settled case).[4] Courts therefore distinguish between class releases that incorporate distinct legal claims based upon the *same facts* as those in the underlying litigation, and class releases that seek to release claims that require proof of *different facts*. *See, e.g., Wal-Mart*, 396 F.3d at 107-08 (finding release permissible where legal claims varied, but defendants' "exclusionary rules" were the factual predicate at the center of both claims); *ADAI*, 211 F.R.D. at 471-72; *Nat'l Super Spuds, Inc. v. New York Mercantile Exch.* (2d Cir. 1981) 660 F.2d 9, 18 n.7 (distinguishing releases that would "prevent class members from subsequently asserting claims relying on a legal theory different from that relied upon in the class action complaint but depending upon the very same set of facts," from those releasing claims that "depend not only upon a different legal theory but upon proof of further facts").

---

[4] In the absence of California law on the criteria for evaluating class actions, California courts look to federal authority. *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801 (citing *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 821).

In light of the foregoing, the broad release of the Disability Class's claims in exchange for the valueless distribution of dividend information is unfair, unreasonable, and legally unsound. *See Acosta v. Trans Union LLC* (C.D. Cal. 2007) 243 F.R.D. 377, 394 (rejecting settlement that "present[ed] an unforgiving whipsaw, releasing Trans Union and Equifax from all conceivable claims while granting nothing of monetary value in return"). Here, the Disability Class's claims were purposefully tied to the issue of dividends. The First Amended Complaint specifies that this case involves "disability insurance policies that were marketed as paying dividends upon 'an escalating percentage of premium' basis. . . ." (Appx. I at APP 112), and the Disability Class allegations focus on how Northwestern improperly marketed and solicited its disability insurance policies by promising "'escalating percentage of premium' dividend." (Appx. I at APP112-16; APP122-23.) The Disability Class definition was likewise confined to the dividend issue. (Appx. I at APP119.)[5] That the factual predicate underlying the Disability Class's claims is limited to the dividend issue is only further evidenced by the

---

[5]   The Disability Class definition is as follows: "The first class is comprised of NML policyholders residing throughout the United States who purchased NML Disability Insurance Contracts who have not received annual dividends from NML calculated upon the escalating percentage of premium methodology (the 'Disability Insurance Class')." (Appx. I at APP119.)

13

informational pamphlet, which is also limited to the dividend issue articulated in the First Amended Complaint. (Appx. I at APP236.)

Simply stated, the "factual predicate" underlying the Disability Class's claims is restricted to the "escalating percentage of premium dividend"—the only issue ever pleaded, discovered, or contemplated during the course of this lawsuit. Notwithstanding this irrefutable fact, Papadakis sanctioned a release under which Disability Class Members release claims wholly unrelated to the dividend issue. While the First Amended Complaint asserted only two claims on behalf of the Disability Class (fraud, and deceptive marketing and sales practices concerning only the issue of the "escalating percentage of premium dividend"), the release is wide-ranging, extending to any issue concerning a disability policy, including "any and all payments" and "any and all sales, marketing, illustrations, or advertising." (*See id*; *see also* Appx. I at APP86-87.) Specifically, the release provides in part:

> In order to avoid any doubt, Released Claims shall include, *but not be limited to, any and all claims connected with, related to, or arising from the Term Policies and/or the Disability Policies and one or more of the following*: (i) . . . decisions relating to surplus, divisible surplus, or the amount and/or allocation of dividends from the beginning of time up to and including the 2009 dividend scale, (ii) *any and all payments*, or failure to pay, dividends from the beginning of time up to and including the 2009 dividend scale; (iii)    *any and all sales, marketing, illustrations, or advertising.*

14

(*Id.* (emphasis added).) This language releases a multitude of potential claims having nothing to do with the subject matter of the lawsuit—dividend calculations and payments.

While section (i) clearly relates to the underlying factual predicate, sections (ii) and (iii) range well beyond. First, section (ii) generally releases claims concerning "any and all payments"; whether intentional or not, without the word "of" after "payments" and before the comma, [6] this clause stands alone and is not (as it should be) limited to "dividends from the beginning of time up to and including the 2009 dividend scale."

Next, without any reference to the dividend issue, subdivision (iii) releases—*across the board*—any and all claims relating to "***any and all sales, marketing, illustrations, or advertising.***" Accordingly, for no consideration at all, the release unforgivingly disposes of Disability (and for that matter, Term) policyholder claims that have ***no connection whatsoever*** to the subject matter of this lawsuit and, therefore, were neither discovered nor litigated. The Settlement Agreement itself confirms that discovery exclusively focused on "dividend allocation policies and practices." (Appx. I at APP182 (emphasis

---

[6] With this revision, subdivision (ii) would read as follows: "any and all payments *of*, or failure to pay, dividends from the beginning of time up to and including the 2009 dividend scale." Thus, with the insertion of the word "of," subdivision (ii) would relate back to the underlying factual predicate: dividends.

added).) Wholly absent is any mention of discovery concerning Northwestern's policies and practices regarding payments, sales, marketing, illustrations, or advertising. (*See id.*)

Indeed, as acknowledged by class action scholars, this is exactly the type of release that, while highly desirable to class defendants, cannot legally be foisted on unknowing, absent class members who may have claims that depend on an entirely different set of facts:

> In order to stifle the threat of further litigation, the defendant will seek a judgment as broad as the law permits. As additional security, it may also seek releases from class members. The scope of a judgment is limited to the claims that were asserted or that may arise out of the transactions or events pleaded in the complaint.... A settlement may properly prevent class members from subsequently asserting claims relying upon a legal theory different from that relied upon in the class action complaint, *but depending upon the same set of facts.*

4 HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 12:15 (4th ed. 2009) (emphasis added). Given the wide reach of this release, which manages to encompass potential claims with no relationship to the underlying dividend issue, this Court should remand with instructions to the trial court to deny approval of the settlement unless the Parties narrow the release to parallel the lawsuit's actual factual predicate.

