

FILED
SEP - 5 2013
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

GREGORY THOMAS BERRY, et al.,

    **Plaintiffs**

**v.**

**LEXISNEXIS RISK & INFORMATION ANALYTICS GROUP, INC., et al.,**

    **Defendants**

Civil Action No. 3:11-cv-00754

Judge James R. Spencer

## OBJECTION TO PROPOSED SETTLEMENT

This Court should refuse to approve the Rule 23(b)(2) injunctive relief portion of the parties' proposed settlement because the proposed relief woefully fails to remedy Defendants' ongoing FCRA violations as detailed in the Plaintiffs' complaint and is a sham settlement that serves primarily to enrich Plaintiffs' counsel.

## ARGUMENT

As the filings in this case illustrate, Lexis maintains and sells numerous consumer database products containing sensitive and extensive personally-identifiable consumer information such as a person's name, name variations, addresses, date of birth, social security number, phone numbers, email addresses, employment information, civil judgments, liens, criminal records, relatives, voter registrations, arrest records, warrants, properties owned, UCC filings, bankruptcy filings, professional licenses, present and historical driver's license information, marriage and divorce information, watercraft ownership, FAA registrations, and a

plethora of other highly sensitive personal information.[1] The product at issue in this case, Lexis's "Accurint" database, is sold to collection agencies, insurance agencies, government entities, health care organizations, and many others. A review of Lexis's product index website[2] reveals the purposes for which Lexis sells these products. For example, Lexis advertises "Accurint for Insurance" on its website as follows:

**Identify people and businesses**

Accurint for Insurance allows you to instantly authenticate the identities of both people and businesses. It verifies essential personal information such as name, address and Social Security Number.

**Investigate suspicious claims**

It searches comprehensive Accurint for Insurance databases for evidence of financial distress or prior criminal activities. Accurint for Insurance also confirms the existence of a variety of different assets, such as property, motor vehicles and FAA aircraft.

**Fight insurance fraud**

Accurint for Insurance offers several other powerful tools for combating insurance fraud. Its fast, powerful reporting feature explores the connections among people, businesses, assets and locations.

**Identity verification**

Accurint for Insurance can be used to verify, validate and authenticate the identities of both people and businesses. . . . It searches billions of records and thousands of independent data sources to provide the broadest and most accurate information.

**Rate Evasion Evaluation: Fight application and premium fraud**

This powerful tool detects applicant misrepresentations, such as identity, address, vehicle ownership and registration information, and property

---

[1] *Comprehensive Report*, LEXISNEXIS, http://www.lexisnexis.com/privacy/for-consumers/report-web-site-example.pdf (last visited Aug. 22, 2013); *Accurint for Insurance Fraud*, LEXISNEXIS, http://www.lexisnexis.com/risk/solutions/accurint-insurance.aspx (last visited Aug. 22, 2013).

[2] *LexisNexis Risk Solutions - Risk Management, Fraud Prevention, and Identity Authentication and Verification Solutions*, LEXISNEXIS, http://www.lexisnexis.com/risk/solutions/product-index.aspx (last visited Aug. 22, 2013).

characteristics.

**Verify applicant information**

To determine whether or not a potential customer has falsified application information, Rate Evasion Evaluation verifies all personal data through our accurate, comprehensive database of public records. It can help you verify everything from date of birth, address, and telephone numbers to ownership, registration information, and even vehicle location and characteristics.

**Detect fraudulent information**

Rate Evasion Evaluation returns a unique and customized score to identify areas of potential risk. You can investigate applicant misrepresentations during the underwriting process or anytime during the life of a claim.[3]

Another Lexis product containing similar information, called "FraudPoint," uses the same core database of consumer information and is advertised as follows:

**Fraud risk — ranked and scored with precision**

FraudPoint reveals fraud characteristics not evident in standard verification and validation processes by catching inconsistencies in applicant and account information.

