IN THE UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

GREGORY THOMAS BERRY, *et al.*,　　　　：

　　　　　Plaintiffs,　　　　：

v.　　　　：　　Civil Action No.:  3:11CV754

LEXISNEXIS RISK & INFORMATION　　：
ANALYTICS GROUP, INC., *et al.*,
　　　　　　　　　　　：
　　　　　Defendants.

## JOINT MEMORANDUM IN OPPOSITION TO
## WATTS GUERRA LLP'S MOTION FOR RECONSIDERATION

Plaintiffs Gregory Thomas Berry, Summer Darbonne, Rickey Millen, Shamoon Saeed, Arthur B. Hernandez, Erika A. Godfrey and Timothy Otten, individually and on behalf of all others similarly situated, ("Plaintiffs"), and Defendants Reed Elsevier Inc., LexisNexis Risk Solutions FL Inc., and LexisNexis Risk Data Management, Inc. ("Defendants") (collectively, "the Parties") respectfully submit this memorandum of law in response to Watts Guerra LLP's Motion for Reconsideration of the Court's October 23, 2013, Order requiring the law Firm of Watts Guerra, LLP ("Watts Guerra") and attorney Ryan Thompson ("Thompson") to cease use of certain advertisements and communications (Doc. 85).  The Parties brought the Motion to Correct Misrepresentations of the Watts Guerra, L.L.P. Group to protect Class Members from Watts Guerra's misleading and false advertising and to prevent Watts Guerra from undermining the Court-supervised Notice program.  For the following reasons, the Court properly entered that Order and should deny Watts Guerra's Motion for Reconsideration.

I.            OVERVIEW

Despite the substantial activity and filings with regard to and from the *Aaron* group,

neither Mr. Anthony nor Mr. Bennett (or any of their counterparts) has ever been successful in

obtaining an e-mail or telephonic response or communication from Mr. Thompson or Watts

Guerra.   Attempts to meet and confer or discuss the Watts Guerra counter-notice have been

rebuffed.  The present motion and matter should have been resolvable between counsel.  Still, the

Parties recognize, by their Virginia counsel, their obligation to attempt a solution that avoids

further judicial burden, but yet provides a fair means to determine the propriety and truthfulness

of the Watts Guerra counter-notice campaign.  Accordingly, The Parties propose that the Court

resolve this dispute by (a.) **Ordering Watts Guerra to meet and confer directly with the**

**Parties' Virginia counsel to determine if there is a negotiable solution to the pending**

**dispute**. As necessary, such conference could be supervised by United States Magistrate Judge

Novak; and (b.) **Referring this matter to a Special Master**.  Retired United States District

Court Judge Friedman, and Retired United States Magistrate Judges Stillman and Poretz[1] are all

immediately available.   The Parties would agree to pay the expense absent a separate motion for

sanctions or other remedy sought by independent motion.   The Special Master would be tasked

with determining the accuracy and ethical permissibility of the Watts Guerra counter-notice

campaign.  Further, the Special Master could and likely would refer the Watts Guerra advertising

to the Virginia State Bar for pre-review by the ethics staff attorneys.[2]  This would be done

---

[1] Counsel understand that Judge Dohnal (Ret.) will be unavailable.

[2]Both the Parties and now Watts Guerra have raised the issue of compliance with Virginia legal ethics.  This is
dangerous territory for any of the attorneys in the case to litigate with uncertainty.   However, as the Court is likely
aware, the Virginia State Bar ethics staff will perform a review of proposed attorney advertising for ethical
permissibility http://www.vsb.org/site/regulation/advertising-and-solicitation/#request.

without risk or expense to Watts Guerra and could start immediately.  Such solution alleviates Watts Guerra's concern that it would have to seek consent or review by the Parties' counsel.

Watts Guerra opposes the proposed Class Settlement in this case.  If it actually represents any class members who intend to object, it has a right to do so.   And Watts Guerra has an unrestricted right to communicate with those clients who have retained the firm.   These issues are not before the Court and are not impacted by the present dispute.  Further, Watts Guerra's urgency is also based upon a false premise – *that the communications at issue are directed to influence class members to decide whether or not to approve the settlement*.   In fact, the deadline to object and opt out has long passed.  Instead, Watts Guerra wants to continue its challenged communications in order to sign up more claimants who it can use to press LexisNexis for more money outside of the settlement in this case (either for actual damages or some other remedy if the settlement is rejected and the case dismissed).  Regardless of the propriety of these objectives, the relevant point is that there is no immediate need to permit an unfettered Watt's Guerra marketing campaign.  There is no irreparable harm faced by Watts Guerra by the very minimal delay in permitting the Virginia State Bar or Special Master review of the counter-notice campaign.

In contrast, if the Settlement is approved, the Watts Guerra communications do pose a real harm or danger to class members.  The Settlement presents real and substantial benefits to class members who take advantage of the consideration.  They may obtain their free full file consumer report and inquiries for users of that file.  Class members will now be able to dispute inaccurate information in the FCRA file, and that information will be restricted to those with a FCRA purpose.  Disputes may be noted even for the information that all concede may not be FCRA governed.  But if class members were told instead that the Berry Settlement provided

3

nothing, Watts Guerra's marketing would serve the improper purpose of impairing class member participation in such benefits.

Accordingly, examination of the details of the Watts Guerra counter-notice, which the Parties contend is unquestionably untruthful and misleading, can await the still-expedited review as proposed herein. The present motion has nothing to do with the Court's pending consideration of the fairness and Adequacy of this settlement.

II.      **FACTUAL BACKGROUND**

Plaintiffs sued Defendants on November 14, 2011, alleging that Defendants sold Accurint® Identity Reports in violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA"). After extensive litigation, on March 15, 2013, the Parties reached a Proposed Settlement Agreement ("the Settlement Agreement") (Doc. 63, Ex. 1). Under the Settlement Agreement, the Court will certify two classes for settlement purposes only. One class, certified under Fed. R. Civ. P. 23(b)(3), will receive monetary compensation, and another, certified under Fed. R. Civ. P. 23(b)(2), will receive substantial injunctive relief. The Court granted preliminary approval of the settlement on April 29, 2013, appointing Class Counsel to represent both the Rule 23(b)(2) and Rule 23(b)(3) classes. The Court also set a deadline by which class members could object to the settlement of August 30, 2013. Publication notice was provided to the Rule 23(b)(2) class commencing in June 2013. On August 30, 2013, Watts Guerra filed objections to settlement, purportedly on behalf of over 20,000 named individuals.

