**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| **GREGORY THOMAS BERRY,** *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Case No. 3:11CV754** |
| | § | |
| **LEXISNEXIS RISK & INFORMATION** | § | |
| **ANALYTICS GROUP, INC.,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | **(Judge James R. Spencer)** |

_____

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF JOINT**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

_____

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND OF THE CASE AND SETTLEMENT ....................................................2

III.    THE SETTLEMENT'S TERMS AS TO EACH CLASS ..................................................5

        A.      The Rule 23(b)(2) Settlement Class........................................................5

                1.      The Class Definition and Relief..................................................5

                2.      The Release of Claims ................................................................7

        B.      Rule 23(b)(3) Settlement Class.................................................................8

                1.      The Class Definition and Relief..................................................8

                2.      The Release of Claims ................................................................9

        C.      The Notice Plan Was Carried Out Precisely as the Court Instructed. .....................9

                1.      The Mail-Notice Program ...........................................................10

                2.      The Published Notice .................................................................10

                3.      The Settlement Websites and Telephone Numbers ...................................11

IV.     THE COURT SHOULD CERTIFY THE CLASSES FOR SETTLEMENT
        PURPOSES...........................................................................................................11

V.      THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND THE
        COURT SHOULD FINALLY APPROVE IT...............................................................12

        A.      The Fourth Circuit Standards for Approval of Class Action Settlements ............12

        B.      The Class Was Given the Best Notice Practicable Under the
                Circumstances. .........................................................................................13

        C.      The Required CAFA Notices Have Been Sent. ........................................15

        D.      Analysis of the Jiffy Lube Factors Shows the Settlement is Fair and
                Reasonable and Should Be Finally Approved. ........................................16

1.    The settlement was reached after lengthy, contentious negotiations spanning five years and three lawsuits........................................................17

2.    Given the litigation history among the Parties, sufficient discovery supports the Settlement. ...........................................................................18

3.    Settlement negotiations were hard-fought and contentious. .....................19

4.    Class Counsel has extensive experience in FCRA litigation and recommends that the Settlement be approved. .........................................20

E.    The Settlement Is Substantively Adequate. ..........................................................22

1.    Plaintiffs' claims are heavily disputed and would encounter substantial defenses...................................................................................23

2.    Continuing this litigation will result in significant additional burdens on the Parties and the Court. ....................................................................25

3.    Possible collection risk and risk of remittitur also favor settlement..........26

4.    Class Member reaction favors approval of the Settlement. ......................26

VI.    CONCLUSION...............................................................................................................28

# TABLE OF AUTHORITIES

## CASES

*Access Now, Inc. v. Claire's Stores, Inc.*,
 No. 00-14017-CIV, 2002 WL 1162422
 (S.D. Fla. May 7, 2002) ...................................................................................15

*Adams, et al. v. LexisNexis Risk & Information Analytics Group, Inc., et al.*,
 No. 08-4708 (D.N.J. 2008) ...............................................................................2

*Alvarado Partners, L.P. v. Mehta*,
 723 F. Supp. 540 (D. Colo. 1989 ......................................................................24

*Armstrong v. Bd. of Sch. Dirs.*,
 616 F.2d 305 (7th Cir. 1980) ...........................................................................12

*Beverly v. Wal-Mart*,
 No. 3:07CV469 (E.D. Va. 2007) ......................................................................21

*Borcea v. Carnival Corp.*,
 238 F.R.D. 664 (S.D. Fla. 2006)......................................................................26

*Boyd v. Bechtel Corp.*,
 485 F. Supp. 610 (N.D. Cal. 1979) ...................................................................28

*Brunson v. Louisiana-Pacific Corp.*,
 818 F. Supp. 2d 922 (D.S.C. 2011).....................................................................27

*Bryan v. Pittsburgh Plate Glass Co. (PPG Indus., Inc.)*,
 494 F.2d 799 (3d Cir. 1974).............................................................................28

*Capetta v. GC Servs., Inc.*,
 No. 3:02cv288 (E.D. Va.) .................................................................................21

*Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*,
 No. 85CV4038, 1987 WL 7030
 (S.D.N.Y. Feb. 13, 1987) .................................................................................24

*Conley v. First Tenn.*,
 No. 1:10CV1247-TSE (E.D. Va.) ....................................................................21

*Cotton v. Hinton*,
 559 F.2d 1326 (5th Cir. 1977) .........................................................................17

*Daily v. NCO*,
No. 3:09CV031 (E.D. Va. 2011) .........................................................21

*Deem v. Ames True Temper, Inc.*,
No. 6:10-CV-01339, 2013 WL 2285972
(S.D. W. Va. May 23, 2013) ..............................................................25

*DeHoyos v. Allstate Corp.*,
240 F.R.D. 269 (W.D. Tex. 2007) ....................................................16

*Domonoske v. Bank of Am., N.A.*,
790 F. Supp. 2d 466 (W.D. Va. 2011) ..............................................13

*Dreher v. Experian Info. Solutions, Inc.*,
No. 3:11-CV-00624-JAG, 2013 WL 2389878
(E.D. Va. May 30, 2013).....................................................................23

*Fidel v. Farley*,
534 F.3d 508 (6th Cir. 2008) .............................................................16

*Fisher v. Va. Elec. & Power Co.*,
217 F.R.D. 201 (E.D. Va. 2003) .......................................................14

*Graham, et al. v. LexisNexis Risk & Information Analytics Group, Inc., et al.*,
No. 3:09-CV-00655-JRS (E.D. Va. 2009) ..........................................2

*Grant v. Bethlehem Steel Corp.*,
823 F.2d 20 (2d Cir. 1987).................................................................27

*Henderson, et al. v. Acxiom Risk Mitigation, Inc., et al.*,
No. 3:12-cv-00589-REP (E.D. Va.)....................................................21

*In re Austrian & German Bank Holocaust Litig.*,
80 F. Supp. 2d 164 (S.D.N.Y. 2000)..................................................28

*In re Beef Industry Antitrust Litig.*,
607 F.2d 167 (5th Cir. 1979) .............................................................28

*In re Jiffy Lube Sec. Litig.*,
927 F.2d 155 (4th Cir. 1991) .......................................................16, 22

*In re Microstrategy, Inc. Sec. Litig.*,
148 F. Supp. 2d 654 (E.D. Va. 2001) ................................... *passim*

*In re Serzone Prods. Liability Litig.*,
231 F.R.D. 221 (S.D. W. Va. 2005)....................................................13

*In re The Mills Corp. Sec. Litig.*,
  265 F.R.D. 246 (E.D. Va. 2009) ....................................................................17

*In re Zurn Pex Plumbing Prods. Liability Litig.*,
  No. 08-MDL-1958 ADM/AJB, 2013 WL 716088
  (D. Minn. Feb. 27, 2013) ............................................................................14

*IUE-CWA v. Gen. Motors Corp.*,
  238 F.R.D. 583 (E.D. Mich. 2006) ...............................................................15

*Kay Co. v. Equitable Prod. Co.*,
  749 F. Supp. 2d 455 (S.D. W. Va. 2010) ......................................................27

*Laskey v. Int'l Union*,
  638 F.2d 954 (6th Cir. 1981) .......................................................................27

*Lengrand v. Wellpoint*,
  No. 3:11CV333-HEH (E.D. Va.) ...................................................................21

*Lipuma v. Am. Express*,
  406 F. Supp. 2d at 1309–10 ........................................................................26

*Lomascolo v. Parsons Brinckerhoff, Inc.*,
  No. 1:08CV1310 (AJT/JFA), 2009 WL 3094955
  (E.D. Va. Sept. 28, 2009) ............................................................................16

*Marisol A. ex rel. Forbes v. Giuliani*,
  185 F.R.D. 152 (S.D.N.Y. 1999) ..................................................................28

*Martin v. United Auto Credit Corp.*,
  3:05cv00143 (E.D. Va. Aug. 29, 2006) .........................................................14

*Mayborg v. City of St. Bernard*,
  1:04-CV-00249, 2007 WL 3047235 (S.D. Ohio Oct. 18, 2007) ......................16

*Moore v. United States*,
  63 Fed. Cl. 781 (Fed. Cl. 2005) ...................................................................16

*Murray v. GMAC Mortgage Corp.*,
  434 F.3d 948 (7th Cir. 2006) .......................................................................26

*New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*,
  234 F.R.D. 627 (W.D. Ky. 2006) ..................................................................16

*Pettway v. Am. Cast Iron Pipe Co.*,
    72 F.2d 315 (11th Cir. 1983) .........................................................................26

*Reppert v. Marvin Lumber & Cedar Co.*,
    359 F.3d 53 (1st Cir. 2004)...........................................................................15

*Rolland v. Cellucci*,
    191 F.R.D. 3 (D. Mass. 2000).......................................................................25

*Ryals v. HireRight Sols. Inc.*,
    No. 3:09CV625 (E.D. Va.) ...........................................................................21

*S.C. Nat'l Bank v. Stone*,
    749 F. Supp. 1419 (D.S.C. 1990)............................................................ *passim*

