# EXHIBIT B

1             UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF VIRGINIA -- RICHMOND

3    _____

4    GREGORY THOMAS BERRY,        )

5         et al.,                 )

6                  Plaintiffs,  )    Civil Case Number:

7         ~vs.~                   )    3:11-CV-00754-JRS

8    LEXIS NEXIS RISK &           )

9         INFORMATION ANALYTICS )

10        GROUP, INC.,            )

11        et al.,                 )

12                 Defendants.  )

13   _____

14             PROCEEDINGS HEARD BEFORE

15   THE HONORABLE MAGISTRATE JUDGE M. HANNAH LAUCK

16             Richmond, Virginia

17          Monday, January 14, 2013

18               2:00 p.m.

19

20

21

22

23

24

25

```
1                    A P P E A R A N C E S
2         ON BEHALF OF THE PLAINTIFFS:
3             LEONARD ANTHONY BENNETT, ESQUIRE
4             Consumer Litigation Associates
5             763 J. Clyde Morris Boulevard
6             Suite 1-A
7             Newport News, Virginia  23601
8             (757) 930-3660
9
10            JAMES ARTHUR FRANCIS, ESQUIRE
11            FRANCIS & MAILMAN, P.C.
12            Land Title Building
13            100 South Broad Street
14            Nineteenth Floor
15            Philadelphia, Pennsylvania  19110
16            (215) 735-8600
17            jfrancis@consumerlaw.com
18
19            MICHAEL ALLEN CADDELL, ESQUIRE
20            CADDELL & CHAPMAN
21            1331 Lamar Street
22            Suite 1070
23            Houston, Texas  77010
24            (713) 751-0400
25            mac@caddellchapman.com
```

```
 1          A P P E A R A N C E S    C O N T I N U E D

 2      ON BEHALF OF THE PLAINTIFFS:

 3          DALE WOOD PITTMAN, ESQUIRE

 4          THE LAW OFFICE OF DALE W. PITTMAN, P.C.

 5          112-A West Tabb Street

 6          Petersburg, Virginia  23803-3212

 7          (804) 861-6000

 8          Dale@pittmanlawoffice.com

 9

10          MATTHEW JAMES ERAUSQUIN, ESQUIRE

11          CONSUMER LITIGATION ASSOCIATES, P.C.

12          1800 Diagonal Road

13          Suite 600

14          Alexandria, Virginia  22314

15          (703) 273-7770

16

17          SUSAN MARY ROTKIS, ESQUIRE

18          CONSUMER LITIGATION ASSOCIATES, P.C.

19          763 J. Clyde Morris Boulevard

20          Suite 1-A

21          Newport News, Virginia  23601

22          (757) 930-3662

23          srotkis@clalegal.com

24

25
```

```
 1          A P P E A R A N C E S    C O N T I N U E D

 2     ON BEHALF OF THE DEFENDANT:

 3          DAVID NEAL ANTHONY, ESQUIRE

 4          TROUTMAN SANDERS, L.L.P.

 5          Troutman Sanders Building

 6          1001 Haxall Point

 7          P.O. Box 1122

 8          Richmond, Virginia  23219

 9          (804) 697-5410

10          David.anthony@troutmansanders.com

11

12          JAMES FRANCIS McCABE, ESQUIRE

13          MORRISON & FOERSTER, L.L.P.

14          425 Market Street

15          San Francisco, California  94105-2482

16          (415) 268-7011

17          jmccabe@mofo.com

18

19          RONALD IRVIN RAETHER, JR., ESQUIRE

20          FARUKI, IRELAND & COX, P.L.L.

21          500 Courthouse Plaza, Southwest

22          10 North Ludlow Street

23          Dayton, Ohio  45402

24          (937) 227-3700

25
```

```
 1                    P R O C E E D I N G S
 2               (Proceedings began at 2:17 p.m.)
 3               THE LAW CLERK:  All rise.
 4               The Honorable United States Magistrate
 5   Judge M. Hannah Lauck presiding.
 6               Court is now in session.
 7               Please be seated and come to order.
 8               THE CLERK:  Civil Action 3:11-cv-00754.
 9               Gregory Thomas Berry, et al., versus
10   LexisNexis, et. al.
11               Mr. Leonard Bennett, Mr. James Francis and
12   Mr. Michael Caddell represent the plaintiffs.
13               Mr. David Anthony, Mr. James McCabe and
14   Mr. Ronald Raether, Jr., represent the defendants.
15               Is counsel ready to proceed?
16               MR. BENNETT:  (Inaudible portion.)
17               THE COURT:  All right.  Thank you.
18               We're ready to proceed.
19               I understand that you all have presentations
20   to make.  How did you anticipate this going forward?
21               MR. BENNETT:  Your Honor, first I would like
22   to introduce my co-counsel, Mr. Caddell, a UVA graduate,
23   Your Honor.  He's from Houston, Texas, the firm of
24   Caddell and Chapman, a national superstar generally in
25   class litigation and FCRA.  He's been at the lead in a
```

1  lot of this.  My co-counsel, Jim Francis from the

2  Philadelphia firm Francis and Mailman.  He does what we

3  do up in the Eastern District of Pennsylvania.  You're

4  familiar with the other class of characters, Judge, of

5  course, Mr. Erausquin, Mr. Pittman and Ms. Rotkis.

6         Mr. Caddell will offer our presentation,

7  which we've now provided in paper copy to Your Honor as

8  well.  And then my understanding is the defendant has

9  its agenda.

10         MR. ANTHONY:  Your Honor, David Anthony,

11  obviously, here for Troutman Sanders.  I'm pleased to

12  introduce my co-counsel, Ron Raether, who is immediately

13  to my right, with the Faruki firm out Dayton, Ohio and

14  Cincinnati.  Jim McCabe with Morrison and Foerster out

15  of San Francisco.

16         And I think the idea is that Len and I have

17  just a couple of overview comments to give to the Court,

18  and then we're going to turn the floor over, and Ron

19  will be doing -- I mean, Mr. McCabe will be doing the

20  bulk of our presentation, and then there will be some

21  parts at the end as part of the presentation that

22  Mr. Raether will be making on the point on our behalf.

23         THE COURT:  All right.

24         MR. BENNETT:  I won't offer a whole lot more

25  despite what Mr. Anthony says.

1           We have had on our side -- on the

2    plaintiffs' side, a co-counsel agreement for a long

3    time -- long before this particular case, and it

4    evolved.  Believe it or not, this is the abbreviated

5    task.  And frankly, you have before you -- I'll carve

6    myself out of that -- really the top Fair Credit

7    Reporting Act class litigation in the country, and that

8    would be -- I think the defense would have a tough time

9    arguing that, if they were to attempt to, and they won't

10   because we're now holding hands.  But you truly do.

11   Mr. Caddell, I've worked with him going back to case,

12   the Clark class action, where we both opposed a class

13   settlement because it didn't make any substantive

14   changes in a really important Fair Credit Reporting Act

15   case.  We were successful at opposing it.  That's where

16   we met in 2003, and so -- but now, we're on the side

17   attempting to pitch as Mr. Caddell will explain the way

18   you're supposed to do it.  And that's our objective, our

19   opinion.

20           MR. ANTHONY:  Thank you, Your Honor.  We've

21   been on numerous conversations with you.  It's a very

22   complicated case.  We could have killed you with much

23   more paperwork.  We tried to give you enough to be

24   dangerous to understand the factual and legal background

25   for this case and for purposes of the settlement.  We

1    don't want to take ten hours of your time to do that, so

2    we tried to put this in presentation format to kind of

3    walk you through soup to nuts of sort of where we were,

4    how we've gotten here and what the key aspects are of

5    the settlement in case the Court has any questions.

6    And, again, at this point in time, Your Honor, among

7    other things as part of the settlement, the defendants

8    have agreed to make some changes to some of their

9    programs and policies and products that are out there.

10   Before we start getting into things like that that could

11   be to a competitive advantage or disadvantage, we want

12   to make sure we weren't missing something in terms of

13   from the settlement of where we thought this was going.

14   So I think the idea is to be more than a preview and

15   less than a final signoff here, but to make sure that

16   there's nothing that jumps out at you because,

17   obviously, you know Judge Spencer and what's likely to

18   draw his attention to that.  We've been going through

19   the process of documenting this from a paper standpoint,

20   and whittling down, you know, the unresolved issues to

21   make them resolved.  So our goal here is sort of try to

22   lay that foundation.

23            MR. BENNETT:  We think that same thing.  I

24   think, at least certainly from the plaintiffs' side, we

25   see this as an opportunity to seek approval in the

1    context of Your Honor's Court and not Judge Spencer's

2    Court, but that your voice and your knowledge and

3    expertise is one that would be well-respected before

4    Judge Spencer, and so this gives us that opportunity.

5    And that's why it is full-throated in our support, in

6    our explanation and in our details.

7           I think that there will be some divides.  We

8    have exchanged draft settlement papers, but we don't

9    have them yet before you.  We expect that before we are

10   done in this process, and hopefully not too much longer,

11   but not tomorrow, that we would have in front of you to

12   add to your dead-tree collection the actually settlement

13   agreement that the parties finally agree to.  But it's

14   deep into that process.  It's not just beginning.  But

15   it's not going to be here tomorrow.

16           THE COURT:  Thank you.

17           MR. ANTHONY:  The last comment that I want

18   to make, Judge, I know lawyers always have a hard time

19   staying on time and giving a lot of materials.  If

20   there's something that we're covering that your sort of

21   feel like, Hey, I've got that, you all can kind of blow

22   through this, just let us know, and perhaps we can scoot

23   through that more quickly.

24           THE COURT:  All right.

25           MR. ANTHONY:  Thank you.

 1          THE COURT:  Let me ask you this, I know you

 2   said that there were some divides.  Are there issues

 3   that you think you need to highlight for me that are

 4   disagreements.  As I hear what it is that you have to

 5   say, I have to say, not much of what you submitted felt

 6   terribly divisive.  Initially, in a couple of phone

 7   conferences, this might have been an opportunity for me

 8   to get feedback about where things might be going in one

 9   direction or another.  But as I read through things, I

10   don't see --

11          MR. BENNETT:  Judge, we think we're -- both

12   sides have a complete understanding of the settlement.

13   We both have a shared agreement as to the deal that

14   we've agreed.  Nevertheless, I'm certain everybody here

15   would expect that we would continue to have to negotiate

16   from this day until the day that we have the negotiate

17   with the FedEx, a copy of the dismissal order or if they

18   send it by mail.  Not because they're more -- they're

19   obstinate in any way -- which they are, by the way --

20   but not because they're -- the defendant is intending

21   any difficulty, but because it's the nature of the way

22   that we do things.  And so by my suggestion that there

23   may be some divides that remain, the major structural

24   divides, I think that we are resolved, and we're asking

25   the Court's opinion of those.

1           THE COURT:  Yes.

2           MR. BENNETT:  We think -- we are essentially

3   asking the Court to approve them.  But those are

4   completed.  We still have to draft a notice, and it

5   might be that we want to use a particular font on the

6   notice because we think this is more understandable, and

7   the class members' reaction would be more informed, and

8   the defendant might disagree.  And that might be the

9   type of -- I'm sure that you would love those kinds of

10  calls on a Friday afternoon -- but those might be the

11  kinds of differences that may occur.  They may not

12  occur.

13          THE COURT:  Right.  Okay.  You're not

14  talking major structural things, though?

15          MR. ANTHONY:  Again, in sitting here today,

16  I don't think we're going to give you a laundry list of

17  things that are items for us to click through.

18          THE COURT:  All right.

19          MR. ANTHONY:  We're not aware of any that

20  really jump at us right now that we need your

21  assistance.

22          THE COURT:  All right.  Okay.

23          MR. BENNETT:  One of the advantages --

24          THE COURT:  This is a post-logue to the

25  prologue.

```
 1              MR. ANTHONY:  It is.
 2              MR. BENNETT:  We have not yet been ex parte
 3   with Your Honor in this instance, and that -- we don't
 4   know whether that may matter at some point, but it might
 5   matter.  And so when we talk about differences, I mean,
 6   I think that -- our side thinks that the
 7   we're-both-present method of discussing this with
 8   Your Honor remains the appropriate way.  And so we would
 9   continue to pursue that --
10              THE COURT:  I see.  All right.
11              MR. BENNETT:  -- in the future.
12              THE COURT:  Got it.  Okay.
13              So you shouldn't be calling me for afternoon
14   chats?
15              MR. BENNETT:  Yes, Your Honor.
16              THE COURT:  I haven't had to yet, so --
17
18        PRESENTATION BY COUNSEL FOR THE PLAINTIFFS:
19              MR. CADDELL:  Your Honor, Mike Caddell.
20   Thank you for having us this afternoon.
21              As Len mentioned, together and separately,
22   Len and I have participated in as lead or co-lead in one
23   way or another four or five of the largest Fair Credit
24   Reporting Act recoveries in history.  And so it's an
25   area that I know a little bit about, enough to be
```

1    dangerous.  Len, with his uncharacteristic modesty,

2    knows a lot about it.  And so I think it's fair to say

3    that we have -- and I tell you that really by way of

4    context for the next statement, which is that this is a

5    settlement that we feel structurally -- and while there

6    are some details that have to be ironed out and we may

7    need the Court's assistance.  The reason we're here

8    today is -- one of those big reasons is that if there's

9    something is glaringly wrong to the Court, and we need

10   to know before LexisNexis takes the next step and makes

11   some of these business practice changes.

12           But having said that, the agreement that we

13   have we feel excited about.  It is a sea change in the

14   way LexisNexis does business, and when we say a sea

15   change in the way LexisNexis does business, you have to

16   appreciate that the LexisNexis information package that

17   they sell that we're now going to be calling collections

18   decisions or collectiong decisions is the leading

19   report on individuals, individual's assets, other

20   information in the country.  And literally -- and you

21   may have seen this or picked up on this, but in the last

22   few years, they have sold over 100,000,000 of these

23   reports in the period covered by the class period.  So

24   when we talk about a sea change in the way that

25   LexisNexis is doing things, we're also talking about

1    what has the potential to be a sea change in the way

2    that the industry as a whole operates in this area, and

3    it's critical.

4            I will go through what I'm going to say

5    fairly quickly because I really want to get to -- and

6    Mr. McCabe will be talking and giving you the LexisNexis

7    perspective on the litigation as a whole, and I think

8    that's important for the Court to understand why we're

9    making certain decisions that we're making.  I mean,

10   some of this is a compromise.  No question about it.

11   From where -- if you simply read our complaint, you

12   would look at what we're proposing to the Court, and

13   you'd say, Well, you're giving up this or you're giving

14   up that, and we are.  We feel really good.  We feel like

15   we got the critical issue resolved in this case, and we

16   feel like we got what's the greatest good for the class.

17   But I think it's important for the Court to hear

18   LexisNexis' perspective on this as well so the Court can

19   understand and have context for the compromises we did

20   make.  But then I think I'd like for us to get beyond

21   both of those really to Mr. Raether's presentation, who

22   will tell the Court, and because of the business

23   sensitivity of it, it's not in any of the papers.

24   There's sort of allusions to it in some of the

25   paperwork, but he'll walk you through the actual changes

1    that LexisNexis will be making in its Accurint product,

2    and I think then the Court will really understand how

3    significant this is.  So let me just go through this.

4            Judge, I think you've read the material.

5    Your reputation and experience (Inaudible portion.)

6            I do think it's worth pointing out -- I'm

7    sure the Court has picked up, that perhaps proposing two

8    settlements, a (b)(2) and a (b)(3).  The (b)(2) is

9    purely injunctive relief.  The (b)(3) is, of course,

10   monetary relief for the individuals.  And I will talk

11   about why for both of those in a few minutes.

12           All through the case, there's an interesting

13   point.  We view this -- and we had a conversation with

14   the counsel for LexisNexis just before we came into the

15   courtroom, and I don't think they disagree with this.

16   We view this, what we're doing today as the culmination

17   of a five-year process.  We had the Williams case in

18   front of Judge Payne.  The Williams case involved

19   another LexisNexis product that was admittedly subject

20   to the Fair Credit Reporting Act, the Securant credit

21   reports, and they were background reports.  And in that

22   case, there was an issue about providing timely notice

23   to affected individuals that action was being taken in

24   response to or as a result of the report issued by

25   LexisNexis.  The case was ultimately settled.  In the

1    course of discovery on that case, we appreciated that

2    LexisNexis had a process by which it collected

3    information a single time, and then split that

4    information into two separate databases.  And the Court

5    may have appreciated -- and this is a compromise that we

6    proposed -- we have taken the position in our papers

7    that if you collected and even if some of that

8    information is intended for an admitted Fair Credit

9    Reporting Act purpose, then all of the information is

10   subject to the Fair Credit Reporting Act.  For purposes

11   of this lawsuit -- and I don't want there to be any

12   misunderstanding about that -- and for purposes of this

13   settlement, we have agreed that LexisNexis as a

14   compromise can continue the practice of collection once,

15   used twice, and continue to separate it into their two

16   separate databases.

17              THE COURT:  The two databases that you

18   placed in front me are different databases other than

19   the two that are described for --

20              MR. CADDELL:  There's a different database

21   out there that LexisNexis uses for other products that

22   have unquestionably been subject to the Fair Credit

23   Reporting Act.

24              THE COURT:  Okay.

25              MR. CADDELL:  So what's in front of you is

1   derived from the same original source, the original

2   collection, but was maintained as a separate database.

3   The Accurint database is what we would call that.

4           THE COURT:  Yes.

5           MR. CADDELL:  And so in the course of the

6   Williams case, we appreciated that that was being done.

7   We had some brief conversations with LexisNexis about

8   it, and we felt then that that was an issue that needed

9   to addressed.  It was not appropriate to do so in the

10  context of the Williams case.  We were far along in the

11  Williams case.  The Williams case was actually -- and

12  the Court may know -- excuse me, Your Honor.  It was

13  certified, and, in fact, there was a 23(f) Appeal denied

14  by the Fourth Circuit, and then the case was settled.

15  So it wasn't appropriate to address it then.

16          Not long after the Williams case was -- the

17  settlement was finalized and the case was dismissed,

18  there was a case filed in Philadelphia by Mr. Francis

19  and his firm called the Adams case, Tony Adams, and it

20  raised the issue of whether the Accurint collections

21  report, a comprehensive report which was sold to debt

22  collectors was, in fact, subject to the Fair Credit

23  Reporting Act.  And we could talk a little bit about

24  that history.  Shortly after that, Mr. Bennett and I

25  filed the Graham case here in the Eastern District of

```
 1    Virginia.  It was assigned initially to Judge Wilson --
 2                THE COURT:  Williams.
 3                MR. CADDELL:  -- Williams.  Sorry.
 4    Judge Williams, and then was transferred to
 5    Judge Spencer.  That case was ultimately dismissed.  We
 6    asked that the case be dismissed.  We actually had
 7    some -- we had a discussion, a mediation effort with
 8    Judge Donnell.  We concluded in the course of that case
 9    that we didn't have the right class representatives.  So
10    the case was dismissed with prejudice as to the two
11    individuals who were plaintiffs in the Williams case,
12    but we had conversations.  And so -- and you'll see we
13    had conversations with LexisNexis about Accurint
14    commencing before the end of the Williams case, then in
15    the context of the Adams and the Graham cases and
16    continuing until the Berry case.  So in that respect, it
17    isn't unusual.  This is an unusual settlement.
18                THE COURT:  Yes.
19                MR. CADDELL:  It's an unusual settlement in
20    that we have been working on this for some five years
21    through the vehicle of two earlier cases that were
22    dismissed, the Adams case because it appeared that it
23    was premature perhaps from a willfulness standpoint, and
24    I'll talk about that in a minute.  The Graham case was
25    dismissed.  We dismissed it voluntarily, although there
```

1   was a motion to dismiss pending.  But we dismissed it

2   voluntarily because we were convinced after our

3   conversations with LexisNexis that we did not have class

4   representatives that were the subject of -- or we

5   couldn't prove that they were the subject of

6   comprehensive reports.  And so --

7           THE COURT:  These are through the Graham and

8   the other plaintiff were the subject of comprehensive

9   reports?

10          MR. CADDELL:  Yes.  Yes.

11          THE COURT:  Okay.

12          MR. CADDELL:  So they're -- in a broad

13  manner, Your Honor, let me sort of lump -- and it's a

14  little unfair to do this, but I think in a big-picture

15  perspective, this is fairly accurate.

16          The comprehensive report that LexisNexis

17  produces and is sold -- the majority of which is sold to

18  debt collectors is very detailed, has not only

19  information about names, Social Security numbers,

20  telephone numbers, home addresses and things of that

21  nature, but also has bankruptcy information, auto

22  information, watercraft information.  It even has

23  information about a neighborhood in which a house is

24  located or in which the individual lives.  So it tells

25  you what the median income is in the neighborhood.  It

1    tells you what the median value of a house is in that

2    neighborhood.  It tells you what the median level of

3    education is in that neighborhood.  So there's a lot of

4    information in the comprehensive report that, in our

5    opinion, went far beyond a mere sort of

6    search-and-locate, you know, sort of an address location

7    service.  And then there is at the other of the

8    spectrum, there is the simple search-and-locate or

9    skip-and-locate report, which simply has name, address,

10   telephone numbers, the Social Security number, that kind

11   of information.  There is a debate, and I think that the

12   case law is pretty clear.  There are a few outliers, I

13   guess, that you could point to, but in general, there is

14   a pretty good consensus that if you're simply providing

15   location information, then you are not subject to the

16   Fair Credit Reporting Act.  It's when you provide these

17   other what are called the seven characteristic

18   information, creditworthiness, credit standing, credit

19   capacity, character, reputation, things of that nature,

20   mode of living, that you then move into areas that are

21   covered by the Fair Credit Reporting Act.

22            So what happened in Graham was we concluded

23   that our class representatives did not have the

24   requisite reports issued on them to have the standing

25   necessary to bring the case on behalf of the entire

1    class.  And so in the context of Graham, we agreed to --

2    we actually settled with a couple of LexisNexis'

3    co-defendants, who were not CRAs, but were, in fact,

4    debt collectors.  We settled for them for fairly modest

5    amounts, but the individuals and those claims were

6    dismissed.  At the same time we had communications with

7    LexisNexis where we advised them that we were not going

8    away, that we were continuing to pursue this, that this

9    was something that we felt strongly about, and that when

10   we found class representatives with the proper standing

11   and had the reports issued on them, that we would file

12   suit again, and that's what we did in the Berry case.

13              THE COURT:  All right.

14              MR. CADDELL:  That's how got to where we

15   are.

16              THE COURT:  I'm going to raise this

17   question, and you can answer it sort in whatever context

18   best fits the presentation that you already have ready.

19              It would help me to hear orally why you

20   think these folks are the appropriate class

21   representatives, what is different about them from the

22   other folks.  Obviously, they're not the same as

23   Ms. Adams, right, who was the victim of identity theft?

24   These are not those types of plaintiffs; is that right?

25              MR. CADDELL:  Actually, I think a couple of

 1    them are.

 2                    THE COURT:  Are they?

 3                    MR. BENNETT:  You --

 4                    MR. CADDELL:  Well, they're all subject to

 5    comprehensive reports.

 6                    THE COURT:  Right.

 7                    MR. CADDELL:  That's the key.  That's the

 8    key.

 9                    THE COURT:  But let me put that in a

10    different context, also, which is at some point I

11    presume you're going to address to me not just why

12    they're appropriate class representatives, but sort of

13    in the context of sort of the typicality and commonality

14    requirements because you all, I think, are rightfully

15    saying that one of your risks is whether or not the

16    class can be certified for whatever reason, and I know

17    this is a different context than the Fourth Circuit

18    decision in Judge Payne's case, The Soutter case where

19    there was a challenge as to the class, but obviously,

20    that is something that you all could face if you weren't

21    reaching an agreement in the meantime.  And so I feel

22    certain that any judge looking at this would want to

23    know why you would survive sort of a Soutter analysis or

24    why these folks meet the requirements as class

25    representatives themselves.

1          MR. BENNETT:  By the way, those are my

2    cases, Your Honor.  So at the appropriate time, I will

3    be happy to --

4          THE COURT:  Right.  I'm just laying that all

5    out there that that is just clearly something that I

6    think any judge looking at this, even though you've

7    agreed, would want to be sure that they're looking

8    behind the agreement that you've reached.

9          MR. BENNETT:  Certainly, Your Honor.

10         MR. CADDELL:  Let me just go through a

11   couple of these other items very quickly.  The extent of

12   discovery -- the discovery -- there was discovery taken

13   in the Graham case, there was discovery taken in the

14   current case, we've looked at documents.  We've worked

15   with experts.  I want to be careful.  There's some

16   discovery that was taken in the Williams case and in the

17   Adams case and in Graham that was either returned or

18   destroyed as a result of a settlement reached in

19   Williams and the settlement reached in Adams.  I don't

20   know that in Graham we had any.

21        (Conferring with co-counsel off the record.)

22         MR. CADDELL:  I don't think so.  But

23   obviously, that information informed our decision making

24   in structuring Berry and where we are going in Berry.

25   The experience of counsel, the Court has already heard,

```
 1    I think, enough of that.

 2              THE COURT:  I don't think that's your issue.

 3              MR. CADDELL:  Yes, Sir -- yes, Ma'am.

 4              THE COURT:  But let me be clear that what

 5    you're saying with respect to discovery, the way that I

 6    read your filings, which makes perfect sense to me, is

 7    that this is sort a latter case in a continuum, and even

 8    though you may not be using actual documents from

 9    previous cases, that they have formed your litigation

10    strategy on both sides in a manner that we have to take

11    that into account as far as sort of what has already

12    been undertaken in your case, whether or not you've had

13    extensive discovery in this particular case.  Is that a

14    fair restatement?

15              MR. CADDELL:  Correct.  Yes, Your Honor.

16              I've already handled this -- the procedural

17    history in Berry, and we talked about the overview.  The

18    Adams case was filed back in September of 2008.  Again,

19    there were depositions taken in the Adams case.  The key

20    element from our standpoint in the Adams case -- or the

21    key development in the Adams case was that LexisNexis

22    argued in a motion to dismiss that its Accurint report

23    was not or could not be construed as a consumer report

24    subject to the FCRA.  And the Court in an opinion,

25    granted in part, denied in part, but as to the consumer
```

1  report issue, the Court determined at least at the

2  motion to dismiss stage that the Court could not

3  conclude that the Accurint report was, in fact, not a

4  consumer report.  And that's the key from out standpoint

5  because we think that in the context of these cases, one

6  of the big issues, of course, is willfulness, and

7  statutory damages are dependent upon a finding of

8  willfulness.  We think that once that opinion was issued

9  by the District Court that you then have -- you can

10 point to sort of decision point where you can say --

11 again, this is the plaintiff's perspective.  Obviously,

12 LexisNexis has a very different perspective.  But from

13 our standpoint, we say that's when you can point to --

14 at that point, you were on notice.  LexisNexis was on

15 notice that merely because you refuse to call it a

16 consumer report and merely because you have people sign

17 a little certificate that says we're not going to use

18 this for a permissible purpose under the FCRA, that

19 doesn't get you there.  That's not -- that doesn't solve

20 the problem.  If you've got that kind of information in

21 your reports, then we think anyone reasonable would

22 understand that that report is going to be used for

23 purposes encompassed by the Fair Credit Reporting Act.

24 So we think that was sort of a watershed moment, and

25 from that point forward, we felt that the risk for

1    LexisNexis of a willfulness finding was significantly

2    increased.  I think that they would agree that it was

3    increased perhaps, but they would say it moved the

4    needle from zero to maybe one percent.

5              Okay, well, Mr. McCabe is not quite willing

6    to concede to one percent.

7              THE COURT:  Maybe he was saying it was 83

8    percent.  He was silent.

9              MR. CADDELL:  Again, we could talk a little

10   bit about Graham, but I don't think we need to belabor

11   that.  There were a couple of depositions taken in the

12   Graham case, which confirmed, again, the sort of collect

13   once, used twice.

14             MR. BENNETT:  Your Honor, at this point --

15             THE COURT:  I don't really care about formal

16   presentations, by the way.  I mean, we're in a

17   settlement context.  Actually, if this is easier -- I'm

18   not being impervious, I meant to tell you.  I'm happy

19   for you to sit and do this.  I don't know how you set up

20   your computers, but I'm happy -- we're doing this

21   relatively formally, but I'd rather the conversation

22   flow in a manner that makes it easier for you all and

23   for me.  I should have said that right off the bat.

24                  (Discussion off the record.)

25             MR. BENNETT:  The one thing that I would

1    point out to support and cheer on of Mr. Caddell's

2    argument, at Page 5 of our memo, you actually have the

3    date chronology --

4              THE COURT:  Right.

5              MR. BENNETT:  Right.

6              And the point is not simply these general

7    claims of, you know, the defendant knew that we were

8    continuing to proceed after Graham.  We actually had had

9    a discussion.  If you look at the dates, you would know.

10   You can see this.  On January 21st, Graham was

11   dismissed.  On the 19th, this was two days after our big

12   meeting in New York with all of the LexisNexis

13   management and all of the attorneys crammed into an

14   otherwise large conference room.  And then prior to --

15   in December of 2010, on the other side of the holidays

16   when we had all flown up to meet Mr. McCabe, without

17   stepping outside of what Mr. McCabe may or may not want

18   us to share, I can say that we actually exchanged

19   detailed injunctive relief proposals.  It wasn't simply

20   work on that.  It was here are all of the changes we

21   need made.  For example, your question about the

22   totality, Mr. Graham couldn't have represented the class

23   as a pitch for those injunctive relief changes.  The

24   changes that we were making were not in the package, or

25   at least in part.  And so if you look at that timetable,

1    you'll see that this wasn't simply a matter of -- well,

2    they knew we weren't giving up, but it was -- I don't

3    want to say orchestrated, but it was a disciplined,

4    deliberate, not retreat, but the final step towards

5    where we are today for the plaintiffs' side.  There is

6    no way you can -- I mean, I'm representing that to you

7    the letters and responses to the parties would so reveal

8    that those dates, I think, are a good point.

9            THE COURT:  All right.  Okay.

10           MR. CADDELL:  Your Honor, I think the next

11   slide we're talking about the Graham case.  Again,

12   LexisNexis filed a motion to dismiss, and I think -- and

13   we did dismiss the claims because we could not determine

14   which reports were sold with respect to our class

15   representatives in the Graham case, and it appeared

16   that -- and this was based in part on representations

17   made by counsel for LexisNexis, and I accept those at

18   face value.  I do today.  I mean, I believe they were

19   accurate, that they were not comprehensive reports.  And

20   so that is -- and I'm not blaming.  I don't mean this to

21   sound pejorative, but that is the pernicious nature of

22   this problem.  When you don't -- when you treat a report

23   as not being subject to the Fair Credit Reporting Act,

24   the subject of the report typically never knows that the

25   report has been issued.  That's the problem.  And these

 1   cases become very difficult to bring or pursue because

 2   often there are victims who are unwitting victims,

 3   unknowing victims.  And the defendant appropriately so,

 4   I'm not -- there's nothing wrong about this.  This is

 5   the way the statute is set up, and if the defendant is

 6   successful in eliminating a class representative, then

 7   they know that it's very difficult.  We can't just go

 8   out and advertise.  And the problem is even if you

 9   could, the people don't know that they've been harmed,

10   that they were the subject of a report.  So if you don't

11   know that, then you don't know that you have rights or

12   claims that you might be able to make.  And so we, in

13   fact, then dismissed the Graham case as a result of

14   that.

15           We ultimately were able to identify

16   individuals that had comprehensive reports issued about

17   them.  They were the subject of debt collection efforts,

18   and I'll just share this with the Court.  They were the

19   subject of debt collection efforts where the debt

20   collectors had acquired a comprehensive report from

21   LexisNexis, an Accurint report.  So they were precisely

22   the people who we believe have been harmed by this

23   practice, by this structure.  And LexisNexis, again,

24   their argument would be what are we to do, we sell this

25   only to people who are willing to certify that they will

1   not use these reports for evaluation of who should be

2   pursued for debt collection.  We sell these reports to

3   people who simply say, Oh, we're just trying to locate

4   somebody.

5          The problem is, and from our standpoint --

6   again, the plaintiffs' standpoint, we think that the

7   problem with the LexisNexis position is if you look at

8   the report itself -- there are various kinds of reports.

9   There's the Accurint background report, which offers a

10  variety of searchs and reports, the search decipherer

11  report, then you've got person search, and then you've

12  got the comprehensive report.  And this is sort of the

13  gateway into the -- or it's on the LexisNexis website,

14  but I think this illustrates best, Your Honor, and you

15  can see at the bottom, and I think -- it doesn't show up

16  there.  You can see in the middle of the page where it

17  says, Address Summary --

18          THE COURT:  Yes.

19          MR. CADDELL:  And right underneath of that,

20  you see where it says, Average Age, 45; median household

21  income, $136,658; median home value, $416,200; average

22  years of education.  It's that kind of information on a

23  comprehensive report that in our mind clearly

24  differentiates this report from something that someone

25  wants to use to simply locate someone.  When you have

1    that kind of information on a report, and you're willing

2    to pay a little more to get it, then we think and our

3    argument has been that you're using that report almost

4    by definition, you're using that report for an

5    evaluation -- effectively, a credit evaluation.  Who am

6    I going to pursue?  And if I've got somebody who has

7    that information versus someone who has information that

8    says the median household income is $10,000, and the

9    median home value is $25,000, and the average years of

10   education is five, I'm definitely going to go after this

11   guy who's living in the better place and neighborhood,

12   got more money, appears to be -- even if he has

13   temporary financial distress, given these indicia, is

14   likely to have money in the future.  So we think it's

15   the inclusion of that, again, the seven characteristic

16   information.  We think that's what converts the

17   comprehensive report from simply a locator report to a

18   credit report.

19              THE COURT:  I know that you're proposing two

20   separate types of reports as part of your settlement --

21              MR. CADDELL:  Yes, Your Honor.

22              THE COURT:  -- the contact-and-locate and

23   the collections whatever --

24              MR. CADDELL:  Collections

25   decisioning (sic.).

1        THE COURT:  -- decisioning (sic.), but is

2   there the equivalent of that now?  Is there a

3   contact-and-locate report now different from this

4   comprehensive report?  I know that you've talked about

5   that there are levels of reports that you can pay for.

6        MR. CADDELL:  There is a simple report

7   called person search.

8        THE COURT:  Person search, which is --

9        MR. CADDELL:  Yes.

10        THE COURT:  -- referred to, and that would

11   just be the addresses?

12        MR. CADDELL:  Well, it's a little more

13   information than that.  It's more --

14        THE COURT:  And Social Security number,

15   obviously.

16        MR. CADDELL:  Yes, yes.

17        But it's more information than that, but it

18   does not have this kind of creditworthiness type of

19   information in it.

20        THE COURT:  Right.  Okay.

21        MR. CADDELL:  (Inaudible portion.)

22   Mr. McCabe will talk about LexisNexis' defenses of --

23   you know, the settlement history.  We first met -- and

24   if I might approach, Your Honor, I have -- it's actually

25   a little incomplete.  I look at it now.  It's often the

1    case when you get in the courtroom and you look at

2    something, and you see something that was missing, but

3    if I might approach your clerk.

4              THE COURT:  Ms. Robertson will help you.

5              MR. CADDELL:  But the timeline -- but you

6    can see, Your Honor, the first time that we met -- the

7    first settlement meeting was more than three years ago.

8    It was a meeting with Mr. Bennett and LexisNexis general

9    counsel and inhouse counsel, Nancy Nash, in Newport News

10   back in December of 2009.  That was some three months or

11   so after the Graham case was filed, but I was involved

12   in that indirectly because we worked with Mr. Bennett on

13   a PowerPoint presentation that we actually modified from

14   the Williams case, and he used that in that

15   presentation.  Subsequent to that, as you can see, we

16   had a meeting in Philadelphia.  Between the meeting in

17   Philadelphia and -- actually, maybe before the meeting

18   in Philadelphia, there was a mediation with

19   Magistrate Donnell in this courthouse where we discussed

20   Graham and where we really discussed and grabbled with

21   the issue of did we have adequate class representatives

22   or not.  We made some progress, and actually, I viewed

23   that, and that's one of the reasons why I noticed that

24   this is not on the timeline.  I viewed that as a

25   critical meeting because it was at that meeting that I

1  think we really began to further refine our thinking

2  about the case.  At that point, I think we were focused

3  as much as anything on the sort of collect once, use

4  twice issue that I've mentioned earlier, and we weren't

5  really being, I think, subtle enough to recognize that

6  the real issue was the sale of -- and we had it in our

7  case.  So don't misunderstand me.  It's not something we

8  hadn't addressed, but I think we began to differentiate

9  between different levels of goals, what we were trying

10  to achieve.  And I think it was at that meeting with

11  Judge Donnell that we began to realize that what we

12  really wanted to achieve was to eliminate the sale of

13  the comprehensive reports to debt collectors, that that

14  was the problem that we really wanted to address in the

15  litigation.  And so that's why I say -- and then we've

16  had -- you can see several other meetings since then.

17  Roughly a year ago, we agreed to retain a mediator.  You

18  may or may not be familiar with Mr. Wulff, he is in

19  Oakland, and he is -- he was interviewed and hired to

20  mediate all of the World Trade Center claims after the

21  Twin Towers were destroyed on 9/11, and he spent three

22  years in New York mediating all of those claims

23  successfully.  At the end of which, he promised his wife

24  he would never leave Oakland again.  And so if you want

25  Randy Wulff to mediate your case, you have to go to

1    Oakland.

2              THE COURT:  Yes.

3              MR. CADDELL:  And so we did go to Oakland on

4    four different dates.  We met with Mr. Wulff, mediated.

5    It probably goes without saying, but I will say the last

6    mediation sessions with Mr. Wulff is when we addressed

7    attorneys' fees.  We did not address attorneys' fees

8    until we had a framework in place for both the

9    injunctive relief and for the monetary relief and what

10   we thought those would look like.

11             THE COURT:  Yes.

12             Let me just say by way of feedback, and then

13   you all, especially LexisNexis, can address this.

14             As I read through this information, the

15   nature of differentiating between different reports as

16   comprehensive reports, it does strike me as sort of

17   having the benefit of commonsense that you don't need

18   all of that information to locate somebody.  So I have

19   read through the briefings that you've had in the Adams

20   case, and I've read through the position paper that you

21   present here.  I understand that that is your position.

22   I think as you look at these reports, it does lean too

23   quickly to a sense of if you're just trying to locate

24   someone, why do you need to know median incomes or

25   bankruptcies or fishing licenses or whatever else that's

1    available through the report.

2              So to the extent that you're looking for

3    feedback, I think that makes commonsense.  It's always a

4    benefit to make commonsense.

5              MR. CADDELL:  Thank you, Your Honor.

6              Your Honor, we allege classes in the Berry

7    case really that fall into two categories.  The broad

8    categories, the one -- while we allege three classes,

9    effectively, they're in two categories.  One is everyone

10   who has been the subject of an Accurint report sold to

11   nongovernmental entities.  Reports sold to governmental

12   entities, we've agreed, again, as a compromise.  We will

13   not -- we're not addressing those reports as part of the

14   settlement.  There are valuable uses made of Accurint

15   reports by law enforcement and other parts of the

16   government, and so we're -- this is -- we're not

17   touching that in any way.  We're not seeking to change

18   any of LexisNexis' practices with respect to reports

19   sold to governmental entities.

20             But as to all other subjects then, we do

21   have a -- and that's the subject of the injunctive

22   relief and the way in which they have agreed to modify

23   and change their business practices.

24             The second broad category is anyone who --

25   and I lump these together a bit, and I'll explain why.

1    All consumers who requested a copy of their Accurint

2    file and all consumers who contacted LexisNexis to

3    dispute information in their Accurint file.  Now, again,

4    you have to appreciate that no one is given notice that

5    they are the subject of an Accurint report.  No one is

6    given notice of the fact that they are, in fact, the

7    subject of an Accurint file, that Accurint has

8    maintained all of this information.  If you were not

9    aware of that kind of thing, there's no notice that

10   would be given to you.  There would be no reason for you

11   to know.  So typically, it has been our contention and

12   our belief, and that forms the reason for the monetary

13   relief class, it's been our contention that while

14   there's not perfect correlation, there is a rough

15   correlation with people who have been pursued by debt

16   collectors as a result of a comprehensive report, or who

17   have had a mixed file issue and that that has been

18   brought to their attention, that those are the people

19   who would then take the next step and contact LexisNexis

20   and either request a copy of their Accurint report or

21   dispute -- attempt to dispute some of the information

22   contained in their Accurint report.  And, of course, one

23   of the things that we are very happy about with the

24   proposed settlement is that there will be a way -- a

25   manner in which consumers can, in fact, dispute content

1  in their comprehensive -- the collections report.

2  They'll actually be able to dispute that, and that

3  will -- and if it's inaccurate, it will be corrected.

4  Even as to sort of what's now a person search and what

5  will become search-and-locate or the more prosaic

6  report, in that report, even then the consumer in the

7  proposed settlement will be able to include up to

8  100-word statement in the file, the Accurint file to

9  those reports not required by the Fair Credit Reporting

10  Act.  This is something we were able negotiate as part

11  of the overall settlement that if they dispute some

12  portion of or the accuracy of their person search

13  file -- what's now a person search, and that will

14  actually be in their file as well.

15        So that's why we have this sort of two broad

16  categories.  There's really no way for LexisNexis to

17  identify people who have suffered adverse effects as a

18  result of the issuance of the comprehensive reports, and

19  so the proxy is we felt that the people who contacted

20  LexisNexis either to request the report or to dispute it

21  would be the most likely individuals to fit that

22  category.

23        THE COURT:  And that's approximately, is it

24  31 thousand --

25        MR. CADDELL:  Yes.

1          THE COURT:  Whatever it is.

2          MR. CADDELL:  Yes, Your Honor.

3          The FCRA, as we've talked about the seven

4   factors, it's creditworthiness, credit capacity, credit

5   standing, personal reputation, mode of living,

6   characteristics, and there's one other.

7          MR. BENNETT:  Capacity and creditworthiness.

8   You have capacity and worthiness --

9          MR. CADDELL:  That's it.

10          And the key is -- and we, again, from our

11   perspective, the key is it's not just information which

12   is used in that manner, but which is expected to be

13   used.  And we would quarrel with LexisNexis --

14   LexisNexis would say, How could we expect people to use

15   this information inappropriately when they would certify

16   to us that they were not going to use it for any Fair

17   Credit related purpose?  And we think that's, again,

18   where commonsense comes into play.

19          Again, Mr. McCabe will address LexisNexis'

20   position, and, I mean they have a very -- we have great

21   respect.  We've worked opposite of these lawyers for --

22   Mr. Raether, six or seven years now.  Mr. Anthony, I

23   know, Mr. Bennett and Mr. Anthony have a long history,

24   mutual respect.  Mr. McCabe, we've worked with for five

25   or six years now.  We have great respect for these

1    lawyers.  They're good lawyers.  They have strong

2    positions.  They articulate their positions well, and so

3    there's risks associated with moving forward, and

4    that's -- again, our goal as representatives of the

5    class is to determine what is the greatest good for the

6    class, and it's not getting at the end of the day what

7    might be $10 a person or $5 a person or $1 a person, but

8    it's making the substantive change, which we cannot

9    achieve through litigation.  We can't get a litigated

10   outcome where we achieve injunctive relief, and I think

11   this is the better -- it's not just the great weight of

12   the authority out there.  I think it's probably the more

13   reasoned -- the better reasoned authority is that

14   private litigants are not afforded injunctive relief

15   under the Fair Credit Reporting Act.  So we can't get

16   there but through a negotiated resolution, and we

17   determined sometime ago that that would be in the best

18   interests of the class.

19           We go through some of the litigation risks.

20   The Court is --

21           THE COURT:  So let me be clear.  You're

22   mentioning that in part because for the greater class --

23   what is it 100 million, 200 million?

24           MR. CADDELL:  Yes.

25           THE COURT:  That none of those individuals

1   will be getting any money?

2              MR. CADDELL:  Correct, Your Honor.

3              THE COURT:  Okay.

4              MR. CADDELL:  That's right.

5              THE COURT:  Okay.

6              MR. CADDELL:  We run through the litigation

7   risks.  The Court's more familiar with the litigation

8   risks, or at least as familiar with litigation risks as

9   we are.  I think -- and let me say this, we're not

10  afraid to go forward in a case where it's appropriate,

11  and the Williams case, I think, demonstrated that.

12  Mr. Bennett was able to achieve a certified class, we

13  survived a 23(f) Appeal, and we were rapidly preparing

14  for trial.  We settled, I want to say in January, and

15  the trial was set for April, and we had already financed

16  the notice to the class.  So, I mean, we're not afraid

17  to should the circumstances warrant it.  This was a

18  case, however, where we felt the better course -- once

19  we achieved the major objective of business practice

20  changes, we felt this was the better course.

21             THE COURT:  Yes.

22             MR. BENNETT:  When you appear before a Court

23  and you tell the truth, and you do your best over a

24  career so that, I think, it's because -- well, I can

25  represent to the Court that I have in my entire FCRA

1    career, class career, I've never met a judge -- I've

2    never had a case where injunctive relief was our almost

3    singular goal, and I've never accomplished as much.

4    Maybe the bankruptcy settlement, we changed how

5    bankruptcy was reported.  This is right up there.

6    Accurint is a huge brunt of it.  It's not like Coke and

7    Pepsi.  It is Accurint.  The way that we allege,

8    LexisNexis is actually a very good corporate citizen,

9    but we allege this product has caused often

10   unlitigatible (sic.) difficulty for the people who we

11   proceed to represent.  I think that the injunctive

12   relief objective is not a footnote or asterisk.  It's

13   not simply going to be a paragraph in the bottom of a

14   settlement agreement.  This is a big deal.  The monetary

15   relief was easy to negotiate for the dispute of the

16   class.  It's certainly much easier.  The injunctive

17   relief was the challenge.  That's what has been the

18   longest periods of delay, why we're here in January and

19   not in October, I argue are for those reasons.

20             THE COURT:  Okay.

21             MR. CADDELL:  Your Honor, the litigation

22   risks for the plaintiffs, I think, are pretty obvious.

23   And the litigation risks for LexisNexis, I mean, given

24   the magnitude of the class, given the statutory

25   penalties.  The defendants, I think, recognize that the

1    Courts are going to work very hard to avoid imposing

2    sort of an overwhelming sanction under a statutory

3    scheme, and I appreciate that as well.  I mean,

4    LexisNexis provides a valuable service.  But

5    nonetheless, the statute seems to be pretty clear, and

6    so given the number of claims that are potential,

7    there's risks for LexisNexis in going forward.

8              The proposed settlements, I think the

9    Court's familiar with this.  And we will -- again, I

10   want Mr. Raether's will be a detailed report, the actual

11   injunctive relief components.  The injunctive relief

12   class, the (b)(2) class is defined as all persons

13   residing in the United States, including the Territories

14   of Puerto Rico, with respect to whom there was

15   information in the Accurint database from November 14th,

16   2006 to the date when the Court enters its preliminary

17   approval order either proposing a notice, even though I

18   know the Court is aware that a (b)(2) class does not

19   require notice, we're proposing notice nonetheless.

20   There will be some published notice.  There will be

21   internet notice, we'll establish a website which will

22   contain the key pleadings from the case and information

23   about the settlement and the business practices.  There

24   will be an internet banner advertisements, things of

25   that nature.  We estimate -- I don't know if the Court

1    has overseen a settlement involving Kathy Kinsella.

2    She's out of D. C.  We've worked with Kathy on many

3    occasions involving literally tens of millions of class

4    members.  She's one of the most respected notice

5    providers in the country.  She has been doing this for a

6    very long time.  I first worked with her in 1993.  She's

7    as good as it gets.  And she's designing this program

8    and estimates that 75 percent of adults 18 and older

9    will be exposed to the notice a minimum of two times.

10            The release is, I think, worthy of comment.

11   There will not be a release given to LexisNexis of

12   actual damages.  So any consumer who can allege or who

13   has suffered actual damages as a result of the sale of

14   the Accurint comprehensive report to debt collectors and

15   then can prevail on a willfulness -- well, even without

16   willfulness because actual damages don't require a

17   finding of willfulness -- they can recover.  And this

18   settlement will not affect their right to pursue that

19   claim in any way.  It will affect their right to pursue

20   punitive damages and statutory damages.  And so that's

21   what we're giving up.  The use of the class device,

22   which is a procedural mechanism, and then we are

23   releasing the willful noncompliance claim in exchange

24   for the injunctive relief.

25            We have a note here, the second big bullet

1    point, what that refers to, Class contracturally agrees

2    that Accurint is not a consumer report under specific

3    limited circumstances.  That's a reference to what is

4    now a person search and what will become the sort of

5    search-and-locate report.  And we have an agreement that

6    that report will not contain the seven characteristic

7    information.  It will be restricted to information

8    necessary to locate an individual and confirm that you

9    do have the correct information -- or the correct

10   individual.  And there's clearly going to be a gray area

11   where we will be working with LexisNexis, and I think

12   both sides will be working in good faith on that to

13   flange that up and to figure out exactly what will and

14   will not go into that report.

15           I think it's important to alert the Court to

16   the fact that while there is a seven-year term to the

17   injunctive relief, there is some fluidity permitted

18   under the settlement agreement because this is an

19   evolving industry.  Information, as the Court is aware,

20   is constantly changing, access to information is

21   constantly changing, and so we've built into the

22   settlement -- or anticipate building into the settlement

23   fluidity both as to business practices, and, of course,

24   anything in response to any sort of regulatory changes,

25   legislative changes.  You may have noticed we have an

```
1    expert report.  The President has launched an initiative
2    about privacy standards.  Other entities out there are
3    sort of focused on this issue.  So it's an evolving
4    matter.  And so we have to build into the settlement
5    some fluidity.  We do have some things that are, I
6    think, very clear and sort of bright lines, and then
7    there are going to be some things where LexisNexis has
8    to have flexibility to respond to the marketplace.
9              THE COURT:  I'm going to ask you about this.
10             MR. CADDELL:  Yes, Your Honor.
11             THE COURT:  When you're talking about -- you
12   all refer to the sunset date, does this apply to both
13   classes, or this is just referring to the person and
14   search requirements or the particular add-ons with
15   respect to that?
16             MR. CADDELL:  The injunctive relief.
17             THE COURT:  The injunctive relief.
18             So there's no part of the agreement -- or is
19   there -- that talks about whether or not, say if
20   LexisNexis decided it wanted to spend millions of
21   dollars to revert to what it did, which it doesn't have
22   the grain of commonsense.  There's no agreement about
23   what happens after seven years?  Do you understand what
24   I'm saying?
25             MR. CADDELL:  Yes, Your Honor, and there is
```

1   no agreement as to what happens after seven years.

2              THE COURT:  Okay.

3              MR. CADDELL:  And frankly, Judge, our

4   perspective is the same.  We've done this -- I've done

5   this before in cases where we have a provision, a sunset

6   provision, and it's three years, four years or five

7   years.  Understandably, defendants don't want to be

8   locked into something ad infinitum.

9              THE COURT:  I'm just making sure I

10  understand it.

11             MR. CADDELL:  But we also appreciate that

12  the reality is once you set that ocean liner on course,

13  it's hard to make a turn, and it generally keeps going

14  in the same direction.

15             THE COURT:  Right.

16             MR. BENNETT:  And, Judge, in this regard, I

17  think that first by fluidity, the discussion that we had

18  was that we were talking about the degree of detail in

19  the injunctive relief order, for example.  That's one of

20  the continuing negotiations of how we pay for this, the

21  verbiage.  You're going to see a very detailed

22  presentation of screen prints, the before and after.

23             THE COURT:  Yes.

24             MR. BENNETT:  The parties do not contemplate

25  the injunction to say that you have to maintain that

1   beautiful blue and use those fonts.  I think the

2   principals that we're talking about aren't fluid.  That

3   is this information to be covered.  From our side, what

4   we believe we accomplish is LexisNexis agreeing that the

5   argued information, the commonsense, it looks like it

6   should be the best area governed, that will be FCRA

7   governed.

8          Candidly, if you were to answer commonsense,

9   an output that has the different versions of Leonard,

10  Leonard Anthony, Leonard A, Len, Bennett, in response to

11  a person search with my last -- with various variations

12  of my home address, you will be more likely -- we will

13  conclude and to think, commonsense tells you,

14  Mr. Bennett, that's not a FCRA product.  Both sides have

15  arguments to the extreme.  Mr. McCabe is the top

16  litigant in the country at parts of this, and

17  Mr. Raether represents all of the information companies.

18  And so they would push the other extreme, and then

19  Mr. Francis and I on our side.

20         That second bullet point that you see is

21  where in that gray we agreed to lay down the line.  And

22  that's an issue of some sensitivity.  That's an

23  important compromise in the injunction because we

24  forfeit contractually the right for the class members

25  the right to assert, so it would be an estoppel or a

1    contractual estoppel argument, the right to assert

2    absent area governance of that person search-like

3    product based on the collected once, used twice argument

4    that we were making.

5         The defendants viscerally, vehemently

6    disagrees that that once/twice argument has any teeth to

7    it, and you recognize that I'm generally passive and

8    docile in the way that I see things.

9         And so that rather than come up -- and I

10   think that really Mr. Anthony and Mr. Caddell got us to

11   a point of truce here, that we will accept that without

12   a determination by the Court as to who's right, that

13   contractually, this is going to be the demarcation point

14   going forward for the seven-year period.  Without any

15   acknowledgement by either side as to who ultimately

16   might have won that battle if Judge Spencer had weighed

17   in on it.  But that's the second bullet point --

18              UNKNOWN SPEAKER:  (Inaudible portion.)

19              MR. BENNETT:  But these people for

20   LexisNexis --

21              THE COURT:  Meaning the nongovernmental

22   people?  Isn't these people --what do you mean by these

23   people?

24              MR. BENNETT:  Well, the injunctive relief

25   class.

```
 1              MR. CADDELL:  You're not missing anything,
 2   Judge.  It's everybody.
 3              We agreed, as I mentioned, at the end of
 4   the -- after we had agreed on and it had actually gone
 5   to the point of seeing a presentation on the new
 6   business practices, then we talked about attorneys'
 7   fees, and we agreed on 5-and-a-half million in
 8   attorneys' fees for the injunctive relief.
 9              We had Neal Richards, who while he is in St.
10   Louis -- he is also a UVA graduate and well-respected.
11   He really is one of --
12              THE COURT:  Let me just ask you this.
13              MR. CADDELL:  Yes, Your Honor.
14              THE COURT:  As to the 5-and-a-half million,
15   how did you get there?
16              MR. CADDELL:  It was simply a negotiated
17   amount.  It was a combination of what we thought the
18   value of the settlement was, and you'll see -- even
19   Mr. Richards says the value of the settlement is -- you
20   could call it billions of dollars.  And you really could
21   because it's a volume thing.  If you've got a 100
22   million of these reports issued --
23              MR. BENNETT:  Your right to a free copy of
24   your consumer report every year, the implication of FCRA
25   governance of this product, for example, is
```

1   multifaceted.  For instance, Your Honor, just to

2   (Inaudible portion.)  was that LexisNexis is charging

3   consumers --

4            THE COURT:  Eight dollars.

5            MR. BENNETT:  -- eight dollars per copy for

6   (Inaudible portion.) an FCRA file, and the consumer is

7   entitled to a free report once a year.  (Inaudible

8   portion.)  So that would be one very simple linear way

9   to evaluate the potential economic relief because all of

10  those consumers that were being charged eight dollars

11  for what was otherwise free under the law.  Now,

12  (Inaudible portion.)  So that's in play here as well.

13           The difficulty -- well, not difficulty.  In

14  the Clark class action, we faced an economics argument

15  by the lawyers that didn't even make a change.  It

16  didn't even correct the method of credit reporting.  In

17  that case, the credit reporting agency used your report,

18  if your spouse filed bankruptcy and the other spouse

19  didn't, it would report both of them has the trade lines

20  of bankruptcy, and the injunctive relief that we

21  objected to, and it was nothing else.  There was no

22  monetary class.  The injunctive relief was that they

23  would change, including the bankruptcy instead of just a

24  bankruptcy.  And even then, it was still scored, nothing

25  changed.  But that we faced the defendant saying -- I

```
1    mean, an economics expert saying that the change was

2    worth 6-point-some billion dollars in an outline.  We

3    don't want to do that.  We will try to monetize it to a

4    degree, but with -- in this circumstance, the value has

5    both monetary value that we can monetize, (Inaudible

6    portion.), and a real non-monetized value in the form of

7    your ability to learn what information exists about you

8    in this major database which answers your question in

9    addition to that, Judge.

10               There would be a disagreement in a fee

11   position.  At the end of this, we would submit a fee

12   petition.  We would want to get the time since we

13   started litigated LexisNexis through this very moment,

14   and we would want to hold the fire and we would want the

15   light.  The defendant would argue that we shouldn't.

16   This money was negotiated to be paid much like any

17   conventional fee petition.  The defendant would agree to

18   pay 5.5 million dollars as a reasonable attorneys' fee

19   under the (Inaudible portion.) Information of the FCRA

20   in this injunctive relief settlement.  But it doesn't

21   come out of -- it isn't like the monetary relief class,

22   which was negotiated independently --

23               THE COURT:  Right.

24               MR. BENNETT:  -- in our room where we're

25   asking for some of the class' money as a fee
```

1    compensation.

2            THE COURT:  It just helps me to know.

3    Often, they're tied to some percentage of something

4    else, and it helps me in the sense.  The brief on this

5    does come into play eventually.  It doesn't strike me as

6    an outrageously high fee.  It strikes me --

7            MR. CADDELL:  Let me mention one other

8    thing, Your Honor, in that context.  The other issue

9    that we discussed was there is the benefit to the class.

10   As lawyers for the class, we always want to look at

11   what's for the benefit of the class.  And I do think it

12   is, any way you cut, the value to the class is in the

13   hundreds-of-millions of dollars.  Because this is, over

14   the next seven years, you're talking about more than

15   100,000,000 of these reports going out, and people will

16   get the benefit of the Fair Credit Reporting Act on

17   those reports.

18           Defendants often look at the cost to the

19   defendant.  And there is a substantial cost.  LexisNexis

20   has not precisely monetized this yet.  Their estimates

21   are 3 to 4 million to implement it, and they believe it

22   may cost them from a business standpoint about

23   8 million.

24           UNKNOWN SPEAKER:  Five.

25           MR. CADDELL:  Five.  Okay.  About 5 million

1   dollars.

2            So you've got sort of at the low end of what

3   it's actually going to cost them both in implementation

4   and in marketing, in their revenue, and at the high end,

5   what the benefit will be to the class.

6            MR. FRANCIS:  Yeah, I also just want to

7   point out that there's a real (Inaudible portion.)

8            Number one, they will now have to sell these

9   reports using the FCRA's standard of maximum possible

10  accuracy.  So whereas before, even up until now, if

11  they're not covered by the FCRA, they don't have an

12  accuracy threshold at all.  Here, in the future,

13  assuming that this Court will agree with this

14  settlement, these reports will be subject to a maximum

15  possible accuracy standard, and LexisNexis will be

16  required to observe that standard.  That's a huge

17  benefit for consumers.  As Your Honor alluded to earlier

18  regarding Ms. Adams' situation, you laid that out

19  because that was an example of what happened.  Turns out

20  in that case, Ms. Adams was the subject of inaccurate

21  Accurint report sold to a debt collector.  As a result,

22  the debt collector continued to hound her, to go after

23  her.  She ended up having her wages garnished.  As a

24  result, she didn't know why.  It was only when we were

25  in that litigation, that we learned what the source of

1   that information was.  So she was without recourse.

2   There was no FCRA covering the act covering the accuracy

3   of reporting.  She was not able to bring a case against

4   LexisNexis.

5            Here, these consumers who are the subject of

6   an inaccurate LexisNexis report will now be able to

7   bring a FCRA case in the event that they sell something

8   wrong about that consumer and it causes them harm, they

9   can bring a FCRA case with the mandatory (Inaudible

10  portion).  They can dispute information that is

11  incorrect.  LexisNexis does not -- they can remove that

12  information, they can delete it from the report, they

13  can bring an action.  So they have real teeth now to

14  ignore the situation that caused harm to Ms. Adams and

15  other people.  So that's a real comfortable monetizing

16  result.

17           MR. CADDELL:  Your Honor, we've got -- we

18  have provided you with a copy of Professor Richards'

19  report.  I think I would have -- I was reading it this

20  morning on the plane.  He, as you can imagine, like most

21  law professors, wrote his own report.  And it was -- I

22  was struck by reading it again how when he talked about

23  the injunctive relief, he talked about tremendous

24  benefit, substantial benefit, great benefit, outstanding

25  change, that sort of thing.  He was quite enthusiastic

1    about the settlement.

2              MR. BENNETT:  Can I footnote this,

3    Your Honor?

4              We're very pretty high up in the national

5    association for consumer advocates and consumer groups,

6    but we did not know Professor Richards before this.  We

7    said let's find a privacy acts expert and that's -- we

8    found him.  He was a stranger to us.  His credentials,

9    as you will see if you haven't already, are impeccable.

10   But I say that because one of the -- sometimes, there

11   are professional witnesses -- professional expert

12   witnesses, repeat witnesses, and that's not this guy.

13             MR. CADDELL:  Your Honor, let me -- briefly,

14   the monetary relief component is, I think, a little

15   easier to cover, and I don't want to take up any more

16   time because I really want to get to Mr. Raether.  I

17   think the Court will enjoy seeing what he's got to say,

18   and Mr. McCabe as well.

19             But the monetary relief settlement, and,

20   again, it's individuals who either requested a copy of

21   their file or disputed some of their file.  And

22   LexisNexis will establish that a

23   13-and-a-half-million-dollar fund, payments will be made

24   pro rata to class members.  Attorneys' fees, we've

25   agreed, by the way -- the agreement we had with

1    LexisNexis was that we would ask for no more than 30

2    percent of the common fund.  We've agreed to cap our

3    request at 25 percent.  And by that, I mean, Mr. Bennett

4    and Mr. Francis and I, we reached that agreement.  And

5    Mr. Bennett felt that that given the district and given

6    the injunctive relief, frankly, although the two are

7    separate, they were negotiated separately, and they

8    actually deal with separate classes in many respects,

9    but we have decided that we would cap it voluntarily at

10   25 percent, the incentive awards at $5,000 per named

11   plaintiff.  The class members will receive a pro rata

12   distribution direct mail notice with a check.  The

13   settlement will release all claims under the Fair Credit

14   Reporting Act and comparable State laws.

15              Let's see.  I want to go back.

16              I did want to mention one thing in

17   conjunction with this, Your Honor.  Some of these names

18   will go back a number of years.  And I want to address

19   two things with respect to that.  One, of course, some

20   of the addresses that we may have will not be current,

21   but LexisNexis, of course, is the best entity in the

22   country to find these people.  So I'm confident that

23   through re-mailing, and we've already agreed that we

24   will do at least one re-mailing to people to make sure

25   that people get it.  Having said that --

```
 1              THE COURT:  When you say get it, do you mean
 2    the notice, or do you mean the check?
 3              MR. CADDELL:  Well, the notice and the
 4    check.
 5              THE COURT:  Okay.
 6              MR. CADDELL:  The check is going to go out
 7    to people.  If they cash the check, then they will be
 8    giving a release.
 9              THE COURT:  Got it.
10              MR. CADDELL:  That's the way it will work.
11    They won't have to make a claim.
12              THE COURT:  That's my question --
13              MR. CADDELL:  This will not be a claims-base
14    only.
15              THE COURT:  Right.
16              MR. CADDELL:  It will be direct mail to
17    every class member, sending them a check.  Negotiating
18    the check will be a release of LexisNexis --
19              THE COURT:  Right.
20              MR. CADDELL:  -- for their claim.
21              MR. BENNETT:  This will be much more -- it
22    will be very similar, if not identical, to the multiple
23    class settlements that have made its way through the
24    Court in this District.  It won't be any catches,
25    there's no secret reversion or claims barrier or the
```

1    like.

2              MR. CADDELL:  Well, now, that's what I was

3    going to mention.

4              Inevitably, experience has taught us that

5    some portion of the class, either they lose the check,

6    they just don't trust class actions, whatever, there

7    will be some people who will not cash the check.  And

8    there's nothing we can do to force them to do so.  So we

9    have agreed with LexisNexis that sort of two things.

10   One, LexisNexis can get reimbursed to the cost of the

11   notice for both the injunctive relief and the monetary

12   relief, notice and administration, which won't be a huge

13   sum, but they can -- we've agreed that they could get

14   reimbursed that much from whatever is left, the residual

15   in the monetary relief fund.  And then the balance would

16   go to cy pres, which, of course, we would address to the

17   Court and ask for Court approval, and the only

18   limitation we have on the cy pres, which we certainly

19   think is appropriate is LexisNexis has asked that the

20   cy pres not go to any -- to finance any litigation, and

21   we're fine with that.  I just wanted to tie up that

22   loose end because the reality is no matter how we try,

23   we will have checks that aren't cashed, and so there

24   will be funds left over, and they will not revert to

25   LexisNexis except for LexisNexis can get reimbursement

1    for its notice costs.

2           THE COURT:  When you're saying all of that,

3    you're saying that only as to the monetary relief class

4    because you said --

5           MR. CADDELL:  The 13.5 million.  Yes,

6    Your Honor.

7           THE COURT:  But you said also both as to

8    injunctive and --

9           MR. CADDELL:  The notice -- because,

10   remember even though they're not obligated to do so, we

11   will be doing a small notice campaign.  I don't think it

12   will be terribly expensive, but it will be effective

13   because it's going to use the internet --

14          THE COURT:  But that's as to the injunctive

15   class?

16          MR. CADDELL:  Yes.

17          THE COURT:  They are getting it from this

18   13.5 --

19          MR. CADDELL:  That's the proposal.

20          THE COURT:  That they can get a little bit

21   back for the folks that don't cash the checks or

22   participate for the notice of the injunctive class.

23          MR. CADDELL:  Correct.  Correct.  That's the

24   proposal.

25          THE COURT:  Notice and administration as to

1    both classes?

2              MR. CADDELL:  Yes, yes.  That's the

3    proposal.  That's why I wanted to highlight that for the

4    Court and make sure that the Court was aware of that.

5              And then we're going to talk about

6    attorneys' fees -- actually, we've already talked about

7    both of those.

8              Your Honor, at this time, I'd like to --

9    of course, I'm available for any questions.

10             MR. BENNETT:  The only thing I have just to

11   wrap it up.  Regarding typicality in the questions

12   Your Honor said earlier on, it is our view that whether

13   this Court or Judge Spencer hears the preliminary

14   approval, we would submit a motion, which would include

15   the case law and the citations, and Your Honor is

16   otherwise familiar with, including typicality.  To

17   summarize, at least, our view of the case law is that

18   it's -- while it will begin by saying that the Court

19   still needs to be rigorous in its consideration of the

20   elements for certification, it's always followed with,

21   however, in a settlement context (Inaudible portion.)

22   that you can construct a settlement class that while it

23   satisfies those elements, is looked at to some degree

24   differently than in an tested class.  It's not simply a

25   matter of, well, now, we don't have an opponent

1    briefing.  They're also is a different threshold for

2    law, although, it's a delicate threshold as articulated.

3              With respect to typicality, in our Soutter

4    victory, the Court held that we had defined our class

5    too broadly.  We followed the opinion, we had convinced

6    Judge Payne through our guile to certify a class

7    representing multiple time periods where I client didn't

8    have the same willfulness evidence and did not have the

9    same proof of negligence or unreasonableness as the rest

10   of the class.  And that, of course, is nothing

11   remarkable.  That's typicality.  That's why this is an

12   unpublished opinion that outlines how we failed in our

13   effort on typicality.

14             We don't -- this wouldn't apply other than

15   that was an FCRA case, unlike the other -- Williams,

16   where 23(f) -- was a much more comparable class

17   definition, the Court denied -- the Fourth Circuit

18   denied the 23(f).  But you have in the range and the

19   class representative before you individuals who made

20   disputes and individuals who did not, individuals who

21   requested their file and individuals who did not, and

22   you have identity-theft victim, Mr. Hernandez, and you

23   have an inaccuracy in Mr. Oton (ph.).  Mr. Oton (ph.), I

24   think that's how you pronounce it.

25             THE COURT:  Oton.

1          MR. BENNETT:  Oton.

2          And so we have the entire gambit of our

3    class definition represented from a typicality

4    standpoint.  Separately, we will satisfy Your Honor, or

5    if it goes before Judge Spencer, Judge Spencer on

6    adequacy.  These individuals were bedded because of

7    their -- they satisfied the class counsels' belief as to

8    a number of the elements as to adequacy.

9          Now, with a settlement, where we really

10   catch a break is on 23(b)(3) class, superiority and

11   predominance issues, the mechanics of litigating a class

12   become less important in the settlement.

13         But for typicality, which, but for Soutter,

14   I would have otherwise described as a very light burden.

15   It's what the case law always said and will continue to

16   say, but for Soutter, and that was a counsel error, by

17   the way.

18         MR. CADDELL:  Thank you, Your Honor.  And

19   unless you have some questions, I want to turn it over

20   to Mr. McCabe.

21         THE COURT:  I think I've asked what I have.

22         Thank you.

23         THE LAW CLERK:  All rise.

24         This Court stands in recess.

25             (Discussion off the record.)

1          (Recess in the proceedings from 3:42 p.m. until

2                    3:51 p.m.)

3          THE LAW CLERK:  The Honorable United States

4   Magistrate Judge M. Hannah Lauck presiding.

5          Court is now in session.

6          Please be seated and come to order.

7          MR. McCABE:  Good afternoon, Your Honor.

8          THE COURT:  Good afternoon.

9          MR. McCABE:  I'm Jim McCabe from Morrison

10  and Foerster.  I represent LexisNexis, and I want to

11  thank the Court on behalf of LexisNexis for all of the

12  time you set aside to deal with this, and obviously the

13  preparations that you've done to hear us on this matter.

14          Lexis agrees with the plaintiffs that the

15  settlement upon which we've agreed is fair, adequate and

16  reasonable.  Mr. Raether is going to talk about the

17  injunctive relief after I'm done.  I would like to cover

18  for the Court for just a few minutes our perspective on

19  the (Inaudible portion.), which is the defendants'

20  defenses and difficulties of proof that the Court would

21  consider in determining the fairness and adequacy of the

22  settlement.

23          I think the Court will see that given the

24  issues in dispute in the case, that the plaintiffs have

25  secured substantial value for the class in a case in

which there was some very serious doubt as to whether
any recovery might be had.  The core of the complaint is
that Accurint is a consumer report.  That's the
threshold for all of this.  There's no such thing as
coverage under the FCRA.  There's no such thing as FCRA
governance.  There's really only the question of is it a
consumer report or not.  If it's a consumer report,
certain consequences float.

THE COURT:  Mr. McCabe, I'm going to
interrupt you with a rather mundane question.  I
obviously have this PowerPoint.  Is this mine to keep or
this something that you get back?

MR. McCABE:  No, you may keep it,
Your Honor.

THE COURT:  I'm an active listener.

All right.  Thank you.

MR. McCABE:  All right.  Very good.

So the whole premise here is whether or not
Accurint is a consumer report because these obligations
apply only in that circumstance.  And it's important to
be precise about the definition because that is what is
going to govern the standard of the case.

Now, the plaintiffs here did not seek any
damages for negligent violation of the FCRA.  That's a
strategic choice because a negligent violation claim is

1    one that is really not amenable of class treatment.

2    Negligent violation, one of the elements is injury or

3    damage.  If you were to try to try that kind of a claim

4    in a class action common issue would not predominate.

5    Individual issues would predominate.  And consequently,

6    the choice here was to assert that LexisNexis willfully

7    violated the FCRA because under the willful branch of

8    liability, the plaintiffs may recover statutory damages

9    in lieu of actual damages.  Consequently, that is a much

10   more certifiable prospect.  Okay.

11             So that carries with it a cost.  And the

12   cost to plaintiffs is that under Supreme Court

13   authority, they must be able to show that the

14   defendants' conduct was not consistent with any

15   objectively reasonable interpretation of the FCRA.

16   Defendants can defeat the class case by showing that

17   their interpretation of the FCRA was objectively

18   reasonable.  Even if it was wrong, it just has to have

19   been reasonable.

20             THE COURT:  Okay.

21             MR. McCABE:  And so here the issue is

22   whether we can read the FCRA's consumer report

23   definition to exclude Accurint reports, whether we can

24   do that reasonably.  It's a question under SafeCo versus

25   Burr of whether -- of the state of the law as of the

1   time of the alleged violation.  That's -- it's much like

2   qualified immunity in that case law.  And, in fact, the

3   Supreme Court drew expressly on qualified immunity case

4   law in forming any standard.  It used clearly

5   established language.  The idea, of course, in a

6   qualified immunity jurisprudence is that a government

7   actor is not liable for violating Constitutional Rights

8   unless in that circumstance, the rights are clearly

9   established, in which case, they have liability.

10  They're either free from liability or subject to

11  liability.  In the FCRA context, actors are subject to

12  damages if they violate the FCRA even negligently.  But

13  they are not subject to willfulness penalties if the law

14  is not clearly established.

15          As the Supreme Court said a defendant who

16  merely adopts one reasonable interpretation of a FCRA

17  violation cannot be a knowing or reckless violator of

18  the Act.  And evidence of the defendants' objective to

19  understanding is irrelevant.  That's footnote 20, and

20  the Court's analysis, as I've mentioned, drew heavily on

21  really establishing the concept of qualified

22  jurisprudence.

23          So the question that would have been

24  presented in this case had it been litigated -- had it

25  been actively litigated, Is it so clear that Accurint is

1  a consumer report that it was reckless for LN to have

2  treated it otherwise?  Is it just that clear?  If it was

3  simply a mistake for LexisNexis to treat Accurint as a

4  non-consumer report, there would be no recover in this

5  case at all because the case asserts only willful

6  violation claims.

7           So then the question becomes, Well, what

8  does the definition provide?  Is it clear?  Is there

9  clear authority from any source, whether it's the

10  statute or the Courts of Appeal or the Federal Trade

11  Commission as to the application of the consumer report

12  definition to the Accurint product.  And the answer is

13  really there's not.  The consumer report definition

14  itself includes communications that are intended to be

15  used as a factor to establish the consumer's eligibility

16  for and it lists a number of things.  Creditor

17  insurance, employment purposes or any other purpose

18  authorized under 604(b).  So it says eligibility for a

19  purpose.  That's not terribly helpful.  In fact, this is

20  just a brief excerpt.  This is 90-word sentence with no

21  fewer than nine clauses that seem to refer to something

22  that precedes the clause in question, and the antecedent

23  is in many cases unclear.  And this problem in the

24  construction of the statute runs throughout a number of

25  different issues that are presented in the case.  That

1    simple contextual ambiguity is something that is a real

2    problem, we believe, for the plaintiffs in this case.

3    To be able to say, Look, you can read right from the

4    statute this is what it means.  Because the defendant

5    can come along and say, No, that doesn't refer to

6    information, that refers to communication and whose

7    expectation or whose intent.  Which one is relevant?

8    And in light of the fact that are no cases that have

9    applied the FCRA consumer report definition to Accurint,

10   that's a very important problem with the statute.

11             Now, because the statute refers to

12   eligibility for any other purpose authorized under

13   1681(b) and because 1681(b) permits consumer reporting

14   agencies to furnish reports to debt collectors, then the

15   plaintiffs contend that well, okay, if it can be

16   furnished to a debt collector, then it must be a

17   consumer report.  If it contains seven-factor

18   information and it's furnished to a debt collector, it

19   must be a consumer report under this definition.  And

20   the question then here is that construction of the

21   statute clearly established.  The statute has to be read

22   to provide the eligibility determination modifies every

23   one of the subparts of the Supreme Court definition,

24   including any other purpose authorized under 604(b).

25   And in context among the legislative history, the

1  structure of the statute and the history of amendments

2  to the statute, it's our position and we believe we

3  would have been able to establish in litigation that

4  purposes brought within the eligibility in defining

5  purpose, the terms of the statute are really limited to

6  things a consumer would want.  The whole point of the

7  statute was to make fair determinations for consumers in

8  their applications for credit, their applications for

9  insurance, their applications for employment and for

10  other transactions that the consumers wanted.

11          There are in 604(b) a large number of

12  permissible uses of consumer reports that have nothing

13  to do with what consumers want.  None.  And the argument

14  goes, therefore, when you construe the consumer report

15  definition, you really have to look to 604(b) and

16  include only those items in 604(b) that are eligibility

17  determinations as the kinds of determinations that

18  qualify a communication as a consumer report.  That's a

19  valid point, (Inaudible portion.) It derives from the

20  language of the statute and circularity of the statute.

21          I do have what -- I have Jim Francis'

22  favorite diagram.

23          THE COURT:  It was in a briefs report.

24          MR. McCABE:  Yes, it was in the Adams brief.

25  It was in the Adams brief, and because he loved it so

1    much there, I use it whenever I can.

2                    (Discussion off the record.)

3              MR. McCABE:  The way we have read the

4    consumer report definition is that there are intended

5    uses of the seven-characteristic information that define

6    a communication as a consumer report.  So there are

7    certain ones.  If it is a communication that is expected

8    or intended to be used for certain eligibility

9    determinations, it is a consumer report.  If those

10   eligibility determinations are credit, insurance and

11   employment, which are expressly mentioned in A and B of

12   the statute, for licensing that is based on prior

13   financial responsibility, that's in 604(b).  For

14   consumer initiated transactions that are also mentioned

15   in 604(b), for continued maintenance of an account, the

16   same, and the government travel cards, the same.  Now,

17   those are all mentioned in 604(b), and they are all

18   logically eligibility determinations for things that a

19   consumer would want.

20             The statute, though, is set up so that there

21   are things that a consumer report may be used for that

22   have nothing to do with eligibility.  And those are

23   found in 604(b) in the context of the larger ellipse

24   here.  For example, a consumer reporting agency may

25   furnish a consumer report in response to a court order

1   or a Federal grand jury subpoena.  That has nothing to

2   do with eligibility.  It can be furnished as instructed

3   in writing by the consumer.  It can go to the FDIC when

4   the FDIC is looking at its revision of an institutional

5   and consumer debt.  Frequently, the regulator at that

6   point wants to know the value of a portfolio and what is

7   this asset worth.  And they can pull credit reports on

8   the debtors in order help evaluate the value of the

9   portfolio.  And the same thing with debt purchasers.

10  They can use them to assess creditor payment risks when

11  they are going to be buying a portfolio of, say, credit

12  card debt.  But the fact the information is prepared for

13  that purpose and the fact that information is prepared

14  to respond to a Federal grand jury subpoena or that

15  information is prepared to make a child support

16  determination, doesn't make it a consumer report.  It

17  must be for eligibility determination, and that's what

18  qualifies it.  Once qualified, it may be used for

19  broader purposes.

20          Where that lead us, though, is that we have

21  other uses of the seven-characteristic information that

22  don't qualify communications as a consumer report but

23  that are also useful to those institutions or for those

24  purposes that are in the middle here.  In other words,

25  there is information about -- you know, address and

1    vehicle information that may be used by law enforcement

2    personnel, information that is useful in finding to

3    them.   It's useful to know what car a person is driving

4    or to be able to locate them as a witness or as a

5    possible suspect in a crime.   That same information may

6    be provided to a debt collector, but it doesn't

7    transform that information into a consumer report.

8                    THE COURT:   No.   I'm with you.

9                    MR. McCABE:   Okay.

10                   THE COURT:   And I'm hearing what you're

11   saying.

12                   MR. McCABE:   Okay.   Good.

13                   So the position that we've taking here and

14   this construction of the statute is one which we believe

15   is supported by the language in the statute and is

16   supported by a number of decisions from the FTC or

17   advice from the FTC over the years in various formal and

18   informal letters and in a bunch of case law that

19   construes and applies the application of consumer report

20   definition to information used in other circumstances.

21   And this, we believe, is a reasonable construction of

22   the statute.

23                   Turning to Accurint, it is a report that is

24   not to be used for eligibility determination purposes.

25   It's an on-line tool that can be used to find and locate

1  people and businesses, it can be used to prevent or

2  detect fraud.  And the way it does that is it allows

3  users to confirm that they're dealing with the right

4  person.

5  I can give you a personal anecdote.  I went

6  to buy my wife a piece of jewelry one time at Macy's in

7  San Francisco, and I presented my credit card.  And the

8  sales person came back and handed me the phone.  She

9  said, They want to talk to you.  And so I got on the

10  phone, and they said, Well, where did you live when you

11  first grew up, you know, what was your address and some

12  other random question, I don't what.  And they said

13  okay, fine, give me back to the sales person, and they

14  approved the transaction.  The purpose of that call

15  there, and they very likely using Accurint, was to be

16  sure that the person to whom the account had been issued

17  was the person who was standing at the counter

18  proceeding to make the purchase.  That is to prevent or

19  detect fraud and to verify the identity of somebody with

20  whom you're dealing.  Historical information that would

21  be known only to the consumer or likely to be known

22  quickly only to the consumer is information that could

23  be used to prevent or detect fraud.

24  Accurint is used by law enforcement to a

25  large extent.  There's a product called Accurint for Law

1   Enforcement.  There are literally thousands of law

2   enforcement agencies throughout the country that use it.

3   They use it to find and locate witnesses.  They have

4   used it successfully -- the number of success stories

5   that we have regarding child abductions.  Child

6   abductors often go back to places that they have been

7   before, and information about prior residences and the

8   locations of family members could be very useful in

9   those detection efforts.  It's used by collections as

10  you've heard from plaintiffs here.  There are other

11  government applications as well.  Lawyers use it to find

12  witnesses, if hey were simply to go to gather

13  information about people and in healthcare as well.

14          The product is basically an aggregation of

15  publicly available information.  It serves -- if you're

16  looking, for example, for Kristin McGrady, and you were

17  to go on-line right now and look through publically

18  available real estate records, you might find 50 Kristen

19  McGradys with different addresses all across the

20  country.  And you could then pick up the phone and call

21  each of the 50 of them.  But the value of Accurint is

22  that it takes public record information from many

23  different sources and predicts that this Kristen McGrady

24  is the one who now lives here and used to live there as

25  opposed to someone who now lives there and used to live

1  there.  And it cuts down the amount of time and effort

2  necessary by someone to find someone that would be

3  consumed by going through sequentially various different

4  public records and sources to try to piece this

5  altogether.  And the value to debt collectors is they

6  want to know they've got the right person.  They've got

7  a live phone and want a current phone number because

8  they don't want to waste time getting on the phone with

9  someone who says that's not me or he doesn't live here

10  anymore.  That's the real value.

11         Now, Accurint is not intended to be used for

12  making any eligibility determinations.  Mr. Caddell

13  showed you the front page for an Accurint search.  In

14  his presentation here, (Inaudible portion.) which says

15  Accurint does not constitute a consumer report as that

16  term is defined in the Federal Fair Credit Reporting

17  Act.  Accordingly, Accurint may not be used in whole or

18  in part as a factor in determining eligibility for

19  credit, insurance, employment or any other impermissible

20  purpose under the FCRA.

21         So this is something that the consumer --

22  that the user has to consent to, and it's in the terms

23  of service.  It's done again on the front page of the

24  web, and we consistently get representations from the

25  user that they're not using this for eligibility

purposes.  And it's part of the screening before they
are signed up to use the Accurint product.  If it turns
out that they're looking for something that they're
going to use to make eligibility determinations, they'll
be steered to a different LN product.

THE COURT:  Well, let me ask you about that
a little bit.

I mean, just by way of background, this is
really in the settlement context.  If you have a locate
option --

MR. McCABE:  Uh-huh.

THE COURT:  -- how are you determining that
somebody is not using it for debt collection?  I mean,
really you're going through the intent of your customer.

MR. McCABE:  Yes.

THE COURT:  And so they are saying we don't
intend to do it, and I get that you get you sort of
shift the risk, but if you actually have a process that
says, you know, we're going to sell you a different
product if you're really doing something different.
What is that process, or was it -- I know you're in the
process of developing --

MR. McCABE:  There's something called
credentialing.  When a new account comes on-line,
they're questioned about what their business is and why

1    is it they need the product, and if they say that

2    they're making -- well, let me back up.

3              THE COURT:  I mean --

4              MR. McCABE:  LN at this point does not

5    believe and did not believe that any information sold to

6    debt collectors is necessarily a consumer report.  We

7    are agreeing in the settlement to treat large bundles of

8    information sold to debt collectors as consumer reports

9    going forward, but to date, there has been no -- that

10   has not been the position and that has not been the

11   structure of business.

12             THE COURT:  Right.

13             MR. McCABE:  However, if someone comes in

14   and says, you know, we're -- we want to make loans or

15   something or we want to do background screening for

16   employment.  They say, well, this isn't the right

17   product for you.  We're going to send you over to our

18   background screening business.  If you're going to be

19   screening, you know, people for rental contracts, we'll

20   send you somewhere else.

21             THE COURT:  But to -- I didn't mean to cut

22   you off, but really there was no sort of sub-screening

23   for debt collectors?  You just sold them this product

24   because you didn't think this is a consumer report?

25             MR. McCABE:  Right.  Well, there's a range

1    of products.  They sign up for Accurint, then -- when

2    they sign in on that screen that you've seen, they can

3    choose -- they have to run a search first.  They have to

4    supply some information, and that will get them back

5    basically search results like Len was describing.  Len

6    Bennett from Newport News, Leonard A., and Leonard

7    Bennett, and so they'll get a list of information.  If

8    they want anything more than search results, if they

9    want to get the information that's clustered around one

10   individual, they have to click through and order a

11   report on that person.

12            THE COURT:  Okay.

13            MR. McCABE:  And when they get the report,

14   they can choose the scope of the report.  They can chose

15   a person-finder report, which will basically just give

16   the name, address and phone number.  They can choose

17   phones-plus, which may give them cell phones, or they

18   can go to the end, the highest volume of information and

19   ask for a comprehensive report.  But there's a whole

20   range of slicing and dicing in between in which the

21   amount of information and the type of information

22   varies.  And that's the choice --

23            THE COURT:  I guess I'm trying to understand

24   the logic where I made the comment earlier that it's a

25   little commonsensible to me that you don't need to know

    1   about fishing licenses necessarily to locate somebody or
    2   you don't need to know the median income.
    3               MR. McCABE:  Right.  That's essentially
    4   extracted information that's --
    5               THE COURT:  Right.  But that's really driven
    6   by the debt collector, what they use.
    7               MR. McCABE:  Yeah, what they use.
    8               THE COURT:  Yes.
    9               MR. McCABE:  And they may use it for
   10   prioritization.
   11               THE COURT:  All right.
   12               MR. RAETHER:  I was going to address the
   13   question when I got up and spoke, Your Honor, but I
   14   think it's important to recognize that this product
   15   was -- originally, this was designed for all sorts of
   16   different marketing reasons.
   17               THE COURT:  Right.
   18               MR. RAETHER:  One of those being law
   19   enforcement.  So when you look at the census data that
   20   relates to real property, I think it's very valuable or
   21   has been valuable to law enforcement in looking for
   22   money laundering, for example.  So if I have a drug
   23   dealer who is living in $450,000 house, but he's
   24   reporting $10,000 a year in income, that provides a red
   25   flag for law enforcement.  When law enforcement is using

1    this type of data, it's essential to them.  The layout

2    in terms of technically how to design things, it was

3    back in 1999.  So we're talking about technology that's

4    fairly old.

5              THE COURT:  Right.

6              MR. RAETHER:  And so the layout that was

7    designed for law enforcement is the same layout that

8    could potentially be available to somebody in the

9    collection industry.

10             THE COURT:  All right.

11             MR. RAETHER:  And they can pick and choose.

12             Now, the other thing that we know is that

13   collection agencies is that some of them consider

14   themselves to be creative.  So the fishing license --

15   for example -- or more likely for a pilot's license, it

16   may be so I know if I have the right John Smith or not.

17   It's a common name, I might know that my John Smith

18   flies an airplane or owns an airplane or works as a

19   commercial fisher-person.  And so having that

20   information, on the report for John Smith saying that

21   they have this particular license, allows the collection

22   individual to say I have the right John Smith.

23             THE COURT:  Okay.  Thank you.

24             MR. BENNETT:  Judge, you're actually getting

25   it.  A lot of this was for the off-docket litigation and

1    these are the issues that divide us.

2              THE COURT:  Right.

3              MR. McCABE:  Exactly.  That's right.

4              And so on the -- moving forward on the

5    Jiffy-Lube factors in terms of the difficulties of proof

6    that the plaintiffs would encounter and the series of

7    defenses.  One of the big issues that the plaintiffs are

8    going to have to contend with here is the fact that the

9    Federal Trade Commission has said that Accurint is not a

10   consumer report.  Now, this, keep in mind the Federal

11   Trade Commission at this time was the -- enforced the

12   Fair Credit Reporting Act as to the consumer reporting

13   agencies in addition to the Federal Trade Commission

14   Act.  And in 2005, Seismic discovered that there had

15   been a security breach with respect to accounts

16   maintained by its subscribers, that a number of law

17   enforcement agencies and debt collectors and others had

18   been hacked, and their accounts at Accurint had been

19   used for other reports that were not authorized.

20   LexisNexis advised the FTC of this, and the FTC

21   investigated and came in and looked it over.  They filed

22   a complaint and consent decree with respect to Accurint

23   that called for changes in the way in which Accurint did

24   business and for certain monitoring to take place for

25   years going forward.  That settlement was published in

1    the Federal Registry for Public Comment.  And in

2    response to the settlement, a letter came in from

3    EPIC -- I think it was EPIC objecting to the settlement

4    saying, Look, you should have gotten penalties under the

5    FCRA like you did in the ChoicePoint case, which was a

6    prior settlement in which ChoicePoint had unwittingly

7    given accounts to identity thieves.  And the FTC came

8    back in a response to the comment, and this was a letter

9    was approved by a vote of the full commission saying,

10   Well, we got penalties in ChoicePoint because those were

11   credit reports -- I think they used the term, those were

12   credit reports -- but we can't get those kinds of

13   penalties here because these are not credit reports,

14   meaning consumer reports.  So that is a statement that

15   Accurint is not a consumer report.

16              THE COURT:  Could I just make sure -- I

17   mean, I've read through the footnote in the consent

18   decree.  The Seismic, that involved Accurint, not any

19   kind of -- what is the other one?  Securant (ph.)?

20              MR. McCABE:  Correct.  Yeah.

21              THE COURT:  That involved Accurint.

22              MR. McCABE:  It involved Accurint.

23              And so then --

24              THE COURT:  And the Accurint was used for

25   what purpose in that FTC case?

1          MR. McCABE:  These were -- all the purposes

2   that we're talking about here --

3          MR. RAETHER:  There were 49 different users

4   who had their systems hacked --

5          THE COURT:  Because of the password problem.

6          MR. RAETHER:  And those 49 users ranged from

7   law enforcement to collection agencies, all of the list

8   of users that Jim had mentioned earlier.

9          MR. McCABE:  Law firms.

10         MR. RAETHER:  Law firms.

11         MR. McCABE:  It was kind of random.  I mean,

12  they used a variety of social engineering --

13         THE COURT:  Okay.

14         MR. McCABE:  Keystroke captured it.

15         THE COURT:  Right.  Okay.

16         MR. McCABE:  And so we have the FTC saying

17  they're not consumer reports.

18         And Mr. Caddell mentioned the Adams decision

19  on the motion for judgment on the pleadings, but there

20  was a further proceeding in that case, which was the

21  motion for reconsideration.

22         THE COURT:  Yes.

23         MR. McCABE:  After the Court entered its

24  order regarding the characterization -- or denying the

25  motion for judgment on the pleadings, we filed a motion

1   for reconsideration, and you'll see here at the bottom,

2   there was a long discussion at the hearing for the

3   motion for reconsideration regarding what the Court had

4   meant.  And Judge Plum (ph.) indicated -- she said that

5   I think you've all misunderstood what I meant to do in

6   my motion or what I meant by my motion denying the

7   motion for judgment on the pleadings.  She said that she

8   wasn't in a position to grant a motion for judgment on

9   the pleadings, but if at the end of the day, there was

10  no contrary authority to this 2008 letter that I just

11  referred to, then summary judgment would be entered for

12  the defendants.  What she explained was that she wasn't

13  clear from the record that was before her that the

14  letter on which we had relied was one that was equally

15  available to the plaintiffs and that it had not been

16  superceded by some other statement by the FTC.  And so

17  her explanation was, Look, you know, if there's

18  something else out there that maybe you wouldn't win,

19  offered Mr. Francis the opportunity to come forward with

20  some other contrary statement, do you want time to do

21  this, why should I do this now, why don't we just wait

22  for summary judgment.  And that was what immediately

23  preceded the dismissal of the class claims in Adams and

24  the ultimate settlement of the case on an individual

25  basis.  And so I think the -- it's important to

1    emphasize here for Jiffy-Lube purposes the weight of

2    that comment and its reflection on the value of the 2008

3    letter from the FTC.

4                There's one other practical construction

5    fact that the plaintiffs would have to contend with in a

6    litigated resolution of the case, and that is the wide

7    use of Accurint by government and law enforcement

8    agencies.  In general, it's illegal for government or

9    law enforcement agencies to procure consumer reports.

10   They just can't do it.  They can't -- in investigating a

11   crime, they can't just pull a credit check.  It's not

12   one of the permissible purposes that is enumerated in

13   the FCRA for furnishing a consumer report.  There are --

14   as I said earlier, there are thousands of law

15   enforcement agencies and government agencies that use

16   Accurint reports for investigative purposes.  FTC is

17   fully aware of this.  They knew of it in the data-breach

18   investigation.  And this fact -- the fact that the

19   agencies are out there buying this stuff, including the

20   FTC, which has an Accurint account -- the fact that

21   these agencies are out there buying these reports is a

22   practical construction of the consumer report

23   definition.  In other words, they are -- let's presume

24   for a moment that they have actually thought about this

25   and that they are trying to do the right thing and they

1    are trying not to do something illegal, they're

2    nonetheless buying consumer reports in very large

3    numbers.  Wholly apart from the fact that it's a

4    practical construction of the statute, it also

5    furnishes, I think, a policy reason for why one would

6    not expand the consumer report definition in the way

7    that the plaintiffs are now advocating.  To do so would

8    deprive law enforcement of a very valuable tool to them.

9    This basically fusion of publically available data that

10   distills things down and predicts the likelihood that

11   they relate to a single person.  It's a very valuable

12   investigative tool, and one that would not be available

13   to law enforcement were the plaintiff to prevail

14   characterizing these reports as consumer reports.

15           Just one other recent development on the

16   willfulness standard.  There's a Third Circuit decision

17   last month in a case involving the consumer report

18   definition and the willfulness claim -- Mr. Francis was

19   involved in it -- in which the Third Circuit tried to

20   apply the consumer report definition to a report that

21   reported property tax liens on a particular piece of

22   property.  And Judge Davis in the Eastern District of

23   Pennsylvania had gone through the consumer report

24   definition and the history of the FTC's pronouncements

25   with regard to the consumer report definition and said

1  that it was a really astonishing lack of authority

2  en point and that it could not be said that it was

3  clearly established that the consumer report definition

4  applied to that particular report before the Court,

5  which is a little different than that here.

6           Importantly, the Third Circuit confirmed the

7  number of positions with regard to SafeCo, that

8  LexisNexis had advanced here and that the plaintiffs had

9  disputed, but I won't go through those at great length

10  because we're not here to ask you to resolve anything,

11  just to appreciate the complexity.

12           THE COURT:  Right.

13           MR. McCABE:  So I think in summary, I can

14  say that a favorable outcome in this case for the

15  plaintiffs is subject to some substantial doubt.  And

16  for that reason, that is a factor to be considered under

17  Jiffy Lube.  The entire case is predicated on the

18  classification of Accurint as a consumer report, that

19  classification being clearly established, the statute is

20  poorly written, ambiguous, circular, confusing.  I have

21  spent -- I'm sure Len has done the same thing -- spent

22  many a night lying awake wondering what it all really

23  means.

24           MR. BENNETT:  You that I have.

25           (Discussion off the record.)

1          MR. McCABE:  And yet, you know, the FTC has

2  stated that Accurint is not a consumer report, and we've

3  got thousands of agencies out there treating them like

4  they're not a consumer report.

5          And nonetheless, it's that background, but

6  the plaintiffs have negotiated some very substantial

7  benefits to the class.  And so I think it might balance,

8  the factor favors approval of the settlement as fair,

9  accurate and reasonable.

10          Unless, Your Honor, you have further

11  questions for me, I'll let Mr. Raether describe the

12  injunctive relief.

13          THE COURT:  No.  I think that was very

14  helpful.

15          Thank you.

16          MR. RAETHER:  Good afternoon, Your Honor.

17          THE COURT:  Good afternoon.

18          MR. RAETHER:  I am Ron Raether of Faruki,

19  Ireland and Cox for LexisNexis.

20          You know, when we were trying to plan today,

21  I thought I should go first because what I have to say I

22  think is the most substantial important thing for us to

23  convey to you today.  I promise you I won't take an

24  hour-and-forty-five minutes, and I probably won't take

25  45 minutes.  So I'll be as quick as I can in being able

1   to convey to you the significance of what I think we've

2   accomplished here because, you know, we really have.  I

3   mean, putting aside the differences in opinion with

4   regard to the law, when I step back and I look at the

5   injunctive relief that we've been able to put together

6   for the benefit of the class, it really is significant.

7   It's really substantial.  And I can say that from the

8   defense table and having dealt with this industry for

9   going on 15 years, that what we've been able to do

10  really is a major shift in the market, that it's fair.

11  When I look at what's in the market and I look at your

12  commonsense approach, which I think most people take

13  when they look at data and they look at these complex

14  issues, ultimately, when we're addressing the jury, it

15  comes down to commonsense.  And I think what we've

16  structured and what we're proposing really meets that

17  commonsense element.  Then when you look at what

18  LexisNexis is being asked to do, this is not a small

19  undertaking.  And I've had this conversation with Len

20  before, and not to minimize what they accomplished in

21  California with White-Hernandez (ph.), to me that was a

22  drop in the bucket compared to the complexity of what's

23  being required of our client in terms of this injunctive

24  relief.  We're not flipping a switch, you know, in terms

25  of electricity in this building.  To me, bankruptcy is

1    the switch.  What we're doing is changing the whole

2    electrical system in this building.  That's the

3    equivalent, I think, in our injunctive relief, and it is

4    substantial.

5            And if you look at really what we tried to

6    do when we put this injunctive relief together was

7    address the issues in the complaint.  It is a

8    significant shift.  The investment -- you know, we

9    talked about 5 million, but it's really 15- to

10   20-thousand hours of times is what it's going to take

11   just in terms of engineering.  So in terms of people

12   sitting down at a computer, writing code, people coming

13   up with development, figuring out how they're going to

14   present this to the market because it's going to have a

15   considerable impact on LexisNexis' customers.  They are

16   accustomed to seeing the interface which is Accurint.

17   They're going to be something new.  And we have to walk

18   them through that educational process.  It's going to

19   take a lot of time and a lot of resources.  And I guess,

20   most importantly more than Jiffy-Lube factors (Inaudible

21   portion.).

22           So if you look at -- and I'm not going to

23   spend because of the limited time that we have, what I

24   can say is that I think we've addressed the issues

25   raised in the complaint.  So we're talking about use,

1    what data can be used for certain uses, what data should

2    be used for uses that meet the definitions of consumer

3    report, it ought to be characterized as such and it's

4    subject to the responsibilities that go along with that

5    definition.  Competitors generally don't do this.  If

6    you look at the market, this is really going to be what

7    I consider cutting-edge.  We're going to be leading the

8    market in terms of collection uses and what data is

9    available to them for the various uses.

10            So what are we proposing?  You know, I think

11   that this case, while we've talked a lot about very

12   detailed legal issues, really it came down to the

13   consumers out there.  And consumers are being pursued by

14   collection agencies.  That was, I think, the genesis of

15   the Adams complaint.  And so what we've done in the

16   injunctive relief is we've looked at Accurint, we've

17   decided that we're going to take Accurint and build a

18   product that's unique for collection uses.  We're

19   actually going to build two products.  We're going to

20   build one that's going to meet the definition of

21   consumer report, and thus be subject to all of the

22   requirements that go with that definition.  We're going

23   to build another product that is just going to be used

24   for skip-and-locating.  And we'll get to that in a

25   minute.  (Inaudible portion.)

1            I won't belabor the point, but you know, if

2       it's a consumer report, there's a lot of rights that go

3       along with that.  We have to have accuracy, we have to

4       credential, we have to make sure that they have

5       permissible purpose, and we have to give them a right to

6       request a copy of their file.  If it's a consumer

7       report, we have to give them a right to dispute.  On

8       contractual commitments, certifications, all of those

9       things go along with data, that we're agreeing through

10      settlement is going to be a consumer report going to

11      meet that definition.

12           We're also agreeing in this settlement that

13      this contact-and-locate product is not going to be a

14      consumer report.  But in that context, we are agreeing

15      upon limitations both in terms of the data that can be

16      in that report product, as well as the uses of that

17      data.

18           THE COURT:  Could I ask you a question.  I

19      should have asked both of you earlier.  You're both

20      referring to the receivable management market, and

21      you've referred me in this set of information to

22      Exhibit A to the complaint, which I just couldn't find.

23      Could you just orally tell me what market you're talking

24      about?  Is it just the collections market?

25           MR. RAETHER:  Yes.  It's a fancy way of

1    saying the collections market.

2            MR. BENNETT:  Collections -- when I started

3    practicing, most collections were all third-party agency

4    and principal, and now, they're mostly debt buying.  So

5    Midland, Encore, for example, Portfolio Recovery, they

6    just buy defaulted debt.  They outmoded receivable and

7    they are collecting their own, but a lot of this is

8    performed by our understanding of governance by the Fair

9    Debt Collection Practices Act.  So as to our thought

10   process, the debt collectors should be governed by the

11   Act --

12           THE COURT:  Right.

13           MR. BENNETT:  -- the debt-buyers.

14           THE COURT:  Thank you.

15           MR. RAETHER:  To police first-party

16   collectors.  I mean, exactly what Len is talking about.

17   There's a lot of different types of entities that are

18   now collecting the debt.

19           THE COURT:  I just want to make sure that it

20   wasn't --

21           MR. RAETHER:  We're trying to capture all of

22   those -- in using the term -- within the industry.

23           MR. BENNETT:  Correcting myself, Judge, this

24   would govern uses beyond -- as Ron just said -- beyond

25   simply those that would attempt to collect debt under

1  the FTC Act.  It would govern direct creditors, first

2  parties that are collecting their own debt, as well as

3  fiduciaries or others that might have exceptions

4  collecting non-billable or non-defaulted debt.

5           MR. RAETHER:  We're using the term

6  (Inaudible portion.).

7           THE COURT:  For just the contact-and-locate,

8  or is that applying both to the injunctive relief?

9           MR. RAETHER:  It's applying to the entirety

10  of the injunctive relief.

11           THE COURT:  Got it.  Okay.

12           MR. RAETHER:  So if you think about it, a

13  customer will come in and we'll say, What do you do?

14  They'll say, We're in debt buying business or we're a

15  third-party collector or we have this first-party

16  collector group, and the people that intake that call

17  will say, We need to put them on

18  collection-decisioning (sic.) or contact-and-locate and

19  not any other product for these purposes and uses.

20           THE COURT:  All right.  I shouldn't have to

21  admit to that I didn't know exactly what you meant, but

22  I'd rather admit it and get it right.

23           MR. RAETHER:  I appreciate that.

24           THE COURT:  Okay.

25           Mr. RAETHER:  So, again, focusing in on

1   contact-and-locate because I think this is, you know,

2   where we admit that a report or a search or a service is

3   going to be a consumer report, all of the requirements

4   of the FCRA that go along with that, where the detail

5   begins to, I think, become more important is when we're

6   talking about contact-and-locate and what's going to be

7   permitted with respect to that product because the FCRA

8   -- you know, the definition of consumer report is not

9   going to apply.  So we have to think of that little bit

10  differently.

11          And so we start off with the available data.

12  So what type of data is going to be made available in

13  the contact-and-locate non-FCRA version of what we're

14  talking about.  And Mike, I think, spent quite a bit of

15  time talking about the seven characteristics, the

16  bear-on type of information.  There are certain types of

17  information that generally have been agreed upon do not

18  bear on eligibility, do not bear on these

19  characteristics, and so that would be permitted.

20          We also went through in some detail and

21  talked about certain other types of information that may

22  be a little bit grayer.  But we provided an explanation

23  as to how that relates to skip-and-locate.  So based on

24  those negotiations with plaintiffs' counsel, we came to

25  an agreement on certain types of other data that could

1   be in the contact-and-locate.

2            MR. BENNETT:  We went through whether

3   fishing licenses should be included, pilots licenses,

4   mortgaged property, a lot of the delay, Your Honor, was

5   productive use of time.

6            THE COURT:  Right.  No.  I believe that.

7            MR. RAETHER:  But even deeper than that,

8   what elements from that public data ought to be in

9   contact-and-locate.  So, I may get 20 elements of data

10  from the Department of Fisheries from Alaska, maybe only

11  five of those elements actually relate to

12  skip-and-locate, so only those five will show up in the

13  contact-and-locate report.

14           And we have an example here of the one that

15  you essentially raised or that we have been talking

16  about, the median household example.  We still provide

17  information on property because people want to know the

18  address and where to locate people, but what we've

19  eliminated, however, is that census data about median

20  household income or value of the home.

21           We're going to have in both products built

22  within the system a means by which the user will know if

23  they're in the right place or not.  So the language that

24  we're looking at here, Your Honor, relates to the

25  contact-and-locate.  And so when a user logs in, when

1    they sign their contract, it will help provide guidance

2    when they're in the right place or the wrong place.

3              The other thing --

4              THE COURT:  Let me just be clear.  This is

5    not different than the what you already have; is that

6    right?  This is essentially the same waiver?

7              MR. RAETHER:  It's slightly different.

8              THE COURT:  Okay.

9              MR. RAETHER:  It's not exactly the same.

10             THE COURT:  All right.

11             MR. RAETHER:  And there is going to be -- a

12   suspension period.  It's going to be contractual

13   commitment, certification.  Really what we -- Jim

14   referred to as credentialing, that's really where we're

15   going to vet the user and decide what product is

16   appropriate for that particular and their intended uses.

17             So it's not -- I think Your Honor had

18   mentioned earlier, and I'm not sure I agree entirely

19   with the characterization that we were shifting the

20   entirety of the burden to the user because we did have

21   the credentialing process in place, even today.  So

22   there is this -- there is some need for the user to be

23   frank with us during this credentialing process, and we

24   will have methods in place to allow that conversation to

25   occur so that we can guide them into the right products,

1    but ultimately, they have to make that database

2    decision.

3              MR. BENNETT:  And, Your Honor, there will be

4    substantial distinction in this same category, where

5    this might have been the almost exclusive, not entirely,

6    but almost exclusive hurdle under the old system.  The

7    new system in the navigation process, there will an

8    additional automated vending process to direct someone

9    away from the FCRA or towards the FCRA's module.

10             MR. RAETHER:  And to be frank, I think that

11   the data that we're making available for those decisions

12   that we were talking about, those negotiation as to what

13   goes into contact-and-locate, and what more importantly,

14   will not be in there any longer, really I think deals

15   more with the issue as to question of use.

16             THE COURT:  Right.

17             MR. RAETHER:  Because the data elements that

18   may have given plaintiffs' counsel concerns are no

19   longer in contact-and-locate.

20             THE COURT:  Right.  I have to say that

21   sounds like --

22             UNKNOWN SPEAKER:  Your Honor, I'd like to

23   point out that the Fair Credit Reporting Act, the user

24   is subject to liability under the FCRA if they falsely

25   certify their purpose.  So in this case, if the debt

1  collector looks at this and tries to use

2  contact-and-locate or vice versa, they're subject to

3  liability, which is the consumer may cause of action

4  against them under the FCRA.

5          THE COURT:  Right.  Okay.

6          MR. RAETHER:  So one of the things that

7  we've been working on is trying flush out and put

8  together an example of what these new products may look

9  like to help the conversation and negotiation not only

10  for plaintiffs' counsel, but also to help ultimately the

11  Court, and I think others, to understand the real

12  significance of what we've accomplished here.  I say

13  that for two reasons.  One is that it is intended to be

14  exemplary.  I think it was mentioned earlier that it's a

15  fluent market.  Technology is constantly changing.  We

16  would not be, I think, good counsel to our client if we

17  agreed to lock them into something that would put them

18  kind of at a competitive disadvantage seven years from

19  now when none of use has a crystal ball and can tell

20  what's going to happen.  The other reason -- so we put

21  together this presentation, it's exemplary, it's meant

22  to help guide the conversation.  It's not meant to be

23  perceived that we're going to be locked into these

24  specific things except for the data that -- the general

25  principals about what data is going to be permitted.

1    The other reason that it's important and just to take a

2    step aside for a moment is this a competitive,

3    sensitive, sensitive issue for our client.  It is a

4    substantial major change in the market not only from our

5    competitors who are doing something different, but from

6    the user base that's out there.  So when this settlement

7    goes public, when it's approved, those users will have a

8    choice.  They'll have a choice to do what I think is the

9    proper thing, the more compliant decision, and that's go

10   with LN's product, but there will be users that make the

11   wrong decision and decide to go with the competitor's

12   product.  But given that, our client --

13           MR. McCABE:  We promise to do what we can to

14   make competitors do the right thing.

15           THE COURT:  Speaking of that cause of

16   action, it's still available.  Okay.

17           MR. BENNETT:  They'll going to help us

18   locate service information.

19               (Discussion off the record.)

20           MR. RAETHER:  But I think the other

21   important reason, Your Honor, is that this is exemplary,

22   and it does show a tremendous amount of detail in terms

23   of what is contemplated by the design.  You know that in

24   the class-approval process, there's the first

25   preliminary approval, and what that does is allows the

1    parties to send out notice to the class to allow the

2    class and to evaluate, come back.  It may or may not get

3    objectors.  It may get people that say this is a great

4    settlement.  There may be retractors.  But ultimately,

5    the Judge -- Judge Spencer will take all of that

6    information, analyze it and decide under 23(e) whether

7    the class ought to be approved or not.  That could a

8    couple of months because we're doing publication notice.

9    Our client is concerned that if the details of this

10   injunctive relief in terms of the exemplary screen shots

11   were to get out to the public, that our competitors

12   would use that during the period of preliminary

13   approval.  So what we've done is we've talked to

14   plaintiffs' counsel, we've put together what I think is

15   a good compromise on those issues.  And when we get to

16   the point, Your Honor, of actually having of piece of

17   paper of what we intend to propose for the Court, we do

18   have a procedural mechanism by which to both protect

19   LexisNexis from this competitive disadvantage in making

20   all of this information public while still allowing the

21   class -- punitive class members to have an opportunity

22   to come and possibly view some of these details, and

23   that's in the form of an amendment to the stipulated

24   protective order that was entered in this case in

25   August, 2012.  And what we would propose is a process by

1    which a class member if they want to see these details

2    and give plaintiffs' counsel a call, set up a time to go

3    and visit Mr. Anthony's office and be able to physically

4    view all of this information without making copies, sign

5    an acknowledgement of the stipulated protective order

6    that they're not going to use those materials outside of

7    the 23(e) process in an evaluation.  And really, it's

8    meant to prevent our competitors from being able to go

9    and pull this information.

10              THE COURT:  Right.

11              MR. RAETHER:  Your Honor, I think that,

12   frankly, is more than would be required in order for the

13   Court and for the class to evaluate the reasonableness

14   of the settlement.  I think that really goes above and

15   beyond what the case law would require.  I think there

16   will be a description of the nature of the settlement,

17   and I think any class member will get a sense of the

18   benefits.  The primary benefit is that, you know, this

19   product sold for collections will be subject to the Fair

20   Credit Reporting Act.  That's really -- I mean, boom,

21   right there, the class member knows this is something

22   that's not happened before, it's a big change, and I'm

23   going to get the benefit of that.  So this really goes

24   beyond that.  If someone wants to do that, then that

25   opportunity would be afforded to them.

```
 1                THE COURT:  And that will be in the notice,

 2   presumably?

 3                MR. RAETHER:  Yes, Your Honor.

 4                MR. BENNETT:  Mr. Anthony and I (Inaudible

 5   portion.)

 6                THE COURT:  So who pays for somebody to come

 7   to your office, Mr. Anthony?

 8                MR. ANTHONY:  (Inaudible portion.)

 9                   (Discussion off the record.)

10                MR. RAETHER:  I think Mr. Caddell makes a

11   good point.  We talked about earlier the 23(c) doesn't

12   necessarily require notice, but there is a due process

13   fairness component to this.  We are, I think, going

14   above and beyond in providing notification --

15                THE COURT:  Right.

16                MR. RAETHER:  -- publication notice and this

17   process as well.

18                THE COURT:  Okay.

19                All right.  That makes sense.

20                MR. RAETHER:  I'm going to run through this

21   quickly, but I just want to really provide you with some

22   of the basic concepts, and obviously, the detail is in

23   the set of slides that we're going to leave with you.

24   You can certainly look at that.  My guess is that we'll

25   have another opportunity to talk again and address any
```

1    questions.

2            But there are some substantial changes.

3    What we've done in this slide presentation is we've

4    taken a look at -- we're giving you a snapshot of what

5    the product looks like today, and then to give you a

6    comparison of what we're planning to do for the

7    injunctive relief.  And so what you're looking at right

8    now would be the homepage for the collections portal.

9    So this would be if I'm a collections user being given

10   access via a website, I can login, and I can choose

11   either to go to -- it says skip-and-locate because we've

12   changed the name to contact-and-locate.  The marketing

13   people are still fiddling around.

14           THE COURT:  Did they choose that word

15   decisioning?

16           MR. RAETHER:  Decisioning --

17   collection-decisioning?  Yes, they chose that.

18           THE COURT:  Did they know that's not a word?

19           MR. RAETHER:  They need feedback from you.

20           THE COURT:  That's not a word.

21           MR. RAETHER:  Marketing people, they're not

22   worried about grammar.

23           THE COURT:  They're so wrong.

24           MR. RAETHER:  But I think the critical thing

25   here to point out is twofold.  One is that we're using a

1   color scheme to help the user know when they're in

2   the -- when they're in a consumer report and when

3   they're in the product that's not a consumer report.  So

4   the blue is -- it's why Mr. Bennett earlier was

5   referencing blue.  And I don't know what color green

6   that is.

7             MR. BENNETT:  There's a footnote to this as

8   well.  This is important because there FCRA obligations

9   on the part of the user in this.  It's not something

10  that the FCRA can provide or furnish, but that the user

11  can use.  And so these distinctions matter in terms of

12  both keeping a user from doing unintended wrong and from

13  establishing culpability for those might intend wrong.

14            MR. RAETHER:  We talked earlier about

15  credentialing.  I won't belabor the point, but if you're

16  not credentialed as a user to access the consumer

17  report, then the green section here that says

18  Collection-decisioning would be grayed-out.  If you

19  clicked on it, it wouldn't do anything.  A box would pop

20  up and it would say, You're not authorized for this,

21  call you call somebody, and it will pop you through.

22            THE COURT:  Right.

23            MR. RAETHER:  But this is the current

24  Accurint for collections.  This is the launch -- the

25  equivalent to the launch page.

1          THE COURT:  Okay.

2          MR. RAETHER:  And as you can see, these are

3    the products that are being used today.  This is the new

4    portal without the block of information in it so you can

5    actually see it in its entirety.  But nothing new to

6    really point out there other than once I click on

7    collection-decisioning, anything within there, the next

8    thing the user sees is this screen.  And what this

9    screen does is it requires the user to confirm that

10   they're in the right product, they're now in the

11   consumer-report product, and also to confirm that they

12   have a permissible use.  So it's not only in the

13   contract, but it's also during the session that the user

14   has to confirm that they have an FCRA (Inaudible

15   portion.)

16          So the next one is the person-search

17   results.  We've talked about this.  This is the current

18   page of what Accurint looks like.  And I guess what I

19   would note for you because I think it's important, it

20   was contentious, it was mentioned in Adams -- in the

21   decision.  If you look at the middle left of the page

22   screen, there's a little gray box there and it says,

23   Includes bankruptcies.  Do you see that?

24          THE COURT:  Yes.

25          MR. RAETHER:  If you check that, under the

1   current system if you ran a person search, you would

2   also get results that indicate whether that individual

3   is in bankruptcy or not.  And our argument is the

4   compliance with the law and the automatic stay

5   provisions, but we debated as to whether or not that

6   would fall under person search.  (Inaudible portion.)

7           MR. RAETHER:  If you go to the next slide,

8   you'll see that we did eliminate the bankruptcy flag.

9           (Inaudible portion.)

10          THE COURT:  All right.

11          Okay.

12          MR. BENNETT:  LexisNexis sells a FCRA

13  product that's used and acknowledged as a necessary

14  product.

15              (Discussion off the record.)

16          MR. RAETHER:  On the record, some of these

17  quickly because I think they'll be exemplary of what

18  we're doing, and we don't necessarily need to show you

19  every single screen that we've changed and how we've

20  changed it, although it's within the set of slides that

21  you're being given.  In fact, I think the one that I

22  would like to focus on is the real property search.

23          THE COURT:  Can I take it back,

24  unfortunately, for you.  I'm sorry.

25          MR. RAETHER:  I'm more considerate of your

1    time, Your Honor.

2             THE COURT:  But no, that's fine.

3    Unfortunately, these folks know I sometimes I go late,

4    which I really do not intend to keep you here late

5    today.  But the new -- where you're saying new Accurint

6    contact-and-locate person search results, it's -- where

7    it says collections-decisioning and the comprehensive

8    report and the balance sheet, all of those things that

9    if you click on them, it will be grayed-out if you're

10   not available.  If you click on them, it doesn't really

11   matter whether you've checked because presumably, you're

12   allowed to use those for bankrupt purposes?  Am I right

13   about that or not?

14            MR. RAETHER:  You're right.  So if you look

15   at the mask, it's more of a navigational guide.  But

16   you'll see the blue where it says people, business,

17   phones, those are all blue, and that's telling the user

18   that this is not a consumer report.

19            Collection-decisioning is in green, and so

20   if the user was not credentialed for a consumer report,

21   that would be gray.  If they were credentialed and they

22   clicked on collection-decisioning, then they would get

23   that pop-up that says, Do you have permissible use, and

24   they would then they are moving into the consumer report

25   product.

1              (Inaudible portion.)

2              THE COURT:  Got it.

3              MR. RAETHER:  That's the first -- just so

4    it's clear, that's the first time in the session.

5              THE COURT:  Got it.  Okay.

6              Now we can skip and choice ahead.

7              MR. RAETHER:  So if you look, I think, three

8    slides ahead.  It's the current Accurint for collections

9    real property search results.

10             THE COURT:  Yes.

11             MR. RAETHER:  And you'll see here that

12   what's disclosed is the sale amount, mortgage amount

13   under the property deed records, so that was at the date

14   the property was sold, not currently, but temporally

15   relating back to when it was sold.

16             THE COURT:  Yes.

17             MR. RAETHER:  What we've done is we've

18   reviewed -- if you look at the next page in the new

19   Accurint real property-locator search results, we've

20   removed that financial data.

21             THE COURT:  The sale amount and the mortgage

22   amount.

23             MR. RAETHER:  Well, we've removed them both.

24             THE COURT:  Right.

25             MR. RAETHER:  Both the sale and the mortgage

```
 1    amount.
 2                    THE COURT:  Okay.
 3                    MR. BENNETT:  As well as the form of
 4    ownership.
 5                    MR. RAETHER:  (Inaudible portion.)
 6                    THE COURT:  Right.  Got it.
 7                    MR. RAETHER:  If you look at --
 8                    THE COURT:  This is just a practical
 9    question because the way this prints out, it looks this
10    way.  If somebody doesn't have access, this -- one of
11    these slides, which I think is the new Accurint
12    contact-and-locate real property search results.  It's
13    one of your examples.  It looks as if there are parts
14    that are shaded-out.  Is that how it --
15                    UNKNOWN SPEAKER:  No, that's the mock-up.
16                    THE COURT:  Got it.  Okay.  Never mind.
17                    MR. RAETHER:  It may not look exactly like
18    this.
19                    THE COURT:  I would think it would not look
20    exactly like this.
21                    MR. RAETHER:  We are putting -- we didn't,
22    like, build the system because that's going to take 14-
23    to 20,000 hours to build.  What we did is we took and
24    mocked it up.
25                    THE COURT:  You didn't think that my time
```

1    was worth it?

2                MR. RAETHER:  Well, we did --

3                THE COURT:  It's a joke.

4                MR. RAETHER:  -- but when I asked people to

5    work over the holidays to make sure they got it done,

6    and they asked for something called overtime.

7                THE COURT:  All right.

8                MR. RAETHER:  I don't think anybody --

9                THE COURT:  That's a different Federal

10   statute.

11                    (Discussion off the record.)

12                MR. RAETHER:  Well, we can talk about it.  I

13   think that they all basically make the same point.  They

14   both did, and if you went through each one, and you will

15   see, for example, in professional licenses --

16                MR. BENNETT:  That's a good one.  That was

17   the one that was some contention, too.

18                THE COURT:  Okay.

19                MR. BENNETT:  We were trying to figure out

20   where that line of gray came with us pushing back and

21   LexisNexis pushing the opposite direction, licenses was

22   one.

23                THE COURT:  So what's the --

24                MR. BENNETT:  Well, our view, generally, had

25   been it was not -- we looked at it from a creditor's

1    standpoint even though it's a collector.  The fact that

2    somebody has an active pharmacist license or law license

3    or that type of thing might make them -- from where I'm

4    looking, and thus, the FCRA governs it.  The flip side

5    is that there was extensive -- well, I don't want to

6    give you the very --

7                MR. RAETHER:  Well, I think the best example

8    is knowing that the debtor is -- if they are a

9    pharmacist and you know the area in which they live,

10   they're trying to -- you have to realize that these are

11   people from the debt collectors perspective that are

12   avoiding trying to be located to pay the debt.  So they

13   have to come up sometimes with creative ways.  This

14   obviously isn't the first step in the process to try to

15   find the debtor.  It's oftentimes the fifth, sixth or

16   seventh step because that person is trying to avoid

17   paying on a legitimate debt.  And so with a pharmacist

18   or a nurse, the pharmacist in this particular example,

19   the idea is this person lives in Columbus, Ohio, you

20   have the general idea in what neighborhood he or she

21   lives in, he's a pharmacist, which means he probably

22   works for the Walgreen's or the CVS in the area.  So the

23   debt collector may call the Walgreen's and CVS to see if

24   that person is employed there in an attempt to try to

25   locate.

 1          MR. BENNETT:  And at the end of that, we

 2     were comfortable after some argument longer than this

 3     discussion has taken, but I think we acceded to that.

 4     It was one that makes a lot of sense, and our view was

 5     more theoretical than -- as opposed to the practical

 6     reality of the LexisNexis request.

 7          THE COURT:  So let me be sure I understand.

 8     So you all this last line that says that somebody has an

 9     inactive license and expiration date, that's all

10     information that the plaintiffs conceded should be

11     available on a locater; is that correct?

12          MR. RAETHER:  If it's inactive, they won't

13     call CVS.

14          THE COURT:  Right.

15          MR. BENNETT:  That was active or inactive,

16     that was all right.

17          MR. RAETHER:  Len and I spent a long time

18     fighting over that.

19          THE COURT:  Right.  Okay.  All right.

20          MR. RAETHER:  Again, quite frankly, we

21     created the collection-decisioning product, and so

22     there's a more robust product out there right now.  If

23     they really want to make eligibility decisions, there's

24     a product that's going to have in aggregate all the data

25     they need to make that determination as opposed to this,

1   which is just one isolated piece of information.  So

2   even assuming that it might somehow bear on eligibility,

3   they're not going to use this report and pay this money

4   to use it for that purpose because (Inaudible portion.).

5            THE COURT:  Okay.

6            MR. RAETHER:  What I wanted to do was shift

7   this line.  It is Number 54.

8            (Discussion off the record.)

9            MR. RAETHER:  This is really the summary of

10  everything we've agreed to in terms of changes.

11            THE COURT:  Sure.

12            MR. RAETHER:  So what you see is really

13  three categories.  The first are data -- and this is

14  really organized to fit on one slide, but I'm not going

15  to go in the logical order.  I'm going to go in the

16  Chinese, Hebrew order as opposed to the English order

17  and start from the right.

18            Because if you look at what we've done is

19  gone from skip-and-locate, which is contact-and-locate,

20  the non-consumer report product, are all of these data

21  sources that used to be available in Accurint for

22  collections, but these are sources that are being

23  eliminated.

24            Working counter-clockwise --

25            THE COURT:  In this set of bullets, what

1    does subject information mean?

2            MR. RAETHER:  The working --

3            THE COURT:  The second bullet.

4            MR. RAETHER:  That's a good question, and I

5    should know the answer, but I don't.

6            THE COURT:  It doesn't make sense to me.

7            MR. RAETHER:  I don't know.

8            THE COURT:  It's gone.

9            MR. RAETHER:  It's gone.

10           MR. BENNETT:  It's not there.

11           MR. RAETHER:  It's not there.  I could make

12   something up, but I'm not going to.

13           THE COURT:  Okay.

14           MR. RAETHER:  I could use commonsense and

15   make something up, but I won't.  I don't know off the

16   top of my head.

17           THE COURT:  That's fine.

18           MR. RAETHER:  So reduce availability in

19   skip-and-locate, these are the sources that we've

20   reduced the fields that are available.  And then moving

21   up, no longer available to collections at all.  So the

22   gone from skip-and-locate, those are fields and sources

23   that we've moved over to collections-decisioning.

24           The no-longer-available-to-collections,

25   we've eliminated mostly for -- because of contractual

1    reasons or others laws which restrict our ability to

2    make that information available for -- in consumer

3    reports.  So the concession is we can't use this data

4    anymore --

5              THE COURT:  Yes.

6              MR. RAETHER:  -- for collections.

7              THE COURT:  What is FL access?

8              MR. RAETHER:  Florida.  I know that one.

9              That's basically access that happened in

10   Florida.  It's the only state that publically makes

11   available access to that information.

12             THE COURT:  Okay.

13             MR. BENNETT:  The driver -- Privacy

14   Protection Act sort of overlays --

15             MR. RAETHER:  The driver's Privacy

16   Protection Act, although those certifications would

17   still be included with that contact-and-locate file.

18   There are permissible purposes under the PPA that allow

19   collection --

20             MR. BENNETT:  (Inaudible portion.)  You see

21   some reference to them, which is another statute that

22   governs Consumer Privacy, but they have already taken --

23   LexisNexis rather has already taken a fairly aggressive

24   or solid privacy approach for those statutes.

25             THE COURT:  Okay.

1          MR. RAETHER:  But I think the main point,

2    Your Honor, to make is that -- this is a resolve to

3    negotiations, a compromise.  It wasn't as though we just

4    threw something together.  We actually looked at the

5    issues that were being raised by plaintiffs and

6    plaintiffs' counsel, had discussions to make compromise

7    in order to put together a suite of products and

8    services that meet that commonsense test that you

9    articulated earlier.

10          THE COURT:  Okay.

11          MR. RAETHER:  So with respect to the

12    contact-and-locate, I think one of -- it might have been

13    Jim mentioned that -- it was Mike actually, that the

14    contact-and-locate is not a consumer report, so it's not

15    subject to all of the requirements of the Fair Credit

16    Reporting Act.  We did look at the issues that were

17    being raised by plaintiffs in their experiences and

18    decided upon through negotiations of practices that we

19    would agree to as part of the injunctive relief.  So

20    otherwise, we wouldn't be legally obligated to provide

21    these to consumers, but in order to address the issues

22    that were being raised in the complaint, we agreed upon

23    these --

24          THE COURT:  Okay.

25          MR. RAETHER:  -- additional concessions as

1   part of the injunctive relief.  And the first one is

2   that a consumer is able to contact LexisNexis and

3   request a free copy of their contact-and-locate

4   comprehensive report.  So that will enable the consumer

5   to know what's being reported about them in

6   contact-and-locate.  With respect to

7   collections-decisioning, they already have that right

8   under the Fair Credit Reporting Act.  So there's no

9   reason to be redundant.  The other one was to allow the

10  consumers to submit a 100-word statement with respect to

11  a phone number or an address.  And really, there what

12  we're talking about is trying to address the actual

13  issue at hand.  So what we were hearing from plaintiffs'

14  counsel was that consumers were getting calls about

15  debts that didn't belong to them.  And it could be

16  because their phone number was showing up on the actual

17  debtor's report, and so a collection agency was looking

18  at debtor's report, calling this number, and the person

19  answering the phone say, I'm not the Graham that owes

20  this debt.  And so just allowing the consumer to come in

21  and dispute that and fix their report really wouldn't

22  cure the issue because the phone number is showing up on

23  someone else's report.  Likewise, the other scenario --

24  I'm not sure if any of the named plaintiffs encountered

25  it that we've heard about -- is getting a call about a

1  relative that owes a debt.  And that's a technique that
2  is used by debt collectors.  I don't know FTCPA, there
3  might issues there.  But being able to say -- so how do
4  you communicate to the debt collector that I haven't
5  seen my brother in ten years, so stop calling me about
6  my brother's debt.  The traditional FCRA dispute
7  mechanisms wouldn't address that issue.  So I think we
8  came up with something not only that is innovative
9  because no one else is doing it, but more importantly
10  addresses the concerns and the issues raised by the
11  plaintiffs, and that's allowing the consumer to call in
12  and submit a 100-word statement with regard to a
13  specific telephone number or with regard to a specific
14  address.  So the consumer -- it obviously has to deal
15  with the accuracy of that information.  I can't just
16  call in and say -- put something random like what might
17  show up on the internet.  It has to actually relate to,
18  This number does not belong to Ron Raether that lives at
19  such-and-such address.  But the idea is to give debt
20  collectors a means by which to be more efficient in what
21  they do, but also to help consumers.
22            THE COURT:  So if somebody calls up and
23  says, I'm getting a call about my brother, then you bear
24  the burden of figuring out where that appears in your
25  computer system?

```
 1              MR. RAETHER:  What we would do -- they would

 2   call up and say, Number 804-555-1234, that does not

 3   belong to Ron Raether who lives at such-and-such

 4   address.  And what we would do is go into our system and

 5   figure out everywhere that number appears, and when --

 6   I'll show you in a minute how it actually will work.

 7   What the user will do is they can click on a list, they

 8   can search by that number, and when they search by that

 9   number, it will tell them the comments that go along

10   with that number.

11              THE COURT:  Okay.

12              MR. RAETHER:  But that will be available in

13   those places where the collections agency user is

14   accessing that data.

15              THE COURT:  You guys came up with that?

16              That's the change?

17              MR. RAETHER:  We're hoping that it will give

18   us a competitive advantage.

19              MR. BENNETT:  The 100-words -- even though

20   the parties are agreeing that the contact-and-locate is

21   not covered by the FCRA, that 100-word statement is

22   modeled after the Fair Credit Reporting Act.

23              THE COURT:  Right.

24              MR. BENNETT:  But the problem is just as he

25   explained is the relational database, they don't
```

```
 1    maintain data by name because -- (Inaudible portion.)
 2              THE COURT:  Right.
 3              MR. BENNETT:  You understand.
 4              MR. RAETHER:  He is right.  There are
 5    technical reasons as well for why we came up with this
 6    solution, but I think, practically, it more directly
 7    addresses the concerns raised by the plaintiffs.
 8              THE COURT:  All right.
 9              MR. RAETHER:  And there will be a link, and
10    this will appear everywhere on the homepage as well as
11    the search pages, the consumer comments.  And, again,
12    this is just a mock-up.  It isn't actually how it might
13    look, but it's based in concept. (Inaudible portion.)
14              THE COURT:  (Reviewing documents.)
15              MR. RAETHER:  If we can go to the next
16    slide.  What you'll see here is sort of a mesh of steps
17    because, again, we're just mocking this up.  But the
18    user would put in a phone number and an address and
19    click search.  The search results would come up and it
20    would show all of the comments that are relative to that
21    phone number --
22              THE COURT:  Yes.
23              MR. RAETHER:  -- or are relative to that
24    address.
25              In the next screen, the purple (Inaudible
```

1    portion.)

2              And then the other thing that LexisNexis is

3    agreeing to do under the settlement is a series of

4    training and educational events, both with regard to

5    consumers as well -- I mean, with regard to customers,

6    as well as with regard to employees about different

7    products, what is permitted and what is prohibited and

8    how they work.

9              THE COURT:  Are you all negotiating in sort

10   of the nature of those training, is that among the

11   things that you're drilling down on or is that

12   something --

13             MR. BENNETT:  It is one of the things that

14   we have to drill down on in the settlement agreement.

15   It won't be such that we could provide the PowerPoints

16   and the training materials --

17             THE COURT:  Right.

18             MR. BENNETT:  We are -- I understand

19   Mr. Francis, who has a computer discount --

20             MR. FRANCIS:  Contract.

21             MR. BENNETT:  -- contract.

22             As we get to the end of that, I would -- the

23   hugest of the injunctive relief is only by application,

24   not in this PowerPoint, which is all of the

25   credit-decisioning category of reports that -- it's the

 1   ability of the consumer, as Mr. Francis already

 2   highlighted --

 3            THE COURT:  Right.

 4            MR. BENNETT:  -- to make dispute as to the

 5   accuracy of the information.

 6            MR. RAETHER:  So on the

 7   collection-decisioning, obviously, the Fair Credit

 8   Reporting Act requirement.  (Inaudible portion.)

 9            MR. BENNETT:  Find out whose obtained your

10   report.

11            THE COURT:  And so how will a consumer do

12   that?

13            MR. RAETHER:  I --

14            THE COURT:  Presumably, they're not your

15   customer, right?

16            MR. RAETHER:  And so there will be  --

17            THE COURT:  So they won't be on these screen

18   shots, correct?

19            MR. RAETHER:  Well, we're talking about two

20   different products.

21            THE COURT:  Right.  I know.

22            MR. RAETHER:  But it's the one that

23   collection-decisioning that's Fair Credit Reporting Act.

24   On the contact-and-locate, there will be -- we're still

25   in the midst of negotiating and putting together, but

1    there will be a communication plan that goes along with

2    educating and notifying consumers how they submit

3    (Inaudible portion.)

4            With respect to the collection-decisioning,

5    there's a series of requirements that comes under the

6    FCRA about how to publicize the consumers, the

7    availability of certain --

8            THE COURT:  Right.

9            MR. RAETHER:  -- rights or resources.  So

10   there will be a web page, there will be all of the

11   things that you normally see that a consumer reporting

12   agency does that inform the consumers about how they can

13   exercise their rights.

14           MR. BENNETT:  And while the defendant has

15   structured different corporate entities to serve

16   different roles as a family -- or as (Inaudible

17   portion.) would say it's a singular reporting agency --

18   LexisNexis has a very long and deep history of FCRA

19   compliance.  The employment reports that were the

20   subject of Williams, primary insurance product for

21   insurance underwriting is now a LexisNexis product, and

22   there are a number of -- the Banco that I jokingly made

23   about the bankruptcy system, it's a necessary product,

24   so that the categorization is as critical -- or is the

25   most critical component of the implementation.  Once the

1    products have either the category of collection,

2    Accurint, it's treated as a FCRA-governed product that

3    pushes it into a family expertise that (Inaudible

4    portion.)

5             MR. RAETHER:  It really resolves the

6    issue -- (Inaudible portion.)

7             THE COURT:  Right.

8             MR. RAETHER:  -- as if there are other parts

9    of the business that are already know how to comply with

10   the Fair Credit Reporting Act.

11            THE COURT:  Right.  I'm asking that question

12   to see if there's any potential disputes about how

13   that's going to happen.  But it sounds as if you already

14   have a system that the plaintiffs recognize is working

15   and viable and a compliant systems, that's not a list of

16   things that you're going to be discussing down the way

17   necessarily.

18            MR. BENNETT:  As working and viable and

19   compliant as any consumer report.

20            MR. RAETHER:  Well, a lot better than some.

21              (Discussion off the record.)

22            MR. RAETHER:  The last thing I want to deal

23   with, Your Honor, is just so that you understand the

24   timing elements.  I talked earlier about the amount of

25   effort that is going to be required in order to

1   implement this injunctive relief, and they're really

2   listed here in categories.  So the engineering costs,

3   sales, this was the announcement to the market letting

4   them know that those new products are coming, probably

5   the most time-intensive as well as costly endeavor will

6   be to credential --

7           THE COURT:  Right.

8           MR. RAETHER:  -- all of existing customers.

9   So there is a mandated credentialing process under the

10  FCRA so that if we're going to allow these customers

11  access to collection-decisioning, we're going to have to

12  put them through that credentialing process, which can

13  include up to a site visit.

14          THE COURT:  Okay.

15          MR. RAETHER:  But, I think, this is really

16  context for the timeline of implementation that we've

17  talked about.  And so what you're looking at here is the

18  current proposal with regard to the timeline for

19  implementation, and this has -- I can't remember if Len

20  said it here, or it might have been Mike.  We're really

21  talking about an ocean liner, a huge ship, that we're

22  moving, and we're developing a product from scratch,

23  which takes time, and so we're looking at the end of

24  this year for releasing the product.  And, of course,

25  those are end of dates, right.  We're going to wait

1    until December 31st.  This is we're going to get it done

2    by then.

3              THE COURT:  Yes.

4              MR. RAETHER:  Same thing with -- obviously,

5    we can't offer a product to customers until it's

6    available and out there, so new customers will

7    immediately be put on the new product as well as we'll

8    begin to migrate existing customers over to those new

9    products.  And once we have contact-and-locate out

10   there, obviously we'll make the consumer access program

11   rights available immediately upon release of that

12   product.

13             So we're going to have a period in which we

14   have to migrate customers.  I think the last count I had

15   was somewhere around 10,000 customers that are going to

16   need to be migrated over.  I think the number is 6 or

17   7,000 customers that will need to be credentialed.  So

18   we have users and customers that will need trained or

19   will need to be moved over on paper, the contracts.  All

20   of those things will happen, but they will be done by

21   December 31st, 2014.  Those are for the on-line

22   customers.  We also have customers that have their own

23   internal computer systems that they, themselves, have to

24   design and develop and retool in order to work with

25   Accurint.  And so we have to get on their calendars and

1   say, You need to do development if you're going to

2   continue to use our products.  You're going to have to

3   do development of your own software, of your own systems

4   in order to be able to handshake with our system to get

5   the data.  So that's really -- normally, companies start

6   doing that in the fall for the next year.  So if we're

7   talking about approval sometime in the second or third

8   quarter of this year, that means we're going to those

9   customers and getting on their development calendars so

10   that we can be in compliance by June 30th, 2013 --

11   (Inaudible portion.)

12          THE COURT:  Yes.

13          MR. RAETHER:  Obviously, we're doing

14   everything we can, even now, to start working on

15   complying with these deadlines in the settlement

16   agreement.  If we need relief from any of these dates,

17   we have to come to Court and request that in a show

18   cause.  And then finally, the sunset date, which we

19   talked about earlier is going to be either seven years

20   from effective date, but at least until June 30th, 2020.

21   And part of that timing, Your Honor, was to take into

22   account this timetable for implementation.

23          THE COURT:  Okay.

24          MR. RAETHER:  That's the end of my

25   presentation.  I can go back and go into more detail

```
 1    about specifics of some of the reports if you want.

 2              THE COURT:  No, this is -- certainly, having

 3    the information in advance is extremely helpful.  It

 4    sort of allows me to place this in context, so

 5    obviously, you all have worked very hard on this.

 6              And my one sort of logistical question

 7    before we sort of close, which I promise, we will, is

 8    with respect to this information, I'll tell you I don't

 9    see right here any sort of red flags.  I want to be sure

10    that I review it and think hard about it.

11              With the explanations that you have, I've

12    sort of raised the issues that I think would likely come

13    up, that a Judge is always going to look at these

14    issues, which is why I asked about it.  I think any

15    Judge whose is going to sort of put this in a context of

16    a recent decision by the Fourth Circuit, and I think not

17    necessarily completely comparable circumstance, but you

18    all, I think, will have to be able to present that in a

19    way that's easily absorbed and collected for

20    Judge Spencer.

21              I don't like the word decisioning.  I feel

22    absolutely certain that Judge Spencer will not care less

23    one way or the other.  So don't take that as feedback.

24    But I just really can't stand it.  So I'm just going to

25    say it again.
```

1          So the question that I would have is about

2    sort of how this potential timetable as to your business

3    needs fits into what the Court timetable would be for

4    preliminary approval on other issues.  I think you have

5    a date with Judge Spencer this month on the books.  Am I

6    right?  You have something?

7                    (Inaudible portion.)

8          THE COURT:  Right.  Obviously, he needs to

9    know that.  But I'll help sort of communicate those

10   issues, but I think it's still on his books.

11         MR. BENNETT:  (Inaudible portion.)

12         But we would like to get those to you as

13   well.

14         THE COURT:  You mean the actual settlement

15   documents?

16         MR. BENNETT:  Yes, Your Honor.

17         THE COURT:  Right.

18         Those are the key.

19         MR. BENNETT:  The injunctive relief order

20   would be more substantial than an ordinary judgment

21   order.

22         THE COURT:  Right.

23         MR. BENNETT:  One of the things is -- and

24   we're cognizant of the burden that we've put on this

25   Court, and we respect that Your Honor doesn't mind that

1    burden, but it's a burden.  And we are motivated to

2    within fairness and following the Court rules, but still

3    to minimize the burden on the Court -- we're all

4    believers in the settlement, but that's not surprising.

5    We recognize that the rest of the world, the class

6    members, will want to have a voice or are entitled to.

7    I'm lucky in my career to not have been the subject of

8    any objectors in my cases, but that's possible.

9           Still, one of the questions that we have

10   lingered -- or has gone back and forth, we caught this

11   privately or away from here is what can we ask from the

12   Court -- what can we ask from Your Honor to help in our

13   objective of fairly reducing Judge Spencer's work?  So

14   for example, we could have just said, Judge, we have it

15   settled.  Thank you.  We're going to file papers with

16   Judge Spencer.  Our view is that you will be as rigorous

17   as Judge Spencer would be, and thus, you have

18   significant experience with that, obviously.  And so our

19   question is what can we do and within a proper posture,

20   and the reason we kept things from being ex parte is to

21   help with the process of reducing judicial burden.

22          THE COURT:  Right.  Well, I'll tell you that

23   one thing that would help me give you a more firm answer

24   about that, perhaps, is your giving me a more firm sense

25   of timing of when things would be coming to the Court.

1    I won't hide to you that what I will do is talk

2    procedure to Judge Spencer.  He can refer to me anything

3    he wants to or not, but he's the decisioning person

4    there.  I'm sorry, I'll stop.

5                    (Discussion off the record.)

6                    THE COURT:  But if you give me a sense of

7    timing, then I can talk to him, and I mean by

8    preliminary approval, when settlement -- and you don't

9    have to give it to me right now.  This might be a good

10   time for all of us to take a moment, you all to caucus,

11   figure out sort of what you think when the settlement

12   documents will really, really be finished.  And I will

13   say it will be helpful not to say we can do it in 30

14   days and have it really be 60.  If I'm engaging

15   Judge Spencer in a timing issue that's significantly

16   more awkward for me to deal with him with lots of

17   changes than it would be if it's just us.

18                   MR. BENNETT:  (Inaudible portion.)  But we

19   actually have a draft settlement agreement that's being

20   exchanged.

21                   THE COURT:  Okay.

22                   MR. BENNETT:  On our side, we have started

23   working on the -- what we think is more complex

24   injunctive relief order, and that will -- that expresses

25   all that you've seen here.

1          THE COURT:  Right, which strikes me as no

2  small feat, I mean, getting that written down.

3          MR. BENNETT:  Right, right.

4              (Inaudible portion.)

5          THE COURT:  Well, also everybody is not

6  available on a dime.

7              (Inaudible portion.)

8            (Discussion off the record.)

9          MR. BENNETT:  It would be fair even if we

10  say -- I mean, I think the belief is that it's 30 days.

11          THE COURT:  30 days for submitting

12  settlement --

13          MR. BENNETT:  Submitting --

14          THE COURT:  -- and the potential injunctive

15  relief.

16          MR. CADDELL:  Why don't we say by the end of

17  February?  End of February, that's 45 days.  That would

18  be preliminary approval motion, we've got to have a form

19  of notice for the (b)(3) class.  We need to flesh out

20  the notice program for the (b)(2) --

21          MR. BENNETT:  Which is pretty far along

22  already.

23          MR. CADDELL:  Right.

24          MR. BENNETT:  Right.  That in --

25              (Discussion off the record.)

1          THE COURT:  All right.  Well, that's

2    important information for me to have.  And then what I

3    would like is just an opportunity to make sure I sit on

4    this, remember what I forgot to ask you about.  I'm a

5    chart person; I think I've reviewed all the charts that

6    were ably prepared on my behalf.  Obviously, you all

7    have been working on this.  I think that's reflected in

8    the documents that you're presenting.

9          This does strike me -- you know, my gut

10   commonsense response is this strikes me as a fair

11   settlement, and ultimately, that's where these things

12   go.  But you have a lot of steps to talk about along the

13   way.  And so there's nothing other than what I've

14   already asked you about that gives me any pause or

15   concern.

16         So why don't you let me be sure that I have

17   some time to speak with Judge Spencer, see what his

18   procedural preference is, and then maybe we can have a

19   conference call so that you can know that before the end

20   of February and then prepare your documents accordingly.

21         All right.

22         MR. McCABE:  And, Your Honor, obviously, if

23   you have any questions, if upon reflection, there are

24   other things, we are more than happy to come back.

25         THE COURT:  Right.

1        MR. CADDELL:  We're happy to do whatever the

2   Court wants to feel comfortable, that you have

3   thoroughly reviewed everything vetted in (Inaudible

4   portion.)

5        I think since the (b)(2) settlement does not

6   require formal notice, but we will be doing program --

7   since the (b)(3) settlement will be direct mail notice

8   to 31,000 people, I would anticipate the notice campaign

9   to be about 60-day period after preliminary approval.

10  So it could move pretty quickly.  We're not talking

11  about millions of people to get direct notice and then

12  have to make claims and things like that.

13       THE COURT:  Right.

14       MR. CADDELL:  You could actually -- if we

15  got preliminary approval in early March, you could look

16  at a fairness hearing in May, for example, or something

17  like that.

18       MR. BENNETT:  90 days.

19       MR. CADDELL:  Okay.

20          (Discussion off the record.)

21       THE COURT:  In all of that, you all are

22  talking about your implementation procedures, but you

23  see this as a dual-track process, right?  So it's not as

24  if you're saying that December 31st is when this begins?

25       UNKNOWN SPEAKER:  Judge, there is work

```
 1    underway right now.
 2                THE COURT:  Right.
 3                     (Inaudible portion.)
 4                THE COURT:  Okay.  So that's part of my
 5    question, is there will be a period of time where you
 6    will have some folks using Accurint and some people
 7    operating -- or at least beginning to operate under a
 8    new contractural basis for the --
 9                UNKNOWN SPEAKER:  And that will commence
10    before the end of December.
11                     (Inaudible portion.)
12                THE COURT:  Well --
13                MR. CADDELL:  And obviously Len can speak
14    for us.
15                THE COURT:  I never do things by phone call.
16    You guys know that.
17                Well, that's -- I appreciate that.
18                Really, this has not been overly burdensome.
19    I see it as my opportunity and job to have this process
20    go as smoothly as possible for you all and for
21    Judge Spencer.  So to the extent I can review things and
22    make sure I understand them, and then whatever -- he's
23    obviously going to go through the process independently,
24    but to the extent that there are any issues that you can
25    work out where he doesn't have to mired in any of the
```

 1   details, I have no problem with that at all.  So I'll do

 2   as much or as little of that as he's comfortable with.

 3   And the same would be true with you all.  I don't feel a

 4   need to -- I mean, it's actually great to see you all.

 5   I feel as if I've heard and read about you and talked to

 6   you enough times that it's actually good to put faces to

 7   the names, and I appreciate your taking the opportunity

 8   to come here because I like it better.  I think it's a

 9   more interesting process, and I can tell you personally

10   that I think you all have worked something out that is

11   very difficult.  I do think it is a sea change and a

12   good one and a thoughtfully conducted one.  On behalf of

13   sets of individuals involved, this does strike me both

14   as a set of circumstances where you all have worked hard

15   to see what's fair, to give up on some things you may

16   not wish to have given up on, but then also sort of

17   seeing the horizon, the commonsensible approach that's

18   going to have to come at one point or another, and it

19   would not be exactly what everybody wants.  And so I

20   think you've worked very hard, and it's evident in what

21   you're presenting to me, and I think it will be quite

22   evident to Judge Spencer, too.  So I appreciate your

23   allowing me to say that to you personally, but also sort

24   give-and-take.  That is a better one for me as a member

25   of the Court system.

```
 1                    (Inaudible portion.)

 2              THE COURT:  Well, I'm happy to do that.

 3   Also, I'm happy that you all are patient that I actually

 4   take time to read through things.  As you know, any

 5   month is already booked up through June for now for me.

 6   I'm sure for you all, too.  And so the changes need for

 7   you all to build in the time to allow Lorie Ann work to

 8   death in between and then me do a little work afterward.

 9   So it's a give-and-take that, I think, is helpful to all

10   of us.  So I appreciate it.

11              MR. CADDELL:  Thank you, Your Honor.

12              THE COURT:  Thank you.

13              I think we're done.  Do you all think so,

14   too?

15              MR. CADDELL:  Yes, Your Honor.

16              Thank you.

17              THE LAW CLERK:  All rise.

18              This Court stands in recess.

19           (Proceedings concluded at 5:35 p.m.)

20

21

22

23

24

25
```

CERTIFICATE OF COURT REPORTER

I, Donna K. Soutter, do hereby certify that I transcribed a recording provided by Consumer Litigations Associates, P.C., of the proceedings heard in the United States Court for the Eastern District of Virginia, in the captioned cause, heard by the Honorable M. Hannah Lauck, Judge of said Court, on Monday, January 14th, 2013.

I further certify that the foregoing transcript of said proceedings constitutes a true, accurate, and complete transcript of said proceedings to the best of my knowledge and ability.

Given under my hand and notarial seal at Culpeper, Virginia, this 14th day of February, 2013.

/s/

_____

Donna K. Soutter,

Notary Public No. 357093

Commonwealth of Virginia at Large

**$**

**$10** [1] - 40:7
**$10,000** [2] - 31:8, 80:24
**$136,658** [1] - 30:21
**$25,000** [1] - 31:9
**$416,200** [1] - 30:21
**$450,000** [1] - 80:23
**$5,000** [1] - 57:10

**/**

**/s** [1] - 140:18

**1**

**1** [1] - 40:7
**1-A** [2] - 2:6, 3:20
**10** [1] - 4:22
**10,000** [1] - 128:15
**100** [3] - 2:13, 40:23, 50:21
**100,000,000** [2] - 13:22, 53:15
**100-word** [4] - 38:8, 119:10, 120:12, 121:21
**100-words** [1] - 121:19
**1001** [1] - 4:6
**1070** [1] - 2:22
**112-A** [1] - 3:5
**1122** [1] - 4:7
**13-and-a-half-million -dollar** [1] - 56:23
**13.5** [2] - 60:5, 60:18
**1331** [1] - 2:21
**14** [2] - 1:17, 111:22
**14th** [3] - 43:15, 140:9, 140:15
**15** [2] - 90:9, 91:9
**1681(b** [2] - 69:13
**18** [1] - 44:8
**1800** [1] - 3:12
**19110** [1] - 2:15
**1993** [1] - 44:6
**1999** [1] - 81:3
**19th** [1] - 27:11

**2**

**20** [2] - 67:19, 97:9
**20,000** [1] - 111:23
**20-thousand** [1] - 91:10
**200** [1] - 40:23
**2003** [1] - 7:16
**2005** [1] - 82:14
**2006** [1] - 43:16

**2008** [3] - 24:18, 85:10, 86:2
**2009** [1] - 33:10
**2010** [1] - 27:15
**2012** [1] - 102:25
**2013** [4] - 1:17, 129:10, 140:9, 140:15
**2014** [1] - 128:21
**2020** [1] - 129:20
**215** [1] - 2:16
**21st** [1] - 27:10
**22314** [1] - 3:14
**227-3700** [1] - 4:24
**23(b)(3** [1] - 63:10
**23(c** [1] - 104:11
**23(e** [2] - 102:6, 103:7
**23(f** [3] - 17:13, 41:13, 62:16
**23(f)** [1] - 62:18
**23219** [1] - 4:8
**23601** [2] - 2:7, 3:21
**23803-3212** [1] - 3:6
**25** [2] - 57:3, 57:10
**268-7011** [1] - 4:16
**273-7770** [1] - 3:15
**2:00** [1] - 1:18
**2:17** [1] - 5:2

**3**

**3** [1] - 53:21
**30** [4] - 57:1, 133:13, 134:10, 134:11
**30th** [2] - 129:10, 129:20
**31** [1] - 38:24
**31,000** [1] - 136:8
**31st** [3] - 128:1, 128:21, 136:24
**357093** [1] - 140:21
**3:11-cv-00754** [1] - 5:8
**3:11-CV-00754-JRS** [1] - 1:7
**3:42** [1] - 64:1
**3:51** [1] - 64:2

**4**

**4** [1] - 53:21
**415** [1] - 4:16
**425** [1] - 4:14
**45** [3] - 30:20, 89:25, 134:17
**45402** [1] - 4:23
**49** [2] - 84:3, 84:6

**5**

**5** [4] - 27:2, 40:7,

53:25, 91:9
**5-and-a-half** [2] - 50:7, 50:14
**5.5** [1] - 52:18
**50** [2] - 75:18, 75:21
**500** [1] - 4:21
**54** [1] - 115:7
**5:35** [1] - 139:19

**6**

**6** [1] - 128:16
**6-point-some** [1] - 52:2
**60** [1] - 133:14
**60-day** [1] - 136:9
**600** [1] - 3:13
**604(b** [6] - 70:11, 70:15, 70:16, 71:15, 71:17, 71:23
**604(b)** [3] - 68:18, 69:24, 71:13
**697-5410** [1] - 4:9

**7**

**7,000** [1] - 128:17
**703** [1] - 3:15
**713** [1] - 2:24
**735-8600** [2] - 2:16
**75** [1] - 44:8
**751-0400** [1] - 2:24
**757** [2] - 2:8, 3:22
**763** [2] - 2:5, 3:19
**77010** [1] - 2:23

**8**

**8** [1] - 53:23
**804** [2] - 3:7, 4:9
**804-555-1234** [1] - 121:2
**83** [1] - 26:7
**861-6000** [1] - 3:7

**9**

**9/11** [1] - 34:21
**90** [1] - 136:18
**90-word** [1] - 68:20
**930-3660** [1] - 2:8
**930-3662** [1] - 3:22
**937** [1] - 4:24
**94105-2482** [1] - 4:15

**A**

**abbreviated** [1] - 7:4
**abductions** [1] - 75:5
**abductors** [1] - 75:6

**ability** [4] - 52:7, 117:1, 124:1, 140:13
**able** [21] - 29:12, 29:15, 38:2, 38:7, 38:10, 41:12, 55:3, 55:6, 66:13, 69:3, 70:3, 73:4, 89:25, 90:5, 90:9, 103:3, 103:8, 119:2, 120:3, 129:4, 130:18
**ably** [1] - 135:6
**absent** [1] - 49:2
**absolutely** [1] - 130:22
**absorbed** [1] - 130:19
**acceded** [1] - 114:3
**accept** [2] - 28:17, 49:11
**access** [9] - 45:20, 105:10, 106:16, 111:10, 117:7, 117:9, 117:11, 127:11, 128:10
**accessing** [1] - 121:14
**accomplish** [1] - 48:4
**accomplished** [4] - 42:3, 90:2, 90:20, 100:12
**accordingly** [2] - 76:17, 135:20
**account** [6] - 24:11, 71:15, 74:16, 77:24, 86:20, 129:22
**accounts** [2] - 82:15, 82:18, 83:7
**accuracy** [8] - 38:12, 54:10, 54:12, 54:15, 55:2, 93:3, 120:15, 124:5
**accurate** [4] - 19:15, 28:19, 89:9, 140:12
**accurint** [1] - 74:24
**Accurint** [68] - 15:1, 17:3, 17:20, 18:13, 24:22, 25:3, 29:21, 30:9, 36:10, 36:14, 37:1, 37:3, 37:5, 37:7, 37:20, 37:22, 38:8, 42:6, 42:7, 43:15, 44:14, 45:2, 54:21, 65:3, 65:19, 66:23, 67:25, 68:3, 68:12, 69:9, 73:23, 74:15, 74:25, 75:21, 76:11, 76:13, 76:15, 76:17, 77:2, 79:1, 82:9, 82:18, 82:22, 82:23, 83:15, 83:18, 83:21, 83:22, 83:24, 86:7, 86:16, 86:20,

88:18, 89:2, 91:16, 92:16, 92:17, 106:24, 107:18, 109:5, 110:8, 110:19, 111:11, 115:21, 126:2, 128:25, 137:6
**accustomed** [1] - 91:16
**achieve** [5] - 34:10, 34:12, 40:9, 40:10, 41:12
**achieved** [1] - 41:19
**acknowledged** [1] - 108:13
**acknowledgement** [2] - 49:15, 103:5
**acquired** [1] - 29:20
**Act** [33] - 7:7, 7:14, 12:24, 15:20, 16:9, 16:10, 16:23, 17:23, 20:16, 20:21, 25:23, 28:23, 38:10, 40:15, 53:16, 57:14, 67:18, 76:17, 82:12, 82:14, 94:9, 94:11, 95:1, 99:23, 103:20, 117:14, 117:16, 118:16, 119:8, 121:22, 124:8, 124:23, 126:10
**act** [1] - 55:2
**Action** [1] - 5:8
**action** [7] - 7:12, 15:23, 51:14, 55:13, 66:4, 100:3, 101:16
**actions** [1] - 59:6
**active** [3] - 65:15, 113:2, 114:15
**actively** [1] - 67:25
**actor** [1] - 67:7
**actors** [1] - 67:11
**acts** [1] - 56:7
**actual** [10] - 14:25, 24:8, 43:10, 44:12, 44:13, 44:16, 66:9, 119:12, 119:16, 131:14
**ad** [1] - 47:8
**Adams** [20] - 17:19, 18:15, 18:22, 21:23, 23:17, 23:19, 24:18, 24:19, 24:20, 24:21, 35:19, 54:20, 55:14, 70:24, 70:25, 84:18, 85:23, 92:15, 107:20
**Adams'** [1] - 54:18
**add** [2] - 9:12, 46:14
**add-ons** [1] - 46:14
**addition** [2] - 52:9,

82:13

**additional** [2] - 99:8, 118:25

**Address** [1] - 30:17

**address** [27] - 17:15, 20:6, 20:9, 22:11, 34:14, 35:7, 35:13, 39:19, 48:12, 57:18, 59:16, 72:25, 74:11, 79:16, 80:12, 91:7, 97:18, 104:25, 118:21, 119:11, 119:12, 120:7, 120:14, 120:19, 121:4, 122:18, 122:24

**addressed** [4] - 17:9, 34:8, 35:6, 91:24

**addresses** [6] - 19:20, 32:11, 57:20, 75:19, 120:10, 122:7

**addressing** [2] - 36:13, 90:14

**adequacy** [3] - 63:6, 63:8, 64:21

**adequate** [2] - 33:21, 64:15

**administration** [2] - 59:12, 60:25

**admit** [3] - 95:21, 95:22, 96:2

**admitted** [1] - 16:8

**admittedly** [1] - 15:19

**adopts** [1] - 67:16

**adults** [1] - 44:8

**advance** [1] - 130:3

**advanced** [1] - 88:8

**advantage** [2] - 8:11, 121:18

**advantages** [1] - 11:23

**adverse** [1] - 38:17

**advertise** [1] - 29:8

**advertisements** [1] - 43:24

**advice** [1] - 73:17

**advised** [2] - 21:7, 82:20

**advocates** [1] - 56:5

**advocating** [1] - 87:7

**affect** [2] - 44:18, 44:19

**affected** [1] - 15:23

**afforded** [2] - 40:14, 103:25

**afraid** [2] - 41:10, 41:16

**afternoon** [7] - 11:10, 12:13, 12:20, 64:7, 64:8, 89:16, 89:17

**Age** [1] - 30:20

**agencies** [14] - 69:14, 75:2, 81:13, 82:13, 82:17, 84:7, 86:8, 86:9, 86:15, 86:19, 86:21, 89:3, 92:14

**agency** [7] - 51:17, 71:24, 94:3, 119:17, 121:13, 125:12, 125:17

**agenda** [1] - 6:9

**aggregate** [1] - 114:24

**aggregation** [1] - 75:14

**aggressive** [1] - 117:23

**ago** [3] - 33:7, 34:17, 40:17

**agree** [9] - 9:13, 26:2, 52:17, 54:13, 98:18, 118:19

**agreed** [22] - 8:8, 10:14, 16:13, 21:1, 23:7, 34:17, 36:12, 36:22, 48:21, 50:3, 50:4, 50:7, 56:25, 57:2, 57:23, 59:9, 59:13, 64:15, 96:17, 100:17, 115:10, 118:22

**agreeing** [7] - 48:4, 78:7, 93:9, 93:12, 93:14, 121:20, 123:3

**agreement** [18] - 7:2, 9:13, 10:13, 13:12, 22:21, 23:8, 42:14, 45:5, 45:18, 46:18, 46:22, 47:1, 56:25, 57:4, 96:25, 123:14, 129:16, 133:19

**agrees** [2] - 45:1, 64:14

**ahead** [2] - 110:6, 110:8

**airplane** [2] - 81:18

**al** [4] - 1:5, 1:11, 5:9, 5:10

**Alaska** [1] - 97:10

**alert** [1] - 45:15

**Alexandria** [1] - 3:14

**allege** [5] - 36:6, 36:8, 42:7, 42:9, 44:12

**alleged** [1] - 67:1

**ALLEN** [1] - 2:19

**allow** [6] - 98:24, 102:1, 117:18, 119:9, 127:10, 139:7

**allowed** [1] - 109:12

**allowing** [4] - 102:20, 119:20, 120:11,

138:23

**allows** [4] - 74:2, 81:21, 101:25, 130:4

**alluded** [1] - 54:17

**allusions** [1] - 14:24

**almost** [4] - 31:3, 42:2, 99:5, 99:6

**altogether** [1] - 76:5

**ambiguity** [1] - 69:1

**ambiguous** [1] - 88:20

**amenable** [1] - 66:1

**amendment** [1] - 102:23

**amendments** [1] - 70:1

**amount** [10] - 50:17, 76:1, 79:21, 101:22, 110:12, 110:21, 110:22, 111:1, 126:24

**amounts** [1] - 21:5

**analysis** [2] - 22:23, 67:20

**ANALYTICS** [1] - 1:9

**analyze** [1] - 102:6

**anecdote** [1] - 74:5

**Ann** [1] - 139:7

**announcement** [1] - 127:3

**answer** [5] - 21:17, 48:8, 68:12, 116:5, 132:23

**answering** [1] - 119:19

**answers** [1] - 52:8

**antecedent** [1] - 68:22

**ANTHONY** [10] - 2:3, 4:3, 6:10, 7:20, 9:17, 9:25, 11:15, 11:19, 12:1, 104:8

**Anthony** [9] - 5:13, 6:10, 6:25, 39:22, 39:23, 48:10, 49:10, 104:4, 104:7

**Anthony's** [1] - 103:3

**anticipate** [3] - 5:20, 45:22, 136:8

**apart** [1] - 87:3

**Appeal** [3] - 17:13, 41:13, 68:10

**appear** [2] - 41:22, 122:10

**appeared** [2] - 18:22, 28:15

**application** [3] - 68:11, 73:19, 123:23

**applications** [4] - 70:8, 70:9, 75:11

**applied** [2] - 69:9, 88:4

**applies** [1] - 73:19

**apply** [5] - 46:12, 62:14, 65:20, 87:20, 96:9

**applying** [2] - 95:8, 95:9

**appreciate** [10] - 13:16, 37:4, 43:3, 47:11, 88:11, 95:23, 137:17, 138:7, 138:22, 139:10

**appreciated** [3] - 16:1, 16:5, 17:6

**approach** [5] - 32:24, 33:3, 90:12, 117:24, 138:17

**appropriate** [9] - 12:8, 17:9, 17:15, 21:20, 22:12, 23:2, 41:10, 59:19, 98:16

**appropriately** [1] - 29:3

**approval** [14] - 8:25, 43:17, 59:17, 61:14, 89:8, 101:24, 101:25, 102:13, 129:7, 131:4, 133:8, 134:18, 136:9, 136:15

**approve** [1] - 11:3

**approved** [4] - 74:14, 83:9, 101:7, 102:7

**April** [1] - 41:15

**area** [7] - 12:25, 14:2, 45:10, 48:6, 49:2, 113:9, 113:22

**areas** [1] - 20:20

**argue** [2] - 42:19, 52:15

**argued** [2] - 24:22, 48:5

**arguing** [1] - 7:9

**argument** [10] - 27:2, 29:24, 31:3, 49:1, 49:3, 49:6, 51:14, 70:13, 108:3, 114:2

**arguments** [1] - 48:15

**ARTHUR** [1] - 2:10

**articulate** [1] - 40:2

**articulated** [2] - 62:2, 118:9

**aside** [3] - 64:12, 90:3, 101:2

**aspects** [1] - 8:4

**assert** [3] - 48:25, 49:1, 66:6

**asserts** [1] - 68:5

**assess** [1] - 72:10

**asset** [1] - 72:7

**assets** [1] - 13:19

**assigned** [1] - 18:1

**assistance** [2] - 11:21, 13:7

**associated** [1] - 40:3

**ASSOCIATES** [2] - 3:11, 3:18

**Associates** [2] - 2:4, 140:5

**association** [1] - 56:5

**assuming** [2] - 54:13, 115:2

**asterisk** [1] - 42:12

**astonishing** [1] - 88:1

**attempt** [4] - 7:9, 37:21, 94:25, 113:24

**attempting** [1] - 7:17

**attention** [2] - 8:18, 37:18

**attorneys** [1] - 27:13

**attorneys'** [7] - 35:7, 50:6, 50:8, 52:18, 56:24, 61:6

**August** [1] - 102:25

**authority** [6] - 40:12, 40:13, 66:13, 68:9, 85:10, 88:1

**authorized** [5] - 68:18, 69:12, 69:24, 82:19, 106:20

**auto** [1] - 19:21

**automated** [1] - 99:8

**automatic** [1] - 108:4

**availability** [2] - 116:18, 125:7

**available** [25] - 36:1, 61:9, 75:15, 75:18, 81:8, 85:15, 87:9, 87:12, 92:9, 96:11, 96:12, 99:11, 101:16, 109:10, 114:11, 115:21, 116:20, 116:21, 116:24, 117:2, 117:11, 121:12, 128:6, 128:11, 134:6

**Average** [1] - 30:20

**average** [2] - 30:21, 31:9

**avoid** [2] - 43:1, 113:16

**avoiding** [1] - 113:12

**awake** [1] - 88:22

**awards** [1] - 57:10

**aware** [6] - 11:19, 37:9, 43:18, 45:19, 61:4, 86:17

**awkward** [1] - 133:16

# B

**b)(2** [6] - 15:8, 43:12, 43:18, 134:20, 136:5
**b)(3** [3] - 15:9, 134:19, 136:7
**b)(3)** [1] - 15:8
**background** [7] - 7:24, 15:21, 30:9, 77:8, 78:15, 78:18, 89:5
**balance** [3] - 59:15, 89:7, 109:8
**ball** [1] - 100:19
**Banco** [1] - 125:22
**bankrupt** [1] - 109:12
**bankruptcies** [2] - 35:25, 107:23
**bankruptcy** [11] - 19:21, 42:4, 42:5, 51:18, 51:20, 51:23, 51:24, 90:25, 108:3, 108:8, 125:23
**banner** [1] - 43:24
**barrier** [1] - 58:25
**base** [2] - 58:13, 101:6
**based** [5] - 28:16, 49:3, 71:12, 96:23, 122:13
**basic** [1] - 104:22
**basis** [2] - 85:25, 137:8
**bat** [1] - 26:23
**battle** [1] - 49:16
**bear** [5] - 96:16, 96:18, 115:2, 120:23
**bear-on** [1] - 96:16
**beautiful** [1] - 48:1
**become** [5] - 29:1, 38:5, 45:4, 63:12, 96:5
**becomes** [1] - 68:7
**bedded** [1] - 63:6
**BEFORE** [1] - 1:14
**began** [4] - 5:2, 34:1, 34:8, 34:11
**begin** [2] - 61:18, 128:8
**beginning** [2] - 9:14, 137:7
**begins** [2] - 96:5, 136:24
**behalf** [5] - 6:22, 20:25, 64:11, 135:6, 138:12
**BEHALF** [3] - 2:2, 3:2, 4:2
**behind** [1] - 23:8
**belabor** [3] - 26:10, 93:1, 106:15

**belief** [3] - 37:12, 63:7, 134:10
**believers** [1] - 132:4
**belong** [3] - 119:15, 120:18, 121:3
**benefit** [13] - 35:17, 36:4, 53:9, 53:11, 53:16, 54:5, 54:17, 55:24, 90:6, 103:18, 103:23
**benefits** [2] - 89:7, 103:18
**BENNETT** [71] - 2:3, 5:16, 5:21, 6:24, 8:23, 10:11, 11:2, 11:23, 12:2, 12:11, 12:15, 22:3, 23:9, 26:14, 26:25, 27:5, 39:7, 41:22, 47:16, 47:24, 49:19, 49:24, 50:23, 51:5, 52:24, 56:2, 58:21, 61:10, 63:1, 81:24, 88:24, 94:2, 94:13, 94:23, 97:2, 99:3, 101:17, 104:4, 106:7, 108:12, 111:3, 112:16, 112:19, 112:24, 114:1, 114:15, 116:10, 117:13, 117:20, 121:19, 121:24, 122:3, 123:13, 123:18, 123:21, 124:4, 124:9, 125:14, 126:18, 131:11, 131:16, 131:19, 131:23, 133:18, 133:22, 134:3, 134:9, 134:13, 134:21, 134:24, 136:18
**Bennett** [13] - 5:11, 17:24, 33:8, 33:12, 39:23, 41:12, 48:10, 48:14, 57:3, 57:5, 79:6, 79:7, 106:4
**bENNETT** [1] - 23:1
**BERRY** [1] - 1:4
**Berry** [7] - 5:9, 18:16, 21:12, 23:24, 24:17, 36:6
**best** [8] - 21:18, 30:14, 40:17, 41:23, 48:6, 57:21, 113:7, 140:13
**better** [8] - 31:11, 40:11, 40:13, 41:18, 41:20, 126:20, 138:8, 138:24
**between** [5] - 33:16,

34:9, 35:15, 79:20, 139:8
**beyond** [7] - 14:20, 20:5, 94:24, 103:15, 103:24, 104:14
**big** [8] - 13:8, 19:14, 25:6, 27:11, 42:14, 44:25, 82:7, 103:22
**big-picture** [1] - 19:14
**billable** [1] - 95:4
**billion** [1] - 52:2
**billions** [1] - 50:20
**bit** [9] - 12:25, 17:23, 26:10, 36:25, 60:20, 77:7, 96:9, 96:14, 96:22
**blaming** [1] - 28:20
**block** [1] - 107:4
**blow** [1] - 9:21
**blue** [5] - 48:1, 106:4, 106:5, 109:16, 109:17
**booked** [1] - 139:5
**books** [2] - 131:5, 131:10
**boom** [1] - 103:20
**bottom** [3] - 30:15, 42:13, 85:1
**Boulevard** [2] - 2:5, 3:19
**Box** [1] - 4:7
**box** [2] - 106:19, 107:22
**branch** [1] - 66:7
**breach** [2] - 82:15, 86:17
**break** [1] - 63:10
**brief** [5] - 17:7, 53:4, 68:20, 70:24, 70:25
**briefing** [1] - 62:1
**briefings** [1] - 35:19
**briefly** [1] - 56:13
**briefs** [1] - 70:23
**bright** [1] - 46:6
**bring** [6] - 20:25, 29:1, 55:3, 55:7, 55:9, 55:13
**broad** [4] - 19:12, 36:7, 36:24, 38:15
**Broad** [1] - 2:13
**broader** [1] - 72:19
**broadly** [1] - 62:5
**brother** [2] - 120:5, 120:23
**brother's** [1] - 120:6
**brought** [2] - 37:18, 70:4
**brunt** [1] - 42:6
**bucket** [1] - 90:22
**build** [8] - 46:4, 92:17,

92:19, 92:20, 92:23, 111:22, 111:23, 139:7
**Building** [2] - 2:12, 4:5
**building** [3] - 45:22, 90:25, 91:2
**built** [2] - 45:21, 97:21
**bulk** [1] - 6:20
**bullet** [4] - 44:25, 48:20, 49:17, 116:3
**bullets** [1] - 115:25
**bunch** [1] - 73:18
**bundles** [1] - 78:7
**burden** [8] - 63:14, 98:20, 120:24, 131:24, 132:1, 132:3, 132:21
**burdensome** [1] - 137:18
**Burr** [1] - 66:25
**business** [18] - 13:11, 13:14, 13:15, 14:22, 36:23, 41:19, 43:23, 45:23, 50:6, 53:22, 77:25, 78:11, 78:18, 82:24, 95:14, 109:16, 126:9, 131:2
**businesses** [1] - 74:1
**buy** [2] - 74:6, 94:6
**buyers** [1] - 94:13
**buying** [6] - 72:11, 86:19, 86:21, 87:2, 94:4, 95:14
**BY** [1] - 12:18

# C

**Caddell** [11] - 5:12, 5:22, 5:24, 6:6, 7:11, 7:17, 12:19, 49:10, 76:12, 84:18, 104:10
**CADDELL** [73] - 2:19, 2:20, 12:19, 16:20, 16:25, 17:5, 18:3, 18:19, 19:10, 19:12, 21:14, 21:25, 22:4, 22:7, 23:10, 23:22, 24:3, 24:15, 26:9, 28:10, 30:19, 31:21, 31:24, 32:6, 32:9, 32:12, 32:16, 32:21, 33:5, 35:3, 36:5, 38:25, 39:2, 39:9, 40:24, 41:2, 41:4, 41:6, 42:21, 46:10, 46:16, 46:25, 47:3, 47:11, 50:1, 50:13, 50:16, 53:7, 53:25, 55:17, 56:13, 58:3, 58:6, 58:10, 58:13,

58:16, 58:20, 59:2, 60:5, 60:9, 60:16, 60:19, 60:23, 61:2, 63:18, 134:16, 134:23, 136:1, 136:14, 136:19, 137:13, 139:11, 139:15
**Caddell's** [1] - 27:1
**calendars** [2] - 128:25, 129:9
**California** [2] - 4:15, 90:21
**campaign** [2] - 60:11, 136:8
**candidly** [1] - 48:8
**cannot** [2] - 40:8, 67:17
**cap** [2] - 57:2, 57:9
**Capacity** [1] - 39:7
**capacity** [3] - 20:19, 39:4, 39:8
**captioned** [1] - 140:7
**capture** [1] - 94:21
**captured** [1] - 84:14
**car** [1] - 73:3
**card** [2] - 72:12, 74:7
**cards** [1] - 71:16
**care** [2] - 26:15, 130:22
**career** [4] - 41:24, 42:1, 132:7
**careful** [1] - 23:15
**carries** [1] - 66:11
**carve** [1] - 7:5
**Case** [1] - 1:6
**case** [99] - 7:3, 7:11, 7:15, 7:22, 7:25, 8:5, 14:15, 15:12, 15:17, 15:18, 15:22, 15:25, 16:1, 17:6, 17:10, 17:11, 17:14, 17:16, 17:17, 17:18, 17:19, 17:25, 18:5, 18:6, 18:8, 18:10, 18:11, 18:14, 18:16, 18:22, 18:24, 20:12, 20:25, 21:12, 22:18, 23:13, 23:14, 23:16, 23:17, 24:7, 24:12, 24:13, 24:18, 24:19, 24:20, 24:21, 26:12, 28:11, 28:15, 29:13, 33:1, 33:11, 33:14, 34:2, 34:7, 34:25, 35:20, 36:7, 41:10, 41:11, 41:18, 42:2, 43:22, 51:17, 54:20, 55:3, 55:7, 55:9, 61:15, 61:17, 62:15, 63:15,

64:24, 64:25, 65:22, 66:16, 67:2, 67:3, 67:9, 67:24, 68:5, 68:25, 69:2, 73:18, 83:5, 83:25, 84:20, 85:24, 86:6, 87:17, 88:14, 88:17, 92:11, 99:25, 102:24, 103:15
**cases** [10] - 18:15, 18:21, 23:2, 24:9, 25:5, 29:1, 47:5, 68:23, 69:8, 133:2
**cash** [3] - 58:7, 59:7, 60:21
**cashed** [1] - 59:23
**catch** [1] - 63:10
**catches** [1] - 58:24
**categories** [6] - 36:7, 36:8, 36:9, 38:16, 115:13, 127:2
**categorization** [1] - 125:24
**category** [5] - 36:24, 38:22, 99:4, 123:25, 126:1
**caucus** [1] - 133:10
**caught** [1] - 132:10
**caused** [2] - 42:9, 55:14
**causes** [1] - 55:8
**cell** [1] - 79:17
**census** [2] - 80:19, 97:19
**Center** [1] - 34:20
**certain** [13] - 10:14, 14:9, 22:22, 65:8, 71:7, 71:8, 82:24, 92:1, 96:16, 96:21, 96:25, 125:7, 130:22
**certainly** [6] - 8:24, 23:9, 42:16, 59:18, 104:24, 130:2
**certifiable** [1] - 66:10
**certificate** [1] - 25:17
**CERTIFICATE** [1] - 140:1
**certification** [2] - 61:20, 98:13
**certifications** [2] - 93:8, 117:16
**certified** [3] - 17:13, 22:16, 41:12
**certify** [6] - 29:25, 39:15, 62:6, 99:25, 140:3, 140:10
**challenge** [2] - 22:19, 42:17
**change** [15] - 13:13, 13:15, 13:24, 14:1,

36:17, 36:23, 40:8, 51:15, 51:23, 52:1, 55:25, 101:4, 103:22, 121:16, 138:11
**changed** [5] - 42:4, 51:25, 105:12, 108:19, 108:20
**changes** [15] - 7:14, 8:8, 13:11, 14:25, 27:20, 27:23, 27:24, 41:20, 45:24, 45:25, 82:23, 105:2, 115:10, 133:17, 139:6
**changing** [4] - 45:20, 45:21, 91:1, 100:15
**CHAPMAN** [1] - 2:20
**Chapman** [1] - 5:24
**character** [1] - 20:19
**characteristic** [5] - 20:17, 31:15, 45:6, 71:5, 72:21
**characteristics** [3] - 39:6, 96:15, 96:19
**characterization** [2] - 84:24, 98:19
**characterized** [1] - 92:3
**characterizing** [1] - 87:14
**characters** [1] - 6:4
**charged** [1] - 51:10
**charging** [1] - 51:2
**chart** [1] - 135:5
**charts** [1] - 135:5
**chats** [1] - 12:14
**check** [11] - 57:12, 58:2, 58:4, 58:6, 58:7, 58:17, 58:18, 59:5, 59:7, 86:11, 107:25
**checked** [1] - 109:11
**checks** [2] - 59:23, 60:21
**cheer** [1] - 27:1
**child** [3] - 72:15, 75:5
**Chinese** [1] - 115:16
**choice** [6] - 65:25, 66:6, 79:22, 101:8, 110:6
**ChoicePoint** [3] - 83:5, 83:6, 83:10
**choose** [6] - 79:3, 79:14, 79:16, 81:11, 105:10, 105:14
**chose** [2] - 79:14, 105:17
**chronology** [1] - 27:3
**Cincinnati** [1] - 6:14

**Circuit** [7] - 17:14, 22:17, 62:17, 87:16, 87:19, 88:6, 130:16
**circular** [1] - 88:20
**circularity** [1] - 70:20
**circumstance** [4] - 52:4, 65:20, 67:8, 130:17
**circumstances** [4] - 41:17, 45:3, 73:20, 138:14
**citations** [1] - 61:15
**citizen** [1] - 42:8
**Civil** [2] - 1:6, 5:8
**claim** [7] - 44:19, 44:23, 58:11, 58:20, 60:25, 66:3, 87:18
**claims** [13] - 21:5, 27:7, 28:13, 29:12, 34:20, 34:22, 43:6, 57:13, 58:13, 58:25, 68:6, 85:23, 136:12
**claims-base** [1] - 58:13
**Clark** [2] - 7:12, 51:14
**class** [86] - 5:25, 6:4, 7:7, 7:12, 11:7, 13:23, 14:16, 18:9, 19:3, 20:23, 21:1, 21:10, 21:20, 22:12, 22:16, 22:19, 22:24, 27:22, 28:14, 29:6, 33:21, 37:13, 40:5, 40:6, 40:18, 40:22, 41:12, 41:16, 42:1, 42:16, 42:24, 43:12, 43:18, 44:3, 44:21, 48:24, 49:25, 51:14, 51:22, 52:21, 53:9, 53:10, 53:11, 53:12, 54:5, 56:24, 57:11, 58:17, 58:23, 59:5, 59:6, 60:3, 60:15, 60:22, 61:22, 61:24, 62:4, 62:6, 62:10, 62:16, 62:19, 63:3, 63:7, 63:10, 63:11, 64:25, 66:1, 66:4, 66:16, 85:23, 89:7, 90:6, 101:24, 102:1, 102:2, 102:7, 102:21, 103:1, 103:13, 103:17, 103:21, 132:5, 134:19
**Class** [1] - 45:1
**class'** [1] - 52:25
**class-approval** [1] - 101:24
**classes** [5] - 36:6,

36:8, 46:13, 57:8, 61:1
**classification** [2] - 88:18, 88:19
**clause** [1] - 68:22
**clauses** [1] - 68:21
**clear** [12] - 20:12, 24:4, 40:21, 43:5, 46:6, 67:25, 68:2, 68:8, 68:9, 85:13, 98:4, 110:4
**clearly** [9] - 23:5, 30:23, 45:10, 67:4, 67:8, 67:14, 69:21, 88:3, 88:19
**CLERK** [5] - 5:3, 5:8, 63:23, 64:3, 139:17
**clerk** [1] - 33:3
**click** [7] - 11:17, 79:10, 107:6, 109:9, 109:10, 121:7, 122:19
**clicked** [2] - 106:19, 109:22
**client** [6] - 62:7, 90:23, 100:16, 101:3, 101:12, 102:9
**clockwise** [1] - 115:24
**close** [1] - 130:7
**clustered** [1] - 79:9
**Clyde** [2] - 2:5, 3:19
**co** [7] - 5:22, 6:1, 6:12, 7:2, 12:22, 21:3, 23:21
**co-counsel** [5] - 5:22, 6:1, 6:12, 7:2, 23:21
**co-defendants** [1] - 21:3
**co-lead** [1] - 12:22
**code** [1] - 91:12
**cognizant** [1] - 131:24
**Coke** [1] - 42:6
**collect** [3] - 26:12, 34:3, 94:25
**collected** [4] - 16:2, 16:7, 49:3, 130:19
**collecting** [4] - 94:7, 94:18, 95:2, 95:4
**collection** [27] - 9:12, 16:14, 17:2, 29:17, 29:19, 30:2, 77:13, 81:9, 81:13, 81:21, 84:7, 92:8, 92:14, 92:18, 95:18, 105:17, 107:7, 109:19, 109:22, 114:21, 117:19, 119:17, 124:7, 124:23, 125:4, 126:1, 127:11

**Collection** [2] - 94:9, 106:18
**Collection-decisioning** [1] - 106:18
**collection-decisioning** [10] - 95:18, 105:17, 107:7, 109:19, 109:22, 114:21, 124:7, 124:23, 125:4, 127:11
**collectioning** [1] - 13:18
**Collections** [1] - 31:24
**collections** [22] - 13:17, 17:20, 31:23, 38:1, 75:9, 93:24, 94:1, 94:2, 94:3, 103:19, 105:8, 105:9, 106:24, 109:7, 110:8, 115:22, 116:21, 116:23, 116:24, 117:6, 119:7, 121:13
**collections-decisioning** [3] - 109:7, 116:23, 119:7
**collector** [12] - 54:21, 54:22, 69:16, 69:18, 73:6, 80:6, 95:15, 95:16, 100:1, 113:1, 113:23, 120:4
**collectors** [18] - 17:22, 19:18, 21:4, 29:20, 34:13, 37:16, 44:14, 69:14, 76:5, 78:6, 78:8, 78:23, 82:17, 94:10, 94:16, 113:11, 120:2, 120:20
**color** [2] - 106:1, 106:5
**Columbus** [1] - 113:19
**combination** [1] - 50:17
**comfortable** [4] - 55:15, 114:2, 136:2, 138:2
**coming** [3] - 91:12, 127:4, 132:25
**commence** [1] - 137:9
**commencing** [1] - 18:14
**Comment** [1] - 83:1
**comment** [5] - 9:17, 44:10, 79:24, 83:8, 86:2
**comments** [4] - 6:17,

121:9, 122:11, 122:20

**commercial** [1] - 81:19

**Commission** [4] - 68:11, 82:9, 82:11, 82:13

**commission** [1] - 83:9

**commitment** [1] - 98:13

**commitments** [1] - 93:8

**common** [3] - 57:2, 66:4, 81:17

**commonality** [1] - 22:13

**commonsense** [14] - 35:17, 36:3, 36:4, 39:18, 46:22, 48:5, 48:8, 48:13, 90:12, 90:15, 90:17, 116:14, 118:8, 135:10

**commonsensible** [2] - 79:25, 138:17

**Commonwealth** [1] - 140:22

**communicate** [2] - 120:4, 131:9

**communication** [5] - 69:6, 70:18, 71:6, 71:7, 125:1

**communications** [3] - 21:6, 68:14, 72:22

**companies** [2] - 48:17, 129:5

**comparable** [3] - 57:14, 62:16, 130:17

**compared** [1] - 90:22

**comparison** [1] - 105:6

**compensation** [1] - 53:1

**competitive** [5] - 8:11, 100:18, 101:2, 102:19, 121:18

**competitor's** [1] - 101:11

**competitors** [5] - 92:5, 101:5, 101:14, 102:11, 103:8

**complaint** [8] - 14:11, 65:2, 82:22, 91:7, 91:25, 92:15, 93:22, 118:22

**complete** [2] - 10:12, 140:12

**completed** [1] - 11:4

**completely** [1] - 130:17

**complex** [2] - 90:13, 133:23

**complexity** [2] - 88:11, 90:22

**compliance** [3] - 108:4, 125:19, 129:10

**compliant** [3] - 101:9, 126:15, 126:19

**complicated** [1] - 7:22

**comply** [1] - 126:9

**complying** [1] - 129:15

**component** [3] - 56:14, 104:13, 125:25

**components** [1] - 43:11

**comprehensive** [22] - 17:21, 19:6, 19:8, 19:16, 20:4, 22:5, 28:19, 29:16, 29:20, 30:12, 30:23, 31:17, 32:4, 34:13, 35:16, 37:16, 38:1, 38:18, 44:14, 79:19, 109:7, 119:4

**compromise** [8] - 14:10, 16:5, 16:14, 36:12, 48:23, 102:15, 118:3, 118:6

**compromises** [1] - 14:19

**computer** [4] - 91:12, 120:25, 123:19, 128:23

**computers** [1] - 26:20

**concede** [1] - 26:6

**conceded** [1] - 114:10

**concept** [2] - 67:21, 122:13

**concepts** [1] - 104:22

**concern** [1] - 135:15

**concerned** [1] - 102:9

**concerns** [3] - 99:18, 120:10, 122:7

**concession** [1] - 117:3

**concessions** [1] - 118:25

**conclude** [2] - 25:3, 48:13

**concluded** [3] - 18:8, 20:22, 139:19

**conduct** [1] - 66:14

**conducted** [1] - 138:12

**conference** [2] - 27:14, 135:19

**conferences** [1] - 10:7

**conferring** [1] - 23:21

**confident** [1] - 57:22

**confirm** [5] - 45:8, 74:3, 107:9, 107:11, 107:14

**confirmed** [2] - 26:12, 88:6

**confusing** [1] - 88:20

**conjunction** [1] - 57:17

**consensus** [1] - 20:14

**consent** [3] - 76:22, 82:22, 83:17

**consequences** [1] - 65:8

**consequently** [2] - 66:5, 66:9

**consider** [3] - 64:21, 81:13, 92:7

**considerable** [1] - 91:15

**considerate** [1] - 108:25

**consideration** [1] - 61:19

**considered** [1] - 88:16

**consistent** [1] - 66:14

**consistently** [1] - 76:24

**constantly** [3] - 45:20, 45:21, 100:15

**constitute** [1] - 76:15

**constitutes** [1] - 140:11

**Constitutional** [1] - 67:7

**construct** [1] - 61:22

**construction** [7] - 68:24, 69:20, 73:14, 73:21, 86:4, 86:22, 87:4

**construe** [1] - 70:14

**construed** [1] - 24:23

**construes** [1] - 73:19

**consumed** [1] - 76:3

**consumer** [99] - 24:23, 24:25, 25:4, 25:16, 38:6, 44:12, 45:2, 50:24, 51:6, 55:8, 56:5, 65:3, 65:7, 65:19, 66:22, 68:1, 68:4, 68:11, 68:13, 69:9, 69:13, 69:17, 69:19, 70:6, 70:12, 70:14, 70:18, 71:4, 71:6, 71:9, 71:14, 71:19, 71:21, 71:24, 71:25, 72:3, 72:5, 72:16, 72:22, 73:7, 73:19, 74:21,

74:22, 76:15, 76:21, 78:6, 78:8, 78:24, 82:10, 82:12, 83:14, 83:15, 84:17, 86:9, 86:13, 86:22, 87:2, 87:6, 87:14, 87:17, 87:20, 87:23, 87:25, 88:3, 88:18, 89:2, 89:4, 92:2, 92:21, 93:2, 93:6, 93:10, 93:14, 96:3, 96:8, 100:3, 106:2, 106:3, 106:16, 107:11, 109:18, 109:20, 109:24, 115:20, 117:2, 118:14, 119:2, 119:4, 119:20, 120:11, 120:14, 122:11, 124:1, 124:11, 125:11, 126:19, 128:10

**Consumer** [3] - 2:4, 117:22, 140:4

**CONSUMER** [2] - 3:11, 3:18

**consumer's** [1] - 68:15

**consumer-report** [1] - 107:11

**consumers** [20] - 37:1, 37:2, 37:25, 51:3, 51:10, 54:17, 55:5, 70:7, 70:10, 70:13, 92:13, 118:21, 119:10, 119:14, 120:21, 123:5, 125:2, 125:6, 125:12

**contact** [29] - 31:22, 32:3, 37:19, 93:13, 95:7, 95:18, 96:1, 96:6, 96:13, 97:1, 97:9, 97:13, 97:25, 99:13, 99:19, 100:2, 105:12, 109:6, 111:12, 115:19, 117:17, 118:12, 118:14, 119:2, 119:3, 119:6, 121:20, 124:24, 128:9

**contact-and-locate** [27] - 31:22, 32:3, 93:13, 95:7, 95:18, 96:1, 96:6, 96:13, 97:1, 97:9, 97:13, 97:25, 99:13, 99:19, 100:2, 105:12, 109:6, 111:12,

115:19, 117:17, 118:12, 118:14, 119:3, 119:6, 121:20, 124:24, 128:9

**contacted** [2] - 37:2, 38:19

**contain** [2] - 43:22, 45:6

**contained** [1] - 37:22

**contains** [1] - 69:17

**contemplate** [1] - 47:24

**contemplated** [1] - 101:23

**contend** [3] - 69:15, 82:8, 86:5

**content** [1] - 37:25

**contention** [3] - 37:11, 37:13, 112:17

**contentious** [1] - 107:20

**context** [22] - 9:1, 13:4, 14:19, 17:10, 18:15, 21:1, 21:17, 22:10, 22:13, 22:17, 25:5, 26:17, 53:8, 61:21, 67:11, 69:25, 71:23, 77:9, 93:14, 127:16, 130:4, 130:15

**contextual** [1] - 69:1

**continue** [6] - 10:15, 12:9, 16:14, 16:15, 63:15, 129:2

**continued** [2] - 54:22, 71:15

**continuing** [4] - 18:16, 21:8, 27:8, 47:20

**continuum** [1] - 24:7

**contract** [4] - 98:1, 107:13, 123:20, 123:21

**contracts** [2] - 78:19, 128:19

**contractual** [4] - 49:1, 93:8, 98:12, 116:25

**contractually** [2] - 48:24, 49:13

**contracrural** [1] - 137:8

**contracturally** [1] - 45:1

**contrary** [2] - 85:10, 85:20

**conventional** [1] - 52:17

**conversation** [6] - 15:13, 26:21, 90:19, 98:24, 100:9, 100:22

conversations [5] -
7:21, 17:7, 18:12,
18:13, 19:3
converts [1] - 31:16
convey [2] - 89:23,
90:1
convinced [2] - 19:2,
62:5
copies [1] - 103:4
copy [10] - 6:7, 10:17,
37:1, 37:20, 50:23,
51:5, 55:18, 56:20,
93:6, 119:3
core [1] - 65:2
corporate [2] - 42:8,
125:15
correct [10] - 24:15,
41:2, 45:9, 51:16,
60:23, 83:20,
114:11, 124:18
corrected [1] - 38:3
correcting [1] - 94:23
correlation [2] -
37:14, 37:15
cost [7] - 53:18, 53:19,
53:22, 54:3, 59:10,
66:11, 66:12
costly [1] - 127:5
costs [2] - 60:1, 127:2
counsel [20] - 5:15,
5:22, 6:1, 6:12, 7:2,
15:14, 23:21, 23:25,
28:17, 33:9, 63:16,
96:24, 99:18,
100:10, 100:16,
102:14, 103:2,
118:6, 119:14
COUNSEL [1] - 12:18
counsels' [1] - 63:7
count [1] - 128:14
counter [2] - 74:17,
115:24
counter-clockwise [1]
- 115:24
country [7] - 7:7,
13:20, 44:5, 48:16,
57:22, 75:2, 75:20
couple [7] - 6:17,
10:6, 21:2, 21:25,
23:11, 26:11, 102:8
course [18] - 6:5, 15:9,
16:1, 17:5, 18:8,
25:6, 37:22, 41:18,
41:20, 45:23, 47:12,
57:19, 57:21, 59:16,
61:9, 62:10, 67:5,
127:24
Court [70] - 5:6, 6:17,
8:5, 9:1, 9:2, 11:3,
13:9, 14:8, 14:12,

14:17, 14:18, 14:22,
15:2, 15:7, 16:4,
17:12, 23:25, 24:24,
25:1, 25:2, 25:9,
29:18, 40:20, 41:22,
41:25, 43:16, 43:18,
43:25, 45:15, 45:19,
49:12, 54:13, 56:17,
58:24, 59:17, 61:4,
61:13, 61:18, 62:4,
62:17, 63:24, 64:5,
64:11, 64:18, 64:20,
64:23, 66:12, 67:3,
67:15, 69:23, 84:23,
85:3, 88:4, 100:11,
102:17, 103:13,
129:17, 131:3,
131:25, 132:2,
132:3, 132:12,
132:25, 136:2,
138:25, 139:18,
140:6, 140:8
court [1] - 71:25
COURT [223] - 1:1,
5:17, 6:23, 9:16,
9:24, 10:1, 11:1,
11:13, 11:18, 11:22,
11:24, 12:10, 12:12,
12:16, 16:17, 16:24,
17:4, 18:2, 18:18,
19:7, 19:11, 21:13,
21:16, 22:2, 22:6,
22:9, 23:4, 24:2,
24:4, 26:7, 26:15,
27:4, 28:9, 30:18,
31:19, 31:22, 32:1,
32:8, 32:10, 32:14,
32:20, 33:4, 35:2,
35:11, 38:23, 39:1,
40:21, 40:25, 41:3,
41:5, 41:21, 42:20,
46:9, 46:11, 46:17,
47:2, 47:9, 47:15,
47:23, 49:21, 50:12,
50:14, 51:4, 52:23,
53:2, 58:1, 58:5,
58:9, 58:12, 58:15,
58:19, 60:2, 60:7,
60:14, 60:17, 60:20,
60:25, 62:25, 63:21,
64:8, 65:9, 65:15,
66:20, 70:23, 73:8,
73:10, 77:6, 77:12,
77:16, 78:3, 78:12,
78:21, 79:12, 79:23,
80:5, 80:8, 80:11,
80:17, 81:5, 81:10,
81:23, 82:2, 83:16,
83:21, 83:24, 84:5,
84:13, 84:15, 84:22,
88:12, 89:13, 89:17,

93:18, 94:12, 94:14,
94:19, 95:7, 95:11,
95:20, 95:24, 97:6,
98:4, 98:8, 98:10,
99:16, 99:20, 100:5,
101:15, 103:10,
104:1, 104:6,
104:15, 104:18,
105:14, 105:18,
105:20, 105:23,
106:22, 107:1,
107:24, 108:10,
108:23, 109:2,
110:2, 110:5,
110:10, 110:16,
110:21, 110:24,
111:2, 111:6, 111:8,
111:16, 111:19,
111:25, 112:3,
112:7, 112:9,
112:18, 112:23,
114:7, 114:14,
114:19, 115:5,
115:11, 115:25,
116:3, 116:6, 116:8,
116:13, 116:17,
117:5, 117:7,
117:12, 117:25,
118:10, 118:24,
120:22, 121:11,
121:15, 121:23,
122:2, 122:8,
122:14, 122:22,
123:9, 123:17,
124:3, 124:11,
124:14, 124:17,
124:21, 125:8,
126:7, 126:11,
127:7, 127:14,
128:3, 129:12,
129:23, 130:2,
131:8, 131:14,
131:17, 131:22,
132:22, 133:6,
133:21, 134:1,
134:5, 134:11,
134:14, 135:1,
135:25, 136:13,
136:21, 137:2,
137:4, 137:12,
137:15, 139:2,
139:12, 140:1
Court's [5] - 10:25,
13:7, 41:7, 43:9,
67:20
courthouse [1] -
33:19
Courthouse [1] - 4:21
courtroom [2] - 15:15,
33:1

Courts [2] - 43:1,
68:10
cover [2] - 56:15,
64:17
coverage [1] - 65:5
covered [5] - 13:23,
20:21, 48:3, 54:11,
121:21
covering [3] - 9:20,
55:2
COX [1] - 4:20
Cox [1] - 89:19
crammed [1] - 27:13
CRAs [1] - 21:3
created [1] - 114:21
creative [2] - 81:14,
113:13
credential [2] - 93:4,
127:6
credentialed [4] -
106:16, 109:20,
109:21, 128:17
credentialing [7] -
77:24, 98:14, 98:21,
98:23, 106:15,
127:9, 127:12
credentials [1] - 56:8
credit [25] - 15:20,
20:18, 31:5, 31:18,
39:4, 51:16, 51:17,
70:8, 71:10, 72:7,
72:11, 74:7, 76:19,
83:11, 83:12, 83:13,
86:11, 123:25
Credit [27] - 7:6, 7:14,
12:23, 15:20, 16:8,
16:10, 16:22, 17:22,
20:16, 20:21, 25:23,
28:23, 38:9, 39:17,
40:15, 53:16, 57:13,
76:16, 82:12, 99:23,
103:20, 118:15,
119:8, 121:22,
124:7, 124:23,
126:10
credit-decisioning [1]
- 123:25
creditor [2] - 68:16,
72:10
creditor's [1] - 112:25
creditors [1] - 95:1
creditworthiness [4] -
20:18, 32:18, 39:4,
39:7
crime [2] - 73:5, 86:11
critical [6] - 14:3,
14:15, 33:25,
105:24, 125:24,
125:25
crystal [1] - 100:19

culmination [1] -
15:16
culpability [1] -
106:13
Culpeper [1] - 140:15
cure [1] - 119:22
current [8] - 23:14,
57:20, 76:7, 106:23,
107:17, 108:1,
110:8, 127:18
customer [3] - 77:14,
95:13, 124:15
customers [14] -
91:15, 123:5, 127:8,
127:10, 128:5,
128:6, 128:8,
128:14, 128:15,
128:17, 128:18,
128:22, 129:9
cut [2] - 53:12, 78:21
cuts [1] - 76:1
cutting [1] - 92:7
cutting-edge [1] -
92:7
CVS [3] - 113:22,
113:23, 114:13
cy [3] - 59:16, 59:18,
59:20

## D

DALE [2] - 3:3, 3:4
dale@
pittmanlawoffice.
com [1] - 3:8
damage [1] - 66:3
damages [10] - 25:7,
44:12, 44:13, 44:16,
44:20, 65:24, 66:8,
66:9, 67:12
dangerous [2] - 7:24,
13:1
data [29] - 80:19, 81:1,
86:17, 87:9, 90:13,
92:1, 92:8, 93:9,
93:15, 93:17, 96:11,
96:12, 96:25, 97:8,
97:9, 97:19, 99:11,
99:17, 100:24,
100:25, 110:20,
114:24, 115:13,
115:20, 117:3,
121:14, 122:1, 129:5
data-breach [1] -
86:17
database [7] - 16:20,
17:2, 17:3, 43:15,
52:8, 99:1, 121:25
databases [4] - 16:4,
16:16, 16:17, 16:18

**date** [9] - 27:3, 43:16, 46:12, 78:9, 110:13, 114:9, 129:18, 129:20, 131:5
**dates** [5] - 27:9, 28:8, 35:4, 127:25, 129:16
**David** [2] - 5:13, 6:10
**DAVID** [1] - 4:3
**david.anthony@ troutmansanders. com** [1] - 4:10
**Davis** [1] - 87:22
**days** [6] - 27:11, 133:14, 134:10, 134:11, 134:17, 136:18
**Dayton** [2] - 4:23, 6:13
**dead** [1] - 9:12
**dead-tree** [1] - 9:12
**deadlines** [1] - 129:15
**deal** [7] - 10:13, 42:14, 57:8, 64:12, 120:14, 126:22, 133:16
**dealer** [1] - 80:23
**dealing** [2] - 74:3, 74:20
**deals** [1] - 99:14
**dealt** [1] - 90:8
**death** [1] - 139:8
**debate** [1] - 20:11
**debated** [1] - 108:5
**Debt** [1] - 94:9
**debt** [46] - 17:21, 19:18, 21:4, 29:17, 29:19, 30:2, 34:13, 37:15, 44:14, 54:21, 54:22, 69:14, 69:16, 69:18, 72:5, 72:9, 72:12, 73:6, 76:5, 77:13, 78:6, 78:8, 78:23, 80:6, 82:17, 94:4, 94:6, 94:10, 94:13, 94:18, 94:25, 95:2, 95:4, 95:14, 99:25, 113:11, 113:12, 113:17, 113:23, 119:20, 120:1, 120:2, 120:4, 120:6, 120:19
**debt-buyers** [1] - 94:13
**debtor** [2] - 113:8, 113:15
**debtor's** [2] - 119:17, 119:18
**debtors** [1] - 72:8
**debts** [1] - 119:15
**December** [6] - 27:15, 33:10, 128:1, 128:21, 136:24,
137:10
**decide** [3] - 98:15, 101:11, 102:6
**decided** [4] - 46:20, 57:9, 92:17, 118:18
**decipherer** [1] - 30:10
**decision** [10] - 22:18, 23:23, 25:10, 84:18, 87:16, 99:2, 101:9, 101:11, 107:21, 130:16
**decisioning** [21] - 31:25, 32:1, 95:18, 105:15, 105:16, 105:17, 106:18, 107:7, 109:7, 109:19, 109:22, 114:21, 116:23, 119:7, 123:25, 124:7, 124:23, 125:4, 127:11, 130:21, 133:3
**decisions** [6] - 13:18, 14:9, 73:16, 99:11, 114:23
**decree** [2] - 82:22, 83:18
**deed** [1] - 110:13
**deep** [2] - 9:14, 125:18
**deeper** [1] - 97:7
**defaulted** [2] - 94:6, 95:4
**defeat** [1] - 66:16
**defendant** [13] - 6:8, 10:20, 11:8, 27:7, 29:3, 29:5, 51:25, 52:15, 52:17, 53:19, 67:15, 69:4, 125:14
**DEFENDANT** [1] - 4:2
**defendants** [8] - 5:14, 8:7, 21:3, 42:25, 47:7, 49:5, 66:16, 85:12
**Defendants** [2] - 1:12, 53:18
**defendants'** [3] - 64:19, 66:14, 67:18
**defense** [2] - 7:8, 90:8
**defenses** [3] - 32:22, 64:20, 82:7
**define** [1] - 71:5
**defined** [3] - 43:12, 62:4, 76:16
**defining** [1] - 70:4
**definitely** [1] - 31:10
**definition** [26] - 31:4, 62:17, 63:3, 65:21, 66:23, 68:8, 68:12, 68:13, 69:9, 69:19, 69:23, 70:15, 71:4,
73:20, 86:23, 87:6, 87:18, 87:20, 87:24, 87:25, 88:3, 92:5, 92:20, 92:22, 93:11, 96:8
**definitions** [1] - 92:2
**degree** [3] - 47:18, 52:4, 61:23
**delay** [2] - 42:18, 97:4
**delete** [1] - 55:12
**deliberate** [1] - 28:4
**delicate** [1] - 62:2
**demarcation** [1] - 49:13
**demonstrated** [1] - 41:11
**denied** [4] - 17:13, 24:25, 62:17, 62:18
**denying** [2] - 84:24, 85:6
**Department** [1] - 97:10
**dependent** [1] - 25:7
**depositions** [2] - 24:19, 26:11
**deprive** [1] - 87:8
**derived** [1] - 17:1
**derives** [1] - 70:19
**describe** [1] - 89:11
**described** [2] - 16:19, 63:14
**describing** [1] - 79:5
**description** [1] - 103:16
**design** [3] - 81:2, 101:23, 128:24
**designed** [2] - 80:15, 81:7
**designing** [1] - 44:7
**despite** [1] - 6:25
**destroyed** [2] - 23:18, 34:21
**detail** [6] - 47:18, 96:4, 96:20, 101:22, 104:22, 129:25
**detailed** [5] - 19:18, 27:19, 43:10, 47:21, 92:12
**details** [6] - 9:6, 13:6, 102:9, 102:22, 103:1, 138:1
**detect** [3] - 74:2, 74:19, 74:23
**detection** [1] - 75:9
**determination** [6] - 49:12, 69:12, 72:16, 72:17, 73:24, 114:25
**determinations** [8] - 70:7, 70:17, 71:9, 71:10, 71:18, 76:12,
77:4
**determine** [2] - 28:13, 40:5
**determined** [2] - 25:1, 40:17
**determining** [3] - 64:21, 76:18, 77:12
**develop** [1] - 128:24
**developing** [2] - 77:22, 127:22
**development** [6] - 24:21, 87:15, 91:13, 129:1, 129:3, 129:9
**device** [1] - 44:21
**Diagonal** [1] - 3:12
**diagram** [1] - 70:22
**dicing** [1] - 79:20
**differences** [3] - 11:11, 12:5, 90:3
**different** [31] - 16:18, 16:20, 21:21, 22:10, 22:17, 25:12, 32:3, 34:9, 35:4, 35:15, 48:9, 62:1, 68:25, 75:19, 75:23, 76:3, 77:5, 77:19, 77:20, 80:16, 84:3, 88:5, 94:17, 98:5, 98:7, 101:5, 112:9, 123:6, 124:20, 125:15, 125:16
**differentiate** [1] - 34:8
**differentiates** [1] - 30:24
**differentiating** [1] - 35:15
**differently** [2] - 61:24, 96:10
**difficult** [3] - 29:1, 29:7, 138:11
**difficulties** [2] - 64:20, 82:5
**difficulty** [4] - 10:21, 42:10, 51:13
**dime** [1] - 134:6
**direct** [6] - 57:12, 58:16, 95:1, 99:8, 136:7, 136:11
**direction** [3] - 10:9, 47:14, 112:21
**directly** [1] - 122:6
**disadvantage** [3] - 8:11, 100:18, 102:19
**disagree** [2] - 11:8, 15:15
**disagreement** [1] - 52:10
**disagreements** [1] - 10:4
**disagrees** [1] - 49:6
**disciplined** [1] - 28:3
**disclosed** [1] - 110:12
**discount** [1] - 123:19
**discovered** [1] - 82:14
**discovery** [8] - 16:1, 23:12, 23:13, 23:16, 24:5, 24:13
**discussed** [3] - 33:19, 33:20, 53:9
**discussing** [2] - 12:7, 126:16
**Discussion** [6] - 71:2, 88:25, 112:11, 126:21, 133:5, 134:8
**discussion** [13] - 18:7, 26:24, 27:9, 47:17, 63:25, 85:2, 101:19, 104:9, 108:15, 114:3, 115:8, 134:25, 136:20
**discussions** [1] - 118:6
**dismiss** [5] - 19:1, 24:22, 25:2, 28:12, 28:13
**dismissal** [2] - 10:17, 85:23
**dismissed** [11] - 17:17, 18:5, 18:6, 18:10, 18:22, 18:25, 19:1, 21:6, 27:11, 29:13
**dispute** [14] - 37:3, 37:21, 37:25, 38:2, 38:11, 38:20, 42:15, 55:10, 64:24, 93:7, 119:21, 120:6, 124:4
**disputed** [2] - 56:21, 88:9
**disputes** [2] - 62:20, 126:12
**distills** [1] - 87:10
**distinction** [1] - 99:4
**distinctions** [1] - 106:11
**distress** [1] - 31:13
**distribution** [1] - 57:12
**DISTRICT** [2] - 1:1, 1:2
**district** [1] - 57:5
**District** [6] - 6:3, 17:25, 25:9, 58:24, 87:22, 140:6
**divide** [1] - 82:1
**divides** [4] - 9:7, 10:2, 10:23, 10:24
**divisive** [1] - 10:6
**docile** [1] - 49:8
**docket** [1] - 81:25
**documenting** [1] -

8:19
**documents** [7] -
23:14, 24:8, 122:14,
131:15, 133:12,
135:8, 135:20
**dollars** [9] - 46:21,
50:20, 51:4, 51:5,
51:10, 52:2, 52:18,
53:13, 54:1
**done** [17] - 9:10, 17:6,
47:4, 64:13, 64:17,
76:23, 88:21, 92:15,
102:13, 105:3,
110:17, 112:5,
115:18, 128:1,
128:20, 139:13
**Donna** [2] - 140:3,
140:20
**Donnell** [3] - 18:8,
33:19, 34:11
**doubt** [2] - 65:1, 88:15
**down** [11] - 8:20,
48:21, 76:1, 87:10,
90:15, 91:12, 92:12,
123:11, 123:14,
126:16, 134:2
**draft** [3] - 9:8, 11:4,
133:19
**draw** [1] - 8:18
**drew** [2] - 67:3, 67:20
**drill** [1] - 123:14
**drilling** [1] - 123:11
**driven** [1] - 80:5
**driver** [1] - 117:13
**driver's** [1] - 117:15
**driving** [1] - 73:3
**drop** [1] - 90:22
**drug** [1] - 80:22
**dual** [1] - 136:23
**dual-track** [1] - 136:23
**due** [1] - 104:12
**during** [3] - 98:23,
102:12, 107:13

## E

**early** [1] - 136:15
**easier** [4] - 26:17,
26:22, 42:16, 56:15
**easily** [1] - 130:19
**EASTERN** [1] - 1:2
**Eastern** [4] - 6:3,
17:25, 87:22, 140:6
**easy** [1] - 42:15
**economic** [1] - 51:9
**economics** [2] -
51:14, 52:1
**edge** [1] - 92:7
**educating** [1] - 125:2
**education** [3] - 20:3,

30:22, 31:10
**educational** [2] -
91:18, 123:4
**effective** [2] - 60:12,
129:20
**effectively** [2] - 31:5,
36:9
**effects** [1] - 38:17
**efficient** [1] - 120:20
**effort** [4] - 18:7, 62:13,
76:1, 126:25
**efforts** [3] - 29:17,
29:19, 75:9
**eight** [3] - 51:4, 51:5,
51:10
**either** [11] - 23:17,
37:20, 38:20, 43:17,
49:15, 56:20, 59:5,
67:10, 105:11,
126:1, 129:19
**electrical** [1] - 91:2
**electricity** [1] - 90:25
**element** [2] - 24:20,
90:17
**elements** [9] - 61:20,
61:23, 63:8, 66:2,
97:8, 97:9, 97:11,
99:17, 126:24
**eligibility** [20] - 68:15,
68:18, 69:12, 69:22,
70:4, 70:16, 71:8,
71:10, 71:18, 71:22,
72:2, 72:17, 73:24,
76:12, 76:18, 76:25,
77:4, 96:18, 114:23,
115:2
**eliminate** [2] - 34:12,
108:8
**eliminated** [3] - 97:19,
115:23, 116:25
**eliminating** [1] - 29:6
**ellipse** [1] - 71:23
**emphasize** [1] - 86:1
**employed** [1] - 113:24
**employees** [1] - 123:6
**employment** [6] -
68:17, 70:9, 71:11,
76:19, 78:16, 125:19
**en** [1] - 88:2
**enable** [1] - 119:4
**encompassed** [1] -
25:23
**Encore** [1] - 94:5
**encounter** [1] - 82:6
**encountered** [1] -
119:24
**end** [20] - 6:21, 18:14,
34:23, 40:6, 50:3,
52:11, 54:2, 54:4,
59:22, 79:18, 85:9,

114:1, 123:22,
127:23, 127:25,
129:24, 134:16,
134:17, 135:19,
137:10
**endeavor** [1] - 127:5
**ended** [1] - 54:23
**enforced** [1] - 82:11
**enforcement** [16] -
36:15, 73:1, 74:24,
75:2, 80:19, 80:21,
80:25, 81:7, 82:17,
84:7, 86:7, 86:9,
86:15, 87:8, 87:13
**Enforcement** [1] -
75:1
**engaging** [1] - 133:14
**engineering** [3] -
84:12, 91:11, 127:2
**English** [1] - 115:16
**enjoy** [1] - 56:17
**entered** [3] - 84:23,
85:11, 102:24
**enters** [1] - 43:16
**enthusiastic** [1] -
55:25
**entire** [4] - 20:25,
41:25, 63:2, 88:17
**entirely** [2] - 98:18,
99:5
**entirety** [3] - 95:9,
98:20, 107:5
**entities** [6] - 36:11,
36:12, 36:19, 46:2,
94:17, 125:15
**entitled** [2] - 51:7,
132:6
**entity** [1] - 57:21
**enumerated** [1] -
86:12
**EPIC** [2] - 83:3
**equally** [1] - 85:14
**equivalent** [3] - 32:2,
91:3, 106:25
**ERAUSQUIN** [1] - 3:10
**Erausquin** [1] - 6:5
**error** [1] - 63:16
**especially** [1] - 35:13
**ESQUIRE** [9] - 2:3,
2:10, 2:19, 3:3, 3:10,
3:17, 4:3, 4:12, 4:19
**essential** [1] - 81:1
**essentially** [4] - 11:2,
80:3, 97:15, 98:6
**establish** [4] - 43:21,
56:22, 68:15, 70:3
**established** [6] - 67:5,
67:9, 67:14, 69:21,
88:3, 88:19
**establishing** [2] -

67:21, 106:13
**estate** [1] - 75:18
**estimate** [1] - 43:25
**estimates** [2] - 44:8,
53:20
**estoppel** [2] - 48:25,
49:1
**et** [4] - 1:5, 1:11, 5:9,
5:10
**evaluate** [4] - 51:9,
72:8, 102:2, 103:13
**evaluation** [4] - 30:1,
31:5, 103:7
**event** [1] - 55:7
**events** [1] - 123:4
**eventually** [1] - 53:5
**everywhere** [2] -
121:5, 122:10
**evidence** [2] - 62:8,
67:18
**evident** [2] - 138:20,
138:22
**evolved** [1] - 7:4
**evolving** [2] - 45:19,
46:3
**ex** [2] - 12:2, 132:20
**exactly** [8] - 45:13,
82:3, 94:16, 95:21,
98:9, 111:17,
111:20, 138:19
**example** [17] - 27:21,
47:19, 50:25, 54:19,
71:24, 75:16, 80:22,
81:15, 94:5, 97:14,
97:16, 100:8,
112:15, 113:7,
113:18, 132:14,
136:16
**examples** [1] - 111:13
**except** [2] - 59:25,
100:24
**exceptions** [1] - 95:3
**excerpt** [1] - 68:20
**exchange** [1] - 44:23
**exchanged** [3] - 9:8,
27:18, 133:20
**excited** [1] - 13:13
**exclude** [1] - 66:23
**exclusive** [2] - 99:5,
99:6
**excuse** [1] - 17:12
**exemplary** [5] -
100:14, 100:21,
101:21, 102:10,
108:17
**exercise** [1] - 125:13
**Exhibit** [1] - 93:22
**existing** [2] - 127:8,
128:8
**exists** [1] - 52:7

**expand** [1] - 87:6
**expect** [3] - 9:9, 10:15,
39:14
**expectation** [1] - 69:7
**expected** [2] - 39:12,
71:7
**expensive** [1] - 60:12
**experience** [4] - 15:5,
23:25, 59:4, 132:18
**experiences** [1] -
118:17
**expert** [4] - 46:1, 52:1,
56:7, 56:11
**expertise** [2] - 9:3,
126:3
**experts** [1] - 23:15
**expiration** [1] - 114:9
**explain** [2] - 7:17,
36:25
**explained** [2] - 85:12,
121:25
**explanation** [3] - 9:6,
85:17, 96:22
**explanations** [1] -
130:11
**exposed** [1] - 44:9
**expresses** [1] - 133:24
**expressly** [2] - 67:3,
71:11
**extensive** [2] - 24:13,
113:5
**extent** [5] - 23:11,
36:2, 74:25, 137:21,
137:24
**extracted** [1] - 80:4
**extreme** [2] - 48:15,
48:18
**extremely** [1] - 130:3

## F

**face** [2] - 22:20, 28:18
**faced** [2] - 51:14,
51:25
**faces** [1] - 138:6
**fact** [22] - 17:13,
17:22, 21:3, 25:3,
29:13, 37:6, 37:25,
45:16, 67:2, 68:19,
69:8, 72:12, 72:13,
82:8, 86:5, 86:18,
86:20, 87:3, 108:21,
113:1
**factor** [5] - 68:15,
69:17, 76:18, 88:16,
89:8
**factors** [3] - 39:4,
82:5, 91:20
**factual** [1] - 7:24
**failed** [1] - 62:12

**Fair** [28] - 7:6, 7:14, 12:23, 15:20, 16:8, 16:10, 16:22, 17:22, 20:16, 20:21, 25:23, 28:23, 38:9, 39:16, 40:15, 53:16, 57:13, 76:16, 82:12, 94:8, 99:23, 103:19, 118:15, 119:8, 121:22, 124:7, 124:23, 126:10
**fair** [9] - 13:2, 24:14, 64:15, 70:7, 89:8, 90:10, 134:9, 135:10, 138:15
**fairly** [6] - 14:5, 19:15, 21:4, 81:4, 117:23, 132:13
**fairness** [4] - 64:21, 104:13, 132:2, 136:16
**faith** [1] - 45:12
**fall** [3] - 36:7, 108:6, 129:6
**falsely** [1] - 99:24
**familiar** [6] - 6:4, 34:18, 41:7, 41:8, 43:9, 61:16
**family** [3] - 75:8, 125:16, 126:3
**fancy** [1] - 93:25
**far** [4] - 17:10, 20:5, 24:11, 134:21
**Faruki** [2] - 6:13, 89:18
**FARUKI** [1] - 4:20
**favorable** [1] - 88:14
**favorite** [1] - 70:22
**favors** [1] - 89:8
**FCRA** [45] - 5:25, 24:24, 25:18, 39:3, 41:25, 48:6, 48:14, 50:24, 51:6, 52:19, 54:11, 55:2, 55:7, 55:9, 62:15, 65:5, 65:24, 66:7, 66:15, 66:17, 67:11, 67:12, 67:16, 69:9, 76:20, 83:5, 86:13, 96:4, 96:7, 96:13, 99:9, 99:24, 100:4, 106:8, 106:10, 107:14, 108:12, 113:4, 120:6, 121:21, 125:6, 125:18, 126:2, 127:10
**FCRA's** [3] - 54:9, 66:22, 99:9
**FCRA-governed** [1] - 126:2

**FDIC** [2] - 72:3, 72:4
**feat** [1] - 134:2
**February** [4] - 134:17, 135:20, 140:15
**Federal** [2] - 68:10, 72:1, 72:14, 76:16, 82:9, 82:10, 82:13, 83:1, 112:9
**FedEx** [1] - 10:17
**fee** [6] - 52:10, 52:11, 52:17, 52:18, 52:25, 53:6
**feedback** [5] - 10:8, 35:12, 36:3, 105:19, 130:23
**fees** [6] - 35:7, 50:7, 50:8, 56:24, 61:6
**felt** [8] - 10:5, 17:8, 21:9, 25:25, 38:19, 41:18, 41:20, 57:5
**few** [4] - 13:22, 15:11, 20:12, 64:18
**fewer** [1] - 68:21
**fiddling** [1] - 105:13
**fiduciaries** [1] - 95:3
**fields** [2] - 116:20, 116:22
**fifth** [1] - 113:15
**fighting** [1] - 114:18
**figure** [4] - 45:13, 112:19, 121:5, 133:11
**figuring** [2] - 91:13, 120:24
**file** [16] - 21:11, 37:2, 37:3, 37:7, 37:17, 38:8, 38:13, 38:14, 51:6, 56:21, 62:21, 93:6, 117:17, 132:15
**filed** [8] - 17:18, 17:25, 24:18, 28:12, 33:11, 51:18, 82:21, 84:25
**filings** [1] - 24:6
**final** [2] - 8:15, 28:4
**finalized** [1] - 17:17
**finally** [2] - 9:13, 129:18
**finance** [1] - 59:20
**financed** [1] - 41:15
**financial** [3] - 31:13, 71:13, 110:20
**finder** [1] - 79:15
**fine** [4] - 59:21, 74:13, 109:2, 116:17
**finished** [1] - 133:12
**fire** [1] - 52:14
**firm** [6] - 5:23, 6:2, 6:13, 17:19, 132:23, 132:24
**firms** [2] - 84:9, 84:10

**first** [18] - 5:21, 32:23, 33:6, 33:7, 44:6, 47:17, 74:11, 79:3, 89:21, 94:15, 95:1, 95:15, 101:24, 110:3, 110:4, 113:14, 115:13, 119:1
**first-party** [2] - 94:15, 95:15
**fisher** [1] - 81:19
**fisher-person** [1] - 81:19
**Fisheries** [1] - 97:10
**fishing** [4] - 35:25, 80:1, 81:14, 97:3
**fit** [2] - 38:21, 115:14
**fits** [2] - 21:18, 131:3
**five** [10] - 12:23, 15:17, 18:20, 31:10, 39:24, 47:6, 53:25, 89:24, 97:11, 97:12
**Five** [1] - 53:24
**five-year** [1] - 15:17
**fix** [1] - 119:21
**FL** [1] - 117:7
**flag** [2] - 80:25, 108:8
**flags** [1] - 130:9
**flange** [1] - 45:13
**flesh** [1] - 134:19
**flexibility** [1] - 46:8
**flies** [1] - 81:18
**flip** [1] - 113:4
**flipping** [1] - 90:24
**float** [2] - 65:8
**Floor** [1] - 2:14
**floor** [1] - 6:18
**florida** [1] - 117:8
**Florida** [1] - 117:10
**flow** [1] - 26:22
**flown** [1] - 27:16
**fluent** [1] - 100:15
**fluid** [1] - 48:2
**fluidity** [4] - 45:17, 45:23, 46:5, 47:17
**flush** [1] - 100:7
**focus** [1] - 108:22
**focused** [2] - 34:2, 46:3
**focusing** [1] - 95:25
**Foerster** [2] - 6:14, 64:10
**FOERSTER** [1] - 4:13
**folks** [6] - 21:20, 21:22, 22:24, 60:21, 109:3, 137:6
**followed** [2] - 61:20, 62:5
**following** [1] - 132:2

**font** [1] - 11:5
**fonts** [1] - 48:1
**footnote** [5] - 42:12, 56:2, 67:19, 83:17, 106:7
**FOR** [1] - 12:18
**force** [1] - 59:8
**foregoing** [1] - 140:10
**forfeit** [1] - 48:24
**forgot** [1] - 135:4
**form** [6] - 52:6, 102:23, 111:3, 134:18
**formal** [2] - 26:15, 73:17, 136:6
**formally** [1] - 26:21
**format** [1] - 8:2
**formed** [1] - 24:9
**forming** [1] - 67:4
**forms** [1] - 37:12
**forth** [1] - 132:10
**forty** [1] - 89:24
**forward** [10] - 5:20, 25:25, 40:3, 41:10, 43:7, 49:14, 78:9, 82:4, 82:25, 85:19
**foundation** [1] - 8:22
**four** [3] - 12:23, 35:4, 47:6
**Fourth** [4] - 17:14, 22:17, 62:17, 130:16
**framework** [1] - 35:8
**Francis** [10] - 5:11, 6:1, 6:2, 17:18, 48:19, 57:4, 85:19, 87:18, 123:19, 124:1
**FRANCIS** [5] - 2:10, 2:11, 4:12, 54:6, 123:20
**Francis'** [1] - 70:21
**Francisco** [3] - 4:15, 6:15, 74:7
**frank** [2] - 98:23, 99:10
**frankly** [5] - 7:5, 47:3, 57:6, 103:12, 114:20
**fraud** [3] - 74:2, 74:19, 74:23
**free** [5] - 50:23, 51:7, 51:11, 67:10, 119:3
**frequently** [1] - 72:5
**Friday** [1] - 11:10
**front** [6] - 9:11, 15:18, 16:18, 16:25, 76:13, 76:23
**FTC** [13] - 73:16, 73:17, 82:20, 83:7, 83:25, 84:16, 85:16, 86:3, 86:16, 86:20, 89:1, 95:1

**FTC's** [1] - 87:24
**FTCPA** [1] - 120:2
**full** [2] - 9:5, 83:9
**full-throated** [1] - 9:5
**fully** [1] - 86:17
**fund** [3] - 56:23, 57:2, 59:15
**funds** [1] - 59:24
**furnish** [3] - 69:14, 71:25, 106:10
**furnished** [3] - 69:16, 69:18, 72:2
**furnishes** [1] - 87:5
**furnishing** [1] - 86:13
**fusion** [1] - 87:9
**future** [3] - 12:11, 31:14, 54:12

**G**

**gambit** [1] - 63:2
**garnished** [1] - 54:23
**gateway** [1] - 30:13
**gather** [1] - 75:12
**general** [6] - 20:13, 27:6, 33:8, 86:8, 100:24, 113:20
**generally** [6] - 5:24, 47:13, 49:7, 92:5, 96:17, 112:24
**genesis** [1] - 92:14
**give-and-take** [2] - 138:24, 139:9
**given** [17] - 31:13, 37:4, 37:6, 37:10, 42:23, 42:24, 43:6, 44:11, 57:5, 64:23, 83:7, 99:18, 101:12, 105:9, 108:21, 138:16
**Given** [1] - 140:14
**glaringly** [1] - 13:9
**goal** [3] - 8:21, 40:4, 42:3
**goals** [1] - 34:9
**govern** [3] - 65:22, 94:24, 95:1
**governance** [4] - 49:2, 50:25, 65:6, 94:8
**governed** [4] - 48:6, 48:7, 94:10, 126:2
**government** [7] - 36:16, 67:16, 71:16, 75:11, 86:7, 86:8, 86:15
**governmental** [2] - 36:11, 36:19
**governs** [2] - 113:4, 117:22
**grabbled** [1] - 33:20

**graduate** [2] - 5:22, 50:10
**Graham** [20] - 17:25, 18:15, 18:24, 19:7, 20:22, 21:1, 23:13, 23:17, 23:20, 26:10, 26:12, 27:8, 27:10, 27:22, 28:11, 28:15, 29:13, 33:11, 33:20, 119:19
**grain** [1] - 46:22
**grammar** [1] - 105:22
**grand** [2] - 72:1, 72:14
**grant** [1] - 85:8
**granted** [1] - 24:25
**gray** [5] - 45:10, 48:21, 107:22, 109:21, 112:20
**grayed** [2] - 106:18, 109:9
**grayed-out** [2] - 106:18, 109:9
**grayer** [1] - 96:22
**great** [7] - 39:20, 39:25, 40:11, 55:24, 88:9, 102:3, 138:4
**greater** [1] - 40:22
**greatest** [2] - 14:16, 40:5
**green** [3] - 106:5, 106:17, 109:19
**Gregory** [1] - 5:9
**GREGORY** [1] - 1:4
**grew** [1] - 74:11
**group** [1] - 95:16
**GROUP** [1] - 1:10
**groups** [1] - 56:5
**guess** [5] - 20:13, 79:23, 91:19, 104:24, 107:18
**guidance** [1] - 98:1
**guide** [3] - 98:25, 100:22, 109:15
**guile** [1] - 62:6
**gut** [1] - 135:9
**guy** [2] - 31:11, 56:12
**guys** [2] - 121:15, 137:16

## H

**hacked** [2] - 82:18, 84:4
**hand** [2] - 119:13, 140:14
**handed** [1] - 74:8
**handled** [1] - 24:16
**hands** [1] - 7:10
**handshake** [1] - 129:4
**HANNAH** [1] - 1:15

**Hannah** [3] - 5:5, 64:4, 140:8
**happy** [8] - 23:3, 26:18, 26:20, 37:23, 135:24, 136:1, 139:2, 139:3
**hard** [7] - 9:18, 43:1, 47:13, 130:5, 130:10, 138:14, 138:20
**harm** [2] - 55:8, 55:14
**harmed** [2] - 29:9, 29:22
**Haxall** [1] - 4:6
**head** [1] - 116:16
**healthcare** [1] - 75:13
**hear** [4] - 10:4, 14:17, 21:19, 64:13
**HEARD** [1] - 1:14
**heard** [6] - 23:25, 75:10, 119:25, 138:5, 140:5, 140:7
**hearing** [4] - 73:10, 85:2, 119:13, 136:16
**hears** [1] - 61:13
**heavily** [1] - 67:20
**Hebrew** [1] - 115:16
**held** [1] - 62:4
**help** [4] - 21:19, 33:4, 72:8, 98:1, 100:9, 100:10, 100:22, 101:17, 106:1, 120:21, 131:9, 132:12, 132:21, 132:23
**helpful** [5] - 68:19, 89:14, 130:3, 133:13, 139:9
**helps** [2] - 53:2, 53:4
**hereby** [1] - 140:3
**Hernandez** [2] - 62:22, 90:21
**hide** [1] - 133:1
**high** [3] - 53:6, 54:4, 56:4
**highest** [1] - 79:18
**highlight** [2] - 10:3, 61:3
**highlighted** [1] - 124:2
**hired** [1] - 34:19
**historical** [1] - 74:20
**history** [9] - 12:24, 17:24, 24:17, 32:23, 39:23, 69:25, 70:1, 87:24, 125:18
**hold** [1] - 52:14
**holding** [1] - 7:10
**holidays** [2] - 27:15, 112:5
**home** [5] - 19:20,

30:21, 31:9, 48:12, 97:20
**homepage** [2] - 105:8, 122:10
**Honor** [66] - 5:21, 5:23, 6:7, 6:10, 7:20, 8:6, 12:3, 12:8, 12:15, 12:19, 17:12, 19:13, 23:2, 23:9, 24:15, 26:14, 28:10, 30:14, 31:21, 32:24, 33:6, 36:5, 36:6, 39:2, 41:2, 42:21, 46:10, 46:25, 50:13, 51:1, 53:8, 54:17, 55:17, 56:3, 56:13, 57:17, 60:6, 61:8, 61:12, 61:15, 63:4, 63:18, 64:7, 65:14, 80:13, 89:10, 89:16, 97:4, 97:24, 98:17, 99:3, 99:22, 101:21, 102:16, 103:11, 104:3, 109:1, 118:2, 126:23, 129:21, 131:16, 131:25, 132:12, 135:22, 139:11, 139:15
**Honor's** [1] - 9:1
**Honorable** [3] - 5:4, 64:3, 140:8
**HONORABLE** [1] - 1:15
**hopefully** [1] - 9:10
**hoping** [1] - 121:17
**horizon** [1] - 138:17
**hound** [1] - 54:22
**hour** [1] - 89:24
**hour-and-forty-five** [1] - 89:24
**hours** [3] - 8:1, 91:10, 111:23
**house** [3] - 19:23, 20:1, 80:23
**household** [4] - 30:20, 31:8, 97:16, 97:20
**Houston** [2] - 2:23, 5:23
**huge** [4] - 42:6, 54:16, 59:12, 127:21
**hugest** [1] - 123:23
**hundreds** [1] - 53:13
**hundreds-of-millions** [1] - 53:13
**hurdle** [1] - 99:6

## I

**idea** [6] - 6:16, 8:14, 67:5, 113:19,

113:20, 120:19
**identical** [1] - 58:22
**identify** [2] - 29:15, 38:17
**identity** [4] - 21:23, 62:22, 74:19, 83:7
**identity-theft** [1] - 62:22
**ignore** [1] - 55:14
**illegal** [2] - 86:8, 87:1
**illustrates** [1] - 30:14
**imagine** [1] - 55:20
**immediately** [4] - 6:12, 85:22, 128:7, 128:11
**immunity** [3] - 67:2, 67:3, 67:6
**impact** [1] - 91:15
**impeccable** [1] - 56:9
**impermissible** [1] - 76:19
**impervious** [1] - 26:18
**implement** [2] - 53:21, 127:1
**implementation** [6] - 54:3, 125:25, 127:16, 127:19, 129:22, 136:22
**implication** [1] - 50:24
**important** [17] - 7:14, 14:8, 14:17, 45:15, 48:23, 63:12, 65:20, 69:10, 80:14, 85:25, 89:22, 96:5, 101:1, 101:21, 106:8, 107:19, 135:2
**importantly** [4] - 88:6, 91:20, 99:13, 120:9
**imposing** [1] - 43:1
**inaccuracy** [1] - 62:23
**inaccurate** [3] - 38:3, 54:20, 55:6
**inactive** [3] - 114:9, 114:12, 114:15
**inappropriately** [1] - 39:15
**inaudible** [20] - 5:16, 32:21, 49:18, 51:7, 92:25, 104:8, 108:6, 108:9, 110:1, 111:5, 117:20, 122:13, 124:8, 131:11, 133:18, 134:4, 134:7, 137:3, 137:11, 139:1
**Inaudible** [26] - 15:5, 51:2, 51:6, 51:12, 52:5, 52:19, 54:7, 55:9, 61:21, 64:19, 70:19, 76:14, 91:20,

95:6, 104:4, 107:14, 115:4, 122:1, 122:25, 125:3, 125:16, 126:3, 126:6, 129:11, 131:7, 136:3
**INC** [1] - 1:10
**incentive** [1] - 57:10
**include** [4] - 38:7, 61:14, 70:16, 127:13
**included** [2] - 97:3, 117:17
**Includes** [1] - 107:23
**includes** [1] - 68:14
**including** [5] - 43:13, 51:23, 61:16, 69:24, 86:19
**inclusion** [1] - 31:15
**income** [6] - 19:25, 30:21, 31:8, 80:2, 80:24, 97:20
**incomes** [1] - 35:24
**incomplete** [1] - 32:25
**incorrect** [1] - 55:11
**increased** [2] - 26:2, 26:3
**independently** [2] - 52:22, 137:23
**indicate** [1] - 108:2
**indicated** [1] - 85:4
**indicia** [1] - 31:13
**indirectly** [1] - 33:12
**individual** [8] - 19:24, 45:8, 45:10, 66:5, 79:10, 81:22, 85:24, 108:2
**individual's** [1] - 13:19
**individuals** [15] - 13:19, 15:10, 15:23, 18:11, 21:5, 29:16, 38:21, 40:25, 56:20, 62:19, 62:20, 62:21, 63:6, 138:13
**industry** [5] - 14:2, 45:19, 81:9, 90:8, 94:22
**Inevitably** [1] - 59:4
**infinitum** [1] - 47:8
**inform** [1] - 125:12
**informal** [1] - 73:18
**information** [97] - 13:16, 13:20, 16:3, 16:4, 16:8, 16:9, 19:19, 19:21, 19:22, 19:23, 20:4, 20:11, 20:15, 20:18, 23:23, 25:20, 30:22, 31:1, 31:7, 31:16, 32:13, 32:17, 32:19, 35:14,

35:18, 37:3, 37:8, 37:21, 39:11, 39:15, 43:15, 43:22, 45:7, 45:9, 45:19, 45:20, 48:3, 48:5, 48:17, 52:7, 52:19, 55:1, 55:10, 55:12, 69:6, 69:18, 71:5, 72:12, 72:13, 72:15, 72:21, 72:25, 73:1, 73:2, 73:5, 73:7, 73:20, 74:20, 74:22, 75:7, 75:13, 75:15, 75:22, 78:5, 78:8, 79:4, 79:7, 79:9, 79:18, 79:21, 80:4, 81:20, 93:21, 96:16, 96:17, 96:21, 97:17, 101:18, 102:6, 102:20, 103:4, 103:9, 107:4, 114:10, 115:1, 116:1, 117:2, 117:11, 120:15, 124:5, 130:3, 130:8, 135:2
**INFORMATION** [1] - 1:9
**informed** [2] - 11:7, 23:23
**inhouse** [1] - 33:9
**initiated** [1] - 71:14
**initiative** [1] - 46:1
**injunction** [2] - 47:25, 48:23
**injunctive** [46] - 15:9, 27:19, 27:23, 35:9, 36:21, 40:10, 40:14, 42:2, 42:11, 42:16, 43:11, 44:24, 45:17, 46:16, 46:17, 47:19, 49:24, 50:8, 51:20, 51:22, 52:20, 55:23, 57:6, 59:11, 60:8, 60:14, 60:22, 64:17, 89:12, 90:5, 90:23, 91:3, 91:6, 92:16, 95:8, 95:10, 102:10, 105:7, 118:19, 119:1, 123:23, 127:1, 131:19, 133:24, 134:14
**injury** [1] - 66:2
**innovative** [1] - 120:8
**instance** [2] - 12:3, 51:1
**instead** [1] - 51:23
**institutional** [1] - 72:4
**institutions** [1] - 72:23
**instructed** [1] - 72:2

**insurance** [6] - 68:17, 70:9, 71:10, 76:19, 125:20, 125:21
**intake** [1] - 95:16
**intend** [4] - 77:17, 102:17, 106:13, 109:4
**intended** [7] - 16:8, 68:14, 71:4, 71:8, 76:11, 98:16, 100:13
**intending** [1] - 10:20
**intensive** [1] - 127:5
**intent** [2] - 69:7, 77:14
**interesting** [2] - 15:12, 138:9
**interests** [1] - 40:18
**interface** [1] - 91:16
**internal** [1] - 128:23
**internet** [4] - 43:21, 43:24, 60:13, 120:17
**interpretation** [3] - 66:15, 66:17, 67:16
**interrupt** [1] - 65:10
**interviewed** [1] - 34:19
**introduce** [2] - 5:22, 6:12
**investigated** [1] - 82:21
**investigating** [1] - 86:10
**investigation** [1] - 86:18
**investigative** [2] - 86:16, 87:12
**investment** [1] - 91:8
**involved** [7] - 15:18, 33:11, 83:18, 83:21, 83:22, 87:19, 138:13
**involving** [3] - 44:1, 44:3, 87:17
**IRELAND** [1] - 4:20
**Ireland** [1] - 89:19
**ironed** [1] - 13:6
**irrelevant** [1] - 67:19
**IRVIN** [1] - 4:19
**isolated** [1] - 115:1
**issuance** [1] - 38:18
**issue** [22] - 14:15, 15:22, 17:8, 17:20, 24:2, 25:1, 33:21, 34:4, 34:6, 37:17, 46:3, 48:22, 53:8, 66:4, 66:21, 99:15, 101:3, 119:13, 119:22, 120:7, 126:6, 133:15
**issued** [8] - 15:24, 20:24, 21:11, 25:8, 28:25, 29:16, 50:22,

74:16
**issues** [24] - 8:20, 10:2, 25:6, 63:11, 64:24, 66:5, 68:25, 82:1, 82:7, 90:14, 91:7, 91:24, 92:12, 102:15, 118:5, 118:16, 118:21, 120:3, 120:10, 130:12, 130:14, 131:4, 131:10, 137:24
**items** [3] - 11:17, 23:11, 70:16
**itself** [2] - 30:8, 68:14

---

## J

**James** [2] - 5:11, 5:13
**JAMES** [3] - 2:10, 3:10, 4:12
**January** [5] - 1:17, 27:10, 41:14, 42:18, 140:9
**jewelry** [1] - 74:6
**jfrancis@ consumerlaw.com** [1] - 2:17
**Jiffy** [4] - 82:5, 86:1, 88:17, 91:20
**Jiffy-Lube** [3] - 82:5, 86:1, 91:20
**Jim** [7] - 6:1, 6:14, 64:9, 70:21, 84:8, 98:13, 118:13
**jmccabe@mofo.com** [1] - 4:17
**job** [1] - 137:19
**John** [4] - 81:16, 81:17, 81:20, 81:22
**joke** [1] - 112:3
**jokingly** [1] - 125:22
**JR** [1] - 4:19
**Jr** [1] - 5:14
**Judge** [47] - 5:5, 6:4, 8:17, 9:1, 9:4, 9:18, 10:11, 15:4, 15:18, 18:1, 18:4, 18:5, 18:8, 22:18, 34:11, 47:3, 47:16, 49:16, 50:2, 52:9, 61:13, 62:6, 63:5, 64:4, 81:24, 85:4, 87:22, 94:23, 102:5, 130:13, 130:15, 130:20, 130:22, 131:5, 132:13, 132:14, 132:16, 132:17, 133:2, 133:15, 135:17,

136:25, 137:21, 138:22, 140:8
**JUDGE** [1] - 1:15
**judge** [3] - 22:22, 23:6, 42:1
**judgment** [7] - 84:19, 84:25, 85:7, 85:8, 85:11, 85:22, 131:20
**judicial** [1] - 132:21
**jump** [1] - 11:20
**jumps** [1] - 8:16
**June** [3] - 129:10, 129:20, 139:5
**jurisprudence** [2] - 67:6, 67:22
**jury** [3] - 72:1, 72:14, 90:14

---

## K

**Kathy** [2] - 44:1, 44:2
**keep** [4] - 65:11, 65:13, 82:10, 109:4
**keeping** [1] - 106:12
**keeps** [1] - 47:13
**kept** [1] - 132:20
**key** [10] - 8:4, 22:7, 22:8, 24:19, 24:21, 25:4, 39:10, 39:11, 43:22, 131:18
**keystroke** [1] - 84:14
**killed** [1] - 7:22
**kind** [12] - 8:2, 9:21, 20:10, 25:20, 30:22, 31:1, 32:18, 37:9, 66:3, 83:19, 84:11, 100:18
**kinds** [5] - 11:9, 11:11, 30:8, 70:17, 83:12
**Kinsella** [1] - 44:1
**knowing** [2] - 67:17, 113:8
**knowledge** [2] - 9:2, 140:13
**known** [2] - 74:21
**knows** [3] - 13:2, 28:24, 103:21
**Kristen** [2] - 75:18, 75:23
**Kristin** [1] - 75:16

---

## L

**L.L.P** [2] - 4:4, 4:13
**lack** [1] - 88:1
**laid** [1] - 54:18
**Lamar** [1] - 2:21
**Land** [1] - 2:12
**language** [4] - 67:5, 70:20, 73:15, 97:23

**Large** [1] - 140:22
**large** [5] - 27:14, 70:11, 74:25, 78:7, 87:2
**larger** [1] - 71:23
**largest** [1] - 12:23
**last** [8] - 9:17, 13:21, 35:5, 48:11, 87:17, 114:8, 126:22, 128:14
**late** [2] - 109:3, 109:4
**latter** [1] - 24:7
**Lauck** [3] - 5:5, 64:4, 140:8
**LAUCK** [1] - 1:15
**launch** [2] - 106:24, 106:25
**launched** [1] - 46:1
**laundering** [1] - 80:22
**laundry** [1] - 11:16
**law** [34] - 20:12, 36:15, 51:11, 55:21, 61:15, 61:17, 62:2, 63:15, 66:25, 67:2, 67:4, 67:13, 73:1, 73:18, 74:24, 75:1, 80:18, 80:21, 80:25, 81:7, 82:16, 84:7, 84:9, 84:10, 86:7, 86:9, 86:14, 87:8, 87:13, 90:4, 103:15, 108:4, 113:2
**LAW** [5] - 3:4, 5:3, 63:23, 64:3, 139:17
**Law** [1] - 74:25
**laws** [2] - 57:14, 117:1
**lawsuit** [1] - 16:11
**lawyers** [7] - 9:18, 39:21, 40:1, 51:15, 53:10, 75:11
**lay** [2] - 8:22, 48:21
**laying** [1] - 23:4
**layout** [3] - 81:1, 81:6, 81:7
**lead** [4] - 5:25, 12:22, 72:20
**leading** [2] - 13:18, 92:7
**lean** [1] - 35:22
**learn** [1] - 52:7
**learned** [1] - 54:25
**least** [8] - 8:24, 25:1, 27:25, 41:8, 57:24, 61:17, 129:20, 137:7
**leave** [2] - 34:24, 104:23
**left** [3] - 59:14, 59:24, 107:21
**legal** [2] - 7:24, 92:12
**legally** [1] - 118:20

**legislative** [2] - 45:25, 69:25
**legitimate** [1] - 113:17
**Len** [12] - 6:16, 12:21, 12:22, 13:1, 48:10, 79:5, 88:21, 90:19, 94:16, 127:19, 137:13
**len** [1] - 114:17
**length** [1] - 88:9
**LEONARD** [1] - 2:3
**Leonard** [6] - 5:11, 48:9, 48:10, 79:6
**less** [3] - 8:15, 63:12, 130:22
**letter** [5] - 83:2, 83:8, 85:10, 85:14, 86:3
**letters** [2] - 28:7, 73:18
**letting** [1] - 127:3
**level** [1] - 20:2
**levels** [2] - 32:5, 34:9
**lexis** [1] - 64:14
**LEXIS** [1] - 1:8
**LexisNexis** [80] - 5:10, 13:10, 13:14, 13:15, 13:16, 13:25, 14:6, 15:1, 15:14, 15:19, 15:25, 16:2, 16:13, 16:21, 17:7, 18:13, 19:3, 19:16, 21:7, 24:21, 25:12, 25:14, 26:1, 27:12, 28:12, 28:17, 29:21, 29:23, 30:7, 30:13, 33:8, 35:13, 37:2, 37:19, 38:16, 38:20, 39:13, 39:14, 42:8, 42:23, 43:4, 43:7, 44:11, 45:11, 46:7, 46:20, 48:4, 49:20, 51:2, 52:13, 53:19, 54:15, 55:4, 55:6, 55:11, 56:22, 57:1, 57:21, 58:18, 59:9, 59:10, 59:19, 59:25, 64:10, 64:11, 66:6, 68:3, 88:8, 89:19, 90:18, 102:19, 108:12, 112:21, 114:6, 117:23, 119:2, 123:2, 125:18, 125:21
**lexisnexis** [1] - 82:20
**LexisNexis'** [6] - 14:18, 21:2, 32:22, 36:18, 39:19, 91:15
**liability** [6] - 66:8, 67:9, 67:10, 67:11, 99:24, 100:3

**liable** [1] - 67:7
**license** [6] - 81:14, 81:15, 81:21, 113:2, 114:9
**licenses** [6] - 35:25, 80:1, 97:3, 112:15, 112:21
**licensing** [1] - 71:12
**liens** [1] - 87:21
**lieu** [1] - 66:9
**light** [3] - 52:15, 63:14, 69:8
**likelihood** [1] - 87:10
**likely** [8] - 8:17, 31:14, 38:21, 48:12, 74:15, 74:21, 81:15, 130:12
**likewise** [1] - 119:23
**limitation** [1] - 59:18
**limitations** [1] - 93:15
**limited** [3] - 45:3, 70:5, 91:23
**line** [8] - 48:21, 73:25, 75:17, 77:24, 112:20, 114:8, 115:7, 128:21
**linear** [1] - 51:8
**liner** [2] - 47:12, 127:21
**lines** [2] - 46:6, 51:19
**lingered** [1] - 132:10
**link** [1] - 122:9
**list** [5] - 11:16, 79:7, 84:7, 121:7, 126:15
**listed** [1] - 127:2
**listener** [1] - 65:15
**lists** [1] - 68:16
**literally** [3] - 13:20, 44:3, 75:1
**litigant** [1] - 48:16
**litigants** [1] - 40:14
**litigated** [5] - 40:9, 52:13, 67:24, 67:25, 86:6
**litigating** [1] - 63:11
**Litigation** [1] - 2:4
**LITIGATION** [2] - 3:11, 3:18
**litigation** [16] - 5:25, 7:7, 14:7, 24:9, 34:15, 40:9, 40:19, 41:6, 41:7, 41:8, 42:21, 42:23, 54:25, 59:20, 70:3, 81:25
**Litigations** [1] - 140:5
**live** [6] - 74:10, 75:24, 75:25, 76:7, 76:9, 113:9
**lives** [7] - 19:24, 75:24, 75:25, 113:19, 113:21,

120:18, 121:3
**living** [4] - 20:20, 31:11, 39:5, 80:23
**LN** [3] - 68:1, 77:5, 78:4
**LN's** [1] - 101:10
**loans** [1] - 78:14
**locate** [51] - 20:6, 20:8, 20:9, 30:3, 30:25, 31:22, 32:3, 35:18, 35:23, 38:5, 45:5, 45:8, 73:4, 73:25, 75:3, 77:9, 80:1, 93:13, 95:7, 95:18, 96:1, 96:6, 96:13, 96:23, 97:1, 97:9, 97:12, 97:13, 97:18, 97:25, 99:13, 99:19, 100:2, 101:18, 105:11, 105:12, 109:6, 111:12, 113:25, 115:19, 116:19, 116:22, 117:17, 118:12, 118:14, 119:3, 119:6, 121:20, 124:24, 128:9
**located** [2] - 19:24, 113:12
**locater** [1] - 114:11
**locating** [1] - 92:24
**location** [2] - 20:6, 20:15
**locations** [1] - 75:8
**locator** [2] - 31:17, 110:19
**lock** [1] - 100:17
**locked** [2] - 47:8, 100:23
**logic** [1] - 79:24
**logical** [1] - 115:15
**logically** [1] - 71:18
**login** [1] - 105:10
**logistical** [1] - 130:6
**logs** [1] - 97:25
**logue** [1] - 11:24
**longest** [1] - 42:18
**look** [37] - 14:12, 27:9, 27:25, 30:7, 32:25, 33:1, 35:10, 35:22, 53:10, 53:18, 70:15, 75:17, 80:19, 90:4, 90:11, 90:13, 90:17, 91:5, 91:22, 92:6, 100:8, 104:24, 105:4, 107:21, 109:14, 110:7, 110:18, 111:7, 111:17, 111:19,

115:18, 118:16, 122:13, 130:13, 136:15
**Look** [3] - 69:3, 83:4, 85:17
**looked** [6] - 23:14, 61:23, 82:21, 92:16, 112:25, 118:4
**looking** [14] - 22:22, 23:6, 23:7, 36:2, 72:4, 75:16, 77:3, 80:21, 97:24, 105:7, 113:4, 119:17, 127:17, 127:23
**looks** [6] - 48:5, 100:1, 105:5, 107:18, 111:9, 111:13
**loose** [1] - 59:22
**Lorie** [1] - 139:7
**lose** [1] - 59:5
**Louis** [1] - 50:10
**love** [1] - 11:9
**loved** [1] - 70:25
**low** [1] - 54:2
**Lube** [4] - 82:5, 86:1, 88:17, 91:20
**lucky** [1] - 132:7
**Ludlow** [1] - 4:22
**lump** [2] - 19:13, 36:25
**lying** [1] - 88:22

---

### M

**Ma'am** [1] - 24:3
**mac@ caddellchapman. com** [1] - 2:25
**Macy's** [1] - 74:6
**Magistrate** [3] - 5:4, 33:19, 64:4
**MAGISTRATE** [1] - 1:15
**magnitude** [1] - 42:24
**mail** [4] - 10:18, 57:12, 58:16, 136:7
**mailing** [1] - 57:23, 57:24
**MAILMAN** [1] - 2:11
**Mailman** [1] - 6:2
**main** [1] - 118:1
**maintain** [2] - 47:25, 122:1
**maintained** [3] - 17:2, 37:8, 82:16
**maintenance** [1] - 71:15
**major** [6] - 10:23, 11:14, 41:19, 52:8, 90:10, 101:4

**majority** [1] - 19:17
**management** [2] - 27:13, 93:20
**mandated** [1] - 127:9
**mandatory** [1] - 55:9
**manner** [5] - 19:13, 24:10, 26:22, 37:25, 39:12
**March** [1] - 136:15
**market** [12] - 90:10, 90:11, 91:14, 92:6, 92:8, 93:20, 93:23, 93:24, 94:1, 100:15, 101:4, 127:3
**Market** [1] - 4:14
**marketing** [4] - 54:4, 80:16, 105:12, 105:21
**marketplace** [1] - 46:8
**MARY** [1] - 3:17
**mask** [1] - 109:15
**material** [1] - 15:4
**materials** [3] - 9:19, 103:6, 123:16
**matter** [9] - 12:4, 12:5, 28:1, 46:4, 59:22, 61:25, 64:13, 106:11, 109:11
**MATTHEW** [1] - 3:10
**maximum** [2] - 54:9, 54:14
**mcCABE** [1] - 64:9
**McCabe** [47] - 4:12, 5:13, 6:14, 6:19, 14:6, 26:5, 27:16, 27:17, 32:22, 39:19, 39:24, 48:15, 56:18, 63:20, 64:7, 64:9, 65:9, 65:13, 65:17, 66:21, 70:24, 71:3, 73:9, 73:12, 77:11, 77:15, 77:23, 78:4, 78:13, 78:25, 79:13, 80:3, 80:7, 80:9, 82:3, 83:20, 83:22, 84:1, 84:9, 84:11, 84:14, 84:16, 84:23, 88:13, 89:1, 101:13, 135:22
**McGrady** [2] - 75:16, 75:23
**McGradys** [1] - 75:19
**mean** [32] - 6:19, 12:5, 14:9, 26:16, 28:6, 28:18, 28:20, 39:20, 41:16, 42:23, 43:3, 49:22, 52:1, 57:3, 58:1, 58:2, 77:8, 77:13, 78:3, 78:21, 83:17, 84:11, 90:3,

94:16, 103:20, 116:1, 123:5, 131:14, 133:7, 134:2, 134:10, 138:4
**meaning** [2] - 49:21, 83:14
**means** [6] - 69:4, 88:23, 97:22, 113:21, 120:20, 129:8
**meant** [8] - 26:18, 85:4, 85:5, 85:6, 95:21, 100:21, 100:22, 103:8
**meantime** [1] - 22:21
**mechanics** [1] - 63:11
**mechanism** [2] - 44:22, 102:18
**mechanisms** [1] - 120:7
**median** [11] - 19:25, 20:1, 20:2, 30:20, 30:21, 31:8, 31:9, 35:24, 80:2, 97:16, 97:19
**mediate** [2] - 34:20, 34:25
**mediated** [1] - 35:4
**mediating** [1] - 34:22
**mediation** [3] - 18:7, 33:18, 35:6
**mediator** [1] - 34:17
**meet** [6] - 22:24, 27:16, 92:2, 92:20, 93:11, 118:8
**meeting** [9] - 27:12, 33:7, 33:8, 33:16, 33:17, 33:25, 34:10
**meetings** [1] - 34:16
**meets** [1] - 90:16
**member** [5] - 58:17, 103:1, 103:17, 103:21, 138:24
**members** [7] - 44:4, 48:24, 56:24, 57:11, 75:8, 102:21, 132:6
**members'** [1] - 11:7
**memo** [1] - 27:2
**mention** [3] - 53:7, 57:16, 59:3
**mentioned** [13] - 12:21, 34:4, 50:3, 67:20, 71:11, 71:14, 71:17, 84:8, 84:18, 98:18, 100:14, 107:20, 118:13
**mentioning** [1] - 40:22
**mere** [1] - 20:5
**merely** [3] - 25:15, 25:16, 67:16

**mesh** [1] - 122:16
**met** [5] - 7:16, 32:23, 33:6, 35:4, 42:1
**method** [2] - 12:7, 51:16
**methods** [1] - 98:24
**Michael** [1] - 5:12
**MICHAEL** [1] - 2:19
**middle** [3] - 30:16, 72:24, 107:21
**Midland** [1] - 94:5
**midst** [1] - 124:25
**might** [27] - 10:7, 10:8, 11:5, 11:8, 11:10, 12:4, 29:12, 32:24, 33:3, 40:7, 49:16, 65:2, 75:18, 81:17, 89:7, 95:3, 99:5, 106:13, 113:3, 115:2, 118:12, 120:3, 120:16, 122:12, 127:20, 133:9
**migrate** [2] - 128:8, 128:14
**migrated** [1] - 128:16
**Mike** [4] - 12:19, 96:14, 118:13, 127:20
**million** [11] - 40:23, 50:7, 50:14, 50:22, 52:18, 53:21, 53:23, 53:25, 60:5, 91:9
**millions** [4] - 44:3, 46:20, 53:13, 136:11
**mind** [4] - 30:23, 82:10, 111:16, 131:25
**mine** [1] - 65:11
**minimize** [2] - 90:20, 132:3
**minimum** [1] - 44:9
**minute** [3] - 18:24, 92:25, 121:6
**minutes** [4] - 15:11, 64:18, 89:24, 89:25
**mired** [1] - 137:25
**missing** [3] - 8:12, 33:2, 50:1
**mistake** [1] - 68:3
**misunderstand** [1] - 34:7
**misunderstanding** [1] - 16:12
**misunderstood** [1] - 85:5
**mixed** [1] - 37:17
**mock** [1] - 111:15, 122:12
**mock-up** [2] - 111:15,

122:12
**mocked** [1] - 111:24
**mocking** [1] - 122:17
**mode** [2] - 20:20, 39:5
**modeled** [1] - 121:22
**modest** [1] - 21:4
**modesty** [1] - 13:1
**modified** [1] - 33:13
**modifies** [1] - 69:22
**modify** [1] - 36:22
**module** [1] - 99:9
**moment** [5] - 25:24, 52:13, 86:24, 101:2, 133:10
**Monday** [2] - 1:17, 140:9
**monetary** [12] - 15:10, 35:9, 37:12, 42:14, 51:22, 52:5, 52:21, 56:14, 56:19, 59:11, 59:15, 60:3
**monetize** [2] - 52:3, 52:5
**monetized** [2] - 52:6, 53:20
**monetizing** [1] - 55:15
**money** [7] - 31:12, 31:14, 41:1, 52:16, 52:25, 80:22, 115:3
**monitoring** [1] - 82:24
**month** [3] - 87:17, 131:5, 139:5
**months** [2] - 33:10, 102:8
**morning** [1] - 55:20
**Morris** [2] - 2:5, 3:19
**Morrison** [2] - 6:14, 64:9
**MORRISON** [1] - 4:13
**mortgage** [3] - 110:12, 110:21, 110:25
**mortgaged** [1] - 97:4
**most** [9] - 38:21, 44:4, 55:20, 89:22, 90:12, 91:20, 94:3, 125:25, 127:5
**mostly** [2] - 94:4, 116:25
**motion** [15] - 19:1, 24:22, 25:2, 28:12, 61:14, 84:19, 84:21, 84:25, 85:3, 85:6, 85:7, 85:8, 134:18
**motivated** [1] - 132:1
**move** [2] - 20:20, 136:10
**moved** [2] - 26:3, 116:23, 128:19
**moving** [5] - 40:3, 82:4, 109:24,

116:20, 127:22
**MR** [278] - 5:16, 5:21, 6:10, 6:24, 7:20, 8:23, 9:17, 9:25, 10:11, 11:2, 11:15, 11:19, 11:23, 12:1, 12:2, 12:11, 12:15, 12:19, 16:20, 16:25, 17:5, 18:3, 18:19, 19:10, 19:12, 21:14, 21:25, 22:3, 22:4, 22:7, 23:1, 23:9, 23:10, 23:22, 24:3, 24:15, 26:9, 26:14, 26:25, 27:5, 28:10, 30:19, 31:21, 31:24, 32:6, 32:9, 32:12, 32:16, 32:21, 33:5, 35:3, 36:5, 38:25, 39:2, 39:7, 39:9, 40:24, 41:2, 41:4, 41:6, 41:22, 42:21, 46:10, 46:16, 46:25, 47:3, 47:11, 47:16, 47:24, 49:19, 49:24, 50:1, 50:13, 50:16, 50:23, 51:5, 52:24, 53:7, 53:25, 54:6, 55:17, 56:2, 56:13, 58:3, 58:6, 58:10, 58:13, 58:16, 58:20, 58:21, 59:2, 60:5, 60:9, 60:16, 60:19, 60:23, 61:2, 61:10, 63:1, 63:18, 64:7, 64:9, 65:13, 65:17, 66:21, 70:24, 71:3, 73:9, 73:12, 77:11, 77:15, 77:23, 78:4, 78:13, 78:25, 79:13, 80:3, 80:7, 80:9, 80:12, 80:18, 81:6, 81:11, 81:24, 82:3, 83:20, 83:22, 84:1, 84:3, 84:6, 84:9, 84:11, 84:14, 84:16, 84:23, 88:13, 88:24, 89:1, 89:16, 89:18, 93:25, 94:2, 94:13, 94:15, 94:21, 94:23, 95:5, 95:9, 95:12, 95:23, 97:2, 97:7, 98:7, 98:9, 98:11, 99:3, 99:10, 101:13, 101:17, 101:20, 103:11, 104:3, 104:4, 104:8, 104:10, 104:16, 104:20, 105:16, 105:19, 105:21, 105:24, 106:7,

106:14, 106:23, 107:2, 107:25, 108:7, 108:12, 108:16, 108:25, 109:14, 110:3, 110:7, 110:11, 110:17, 110:23, 110:25, 111:3, 111:5, 111:7, 111:17, 111:21, 112:2, 112:4, 112:8, 112:12, 112:16, 112:19, 112:24, 113:7, 114:1, 114:12, 114:15, 114:17, 114:20, 115:6, 115:9, 115:12, 116:2, 116:4, 116:7, 116:9, 116:10, 116:11, 116:14, 116:18, 117:6, 117:8, 117:13, 117:15, 117:20, 118:1, 118:11, 118:25, 121:1, 121:12, 121:17, 121:19, 121:24, 122:3, 122:4, 122:9, 122:15, 122:23, 123:13, 123:18, 123:20, 123:21, 124:4, 124:6, 124:9, 124:13, 124:16, 124:19, 124:22, 125:9, 125:14, 126:5, 126:8, 126:18, 126:20, 126:22, 127:8, 127:15, 128:4, 129:13, 129:24, 131:11, 131:16, 131:19, 131:23, 133:18, 133:22, 134:3, 134:9, 134:13, 134:16, 134:21, 134:23, 134:24, 135:22, 136:1, 136:14, 136:18, 136:19, 137:13, 139:11, 139:15
**multifaceted** [1] - 51:1
**multiple** [2] - 58:22, 62:7
**mundane** [1] - 65:10
**must** [4] - 66:13, 69:16, 69:19, 72:17
**mutual** [1] - 39:24

**N**

**name** [5] - 20:9, 79:16, 81:17, 105:12, 122:1
**named** [2] - 57:10, 119:24
**names** [3] - 19:19, 57:17, 138:7
**Nancy** [1] - 33:9
**Nash** [1] - 33:9
**national** [2] - 5:24, 56:4
**nature** [8] - 10:21, 19:21, 20:19, 28:21, 35:15, 43:25, 103:16, 123:10
**navigation** [1] - 99:7
**navigational** [1] - 109:15
**Neal** [1] - 50:9
**NEAL** [1] - 4:3
**necessarily** [6] - 78:6, 80:1, 104:12, 108:18, 126:17, 130:17
**necessary** [5] - 20:25, 45:8, 76:2, 108:13, 125:23
**need** [25] - 10:3, 11:20, 13:7, 13:9, 26:10, 27:21, 35:17, 35:24, 78:1, 79:25, 80:2, 95:17, 98:22, 105:19, 108:18, 114:25, 128:16, 128:17, 128:18, 128:19, 129:1, 129:16, 134:19, 138:4, 139:6
**needed** [1] - 17:8
**needle** [1] - 26:4
**needs** [3] - 61:19, 131:3, 131:8
**negligence** [1] - 62:9
**negligent** [3] - 65:24, 65:25, 66:2
**negligently** [1] - 67:12
**negotiate** [4] - 10:15, 10:16, 38:10, 42:15
**negotiated** [6] - 40:16, 50:16, 52:16, 52:22, 57:7, 89:6
**negotiating** [3] - 58:17, 123:9, 124:25
**negotiation** [2] - 99:12, 100:9
**negotiations** [4] - 47:20, 96:24, 118:3, 118:18
**neighborhood** [6] -

19:23, 19:25, 20:2, 20:3, 31:11, 113:20
**never** [7] - 28:24, 34:24, 42:1, 42:2, 42:3, 111:16, 137:15
**nevertheless** [1] - 10:14
**New** [2] - 27:12, 34:22
**new** [16] - 50:5, 77:24, 91:17, 99:7, 100:8, 107:3, 107:5, 109:5, 110:18, 111:11, 127:4, 128:6, 128:7, 128:8, 137:8
**Newport** [4] - 2:7, 3:21, 33:9, 79:6
**News** [4] - 2:7, 3:21, 33:9, 79:6
**NEXIS** [1] - 1:8
**next** [12] - 13:4, 13:10, 28:10, 37:19, 53:14, 107:7, 107:16, 108:7, 110:18, 122:15, 122:25, 129:6
**night** [1] - 88:22
**nine** [1] - 68:21
**Nineteenth** [1] - 2:14
**no-longer-available-to-collections** [1] - 116:24
**non** [6] - 52:6, 68:4, 95:4, 96:13, 115:20
**non-billable** [1] - 95:4
**non-consumer** [2] - 68:4, 115:20
**non-defaulted** [1] - 95:4
**non-FCRA** [1] - 96:13
**non-monetized** [1] - 52:6
**noncompliance** [1] - 44:23
**none** [3] - 40:25, 70:13, 100:19
**nonetheless** [4] - 43:5, 43:19, 87:2, 89:5
**nongovernmental** [2] - 36:11, 49:21
**normally** [2] - 125:11, 129:5
**North** [1] - 4:22
**notarial** [1] - 140:14
**Notary** [1] - 140:21
**note** [2] - 44:25, 107:19
**nothing** [1] - 8:16, 29:4, 51:21, 51:24, 59:8, 62:10, 70:12,

71:22, 72:1, 107:5, 135:13
**notice** [37] - 11:4, 11:6, 15:22, 25:14, 25:15, 37:4, 37:6, 37:9, 41:16, 43:17, 43:19, 43:20, 43:21, 44:4, 44:9, 57:12, 58:2, 58:3, 59:11, 59:12, 60:1, 60:9, 60:11, 60:22, 60:25, 102:1, 102:8, 104:1, 104:12, 104:16, 134:19, 134:20, 136:6, 136:7, 136:8, 136:11
**noticed** [2] - 33:23, 45:25
**notification** [1] - 104:14
**notifying** [1] - 125:2
**November** [1] - 43:15
**number** [28] - 20:10, 32:14, 43:6, 57:18, 63:8, 68:16, 68:24, 70:11, 73:16, 75:4, 76:7, 79:16, 82:16, 88:7, 119:11, 119:16, 119:18, 119:22, 120:13, 120:18, 121:5, 121:8, 121:9, 121:10, 122:18, 122:21, 125:22, 128:16
**Number** [4] - 1:6, 54:8, 115:7, 121:2
**numbers** [4] - 19:19, 19:20, 20:10, 87:3
**numerous** [1] - 7:21
**nurse** [1] - 113:18
**nuts** [1] - 8:3

**O**

**Oakland** [4] - 34:19, 34:24, 35:1, 35:3
**objected** [1] - 51:21
**objecting** [1] - 83:3
**objective** [5] - 7:18, 41:19, 42:12, 67:18, 132:13
**objectively** [2] - 66:15, 66:17
**objectors** [2] - 102:3, 132:8
**obligated** [2] - 60:10, 118:20
**obligations** [2] - 65:19, 106:8

**observe** [1] - 54:16
**obstinate** [1] - 10:19
**obtained** [1] - 124:9
**obvious** [1] - 42:22
**obviously** [23] - 6:11, 8:17, 21:22, 22:19, 23:23, 25:11, 32:15, 64:12, 65:11, 104:22, 113:14, 120:14, 124:7, 128:4, 128:10, 129:13, 130:5, 131:8, 132:18, 135:6, 135:22, 137:13, 137:23
**occasions** [1] - 44:3
**occur** [3] - 11:11, 11:12, 98:25
**ocean** [2] - 47:12, 127:21
**October** [1] - 42:19
**OF** [6] - 1:2, 2:2, 3:2, 3:4, 4:2, 140:1
**off-docket** [1] - 81:25
**offer** [3] - 6:6, 6:24, 128:5
**offered** [1] - 85:19
**offers** [1] - 30:9
**OFFICE** [1] - 3:4
**office** [2] - 103:3, 104:7
**often** [6] - 29:2, 32:25, 42:9, 53:3, 53:18, 75:6
**oftentimes** [1] - 113:15
**Ohio** [3] - 4:23, 6:13, 113:19
**old** [2] - 81:4, 99:6
**older** [1] - 44:8
**ON** [3] - 2:2, 3:2, 4:2
**on-line** [4] - 73:25, 75:17, 77:24, 128:21
**once** [12] - 16:14, 25:8, 26:13, 34:3, 41:18, 47:12, 49:3, 51:7, 72:18, 107:6, 125:25, 128:9
**once/twice** [1] - 49:6
**One** [1] - 80:18
**one** [77] - 9:3, 10:8, 11:23, 12:22, 13:8, 22:15, 25:5, 26:4, 26:6, 26:25, 33:23, 36:8, 36:9, 37:4, 37:5, 37:22, 39:6, 44:4, 47:19, 50:11, 51:8, 53:7, 54:8, 56:10, 57:16, 57:19, 57:24, 59:10, 66:1,

66:2, 67:16, 69:7, 69:23, 73:14, 74:6, 75:24, 79:9, 82:7, 83:19, 85:14, 86:4, 86:12, 87:5, 87:12, 87:15, 92:20, 97:14, 100:6, 100:13, 105:25, 107:16, 108:21, 111:10, 111:13, 112:14, 112:16, 112:17, 112:22, 114:4, 115:1, 115:14, 117:8, 118:12, 119:1, 119:9, 120:9, 123:13, 124:22, 130:6, 130:23, 131:23, 132:9, 132:23, 138:12, 138:18, 138:24
**ones** [1] - 71:7
**ons** [1] - 46:14
**operate** [1] - 137:7
**operates** [1] - 14:2
**operating** [1] - 137:7
**opinion** [8] - 7:19, 10:25, 20:5, 24:24, 25:8, 62:5, 62:12, 90:3
**opponent** [1] - 61:25
**opportunity** [10] - 8:25, 9:4, 10:7, 85:19, 102:21, 103:25, 104:25, 135:3, 137:19, 138:7
**opposed** [5] - 7:12, 75:25, 114:5, 114:25, 115:16
**opposing** [1] - 7:15
**opposite** [2] - 39:21, 112:21
**option** [1] - 77:10
**orally** [2] - 21:19, 93:23
**orchestrated** [1] - 28:3
**order** [23] - 5:7, 10:17, 43:17, 47:19, 64:6, 71:25, 72:8, 79:10, 84:24, 102:24, 103:5, 103:12, 115:15, 115:16, 118:7, 118:21, 126:25, 128:24, 129:4, 131:19, 131:21, 133:24
**ordinary** [1] - 131:20
**organized** [1] - 115:14
**original** [2] - 17:1
**originally** [1] - 80:15

**otherwise** [6] - 27:14, 51:11, 61:16, 63:14, 68:2, 118:20
**oton** [3] - 62:23, 62:25, 63:1
**Oton** [1] - 62:23
**ought** [3] - 92:3, 97:8, 102:7
**outcome** [2] - 40:10, 88:14
**outliers** [1] - 20:12
**outline** [1] - 52:2
**outlines** [1] - 62:12
**outmoded** [1] - 94:6
**output** [1] - 48:9
**outrageously** [1] - 53:6
**outside** [2] - 27:17, 103:6
**outstanding** [1] - 55:24
**overall** [1] - 38:11
**overlays** [1] - 117:14
**overly** [1] - 137:18
**overseen** [1] - 44:1
**overtime** [1] - 112:6
**overview** [2] - 6:17, 24:17
**overwhelming** [1] - 43:2
**owes** [2] - 119:19, 120:1
**own** [6] - 55:21, 94:7, 95:2, 128:22, 129:3
**ownership** [1] - 111:4
**owns** [1] - 81:18

**P**

**P.C** [5] - 2:11, 3:4, 3:11, 3:18, 140:5
**P.L.L** [1] - 4:20
**p.m** [5] - 1:18, 5:2, 64:1, 64:2, 139:19
**P.O** [1] - 4:7
**package** [2] - 13:16, 27:24
**Page** [1] - 27:2
**page** [8] - 30:16, 76:13, 76:23, 106:25, 107:18, 107:21, 110:18, 125:10
**pages** [1] - 122:11
**paid** [1] - 52:16
**paper** [5] - 6:7, 8:19, 35:20, 102:17, 128:19
**papers** [4] - 9:8, 14:23, 16:6, 132:15

**paperwork** [2] - 7:23, 14:25
**paragraph** [1] - 42:13
**part** [18] - 6:21, 8:7, 24:25, 27:25, 28:16, 31:20, 36:13, 38:10, 40:22, 46:18, 76:18, 77:1, 106:9, 118:19, 119:1, 129:21, 137:4
**parte** [2] - 12:2, 132:20
**participate** [1] - 60:22
**participated** [1] - 12:22
**particular** [9] - 7:3, 11:5, 24:13, 46:14, 81:21, 87:21, 88:4, 98:16, 113:18
**parties** [6] - 9:13, 28:7, 47:24, 95:2, 102:1, 121:20
**parts** [5] - 6:21, 36:15, 48:16, 111:13, 126:8
**party** [4] - 94:3, 94:15, 95:15
**passive** [1] - 49:7
**password** [1] - 84:5
**patient** [1] - 139:3
**pause** [1] - 135:14
**pay** [6] - 31:2, 32:5, 47:20, 52:18, 113:12, 115:3
**paying** [1] - 113:17
**payment** [1] - 72:10
**payments** [1] - 56:23
**Payne** [2] - 15:18, 62:6
**Payne's** [1] - 22:18
**pays** [1] - 104:6
**pejorative** [1] - 28:21
**penalties** [5] - 42:25, 67:13, 83:4, 83:10, 83:13
**pending** [1] - 19:1
**Pennsylvania** [3] - 2:15, 6:3, 87:23
**people** [40] - 25:16, 29:9, 29:22, 29:25, 30:3, 37:15, 37:18, 38:17, 38:19, 39:14, 42:10, 49:19, 49:22, 49:23, 53:15, 55:15, 57:22, 57:24, 57:25, 58:7, 59:7, 74:1, 75:13, 78:19, 90:12, 91:11, 91:12, 95:16, 97:17, 97:18, 102:3, 105:13, 105:21, 109:16, 112:4, 113:11, 136:8, 136:11, 137:6

**Pepsi** [1] - 42:7
**per** [2] - 51:5, 57:10
**perceived** [1] - 100:23
**percent** [7] - 26:4, 26:6, 26:8, 44:8, 57:2, 57:3, 57:10
**percentage** [1] - 53:3
**perfect** [2] - 24:6, 37:14
**performed** [1] - 94:8
**perhaps** [5] - 9:22, 15:7, 18:23, 26:3, 132:24
**period** [8] - 13:23, 49:14, 98:12, 102:12, 128:13, 136:9, 137:5
**periods** [2] - 42:18, 62:7
**permissible** [7] - 25:18, 70:12, 86:12, 93:5, 107:12, 109:23, 117:18
**permits** [1] - 69:13
**permitted** [5] - 45:17, 96:7, 96:19, 100:25, 123:7
**pernicious** [1] - 28:21
**person** [34] - 30:11, 32:7, 32:8, 38:4, 38:12, 38:13, 40:7, 45:4, 46:13, 48:11, 49:2, 73:3, 74:4, 74:8, 74:13, 74:16, 74:17, 76:6, 79:11, 79:15, 81:19, 87:11, 107:16, 108:1, 108:6, 109:6, 113:16, 113:19, 113:24, 119:18, 133:3, 135:5
**person-finder** [1] - 79:15
**person-search** [1] - 107:16
**personal** [2] - 39:5, 74:5
**personally** [2] - 138:9, 138:23
**personnel** [1] - 73:2
**persons** [1] - 43:12
**perspective** [9] - 14:7, 14:18, 19:15, 25:11, 25:12, 39:11, 47:4, 64:18, 113:11
**Petersburg** [1] - 3:6
**petition** [2] - 52:12, 52:17
**ph** [4] - 62:23, 83:19, 85:4, 90:21

**ph.)** [1] - 62:23
**pharmacist** [5] - 113:2, 113:9, 113:17, 113:18, 113:21
**Philadelphia** [6] - 2:15, 6:2, 17:18, 33:16, 33:17, 33:18
**phone** [15] - 10:6, 74:8, 74:10, 75:20, 76:7, 76:8, 79:16, 119:11, 119:16, 119:19, 119:22, 122:18, 122:21, 137:15
**phones** [3] - 79:17, 109:17
**phones-plus** [1] - 79:17
**physically** [1] - 103:3
**pick** [2] - 75:20, 81:11
**picked** [2] - 13:21, 15:7
**picture** [1] - 19:14
**piece** [5] - 74:6, 76:4, 87:21, 102:16, 115:1
**pilot's** [1] - 81:15
**pilots** [1] - 97:3
**pitch** [2] - 7:17, 27:23
**Pittman** [1] - 6:5
**PITTMAN** [2] - 3:3, 3:4
**place** [9] - 31:11, 35:8, 82:24, 97:23, 98:2, 98:21, 98:24, 130:4
**placed** [1] - 16:18
**places** [2] - 75:6, 121:13
**plaintiff** [3] - 19:8, 57:11, 87:13
**plaintiff's** [1] - 25:11
**Plaintiffs** [1] - 1:6
**plaintiffs** [27] - 5:12, 18:11, 21:14, 42:22, 64:14, 64:24, 65:23, 66:8, 66:12, 69:2, 69:15, 75:10, 82:6, 82:7, 85:15, 86:5, 87:7, 88:8, 88:15, 89:6, 114:10, 118:5, 118:17, 119:24, 120:11, 122:7, 126:14
**PLAINTIFFS** [3] - 2:2, 3:2, 12:18
**plaintiffs'** [11] - 7:2, 8:24, 28:5, 30:6, 96:24, 99:18, 100:10, 102:14, 103:2, 118:6, 119:13
**plan** [2] - 89:20, 125:1

**plane** [1] - 55:20
**planning** [1] - 105:6
**play** [3] - 39:18, 51:12, 53:5
**Plaza** [1] - 4:21
**pleadings** [5] - 43:22, 84:19, 84:25, 85:7, 85:9
**pleased** [1] - 6:11
**Plum** [1] - 85:4
**plus** [1] - 79:17
**point** [38] - 6:22, 8:6, 12:4, 15:13, 20:13, 22:10, 25:10, 25:13, 25:14, 25:25, 26:14, 27:1, 27:6, 28:8, 34:2, 45:1, 48:20, 49:11, 49:13, 49:17, 50:5, 54:7, 70:6, 70:19, 72:6, 78:4, 88:2, 93:1, 99:23, 102:16, 104:11, 105:25, 106:15, 107:6, 112:13, 118:1, 138:18
**Point** [1] - 4:6
**pointing** [1] - 15:6
**police** [1] - 94:15
**policies** [1] - 8:9
**policy** [1] - 87:5
**poorly** [1] - 88:20
**pop** [3] - 106:19, 106:21, 109:23
**pop-up** [1] - 109:23
**portal** [2] - 105:8, 107:4
**portfolio** [3] - 72:6, 72:9, 72:11
**Portfolio** [1] - 94:5
**portion** [44] - 5:16, 15:5, 32:21, 38:12, 49:18, 51:2, 51:6, 51:8, 51:12, 52:6, 52:19, 54:7, 59:5, 61:21, 64:19, 70:19, 76:14, 92:25, 104:5, 104:8, 107:15, 108:6, 108:9, 110:1, 111:5, 117:20, 122:1, 122:13, 123:1, 124:8, 125:3, 125:17, 126:4, 126:6, 129:11, 131:7, 131:11, 133:18, 134:4, 134:7, 136:4, 137:3, 137:11, 139:1
**portion.)** [3] - 91:21, 95:6, 115:4
**position** [10] - 16:6,

30:7, 35:20, 35:21, 39:20, 52:11, 70:2, 73:13, 78:10, 85:8
**positions** [3] - 40:2, 88:7
**possible** [5] - 54:9, 54:15, 73:5, 132:8, 137:20
**possibly** [1] - 102:22
**post** [1] - 11:24
**post-logue** [1] - 11:24
**posture** [1] - 132:19
**potential** [6] - 14:1, 43:6, 51:9, 126:12, 131:2, 134:14
**potentially** [1] - 81:8
**PowerPoint** [3] - 33:13, 65:11, 123:24
**PowerPoints** [1] - 123:15
**PPA** [1] - 117:18
**practical** [5] - 86:4, 86:22, 87:4, 111:8, 114:5
**practically** [1] - 122:6
**practice** [4] - 13:11, 16:14, 29:23, 41:19
**Practices** [1] - 94:9
**practices** [6] - 36:18, 36:23, 43:23, 45:23, 50:6, 118:18
**practicing** [1] - 94:3
**preceded** [1] - 85:23
**precedes** [1] - 68:22
**precise** [1] - 65:21
**precisely** [2] - 29:21, 53:20
**predicated** [1] - 88:17
**predicts** [2] - 75:23, 87:10
**predominance** [1] - 63:11
**predominate** [2] - 66:4, 66:5
**preference** [1] - 135:18
**prejudice** [1] - 18:10
**preliminary** [9] - 43:16, 61:13, 101:25, 102:12, 131:4, 133:8, 134:18, 136:9, 136:15
**premature** [1] - 18:23
**premise** [1] - 65:18
**preparations** [1] - 64:13
**prepare** [1] - 135:20
**prepared** [4] - 72:12, 72:13, 72:15, 135:6

**preparing** [1] - 41:13
**pres** [3] - 59:16, 59:18, 59:20
**present** [4] - 12:7, 35:21, 91:14, 130:18
**presentation** [14] - 6:6, 6:20, 6:21, 8:2, 14:21, 21:18, 33:13, 33:15, 47:22, 50:5, 76:14, 100:21, 105:3, 129:25
**PRESENTATION** [1] - 12:18
**presentations** [2] - 5:19, 26:16
**presented** [3] - 67:24, 68:25, 74:7
**presenting** [2] - 135:8, 138:21
**President** [1] - 46:1
**presiding** [2] - 5:5, 64:4
**presumably** [3] - 104:2, 109:11, 124:14
**presume** [2] - 22:11, 86:23
**pretty** [7] - 20:12, 20:14, 42:22, 43:5, 56:4, 134:21, 136:10
**prevail** [2] - 44:15, 87:13
**prevent** [4] - 74:1, 74:18, 74:23, 103:8
**preview** [1] - 8:14
**previous** [1] - 24:9
**primary** [2] - 103:18, 125:20
**principal** [1] - 94:4
**principals** [2] - 48:2, 100:25
**prints** [2] - 47:22, 111:9
**prioritization** [1] - 80:10
**privacy** [3] - 46:2, 56:7, 117:24
**Privacy** [3] - 117:13, 117:15, 117:22
**private** [1] - 40:14
**privately** [1] - 132:11
**pro** [2] - 56:24, 57:11
**problem** [13] - 25:20, 28:22, 28:25, 29:8, 30:5, 30:7, 34:14, 68:23, 69:2, 69:10, 84:5, 121:24, 138:1
**procedural** [4] - 24:16, 44:22, 102:18, 135:18

**procedure** [1] - 133:2
**procedures** [1] - 136:22
**proceed** [4] - 5:15, 5:18, 27:8, 42:11
**proceeding** [2] - 74:18, 84:20
**PROCEEDINGS** [1] - 1:14
**proceedings** [6] - 5:2, 64:1, 139:19, 140:5, 140:11, 140:12
**process** [27] - 8:19, 9:10, 9:14, 15:17, 16:2, 77:18, 77:21, 77:22, 91:18, 94:10, 98:21, 98:23, 99:7, 99:8, 101:24, 102:25, 103:7, 104:12, 104:17, 113:14, 127:9, 127:12, 132:21, 136:23, 137:19, 137:23, 138:9
**procure** [1] - 86:9
**produces** [1] - 19:17
**product** [46] - 15:1, 15:19, 42:9, 48:14, 49:3, 50:25, 68:12, 74:25, 75:14, 77:2, 77:5, 77:20, 78:1, 78:17, 78:23, 80:14, 92:18, 92:23, 93:13, 93:16, 95:19, 96:7, 98:15, 101:10, 101:12, 103:19, 105:5, 106:3, 107:10, 107:11, 108:13, 108:14, 109:25, 114:21, 114:22, 114:24, 115:20, 125:20, 125:21, 125:23, 126:2, 127:22, 127:24, 128:5, 128:7, 128:12
**productive** [1] - 97:5
**products** [15] - 8:9, 16:21, 79:1, 92:19, 97:21, 98:25, 100:8, 107:3, 118:7, 123:7, 124:20, 126:1, 127:4, 128:9, 129:2
**professional** [3] - 56:11, 112:15
**Professor** [2] - 55:18, 56:6
**professors** [1] - 55:21
**program** [4] - 44:7, 128:10, 134:20,

136:6
**programs** [1] - 8:9
**progress** [1] - 33:22
**prohibited** [1] - 123:7
**prologue** [1] - 11:25
**promise** [3] - 89:23, 101:13, 130:7
**promised** [1] - 34:23
**pronounce** [1] - 62:24
**pronouncements** [1] - 87:24
**proof** [3] - 62:9, 64:20, 82:5
**proper** [3] - 21:10, 101:9, 132:19
**property** [11] - 80:20, 87:21, 87:22, 97:4, 97:17, 108:22, 110:9, 110:13, 110:14, 110:19, 111:12
**property-locator** [1] - 110:19
**proposal** [4] - 60:19, 60:24, 61:3, 127:18
**proposals** [1] - 27:19
**propose** [2] - 102:17, 102:25
**proposed** [4] - 16:6, 37:24, 38:7, 43:8
**proposing** [7] - 14:12, 15:7, 31:19, 43:17, 43:19, 90:16, 92:10
**prosaic** [1] - 38:5
**prospect** [1] - 66:10
**protect** [1] - 102:18
**Protection** [2] - 117:14, 117:16
**protective** [2] - 102:24, 103:5
**prove** [1] - 19:5
**provide** [9] - 20:16, 68:8, 69:22, 97:16, 98:1, 104:21, 106:10, 118:20, 123:15
**provided** [5] - 6:7, 55:18, 73:6, 96:22, 140:4
**providers** [1] - 44:5
**provides** [2] - 43:4, 80:24
**providing** [3] - 15:22, 20:14, 104:14
**provision** [2] - 47:5, 47:6
**provisions** [1] - 108:5
**proxy** [1] - 38:19
**Public** [2] - 83:1, 140:21

**public** [6] - 75:22, 76:4, 97:8, 101:7, 102:11, 102:20
**publically** [2] - 75:17, 87:9, 117:10
**publication** [2] - 102:8, 104:16
**publicize** [1] - 125:6
**publicly** [1] - 75:15
**published** [2] - 43:20, 82:25
**Puerto** [1] - 43:14
**pull** [3] - 72:7, 86:11, 103:9
**punitive** [2] - 44:20, 102:21
**purchase** [1] - 74:18
**purchasers** [1] - 72:9
**purely** [1] - 15:9
**purple** [1] - 122:25
**purpose** [15] - 16:9, 25:18, 39:17, 68:17, 68:19, 69:12, 69:24, 70:5, 72:13, 74:14, 76:20, 83:25, 93:5, 99:25, 115:14
**purposes** [17] - 7:25, 16:10, 16:12, 25:23, 68:17, 70:4, 72:19, 72:24, 73:24, 77:1, 84:1, 86:1, 86:12, 86:16, 95:19, 109:12, 117:18
**pursue** [6] - 12:9, 21:8, 29:1, 31:6, 44:18, 44:19
**pursued** [3] - 30:2, 37:15, 92:13
**push** [1] - 48:18
**pushes** [1] - 126:3
**pushing** [2] - 112:20, 112:21
**put** [17] - 8:2, 22:9, 90:5, 91:6, 95:17, 100:7, 100:17, 100:20, 102:14, 118:7, 120:16, 122:18, 127:12, 128:7, 130:15, 131:24, 138:6
**putting** [2] - 90:3, 111:21, 124:25

---

**Q**

**qualified** [5] - 67:2, 67:3, 67:6, 67:21, 72:18
**qualifies** [1] - 72:18
**qualify** [2] - 70:18,

72:22
**quarrel** [1] - 39:13
**quarter** [1] - 129:8
**questioned** [1] - 77:25
**questions** [8] - 8:5,
61:9, 61:11, 63:19,
89:11, 105:1, 132:9,
135:23
**quick** [1] - 89:25
**quickly** [8] - 9:23,
14:5, 23:11, 35:23,
74:22, 104:21,
108:17, 136:10
**quite** [5] - 26:5, 55:25,
96:14, 114:20,
138:21

# R

**rAETHER** [1] - 109:14
**Raether** [11] - 5:14,
6:12, 6:22, 39:22,
48:17, 56:16, 64:16,
89:11, 89:18,
120:18, 121:3
**RAETHER** [98] - 4:19,
80:12, 80:18, 81:6,
81:11, 84:3, 84:6,
84:10, 89:16, 89:18,
93:25, 94:15, 94:21,
95:5, 95:9, 95:12,
95:23, 95:25, 97:7,
98:7, 98:9, 98:11,
99:10, 99:17, 100:6,
101:20, 103:11,
104:3, 104:10,
104:16, 104:20,
105:16, 105:19,
105:21, 105:24,
106:14, 106:23,
107:2, 107:25,
108:7, 108:16,
108:25, 110:3,
110:7, 110:11,
110:17, 110:23,
110:25, 111:5,
111:7, 111:17,
111:21, 112:2,
112:4, 112:8,
112:12, 113:7,
114:12, 114:17,
114:20, 115:6,
115:9, 115:12,
116:2, 116:4, 116:7,
116:9, 116:11,
116:14, 116:18,
117:6, 117:8,
117:15, 118:1,
118:11, 118:25,
121:1, 121:12,

121:17, 122:4,
122:9, 122:15,
122:23, 124:6,
124:13, 124:16,
124:19, 124:22,
125:9, 126:5, 126:8,
126:20, 126:22,
127:8, 127:15,
128:4, 129:13,
129:24
**Raether's** [2] - 14:21,
43:10
**raise** [1] - 21:16
**raised** [9] - 17:20,
91:25, 97:15, 118:5,
118:17, 118:22,
120:10, 122:7,
130:12
**ran** [1] - 108:1
**random** [3] - 74:12,
84:11, 120:16
**Randy** [1] - 34:25
**range** [3] - 62:18,
78:25, 79:20
**ranged** [1] - 84:6
**rapidly** [1] - 41:13
**rata** [2] - 56:24, 57:11
**rather** [5] - 26:21,
49:9, 65:10, 95:22,
117:23
**re** [2] - 57:23, 57:24
**re-mailing** [1] - 57:23,
57:24
**reached** [4] - 23:8,
23:18, 23:19, 57:4
**reaching** [1] - 22:21
**reaction** [1] - 11:7
**read** [14] - 10:9, 14:11,
15:4, 24:6, 35:14,
35:19, 35:20, 66:22,
69:3, 69:21, 71:3,
83:17, 138:5, 139:4
**reading** [2] - 55:19,
55:22
**ready** [3] - 5:15, 5:18,
21:18
**real** [14] - 34:6, 52:6,
54:7, 55:13, 55:15,
69:1, 75:18, 76:10,
80:20, 100:11,
108:22, 110:9,
110:19, 111:12
**reality** [3] - 47:12,
59:22, 114:6
**realize** [2] - 34:11,
113:10
**really** [70] - 7:6, 7:14,
11:20, 13:3, 14:5,
14:14, 14:21, 15:2,
26:15, 33:20, 34:1,

34:5, 34:12, 34:14,
36:7, 38:16, 49:10,
50:11, 50:20, 56:16,
63:9, 65:6, 66:1,
67:21, 68:13, 70:5,
70:15, 77:9, 77:14,
77:20, 78:22, 80:5,
88:1, 88:22, 90:2,
90:6, 90:7, 90:10,
90:16, 91:5, 91:9,
92:6, 92:12, 98:13,
98:14, 99:14, 103:7,
103:14, 103:20,
103:23, 104:21,
107:6, 109:4,
109:10, 114:23,
115:9, 115:12,
115:14, 119:11,
119:21, 126:5,
127:1, 127:15,
127:20, 129:5,
130:24, 133:12,
133:14, 137:18
**reason** [11] - 13:7,
22:16, 37:10, 37:12,
87:5, 88:16, 100:20,
101:1, 101:21,
119:9, 132:20
**reasonable** [9] -
25:21, 52:18, 64:16,
66:15, 66:18, 66:19,
67:16, 73:21, 89:9
**reasonableness** [1] -
103:13
**reasonably** [1] - 66:24
**reasoned** [2] - 40:13
**reasons** [7] - 13:8,
33:23, 42:19, 80:16,
100:13, 117:1, 122:5
**receivable** [2] - 93:20,
94:6
**receive** [1] - 57:11
**recent** [2] - 87:15,
130:16
**recess** [2] - 63:24,
139:18
**Recess** [1] - 64:1
**reckless** [2] - 67:17,
68:1
**recognize** [6] - 34:5,
42:25, 49:7, 80:14,
126:14, 132:5
**reconsideration** [3] -
84:21, 85:1, 85:3
**record** [18] - 23:21,
26:24, 63:25, 71:2,
75:22, 85:13, 88:25,
101:19, 104:9,
108:15, 108:16,
112:11, 115:8,

126:21, 133:5,
134:8, 134:25,
136:20
**recording** [1] - 140:4
**records** [3] - 75:18,
76:4, 110:13
**recourse** [1] - 55:1
**recover** [3] - 44:17,
66:8, 68:4
**recoveries** [1] - 12:24
**recovery** [1] - 65:2
**Recovery** [1] - 94:5
**red** [2] - 80:24, 130:9
**reduce** [1] - 116:18
**reduced** [1] - 116:20
**reducing** [2] - 132:13,
132:21
**redundant** [1] - 119:9
**refer** [4] - 46:12,
68:21, 69:5, 133:2
**reference** [2] - 45:3,
117:21
**referencing** [1] - 106:5
**referred** [4] - 32:10,
85:11, 93:21, 98:14
**referring** [2] - 46:13,
93:20
**refers** [3] - 45:1, 69:6,
69:11
**refine** [1] - 34:1
**reflected** [1] - 135:7
**reflection** [2] - 86:2,
135:23
**refuse** [1] - 25:15
**regard** [10] - 47:16,
87:25, 88:7, 90:4,
120:12, 120:13,
123:4, 123:5, 123:6,
127:18
**regarding** [5] - 54:18,
61:11, 75:5, 84:24,
85:3
**Registry** [1] - 83:1
**regulator** [1] - 72:5
**regulatory** [1] - 45:24
**reimbursed** [2] -
59:10, 59:14
**reimbursement** [1] -
59:25
**relate** [3] - 87:11,
97:11, 120:17
**related** [1] - 39:17
**relates** [3] - 80:20,
96:23, 97:24
**relating** [1] - 110:15
**relational** [1] - 121:25
**relative** [3] - 120:1,
122:20, 122:23
**relatively** [1] - 26:21
**release** [6] - 44:10,

44:11, 57:13, 58:8,
58:18, 128:11
**releasing** [2] - 44:23,
127:24
**relevant** [1] - 69:7
**relied** [1] - 85:14
**relief** [55] - 15:9,
15:10, 27:19, 27:23,
35:9, 36:22, 37:13,
40:10, 40:14, 42:2,
42:12, 42:15, 42:17,
43:11, 44:24, 45:17,
46:16, 46:17, 47:19,
49:24, 50:8, 51:9,
51:20, 51:22, 52:20,
52:21, 55:23, 56:14,
56:19, 57:6, 59:11,
59:12, 59:15, 60:3,
64:17, 89:12, 90:5,
90:24, 91:3, 91:6,
92:16, 95:8, 95:10,
102:10, 105:7,
118:19, 119:1,
123:23, 127:1,
129:16, 131:19,
133:24, 134:15
**remain** [1] - 10:23
**remains** [1] - 12:8
**remarkable** [1] - 62:11
**remember** [3] - 60:10,
127:19, 135:4
**remove** [1] - 55:11
**removed** [2] - 110:20,
110:23
**rental** [1] - 78:19
**repeat** [1] - 56:12
**report** [139] - 13:19,
15:24, 17:21, 19:16,
20:4, 20:9, 24:22,
24:23, 25:1, 25:3,
25:4, 25:16, 25:22,
28:22, 28:24, 28:25,
29:10, 29:20, 29:21,
30:8, 30:9, 30:11,
30:12, 30:23, 30:24,
31:1, 31:3, 31:4,
31:17, 31:18, 32:3,
32:4, 32:6, 36:1,
36:10, 37:5, 37:16,
37:20, 37:22, 38:1,
38:6, 38:20, 43:10,
44:14, 45:2, 45:5,
45:6, 45:14, 46:1,
50:24, 51:7, 51:17,
51:19, 54:21, 55:6,
55:12, 55:19, 55:21,
65:3, 65:7, 65:19,
66:22, 68:1, 68:4,
68:11, 68:13, 69:9,
69:17, 69:19, 70:14,

70:18, 70:23, 71:4,
71:6, 71:9, 71:21,
71:25, 72:16, 72:22,
73:7, 73:19, 73:23,
76:15, 78:6, 78:24,
79:11, 79:13, 79:14,
79:15, 79:19, 81:20,
82:10, 83:15, 86:13,
86:22, 87:6, 87:17,
87:20, 87:23, 87:25,
88:3, 88:4, 88:18,
89:2, 89:4, 92:3,
92:21, 93:2, 93:7,
93:10, 93:14, 93:16,
96:2, 96:3, 96:8,
97:13, 106:2, 106:3,
106:17, 107:11,
109:8, 109:18,
109:20, 109:24,
115:3, 115:20,
118:14, 119:4,
119:17, 119:18,
119:21, 119:23,
124:10, 126:19
**reported** [3] - 42:5,
87:21, 119:5
**REPORTER** [1] -
140:1
**Reporting** [26] - 7:7,
7:14, 12:24, 15:20,
16:9, 16:10, 16:23,
17:23, 20:16, 20:21,
25:23, 28:23, 38:9,
40:15, 53:16, 57:14,
76:16, 82:12, 99:23,
103:20, 118:16,
119:8, 121:22,
124:8, 124:23,
126:10
**reporting** [9] - 51:16,
51:17, 55:3, 69:13,
71:24, 80:24, 82:12,
125:11, 125:17
**reports** [54] - 13:23,
15:21, 19:6, 19:9,
20:24, 21:11, 22:5,
25:21, 28:14, 28:19,
29:16, 30:1, 30:2,
30:8, 30:10, 31:20,
32:5, 34:13, 35:15,
35:16, 35:22, 36:11,
36:13, 36:15, 36:18,
38:9, 38:18, 50:22,
53:15, 53:17, 54:9,
54:14, 66:23, 69:14,
70:12, 72:7, 78:8,
82:19, 83:11, 83:12,
83:13, 83:14, 84:17,
86:9, 86:16, 86:21,
87:2, 87:14, 117:3,

123:25, 125:19,
130:1
**represent** [5] - 5:12,
5:14, 41:25, 42:11,
64:10
**representations** [2] -
28:16, 76:24
**representative** [2] -
29:6, 62:19
**representatives** [10] -
18:9, 19:4, 20:23,
21:10, 21:21, 22:12,
22:25, 28:15, 33:21,
40:4
**represented** [2] -
27:22, 63:3
**representing** [2] -
28:6, 62:7
**represents** [1] - 48:17
**reputation** [3] - 15:5,
20:19, 39:5
**request** [7] - 37:20,
38:20, 57:3, 93:6,
114:6, 119:3, 129:17
**requested** [3] - 37:1,
56:20, 62:21
**require** [5] - 43:19,
44:16, 103:15,
104:12, 136:6
**required** [5] - 38:9,
54:16, 90:23,
103:12, 126:25
**requirement** [1] -
124:8
**requirements** [7] -
22:14, 22:24, 46:14,
92:22, 96:3, 118:15,
125:5
**requires** [1] - 107:9
**requisite** [1] - 20:24
**residences** [1] - 75:7
**residing** [1] - 43:13
**residual** [1] - 59:14
**resolution** [2] - 40:16,
86:6
**resolve** [2] - 88:10,
118:2
**resolved** [3] - 8:21,
10:24, 14:15
**resolves** [1] - 126:5
**resources** [2] - 91:19,
125:9
**respect** [20] - 18:16,
24:5, 28:14, 36:18,
39:21, 39:24, 39:25,
39:21, 82:15, 82:22,
96:7, 118:11, 119:6,
119:10, 125:4,
130:8, 131:25

**respected** [3] - 9:3,
44:4, 50:10
**respects** [1] - 57:8
**respond** [2] - 46:8,
72:14
**response** [7] - 15:24,
45:24, 48:10, 71:25,
83:2, 83:8, 135:10
**responses** [1] - 28:7
**responsibilities** [1] -
92:4
**responsibility** [1] -
71:13
**rest** [2] - 62:9, 132:5
**restatement** [1] -
24:14
**restrict** [1] - 117:1
**restricted** [1] - 45:7
**result** [9] - 15:24,
23:18, 29:13, 37:16,
38:18, 44:13, 54:21,
54:24, 55:16
**results** [9] - 79:5,
79:8, 107:17, 108:2,
109:6, 110:9,
110:19, 111:12,
122:19
**retain** [1] - 34:17
**retool** [1] - 128:24
**retractors** [1] - 102:4
**retreat** [1] - 28:4
**returned** [1] - 23:17
**reveal** [1] - 28:7
**revenue** [1] - 54:4
**reversion** [1] - 58:25
**revert** [2] - 46:21,
59:24
**review** [2] - 130:10,
137:21
**reviewed** [3] - 110:18,
135:5, 136:3
**reviewing** [1] - 122:14
**revision** [1] - 72:4
**Richards** [3] - 50:9,
50:19, 56:6
**Richards'** [1] - 55:18
**RICHMOND** [1] - 1:2
**Richmond** [2] - 1:16,
4:8
**Rico** [1] - 43:14
**rightfully** [1] - 22:14
**Rights** [1] - 67:7
**rights** [6] - 29:11,
67:8, 93:2, 125:9,
125:13, 128:11
**rigorous** [2] - 61:19,
132:16
**rise** [3] - 5:3, 63:23,
139:17
**risk** [2] - 25:25, 77:18

**RISK** [1] - 1:8
**risks** [10] - 22:15,
40:3, 40:19, 41:7,
41:8, 42:22, 42:23,
43:7, 72:10
**Road** [1] - 3:12
**Robertson** [1] - 33:4
**robust** [1] - 114:22
**roles** [1] - 125:16
**Ron** [6] - 6:12, 6:18,
89:18, 94:24,
120:18, 121:3
**RONALD** [1] - 4:19
**Ronald** [1] - 5:14
**room** [2] - 27:14,
52:24
**ROTKIS** [1] - 3:17
**Rotkis** [1] - 6:5
**rough** [1] - 37:14
**roughly** [1] - 34:17
**rules** [1] - 132:2
**run** [3] - 41:6, 79:3,
104:20
**runs** [1] - 68:24

## S

**SafeCo** [2] - 66:24,
88:7
**sale** [6] - 34:6, 34:12,
44:13, 110:12,
110:21, 110:25
**sales** [3] - 74:8, 74:13,
127:3
**San** [3] - 4:15, 6:15,
74:7
**sanction** [1] - 43:2
**SANDERS** [1] - 4:4
**Sanders** [2] - 4:5, 6:11
**satisfied** [1] - 63:7
**satisfies** [1] - 61:23
**satisfy** [1] - 63:4
**scenario** [1] - 119:23
**scheme** [2] - 43:3,
106:1
**scoot** [1] - 9:22
**scope** [1] - 79:14
**scored** [1] - 51:24
**scratch** [1] - 127:22
**screen** [9] - 47:22,
79:2, 102:10, 107:8,
107:9, 107:22,
108:19, 122:25,
124:17
**screening** [5] - 77:1,
78:15, 78:18, 78:19,
78:22
**sea** [5] - 13:13, 13:14,
13:24, 14:1, 138:11
**seal** [1] - 140:14

**search** [33] - 20:6,
20:8, 30:10, 30:11,
32:7, 32:8, 38:4,
38:5, 38:12, 38:13,
45:4, 45:5, 46:14,
48:11, 49:2, 76:13,
79:3, 79:5, 79:8,
96:2, 107:16, 108:1,
108:6, 108:22,
109:6, 110:9,
110:19, 111:12,
121:8, 122:11,
122:19
**search-and-locate** [4]
- 20:6, 20:8, 38:5,
45:5
**search-like** [1] - 49:2
**searchs** [1] - 30:10
**seated** [2] - 5:7, 64:6
**second** [6] - 36:24,
44:25, 48:20, 49:17,
116:3, 129:7
**secret** [1] - 58:25
**section** [1] - 106:17
**securant** [1] - 83:19
**Securant** [1] - 15:20
**secured** [1] - 64:25
**Security** [3] - 19:19,
20:10, 32:14
**security** [1] - 82:15
**see** [41] - 8:25, 10:10,
12:10, 18:12, 27:10,
28:1, 30:15, 30:16,
30:20, 33:2, 33:6,
33:15, 34:16, 47:21,
48:20, 49:8, 50:18,
56:9, 57:15, 64:23,
85:1, 103:1, 107:2,
107:5, 107:23,
108:8, 109:16,
110:11, 112:15,
113:23, 115:12,
117:20, 122:16,
125:11, 126:12,
130:9, 135:17,
136:23, 137:19,
138:4, 138:15
**seeing** [4] - 50:5,
56:17, 91:16, 138:17
**seek** [2] - 8:25, 65:23
**seeking** [1] - 36:17
**seem** [1] - 68:21
**sees** [1] - 107:8
**Seismic** [2] - 82:14,
83:18
**sell** [6] - 13:17, 29:24,
30:2, 54:8, 55:7,
77:19
**sells** [1] - 108:12
**send** [4] - 10:18,

78:17, 78:20, 102:1
**sending** [1] - 58:17
**sense** [9] - 24:6,
35:23, 53:4, 103:17,
104:19, 114:4,
116:6, 132:24, 133:6
**sensitive** [2] - 101:3
**sensitivity** [2] - 14:23,
48:22
**sentence** [1] - 68:20
**separate** [7] - 16:4,
16:15, 16:16, 17:2,
31:20, 57:7, 57:8
**separately** [3] - 12:21,
57:7, 63:4
**September** [1] - 24:18
**sequentially** [1] - 76:3
**series** [3] - 82:6,
123:3, 125:5
**serious** [1] - 65:1
**serve** [1] - 125:15
**serves** [1] - 75:15
**service** [5] - 20:7,
43:4, 76:23, 96:2,
101:18
**services** [1] - 118:8
**session** [4] - 5:6, 64:5,
107:13, 110:4
**sessions** [1] - 35:6
**set** [12] - 26:19, 29:5,
41:15, 47:12, 64:12,
71:20, 93:21, 103:2,
104:23, 108:20,
115:25, 138:14
**sets** [1] - 138:13
**settled** [6] - 15:25,
17:14, 21:2, 21:4,
41:14, 132:15
**settlement** [71] - 7:13,
7:25, 8:5, 8:7, 8:13,
9:8, 9:12, 10:12,
13:5, 16:13, 17:17,
18:17, 18:19, 23:18,
23:19, 26:17, 31:20,
32:23, 33:7, 36:14,
37:24, 38:7, 38:11,
42:4, 42:14, 43:23,
44:1, 44:18, 45:18,
45:22, 46:4, 50:18,
50:19, 52:20, 54:14,
56:1, 56:19, 57:13,
61:21, 61:22, 63:9,
63:12, 64:15, 64:22,
77:9, 78:7, 82:25,
83:2, 83:3, 83:6,
85:24, 89:8, 93:10,
93:12, 101:6, 102:4,
103:14, 103:16,
123:3, 123:14,
129:15, 131:14,

132:4, 133:8,
133:11, 133:19,
134:12, 135:11,
136:5, 136:7
**settlements** [3] - 15:8,
43:8, 58:23
**seven** [16] - 20:17,
31:15, 39:3, 39:22,
45:6, 45:16, 46:23,
47:1, 49:14, 53:14,
69:17, 71:5, 72:21,
96:15, 100:18,
129:19
**seven-characteristic**
[2] - 71:5, 72:21
**seven-factor** [1] -
69:17
**seven-year** [2] -
45:16, 49:14
**seventh** [1] - 113:16
**several** [1] - 34:16
**shaded** [1] - 111:14
**shaded-out** [1] -
111:14
**share** [2] - 27:18,
29:18
**shared** [1] - 10:13
**sheet** [1] - 109:8
**shift** [4] - 77:18,
90:10, 91:8, 115:6
**shifting** [1] - 98:19
**ship** [1] - 127:21
**shortly** [1] - 17:24
**shots** [2] - 102:10,
124:18
**show** [9] - 30:15,
66:13, 97:12,
101:22, 108:18,
120:17, 121:6,
122:20, 129:17
**showed** [1] - 76:13
**showing** [3] - 66:16,
119:16, 119:22
**sic** [3] - 32:1, 42:10,
95:18
**sic.)** [1] - 31:25
**side** [12] - 7:1, 7:2,
7:16, 8:24, 12:6,
27:15, 28:5, 48:3,
48:19, 49:15, 113:4,
133:22
**sides** [4] - 10:12,
24:10, 45:12, 48:14
**sign** [5] - 25:16, 79:1,
79:2, 98:1, 103:4
**signed** [1] - 77:2
**significance** [2] -
90:1, 100:12
**significant** [4] - 15:3,
90:6, 91:8, 132:18

**significantly** [2] -
26:1, 133:15
**signoff** [1] - 8:15
**silent** [1] - 26:8
**similar** [1] - 58:22
**simple** [4] - 20:8, 32:6,
51:8, 69:1
**simply** [15] - 14:11,
20:9, 20:14, 27:6,
27:19, 28:1, 30:3,
30:25, 31:17, 42:13,
50:16, 61:24, 68:3,
75:12, 94:25
**single** [3] - 16:3,
87:11, 108:19
**singular** [2] - 42:3,
125:17
**sit** [2] - 26:19, 135:3
**site** [1] - 127:13
**sitting** [2] - 11:15,
91:12
**situation** [2] - 54:18,
55:14
**six** [2] - 39:22, 39:25
**sixth** [1] - 113:15
**skip** [9] - 20:9, 92:24,
96:23, 97:12,
105:11, 110:6,
115:19, 116:19,
116:22
**skip-and-locate** [7] -
20:9, 96:23, 97:12,
105:11, 115:19,
116:19, 116:22
**skip-and-locating** [1]
- 92:24
**slicing** [1] - 79:20
**slide** [5] - 28:11,
105:3, 108:7,
115:14, 122:16
**slides** [4] - 104:23,
108:20, 110:8,
111:11
**slightly** [1] - 98:7
**small** [3] - 60:11,
90:18, 134:2
**Smith** [4] - 81:16,
81:17, 81:20, 81:22
**smoothly** [1] - 137:20
**snapshot** [1] - 105:4
**Social** [3] - 19:19,
20:10, 32:14
**social** [1] - 84:12
**software** [1] - 129:3
**sold** [15] - 13:22,
17:21, 19:17, 28:14,
36:10, 36:11, 36:19,
54:21, 78:5, 78:8,
78:23, 103:19,
110:14, 110:15

**solid** [1] - 117:24
**solution** [1] - 122:6
**solve** [1] - 25:19
**someone** [12] - 30:24,
30:25, 31:7, 35:24,
75:25, 76:2, 76:9,
78:13, 99:8, 103:24,
119:23
**sometime** [2] - 40:17,
129:7
**sometimes** [3] -
56:10, 109:3, 113:13
**somewhere** [2] -
78:20, 128:15
**sorry** [3] - 18:3,
108:24, 133:4
**sort** [45] - 8:3, 8:21,
9:20, 14:24, 19:13,
20:5, 20:6, 21:17,
22:12, 22:13, 22:23,
24:7, 24:11, 25:10,
25:24, 26:12, 30:12,
34:3, 35:16, 38:4,
38:15, 43:2, 45:4,
45:24, 46:3, 46:6,
54:2, 55:25, 59:9,
77:17, 78:22,
117:14, 122:16,
123:9, 130:4, 130:6,
130:7, 130:9,
130:12, 130:15,
131:2, 131:9,
133:11, 138:16,
138:23
**sorts** [1] - 80:15
**sound** [1] - 28:21
**sounds** [2] - 99:21,
126:13
**soup** [1] - 8:3
**source** [3] - 17:1,
54:25, 68:9
**sources** [6] - 75:23,
76:4, 115:21,
115:22, 116:19,
116:22
**South** [1] - 2:13
**Southwest** [1] - 4:21
**Soutter** [7] - 22:18,
22:23, 62:3, 63:13,
63:16, 140:3, 140:20
**SPEAKER** [6] - 49:18,
53:24, 99:22,
111:15, 136:25,
137:9
**speaking** [1] - 101:15
**specific** [4] - 45:2,
100:24, 120:13
**specifics** [1] - 130:1
**spectrum** [1] - 20:8
**Spencer** [18] - 8:17,

9:4, 18:5, 49:16,
61:13, 63:5, 102:5,
130:20, 130:22,
131:5, 132:16,
132:17, 133:2,
133:15, 135:17,
137:21, 138:22
**Spencer's** [2] - 9:1,
132:13
**spend** [2] - 46:20,
91:23
**spent** [5] - 34:21,
88:21, 96:14, 114:17
**split** [1] - 16:3
**spouse** [2] - 51:18
**srotkis@clalegal.**
**com** [1] - 3:23
**St** [1] - 50:9
**stage** [1] - 25:2
**stand** [1] - 130:24
**standard** [6] - 54:9,
54:15, 54:16, 65:22,
67:4, 87:16
**standards** [1] - 46:2
**standing** [5] - 20:18,
20:24, 21:10, 39:5,
74:17
**standpoint** [10] - 8:19,
18:23, 24:20, 25:4,
25:13, 30:5, 30:6,
53:22, 63:4, 113:1
**stands** [2] - 63:24,
139:18
**start** [5] - 8:10, 96:11,
115:17, 129:5,
129:14
**started** [3] - 52:13,
94:2, 133:22
**State** [1] - 57:14
**state** [2] - 66:25,
117:10
**statement** [8] - 13:4,
38:8, 83:14, 85:16,
85:20, 119:10,
120:12, 121:21
**STATES** [1] - 1:1
**States** [4] - 5:4, 43:13,
64:3, 140:6
**statute** [24] - 29:5,
43:5, 68:10, 68:24,
69:4, 69:10, 69:11,
69:21, 70:1, 70:2,
70:5, 70:7, 70:20,
71:12, 71:20, 73:14,
73:15, 73:22, 87:4,
88:19, 112:10,
117:21
**statutes** [1] - 117:24
**statutory** [5] - 25:7,
42:24, 43:2, 44:20,

66:8
**stay** [1] - 108:4
**staying** [1] - 9:19
**steered** [1] - 77:5
**step** [7] - 13:10, 28:4,
37:19, 90:4, 101:2,
113:14, 113:16
**stepping** [1] - 27:17
**steps** [2] - 122:16,
135:12
**still** [12] - 11:4, 51:24,
61:19, 97:16,
101:16, 102:20,
105:13, 117:17,
124:24, 131:10,
132:2, 132:9
**stipulated** [2] -
102:23, 103:5
**stop** [2] - 120:5, 133:4
**stories** [1] - 75:4
**stranger** [1] - 56:8
**strategic** [1] - 65:25
**strategy** [1] - 24:10
**Street** [5] - 2:13, 2:21,
3:5, 4:14, 4:22
**strike** [4] - 35:16,
53:5, 135:9, 138:13
**strikes** [3] - 53:6,
134:1, 135:10
**strong** [1] - 40:1
**strongly** [1] - 21:9
**struck** [1] - 55:22
**structural** [2] - 10:23,
11:14
**structurally** [1] - 13:5
**structure** [3] - 29:23,
70:1, 78:11
**structured** [2] - 90:16,
125:15
**structuring** [1] - 23:24
**stuff** [1] - 86:19
**sub** [1] - 78:22
**sub-screening** [1] -
78:22
**subject** [35] - 15:19,
16:10, 16:22, 17:22,
19:4, 19:5, 19:8,
20:15, 22:4, 24:24,
28:23, 28:24, 29:10,
29:17, 29:19, 36:10,
36:21, 37:5, 37:7,
54:14, 54:20, 55:5,
67:10, 67:11, 67:13,
88:15, 92:4, 92:21,
99:24, 100:2,
103:19, 116:1,
118:15, 125:20,
132:7
**subjects** [1] - 36:20
**submit** [5] - 52:11,

61:14, 119:10,
120:12, 125:2
**submitted** [1] - 10:5
**submitting** [2] -
134:11, 134:13
**subparts** [1] - 69:23
**subpoena** [2] - 72:1,
72:14
**subscribers** [1] -
82:16
**subsequent** [1] -
33:15
**substantial** [12] -
53:19, 55:24, 64:25,
88:15, 89:6, 89:22,
90:7, 91:4, 99:4,
101:4, 105:2, 131:20
**substantive** [2] - 7:13,
40:8
**subtle** [1] - 34:5
**success** [1] - 75:4
**successful** [2] - 7:15,
29:6
**successfully** [2] -
34:23, 75:4
**such-and-such** [2] -
120:19, 121:3
**suffered** [2] - 38:17,
44:13
**suggestion** [1] - 10:22
**suit** [1] - 21:12
**Suite** [4] - 2:6, 2:22,
3:13, 3:20
**suite** [1] - 118:7
**sum** [1] - 59:13
**summarize** [1] - 61:17
**Summary** [1] - 30:17
**summary** [4] - 85:11,
85:22, 88:13, 115:9
**sunset** [3] - 46:12,
47:5, 129:18
**superceded** [1] -
85:16
**superiority** [1] - 63:10
**superstar** [1] - 5:24
**supply** [1] - 79:4
**support** [3] - 9:5, 27:1,
72:15
**supported** [2] - 73:15,
73:16
**supposed** [1] - 7:18
**Supreme** [4] - 66:12,
67:3, 67:15, 69:23
**surprising** [1] - 132:4
**survive** [1] - 22:23
**survived** [1] - 41:13
**SUSAN** [1] - 3:17
**suspect** [1] - 73:5
**suspension** [1] -
98:12

**switch** [2] - 90:24,
91:1
**system** [12] - 91:2,
97:22, 99:6, 99:7,
108:1, 111:22,
120:25, 121:4,
125:23, 126:14,
129:4, 138:25
**systems** [4] - 84:4,
126:15, 128:23,
129:3

## T

**Tabb** [1] - 3:5
**table** [1] - 90:8
**talks** [1] - 46:19
**task** [1] - 7:5
**taught** [1] - 59:4
**tax** [1] - 87:21
**technical** [1] - 122:5
**technically** [1] - 81:2
**technique** [1] - 120:1
**technology** [2] - 81:3,
100:15
**teeth** [2] - 49:6, 55:13
**telephone** [3] - 19:20,
20:10, 120:13
**temporally** [1] -
110:14
**temporary** [1] - 31:13
**ten** [2] - 8:1, 120:5
**tens** [1] - 44:3
**term** [2] - 45:16,
76:16, 83:11, 94:22,
95:5
**terms** [15] - 8:12, 70:5,
76:22, 81:2, 82:5,
90:23, 90:24, 91:11,
92:8, 93:15, 101:22,
102:10, 106:11,
115:10
**terribly** [3] - 10:6,
60:12, 68:19
**Territories** [1] - 43:13
**test** [1] - 118:8
**tested** [1] - 61:24
**Texas** [2] - 2:23, 5:23
**THE** [230] - 1:15, 2:2,
3:2, 3:4, 4:2, 5:3,
5:8, 5:17, 6:23, 9:16,
9:24, 10:1, 11:1,
11:13, 11:18, 11:22,
11:24, 12:10, 12:12,
12:16, 12:18, 16:17,
16:24, 17:4, 18:2,
18:18, 19:7, 19:11,
21:13, 21:16, 22:2,
22:6, 22:9, 23:4,
24:2, 24:4, 26:7,

26:15, 27:4, 28:9,
30:18, 31:19, 31:22,
32:1, 32:8, 32:10,
32:14, 32:20, 33:4,
35:2, 35:11, 38:23,
39:1, 40:21, 40:25,
41:3, 41:5, 41:21,
42:20, 46:9, 46:11,
46:17, 47:2, 47:9,
47:15, 47:23, 49:21,
50:12, 50:14, 51:4,
52:23, 53:2, 58:1,
58:5, 58:9, 58:12,
58:15, 58:19, 60:2,
60:7, 60:14, 60:17,
60:20, 60:25, 62:25,
63:21, 63:23, 64:3,
64:8, 65:9, 65:15,
66:20, 70:23, 73:8,
73:10, 77:6, 77:12,
77:16, 78:3, 78:12,
78:21, 79:12, 79:23,
80:5, 80:8, 80:11,
80:17, 81:5, 81:10,
81:23, 82:2, 83:16,
83:21, 83:24, 84:5,
84:13, 84:15, 84:22,
88:12, 89:13, 89:17,
93:18, 94:12, 94:14,
94:19, 95:7, 95:11,
95:20, 95:24, 97:6,
98:4, 98:8, 98:10,
99:16, 99:20, 100:5,
101:15, 103:10,
104:1, 104:6,
104:15, 104:18,
105:14, 105:18,
105:20, 105:23,
106:22, 107:1,
107:24, 108:10,
108:23, 109:2,
110:2, 110:5,
110:10, 110:16,
110:21, 110:24,
111:2, 111:6, 111:8,
111:16, 111:19,
111:25, 112:3,
112:7, 112:9,
112:18, 112:23,
114:7, 114:14,
114:19, 115:5,
115:11, 115:25,
116:3, 116:6, 116:8,
116:13, 116:17,
117:5, 117:7,
117:12, 117:25,
118:10, 118:24,
120:22, 121:11,
121:15, 121:23,
122:2, 122:8,
122:14, 122:22,

123:9, 123:17,
124:3, 124:11,
124:14, 124:17,
124:21, 125:8,
126:7, 126:11,
127:7, 127:14,
128:3, 129:12,
129:23, 130:2,
131:8, 131:14,
131:17, 131:22,
132:22, 133:6,
133:21, 134:1,
134:5, 134:11,
134:14, 135:1,
135:25, 136:13,
137:2, 137:12,
137:15, 139:2,
139:12, 139:17
**theft** [2] - 21:23, 62:22
**themselves** [3] -
22:25, 81:14, 128:23
**theoretical** [1] - 114:5
**therefore** [1] - 70:14
**they've** [3] - 29:9, 76:6
**thieves** [1] - 83:7
**thinking** [1] - 34:1
**thinks** [1] - 12:6
**third** [3] - 94:3, 95:15,
129:7
**Third** [3] - 87:16,
87:19, 88:6
**third-party** [2] - 94:3,
95:15
**THOMAS** [1] - 1:4
**Thomas** [1] - 5:9
**thoroughly** [1] - 136:3
**thoughtfully** [1] -
138:12
**thousand** [1] - 38:24
**thousands** [3] - 75:1,
86:14, 89:3
**three** [7] - 33:7, 33:10,
34:21, 36:8, 47:6,
110:7, 115:13
**threshold** [4] - 54:12,
62:1, 62:2, 65:4
**threw** [1] - 118:4
**throated** [1] - 9:5
**throughout** [2] -
68:24, 75:2
**tie** [1] - 59:21
**tied** [1] - 53:3
**time-intensive** [1] -
127:5
**timeline** [4] - 33:5,
33:24, 127:16,
127:18
**timely** [1] - 15:22
**timetable** [4] - 27:25,
129:22, 131:2, 131:3

**timing** [5] - 126:24, 129:21, 132:25, 133:7, 133:15
**Title** [1] - 2:12
**today** [11] - 11:15, 13:8, 15:16, 28:5, 28:18, 89:20, 89:23, 98:21, 105:5, 107:3, 109:5
**together** [10] - 12:21, 36:25, 90:5, 91:6, 100:8, 100:21, 102:14, 118:4, 118:7, 124:25
**tomorrow** [2] - 9:11, 9:15
**Tony** [1] - 17:19
**took** [1] - 111:23
**tool** [3] - 73:25, 87:8, 87:12
**top** [3] - 7:6, 48:15, 116:16
**totality** [1] - 27:22
**touching** [1] - 36:17
**tough** [1] - 7:8
**towards** [2] - 28:4, 99:9
**Towers** [1] - 34:21
**track** [1] - 136:23
**Trade** [5] - 34:20, 68:10, 82:9, 82:11, 82:13
**trade** [1] - 51:19
**traditional** [1] - 120:6
**trained** [1] - 128:18
**training** [3] - 123:4, 123:10, 123:16
**transaction** [1] - 74:14
**transactions** [2] - 70:10, 71:14
**transcribed** [1] - 140:4
**transcript** [2] - 140:11, 140:12
**transferred** [1] - 18:4
**transform** [1] - 73:7
**travel** [1] - 71:16
**treat** [3] - 28:22, 68:3, 78:7
**treated** [2] - 68:2, 126:2
**treating** [1] - 89:3
**treatment** [1] - 66:1
**tree** [1] - 9:12
**tremendous** [2] - 55:23, 101:22
**trial** [2] - 41:14, 41:15
**tried** [4] - 7:23, 8:2, 87:19, 91:5
**tries** [1] - 100:1
**TROUTMAN** [1] - 4:4

**Troutman** [2] - 4:5, 6:11
**truce** [1] - 49:11
**true** [2] - 138:3, 140:11
**truly** [1] - 7:10
**trust** [1] - 59:6
**truth** [1] - 41:23
**try** [8] - 8:21, 52:3, 59:22, 66:3, 76:4, 113:14, 113:24
**trying** [14] - 30:3, 34:9, 35:23, 79:23, 86:25, 87:1, 89:20, 94:21, 100:7, 112:19, 113:10, 113:12, 113:16, 119:12
**turn** [3] - 6:18, 47:13, 63:19
**turning** [1] - 73:23
**turns** [2] - 54:19, 77:2
**twice** [4] - 16:15, 26:13, 34:4, 49:3
**Twin** [1] - 34:21
**two** [19] - 15:7, 16:4, 16:15, 16:17, 16:19, 18:10, 18:21, 27:11, 31:19, 36:7, 36:9, 38:15, 44:9, 57:6, 57:19, 59:9, 92:19, 100:13, 124:19
**twofold** [1] - 105:25
**type** [7] - 11:9, 32:18, 79:21, 81:1, 96:12, 96:16, 113:3
**types** [6] - 21:24, 31:20, 94:17, 96:16, 96:21, 96:25
**typicality** [8] - 22:13, 61:11, 61:16, 62:3, 62:11, 62:13, 63:3, 63:13
**typically** [2] - 28:24, 37:11

## U

**ultimate** [1] - 85:24
**ultimately** [9] - 15:25, 18:5, 29:15, 49:15, 90:14, 99:1, 100:10, 102:4, 135:11
**uncharacteristic** [1] - 13:1
**unclear** [1] - 68:23
**under** [34] - 25:18, 40:15, 43:2, 45:2, 45:18, 51:11, 52:19, 57:13, 65:5, 66:7, 66:12, 66:24, 68:18,

69:12, 69:19, 69:24, 76:20, 83:4, 88:16, 94:25, 99:6, 99:24, 100:4, 102:6, 107:25, 108:6, 110:13, 117:18, 119:8, 123:3, 125:5, 127:9, 137:7, 140:14
**underneath** [1] - 30:19
**understandable** [1] - 11:6
**understandably** [1] - 47:7
**undertaken** [1] - 24:12
**undertaking** [1] - 90:19
**underway** [1] - 137:1
**underwriting** [1] - 125:21
**unfair** [1] - 19:14
**unfortunately** [2] - 108:24, 109:3
**unintended** [1] - 106:12
**unique** [1] - 92:18
**United** [4] - 5:4, 43:13, 64:3, 140:6
**UNITED** [1] - 1:1
**unknowing** [1] - 29:3
**UNKNOWN** [6] - 49:18, 53:24, 99:22, 111:15, 136:25, 137:9
**unless** [3] - 63:19, 67:8, 89:10
**unlike** [1] - 62:15
**unlitigable** [1] - 42:10
**unpublished** [1] - 62:12
**unquestionably** [1] - 16:22
**unreasonableness** [1] - 62:9
**unresolved** [1] - 8:20
**unusual** [3] - 18:17, 18:19
**unwitting** [1] - 29:2
**unwittingly** [1] - 83:6
**up** [55] - 6:3, 13:21, 14:13, 14:14, 15:7, 26:19, 27:16, 28:2, 29:5, 30:15, 38:7, 42:5, 44:21, 45:13, 49:9, 54:10, 54:23, 56:4, 56:15, 59:21, 61:11, 71:20, 74:11, 75:20, 77:2, 78:2, 79:1, 80:13, 91:13,

97:12, 103:2, 106:20, 109:23, 111:15, 111:24, 113:13, 116:12, 116:15, 116:21, 119:16, 119:22, 120:8, 120:17, 120:22, 121:2, 121:15, 122:5, 122:12, 122:17, 122:19, 127:13, 130:13, 138:15, 138:16, 139:5
**useful** [4] - 72:23, 73:2, 73:3, 75:8
**user** [23] - 74:22, 76:25, 97:22, 97:25, 98:15, 98:20, 98:22, 99:23, 101:6, 105:9, 106:1, 106:9, 106:10, 106:12, 106:16, 107:8, 107:9, 107:13, 109:17, 109:20, 121:7, 121:13, 122:18
**users** [7] - 74:3, 84:3, 84:6, 84:8, 101:7, 101:10, 128:18
**uses** [14] - 16:21, 36:14, 70:12, 71:5, 72:21, 92:1, 92:2, 92:8, 92:9, 92:18, 93:16, 94:24, 95:19, 98:16
**UVA** [2] - 5:22, 50:10

## V

**valid** [1] - 70:19
**valuable** [6] - 36:14, 43:4, 80:20, 80:21, 87:8, 87:11
**value** [18] - 20:1, 28:18, 30:21, 31:9, 50:18, 50:19, 52:4, 52:5, 52:6, 53:12, 64:25, 72:6, 72:8, 75:21, 76:5, 76:10, 86:2, 97:20
**variations** [1] - 48:11
**varies** [1] - 79:22
**variety** [2] - 30:10, 84:12
**various** [5] - 30:8, 48:11, 73:17, 76:3, 92:9
**vehemently** [1] - 49:5
**vehicle** [2] - 18:21, 73:1

**vending** [1] - 99:8
**verbiage** [1] - 47:21
**verify** [1] - 74:19
**versa** [1] - 100:2
**version** [1] - 96:13
**versions** [1] - 48:9
**versus** [3] - 5:9, 31:7, 66:24
**vet** [1] - 98:15
**vetted** [1] - 136:3
**via** [1] - 105:10
**viable** [2] - 126:15, 126:18
**vice** [1] - 100:2
**victim** [2] - 21:23, 62:22
**victims** [3] - 29:2, 29:3
**victory** [1] - 62:4
**view** [9] - 15:13, 15:16, 61:12, 61:17, 102:22, 103:4, 112:24, 114:4, 132:16
**viewed** [2] - 33:22, 33:24
**violate** [1] - 67:12
**violated** [1] - 66:7
**violating** [1] - 67:7
**violation** [6] - 65:24, 65:25, 66:2, 67:1, 67:17, 68:6
**violator** [1] - 67:17
**VIRGINIA** [1] - 1:2
**Virginia** [10] - 1:16, 2:7, 3:6, 3:14, 3:21, 4:8, 18:1, 140:7, 140:15, 140:22
**viscerally** [1] - 49:5
**visit** [2] - 103:3, 127:13
**voice** [2] - 9:2, 132:6
**volume** [2] - 50:21, 79:18
**voluntarily** [3] - 18:25, 19:2, 57:9
**vote** [1] - 83:9
**vs** [1] - 1:7

## W

**wages** [1] - 54:23
**wait** [2] - 85:21, 127:25
**waiver** [1] - 98:6
**Walgreen's** [2] - 113:22, 113:23
**walk** [3] - 8:3, 14:25, 91:17
**wants** [6] - 30:25, 72:6, 103:24, 133:3,

136:2, 138:19
**warrant** [1] - 41:17
**waste** [1] - 76:8
**watercraft** [1] - 19:22
**watershed** [1] - 25:24
**ways** [1] - 113:13
**we're-both-present**
 [1] - 12:7
**web** [2] - 76:24,
125:10
**website** [3] - 30:13,
43:21, 105:10
**weighed** [1] - 49:16
**weight** [2] - 40:11,
86:1
**well-respected** [2] -
9:3, 50:10
**West** [1] - 3:5
**whereas** [1] - 54:10
**White** [1] - 90:21
**White-Hernandez** [1] -
90:21
**whittling** [1] - 8:20
**whole** [8] - 6:24, 14:2,
14:7, 65:18, 70:6,
76:17, 79:19, 91:1
**wholly** [1] - 87:3
**wide** [1] - 86:6
**wife** [2] - 34:23, 74:6
**willful** [3] - 44:23,
66:7, 68:5
**willfully** [1] - 66:6
**willfulness** [11] -
18:23, 25:6, 25:8,
26:1, 44:15, 44:16,
44:17, 62:8, 67:13,
87:16, 87:18
**Williams** [17] - 15:17,
15:18, 17:6, 17:10,
17:11, 17:16, 18:3,
18:4, 18:11, 18:14,
23:16, 23:19, 33:14,
41:11, 62:15, 125:20
**williams** [1] - 18:2
**willing** [3] - 26:5,
29:25, 31:1
**Wilson** [1] - 18:1
**win** [1] - 85:18
**wish** [1] - 138:16
**witness** [1] - 73:4
**witnesses** [5] - 56:11,
56:12, 75:3, 75:12
**won** [1] - 49:16
**wondering** [1] - 88:22
**WOOD** [1] - 3:3
**word** [4] - 105:14,
105:18, 105:20,
130:21
**words** [2] - 72:24,
86:23

**works** [2] - 81:18,
113:22
**world** [1] - 132:5
**World** [1] - 34:20
**worried** [1] - 105:22
**worth** [4] - 15:6, 52:2,
72:7, 112:1
**worthiness** [1] - 39:8
**worthy** [1] - 44:10
**wrap** [1] - 61:11
**writing** [2] - 72:3,
91:12
**written** [2] - 88:20,
134:2
**wrote** [1] - 55:21
**Wulff** [4] - 34:18,
34:25, 35:4, 35:6

## Y

**year** [10] - 15:17,
34:17, 45:16, 49:14,
50:24, 51:7, 80:24,
127:24, 129:6, 129:8
**years** [21] - 13:22,
18:20, 30:22, 31:9,
33:7, 34:22, 39:22,
39:25, 46:23, 47:1,
47:6, 47:7, 53:14,
57:18, 73:17, 82:25,
90:9, 100:18, 120:5,
129:19
**York** [2] - 27:12, 34:22

## Z

**zero** [1] - 26:4