16

**B.      The Trial Court Erred in Approving the Settlement Because Members of the Disability Class Release Valuable Claims—Unrelated to the Subject Matter of this Lawsuit—in Exchange for Valueless Consideration**

**1.      The So-Called "Informational Pamphlet," Limited to the Dividend Issue, is of No Value**

While the Settlement requires Northwestern to pay $92 million in consideration for the release of the Term Class members' claims, it requires Northwestern to pay no cash and provide nothing else of value in consideration for the wholesale release of the Disability Class members' claims or potential claims, even those unrelated to the chose in action. ( *See* Appx. VII at APP1599.) The only "consideration" the Settlement provides in exchange for the release of the Disability Class members' claims is illusory—a single page of general information concerning dividend issues only. (*Id.*)

In particular, the one-page "informational pamphlet" briefly explains the terms "participating," "dividends," "reserves and surplus," "dividend distribution," and "illustrations" *vis-a-vis* the dividend issue. (Appx. I at APP236.) It then explains that Northwestern's Board of Trustees has complete discretion when making its annual decision regarding dividends, that dividends are not guaranteed, and that the company's philosophy is to pay the highest level of dividends consistent with maintaining a strong surplus position. (*Id.*) It further states that Northwestern applies an industry standard known as the

17

"contribution principle," which means dividends are proportionate to the contribution made by each group of policyholders. (*Id.*) The pamphlet then summarizes the factors affecting dividend allocation, discloses that the Board is free to change how it determines and allocates dividends without notice, and explains that dividends are paid to the policy owner or subtracted from premium amounts. (*Id.*) Finally, it includes a disclaimer that any illustrations (concerning dividends) are based on the current dividend scale, and are neither estimates nor guarantees of future dividend amounts. (*Id.*)

In summary, the informational pamphlet tells customers (and former customers, who have absolutely no use for this information) that Northwestern's Board maintains unfettered discretion regarding dividend distribution and that dividend illustrations guarantee nothing. As such, the "informational pamphlet" provides no concrete, useful information and essentially serves as a marketing tool wherein Northwestern is given the opportunity to contact current and former policyholders and tout its general "philosophy" to pay the highest dividend possible while still maintaining a strong surplus, but at the same time, it neither commits to anything specific nor reveals any nonpublic information (such as how much of a surplus it considers strong enough to justify dividend distribution). Under this standard,

18

Northwestern will always be free to decline to pay dividends under the justification that it believed its surplus needed further strengthening.

Without question, this generalized, self-serving boilerplate is: (1) of no value to anyone, in particular *former* disability policy holders, and policy holders who may have potential claims emanating from non-dividend related policies and practices, which are nonetheless released for this unrelated information; (2) not restrictive in any way on Northwestern's future conduct (and even if it were, such restriction could not benefit former policy holders); and (3) already publicly available at no cost.[7] Yet, this is the *sum total* of the information provided to Disability Class Members, whether they be current disability policy holders or not, in exchange for the wide-ranging release of myriad potential claims—dividend related or not—relating to their Disability Policies.

> ## 2. Regardless of the Strength of the Disability Class's Claims, it is Untenable to Release Such Claims in Exchange for Valueless Consideration

In the underlying action, Class Counsel attempted to ameliorate the inadequacy of the Settlement's relief to the Disability Class by arguing that

---

[7] Even if the receipt of the informational pamphlet could somehow be considered sufficient consideration for the release of a potentially valuable claim, this "pamphlet" is on file with the trial court as an attachment to the preliminary approval motion and is thus already available to any Class Members interested in this information. (Appx. I at APP236.)

during the course of litigation he learned that there were several obstacles to prevailing on the Disability Class's claims. Regardless of such obstacles, it is both unreasonable and legally insupportable to release the dividend-related claims (not to mention non-dividend related claims) stemming from numerous series of Disability Policies issued over approximately a 27-year period (1983 through 2008) (*see* Appx. I at APP140)[8] in exchange for very limited, publicly available information. If this illusory benefit were all that Northwestern ultimately offered, the only proper course for Class Counsel would have been to decline to settle, *or dismiss*, those particular claims.

In the underlying action, Plaintiff cited *Hill v. State Farm Mutual Automobile Insurance Co.* (2008) 166 Cal.App.4th 1438, 1468, for his argument that "the informative disclosure that will be provided to Disability Class members is valuable consideration that describes the actual deliberative dividend process—which, apart from the Settlement, NML had no duty to provide." (Appx. III at APP750.) While *Hill* does hold that an insurer has no duty to explain its dividend practices, it provides zero support for Plaintiff's proposition that such an explanation constitutes any, let alone adequate, consideration for the broad release of rights in a class action settlement. In

---

[8] The 27-year class period is an estimate, based on the facts that the period apparently begins in 1983 and has no time limit for inclusion. (*See* Appx. I at APP140.)

20

fact, *Hill* commands the opposite conclusion—that an explanation of an insurer's dividend practices is of no real value (and certainly of no value at all to former policy holders or policy holders with potential non-dividend related claims):

> [E]ven if State Farm had made the disclosure sought, policyholders would not have had any better idea of the dividends they might receive.  The insurance policies and bylaws did not indicate that dividends would be declared in any particular amount, manner, or time.  *Any disclosure about the surplus would have been of no assistance*.

*Hill*, 166 Cal.App.4th at 1489 (emphasis added).  Indeed, the informational pamphlet in this case is just as uninformative and useless as *Hill* presaged.

Caddell will not second-guess Class Counsel's evaluation of the Disability Class's *dividend claims* or willingness to settle those claims for nonmonetary consideration, provided such consideration has value. However, were this Court to affirm the trial court's approval of this settlement, thus condoning the overbroad release of the Disability Class's claims (including claims and potential claims beyond those related to Northwestern's dividend payments) in exchange for no consideration other than general information concerning dividend issues only, a dangerous new precedent would be set for the approval of a new category of nonmonetary "consideration" in class action settlements.   Not surprisingly, neither Class Counsel nor Northwestern provided the trial court with any authority supporting the notion that one page

21

of vague information somehow constitutes sufficient consideration justifying a blanket release of claims.