With access to the most authoritative data and analytics, FraudPoint Score is an analytic scoring solution that delivers critical, relevant insight that can substantially improve your ability to predict and prevent fraud — and recognize and approve authentic customers. An easy-to-interpret, three-digit score ranks individuals according to their calculated risk to commit fraud, making the decision process simple.

Not only will you be preventing fraud as you identify legitimate new customers, but you'll also be doing it quickly.

**Accurate risk assessment**

The effectiveness of a predictive score depends on the quality of the underlying data used to produce it. FraudPoint scores are generated from a vast collection of public records and non-traditional, proprietary information. This data is then used to assess the likelihood that an individual will potentially commit fraud.

---

[3] *LexisNexis Accurint for Insurance*, LEXISNEXIS,
http://www.lexisnexis.com/risk/downloads/literature/accurint-insurance.pdf (last visited Aug. 22, 2013).

**Comprehensive data sources**

FraudPoint incorporates a wealth of constantly updated public records and can evaluate up to 75 million more consumers than traditional credit bureaus. Once the data is gathered from multiple sources, it goes through a sophisticated linking and analytics process that ultimately assigns a score based on fraud potential or the lack thereof.[4]

At the heart of this case is whether the FCRA's definition of "consumer report" encompasses these uses. For the reason set forth below, it is virtually indisputable that the FCRA does cover, and was clearly designed to cover, these uses of consumer information. To argue otherwise is so anathematic to the plain language of the FCRA and to Congress's expressed intent that in an ideal world Lexis's counsel would be sanctioned for persisting in a frivolous defense that has no reasonable basis in law or fact.

## LEGISLATIVE INTENT BEHIND THE FAIR CREDIT REPORTING ACT

When the FCRA — introduced in Congress as "The Good Name Protection Bill"[5] — was passed in 1970, abuses by consumer reporting agencies ("CRAs") that collected and sold personal consumer information were "extensive and intolerable."[6] By the late 1960s, one U.S. credit bureau sold over 97 million credit reports each year and maintained files on over 110 million Americans.[7] Reports not only contained basic information such as "the applicant's name, address, marital status, bank references, and a summary of his bill paying habits," but also

---

[4] *FraudPoint Fraud Prevention Solution*, LEXISNEXIS, http://www.lexisnexis.com/risk/solutions/fraudpoint-fraud-prevention.aspx (last visited Aug. 22, 2013); *LexisNexis FraudPoint Solutions*, LEXISNEXIS, http://www.lexisnexis.com/risk/downloads/literature/fps.pdf (last visited Aug. 22, 2013).

[5] A Bill to Enable Consumers to Protect Themselves Against Arbitrary, Erroneous, and Malicious Credit Information, H.R. 19403, 91st Cong. (1970).

[6] A Bill to Enable Consumers to Protect Themselves Against Arbitrary, Erroneous, and Malicious Credit Information: Hearing on H.R. 16340 Before the Subcomm. on Consumer Affairs of the H. Comm. on Banking and Currency, 91st Cong. 10 (1970) (statement of Leonor Sullivan, Chairman, Subcomm. on Consumer Affairs of the H. Comm. on Banking and Currency).

[7] Craig Wilson, *Protecting Consumers from Arbitrary, Erroneous, and Malicious Credit Information*, 4 U.C.D. L. Rev. 404, 404 (1971).

typically contained "comment[s] on the individual's personal character," information gleaned "from newspapers and other public records," "unverified gossip [from] neighbors and business associates," and "falsified information" from agency employees "resort[ing] to short-cut techniques."[8] Some credit bureaus included court records indicating that a consumer had been arrested or sued, yet failed to "follow up on the outcome of the cases."[9] Making matters worse, a lender who refused a consumer credit or an employer who rejected an applicant was not required to disclose that the reason for rejection was information in a consumer report.[10] In fact, most credit bureaus contractually forbade their customers from informing consumers of the existence of the report or the identity of the credit bureau, a foreshadowing of Lexis's current practice of relying on its contractual disclaimers with report end-users.[11] A consumer could not obtain a copy of his report directly from the credit bureau.[12] On the other hand, it was "with great ease" that almost anyone but the subject of the report could access the file.[13]

Congress passed the Fair Credit Reporting Act to remedy these widespread abuses. Acknowledging in the FCRA itself that "[a]n elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers," the Act created affirmative consumer rights designed to "insure that consumer reporting agencies exercise their grave responsibilities with fairness,

---

[8] *Id.* at 404; Joanne Colombani, *The Fair Credit Reporting Act*, 13 Suffolk U. L. Rev. 63, 63 n.1 (1979).