It is not clear just when Watts Guerra began the misleading advertising campaign that was the subject of this Court's order. Thompson registered the website – http://www.BringaClaim.com ("the Website") – in June 2012, and used it until at least mid-August, 2013 to make misleading solicitations in another case, **the national mortgage**

4

**settlement**.[3]  Sometime thereafter, the website content was changed to solicit consumers to hire Watts Guerra to provide services with respect to the claims embraced by the *Berry* Settlement Agreement.  Since no "claims" are either permitted or required to obtain benefits in this case, use of "bringaclaim.com" for this purpose was inherently misleading.  Watts Guerra recorded one or more videos targeted at the Rule 23(b)(2) class members for whom the Court has already appointed Class Counsel.  The videos did not contain the cautionary language required by various state bars for attorney advertising, did not advise Class Members that the Court had already appointed Class Counsel to represent them, and were in other ways misleading.  The Website provided false and misleading information and failed to provide important class information.  Watts Guerra designed the Website to encourage viewers to sign quickly a retainer agreement with its firm without fully considering all information necessary to make an informed decision.  Watts Guerra used the website, which contained a form retainer agreement, to solicit clients.

After the August 30 objection deadline passed, Watts Guerra began to run advertisements on television on such channels as Fox News, BET, and the Game Show Network and left the website operative.   Watts Guerra's post-August 30 advertising continued to suggest to viewers that if the viewer signed up with Watts Guerra after the objection deadline, there was some legal service that Watts Guerra could offer them in connection with this litigation.

---

[3] The West Virginia Attorney General sued Thompson's prior law firm, Murray LLP, in 2012, alleging that the firm sought to charge consumers a fee of 20% to assist them in processing a claim for benefits they were already guaranteed to receive, and that the firm's conduct was unscrupulous and deceptive.  Murray agreed to stop offering services to West Virginia residents in order to settle that case.  *See http://stellionata.com/in-the-news/8022-the-west-virginia-attorney-general-darrell-mcgraw-gives-his-written-opinions-and-advice-upon-questions-of-law-to-state-officials-heads-of-state-institutions-and-the-prosecuting-attorneys-handles-all-litigation-on-behalf-of-the-state-government-and-any-dep* (last visited November 1, 2013) (original press release regarding the West Virginia Attorney General's settlement of a suit against Thompson's prior law firm is no longer available on line).  Thompson's solicitation video for that misleading campaign can be viewed at; http://www.youtube.com/watch?v=v02hBwfIiIY (last viewed November 1, 2013).

On October 21, 2013, the Parties requested that the Court order Watts Guerra to take down the

website and videos because they contain false and misleading advertising to members of the Rule

23(b)(2) class (Doc. 82).  Two days later, the Court granted the motion and issued an order

requiring Watts Guerra to take down the Website and refrain from further mass marketing

regarding the Settlement Agreement without prior Court approval ("the Take Down Order")

(Doc. 84).  On October 28, 2013, Watts Guerra filed a notice certifying compliance with the

Order, (Doc. 87), but also filed a Motion for Reconsideration, arguing that the order violates the

First Amendment and that the Court erroneously based its decision on misstatements made in the

Parties' motion.  (Docs. 85, 86).  Defendants respectfully submit this Response to Watts Guerra's

Motion for Reconsideration to refute those contentions.

III.        **WINSTON STRAWN DOES NOT REPRESENT WATTS GUERRA OR
            RYAN THOMPSON AND HAS NO STANDING TO PROSECUTE THIS
            MOTION**

In *In re Trans Union Corp. Privacy Litig.*, the United States Court of Appeals for the

Seventh Circuit disposed of an appellate matter in which Watts Guerra was represented by the

same Winston Strawn attorney who has communicated and corresponded with the Parties in this

case, Kimball Anderson.  664 F.3d 1081, 1083 (7th Cir. 2011).  In that matter, as *sub judice*,

Thompson and Watts Guerra tried to hover just beyond the jurisdiction of the court, pursuing

what Judge Posner described as its "[h]eads I win, tails you lose, strategy."  *Id*. at 1083-84.   And

now, the movants herein are engaging in a similar game.

Thompson and Watts Guerra have never properly entered an appearance before this

Court.  On August 30, 2013, the *Aaron* "Objectors" filed a pleading in which various attorneys

where listed as counsel for the *Aaron* individuals.  Of these, Charles B. Molster, III has a

Virginia law license and is apparently charged with signing the group's pleadings.  Mssrs.

Ferranti (Chicago) and Issacharoff (New York)[4] moved for admission *pro hac vice*, which motions were granted without objection.  (Docs.  77, 78).  No other *Aaron* group attorneys are admitted before the Court.

And now, Mr. Molster has filed the present motion, seeking to speak for his "on paper" co-counsel, Thompson and Watts Guerra.  This presents several real problems.  First, Winston Strawn cannot properly represent both the *Aaron* individuals and Watts Guerra.  As this Court has explained,

> "Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that otherwise would be available to the client. It is also important to note that "[s]imultaneous representation of parties whose interests in litigation may conflict, such as co-plaintiffs or co-defendants, is governed by paragraph (a)(2)" of Rule 1.7. Rule 1.7, Note [23]. "An impermissible conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question." *Id.*

> The United States Court of Appeals for the Fourth Circuit has made clear that: In determining whether to disqualify counsel for conflict of interest, the trial court is not to weigh the circumstances 'with hair-splitting nicety' but, in the proper exercise of its supervising power over the members of the bar and with the view of preventing 'the appearance of impropriety,' it is to resolve all doubts in favor of disqualification.

> In other words, the assessment must be made in perspective of the realities of the case.