*Soutter v. Equifax Info. Servs., LLC*,
    No. 3:10CV107, 2011 WL 1226025
    (E.D. Va. Mar. 30, 2011) ..............................................................................21

*Stoetzner v. U.S. Steel Corp.*,
    897 F.2d 115 (3d Cir. 1990)..........................................................................27

*Strang v. JHM Mortgage Sec. Ltd. P'ship*,
    890 F. Supp. 499 (E.D. Va. 1995) ................................................................22

*United States v. State of Or.*,
    913 F.2d 576 (9th Cir. 1990) .........................................................................16

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)............................................................................20

*Weiss v. Regal Collections*,
    Civ. No. 01CV881-DMC, 2006 WL 2038493
    (D.N.J. July 19, 2006)...................................................................................20

*West Virginia v. Chas. Pfizer & Co.*,
    314 F. Supp. 710 (D.W.V. 1970)..................................................................25

*Williams v. First Nat'l Bank*,
    216 U.S. 582 (1910)......................................................................................12

*Williams v. Lexis-Nexis Risk Mgmt.*,
    No. 3:06CV241 (E.D. Va. 2008) ...................................................................21

## <u>STATUTES</u>

15 U.S.C. § 1681b ................................................................................................. *passim*

28 U.S.C. §1715 ........................................................................................................ 15

## <u>RULES</u>

Fed R. Civ. P. 23 ................................................................................................. *passim*

Plaintiffs Gregory Thomas Berry, Summer Darbonne, Rickey Millen, Shamoon Saeed, Arthur B. Hernandez, Erika A. Godfrey, and Timothy Otten, individually and on behalf of all others similarly situated, ("Plaintiffs"), respectfully submit this memorandum of law in support of the Parties Joint Motion for Final Approval of Class Action Settlement. Because the Settlement represents an excellent result for the Class and will avoid the risks and expense of further litigation, the Court should grant Final Approval.

## I.    INTRODUCTION

After years of hard-fought litigation—in this case as well as in two predecessor cases—over whether the Fair Credit Reporting Act ("FCRA") applies to the Accurint for Collections ("Accurint") database, and whether Defendants LexisNexis Risk & Information Analytics Group, Inc., Seisint, Inc., and Reed Elsevier Inc. (collectively, "LexisNexis") can be found to have willfully violated the FCRA by collecting and selling the information without complying with FCRA regulations, Plaintiffs have achieved an enormously valuable settlement for members of the proposed Classes. The Proposed Settlement will provide significant privacy protections for consumers in the Rule 23(b)(2) Class and will also offer monetary relief to consumers who have disputed the accuracy of their Accurint information and who are members of the Rule 23(b)(3) Class. This Settlement represents a significant shift in data broker industry practices and an important victory for consumer privacy.

After an extensive hearing on April 19, 2013, the Court preliminarily approved the Settlement and conditionally certified one settlement class under Federal Rule of Civil Procedure 23(b)(2) and one settlement class under Federal Rule of Civil Procedure 23(b)(3). (*See* Dkt. No. 67.) That hearing was preceded by a settlement presentation to Judge Lauck, who met with the Parties on January 14, 2013, and fully vetted the Settlement during a 3.5 hour, on-the-record conference. Because the Settlement remains a fair, reasonable, and adequate result for Class Members, the Court should now grant final approval.

1

## II.     BACKGROUND OF THE CASE AND SETTLEMENT

This Settlement is the culmination of extensive, years-long litigation over LexisNexis's Accurint reports, including extensive discovery and mediations in two predecessor cases, as well as in this case. The process that led to the Settlement was at all times adversarial and contentious, and the Parties' settlement discussions have been supervised by several mediators, including Judge Lauck.

Filed in November 2011, this case is the third national class action filed by Plaintiffs' Counsel against LexisNexis regarding the Accurint reports. (Declaration of Michael A. Caddell, attached as Ex. 1, ("Caddell Decl.") ¶ 33; Dkt. No. 63 at 7.) Two earlier cases, *Adams, et al. v. LexisNexis Risk & Information Analytics Group, Inc., et al.*, No. 08-4708 (D.N.J. 2008) and *Graham, et al. v. LexisNexis Risk & Information Analytics Group, Inc., et al.*, No. 3:09-CV-00655-JRS (E.D. Va. 2009), raised claims similar to Plaintiffs' claims here.  Neither case resulted in classwide relief. (Caddell Decl. ¶ 33; Dkt. No. 63 at 7.) Following the dismissals of *Adams* and *Graham*, Plaintiffs' Counsel filed this action to continue pursuing relief on a classwide basis on behalf of consumers affected by LexisNexis's Accurint data policies. Plaintiffs' Counsel conducted formal and informal discovery in all three cases.  This discovery included deposing witnesses, serving and responding to written discovery, and reviewing substantial information and documents. (Caddell Decl. ¶ 33; Dkt. No. 63 at 7.) Plaintiffs' Counsel drew upon their combined knowledge from and experience in *Adams* and *Graham* to place this case in the best posture for classwide settlement. (Caddell Decl. ¶ 34; *see* Dkt. No. 63 at 10.)

Over the course of the litigation of these three cases, the Parties have met—face-to-face—for mediation conferences at least nine times in Richmond, Newport News, New York, Philadelphia, Houston, Oakland, and Fort Lauderdale. (Caddell Decl. ¶ 39; Dkt. No. 63 at 2, 10–11.) Specifically in this *Berry* action, three mediators have assisted in reaching this Settlement: Judges Lauck and Dohnal, and Randall Wulff. (Dkt. No. 63 at 2.) In addition to these in-person

meetings, the Parties conducted numerous telephone conferences that ultimately led to this Settlement.  (Dkt. No. 63 at 11.)

The first face-to-face settlement negotiation took place in 2009 in Newport News shortly after the *Graham* action was filed, with top decision makers from both sides involved.  A detailed presentation was made over the course of a full day, and the parties engaged in substantial, in-depth discussions regarding the LexisNexis products and the claims at issue. (Caddell Decl. ¶ 39; Dkt. No. 63 at 10.) The Parties met again in Philadelphia and New York, primarily for purposes of discussing an injunctive relief settlement. (Caddell Decl. ¶ 39; Dkt. No. 63 at 11.) Monetary relief was not the focus of these meetings.  Instead, the parties discussed very specific and detailed changes in LexisNexis's business practices at a product by product level that they believed were necessary to address the issues raised in the complaint and to settle these claims. (Caddell Decl. ¶ 39; Dkt. No. 63 at 11.) Across these meetings, Plaintiffs' Counsel discussed with Defendants the business practice changes Counsel believed were necessary to resolve FCRA claims related to the Accurint database and delved painstakingly into each product offering in the Accurint suite, report by report, and, in some instances, data field by data field. After these meetings concluded without a resolution, Plaintiffs filed this case in November 2011. (Caddell Decl. ¶ 40; Dkt. No. 63 at 11.)

The Parties began settlement talks in the *Berry* case in 2012, with an initial phone conference with Judge Lauck and another face-to-face meeting, this time in Houston, to discuss settlement. (Caddell Decl. ¶ 40; Dkt. No. 63 at 11.) The Parties then agreed to mediate the case with the assistance of Randall Wulff, chosen because of his experience mediating complex cases, and especially because of his FCRA expertise. (Caddell Decl. ¶ 40; Dkt. No. 63 at 11.) After substantive presentations of both sides' positions, no settlement was reached. (Caddell Decl. ¶ 40; Dkt. No. 63 at 11.) The Parties did agree, however, to reserve three additional mediation dates with Mr. Wulff and to retain Judge Dohnal to further assist with the mediation process. (Caddell Decl. ¶ 40; Dkt. No. 63 at 11.)

Through additional telephone conversations, the Parties began to craft the parameters of a settlement. (Caddell Decl. ¶ 41; Dkt. No. 63 at 11.) These discussions culminated in a July 18, 2012 letter in which LexisNexis proposed radical modifications to its reporting business with respect to debt collectors, including the implementation of certain FCRA-like rights connected to reports that ordinarily would not have such rights. (Caddell Decl. ¶ 41;  Dkt. No. 63 at 11.) With these proposed business changes as the starting point, the Parties again mediated with Mr. Wulff in Oakland, California on July 30, and August 21–22. (Caddell Decl. ¶ 41; Dkt. No. 63 at 12.) This final session again consisted of substantive presentations and exchange of documents setting forth the Parties' litigation positions and ended with the Parties' agreement to the general outline of the Settlement presented here. (Caddell Decl. ¶ 41; Dkt. No. 63 at 12.) The Parties met twice more, once in Houston and once in Fort Lauderdale, to further define the practice changes necessary for LexisNexis to implement the injunctive relief. (Caddell Decl. ¶ 42; Dkt. No. 63 at 12.) All the while, the Parties continued to conduct discovery and litigate the case, aggressively pursuing the dual-track approach until the final mediation sessions with Mr. Wulff approached a resolution. (Caddell Decl. ¶ 43; Dkt. No. 63 at 12.)