To the contrary, settling claims in exchange for nonmonetary, valueless consideration has been repeatedly criticized by the judiciary and class action scholars. The Manual for Complex Litigation warns against class settlements where illusory, nonmonetary relief is the only consideration exchanged for the release of claims:

> There are a number of recurring potential abuses in class action litigation that judges should be wary of as they review proposed settlements: . . . *granting class members illusory nonmonetary benefits, such as discount coupons for more of defendants' product, while granting substantial monetary attorney fee awards; . . . releasing claims of parties who received no compensation in the settlement* . . . .

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.61, 463 n.953, 464 n.958 (2008) (emphasis added). The Manual further explains that "[i]n determining the weight accorded these and other factors, courts have examined whether . . . nonmonetary relief, such as coupons or discounts, is unlikely to have much, if any, market or other value to the class." *Id.* § 21.62, 469 n.972.

A hotly-debated topic in class action jurisprudence has focused on whether coupons are adequate consideration in class action settlements (of course, this "pamphlet" does not even rise to the level of the oft-disparaged coupon, which at least, arguably, has some redemptive value). Courts have

22

criticized the benefits of some coupon settlements as being illusory consideration if the coupons cannot be combined or aggregated. *See Clement v. Am. Honda Fin. Corp.* (D. Conn. 1997) 176 F.R.D. 15, 28; *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.* (3d Cir. 1995) 55 F.3d 768, 807; *Buchet v. ITT Consumer Fin. Corp.* (D. Minn. 1994) 845 F. Supp. 684, 692-94, *as amended*, 858 F. Supp. 944. In fact, one result of the proliferation of often dubious coupon settlements was the passage of the Class Action Fairness Act of 2005, which adds additional specific requirements to coupon settlements to increase the level of scrutiny. *See* 28 U.S.C. § 1712(a)-(e). Ironically, here, the proposed settlement of the Disability Class Members' claims (and potential non-dividend related claims) attempts to push beyond the oft-criticized coupon to an entirely new category of nonmonetary class action consideration—the mere distribution of information.[9]

Consistent with the skepticism directed toward non-monetary consideration, a Federal Judicial Center publication cautions: "Some

---

[9]  The distribution of information is not one of the five recognized categories of nonpecuniary consideration in class action settlements, those being: (1) distribution of coupons, (2) monitoring for future harm, (3) distribution of securities, (4) reverter funds in which unclaimed funds revert to the defendant, and (5) fluid or *cy pres* recovery where unclaimed funds are distributed to persons other than class members. Geoffrey P. Miller and Lori S. Singer, NONPECUNIARY CLASS ACTION SETTLEMENTS, 60 Law & Contemp. Probs. 97, 98-99 (Autumn 1997).

settlement terms—'hot button indicators'—show their potential unfairness on their face. . . . *Hot button indicators include any remedy to which you cannot confidently assign a cash value.*" Barbara J. Rothstein & Thomas E. Willging, MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE FOR JUDGES (Federal Judicial Center 2005) at § III(C), p. 12 (emphasis added). Obviously, no cash value has been or can be assigned to the narrowly drawn informational "relief" proposed as the sole remedy for the Disability Class.

Moreover, while no case law exists *supporting* the release of class claims in exchange for publicly available information, case law does exist *rejecting* settlements where a class receives nothing more than "information" or nothing at all. For example, *In re Ford Motor Co. Bronco II Products Liability Litigation* (E.D. La. 1991) 981 F.Supp. 969, involved the proposed settlement of class claims for an alleged design defect that rendered sport utility vehicles prone to rolling over. *Id.* at 969. As here, the parties proposed a settlement awarding class members informational relief (though far *more* detailed than the single sheet of "information" here) of questionable monetary value in exchange for a similarly broad release. *Id.* at 972. In particular, class members were slated to receive a so-called "utility vehicle package," including a safe driving and handling video, a supplemental owners guide, an on-product safety-related sticker, a limited complimentary vehicle inspection, and a cost-

24

sharing offer for certain parts and repairs. *Id.* at 970. The United States District Court for the Eastern District of Louisiana denied preliminary approval, finding that class members would be receiving insufficient consideration for the "complete release of all consumer-related claims." *Id.* at 972. Significant to the court's decision was the parties' candid admission that it was virtually impossible to place any monetary value on the package. Particularly relevant here, the parties themselves placed *no monetary value at all* on the informational part of the package, instead urging that the complimentary vehicle inspection and cost-sharing components awarded class members some monetary relief. *Id.* The only features of the *Ford* settlement that even arguably provided monetary value are completely absent here, yet the *Ford* court *still* found the consideration inadequate to merit approval of the settlement.

Similarly, in *Crawford v. Equifax Payment Services, Inc.* (7th Cir. 2000) 201 F.3d 877, the Seventh Circuit reversed approval of a Rule 23(e) settlement when class members received nothing in exchange for giving up the right to pursue their claims as a class action. *Crawford* involved a class action under the Fair Debt Collection Practices act. *Id.* at 879. The parties settled, with Crawford to receive damages and an incentive fee totaling $2,000, and the rest of the class to receive nothing. *Id.* at 880. Significantly, the class

25

members receiving nothing did not give up their right to pursue individual claims against Equifax, but they did lose the right to proceed as a class action. *Id.* The Seventh Circuit rejected this arrangement, observing that the settlement did nothing for class members but "cut them off at the knees." *Id.* at 882. In the instant case, of course, Class Members give up far more than their procedural right to proceed as a class in exchange for nothing. Indeed, their claims—including claims unrelated to Northwestern's dividend payment practices that were never contemplated, investigated, pleaded, discovered, or litigated—are wholly extinguished, and they can proceed neither on a class-wide nor individual basis.[10]

Without question, courts should apply heightened scrutiny to class releases involving nonmonetary consideration, particularly where such consideration is nothing more than general information not particularized to each Class Member, and where it is the only "relief" being provided to the members of a class. Caddell recognizes that certain common forms of coupon settlements could be seen as the distribution of information, in particular the free credit reports and/or credit scores that are often components of settlements in Fair Credit Reporting Act cases. However, unlike the information provided

---

[10]  The release expressly releases individual claims. (Appx. I at APP193.)

under the instant settlement, credit reports and/or scores consist of information particularized to each individual class member; furthermore, credit reports and credit scores are regularly purchased on the open market by consumers who desire this information.[11]

In the present case, the information provided is mere general information that, in essence, explains Northwestern's defenses in this case and is not information that any Class Member would *ever* voluntarily purchase on the open market. Indeed, this information cannot be sold or traded for anything of value, cannot be aggregated to increase its value, and provides no real assistance to Class Members in being able to predict what their dividends will actually be.