[9] Wilson at 406.

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.* at 407.

impartiality, and a respect for the consumer's right to privacy."[14] Among other remedies, the FCRA provides a consumer with the right to find out what information is in his consumer report; requires CRAs to "follow reasonable procedures to assure maximum possible accuracy" of reports; gives consumers the right to dispute inaccurate information and have unverifiable or incorrect information deleted; and limits the permissible purposes for which a consumer report can be disclosed.[15]

Now, however, instead of two or three large credit bureaus as in the 1960s, there are over 400 CRAs operating in the United States, collecting and selling such diverse information as tenant histories, medical information, prescription histories, professional license information, and any other personally identifiable information they can acquire.[16] The computerization of data has made it easy and inexpensive for "data brokers" such as Lexis to collect information such as court records, addresses, telephone listings, and social security numbers, all of which were once only available in paper format or by access to remote, restricted databases.[17] Voluminous data about consumers is then sold to potential employers, insurance companies, law enforcement, and to members of the public willing to pay a small fee for information about someone else. The FTC has noted that this data is now often "used in place of traditional credit reports to make

---

[14] 15 U.S.C. § 1681(a) (2006).

[15] 15 U.S.C. §§ 1681g, 1681e(b), 1681i, 1681b (2006).

[16] Emily Stephenson, *US Consumer Agency to Supervise Credit Reporting Companies*, REUTERS, July 16, 2012, http://www.reuters.com/article/2012/07/16/financial-regulation-cfpb-idUSL2E8IDGGZ20120716; *Fact Sheet 6b: "Other" Consumer Reports: What You Should Know about "Specialty" Reports*, PRIVACY RIGHTS CLEARINGHOUSE (January 2013), https://www.privacyrights.org/fs/fs6b-SpecReports.htm.

[17] Juliana Gruenwald, *FTC Official Calls On Data Brokers to Provide More Info*, NAT'L J., Jan. 26, 2012, http://www.nationaljournal.com/tech/ftc-official-calls-on-data-brokers-to-provide-more-info-20120126.

predictions that become a part of the basis for making determinations regarding a consumer's credit, his or her ability to secure housing, gainful employment or various types of insurance."[18]

## APPLICABILITY OF THE FCRA TO LEXIS

Despite the fact that Lexis is selling consumer data for purposes that clearly fall within the plain language of the FCRA, Lexis obstinately persists in denials that these reports are "consumer reports" as defined by the FCRA. Moreover, Lexis lies to consumers when consumers dispute inaccurate information by telling them, "We do not examine of verify our data, nor is it possible for our computers to correct or change data that is incorrect -- Accurint can provide only the data that was provided to us."[19] Lexis makes the preposterous assertion that these reports fall outside of the FCRA as a result of its contractual agreements with the reports' purchasers in which the purchasers agree not to use the product "in whole or in part as a factor in determining eligibility for credit, insurance, employment or another permissible purpose under the FCRA."[20] In other words, Lexis is claiming that it can exempt itself from the FCRA's requirements simply by using contractual disclaimers.

The FCRA defines a "consumer report" as

any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living *which is used or expected to be used or collected in whole or in part* for the purpose of serving as a factor in establishing the consumer's eligibility for

    (A)    credit or insurance to be used primarily for personal, family, or household purposes;

---

[18] *Id.*

[19] Letter from LexisNexis Risk Solutions, Accurint Consumer Inquiry Department.