> It is, of course, important in our system of justice that parties be free to retain counsel of their choice. "However, this Court has held that the right of one to retain counsel of his choosing is 'secondary in importance to the Court's duty to maintain the highest ethical standards of professional conduct to insure and preserve trust in the integrity of the bar.'"

---

[4] For whatever reason, Mr. Issacharoff is not on the counsel list for the present motion.

*Sanford v. Commonwealth of Virginia*, 687 F. Supp. 2d 591, 601-02 (E.D. Va. 2009) (citations omitted).  The subject Motion, and that of the Parties that led to the Order, were directed solely at Watts Guerra and Thompson.  There is no challenge to the rights or interests of the *Aaron* individuals.  And, if Winston Strawn seeks to represent those individuals, the Parties would ordinarily lack any standing to complain.  But Winston Strawn cannot also represent Watts Guerra, which is alleged by these motions to have misled the very consumers Winston Strawn claims to represent.

Accordingly, the real postural problem for Watts Guerra's motion is not simply an active conflict of interest, but rather one of standing.  Winston Strawn has not actually appeared as counsel Mr. Thompson or Watts Guerra in this case.  And Mr. Thompson himself has not sought admission *pro hac vice*.  There is no one who has been responsive to the Parties' meet-and-confer-attempts.  Mr. Anderson made a very explicit proclamation that Winston Strawn does not represent Watts Guerra.  While the text and tone of the present motion may suggest an intention to speak for Watts Guerra, that entity and Thompson first need to appear in the case as an interested party, and with attorney representation that is not already bound to represent the *Aaron* consumers – who are themselves potentially adverse to Watts Guerra.

This is also of concern for another important reason.  There is no one answerable to the Court who has been willing to meet-and-confer or to engage with the Parties to discuss these motions (or anything else in the case).  Prior to the Court's Order, Messrs. Anthony and Bennett contacted by e-mail the various attorneys who were listed within the *Aaron* pleadings.  Only one responded – Kimball Anderson, a Chicago lawyer not admitted in this case.  In each of several e-mails back and forth to schedule a meet and confer call, Mr. Anderson removed Thompson from the contact chain.  When that first call occurred, the day the Order was entered, Mr. Anderson

very explicitly responded to the Parties' counsel on the call (including Anthony and Bennett) that, "I don't represent Watts Guerra." (*verbatim*).  In later communications and another meet and confer call attempt, Mr. Anderson was the only attorney who responded or attended.  Watts Guerra and Thompson have yet to respond even once.

IV.　　　　　**ARGUMENT**

　　A.　　**The Court's Take Down Order Was and Is Proper**

Lawyer advertising – and there is no doubt but that the Watts Guerra campaign was lawyer advertising – is commercial speech" (*Bates v. State Bar of Arizona,* 433 U.S. 350, 363-64, 97 S.Ct. 2691, 2698-99 (1977)) entitled to First Amendment protection only if it is not misleading.  *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351 (1980).  Because public naiveté may cause even literally accurate lawyer advertising to be misleading, there is a substantial governmental interest in placing lawyer advertising in its proper perspective.  *Peel v. Atty. Registration & Disciplinary Comm'n,* 496 U.S. 91, 108, S.Ct. 2281, 2291 (1990).  Watts Guerra's campaign was inherently misleading: it falsely suggested the existence of a "claims" process; it inaccurately described the settlement and the procedural setting of the case; it failed to advise its targets that they already had appointed counsel, and, after August 30, it falsely implied that there was action the viewer could take in the *Berry* case for which a lawyer's services would be useful.  The Court's order is entirely consistent with the First Amendment.

To avoid the legitimate governmental strictures on lawyer advertising to persons with whom the lawyer has no prior relationship, Watts Guerra makes a specious argument that their BringaClaim.com website, available to literally billions of internet users worldwide, and their

television ads that ran on cable channels such as Fox News, BET and Investigation Discovery, were "communications . . . made by Watts Guerra principally to the own clients." (Doc. 86, p. 6).

First, the "clients" Watts Guerra refers to are not "clients" with respect to the *Berry* matter; they are 20,000 claimants from the *In Re Trans Union* litigation to whom Watts Guerra had previously and effectively marketed.  Until they signed up as clients in this case, they were *former* clients.

Second, Watts Guerra long ago acquired physical mailing addresses, telephone numbers, and in many cases email addresses for those former limited scope clients.  If Watts Guerra wanted to communicate "principally" with its former clients, the tailored and by far most economical means by which to do so would have been to drop a letter in the mail.  The scope and expense of what Watts Guerra did puts the lie to their statements to the Court:  internet and television advertising is *principally* useful in reaching persons with whom the advertiser *does not yet have* a relationship.  Here, the obviously intended targets of Watts Guerra's advertising were non-clients represented by other, Court-appointed counsel.  Their communications must be analyzed as lawyer advertising.

Third, the television advertising campaign began *after* the objection deadline had passed, *after* the last date on which Watts Guerra could offer services to anyone who had not already signed up with them.

The Motion for Reconsideration mischaracterizes the Court's order as prohibiting Watts Guerra from communicating with its clients.  The Order does no such thing.  Watts Guerra is free to call, write or email anyone who has signed an agreement retained them for services in this case.  The Order merely prohibits Watts Guerra from indiscriminately communicating with

10

persons represented by Class Counsel with misleading materials implying that a Class Member who has not already objected to the Settlement has the ability to do so after the deadline has expired.

The Court's order requiring Watts Guerra to take down the Website and preventing it from making further statements to Class Members was not an unlawful prior restraint.  The Court did not prevent Watts Guerra from speaking in the first instance.  Rather, Watts Guerra spoke first and the Court then sanctioned the firm based on that impermissible speech.  Only after Watts Guerra spoke did the Court sanction it by limiting similar future speech.  Although the Court did not explicitly state the factual basis for such violations, the Parties supplied several legitimate reasons in their Motion to Correct (Doc. 83).  As discussed below, the Website and Videos were saturated with false statements.  Watts Guerra cannot, therefore, complain that it does not know on what basis the Court made its decision.  The Order does not amount to an impermissible prior restraint.