Throughout the course of these discussions, meetings, and litigation, Judge Lauck directly supervised the settlement process by conducting telephone conferences to keep abreast of the case status. (Caddell Decl. ¶ 44; Dkt. No. 63 at 12.) In January 2013, with a settlement proposal in place, the Parties attended a settlement conference with Judge Lauck. The Parties provided Judge Lauck with a substantial record of the litigation, the claims, and the settlement process up to that point. (Caddell Decl. ¶ 44; Dkt. No. 63 at 12.) At the 3.5 hour conference, each side gave a substantive presentation on the proposed Settlement, and Judge Lauck asked pointed questions regarding the details of the Settlement. (Caddell Decl. ¶ 44; Dkt. No. 63 at 12.) The conference culminated with Judge Lauck's supportive comments regarding the Settlement:

> . . . I can tell you personally that I think you all have worked something out that is very difficult. I do think it is a sea change and a good one and a thoughtfully conducted one. On behalf of sets of individuals involved, this does strike me both as a set of circumstances where you all have worked hard to see what's fair, to give up on some things you may not wish to have given up on, but then also sort

> of seeing the horizon, the commonsensible approach that's going to have to come at one point or another, and it would not be exactly what everybody wants. And so I think you've worked very hard, and it's evident in what you're presenting to me.

(Jan. 14, 2013 Hr'g Tr., Ex. B to Caddell Decl. at 138:5–21).) Plainly, this Settlement resulted from hard-fought, contentious, and arm's-length negotiations.

## III.   THE SETTLEMENT'S TERMS AS TO EACH CLASS

The Settlement includes two Classes—(1) the Rule 23(b)(2) Class, including more than one-hundred million consumers who will significantly benefit from the agreed substantial business practice changes while preserving claims for actual damages, and (2) the Rule 23(b)(3) Class, including approximately 31,000 consumers who requested copies of or disputed the accuracy of their Accurint reports and will receive monetary damages.

### A.   The Rule 23(b)(2) Settlement Class

#### 1.   The Class Definition and Relief

In its Order Granting Preliminary Approval ("Order"), the Court preliminarily approved the following Class of consumers under Federal Rule of Civil Procedure 23(b)(2):

> All persons residing in the United States of America (including its territories and Puerto Rico) about whom information resided in the Accurint® Database from November 14, 2006 to the date when the Court enters its Preliminary Approval Order. Excluded from the settlement class are counsel of record (and their respective law firms) for any of the parties and the presiding judge in the action and his staff, and all members of their immediate family.

(Dkt. No. 67 ¶ 2.) In agreeing that preliminary approval was appropriate under Rule 23(b)(2), the Court held that "the fact that the Settlement modifies Defendants' conduct as to the Impermissible Use class as a whole makes it appropriate for certification under Rule 23(b)(2)." (*Id.* ¶ 3.E.)

This Class definition is based on the determination that the violations of the Complaint's Impermissible Use Class are largely procedural in nature, making any claims for statutory damages under 15 U.S.C. § 1681n by Class Members incidental to requiring LexisNexis to change its data-handling practices. (Dkt. No. 63 at 13.) The Court agreed with that assessment in its Order granting preliminary approval. (Dkt. No. 67 ¶ 3.E ("The court further finds that the

[FCRA] willfulness remedies, 15 U.S.C. § 1681n, released by the settlement are incidental to injunctive relief.").)

Pursuant to the agreed changes to Defendants' conduct, Defendants will separate their sale of Accurint for Collections data based on content and use. Briefly, Defendants will overhaul their currently existing Accurint for Collections suite of products for the Receivable Management Market,[1] which they currently do not treat as "consumer reports" as defined in the FCRA, and split what is now Accurint for Collections into two newly developed suites of products and services, each containing different sets of information for different uses, where one suite of products and services ("Collections Decisioning") will be treated and recognized by Defendants as falling within the FCRA's "consumer report" definition. (Settlement Agmt. ¶ 4.3.1.) The other suite of products, "Contact & Locate," will not be treated as falling within the ambit of the FCRA but will still provide consumers with FCRA-like rights, such as the ability to obtain a free copy of their Contact & Locate Comprehensive Reports once per year and the ability to submit clarifying information to phone numbers provided in Contact & Locate reports. (*Id.* ¶¶ 4.3.1.2.1, 4.3.1.3; Dkt. No. 63-7 [Declaration of Tom Sizer, filed under seal] ¶ 11 and Ex. 1.).)

Unlike the pre-settlement Accurint for Collections product, LexisNexis customers who are granted access to the Collections Decisioning product and services will now be permitted to use the information only if they are able to certify a permissible purpose under 15 U.S.C. § 1681b. (Settlement Agmt.¶ 4.3.1.1.2.) Consumers will be able to request and review their consumer files, which will display inquiries. Consumers will be able to dispute the accuracy of their information, and Defendants will be required to follow reasonable procedures to help assure

---

[1]   The Settlement defines the Receivables Management Market as "credit originators (such as financial services organizations) and any . . . entity engaged in the collection or attempted collection of an outstanding or past due consumer credit obligation which (a) used or had access to Accurint for Collections prior to the Effective Date or (b) becomes a customer or user after the Effective Date and but for the Injunctive Relief would have been marketed, sold, or given access to Accurint for Collections."   (Settlement Agreement, Ex. A to Caddell Decl., ¶ 2.29 ("Settlement Agmt.").)

accuracy and omit certain prohibited information. Since the Contact & Locate product will not be treated as falling within the FCRA's "consumer report" definition, it will provide only certain categories of data and will limit the uses of that data. (*Id.* ¶¶ 4.3.1.2.1–.3.) The information in this product will be stripped of consumer data that does not bear on the location of a debtor (such as job title, length of employment, property or loan values, judgment histories, and the like). (*Id.* ¶ 4.3.1.2.2.) The settlement injunction will also require Defendants to provide educational seminars and materials, free of charge, to customers regarding their use of and responsibilities relating to Collections Decisioning and Contact & Locate and to train employees who work on or with Collections Decisioning or Contact & Locate regarding the requirements of the Injunctive Relief. (*Id.* ¶¶ 4.3.1.6.)

The relief afforded the 23(b)(2) Class addresses Plaintiffs' primary goal in pursuing this litigation, which was to change LexisNexis's practices relating to the use of Accurint reports by debt collectors. Plaintiffs have asserted all along that the FCRA applies to Accurint reports used by debt collectors because the reports allegedly contain "seven characteristic" information and are used for purposes of debt collection. (Dkt. No. 1 ¶¶ 1, 50.) The significant business changes to which the injunctive relief obligates Defendants constitutes a substantial, nationwide program of injunctive relief, which Defendants' Counsel described as "a shift," "an earthquake within the market." (Dkt. No. 68 at 27:4–5.)

### 2. The Release of Claims

Under the Settlement, Members of the Rule 23(b)(2) Settlement Class release any remedies they may have for willful violations of the FCRA and the ability to pursue future claims using the class-action procedural device, but they do not release any claims they have for actual damages for LexisNexis's FCRA violations. (Settlement Agmt. ¶¶ 4.5.1, 4.5.2.) Thus, while releasing monetary remedies for willful violations that the Court concluded are "incidental to the injunctive relief," (Dkt. No. 67 ¶ 3.E), Rule 23(b)(2) Class Members retain their full rights to sue LexisNexis for claims for actual damages suffered by violations of the FCRA or state-law equivalents. (Settlement Agmt. ¶ 4.5.1.) As the Court put it in the preliminary approval Order,

7

"[a]ny claims that class members may have for actual damages are preserved by the settlement and thus do not preclude certification under Rule 23(b)(2)." (Dkt. No. 67 ¶ 3.E.) This preservation of Class Members' actual damages claims is a key feature of the injunctive relief aspect of the Settlement, as it permits individuals with provable claims to still pursue those claims individually against LexisNexis, while still providing those same consumers with the benefits of the injunctive relief to which LexisNexis has agreed.

### B.    Rule 23(b)(3) Settlement Class

#### 1.    The Class Definition and Relief

In its Order Granting Preliminary Approval ("Order"), the Court also granted preliminarily approval to the following Class of consumers under Federal Rule of Civil Procedure 23(b)(3):

> All persons residing in the United States of America (including its territories and Puerto Rico) who, from October 1, 2006 to April 19, 2013, requested a copy of an Accurint® report about themselves or initiated or submitted a dispute or other inquiry regarding  any Accurint® report to any of the Defendants or any of their predecessors or affiliates. Counsel of record (and their respective law firms) for any of the Parties, along with the presiding judge in this action and his staff, and all members of their immediate families, are excluded from this class definition.

(Dkt. No. 67 ¶ 5.) There are approximately 31,000 members of this Class. (*Id.* ¶ 6.) These individuals are, essentially, consumers who over a six-year period contacted LexisNexis and sought specific, FCRA-like protections regarding Accurint reports about them. (Dkt. No. 63 at 17.)