### 3. The Term Class's Receipt of $92 Million Cannot Justify the Disability Class's Receipt of Nothing

To ensure fairness to the members of the Disability Class, the settlement of the Disability Class's claims must withstand scrutiny on its own without regard to the settlement of the Term Class's claims. *See Wershba*, 91 Cal.App.4th at 239 (concluding trial court adequately evaluated settlement where it "considered whether the relief offered in the settlement agreement

---

[11] *But see Acosta v. Trans Union* LLC (C.D. Cal. 2007) 243 F.R.D. 377, 390 (criticizing the value of free credit reports in a proposed class action settlement).

sufficiently benefitted each category of class members and found that it did"). Put another way, if this litigation involved only the Disability Class and the sole consideration provided by Northwestern was the informational "pamphlet," the trial court would likely not have approved the settlement. The fact that the Disability Class and the Term Class are combined in one lawsuit does not alter this evaluation of fairness to the Disability Class. *See Mirfasihi v. Fleet Mortgage Corp.* (7th Cir. 2006) 450 F.3d 745, 749-51.

In the first of two appeals of *Mirfasihi*, the Seventh Circuit rejected a proposed settlement in which members of one of two sub-classes received nothing of value in exchange for giving up their claims. *Mirfasihi v. Fleet Mortgage Corp.* (7th Cir. 2004) 356 F.3d 781, 785-87. There, mortgagors brought a Fair Credit Reporting Act class action against their mortgage company alleging transmission of their personal financial information. *Mirfasihi,* 356 F.3d at 782. As here, the proposed settlement involved two subclasses: a "telemarketing class" and an "information-sharing class." While the settlement provided members of the telemarketing class with monetary relief, the members of the information-sharing class were to receive, in the Seventh Circuit's words, "a big fat zero." *Id.* at 785. In reversing the district court's approval of the settlement, the Seventh Circuit was particularly concerned that class counsel—who, like here, represented both classes—did

not behave as honest fiduciaries who represented the class as a whole. *Id.* at 783 (stating that "[t]he idea that a rational fiduciary would surrender a claim worth $35 million in exchange for the satisfaction of knowing that his wrongdoer had been forced to pay $243,000 to members of another class staggers the imagination."). In a stinging criticism of the settlement that stripped one class of its claims with no remedy, the Seventh Circuit further stated:

> Would it be too cynical to speculate that what may be going on here is that class counsel wanted a settlement that would give them a generous fee and Fleet wanted a settlement that would extinguish 1.4 million claims against it at no cost to itself? The settlement that the district judge approved sold these 1.4 million claimants down the river. Only if they had no claim—more precisely no claim large enough to justify a distribution to them—did they lose nothing by the settlement, and the judge made no finding that they had no such claim.

*Id.* at 785. Ultimately, the Seventh Circuit remanded to the district court to determine whether the information-sharing class's claims were truly worthless.[12]

---

[12] In the instant case, the Settlement's broad release covers far more than the two dividend-related claims actually asserted on behalf of the Disability Class. The Settlement is thus improper notwithstanding that the trial court generally questioned the value of the two Disability Class's claims in the original proceeding because the Settlement releases potential claims that neither Class Counsel nor the trial court even considered, much less valued.

Along the lines of the Seventh Circuit's observations in *Mirfasihi* concerning the defendant's desire to settle purportedly worthless claims, during the December 24, 2008 fairness hearing, the trial court noted that (1) it was shocked that the settlement did not fall apart after the *Hill v. State Farm* opinion was issued, and (2) it assumed that Northwestern, after reading the *Hill* case, would decide not to settle and use some type of procedural device to get the issue before the Court. (RR at H22-H24.)

As Caddell argued to the trial court, Northwestern's desire to carry through with the settlement despite *Hill* can only be explained by the breadth of the release, which extends far beyond the claims that were actually explored and litigated, even to claims that have no connection to Northwestern's dividend policies and practices. Significantly, the trial court acknowledged this argument made by Caddell and others, and actually stated that it applauded suspicions regarding the scope of the release:

> But I will applaud you for one of your comments. And that is, your suspicion that the settlement did not fall apart or unravel after the *Hill* decision is based in part on the scope of the release. *I certainly can't say you're wrong in that regard*. That's a thought that has occurred to me as well. And it's something that I'm examining and have to examine by way of this hearing, so I think it's a good thought.

(RR at H33-H34 (emphasis added).)

30

In addition, *Hill*, which narrowly addresses the business judgment rule in the context of dividend payments, provides no defense to other claims released relating to "any and all payments . . . sales, marketing, illustrations, or advertising." (*See* Appx. I at APP193.) Accordingly, the broad release is undoubtedly attractive and valuable to Northwestern, particularly where the cost to Northwestern involves nothing more than providing a valueless disclosure of vague information concerning dividend policies only.

### 4. The Settlement Provides Absolutely No Relief to Former Policy Holders

Courts have also criticized class action settlements that, as here, provide inadequate relief, let alone no relief at all, to former customers. *See, e.g., Parker v. Time Warner Entm't Co., L.P.* (E.D.N.Y. 2007) 239 F.R.D. 318. *Parker* involved a class action regarding Time Warner's disclosure and sale of its customers' personal identification information in violation of privacy laws. The proposed settlement provided current customers with credit for free movies and provided former customers (who lived outside the service area and could not use this credit) with the right to transfer the credit to a person living in Time Warner's service area. *Parker*, 239 F.R.D. at 326. The court rejected the settlement, finding that merely providing former customers with a credit that they could not use themselves was not a sufficient benefit. *Id.* at 340-42.

31

In the present case, the benefit to former policyholders is much less valuable than the rejected benefit in *Parker*. Even assuming that the informational pamphlet actually has value to Northwestern's current policyholders, it is inconceivable how such information could have any value to a former policyholder like Caddell who no longer has a policy or any interest in how dividends are determined for those who still have policies.