[20] *Accurint for Insurance Fraud, supra*; Telephone Interview with Supervisor, LexisNexis Consumer Center (stating that "Accurint reports are not covered by the FCRA" and denying that Accurint reports are sold to insurance companies).

7

(B)     employment purposes; or

(C)     ***any other purpose authorized under section 604*** [15 U.S.C §
1681b] (emphasis added).[21]

Section 604 of the FCRA states:

[A]ny consumer reporting agency may furnish a consumer report under the
following circumstances and no other:

\* \* \*

(3)     To a person which it has reason to believe

(A)     intends to use the information ***in connection with a credit
transaction involving the consumer*** on whom the information
is to be furnished and involving the extension of credit to, or
***review or collection of an account*** of, the consumer; or

(B)     intends to use the information for employment purposes; or

(C)     intends to use the information in connection with the
underwriting of insurance involving the consumer; or

(D)     intends to use the information in connection with a
determination of the consumer's eligibility for a license or other
benefit granted by a governmental instrumentality required by
law to consider an applicant's financial responsibility or status;
or

(E)     intends to use the information, as a potential investor or
servicer, or current insurer, in connection with a valuation of, or
an assessment of the credit or prepayment risks associated with,
an existing credit obligation; or

(F)     ***otherwise has a legitimate business need for the information***

(i)     ***in connection with a business transaction that is
initiated by the consumer***; or

(ii)    to review an account to determine whether the consumer
continues to meet the terms of the account (emphasis
added).[22]

---

[21] 15 U.S.C. § 1681a(d)(1) (2006).

[22] 15 U.S.C. § 1681b (2006).

8

\* \* \*

In addition to the definition of a "consumer report," the FCRA also has a definition for

"consumer reporting agency," which states:

> The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, *regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers* for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports (emphasis added).[23]

As the court in <u>Adams v. LexisNexis</u> noted, whether a company or individual is a

"consumer reporting agency" hinges on the definition of "consumer report" because that is part

of the definition of "consumer reporting agency."[24] Here, Lexis sells its reports "for monetary

fees," and also regularly assembles and evaluates "information on consumers," including

information "bearing on a consumer's credit worthiness, credit standing, credit capacity,

character, general reputation, personal characteristics, or mode of living," which Lexis sells to

third parties via interstate commerce.[25] Lexis assembles and evaluates that information "for the

purpose of furnishing consumer reports."[26] Additionally, Lexis's Accurint reports are "consumer

reports" because the reports contain the types of personal information listed in 15 U.S.C. §

1681a(d)(1) *and* that information "is used or expected to be used" pursuant to, or is "collected in

whole or in part" to serve "as a factor in establishing the consumer's eligibility" under, at least

---

[23] 15 U.S.C. § 1681a(f) (2006).

[24] Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, Adams v. LexisNexis Risk & Info. Analytics Grp., Inc., No. 08-4708 (D.N.J. May 12, 2010), at 12.

[25] *Id.* at 13; 15 U.S.C. § 1681a(f) (2006); 15 U.S.C. § 1681a(d)(1) (2006).

[26] Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, at 13; 15 U.S.C. § 1681a(f) (2006); 15 U.S.C. § 1681a(d)(1) (2006).

one of the permissible purposes under the FCRA.[27] Although it is true that "[a] report will not be covered by the Act solely because it contains the type of information generally found in consumer reports"[28] (such as public telephone books or public directories that list professionals, such as lawyers and doctors), here, as evidenced by Lexis's advertising and its knowledge of the uses to which its reports are put, Lexis is obviously aware that its reports are used for FCRA-covered purposes.