Finally, Watts Guerra cannot now complain of the purported overbreadth or scope of the current Order as they have had every opportunity to suggest an alternative (and a truthful one) to the broad and inaccurate advertising previously utilized.  On multiple occasions, Messrs. Bennett and Anthony, on behalf of their respective clients and teams, tried to meet and confer with Watts Guerra.  Neither Mr. Thompson nor any other person from Watts Guerra has even been so courtesy (or concerned) as to respond to an e-mail or attend a telephone conference.  The lone Aaron attorney to respond, Mr. Anderson, refused to discuss any alternative language or changes to the Watts Guerra advertising.

**B.     Watts Guerra's Counter-Notice Campaign Would Likely Confuse and Mislead the Members of the Public and Rule 23(b)(2) Class**

The "counter-notice" campaign proposed by Watts Guerra is as inherently misleading. Given the procedural setting of the case, Class Members who have not already objected have no action to take in the case whatsoever. Since they have no choices to make, and no actions to take unless and until a court denies settlement approval, they have no current use for additional legal services. Offering to "represent" them in a matter in which they can now play no role is inexcusable.

Watts Guerra appears to be trying to assemble a list of persons who *might* have a claim to assert against LexisNexis *if* the *Berry* settlement is not ultimately approved. They cannot lure consumers into giving them information with false representations that Watts Guerra can provide them services in connection with the Court's determination of whether to approve the settlement.

Watts Guerra does not deny the strong majority of the accusations leveled as to its http://www.BringAClaim.com website, its "we will send you a check" promise or the overshadowing of the Class Notice by the aggressive marketing and sales pitch. Instead, the firm defends its advertising by suggesting that some of it was not 100% inaccurate, or that while misleading on its own, the Watts Guerra counter-notice campaign would not be practically misleading because class members could also find and read the Court's actual notice. These defenses are best viewed as mitigation of Watts Guerra's ethical exposure rather than as meaningful arguments for Watts Guerra's unfettered distortion of the Court's final approval process, or worse – successful implementation of an approved settlement. Even accepting that some of Watts Guerra's recent webpages included a link to the actual settlement notice and

website, as a whole and in most ways by itself, the Watts Guerra campaign grossly misstated the settlement and case and made promises that are unsupported by the claims and law in the case.

Watts Guerra's statements suggest to Website viewers that they will gain nothing and lose everything under the current Settlement Agreement, lose absolutely nothing by opposing it, and gain a cash award if they hire Watts Guerra.  (Doc. 83, Ex. D).  Essentially, Watts Guerra presents a classic "too good to be true scenario" -- that hiring Watts Guerra presents very little risk and a comparatively high potential reward.  (Doc. 83, Ex. D).  This is one of the overarching misimpressions that the Parties seek to correct.

Watts Guerra creates this low risk, high reward misimpression by providing several pieces of misleading information while omitting two pieces of critical information.  First, the firm states that if viewers do not object to the settlement the Court will likely approve it, in which event.  Rule 23(b)(2) class members will receive no money.  This implies both that viewers can still object to the settlement, and that the Rule 23(b)(2) class will receive no value in the settlement.  (Doc. 83, Ex. B, p. 1).  It also states that the firm provides an alternative -- suggesting that if a viewer objects (after the passage of the objection deadline), Watts Guerra might obtain $100 to $1,000 on that person's behalf (without explaining the difficulty of a willfulness claim or the uncertainty of litigation generally).  (Doc. 83, Ex. B, p. 8).  The site omits any reference to the substantial benefits the injunctive relief will provide the Rule 23(b)(2) class.  It also omits the fact that the Rule 23(b)(2) class members retain an important alternative to objecting: they retain their right to bring individual claims for actual damages under the FCRA, and may recover attorneys' fees for those claims.  Taken together, these facts improperly suggest to website viewers that they will gain nothing and lose everything under the current

settlement, lose absolutely nothing by challenging it, and gain a cash award if they do.  None of these suggestions has a basis in fact.

This misimpression is particularly noteworthy when one puts the communications into context.  Watts Guerra continued to direct these communications at members of the Rule 23(b)(2) class well after the objection deadline had passed, at a time when those class members had literally no use for the services of the Watts Guerra law firm.[5]  This included a television ad that was directed at all Rule 23(b)(2) class members, not just the Watts Guerra firm's supposed "clients."  *See id.*  Although that television ad exhorted class members to "Call to File Your Claim NOW!", no claims process exists—a fact not disclosed in the television ad.  Nor does the television ad, in addition to asking class members to call the Watts Guerra's firm's toll-free number to "File Your Claim NOW!", disclose the existence of class counsel, inform class members that the objections deadline had passed, or say anything about the existing proposed settlement.  When placed into this context, it becomes clear that the television ad, like the other parts of the Advertising Campaign, could only confuse absent class members and was not part of a *bona fide* lawyer solicitation.

The fact that Watts Guerra also included some truthful statements in the Website and Videos does not provide the Advertising Campaign, as a whole, with First Amendment protection.  To the contrary, the Court must not assume that individual viewers will know which statements are truthful, know which are not, and ignore the latter.  Simply put, and especially in the context of lawyer advertising, the Court should not assume that viewers will parse out Watts

---

[5] *See, e.g.,* the television ad currently available at http://www.ispot.tv/ad/72lV/watts-guerra-consumer-report, which last aired on television on September 30, 2013, and which promises viewing class members, "You May Be Entitled to Cash Compensation!" and "You May Be Entitled to Compensation!  Call to File Your Claim NOW!"

Guerra's false statements from its true statements when making the critical decision regarding whether to retain its services.  Rather, the Court must view the materials in their entirety as would any ordinary viewer.  When viewed this way, Watts Guerra's statements intentionally create viewer misimpressions and confusion.

Watts Guerra attempt to circumvent the ethical requirements, which require attorneys to communicate truthfully and candidly, by stating that it merely communicated with its "clients" from the Trans Union litigation.  Watts Guerra asserts that this preexisting relationship allows it to communicate more freely with those clients.  However, even if a preexisting attorney-client relationship allowed an attorney to mislead and lie to his or her current clients (which it does not), that is not what happened here.  Rather, Watts Guerra provided mass advertising on television, internet videos, and internet websites that reached many members of the general public that Watts Guerra never before represented.  Nor does a past relationship with a "client" in the Trans Union matter provide a basis for finding that those people remain Watts Guerra clients for the purposes of this matter.[6]  When that case ended, so too did Watts Guerra's relationship with those clients.  Watts Guerra had no preexisting relationship with the potential clients it misled.