Under the Settlement Agreement, LexisNexis has agreed to create a $13.5 million common fund to compensate members of the Rule 23(b)(3) Settlement Class. (Settlement Agmt. ¶ 5.3.) LexisNexis also bore the full costs of notice and settlement administration. (*Id.* ¶¶ 5.2.6, 8.6.) The amount of the common fund includes any Court award of attorneys' fees and costs and does not revert to LexisNexis except that any funds not claimed by Class Members may be used to repay expenses of notice for the Rule 23(b)(3) Settlement. (*Id.* ¶¶ 5.3, 5.7.) Any funds

remaining after those costs are repaid will be distributed according to a Court-approved *cy pres* award. (*Id.* ¶ 5.7.)

## 2.    The Release of Claims

In exchange for a cash payment from the common fund, Rule 23(b)(3) Settlement Class Members will release Defendants and related persons from all claims resulting from, arising out of, or in any way connected to "Covered Conduct," defined as:

> [A]ny and all conduct or activity of the Defendants challenged by Named Plaintiffs in the Litigation relating to the characterization of any Accurint Reports as a "consumer report" as defined in the FCRA and any related alleged violations of the FCRA. Covered Conduct does not include activity of the Defendants that may relate to products or services that Released Parties have marketed or sold as "consumer reports."

(Settlement Agmt. ¶ 2.11.) The breadth of the release is justified by the fact that Rule 23(b)(3) Class Members will receive a cash payment—which is appropriate to compensate them for damages they likely suffered, since these consumers were sufficiently affected to contact LexisNexis regarding their Accurint reports.    Thus, a release of actual damage claims is appropriate for members of the Rule 23(b)(3) Class.  If any members of the Rule 23(b)(3) Class believe they suffered actual damages greater than $300, they have the power to opt out to preserve their claims.

## C.    The Notice Plan Was Carried Out Precisely as the Court Instructed.

The Court appointed Kinsella Media and Rust Consulting as the third-party administrators of the Settlements and approved the proposed notice plan presented with the motion for preliminary approval. (Dkt. No. 67 ¶¶ 11–12.) This comprehensive notice plan consisted of a notice mailed directly to members of the Rule 23(b)(3) Class; publication of a summary notice in consumer magazines, a newspaper supplement, and newspapers in U.S. territories for the Rule 23(b)(2) Class; Internet banner advertising for the Rule 23(b)(2) Class; the creation and maintenance of two separate Internet websites dedicated to each class; and the maintenance of toll-free telephone numbers and post-office boxes related to the Settlement. (Dkt. No. 63-3 ¶¶ 13–15, 25–28.)

### 1.   The Mail-Notice Program

As set forth in the Settlement Agreement, LexisNexis generated the list of Rule 23(b)(3) Class Members from its archive files. (Settlement Agmt. ¶ 5.2.1.) The Parties then charged Rust with sending the Court-approved notice letters to Rule 23(b)(3) Settlement Class Members by U.S. mail, to the last known address of Class Members appearing on the Class List. (*Id.* ¶ 5.2.4.) LexisNexis provided Rust with the Class List on May 22, 2013, and Rust processed and scrubbed the data to ensure adequate address formatting, resulting in 32,558 records for mailing. (Declaration of Karen Rogan, attached as Ex. 2 ("Rogan Decl.") ¶¶ 4–5.) Rust then formatted the postcard notices for these Class Member addresses, prepaid first-class postage, and delivered them to the U.S. Post Office for mailing on June 12, 2013. (*Id.* ¶ 6.) Rust originally mailed 32,558 notices, and 6,081 were returned undeliverable and without forwarding addresses. (*Id.* ¶¶ 7–8.) Rust then used a trace process to update the addresses of those Class Members whose notices were returned, and was able to update 2,776 addresses. (*Id.* ¶ 8.) Rust then remailed these 2,776 notices, as well as 135 original notices that were returned with forwarding addresses. (*Id.*) From that second mailing, 515 were again returned undeliverable, even after the addresses were updated. (*Id.*) All told, 3,836 notices were returned undeliverable, meaning the postcard notices reached approximately 88.2% of Rule 23(b)(3) Settlement Class Members. (*Id.* ¶¶ 8–9.)

### 2.   The Published Notice

Kinsella Media designed the published notice plan to reach an estimated 78% of adults 18 and older an average of two times each. (Dkt. No. 63-3 ¶ 16.) Beginning June 26, 2013, Kinsella Media caused the Court-approved summary notice to be published in the following publications—Better Homes & Gardens, National Geographic, Parents, People, People en Español, El Nueva Dia, El Vocero, Pacific Daily News (Guam), Primera Hora, Saipan Tribune, Samoa News, St. Croix Avis, St. Johns Tradewinds, Virgin Islands Daily News, and Parade. (Declaration of Shannon Wheatman, attached as Ex. 3 ("Wheatman Decl.") ¶¶ 13–14, and Ex. 1.) Those publications continued through July, 2013 in each of these publications. (*Id.*) In addition to these written publications, Kinsella also purchased advertisements on the 24/7

Network and Facebook.com Internet sites. (*Id.*) Ms. Wheatman confirmed these publications, and further that the notices were designed to increase noticeability and comprehension for individuals viewing them. (*Id.* ¶¶ 21–22.) Ms. Wheatman further determined that the published notice reached an estimated 75.1% of potential Rule 23(b)(2) Class Members. (*Id.* ¶ 20.)

### 3.    The Settlement Websites and Telephone Numbers

Also as set forth in the Settlement Agreement, Rust created and maintained Internet websites dedicated solely to the two Settlement Classes. (Settlement Agmt. ¶ 5.2.4; Rogan Decl. ¶ 13.) Each website includes general information about each particular Class, long-form versions of the notices in English and Spanish, viewable versions of the Settlement Agreement and the Court's Order Granting Preliminary Approval of the Settlement, important dates relating to the Settlement, a set of frequently asked questions and answers, and toll-free numbers consumers can call for more information. (Rogan Decl. ¶ 13.) As of November 18, 2013, Rust registered 6,261 unique visits to the Rule 23(b)(3) website, and 199,867 unique visits to the Rule 23(b)(2) website. (*Id.*)

Rust also established and continues to maintain two toll-free telephone numbers for each Class, to respond to inquiries from Class Members. (Rogan Decl. ¶ 12.) The numbers became operational June 7, 2013, and remain operational. (*Id.*) As of November 18, 2013, Rust received 2,211 calls to the Rule 23(b)(3) Class line, and 3,084 calls to the Rule 23(b)(2) Class line. (*Id.*) In response to Class Member requests, Rust mailed the Court-approved long-form notices to 307 Rule 23(b)(3) Class Members, and 1,309 to Rule 23(b)(2) Class Members. (*Id.*) In addition, Rust mailed two and fifteen long-form notices in Spanish to members of the Rule 23(b)(3) and 23(b)(2) Classes, respectively. (*Id.*) Simply put, the Parties carried out the notice program exactly as the Court required, so there can be no reasoned argument that notice was inadequate.

## IV.    THE COURT SHOULD CERTIFY THE CLASSES FOR SETTLEMENT PURPOSES.

In its Order Granting Preliminary Approval, the Court conditionally certified both Classes, holding that both Settlement Classes meet Rule 23(a)'s requirements of numerosity,

commonality, typicality, and adequacy of representation.[2] (Dkt. No. 67 ¶¶ 3, 7.) The Court further concluded that the Rule 23(b)(3) Settlement Class met that subsection's predominance and superiority requirements and that the Defendants acted on grounds generally applicable to the Rule 23(b)(2) Settlement Class as a whole, meeting that subsection's requirement for certification. (*Id.* ¶¶ 3.E, 7.E.) For the same reasons, the Court should certify the Classes for settlement purposes here.

## V.  THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND THE COURT SHOULD FINALLY APPROVE IT.

### A.  The Fourth Circuit Standards for Approval of Class Action Settlements

There is a strong and long-standing judicial policy within this Circuit favoring resolution of litigation before trial. *See S.C. Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1423 (D.S.C. 1990) ("[t]he voluntary resolution of litigation through settlement is strongly favored by the courts") (citing *Williams v. First Nat'l Bank*, 216 U.S. 582 (1910)). Settlement spares the litigants the uncertainty, delay, and expense of a trial and appeals while simultaneously reducing the burden on judicial resources. As the court in *South Carolina National Bank* observed:

> In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strains such litigation imposes upon already scarce judicial resources.

749 F. Supp. at 1423 (quoting *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 313 (7th Cir. 1980)). Rule of Civil Procedure 23(e) requires that the Court evaluate and approve any class action settlement. FED. R. CIV. P. 23(e). Rule 23(e) thus imposes two basic requirements on the parties and on the Court before the approval of a class settlement and dismissal. First, the Court must determine that notice was directed "in a reasonable manner to all class members." FED R. CIV. P. 23(e)(1)(B). Second, the Court must determine that the settlement "is fair, reasonable, and adequate." FED R. CIV. P. 23(e)(1)(C).

---

[2]  Plaintiffs refute the objectors' challenges to adequacy and the Settlement in general in the separately filed Responses to Objections brief.