Notably, the class counsel in *Parker* at least attempted to create some benefit for former customers by negotiating for a provision that permitted the former customer (who lived outside the Time Warner service area and thus could not use the credit) to sell the credit to someone who could use it. *Id.* at 326. Here, the benefit to former disability policy holders is even more inadequate than in *Parker* because not only does the former policyholder have no use for the pamphlet, he cannot obtain any benefit by transferring it to a current policyholder. Of course this fact highlights Caddell's main point *The pamphlet has no value to anyone*. In addition, stripping former customers of claims never even contemplated by this lawsuit only adds insult to injury.

### 5.    The Opt-Out Right Is No Cure-All

Class Counsel's inability to obtain any valuable consideration in exchange for the Disability Class release should have resulted in dismissal of those claims rather than settlement on an illusory basis. However, rather than

32

dismissing these purportedly worthless claims, Northwestern resorted to arguing that those Class Members who do not like the settlement can simply opt out. (*See* Appx. III at APP636-37.) This perfunctory, widely-rejected argument cannot justify the settlement as it applies equally to all opt-out settlements—that is, accepting this argument effectively mandates the final approval of any class action settlement with opt-out rights because, no matter how unfair the settlement, the proponents can always argue that dissatisfied Class Members are free to opt out. Not surprisingly, as fairness would have it, the mere presence of the opt-out right cannot save an otherwise inadequate settlement. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.* (3d. Cir. 1995) 55 F.3d 768, 809 (stating that "the right of parties to opt out does not relieve the court of its duty to safeguard the interests of the class and to withhold approval from any settlement that creates conflicts among the class."); *see also Acosta*, 243 F.R.D. at 388 (holding that opt-out right did not save a settlement that denied relief to an entire segment of a class).

In the present case, as in all 23(b)(3) class action settlements, opting out is not a viable alternative for Class Members whose claims are too small to pursue individually. The opt-out provision might be a viable choice for a Class Member with a sizable claim who has particular interests that materially differ from the majority of the Class Members and are not appropriately

compensated under the proposed Settlement Agreement.  However, for Class

Members with small claims who have objections to the settlement not limited

to their particular situations, opting out is not a viable option capable of curing

deficiencies in the settlement.  *See In re Gen. Motors Corp. Pick-Up*, 55 F.3d

at 809 (observing that the argument that dissatisfied plaintiffs can opt out of

the class "ignores the realities of pursuing small claims"); *Acosta*, 243 F.R.D.

at 388 (observing that "common sense and empirical study admonish that any

belief that a significant number of class members [will opt out] is ill-

founded").

C.     **The Trial Court Erred in Approving the Settlement Given
        An Incurable Conflict of Interest that Rendered Both the
        Class Representative and Class Counsel Inadequate**

The lack of an independent, non-conflicted class representative and

class counsel for each distinct class likewise renders the Settlement unfair and

unreasonable.  Of course, this observation becomes all the more acute in

retrospect, when one of the two classes is left with nothing under the

settlement.  *See Molski v. Gleick*   (9th Cir. 2003) 318 F.3d 937, 956

(concluding trial court abused its discretion by finding adequacy of

representation requirement was met where case settled and awarded almost all

class members no compensation in exchange for release of their claims);

*Mirfasihi*, 356 F.3d at 785 (finding class settlement inadequate where "the

34

[subclass] that was denied relief did not have separate counsel from the counsel for the favored class").

Caddell does not suggest that a class representative and class counsel can never adequately represent two classes simultaneously. In the present case, however, Mr. Papadakis and his counsel suffered an incurable conflict of interest highlighted by a settlement that provides $92 million to the members of the Term Class and no money to the Disability Class in exchange for a comprehensive release. The gross disparity in consideration paid for the release of these distinct claims demonstrates that neither Mr. Papadakis nor Class Counsel is able to adequately represent both the Term Class and the Disability Class.

Regarding Mr. Papadakis, the law requires not only that a class representative be a part of the same class he represents, but also that he "possess the *same interest* and suffer the *same injury* as the class members." *Amchem Products, Inc. v. Windsor* (1997) 521 U.S. 591, 625-26 (emphasis added and internal quotation omitted); *see also In re Joint E. & S. Dist.*, 982 F.2d at 742-743, (stating that "adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent *solely* the members of their respective subgroups.") (emphasis added).

35

Class Counsel admitted that this litigation is "based upon two separate and distinct patterns of illicit conduct" and that there are "two distinct classes of aggrieved NML policyholders." (Appx. I at APP119.)  Class Counsel nevertheless asserts that the Mr. Papadakis "will fairly and adequately represent and protect the interests of each class in that he has no interests antagonistic to those of the other Class Members." (Appx. I at APP121.) Because Mr. Papadakis is a member of both classes, however, he is uniquely situated to benefit from a Settlement that provides 100% of its monetary relief to the Term Class and *no money at all* to the Disability Class.[13]  If the Disability Class were represented by a unconflicted class representative who was a member of the Disability Class alone (as required), that class representative would have an incentive to object to the arrangement. *See In re Joint E. & S. Dist. Asbestos Litig.* (2d Cir. 1992) 982 F.2d 721, 742-743, *modified on reh'g sub nom., In re Findley* (2d Cir. 1993) 993 F.2d 7 (stating

---

[13] Mr. Papadakis has other differences with Disability Class members that reinforce his inadequacy as a disability class representative.  When deposed, Mr. Papadakis testified that his agent advised him that disability dividends were not guaranteed and could go up or down. (*See* Appx. III at APP640-41 (citing Appx. III at APP695-96).)  Accordingly, Mr. Papadakis, the sole class representative for the Disability Class, made admissions in his deposition that completely undermined his Disability Claim, thereby rendering him inadequate to represent members of the Disability Class who were not given these oral warnings.  Other members of the Disability Class, who were not given these warnings by their agents, would surely have stronger claims, and in turn, a stronger bargaining position.