Additionally, although the FTC official commentary "has no force or effect of law" with respect to the FCRA, the FTC has noted that liability under the FCRA would arise for a report furnisher if it had "reason to know" that the report would be used for a covered purpose.[29] The FTC commentary states that

> [t]he question arises whether a report that is not otherwise a consumer report is subject to the FCRA because the recipient subsequently uses the report for a permissible purpose. If the reporting party's procedures are such that it *neither knows of nor should reasonably anticipate such use*, the report is not a consumer report. If a reporting party has taken *reasonable steps to insure that the report is not used for such a purpose*, *and if it neither knows of, nor can reasonably anticipate such use*, the report should not be deemed a consumer report by virtue of uses beyond the reporting party's control (emphasis added).[30]

Clearly, that is not the case here, as Lexis knows and anticipates such use. Moreover, even if the end-user of a report does not use or intend to use the report for a purpose covered by the FCRA, the report may still be a "consumer report" if the information in the report was "collected in whole or in part for the purpose of serving as a factor in establishing the consumer's

---

[27] Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, at 14; 15 U.S.C. § 1681a(f) (2006); 15 U.S.C. § 1681a(d)(1) (2006).

[28] *Id.* at 15 (quoting Arcidiacono v. Am. Express Co., No. Civ. A. 92-3428, 1993 WL 94327, at *3 (D.N.J. Mar. 29, 1993)).

[29] *Id.* at 16 n.6.

[30] *Id.* (quoting 16 C.F.R. Pt. 600, App. § 603(d) cmt. 5(D) (2010)).

eligibility for" a permissible purpose.[31] In Adams, the court held at the motion to dismiss stage

that Lexis's Accurint report is a consumer report because it is furnished for use in the "collection

of an account of[] the consumer," which is explicitly specified in Section 604(a)(3)(A) of the

FCRA.[32] The court also rejected Lexis's "contractual use restriction" defense, noting that even

though the report warned that "Accurint data is not permitted to be used to grant or deny credit,

make employment decisions, or make tenant and housing screening decisions, or any other uses

regulated by the Fair Credit Reporting Act," Lexis knew, or reasonably should have known, that

the report would be used for such purposes.[33] Indeed, it would be hard for Lexis to claim that it

did not expect the report to be used for collection purposes, given that its website advertises

"Accurint for Collections" as a "powerful tool [that] returns current addresses, unpublished and

cell phone telephone numbers, relatives, roommates, associates, property, work and business

locations to improve your skip trace efforts."[34]

　　Also on point is Phillips v. Grendahl, in which that court held that a "Finder's Report" —

a skiptracing tools sold to collection agencies — "'was designed by and for collections

professionals who need timely debt-recovery support at an economical price,'" and therefore was

intended to be used "'in connection with a credit transaction . . . involving . . . collection of an

account of, the consumer,' in other words, debt collection."[35] Because the report was advertised

---

[31] 15 U.S.C. § 1681a(d)(1) (2006); Phillips v. Grendahl, 312 F.3d 357, 366 (8th Cir. 2002) (overruled on other grounds by Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47 (2007)).

[32] Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, at 23.

[33] Id. at 24.

[34] Skip Tracing and Debt Collection Solutions, LEXISNEXIS, http://www.lexisnexis.com/risk/solutions/contact-locate/skip-tracing-accurint-collections.aspx (last visited Aug. 22, 2013).

[35] Phillips v. Grendahl, 312 F.3d at 366 (internal citations omitted).

as such, the report was "a consumer report even though the requestor never used or intended to use it for a statutory purpose."[36]

Although there are some Lexis products for which one could make a plausible argument that they are not covered by the FCRA, the Accurint product is not one of them. It clearly is covered by the FCRA because the plain language of the Act encompasses the types of reports sold through the Accurint product. Only a tortured reading of the FCRA that ignores its plain language, the FCRA's legislative history, the intention of Congress, and the interpretations of the FTC, would allow one to conclude otherwise.