Watts Guerra stated in its Website video, and continues to falsely assert, that potential clients "risk nothing by being part of this action." (Doc. 86, pp. 14-15; Doc. 83, Ex. D) ("stating that Watts Guerra "Fails to fairly describe the injunctive relief provided for in the Proposed Settlement, objectively or otherwise").  Watts Guerra remains adamant in its position that "the

---

[6]  This is especially true considering the tenuous nature of Watts Guerra's relationship is with any one "client" in such cases.

(b)(2) class members get nothing in the proposed settlement--and, therefore, risk nothing in objecting to same." (Doc. 86, p. 14). In light of the prior briefing on this issue and the Court's preliminary approval order recognizing the value of the injunctive relief, the Parties will not reargue this point. (Doc. 83, Ex. D). Watts Guerra's statement that the injunctive relief lacks value does not make that contention true, no matter how many times it is repeated. The fact remains that the injunctive relief provides industry-wide changes that *will ensure Class Members are not subject to the precise treatment of which they complained when they originally filed this suit* in 2011. (Doc. 83, Ex. A) ("The Settlement requires the Defendants, at their expense, to design, implement, and maintain specific, substantial procedures that *address the lawsuit's concerns about the preparation and sale of Accurint® searches and reports to debt collectors*."). Watts Guerra's statement that the injunctive relief lacks value is false.

Watts Guerra, in addition, failed to address several misrepresentations the Parties identified in their Motion to Correct. For example, Watts Guerra did not address the Parties contention that the Website "[f]alsely describes the release as being broader than it really is, in order to convince absent class members to object . . . ." (Doc. 83, Ex. D, p. 4). Nor does Watts Guerra address the Parties claim that the advertising campaign "[f]alsely obscures the distinction between the proposed Rule 23(b)(2) Class and the Rule 23(b)(3) Class." (Doc. 83, Ex. D, p. 5). The Parties' Motion to Correct provides further examples and exhibits in support. (Doc. 83).

The following excerpts from the Website explain the disagreement and more thoroughly demonstrate the Parties' position that the Website has a misleading design intended to create a "high-pressure sales" feel. Specifically, the screen shots show exactly how a viewer may access the Court-approved settlement website from the Watts Guerra Website.

16

After entering http://www.BringaClaim.com as intended and displayed before the Court's "Take-down" Order, the viewer sees the following ("the Home Page"):[7]

---

[7] The Parties have resized the pictures for clarity of presentation.





**You may be entitled to cash compensation for misuse of your consumer report.**

**Click Here For Help With Your Claim**

You may be entitled to cash compensation for violation of your privacy rights. Like Trans Union, LexisNexis may be selling consumer reports about you that violate your privacy rights. And, as a result, you may be entitled to cash compensation in connection with those violations.

We were happy to represent you against Trans Union, and we'd be happy to represent you against LexisNexis; on the same basis; that is, on a pure contingent-fee basis (we don't get paid, unless and until you get paid).

To get started, we need you to answer a few questions unique to the LexisNexis Litigation, as we call it. Click here to get started.



In the first step, in order to stumble across the actual approved Notice website link, the viewer must ignore the prominent video, both the "LEARN MORE" button and the large "Click Here For Help With Your Claim" link, and an embedded textual hyperlink.  The viewer must instead scroll to the bottom of the page to locate "THE BERRY SETTLEMENT" link on the Home Page.[8]  Clicking that link opens the following page:

---

[8]  Watts Guerra states in its Motion for Reconsideration that "the home page had *two* prominent links routing viewers to a landing page for 'The Berry Settlement' . . . ." (emphasis added).  Watts Guerra appears to be mistaken -- the only link routing the Website Home Page to "The Berry Settlement" page is outlined in the above image. (Doc. 86, pp. 9-10.).



## The Berry Settlement

Berry v. LexisNexis Risk & Information Analytics Group, Inc., Case No. 3:11-cv-00754-JRS., In the United States District Court for the Eastern District of Virginia

*Below we have provided excerpts or our interpretation and commentary on a few noteworthy provisions from the Settlement Website regarding the Rule 23(b)(2) 'LexisNexis Report' Class. We encourage you to read these provisions, and preferably, click on the link below so that you can read the entire body of information and related documents provided on this website. Doing so will allow you to fully review each and all of the relevant provisions so you understand your rights.*

### http://www.collectionreportlawsuit.com

### What is this lawsuit or class action all about?

The lawsuit claims that the Defendants prepared and sold Accurint® searches and reports, that these reports were (1) "consumer reports" under the FCRA, and that (2) Defendants failed to follow certain Fair Credit Reporting Act ("FCRA") requirements that apply to consumer reports, including handling disputes about the reports' contents and providing consumers with full copies of reports about them.

### Who is included in this settlement?

You are included in the proposed Settlement if information about you was in the databases used to prepare Accurint® brand products at any time between November 14, 2006 and April 19, 2013. These databases contain the names and addresses of all U.S. residents who have opened a credit account, as well as information from many public records such as telephone directories, voter registration records, motor vehicle registrations, and mortgage records. If you are 18 years or older, there is probably information about you in these databases.

### If I do nothing will my rights be affected? Must I act?

Your legal rights are affected by the proposed Settlement even if you do nothing. If the proposed Settlement is finally approved by the Court, then you will be giving up the right to file a lawsuit against any of the Defendants or their related companies for certain money damages relating to any violation of the FCRA or any similar state law about the claims covered by this Settlement. This is called "releasing" your claims. This means you cannot seek, or continue to seek, limited statutory remedies based on any of the Defendants' alleged violation of the FCRA, including: 1) using your information without your permission, 2) responding inadequately to your request for a copy of an Accurint® report about you, or 3) inadequately responding to a dispute you initiated or submitted to one of the Defendants regarding Accurint®. You will be giving up all such claims, whether or not you know about them.