Approval of a class action settlement is committed to the "sound discretion of the district courts to appraise the reasonableness of particular class-action settlements on a case-by-case basis, in light of the relevant circumstances." *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 663 (E.D. Va. 2001). Additionally, "there is a strong initial presumption that the compromise is fair and reasonable." *Id.* (quoting *S.C. Nat'l Bank*, 139 F.R.D. at 339).

## B.    The Class Was Given the Best Notice Practicable Under the Circumstances.

Due process requires reasonable notice to 23(b)(3) class members. *In re Serzone Prods. Liability Litig.*, 231 F.R.D. 221, 231 (S.D. W. Va. 2005). The notice to Rule 23(b)(3) class members must inform class members (1) of their opportunity to opt out of the class; (2) that the judgment will bind all class members who do not opt out; and (3) that any member who does not opt out may appear through counsel at the final fairness hearing. FED. R. CIV. P. 23(c)(2)(B). Rule 23 does not require perfect notice but, rather, "the best practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." FED. R. CIV. P. 23(c). This requirement is satisfied with a mailing of the notice to each class member by first class mail. *Domonoske v. Bank of Am., N.A.*, 790 F. Supp. 2d 466, 472 (W.D. Va. 2011).

In its Order granting preliminary approval, the Court found that the proposed Mail Notice plan for the Rule 23(b)(3) Settlement Class met the requirements of due process and constituted the best notice practicable under the circumstances. (Dkt. No. 67 ¶ 12.) The Parties submitted a sample notice letter for the Rule 23(b)(3) Settlement Class, which the Court likewise approved. (*Id.*)  As set forth above, the Administrator sent the Mailed Notice to 32,558 members of the Rule 23(b)(3) Settlement Class and sent a second mailing to class members for whom the Administrator was able to identify updated or forwarding addresses.  (*See supra*, Section III.C.) Once completed, the notice process reached 88.4% of the Rule 23(b)(3) Class Members. *See In re Serzone Prods. Liability Litig.*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail portion was estimated to have reached 80% of class members);

*Martin v. United Auto Credit Corp.*, 3:05cv00143 (E.D. Va. Aug. 29, 2006) (approving settlement with class notice of approximately 85% delivery); *see also In re Zurn Pex Plumbing Prods. Liability Litig.*, No. 08-MDL-1958 ADM/AJB, 2013 WL 716088, at *8–9 (D. Minn. Feb. 27, 2013) (granting final approval where notice plan, including direct mail portion, reached at least 80.6% of potential class members). The Parties filed notice on June 21, 2013, attesting to the mailing of the Rule 23(b)(3) Settlement Class notice as the Court ordered. (Dkt. No. 69.)  As of the opt-out and objection deadline of November 18, 2013, only 18 members of the Rule 23(b)(3) class had requested exclusion.  (Rogan Decl. ¶ 10.)  This notice plainly meets Rule 23(b)(3)'s requirements.

Unlike the mandatory notice requirements of Rule 23(b)(3), notice is optional to members of classes certified under rule 23(b)(2). *Compare* FED. R. CIV. P. 23(c)(2)(A) (noting the court "*may* direct appropriate notice to the class" certified under Rule 23(b)(2)) *with* FED. R. CIV. P. 23(c)(2)(B) (explaining that the "court *must* direct to class members the best notice that is practicable under the circumstances") (emphasis added).  Although notice to 23(b)(2) Class Members is not required, the Parties proposed, and the Court approved, a comprehensive, national published notice program for the Rule 23(b)(2) Settlement Class. (Dkt. No. 67 ¶ 12.) That Notice Plan, carried out by Kinsella, was expected to reach 75% of adults 18 years and older an average of two times each. (Dkt. No. 63-3 ¶ 16.)  Ms. Wheatman confirmed that reach of 75% of potential Class Members. (Wheatman Decl. ¶ 20.) This notice was more than reasonable under the circumstances considering: (a) the available information; (b) the possible identification methods; (c) the number of class members; and (d) the amount of the settlement. *See Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 227 (E.D. Va. 2003) ("What amounts to reasonable efforts under the circumstances is for the Court to determine after examining the available information and possible identification methods . . . 'In every case, reasonableness is a function of [the] anticipated results, costs, and amount involved.'") (citations omitted).

The Parties have complied fully with the Court's Preliminary Approval Order and have taken reasonable steps to ensure that the Class Members were notified—in the best and most

direct manner possible—of the Settlement's terms and excellent benefits. The notice plan executed here thus fully satisfies due process requirements. *Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 56 (1st Cir. 2004) ("Individual notice of class proceedings is not meant to guarantee that every member entitled to individual notice receives such notice, but it is the court's duty to ensure that the notice ordered is reasonably calculated to reach the absent class members.") (internal quotation marks and citation omitted).

### C. The Required CAFA Notices Have Been Sent.

As required by the Settlement Agreement, Rust also served notice of this settlement on the relevant state and federal authorities as required by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1715.  (Rogan Decl. ¶ 3.)  None of these agencies or states have objected to the Settlement.  One of the most important mechanisms under CAFA for ensuring the fairness of class action settlements is the requirement that Settling Defendants provide notice of a proposed settlement to interested federal and state governmental authorities.  28 U.S.C. § 1715. As CAFA recognized, such entities would be uniquely positioned to provide a court with educated and reasoned opinions about a proposed settlement.

Here, not a single governmental entity has made any objection to the proposed settlement. That silence in fact speaks volumes.  *See, e.g.*, *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 590 (E.D. Mich. 2006) (granting final approval to proposed class action settlement and noting that "GM issued notice to the appropriate federal and state attorneys general pursuant to [CAFA.] None submitted an objection."); *Access Now, Inc. v. Claire's Stores, Inc.*, No. 00-14017-CIV, 2002 WL 1162422, at *7 (S.D. Fla. May 7, 2002) ("The Court notes that in several recent Title III of the ADA class actions in this district which were similarly noticed, the Department of Justice and several state attorneys general filed objections.  This has not been the case in this matter.  The fact that no objections have been filed strongly favors approval of the settlement.").

15

**D.    Analysis of the *Jiffy Lube* Factors Shows the Settlement is Fair and Reasonable and Should Be Finally Approved.**

The "fairness" analysis of a settlement ensures that "the settlement was reached as a result of good-faith bargaining at arm's length, without collusion." *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991). A settlement is entitled to a presumption of reasonableness where, as here, it is the result of arm's length negotiations between competent counsel. *Lomascolo v. Parsons Brinckerhoff, Inc.*, No. 1:08CV1310 (AJT/JFA), 2009 WL 3094955, at *10 (E.D. Va. Sept. 28, 2009); *S.C. Nat'l Bank*, 139 F.R.D. at 339; *see also United States v. State of Or.*, 913 F.2d 576, 581 (9th Cir. 1990) (recognizing that where a court is satisfied that the decree was the product of good faith, arm's-length negotiations, a negotiated decree is presumptively valid and the objecting party "has a heavy burden of demonstrating that the decree is unreasonable.").

"Once the court has given preliminary approval, an agreement is presumptively reasonable, and an individual who objects has a heavy burden of demonstrating that the settlement is unreasonable." *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 293 (W.D. Tex. 2007); *Mayborg v. City of St. Bernard*, 1:04-CV-00249, 2007 WL 3047235, at *3 (S.D. Ohio Oct. 18, 2007) ("With such preliminary approval, the settlement is presumptively reasonable, and an individual who objects has a heavy burden of proving the settlement is unreasonable."); *Moore v. United States*, 63 Fed. Cl. 781, 784 (Fed. Cl. 2005) (same); *New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*, 234 F.R.D. 627, 631 (W.D. Ky. 2006) *aff'd sub nom. Fidel v. Farley*, 534 F.3d 508 (6th Cir. 2008) ("Preliminary approval gives rise to a presumption that the settlement is fair, reasonable and adequate.  Objectors, therefore, have the burden of persuading this Court that the proposed settlement is unreasonable.").

The Court's primary concern in the fairness analysis is confirming that the rights of absent class members received sufficient consideration in the settlement negotiations. *Jiffy Lube*, 927 F.2d at 158. The factors that the Court should consider in the fairness determination include "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience

of counsel in the area of class action litigation." *Id.* at 159; *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 254 (E.D. Va. 2009). The Court should conduct its analysis in light of the "overriding public interest in favor of settlement, particularly in class action suits." *Lomascolo*, 2009 WL 3094955, at *10 (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). In addition, "[t]here is a 'strong presumption in favor of finding a settlement fair' that must be kept in mind in considering the various factors to be reviewed in making the determination of whether a settlement is fair, adequate and reasonable." *Id.* Here, because the Settlement was reached after multiple, contentious, arm's-length negotiations and is an excellent result for the Class, the Court should confirm the fairness decision it reached on preliminary approval of the Settlement.