36

subclasses must be represented by those whose role is to represent *solely* the members of their respective subgroups); *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.23 (2008) ("Each class or subclass must independently satisfy all the prerequisites of Rules 23(a) and (b)."); *see also Cunningham Charter Corp. v. Learjet, Inc.* (S.D. Ill. 2009) 258 F.R.D. 320, 325 ("Rule 23 treats subclasses as regular classes that must independently satisfy every Rule 23 requirement."); *Jones v. Goord* (S.D.N.Y. 2006) 435 F. Supp. 2d 221, 232 ("Because a subclass is itself a class, each subclass must separately and independently satisfy the requirements of Rule 23 for class certification.").

Regarding Class Counsel, his fee was calculated as a percentage of the $92 million being paid to the Term Class members—he is being paid *nothing* for the illusory relief he obtained for the Disability Class. (Appx. V at APP1147.) Class Counsel thus had little incentive to jeopardize a $27 million fee in the name of refusing to settle the Disability Class's claims for essentially nothing. This is the precise scenario the Seventh Circuit rejected in *Mirfasihi. See* 356 F.3d at 785 (finding class counsel inadequate when it brokered a settlement that denied relief to an entire subclass).

Both Mr. Papadakis and his counsel were conflicted when negotiating with a defendant who insisted on a comprehensive release of the Disability

37

Class's claims in exchange for no consideration.  Though seemingly cynical, the $92 million Term Class settlement was unquestionably tied to securing the $0 Disability Class settlement and, thus, Papadakis and Class Counsel were likely motivated to sacrifice the claims (both asserted and unasserted in this lawsuit) of the Disability Class in order to obtain the Term Class settlement. Because this settlement provides all the monetary consideration to the Term Class and provides only valueless and illusory "informational" relief to the Disability Class, it becomes clear that (regardless of good intent or hard work) the Class Representative and his counsel did not provide adequate representation to the Disability Class, and their clear conflict of interest (in representing both Classes simultaneously) prevented them from adequately representing the Disability Class.   Conversely, were the Term Class represented by a different class representative and separate counsel, they might have raised an objection to the fact that their settlement funds were being used to pay the legal fees and expenses—including those of Mr. Caliri—incurred at least in part by Class Counsel in pursuing the Disability Class's claims. Moreover, if the Disability Class had separate counsel, said counsel would have undoubtedly declined a settlement under which Northwestern paid no money to the Class and no attorney's fees.

38

D.    **The Trial Court Erred In Approving Payments to Plaintiff's Non-Lawyer Consultant from Class Counsel, As Well As From the Settlement Fund**

In the proceeding below, the trial court approved two forms of so-called "consulting expenses" to Class Counsel's non-lawyer consultant, Frank Caliri. (Appx. V at APP1158.)   First, the trial court approved an undisclosed contingent payment to be made by Class Counsel to Mr. Caliri.   (Appx. V at APP1158-59, APP1161-62.)   Second, the trial court awarded Mr. Caliri $3.79 million to be paid from the settlement fund.   (*Id.*)   The contingent fee-sharing arrangement plainly violates both the California disciplinary rules and law, and the multi-million dollar payment from the settlement fund is excessive based on recently discovered evidence.   As such, neither award may stand.

1.    **California Law Prohibits a Non-Lawyer Consultant from Sharing in Class Counsel's Attorney's Fees**

Turning first to the contingency-fee issue, California law unquestionably prevents lawyers from sharing their contingent fee awards with non-lawyers. *Gassman v. State Bar* (1976) 18 Cal.3d 125, 130-31; *McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 344; RULES PROF. CONDUCT, rule 1-320(A) (prohibiting a law firm from directly *or indirectly* sharing legal fees with a person who is not a lawyer).   In *McIntosh*, (which is virtually indistinguishable from the instant case) an attorney agreed to share a portion of his contingency fee award with a non-lawyer consultant in exchange for the

39

consultant's help in pursuing two class actions. *McIntosh*, 121 Cal.App.4th at 337. When one of the class actions settled, the attorney refused to honor the agreement, and the non-lawyer consultant sued. *Id.* Citing California Rule of Professional Conduct Rule 1-320(A), the California Court of Appeal found the fee-sharing agreement illegal and affirmed summary judgment for the attorney. *Id.* at 344. In part of its lengthy discussion regarding the ethical problems surrounding fee sharing with non-lawyers, the Court noted the "particularly acute" problems of non-lawyer fee sharing in the class-action context:

> The potential problems associated with fee sharing are perceived to be particularly acute when viewed in the context of class action litigation where unique, and sometimes intractable, conflicts may already exist. These conflicts appear most commonly as "agency issues" resulting from the fact that the attorney is usually retained by a single or small group of named plaintiffs but who also represents a large class of unnamed individuals. Because of the extent of the potential conflicts arising from the settlement of class action litigation, it has been suggested that courts should take special care to ensure accountability by the attorney to nonpresent class members.

*Id.* at 345-46 (internal citation omitted).

Anticipating that the fee-sharing arrangement was likely improper, the order awarding attorneys fees, which was drafted by Class Counsel, recites that Mr. Caliri's contingent fee will be paid "as a general obligation of the firm" and "not out of [Class Counsel's] Fee Award." (Appx. V at APP1161.) This characterization is initially belied by the order itself, which candidly states that

"Mr. Caliri undertook this engagement on a contingency basis . . . ." (*Id.* at APP1159.) Indeed, Class Counsel admits that he entered into a non-testifying contingency consulting agreement with Mr. Caliri because he otherwise ***could not afford to pay him.*** (Appx. II at APP313-14.) Absent the fee award, therefore, Class Counsel could never make good on his firm's "general obligation."

In any event, the California Disciplinary Rules both contemplate and prohibit the meaningless distinction advanced here by prohibiting not only direct, ***but also indirect*** fee-sharing. *See McIntosh*, 121 Cal.App.4th at 344 (quoting RULES PROF. CONDUCT, rule 1-320(A)). Class Counsel cannot end-run the disciplinary rules by characterizing Mr. Caliri's portion of the contingency fee award as a general obligation of his firm.