## CONSEQUENCES OF LEXIS'S CONTINUED FAILURE TO ABIDE BY THE FCRA

Unfortunately, many consumers, including members of the (b)(2) class in this case, are unaware of just how many data brokers collect their personal information and the myriad ways in which such data is sold, traded, used, and misused until they are personally victimized.[37] A consumer might suffer an adverse action, such as rejection of employment, or be confused with someone else, due to inaccuracies in a CRA's files, and the likelihood of victimization increases substantially when consumers are unable to challenge and correct inaccurate information held in a CRA's database. In Adams, for example, the plaintiff's wages were wrongly garnished because information about her was incorrectly associated with another individual in Lexis's Accurint report.[38] The Adams plaintiff's Complaint noted that "Defendants regularly sell a product called an 'Accurint' report to the debt collection industry, credit insurers and employers," and that the report "provides substantial and detailed personal and credit information about an individual

---

[36] *Id.*

[37] Press Release, Fed. Trade Comm'n., FTC to Study Data Broker Industry's Collection and Use of Consumer Data — Commission Issues Nine Orders for Information to Analyze Industry's Privacy Practices (Dec. 18, 2012), http://ftc.gov/opa/2012/12/databrokers.shtm.

[38] Second Amended Complaint at 6, Adams v. LexisNexis Risk & Info. Analytics Grp., Inc., No. 08-4708 (D.N.J. July 7, 2010).

consumer."[39] As in the case at bar, the <u>Adams</u> plaintiff correctly noted that although "other companies which sell similar types of reports do not question the fact that they are regulated by the FCRA, Defendants ignore the FCRA."[40] Instead, Lexis continues to violate the FCRA by refusing to disclose to consumers "all of the information in their files that pertain to them" and "the sources of the information they report," refusing to "investigate any consumer disputes," failing to provide consumers with a free copy of their Accurint report, and failing to "observe any reasonable standard of accuracy regarding the information contained within the Accurint reports."[41] As a result of Lexis's "sale of a grossly inaccurate Accurint report to a third party debt collector, [the plaintiff in <u>Adams</u>] became the unfortunate subject of unwarranted debt collection efforts, and ended up having her wages garnished for debts she did not owe."[42]

## THE PROPOSED SETTLEMENT FAILS TO PREVENT FUTURE VIOLATIONS

Plaintiffs acknowledge in their proposed settlement agreement that "any claim for statutory damages [is] incidental to compelling changes in data practices" and that "substantial changes to those products" must be implemented.[43] They are correct that permitting Lexis to continue to evade the FCRA, which this proposed settlement in fact permits, would defeat the primary purpose of this lawsuit. In effect, if this settlement is approved, the end result would almost be as if no lawsuit had ever been filed in the first place; the status quo ante would remain unchanged and Lexis would continue abusing Americans' rights under the FCRA. This court

---

[39] <i>Id.</i> at 1.

[40] <i>Id.</i> at 2.

[41] <i>Id.</i> at 4-5.

[42] <i>Id.</i> at 6.

[43] Settlement Agreement and Release at 2, Berry v. LexisNexis Risk & Info. Analytics Grp., Inc., No. 3:11-cv-754 (E.D. Va.) (Mar. 15, 2013).

should reject the "sham" settlement proposed by the parties, a settlement whose only legacy to this cause of action is enrichment of Plaintiffs' counsel.

Merely splitting the Accurint database into two different databases, as proposed by the settlement agreement, each database based on substantially the same personally-identifiable consumer information, with one to be used for so-called "collections decisioning" and the other for other collections processes, simply does not solve the problem which precipitated this lawsuit. In reality, both resulting products would fall under the FCRA. Without any basis in law, the parties suppose that this proposed arrangement of duplicating virtually the same database of consumer information and then using it for slightly different purposes, all of which involve FCRA-regulated uses such as collecting debts, will somehow prove to be in compliance with the FCRA. The term "collections decisioning" is nowhere to be found in the FCRA. Nor is any distinction between consumer data used for "collections decisioning" and data used to "Contact & Locate" a debtor. The FCRA clearly refers to "review or collection of an account," and the parties cannot change the explicit text of the Act through their proposed settlement, no matter how much the courts, and the attorneys' wallets, favor the settlement of litigation. As the court in Adams noted, Lexis simply cannot evade the FCRA by using contractual limitations or disclaimers with the end-users of their privacy-invasive reports. In reality, Lexis has little ability to control the actual uses, by the tens of thousands of end-users, of their report data, as this misleading settlement agreement would lead this Court to believe.