### If I am a member of the Rule 23(b)(2) Class will I receive any money under the class action settlement?

No, there will be no payments to members of this class as a result of the settlement agreement.

### What are my legal rights and options at this point?

You have three basic options. One, you can object to the settlement in writing, on your own, or, with counsel; two, ask the Court to allow you to speak at a hearing on the settlement, again, on your own, or with counsel; or three, do nothing.

### Will you help me object to this settlement?

If you would like to object to the settlement, the lawyers at Watts Guerra LLP are willing to help. Click here now to get started.

### What are some other useful links and documents I should look at?

To read the detailed notice about the proposed settlement, click here.

https://www.bringaclaim.com/berry-settlement.html[8/30/2013 5:35:40 PM]

The viewer must again ignore the large "CLICK HERE" button and click on the non-descript website link or the embedded hyperlink at the end of the page to visit the class settlement home page.  In fact, Watts Guerra similarly buried nearly all of the important links on its Website to make it less likely that readers would actually obtain the court-approved information.  (Doc. 83, Ex. B).

Fundamentally,, Watts Guerra provided only deeply buried links to information regarding the existence of Class Counsel and Class Counsel's relationship with the Rule 23(b)(2) class (Doc. 83, Ex. B; Doc. 86, p. 13).  Watts Guerra argues that it provided a disclaimer on the Website containing the Video, stating that "[p]rior results do not guarantee a similar outcome and depend on the facts of each matter."  (Doc. 86, p. 14).  The *only* way to access this disclaimer statement from the Website Home page is to click "THE BERRY SETTLEMENT" link in the first image, and to then dig deeper into the second image, where a further miniscule link is provided at the very bottom of the page:





**You may be entitled to cash compensation for misuse of your consumer report.**

## Click Here For Help With Your Claim

You may be entitled to cash compensation for violation of your privacy rights. Like Trans Union, LexisNexis may be selling consumer reports about you that violate your privacy rights. And, as a result, you may be entitled to cash compensation in connection with those violations.

We were happy to represent you against Trans Union, and we'd be happy to represent you against LexisNexis; on the same basis; that is, on a pure contingent-fee basis (we don't get paid, unless and until you get paid).

To get started, we need you to answer a few questions unique to the LexisNexis Litigation, as we call it. Click here to get started.



Merely providing these relatively small links (in relation to the large "CLICK HERE" buttons and other links) does not transform the Website and its sub pages, as a whole, into a fair and accurate depiction of the Settlement Agreement.

Watts Guerra created this overall Website design in an attempt to lure viewers into "signing up" before actually visiting the official Court-approved Class Website and becoming fully informed of the relevant issues.  In fact, the retainer agreement "eSign" form used a technology that directs the viewer to the "Next" part of the form the viewer must fill in.  Clicking the "Next" button after filling out the initial questionnaire form skipped over all of the terms of the agreement and took the viewer to the "eSignature" block at the end of the document.  (Doc. 83, pp. 3-6) (the PDF version does not currently contain the technology).  Taken together, the Website design and content show that Watts Guerra intentionally misled viewers into quickly signing up based on misimpressions about the Rule 23(b)(2) settlement.[9]  Thus, Watts Guerra Marketing Campaign purposefully avoids any substantive discussion of, or convenient or conspicuous reference to, the Court-approved settlement websites and the Court-approved notice describing the settlement.

### C.  Watts Guerra's Speech Amounts to False Advertisement that the First Amendment Does Not Protect

False and misleading statements and material omissions permeate the Watts Guerra mass-advertising campaign.  The First Amendment does not protect such statements, and Watts Guerra's Motion for Reconsideration therefore lacks merit.  Attorney "[a]dvertising that is false, deceptive, or misleading of course is subject to restraint."  *Bates v. State Bar of Ariz.*, 433 U.S.

---

[9] Of course, the television advertising contains no references whatsoever to appointed Class Counsel or discussion of the existing settlement.  Instead, the ads compel class members to visit the Watts Guerra website first, after hearing the misleading descriptions that comprise the ads.

350, 383, 97 S.Ct. 2691, 2709 (1977) (citing *Virginia Pharmacy Bd. v. Virginia Consumer Council*, 425 U.S. 748, 771-72 & n. 24, 96 S.Ct 1817, 1830-31 (1976).  Because "the advertiser knows his product and has a commercial interest in its dissemination, we have little worry that regulation to assure truthfulness will discourage protected speech." *Bates,* 433 U.S. at 383. "Indeed, the public and private benefits from commercial speech derive from confidence in its accuracy and reliability." *Id.* Thus, the First Amendment provides no protection for 'untruthful or misleading expression' in lawyer advertising." *Id.*   In fact, "because the public lacks sophistication concerning legal services, misstatements that might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising." *Id.*

1.  **The Court's Order Does Not Constitute an Impermissible Prior Restraint on Protected Speech**

The Court should also reject Watts Guerra's argument that the Court's Take Down Order amounts to an impermissible prior restraint on speech.[10]  Courts have the ability to limit communications between parties and potential class members.  District courts have "both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties."  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 2200 (1981).  Rule 23(d) provides that, "[i]n the conducting an action under this

---

[10]  Contrary to Watts Guerra's contention, the Court's Order does not require the "blessing of both Class Counsel and the Court . . ." before Watts Guerra may post further information related to the Settlement Agreement.  Rather, the Court required that Watts Guerra meet and confer with the Parties Counsel before posting information to ensure that there is an actual dispute between the Parties and Watts Guerra.  If the Parties do not object, Watts Guerra will be free to post information as it pleases.  The Order does not, therefore, improperly delegate authority to the Parties.  It instead preserves the Court's resources by ensuring that all involved do not, in fact, agree that the future communication is permissible.

As far the "blessing" of the Court, the Parties suggest that this Court refer the clearance of any future website content to a Special Master or Magistrate Judge for approval if there is a dispute as to content between the Parties and Watts Guerra.

rule, the court may issue orders that: . . . (C) impose conditions on the representative parties or on intervenors . . . [and] (E) deal with similar procedural matters." Fed. R. Civ. P. 23(d).