### 1. The settlement was reached after lengthy, contentious negotiations spanning five years and three lawsuits.

One critical consideration in the fairness analysis is the fact that this litigation has spanned more than five years and three federal court dockets. As the Parties explained to the Court in their Preliminary Approval briefing, this is the third case brought by Plaintiffs' Counsel challenging the application of the FCRA to Accurint reports. (Caddell Decl. ¶ 33.) The two earlier cases, *Adams* and *Graham*, involved nearly identical claims, but neither resolved the key liability issues—such as the application of the FCRA to Accurint reports or LexisNexis's willfulness—between the Parties in this case. (*Id.* ¶¶ 33–34.) In all three cases, Plaintiffs' Counsel conducted formal and informal discovery and evaluated substantial information and documents. (*Id.* ¶ 33.) They then built upon this knowledge base in subsequent cases. The level of factual knowledge Plaintiffs' Counsel obtained through its history of Accurint litigation is reflected in the detailed allegations of Plaintiffs' Complaint in this case.

The litigation history of *Adams* and *Graham* provided the Parties with a solid foundation for their settlement negotiations here. The discovery obtained in these earlier cases permitted detailed, substantive discussions. Taking advantage of the work that had already been done, the Parties could present their respective positions on the key issues without duplicating earlier discovery. Thus, while this settlement came at a relatively early procedural stage in the *Berry*

17

matter, it was the result of years of discovery and litigation against LexisNexis regarding the FCRA's application to the Accurint database. *See In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 664 (E.D. Va. 2001) (approving of proposed settlement despite the fact that it was reached "early" in litigation).

In addition, the Settlement was reached only after multiple, face-to-face meetings, in this case as well as in *Adams* and *Graham*, to negotiate and then fine-tune the Settlement. (Caddell Decl. ¶ 39.) As described above, there have been at least nine in-person mediations, over the course of three years, with the assistance of the mediators, and with the entire settlement process supervised by Judge Lauk. (*See supra*, Section II.) As Judge Lauck observed, the Parties "worked very hard" to arrive at the settlement. (*Id.*) Because these arm's-length negotiations raise the presumption that the Settlement is fair, *Lomascolo*, 2009 WL 3094955, at *10, and there is nothing in the record to rebut that presumption, the Court should conclude that this factor favors Settlement approval.

### 2. Given the litigation history among the Parties, sufficient discovery supports the Settlement.

Plaintiffs also obtained substantial discovery in this and prior cases against LexisNexis sufficient to support their position that the Settlement is the best and most appropriate means for resolving this case. The Parties litigated the same issues in their prior cases, (Dkt. No. 63 at 35), so that they are intimately familiar with each other's positions regarding the central issues—*i.e.*, whether the FCRA applies to Accurint reports and whether the alleged FCRA violation was willful. (*See* Dkt. No. 1 ¶¶ 79, 88, 92 (pleading for damages for willful violations of the FCRA).) Knowledge gained through *Adams* and *Graham* allowed the Parties to present their respective positions regarding substantive issues that are also raised in this case. The extensive discovery and motion practice in these prior cases allowed each side to evaluate the merits of the other side's position and laid the groundwork for the multiple negotiation sessions that resulted in the Settlement.

In the *Adams* case, for example, LexisNexis produced more than 1,600 pages of documents, and Plaintiffs' Counsel deposed five LexisNexis witnesses in three states. (Declaration of James Francis, attached as Ex. 2 to Plaintiffs' Memorandum in Support of Motion for Award of Attorneys' Fees, Expenses, and Service Awards ("Francis Decl."), ¶ 11.) Motion practice in that case focused on LexisNexis's Rule 12(c) motion for judgment on the pleadings, which argued—as LexisNexis would argue here—that Accurint reports were not subject to the FCRA. (*Id.* ¶ 12.) Adams prevailed on that motion, but dismissed her claims soon after the court's ruling without obtaining classwide relief. (*Id.*) Similarly, in *Graham*, motion practice focused on a request to transfer venue to either Florida or New Jersey (the court in which *Adams* was pending) and the issue of subject matter jurisdiction. (Caddell Decl. ¶¶ 33.) After briefing on these motions was completed, Plaintiff dismissed his complaint without obtaining classwide relief. (*Id.* ¶ 33.) Plaintiffs' Counsel remained steadfast in their belief that the sale of Accurint reports violates the FCRA and filed this case in November 2011. (*Id.* ¶ 34.)

As a result of this earlier litigation and the pursuit of the current case, Plaintiffs' Counsel obtained extensive, detailed knowledge regarding Accurint and the processes LexisNexis uses to create Accurint reports. (*Id.* ¶ 37.) Only through that knowledge could Plaintiffs have been able to negotiate the excellent Settlement presented here for approval. (*Id.*) Accordingly, the Court should conclude that the Parties had sufficient information at their disposal through which to fairly negotiate the Settlement. *In re Microstrategy*, 148 F. Supp. 2d at 664.

### 3.    Settlement negotiations were hard-fought and contentious.

As set forth in detail above, the settlement negotiations surrounding Accurint reports began in 2009, and the Parties have met more than nine times, in-person, to mediate and attempt to resolve the litigation. (Caddell Decl. ¶ 39; Dkt. No. 63-8 ¶ 14.) The Parties utilized private mediators in multiple sessions, repeated face-to-face discussions, and additional telephonic conferences.   In addition, the settlement process was fully vetted and supervised by Court's magistrate. As Judge Lauck put it at the end of the Parties' presentation of the Settlement to her:

> I can tell you personally that I think you all have worked something out that is very difficult. I do think it is a sea change and a good one and a thoughtfully conducted one. On behalf of sets of individuals involved, this does strike me both as a set of circumstances where you all have worked hard to see what's fair, to give up on some things you may not wish to have given up on, but then also sort of seeing the horizon, the commonsensible approach that's going to have to come at one point or another, and it would not be exactly what everybody wants.

(Ex. B to Caddell Decl., Jan. 14, 2013 Hr'g Tr. at 138:9–19.) The settlement negotiations were presided over by Judges Dohnal and Lauck, as well as highly regarded mediator Randall Wulff. (Caddell Decl. ¶ 39; Dkt. No. 63-8 ¶¶ 16, 18.) The settlement negotiations were arm's length and contentious at all times. (Caddell Decl. ¶ 38); *see S.C. Nat'l Bank*, 139 F.R.D. at 339 (concluding fairness met where settlement discussions "were, at times, supervised by a magistrate judge and were hard fought and always adversarial," and those negotiations "were conducted by able counsel" with substantial experience in the area of securities law); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) (affirming district court's conclusion of no collusion where litigation spanned nearly a decade and was accompanied by "impassioned settlement negotiations"); *Weiss v. Regal Collections*, Civ. No. 01CV881-DMC, 2006 WL 2038493, at *2 (D.N.J. July 19, 2006) (grating final approval of settlement "reached after extensive arms-length negotiations between the parties, with the active participation and assistance of" magistrate judge). The Settlement is therefore entitled to a presumption of fairness. *Lomascolo*, 2009 WL 3094955, at *10.

### 4. Class Counsel has extensive experience in FCRA litigation and recommends that the Settlement be approved.

Class Counsel has served as lead or co-lead counsel in numerous FCRA class actions. (Caddell Decl. ¶¶ 13, 28); *see S.C. Nat'l Bank*, 139 F.R.D. at 339 (concluding fairness met where negotiations "were conducted by able counsel" with substantial experience in the area of securities law). Francis & Mailman was plaintiffs' counsel in *Adams*, and Caddell & Chapman and Consumer Litigation Associates were plaintiffs' counsel in *Graham*. In addition to their experience litigating the claims here against LexisNexis, these firms all have substantial experience litigating FCRA class-action matters. (Caddell Decl. ¶ 28.) Leonard Bennett and

Matthew Erausquin of Consumer Litigation Associates, P.C., have extensive, collective experience in both consumer-protection and class-action litigation, having been involved in numerous, large consumer class actions where they have been appointed Class Counsel. *See, e.g.*, *Soutter v. Equifax Info. Servs., LLC*, No. 3:10CV107, 2011 WL 1226025, at *10 (E.D. Va. Mar. 30, 2011) ("[T]he Court finds that Soutter's counsel is qualified, experienced, and able to conduct this litigation. Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous cases."); *Williams v. Lexis-Nexis Risk Mgmt.*, No. 3:06CV241 (E.D. Va. 2008) (co-representing plaintiffs with Caddell & Chapman); *Beverly v. Wal-Mart*, No. 3:07CV469 (E.D. Va. 2007); *Capetta v. GC Servs., Inc.*, No. 3:02CV288 (E.D. Va.); *Ryals v. HireRight Sols. Inc.*, No. 3:09CV625 (E.D. Va.); *Daily v. NCO*, No. 3:09CV031 (E.D. Va. 2011); *Conley v. First Tenn.*, No. 1:10CV1247-TSE (E.D. Va.); *Lengrand v. Wellpoint,* No. 3:11CV333-HEH (E.D. Va.).