Caddell anticipates that Class Counsel, relying on *Ojeda v. Sharp Cabrillo Hospital* (1992) 8 Cal.App.4th 1, will argue—just as it did to the trial court—that Caddell's objection to its arrangement with Caliri contradicts well-settled California law specifically allowing a non-testifying consultant to be paid on a contingent basis. Of course, if California law on this issue were truly well-settled in Class Counsel's favor, Class Counsel would not have troubled himself to clarify that Mr. Caliri's fee will be paid as a general obligation of Class Counsel's firm as opposed to a portion of his Fee Award. (*See* Appx. V

41

at APP1161.) Not surprisingly, an examination of *Ojeda* reveals that the issue in that case centered on whether a *plaintiff* may a pay non-testifying consultant on a contingent basis, not whether an attorney may *share* his contingency fee award with a non-lawyer consultant.

*Ojeda* involved a medical malpractice claim where the *plaintiff* hired a non-lawyer consultant to assist her attorney by reviewing medical records and locating experts. *Ojeda*, 8 Cal.App.4th at 4-5. Thus the *plaintiff*—and not her attorney—entered into a contract agreeing to pay the consultant twenty percent of *her recovery* in exchange for these services. *Id.* at 4-5. Because the fee was to be paid out of the client's recovery, and not the attorney's fee, no fee sharing was involved. The court of appeals approved the arrangement (*id.* at 14-17), and also provided guidelines for the trial court to use in evaluating the reasonableness of such a fee on remand and in future cases. *Id.* at 20-22. In so holding, the court carefully confined its evaluation of the contract at issue to the circumstances of that case, including the interaction of the Rules of Professional Conduct with the strictures of the Medical Injury Compensation Reform Act of 1975 (MICRA), which limits the contingent fee an attorney may charge in a negligence case against a healthcare provider. *Id.* at 8-10. The scenario approved by the *Ojeda* court is thus markedly different from the scenario here, which undisputedly involves an agreement in which

attorneys—who could not afford to pay a consultant prior to receiving their fee award—agreed to share a portion of their fees with a non-lawyer consultant. (Appx. II at APP313-14.)

Ojeda is further distinguishable because, unlike McIntosh, it did not involve a class action, and instead involved a contract in which a single plaintiff agreed to pay a consultant a contingent fee. 8 Cal.App.4th at 4. As such, the plaintiff was free to evaluate whether she wanted to pay the agreed-upon amount after consideration and negotiation. By contrast, a class action necessarily involves absent class members who have *no ability* to determine whether paying a consultant a multi-million dollar contingent fee is in their best interest. *See McIntosh*, 121 Cal.App.4th at 345-46. Class actions are generally recognized as unique because of the need to protect the interests of absent class members, and this instance provides an example where those interests have been short-changed. *Id; see also Kullar*, 168 Cal.App.4th at 130 ("[T]o protect the interests of absent class members, the court must independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interests of those whose claims will be extinguished.").

Finally, the contingent-fee arrangement is flawed because it shifts risk from Class Counsel to Mr. Caliri, thereby reducing Class Counsel's potential

43

exposure in this case should there be a take-nothing result. Class Counsel requested a relatively high fee in this matter—amounting to a lodestar multiplier factor of 3.83 and a percentage of the fund of 30%. (Appx. V at APP1147.) Lodestar multipliers are meant to reward class counsel for, among other things, taking on the risk of no recovery. *See In re Consumer Privacy Cases* (2009) 175 Cal.App.4th 545, 556; *Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 624-25. The reward is intended to compensate not only for the risk that class counsel may be unpaid for their time, but also that class counsel may be unable to recover the (often substantial) outlay of funds necessary to retain experts. By shifting this risk to Caliri without reducing his fee accordingly, Class Counsel is effectively being compensated for a risk never undertaken. In a traditional arrangement, Class Counsel would have presumably paid Mr. Caliri several millions of dollars out-of-pocket and risked losing this amount were the litigation unsuccessful. Here, while no such risk was undertaken, Class Counsel's lodestar multiplier and percentage of the fund (both on the high end of the spectrum) reflect otherwise.

In the end, the fee-arrangement here mirrors the illegal contract in *McIntosh* rather than permissible contract in *Ojeda*. Because the underlying

44

contract was illegal, the fee-sharing arrangement it contemplated should not have been approved by the trial court here.

### 2. The Hourly Award to Mr. Caliri from the Settlement Fund was Excessive

Mr. Caliri's $3.8 million fee award was also improper given the scant evidence justifying the hourly rate used to calculate his fee—evidence that Class Counsel has now, in a sense, retracted. Class Counsel repeatedly represented to the trial court that Caliri's regular 2004 hourly rate was $550 per hour. (Appx. III at APP823.) This was echoed in Class Counsel's fee request, which sought payment of Caliri's "regular" hourly rate: "Class Counsel seeks 5.78% of the Common Fund to pay out of pocket expenses and *Caliri's regular hourly rate*." (Appx. II at APP314 (emphasis added).)

After discovering sworn testimony from another case stating that Caliri's 2005 hourly rate ranged from $325 to $375 per hour depending on the complexity of the case[14] and the issues involved, Caddell questioned Class Counsel about the rate charged in this matter. (*See* Appx. IX at APP2155.) When confronted with the discrepancy, Class Counsel reversed course and presented a new declaration from Caliri recharacterizing the $550/hour as the

---

[14] Apparently, Mr. Caliri charged as much as $375 for complex matters. At this rate, with 6,895 hours, Mr. Caliri should have received no more than $2,585,625.

"rate [Caliri] . . . charged for [his] *complex* financial analysis work." (Appx. IX at APP2148 (emphasis added).)  Caliri further claimed that the hourly rate he charges for insurance claims analysis is less than the rate he charges for financial analysis "given the widely different skill sets involved." (Appx. IX at APP2150.)

Class Counsel, when drafting the Fee Order for the trial court's signature, strategically avoided any recitations about Caliri's "normal" billing rate, instead stating only that the rate is "reasonable and not excessive." (*See* Appx. V at APP1160.)  Presumably this finding was based, at least in part, on Caliri's previous representations that $550 was his *regular* rate rather than a rate inflated for the purposes of this litigation.  Given Mr. Caliri's revelations, the Court should remand to the trial court to reevaluate Mr. Caliri's fee award, particularly when the Court awarded Caliri a staggering $3.8 million fee based on the full $550 rate and the full amount of the almost 7,000 hours he billed, plus the additional amount he is to be paid by Class Counsel pursuant to the contingency multiplier.  Given that Caliri is receiving millions of dollars that would otherwise go to Class Members, the trial court should have conducted a more extensive inquiry into the reasonableness of the hourly rate used to calculate his fee.