According to the proposed settlement, "Post Settlement Products" -- including those used for "law enforcement, government, legal services, legal compliance, portfolio analysis, customer relationship management, online security credentialing, direct to consumer offering, insurance (for purposes other than eligibility and establishing a price for insurance), and financial services

(for purposes other than determining credit eligibility), fraud investigation and prevention, claim investigation, and identity verification purposes and the new Contact & Locate product and services" – are to be exempted from compliance with the FCRA under this agreement.[44] That result simply does not comport with the imperatives of the FCRA.

If this Court considers a basic hypothetical of the post-settlement state of affairs, it would look something like this: Lexis will sell two different products to the collections industry, one which is FCRA-compliant and allows the collections end-user to decide whether a debt is worth collecting based on the "collections decisioning" product. Once the collections end-user has run that search (and decided that the debtor is worth pursuing), he then switches screens to another database, the "Contact & Locate" database, which effectively contains the same inaccurate data about consumers that the current "Accurint for Collections" database now contains. If the Court reviews the Plaintiffs' Complaint in this case, as well as the Complaint in <u>Adams</u>, for example, it will be obvious that this "false solution" will not prevent innocent consumers from being wrongly targeted for debt collection measures as a result of incorrect information in the proposed "Contact & Locate" database.

Indeed, the parties' proposed settlement agreement admits that the new "Contact & Locate" product will contain "information, the use of which bears a reasonable relationship to the location of a debtor or to the location of assets securing the debt for purpose of repossession, even if such information may arguably bear on an eligibility determination under the FCRA."[45] This is completely unacceptable because it fails to solve the core problem: Lexis selling incorrect data about American consumers and giving consumers no ability to correct that data, as required by the FCRA.

---

[44] *Id.* at 10.

[45] *Id.* at 25.

Additionally, if Lexis is willing to implement a "consumer access program" in order to comply with the FCRA with respect to certain of its products (all of which effectively use the same core database of consumer information), then why not implement that program for all of its consumer report products? It cannot be so difficult to extend such a program from a dozen or so products, as it now covers, to all of Lexis's consumer reports. The true reason that Lexis does not wish to do so is that they will forgo immense revenue by giving consumers some control over their data and by having less information to sell to Lexis's customers.

If, indeed, "Accurint Reports are used by law enforcement, government, package delivery, banking, insurance, health care, legal, and receivable management subscribers to locate people, prevent fraud, comply with the law, authenticate identities, perform administrative functions, and aid in online security credentialing with data derived from the Accurint Database," as the parties admit in the proposed settlement agreement, then all Americans have a strong interest in ensuring that all of those reports about them contain accurate information.[46] That is why the FCRA was passed in the first place.

Finally, the parties cannot "pick and choose" which provisions of the FCRA they are willing to implement. For example, the parties' proposed agreement will only require Lexis to provide a "free copy of a Contact & Locate Comprehensive Report regarding the individual once a year" and the ability "to submit a statement of up to 100 words regarding any phone number or address displayed in the Contact & Locate suite of products and services and that is being used to contact the individual related to a consumer credit obligation subject to collection," but not the ability to simply have the incorrect information removed, as required by the FCRA.[47] The plain language of the FCRA itself makes Lexis's obligations clear: they must allow consumers to

[46] *Id.* at 5.

[47] *Id.* at 28.

correct or delete inaccurate information. The parties cannot "rewrite" the FCRA to suit their own purposes. Congress has already made the decision for them, and this court should not sanction a settlement agreement that contravenes the expressed intention of Congress.

## CONCLUSION

For the reasons stated above, I urge this Court to reject the proposed settlement agreement and any future proposed settlement in this case unless it requires Lexis to fully comply with all of the FCRA's requirements with respect to all Lexis products that contain personal consumer data.[48]

Respectfully submitted,

David Brown
1717 Market Street
Tacoma, WA 98402
(206) 666-5643
dbrown2c@yahoo.com

Dated: August 27, 2013

---

[48] See attached chart.