As Watts Guerra notes, the Court should impose a remedy restricted to that necessary to prevent and correct the effects of improper Class communications and conduct under Rule 23. *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977), *cert denied,* 434 U.S. 985, 98 S.Ct. 611.  The Supreme Court stated in *Gulf Oil* that "[a]n order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." 452 U.S. at 101-102. The district court in *Georgine v. Amchem Prods., Inc.*, 160 F.R.D. 478 (E.D. Pa. 1995), faced a similar factual situation.  Several law firms sent misleading solicitations to members of the potential settlement class, urging them to opt-out or to object to the fairness of the proposed settlement.  By the opt-out date, absent class members had filed 201,654 opt-out requests.  The court determined that the solicitations by outside counsel contained misstatements, "likely confused and misled class members, caused a high number of opt-outs, and therefore, had an adverse effect on the administration of justice." *Id*. at 498.

The outside counsel made very similar misstatements to those made by Watts Guerra in this case.  For example, they stated:

1. "[T]he only way to protect your rights to future compensation is to sign the enclosed 'opt out' form immediately and "if you do not send in this form immediately, YOU WILL LOSE VALUABLE RIGHTS IN THE EVENT YOU DEVELOP AN ASBESTOS-RELATED DISEASE IN THE FUTURE." *Id*. at 491.

2. "[A]sbestos companies can back out of this proposed settlement at any time but victims are bound to its terms forever." *Id*. at 492.

3.      Letters stating that "this proposed settlement forces you to give up something…
FOR NOTHING IN RETURN."  *Id*. at 494.

The court further stated that:

> To compound the problem, but not the sole factor that makes these
> communications misleading, is the fact that almost all of the communications
> submitted by the settling parties in support of their joint motion contain one-sided
> attacks on the proposed settlement without any mention of its benefits. . . .
> Indeed, most do not even note the existence of a Court-approved notice packet or
> how to obtain one. . . .  It is apparent that the manner in which information was
> presented in these letters and advertisements was certain to discourage class
> members from participating in the settlement.

*Id*. at 496 (footnote omitted).  In that case, the Court required curative notice to those who had

opted-out, and established a second opt-out period.  *Id.* at 502.

Similar action has been taken by other courts.  *See In re Fed. Skywalk Cases*, 97 F.R.D.

370, 374 (W.D. Mo. 1983); *Impervious Paint Indus., Inc. v. Ashland Oil*, 508 F. Supp. 720, 722

(W.D. Ky. 1981); *see also* David F. Herr, Manual for Complex Litigation (Fourth) § 21.33

(2008) ("Objectors to a class settlement or their attorneys may not communicate misleading or

inaccurate statements to class members about the terms of a settlement to induce them to file

objections or to opt out.  If improper communications occur, curative action might be necessary,

such as extending deadlines for opting out . . . or voiding improperly solicited opt outs and

providing a new opportunity to opt out.").

The rules and caselaw limiting what Watts Guerra could say in its advertising to potential

clients existed at the time that it spoke.  No law required Watts Guerra to obtain a license or pre-

approval from the government to make those communications.  After Watts Guerra spoke, the

parties complained to the court and the court took corrective action.  In this case Watts Guerra

spoke first and then was required to retract its misleading and inaccurate speech, rather than

being prevented from speaking in the first instance.  The court then issued its order preventing

similar future speech based on its finding that the speech violates the rules and law.  These

events do not constitute prior restraint; rather, they are corrective action after the fact.

> **2.  Even if the First Amendment Provides Some Protection to Watts Guerra's Speech, the Court May Nevertheless Properly Limit that Speech in this Case**

The Court should apply the "commercial speech" test.  At best this is a lawyer advertising

issue involving commercial speech.  Movant even must acknowledge that Watts Guerra, or any

other law firm, may not mislead or make a misrepresentation.  Additionally, Watts Guerra cannot

mount a facial challenge because this is commercial speech.

Speech by professionals obviously has many dimensions.  "There are circumstances in

which we will accord speech by attorneys on public issues and matters of legal representation the

strongest protection our Constitution has to offer."  *See*, *e.g.*, *Gentile v. State Bar of Nevada*, 501

U.S. 1030, 111 S.Ct. 2720 (1991); *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893 (1978).  However,

pure commercial advertising has always received a lesser degree of protection under the First

Amendment.  "Particularly because the standards and conduct of state-licensed lawyers have

traditionally been subject to extensive regulation by the States, it is all the more appropriate that

we limit our scrutiny of state regulations to a level commensurate with the 'subordinate position'

of commercial speech in the scale of First Amendment values."  *Florida Bar v. Went For It, Inc.*,

515 U.S. 618, 635, 115 S.Ct. 2371, 2381 (1995) (citations omitted).

> **a.  The Court and the Parties have a Substantial Interest in Protecting the Class Settlement Process**

The State has a legitimate and, indeed, "compelling" interest in preventing those aspects

of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of

"vexatious conduct." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 462, 98 S.Ct. 1912, 1918 (1978).  The Court, in addition, has an obligation to protect class members from such information in precisely the manner in which it did in this case.  Fed. R. Civ. P. 23(d)).  Concerning communications with putative class members, the Supreme Court in *Gulf Oil* articulated the standard:  "regulation of communication is appropriate where the purposes of Rule 23 are threatened or undermined." *Adair v. EQT Prod. Co.*, 2011 U.S. Dist. LEXIS 110512 (W.D. Va. Sept. 28, 2011) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 2200 (1981), ("Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties.").  The Court also has the interest in protecting its own investment in time and resources to effectuate the Settlement Agreement against illegitimate attack.

### b.      The Court Adequately Tailored its Order to the Facts of this Case

The Court adequately tailored its Take Down Order.  Because regulation of commercial speech "may extend only as far as the interest it serves,' . . . state rules that are designed to prevent the 'potential for deception and confusion . . . may be no broader than reasonably necessary to prevent the' perceived evil." *Shapero v. Kentucky Bar Assn.*, 486 U.S. 466, 472, 108 S.Ct. 1916, 1921 (1988) (citations omitted).