Caddell & Chapman's current docket includes eight national class actions under the FCRA, at various stages of litigation.  (Caddell Decl. ¶ 28.)  In each case, Caddell & Chapman has either been appointed Lead or Co-Lead Counsel, or will seek appointment to such a lead role at the appropriate time.  (*Id*.)  In this District, apart from the *Williams* case described in the preceding paragraph, Caddell & Chapman is co-litigating this case and *Henderson, et al. v. Acxiom Risk Mitigation, Inc., et al.*, No. 3:12-cv-00589-REP (E.D. Va.) along with Consumer Litigation Associates and Francis & Mailman. (*Id*.) Defendants in Caddell & Chapman's other FCRA cases include American DataBank; Corelogic, Inc.; Harbor Freight Tools; Kroll Factual Data; LexisNexis; Lowe's Companies, Inc.; and Wells Fargo. (*Id*.)

Francis & Mailman concentrates its practice in consumer protection litigation, with two of the firm's primary practice concentrations being fair credit reporting litigation ("FCRA litigation") and consumer class actions, such as the instant matter. (Declaration of James A. Francis, attached as Ex. 2 to Pls. Mem. in Supp. of Mot. for Attorneys' Fees, filed concurrently herewith, ("Francis Decl.") ¶ 2.) Within the firm, James Francis concentrates practice in those two areas almost exclusively, regularly bringing national class actions like this one in districts

across the country. (Francis Decl. ¶¶ 2–3.) Francis & Mailman has extensive experience in litigating national FCRA class actions, being co-lead counsel in the third largest FCRA settlement in history, and is currently involved in the second largest FCRA proposed class action settlement. (*Id.* ¶ 3.) Apart from this case, Francis & Mailman is currently co-lead or lead counsel in FCRA class actions in the United States District Courts for: the Eastern District of Pennsylvania, the Middle District of Pennsylvania, the District of New Jersey, the District of Rhode Island, the District of Massachusetts, the Northern District of Georgia, the District of Colorado, the Eastern District of Virginia, the Northern District of California, and the Central District of California. (*Id.*)

Each of these firms alone brings substantial FCRA experience to the table. Combined, there can simply be no finer a group of attorneys to litigate, negotiate, and resolve FCRA cases with national implications like this one. Each firm wholeheartedly endorses the Settlement as fair, and the Court should conclude likewise. *See Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501–02 (E.D. Va. 1995) (concluding fairness requirement met where "plaintiffs' counsel, with their wealth of experience and knowledge in the securities-class action area, engaged in sufficiently extended and detailed settlement negotiations to secure a favorable settlement for the Class").

### E.      The Settlement Is Substantively Adequate.

The Fourth Circuit in *Jiffy Lube* instructs the Court to also determine whether the proposed class settlement is substantively "adequate." That analysis is guided by evaluating: (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement. *In re Jiffy Lube,* 927 F.2d at 159.

1.    **Plaintiffs' claims are heavily disputed and would encounter substantial defenses.**

While Plaintiffs believe strongly in their case, they also appreciate the litigation risk presented by LexisNexis's defenses. (Caddell Decl. ¶ 45.)  Defendants were prepared to contest, among other things, class certification, FCRA coverage for Accurint reports, and willfulness. (*Id*.; *see also* Defendants' Mem. in Supp. of Mot. for Final Approval at 10–26.) Regarding class certification, given the outcomes in *Adams* and *Graham*, Plaintiffs were always mindful that this case could end up without classwide relief. (Caddell Decl. ¶ 45.) Regarding willfulness, under the FCRA, liability can be established either upon a showing of negligent or willful noncompliance. 15 U.S.C. §§ 1681n, 1681o. If negligent noncompliance is proven, a consumer may recover actual damages. In the case of willful noncompliance, a consumer may also recover statutory and punitive damages. *Id.* § 1681n. Plaintiffs alleged willfulness here and sought statutory and punitive damages, requiring evidence that LexisNexis was at least reckless in violating the FCRA. *Dreher v. Experian Info. Solutions, Inc.*, No. 3:11-CV-00624-JAG, 2013 WL 2389878, at *3–4 (E.D. Va. May 30, 2013).

Defendants' positions, particularly with regard to willfulness, were always front-and-center during the Parties' mediation sessions. (Caddell Decl. ¶ 46; Dkt. No. 63-8 ¶¶ 16–17 (noting substantive presentations before Mr. Wulff).)  LexisNexis openly shared draft motions and mediation statements setting out its arguments, permitting Plaintiffs an unfiltered view of what they would face should settlement negotiations falter. (Caddell Decl. ¶ 46.) Without the Settlement, all Parties would have continued the long, expensive process of dispositive motion practice, the litigation and interlocutory appeal of class certification, and a trial on the merits (assuming Plaintiff's success on dispositive and class-certification motions) followed, no doubt, by an equally contentious appeal. At any point in this process, of course, Defendants might have prevailed.

While Plaintiffs' side is staffed with preeminent FCRA litigators, LexisNexis hired counsel of equal strength and experience. David Anthony of Troutman Sanders, Lead Counsel in

Virginia for the Defendants, has litigated many FCRA cases before the Court and against Plaintiffs' Counsel. LexisNexis also retained James McCabe of Morrison Foerster and Ronald Raether of Faruki Ireland & Cox, nationally known FCRA litigators with extensive class-action experience.

As part of the negotiation process, Defendants shared with Plaintiffs a motion to dismiss for lack of subject-matter jurisdiction that they intended to file should settlement discussions break down. (Caddell Decl. ¶ 48.) That motion would challenge the most basic element of Plaintiffs' claims—whether they were harmed at all by LexisNexis's sale of reports about them for purposes that are permissible under the FCRA. (*Id.*) If the reports were sold for permissible purposes, the motion would assert, Plaintiffs were not injured and cannot therefore sustain Article III standing. (*Id.*) While Plaintiffs disagree with LexisNexis's position on this point, they of course appreciate the risk that, if the Court were to sustain LexisNexis's motion, the case would be eliminated with prejudice.

Similarly, LexisNexis made clear that it was going to file a summary judgment motion as to willfulness.  While Plaintiffs believed that LexisNexis's interpretation of the FCRA was incorrect, LexisNexis had substantial counterarguments, and Plaintiffs could not be certain of the outcome of such a motion. (*Id.* ¶ 47; *see also* Defendants' Mem. in Supp. of Mot. for Final Approval at 11–26.) Considering the strengths and weaknesses of Plaintiffs' claims and the substantive defenses, Plaintiffs concluded that Settlement was appropriate to secure substantial relief for the Class while avoiding the risk of a defense victory. (*Id.* ¶ 48.) *See Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.,* No. 85CV4038, 1987 WL 7030, at *2 (S.D.N.Y. Feb. 13, 1987) (concluding that because continued prosecution of the action would have been expensive and time-consuming, and would have involved substantial risks, "it [was] not unreasonable for the plaintiff class to take a 'bird in the hand'"); *Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 547 (D. Colo. 1989) (noting that "[i]t has been held prudent to take 'a bird in the hand instead of a prospective flock in the bush'" in weighing the value of an immediate recovery against "the mere possibility of future relief after protracted and expensive litigation") (quoting

24

*West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 740 (D.W.V. 1970)); *In re Microstrategy*, 148 F. Supp. 2d at 667 (discussing the potential risks of continued litigation and noting "the old adage, 'a bird in hand is worth two in the bush' applies with particular force in this case"). "'When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight.'" *Deem v. Ames True Temper, Inc.*, No. 6:10-CV-01339, 2013 WL 2285972, at *2 (S.D. W. Va. May 23, 2013) (quoting *Rolland v. Cellucci*, 191 F.R.D. 3, 10 (D. Mass. 2000)).

Given the risks to both sides and the possibility that the Plaintiffs might not prevail on motions Defendants were prepared to file, the Settlement is fair and adequate under the *Jiffy Lube* factors. The Settlement provides genuine, substantial injunctive and monetary relief, without the need for Class Members to take any action. The benefits realized by the Class Members immediately are significant, including substantial new protections that LexisNexis' practice changes will provide millions of consumers and cash relief for persons who requested a copy of or disputed the accuracy of their Accurint reports. This factor weighs strongly in favor of the adequacy of the Settlement.

### 2.   Continuing this litigation will result in significant additional burdens on the Parties and the Court.

If this Settlement were not approved, the alternative would be protracted litigation. LexisNexis has indicated that it has a substantial dispositive motion ready to file.  Assuming Plaintiffs could prevail on this motion, additional substantial litigation would then be necessary for Plaintiffs to carry their burden on class certification, defeat the inevitable summary judgment from LexisNexis on willfulness, and prepare for trial.

As shown by their persistence in filing three cases litigating the FCRA's application to Accurint, Plaintiffs' Counsel is intent on staying the course and achieving the best possible result for the class including, if necessary, a trial on the merits. (Caddell Decl. ¶ 48.) But Plaintiff's Counsel also appreciates the cost and delay associated with continued litigation and the

advantages of immediate relief. (*Id*.) There is no guarantee that a successful result would provide greater relief than the practice changes and approximately $300 that Class Members will receive here. (*Id*.) This factor therefore weighs in favor of finding the Settlement to be adequate.