## IX.   CONCLUSION

The trial court erred in approving an unfair, inadequate settlement that provides the Term Life Class a significant cash payment while the Disability Class receives something no appellate court has recognized as acceptable, let alone valuable, consideration.  Even worse, the Disability Class receives this valueless consideration in exchange for the release of claims wholly unrelated to this lawsuit.

The trial court likewise erred when it found Mr. Papadakis and Class Counsel could adequately represent both the Term Life and Disability Class. Because both Mr. Papadakis and his Counsel stood to benefit from the large cash settlement offered to the Term Life Class, neither was able to adequately object to the inadequate settlement offered to the Disability Class.

Finally, the trial court erred by allowing Class Counsel to pay its consultant an undisclosed contingent fee in violation of California law and the California Disciplinary Rules, and by allowing this same consultant to be paid an excessive hourly fee from the settlement fund.  Not surprisingly, no California court has ever approved such an arrangement, and this Court should not be the first, especially when that approval would come at the expense of millions of absent class members.

For the reasons set forth above, the Court should conclude that the settlement is inadequate and should remand this case to the trial court. To do otherwise would effectively invite class action lawyers to settle class claims for valueless consideration while garnering large attorneys' fees for themselves.

Dated:        November 13, 2009

CADDELL & CHAPMAN

Cory S. Fein
(California State Bar No. 250758)
CADDELL & CHAPMAN
1331 Lamar St., Suite 1070
Houston, TX 77010
Telephone: (713) 751-0400
Facsimile: (713) 751-0906

**Attorney for Appellant**
**MICHAEL A. CADDELL**

48

## CERTIFICATE OF COMPLIANCE

Counsel of Record hereby certifies that pursuant to Rule 8.204(c)(1) or 8.504(d)(1) of the California Rules of Court, the enclosed Brief of Appellant is produced using 13-point or greater Roman type, including footnotes, and contains 10,749 words, which is less than the total words permitted by the rules of court. Counsel relies on the word count of the computer program used to prepare this brief.

Dated:        November 13, 2009

> CADDELL & CHAPMAN
>
> Cory S. Pein
> (California State Bar No. 250758)
> CADDELL & CHAPMAN
> 1331 Lamar St., Suite 1070
> Houston, TX 77010
> Telephone: (713) 751-0400
> Facsimile: (713) 751-0906
>
> ***Attorney for Appellant***
> ***MICHAEL A. CADDELL***

49

State of California          )          Proof of Service by:
County of Los Angeles  )          ✓ US Postal Service
                                     )                 Federal Express

I, Elizabeth Hong          , declare that I am not a party to the action, am over 18 years of age and my business address is:  354 South Spring St., Suite 610, Los Angeles, California 90013.

On 11/13/2009 declarant served the within: Brief of Appellant upon:

| 1   Copies   FedEx  ✓ USPS |
| --- |
| Each Party on Attached Service List |

| 4   Copies   FedEx  ✓ USPS |
| --- |
| Office of the Clerk
Supreme Court of California
350 McAllister Street
San Francisco, CA 94102-4797 |

| Copies   FedEx   USPS |
| --- |
|  |

| Copies   FedEx   USPS |
| --- |
|  |

the address(es) designated by said attorney(s) for that purpose by depositing **the number of copies indicated above,** of same, enclosed in a postpaid properly addressed wrapper in a Post Office Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of California, or properly addressed wrapper in an Federal Express Official Depository, under the exclusive custody and care of Federal Express, within the State of California

I further declare that this same day the **original and** 4 copies has/have been ✓ hand delivered for filing OR the **original and** copies has/have been filed by third party commercial carrier for next business day delivery to:

Office of the Clerk
Court of Appeal
2nd Appellate District, Division 8
Ronald Reagan State Building
300 South Spring Street
2nd Floor
Los Angeles, CA 90013

I declare under penalty of perjury that the foregoing is true and correct:

Signature: _____

# SERVICE LIST

Timothy J. Morris
Gianelli & Morris
626 Wilshire Boulevard
Suite 800
Los Angeles, CA 90017
> *Attorney for Plaintiff,*
> *Nicholas Papadakis*

George A. Riley
Phillip Robert Kaplan
O'Melveny & Myers
610 Newport Center Drive
17th Floor
Newport Beach, CA 92660
> *Attorney for Defendant-Respondent,*
> *The Northwestern Mutual Life Insurance Company*

Darrell Palmer
Law Offices of Darrell Palmer
603 North Highway 101, Suite A
Solana Beach, California 92075
> *Attorney for Objectors-Appellants,*
> *Marci R. Frenkel, Eric Zeigenhorn, Norma Hoffman,*
> *Stuart Mintz, Kirk Stewart, Steven Sindell,*
> *and Paul M. Kaufman*

David Michael Poore
Kahn Brown & Poore LLP
110 Kentucky Street
Petaluma, CA 94952
> *Attorney for Objectors-Appellants,*
> *David Berardinelli, Debra Ortiz Berardinelli,*
> *Samantha V. Rodriquez, Russell A. Rodriquez,*
> *and Bryan Lopez*

Michael D. Luppi
18341 Sherman Way
Suite 202
Reseda, CA 91335-4498
    *Attorney for Objectors-Appellants,*
    *Jack O. Tomlinson and Russell Vandevelve*

Alan Jan Sherwood
Law Offices of Alan J. Sherwood
1300 Clay Street
Suite 600
Oakland, CA 94612
    *Attorney for Objectors-Appellants,*
    *Jim Foyt and Henry Washburn*

Clerk for the Hon. Peter Lichtman
Los Angeles County Superior Court
Central Civil West Courthouse
Department 322
600 South Commonwealth Avenue
Los Angeles, CA 90005