The Order merely required Watts Guerra to stop using mass advertising to communicate with Rule 23(b)(2) Class Members who have no current ability to make use of any legal services in this case.  The Order required Watts Guerra to take down all websites and videos relating to the Proposed Settlement and cease any and all advertising campaigns or other communications related to the Proposed Settlement whether on television, the radio, or other media.  (Doc. 84, pp.

1-2).  Additionally, no other Watts Guerra- or Thompson-controlled websites were implicated in the Take Down Order.  Similarly, the only videos, advertising campaigns or other communications implicated in the Court's order were those describing the Proposed Settlement and indiscriminately directed at persons who could make no use of Watts Guerra's services.  The Court thus tailored the Order to preclude communications that would necessarily reach members of the Rule 23(b)(2) who have not already objected to the settlement..

Watts Guerra remains free to contact its existing clients through any other means available.  (Doc. 84).  Watts Guerra may call its clients by phone, send them letters, or visit them in person.  In fact, if Watts Guerra does not have other means of directly communicating with its "clients," it would probably run afoul of the Rules of Professional Conduct requiring attorneys to keep clients apprised of information related to their case.

Most tellingly, in its Motion for Reconsideration, Watts Guerra claims the Take Down Order is not adequately tailored but never offers a less-restrictive means to achieve the substantial interest in protecting the Class Members from its misrepresentations.  After the Court issued the Take Down Order, Parties' counsel attempted to discuss with Watts Guerra what less restrictive alternatives could accomplish this goal.  Watts Guerra either could not come up with, or would not share, any ideas.[11]  Instead it filed this motion while pretending to meet and confer.  Watts Guerra has not suggested a better restriction either or proposed what it thinks is accurate.

---

[11]  As earlier stated, Watts Guerra would not meet and confer on this issue in good faith.  It provided only Kimball Anderson, who stated he could not speak on behalf of Watts Guerra.  Anderson Then requested twenty-four hours to respond, and pushed this request back further in his email.  Ultimately, Watts Guerra did not respond but instead elected to file the Motion for Reconsideration.  The Parties believe that all concerned might have been able to reach an agreement and avoid the additional extensive filings had Watts Guerra undertaken a good-faith meet and confer.  Although this response shows that Watts Guerra's arguments lack merit, for the Court's convenience, the Parties remain willing to address the issue informally.

### c. The Potential Harm Far Outweighs Any Value the Speech May Have

The value any truthful statements in Watts Guerra's campaign are undermined by the accompanying false and misleading statements.  Watts Guerra has no legitimate need to speak to class members whom are not their clients after the objection deadline.  Watts Guerra is merely trying to get a list of people it can later represent in individual suits.  It is, therefore, abusing the legal system to create a client list for future cases.  The Court should not condone this behavior.  Watts Guerra's speech is at best misleading and retains little value.  On the other hand, Watts Guerra threatens to destroy the immense value provided by the injunctive relief.  This balance favors strongly favors the remedy the court ordered.

## V.        CONCLUSION

For the foregoing reasons, the Court should overrule Watts Guerra's Motion for Reconsideration, or in the alternative Order Watts Guerra to meet and confer directly with the Parties' Virginia counsel to determine of there is a negotiable solution to the pending dispute; and Refer this matter to a Special Master.

**GREGORY THOMAS BERRY, SUMMER DARBONNE, RICKEY MILLEN, SHAMOON SAEED, ARTHUR B. HERNANDEZ, ERIKA A. GODFREY, AND TIMOTHY OTTEN, individually and on behalf of all others similarly situated**

**LEXISNEXIS RISK SOLUTIONS FL, INC., LEXISNEXIS RISK DATA MANAGEMENT, INC., AND REED ELSEVIER, INC.**

By:/s/Leonard A. Bennett
   Leonard A. Bennett
   Virginia State Bar No. 37523
   CONSUMER LITIGATION
   ASSOCIATES, P.C.
   763 J. Clyde Morris Boulevard, Suite 1A
   Newport News, Virginia 23601
   Telephone: 757-930-3660
   Facsimile: 757-930-3662
   Email: lenbennett@clalegal.com

   Michael A. Caddell
   Cynthia B. Chapman
   Craig C. Marchinado
   CADDELL & CHAPMAN
   1331 Lamar St., Suite 1070
   Houston, TX 77010
   Telephone: 713-751-0400
   Facsimile: 713-751-0906
   Email: mac@caddellchapman.com

   James Arthur Francis
   FRANCIS & MAILMAN PC
   100 S Broad Street 19th Floor
   Philadelphia, PA 19110
   Telephone: 215-735-8600
   Facsimile: 215-940-8000
   Email: jfrancis@consumerlawfirm.com

   Dale Wood Pittman
   Virginia State Bar No. 15673
   112-A W Tabb St.
   Petersburg, VA 23803-3212
   Telephone: 804-861-6000
   Facsimile: 804-861-3368
   *Counsel for Plaintiffs*

By:/s/David N. Anthony
   David Neal Anthony
   Virginia State Bar No. 31696
   TROUTMAN SANDERS LLP
   Troutman Sanders Bldg
   1001 Haxall Point
   Richmond, VA 23219
   Telephone: 804-697-5410
   Fax: 804-698-5118
   Email: david.anthony@troutmansanders.com

   Ronald Irvin Raether, Jr.
   FARUKI IRELAND & COX PLL
   500 Courthouse Plaza SW
   10 N Ludlow St.
   Dayton, OH 45402
   Telephone: 937-227-3733
   Facsimile: 937-227-3717
   Email: rraether@ficlaw.com

   James Francis McCabe
   MORRISON & FOERSTER LLP
   425 Market Street
   San Francisco, CA 94105-2482
   Telephone: 415-268-7011
   Facsimile: 415-268-7522
   Email: jmccabe@mofo.com

   *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on the 1st day of November, 2013, I electronically filed the foregoing

Memorandum with the Clerk of Courts using the CM/ECF system, which will send notification

of such filing to CM/ECF participants, and I hereby certify that I have mailed by United States

Postal Service the document to any non-CM/ECF participants.


/s/Leonard A. Bennett
Leonard A. Bennett
Virginia State Bar No. 37523
*Counsel for Plaintiffs*
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1A
Newport News, Virginia 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: lenbennett@clalegal.com