### 3. Possible collection risk and risk of remittitur also favor settlement.

In addition, even if Plaintiffs were to prevail on their statutory and punitive damage claims on behalf of a class numbering more than one hundred million people, and receive a judgment for $1–10 billion, they might find themselves in a position where they could not collect such a large judgment from LexisNexis or one in which the judgment would be subject to remittitur. *See Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) ("An award that would be unconstitutionally excessive may be reduced . . . .") The $13.5 million agreed-upon common fund, on the other hand, provides certain relief to Class Members now, eliminating all risk of insolvency or remittitur. This factor therefore supports further favors approval of the settlement. *Deem*, 2013 WL 2285972, at *3.

### 4. Class Member reaction favors approval of the Settlement.

As noted above, of the approximately 31,000 members of the Rule 23(b)(3) Settlement Class, only one individual, JoAnn Nix,[3] objected to the Settlement and only 18 Class Members have opted out. (Rogan Decl. ¶ 10.) These numbers provide convincing evidence that the Class Members are satisfied with the cash payments they will receive as a result of the Settlement. *Cf. Pettway v. Am. Cast Iron Pipe Co.*, 72 F.2d 315 (11th Cir. 1983) (approving settlement where five percent of class objected); *Borcea v. Carnival Corp.*, 238 F.R.D. 664, 671 (S.D. Fla. 2006) (approving settlement where only 0.02% of the class submitted objections); *Lipuma v. Am. Express*, 406 F. Supp. 2d at 1309–10 (approving settlement with 41 objections in class of approximately 8.8 million); *see also Cotton*, 559 F.2d at 1331 ("a settlement can be fair notwithstanding a large number of class members who oppose it").

---

[3] Plaintiffs address the substance of Ms. Nix's objection in the concurrently filed Responses to Objections brief.

The reaction to the Rule 23(b)(2) Settlement also supports final approval of the Settlement. Only seven Rule 23(b)(2) Class members timely objected to the Settlement. (Rogan Decl. ¶ 11.)[4] Courts have routinely held that where only a small fraction of Class objects, particularly where, as here, no governmental authorities have objected after duly receiving CAFA notice and only an infinitesimal percentage of the class has opted out, Class members' reaction supports settlement approval. *See Domonoske*, 790 F. Supp. 2d at 474 (holding that 59 objections out of 3 million class members and .04% opting out "supports the adequacy of the settlement"); *The Mills Corp.*, 265 F.R.D. at 257 ("[A]n absence of objections and a small number of opt-outs weighs significantly in favor of the settlement's adequacy."); *Brunson v. Louisiana-Pacific Corp.*, 818 F. Supp. 2d 922, 927 (D.S.C. 2011) (holding that a lack of objections "indicates that the Settlement is fair, adequate and reasonable"); *Kay Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 468 (S.D. W. Va. 2010) ("[I]n this case the very low incidence of objections, especially in light of the success of the direct notification of class members, serves to demonstrate the bulk of the Class Members' satisfaction with the settlement result, and also shows their implicit approval of its terms, including the attorneys' fee provision."); *see also Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118–19 (3d Cir. 1990) (concluding 29 objections out of 281 member class "strongly favors settlement"); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987) (approving settlement where thirty-six percent objected); *Laskey v. Int'l Union*, 638 F.2d 954, 957 (6th Cir. 1981) (concluding court should consider, as part of the evaluation of

---

[4] One of these objectors, Ms. Aaron, purported to represent 20,200 objector "clients." As set forth in the Parties' Joint Motion to Correct Misrepresentations of the Watts Guerra, L.L.P. Objector Group, however, it is highly questionable at best whether the approximately 20,200 "clients" genuinely object to the Settlement, or whether they have been duped into signing on to what has been improperly and inaccurately represented to them as simply a cash grab. (*See* Dkt. No. 83.) Even assuming that these individuals intended valid objections to the Rule 23(b)(2) Settlement, however, by Watts Guerra's own estimation that the Class numbers 200 million (Dkt. No. 72 at 3, 7), these objectors total a mere .0001 percent of the Class.

Similarly, professional objector Edward Cochran has submitted objections on behalf of 7,289 individuals he purports to represent. (*See* Cochran Objection, Ex. 5 to the Parties' Responses to Objections.) While this supposed arrangement should be viewed with the same suspicion as that of the Watts Guerra clients, even consolidating this supposed objector group with Watts Guerra's, for a total of 27,489 "clients," raises the objection percentage to .00014. Again, such an infinitesimal number does not favor rejection of the Settlement.

the settlement, the fact that 7 out of 109 class members, including the named plaintiffs, objected to the proposed settlement); *In re Beef Industry Antitrust Litig.*, 607 F.2d 167, 180 (5th Cir. 1979) (approving settlement where 2.5 percent of 54,808 notified class members opted out and three objections filed); *Bryan v. Pittsburgh Plate Glass Co. (PPG Indus., Inc.)*, 494 F.2d 799, 803 (3d Cir. 1974) (approving settlement where 20 percent opted out or objected); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 175 (S.D.N.Y. 2000) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.") (citations omitted); *Marisol A. ex rel. Forbes v. Giuliani*, 185 F.R.D. 152, 162 (S.D.N.Y. 1999) ("The Court views the small number of comments from a plaintiff class of over 100,000 children as evidence of the Settlement Agreements' fairness, reasonableness and adequacy."); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (finding "persuasive" the fact that 84% of the class has filed no opposition); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (approving settlement despite sixteen percent objection rate). In short, where the class as a whole supports a settlement, it should be approved. The Court should therefore conclude that the minimal number of objections and requests for exclusion indicates Class Member support for the Settlement, and approve the Settlement as fair and adequate.

## VI.    CONCLUSION

For the reasons stated above, the Court should enter an Order: (1) finally certifying the Classes for settlement purposes only pursuant to Federal Rule Civil Procedure 23; (2) releasing the Defendants from all claims and dismissing with prejudice all claims of Class Members who did not timely exclude themselves from the Settlement; and (3) granting final approval of the Settlement.

November 22, 2013

Respectfully submitted,


_____/s/ Leonard A. Bennett_____
Leonard A. Bennett
**CONSUMER LITIGATION
ASSOCIATES, P.C.**
Matthew J. Erausquin
763 J Clyde Morris Blvd., Suite 1A
Newport News, VA  23601

Michael A. Caddell
Cynthia B. Chapman
Craig C. Marchiando
**CADDELL & CHAPMAN**
1331 Lamar St.
Suite 1070
Houston, TX  77010

James A. Francis
David Searles
John Soumilas
**FRANCIS & MAILMAN PC**
Land Title Building
100 S. Broad Street, 19th Floor
Philadelphia, PA  19110

Dale W. Pittman
**THE LAW OFFICE OF DALE W.
PITTMAN, P.C.**
112-A W. Tabb St.
Petersburg, VA  23803-3212

*Attorneys for Plaintiffs Gregory
Thomas Berry, Summer Darbonne,
Rickey Millen, Shamoon Saeed,
Arthur B. Hernandez, Erika A.
Godfrey and Timothy Otten*

## CERTIFICATE OF SERVICE

I certify that on the 22nd day of November, 2013, I electronically filed the foregoing Plaintiffs' Memorandum in Support of Joint Motion for Final Approval of Class Action Settlement with the Clerk of Courts using the CM/ECF system, which will send notification of such filing to CM/ECF participants, and I hereby certify that I will mail by United States Postal Service the document to the non-CM/ECF participants:

James Francis McCabe
MORRISON & FOERSTER LLP
425 Market Street
San Francisco CA 94105-2482
(415) 268-7011
jmccabe@mofo.com

Ronald Irvin Raether , Jr.
FARUKI IRELAND & COX PLL
500 Courthouse Plaza SW
10 N Ludlow Street
Dayton OH 45402
(937) 227-3733
rraether@ficlaw.com

David Neal Anthony
TROUTMAN SANDERS LLP
Troutman Sanders Bldg
1001 Haxall Point
PO Box 1122
Richmond VA 23219
(804) 697-5410
david.anthony@troutmansanders.com

*Attorneys for Defendants*

Charles B. Molster, III
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington DC 20006
(202) 282-5000 (phone)
(202) 282-5100 (fax)
cmolster@winston.com

*Attorney for Objector, Megan
Christina Aaron, et al.*

I further certify that on November 25, 2013, I caused the Plaintiffs' Memorandum in Support of Joint Motion for Final Approval of Class Action Settlement to be mailed by United States First Class Mail to the following individuals:

Adam E. Schulman
Center for Class Action Fairness
1718 M. Street NW #236
Washington DC 20036

David Brown
1717 Market Street
Tacoma WA 98402

Jeanne Giles
260 Gooseberry Drive
Reno NV 89523

JoAnn Nix
151 Gaddis Road NW
Cartersville GA 30120-4612

Edward W. Cochran
20030 Marchmont Rd.
Shaker Heights OH 44122

       /s/ Leonard A. Bennett
       Leonard A. Bennett