# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| **GREGORY THOMAS BERRY**, *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | **Case No. 3:11CV754** |
| | § | |
| **LEXISNEXIS  RISK  &  INFORMATION** | § | |
| **ANALYTICS GROUP, INC.**, *et al.*, | § | **(Judge James R. Spencer)** |
| | § | |
| **Defendants.** | § | |

---

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS

---

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION AND BACKGROUND ......................................................................1

II.    IN LIGHT OF THE EXCELLENT RESULT OBTAINED FOR THE CLASSES,
       THE COURT SHOULD AWARD TO COUNSEL THE UNOPPOSED
       REQUESTED ATTORNEYS' FEES AND SERVICE AWARDS. ...................................3

       A.     An Award of 25% of the Rule 23(b)(3) Settlement Fund Is Appropriate
              As Attorneys' Fees for the Benefit Secured for the 23(b)(3) Class.........................3

       B.     An Award of Attorneys' Fees Based on Counsel's Lodestar is Also
              Appropriate as Compensation for the Benefit Conferred on the Rule
              23(b)(2) Injunctive Relief Class...............................................................................8

              1.     Counsel's lodestar reflects the time, labor, and skill reasonably
                     required to prosecute this complex action. ..................................................9

              2.     Plaintiffs' Counsel's hourly rates are reasonable.......................................12

              3.     The requested multiplier is reasonable in light of the results
                     achieved. ....................................................................................................13

              4.     The Court should also award Counsel's reasonably incurred
                     expenses of litigation. ...............................................................................17

       C.     The Reaction of Class Members Also Favors Granting the Requested Fee..........18

       D.     The Court Should Award the Agreed-Upon Service Awards to the
              Class Representatives.............................................................................................21

III.   CONCLUSION...............................................................................................................22

# TABLE OF AUTHORITIES

## CASES

*Blum v. Stenson*,
    465 U.S. 886 (1984) ............................................................................................. 3

*Boeing Co. v. van Gemert*,
    444 U.S. 472 (1980) .............................................................................................3

*Camden I Condo. Ass'n, Inc. v. Dunkle*,
    946 F.2d 768 (11th Cir. 1991) ........................................................................... 4

*Cappetta v. GC Servs. LP*,
    No. 3:08cv288-JRS (E.D. Va. April 27, 2011) ............................................... 21

*Conley, et al. v. First Tennessee Bank, N.A.*,
    No. 1:10cv1247 (E.D. Va. Aug. 18, 2011) ...................................................... 22

*Court Awarded Attorney Fees*,
    108 F.R.D. 237 (Oct. 8, 1985) ........................................................................... 3

*Deem v. Ames True Temper, Inc.*,
    No. 6:10-CV-01339, 2013 WL 2285972
    (S.D. W. Va. May 23, 2013) ........................................................................ 4, 21

*DeLoach v. Philip Morris Cos.*,
    No. 00-1235, 2003 WL 23094907
    (M.D.N.C. Dec. 19, 2003) ................................................................................. 4

*DiGiacomo v. Plains All Am. Pipeline*,
    Nos. Civ. H-994137, Civ. H-99-4212, 2001 WL 34633373
    (S.D. Tex. Dec. 19, 2001) ............................................................................... 16

*Elkins v. Equitable Life Ins. of Iowa*,
    No. CIVA96-296-CIV-7-17B, 1998 WL 133741
    (M.D. Fla. Jan. 27, 1998) ............................................................................... 20

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)

*Gottlieb v. Barry*,
    43 F.3d 474 (10th Cir. 1994) ............................................................................ 4

*Grissom v. The Mills Corp.*,
    549 F.3d 313 (4th Cir. 2008) ............................................................................ 9

*Gwozdzinnsky v. Sandler Assoc.*,
No. 97-7314, 1998 WL 50368, 159 F.3d 1346 (2d Cir. 1998) .......................................... 5

*Henderson v. Verifications Inc.*,
No. 3:11cv514 (E.D. Va. Mar. 13, 2013) ....................................................................... 21

*In re Bancorp Litig.*,
291 F.3d 1035 (8th Cir. 2002) ..................................................................................... 5

*In re Cardinal Health Inc. Sec. Litig.*,
528 F. Supp. 2d 752 (S.D. Ohio 2007) ......................................................................... 16

*In re Charger Commc'n, Inc., Sec. Litig.*,
No. MDL 1506, 4:02CV1186CAS, 2005 WL 4045741
(E.D. Mo. June 20, 2005) ............................................................................................ 16

*In re CMS Energy ERISA Litig.*,
No. 02-72834, 2006 WL 2109499
(E.D. Mich. June 27, 2006) .......................................................................................... 5

*In re Combustion, Inc.*,
968 F. Supp. 1116 (W.D. La. 1997) ............................................................................... 5

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
216 F.R.D. 197 (D. Me. 2003) ...................................................................................... 4

*In re Educ. Testing Serv.*,
447 F. Supp. 2d 612 (E.D. La. 2006) ............................................................................. 5

*In re Excel Energy, Inc., Sec., Derivative & ERISA Litig.*,
364 F. Supp. 2d 980 (D. Minn. 2005) ........................................................................... 16

*In re GMC*,
55 F.3d 768 (3d Cir. 1995) ........................................................................................... 4

*In re Interpublic Sec. Litig.*,
No. 02 Civ.6527(DLC), 03 Civ.1194(DLC), 2004 WL 2397190
(S.D.N.Y. Oct. 26, 2004) ............................................................................................ 17

*In re LandAmerica 1031 Exch. Servs., Inc. I.R.S. 1031 Tax Deferred Exch. Litig.*,
MDL 2054, 2012 WL 5430841
(D.S.C. Nov. 7, 2012) ................................................................................................. 5

*In re Microstrategy*,
172 F. Supp. 2d at 788 ................................................................................................. 7

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................ 16

*In re Rite Aid Corp. Sec. Litig.*,
    362 F. Supp. 2d 587 (E.D. Pa. 2005) ........................................................ 16

*In re Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig.*,
    56 F.3d 295 (1st Cir. 1995) ................................................................... 4, 5

*In re Wachovia Corp. ERISA Litig.*,
    No. 3:09cv262, 2011 WL 7787962
    (W.D.N.C. Oct. 24, 2011) ...................................................................... 20

*In re WorldCom, Inc., Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) ....................................................... 17

*In re Xcel Energy, Inc.*,
    364 F. Supp. 2d 980 (D. Minn. 2005) ......................................................... 6

*Jones v. Dominion Res. Servs., Inc.*,
    601 F. Supp. 2d 756 (S.D. W. Va. 2009) .................................................... 20

*Kabore v. Anchor Staffing, Inc.*,
    No. L-10-3204, 2012 WL 5077636
    (D. Md. Oct.17, 2012) .......................................................................... 17

*Kidrick v. ABC Television & Appliance Rental*,
    No. 3:97cv69, 1999 WL 1027050
    (N.D. W. Va. May 12, 1999) .................................................................... 6

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y 2002) ..................................................... 6, 16

*Pitt v. Kmart Corp., et al.*,
    No. 3:11cv697 (E.D. Va. May 24, 2013) ..................................................... 21

*Rawlings v. Prudential-Bache Props., Inc.*,
    9 F.3d 513 (6th Cir. 1993) ..................................................................... 4

*Roberts v. Texaco, Inc.*,
    979 F. Supp. 185 (S.D.N.Y. 1997) ............................................................ 17

*Robinson v. Equifax Info. Servs.*,
    560 F.3d 235 (4th Cir.2009) ................................................................... 14

*Ryals, Jr. et al. v. HireRight Solutions, Inc.*,
    No. 3:09cv625 (E.D. Va. Dec. 22, 2011)........................................................................ 22

*Singleton v. Domino's Pizza, LLC*,
    __ F. Supp. 2d __, No. CIV.A. DKC 11-1823, 2013 WL 5506027
    (D. Md. Oct. 2, 2013).................................................................................................... 3, 18

*Smith v. Krispy Kreme Doughnut Corp.*,
    No. 1:05cv00187, 2007 WL 119157
    (M.D.N.C. Jan 10, 2007).................................................................................................... 4

*Spell v. McDaniel*,
    852 F.2d 762 (4th Cir. 1988) .......................................................................................... 17

*Sprague v. Ticonic Nat'l Bank*,
    307 U.S. 161 (1939)........................................................................................................... 3

*Stoetzner v. United States Steel Corp.*,
    897 F.2d 115 (3d Cir. 1990)............................................................................................ 20

*Strang v. JHM Mortg. Sec. Ltd. P'ship*,
    890 F. Supp. 499 (E.D. Va. 1995) .................................................................................... 4

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003).............................................................................. 6

*Swedish Hosp. Corp v. Shalala*,
    1 F.3d 1261 (D.C. Cir. 1993)........................................................................................... 4

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ..................................................................................... 4, 17

## OTHER AUTHORITIES

Theodore Eisenberg & Geoffrey P. Miller,
    *Attorney Fees in Class Action Settlements: An Empirical Study*,
    1 J. OF EMPIRICAL LEGAL STUDIES 27, 31, 33 (2004) ........................................................ 5

## I.    INTRODUCTION AND BACKGROUND

The Settlement in this case is the culmination of five years of litigation across three Federal Court dockets seeking to apply the strictures of the FCRA to Defendants LexisNexis Risk & Information Analytics Group, Inc., Seisint, Inc., and Reed Elsevier Inc.'s (together "LexisNexis") Accurint product sold to debt collectors.   This is the third case brought by Plaintiffs' Counsel over this exact issue, and the only one that will provide classwide relief to consumers.   That relief takes two forms:  (1) comprehensive injunctive relief—benefitting a class of more than 100 million consumers—in which LexisNexis will wholly restructure its reporting procedures as it pertains to Accurint reports sold to debt collectors, and (2) a significant cash payment to a class of 31,000 consumers preliminarily certified under Rule 23(b)(3).   By this Motion, Plaintiffs request that the Court award the agreed-upon service awards to the Named Plaintiffs and attorneys' fees and costs—also agreed-upon by the Parties—to Plaintiffs' Counsel.

Filed two years ago, this case alleges that Defendants violate the FCRA by failing to apply its strictures—including, among other things, a consumer's right to dispute inaccurate information and to obtain a free copy of their report—to Accurint reports sold to debt collectors. (Dkt. 63 at 3–4.) Defendants have long contended that Accurint falls outside of the FCRA, and so they provide consumers with no FCRA rights with respect to Accurint reports.  (*Id.*)  The heart of this litigation, therefore, focuses on whether the FCRA indeed applies to Accurint reports sold to debt collectors.

Two prior class actions, *Adams, et al. v. LexisNexis Risk & Information Analytics Group, Inc., et al.*, No. 08-4708 (D.N.J.) and *Graham, et al. v. LexisNexis Risk & Information Analytics Management Group, Inc.*, No. 3:09-cv-00655 (E.D. Va.), both alleged similar claims against LexisNexis involving Accurint reports, but neither case decided the issues Plaintiffs allege here

or resulted in classwide relief. (Dkt. 63 at 7.) Following the dismissals of *Adams* and *Graham*, Plaintiffs' Counsel filed this case to continue pursuing classwide relief for consumers affected by LexisNexis's Accurint data policies.  Plaintiffs' Counsel conducted discovery—both formal and informal—in all three cases.  (Declaration of Michael A. Caddell, attached as Ex. 1, to Plaintiffs' Memorandum in Support of Joint Motion for Final Approval of Class Action Settlement, filed concurrently herewith ("Caddell Decl.") ¶ 33.) This discovery included deposing witnesses, serving and responding to written discovery, and reviewing substantial information and documents. (*Id.*) This Settlement is the product of the extensive discovery and mediations in these two previous cases, as well as in this *Berry* action. (Caddell Decl. ¶¶ 33–34; Dkt. No. 63 at 10.)

As shown in more detail in Plaintiffs' Memorandum in Support of the Joint Motion for Final Approval,[1] this Settlement resulted from hard-fought, contentious, and arm's-length negotiations that required Counsel to leverage their considerable FCRA knowledge and experience against Defendants who had successfully held off class-wide relief in two prior cases. The Settlement will provide important privacy protections to a class of over 100 million people, as well as substantial cash payments to approximately 31,000 individuals who had sought a copy of or disputed the accuracy of their Accurint reports.  (*See* Declaration of Professor Neil Richards, attached as Ex. 2 to Plaintiffs' Response to Objections to Class Action Settlement, filed concurrently herewith, ("Prof. Richards Decl.") ¶¶ 13–15.)

Importantly, in all of the mediations, the Parties adhered to the recognized "best practice" of deferring any discussion of attorneys' fees or service awards to the Named Plaintiffs until the substantive terms of the Settlement, including the injunctive relief, had been negotiated and

---

[1]  Plaintiffs incorporate the facts set forth in their Memorandum in Support of the Joint Motion for Final Approval, filed concurrently herewith, by reference as though fully set forth here.

agreed-upon during the final mediation.  (Settlement Agreement, Ex. A to Caddell Decl., ¶ 4.4.1; Declaration of Geoffrey P. Miller, attached as Ex. 1 hereto, ("Prof. Miller Decl.") ¶ 22 (identifying this deferral of attorneys' fee negotiation as the "best practice," and noting that "[t]he practice eliminated any possibility of a tradeoff of a lower merits settlement for a higher fee.").)

The Settlement reached here is an excellent result for consumers, and the requested attorneys' fees and service awards are truly modest in comparison.  Not only does the law overwhelmingly support the fees requested, but the foremost authority on class action fee awards, Professor Geoffrey Miller, views the Settlement as an outstanding result and considers the fees requested as well "within the range of reason when judged against awards in similar cases."  (Prof. Miller Decl. ¶ 49(a).)

## II.     IN LIGHT OF THE EXCELLENT RESULT OBTAINED FOR THE CLASSES, THE COURT SHOULD AWARD TO COUNSEL THE UNOPPOSED REQUESTED ATTORNEYS' FEES AND SERVICE AWARDS.

### A.     An Award of 25% of the Rule 23(b)(3) Settlement Fund Is Appropriate As Attorneys' Fees for the Benefit Secured for the 23(b)(3) Class.

Courts generally recognize two methods for awarding attorneys' fees in class actions: the percentage method, which awards fees as a percentage of the benefit secured for the Class, and the lodestar method, which awards fees based on the value of Counsel's time spent litigating the claims.  *Singleton v. Domino's Pizza, LLC*, __ F. Supp. 2d __, No. CIV.A. DKC 11-1823, 2013 WL 5506027, at *10 (D. Md. Oct. 2, 2013).  The percentage method is favored where there is a common fund, making the calculation of attorneys' fees as a percentage of the benefit a straightforward exercise.  *Id.*  The Supreme Court has consistently calculated attorneys' fees in common funds cases on a percentage-of-the-fund basis.  *See Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165–67 (1939); *Boeing Co. v. van Gemert*, 444 U.S. 472, 478–79 (1980); *Blum v.*

*Stenson*, 465 U.S. 886, 900 n.16 (1984); *see also* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 242 (Oct. 8, 1985) (noting that fee awards in common funds cases have historically been computed based on a percentage of the fund).  Virtually every Circuit Court of Appeals has joined the Supreme Court in affirmatively endorsing the percentage of recovery method as an appropriate method for determining an amount of attorneys' fees in cases where a common fund is created.  *See In re Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49 (2d Cir. 2000); *In re GMC*, 55 F.3d 768, 821–22 (3d Cir. 1995); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 515–16 (6th Cir. 1993); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047–50 (9th Cir. 2002); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994); *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *Swedish Hosp. Corp v. Shalala*, 1 F.3d 1261, 1268–70 (D.C. Cir. 1993).

In the Fourth Circuit, attorneys' fees in common fund cases are almost universally awarded on a percentage-of-the-recovery basis.  *Deem v. Ames True Temper, Inc.*, No. 6:10-CV-01339, 2013 WL 2285972, at *4 (S.D. W. Va. May 23, 2013) (noting that "[d]istrict courts within the Fourth Circuit have consistently endorsed the percentage method," and collecting cases supporting this conclusion); *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05cv00187, 2007 WL 119157, at *1 (M.D.N.C. Jan 10, 2007); *see DeLoach v. Philip Morris Cos.*, No. 00-1235, 2003 WL 23094907, at *3 (M.D.N.C. Dec. 19, 2003) (citing, with approval for this same proposition, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215 (D. Me. 2003)); *see also Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 502 (E.D. Va. 1995) (explaining "[a]lthough the Fourth Circuit has not yet ruled on this issue, the current trend

among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases.").

District courts within the Fourth Circuit have noted that most percentage fee awards range from 18 percent to 36 percent of the settlement fund. *See In re LandAmerica 1031 Exch. Servs., Inc. I.R.S. 1031 Tax Deferred Exch. Litig.*, MDL 2054, 2012 WL 5430841, at *4 (D.S.C. Nov. 7, 2012) (collecting cases). This is consistent with the practice of other circuit courts: a comprehensive study of attorneys' fees in class action cases—co-authored by Professor Miller— notes "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. OF EMPIRICAL LEGAL STUDIES 27, 31, 33 (2004); (*see also* Prof. Miller Decl. ¶ 45 (finding that the median fee in a range of class actions was 30.0% and that the median fee award in consumer cases was 25%).) This holds true even in instances where the class recovery runs into the hundreds of millions of dollars. *See, e.g.*, *In re Thirteen Appeals*, 56 F.3d at 295 (approving award of thirty percent of $220 million); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D. La. 1997) (awarding thirty-six percent of $125 million). In cases of smaller funds, such as this one, 25% to 33.3% of the fund is the accepted award. *In re LandAmerica*, 2012 WL 5430841, at *4 (noting that the 25% requested fee "falls at the low end of the average range of fees awarded in common fund class actions"); *Deem*, 2013 WL 2285972, at *6 (awarding 33 1/3% of the settlement fund); *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (approving award of 36% of $3.5 million settlement fund); *Gwozdzinnsky v. Sandler Assoc.*, No. 97-7314, 1998 WL 50368, 159 F.3d 1346 (2d Cir. 1998) (unpublished) (affirming district court's award of 25% of $1 million common fund); *In re Educ. Testing Serv.*, 447 F. Supp. 2d 612, 631 (E.D. La. 2006) (concluding the customary fee award for class actions "is

between 22% and 27%"); *In re CMS Energy ERISA Litig.*, No. 02-72834, 2006 WL 2109499, at *1 (E.D. Mich. June 27, 2006) (awarding fee of 28.5% of $28 million settlement fund); *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005) (awarding 25% of $80 million settlement fund); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (granting attorneys' fees in amount of 33 1/3% of $1.5 million settlement fund); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (awarding 33.3% of $3.8 million settlement fund); *Kidrick v. ABC Television & Appliance Rental*, No. 3:97cv69, 1999 WL 1027050, at *1–2 (N.D. W. Va. May 12, 1999) (awarding 30.6% of approximately $400,000 settlement fund, noting that "[a]n award of fees in the range of 30% of the fund has been held to be reasonable. . . . Fees as high as 50% of the fund have been awarded.") (internal citations omitted).  Since the Settlement creates a common fund for the Rule 23(b)(3) Settlement Class, it is appropriate for the Court to award fees as a percentage of that fund.

In this case, the Defendants have agreed not to oppose Class Counsel's fee request for up to 30% of the Settlement Fund. (Settlement Agreement, Ex. A to Caddell Decl., ¶ 5.5.) Despite this agreement and the ample authority supporting such an award, Class Counsel asks that the Court award it only 25% of the fund, or $3,375,000, in combined fees and expenses.  (Caddell Decl. ¶ 49.) The Rule 23(b)(3) Class was informed by direct mail notice of Counsel's plan to request this amount, and the Class has universally approved the request, as even the lone objection to the Rule 23(b)(3) Settlement makes no reference at all to attorneys' fees.  (*See* Nix Objection, attached as Ex. 3 to Response to Objections, filed contemporaneously herewith.) With this amount for fees and expenses taken from the fund, each of the approximately 31,000 Class Members stands to receive around $300.  (Caddell Decl. ¶ 52.) Again, the Notice informed the Rule 23(b)(3) Class Members of this estimated recovery, and none has disagreed or otherwise

raised an objection. (*Id.*) Thus, among all of the parties who had standing and the opportunity to voice opposition to this fee request, none did.

In this case, Class Counsel bore the risk of the litigation entirely and advanced significant funds in furtherance of the litigation. (Caddell Decl. ¶ 58.) A fee and expense award of 25% of the cash recovered for the Rule 23(b)(3) Settlement Class is therefore reasonable. *See In re Microstrategy*, 172 F. Supp. 2d at 788 ("But finally and equally importantly, the process of setting a proper fee in a [securities class action] case must include an incentive component to ensure that competent, experienced counsel will be encouraged to undertake the often risky and arduous task of representing a class in a securities fraud case."). While 30% or even more is justifiable compensation for Class Counsel in this case, the 25% requested—and unopposed by anyone—is certainly reasonable and well-within Fourth Circuit guidelines. (*See* Declaration of Professor Geoffrey P. Miller, attached as Ex. 1 ("Prof. Miller Decl.") ¶¶ 43–48 (collecting studies showing percentage fee awards ranging between 25 and 30 percent, and concluding that "the extensive empirical research on attorneys' fees on common fund cases overwhelmingly supports the reasonableness of the requested fee of 25% of the $13.5 million common fund").)

Class Counsel here shouldered the entire risk of the litigation in three different cases on three different Federal Court dockets, appropriately staffing the cases with experienced counsel, spending significant time to investigate the cases prior to filing, strategically addressing issues raised in a dispositive motion, conducting the back-and-forth of discovery, vigorously litigating, and finally negotiating, exhaustively and over a period of years, to reach this result for the Class. (*See* Caddell Decl. ¶ 32.) Doing so required remaining steadfast following the dismissals of *Adams* and *Graham* and continuing to pursue this litigation even after the first two cases failed to result in class-wide relief. (*See* Caddell Decl. ¶ 36.) There was certainly a substantial investment

7

and risk incurred.   Given the result obtained on behalf of the 23(b)(3) class and the unequivocal

law supporting an award of a 25% fee, Professor Miller concluded:

> In short, the extensive empirical research on attorneys' fees on common fund
> cases overwhelmingly supports the reasonableness of the requested fee of 25% of
> the $13.5 million common fund.  That fact, together with other factors mentioned
> above—the  outstanding results achieved; the high levels of energy, diligence and
> skill displayed by counsel; the social utility of this litigation; the risk of the
> litigation, and other considerations—makes it abundantly clear that the fee
> requested for the common fund component of this case is entirely reasonable and
> appropriate.

(Prof. Miller Decl. ¶ 48.)  Because Class Counsel's requested fee of 25% is reasonable under the

circumstances of this case and the applicable law, the Court should award the requested fee.

(Prof. Miller Decl. ¶¶ 42–43 (opining that the 25% requested fee "is within the range of reason

and in fact below the norm for comparable cases").)

> **B.      An Award of Attorneys' Fees Based on Counsel's Lodestar is Also
> Appropriate as Compensation for the Benefit Conferred on the Rule 23(b)(2)
> Injunctive Relief Class.**

Separately from the $13.5 million common fund created for the approximately 31,000

members of the Rule 23(b)(3) Class, Class Counsel also secured significant and valuable benefits

for a much larger class, comprising over 100 million consumers who will benefit from business

practice changes that constitute a sea change in the industry and a fundamental reform to an

important part of the debt collection industry in the United States.  (*See* Settlement Agreement,

Ex. A to Caddell Decl., ¶ 4.3 (describing injunctive relief achieved); Second Declaration of

Professor Neil M. Richards, attached as Ex. 2 to Response to Objections, filed concurrently

herewith, ("Prof. Richards Decl.") Decl. ¶ 13; ("The Proposed Settlement also represents a

significant shift in the practices of the data broker industry—an industry which currently is

subject to minimal regulation in its treatment of personal data."); Prof. Miller Decl. ¶ 21.)

Because the value of this benefit is difficult to quantify precisely, the lodestar method is best suited to award fees based on the injunctive relief.  (Prof. Miller Decl. ¶ 24.)

Class Counsel requests, and LexisNexis does not oppose, a payment of $5.5 million for Counsel's attorneys' fees and expenses incurred in litigating and negotiating the injunctive relief. (Settlement Agreement, Ex. A to Caddell Decl., ¶ 4.4.1.) Deducting Class Counsel's reasonable expenses of $116,811.79, (*see infra* Section II.B.4), Counsel requests a fee of $5,333,188.21.  It is important to note that this fee will be paid by LexisNexis and will not reduce the recovery available to the Class.  (*See id.*; Prof. Miller Decl. ¶ 21.) Also noteworthy is the fact that this fee, like all attorneys' fees and service awards in this case, was negotiated only *after* the substantive terms of relief to the Class had been agreed, affording the protections of the adversary system to the fee-setting process.  (Prof. Miller Decl. ¶ 22.)

> ### 1.    Counsel's lodestar reflects the time, labor, and skill reasonably required to prosecute this complex action.

The Court's analysis begins by calculating Counsel's lodestar—reasonable hourly rate multiplied by hours reasonably expended in the litigation.  *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008).  Here, as Counsel attested, they reasonably expended 6,811.8 total hours litigating against LexisNexis over application of the FCRA to Accurint reports (Caddell Decl. ¶¶ 54–55; Declaration of James A. Francis, attached as Ex. 2 hereto, ("Francis Decl.") ¶ 19; Declaration of Leonard A. Bennett, attached as Ex. 3 hereto, ("Bennett Decl.") ¶ 37; *see also* Prof. Miller Decl. ¶ 27 (describing this case as "a major piece of litigation," and finding that the total number of hours expended appears reasonable under the circumstances).) Cognizant of the need to work efficiently, Counsel for the four firms representing Plaintiffs coordinated their work to avoid duplication of effort and assigned work to associate and paralegal personnel where possible and prudent to keep costs low.  (Caddell Decl. ¶ 35.)

Over the course of the litigation, in addition to performing significant formal and informal discovery, the Parties have met—face-to-face—for mediation conferences at least nine times in Richmond, Newport News, New York, Philadelphia, Houston, Oakland, and Fort Lauderdale.  (Caddell Decl. ¶ 39.) The first face-to-face settlement negotiation took place in 2009 in Newport News shortly after the *Graham* action was filed, with top decision makers from both sides involved.  A detailed presentation was made over the course of a full day, and the parties engaged in substantial, in depth discussions regarding the LexisNexis products and the claims at issue.  Subsequently, on April 16, 2010, the Parties met in Richmond at the federal courthouse before Magistrate Dohnal in a moderated settlement conference, at which Plaintiffs' Counsel made a PowerPoint presentation and presented proposals for changes in LexisNexis business practices relating to its Accurint product. Then-Magistrate Judge Dohnal remained involved in resolution of this matter over the next several years, both as a Magistrate Judge and then as a private mediator.  (*Id.*)  On December 3, 2010, and on January 19, 2011, the Parties met again in Philadelphia and New York, primarily for purposes of discussing an injunctive relief settlement.  (*Id.*)  Plaintiffs' Counsel presented to Defendants a detailed analysis of the business practice changes Counsel believed were necessary to resolve FCRA claims related to the Accurint database.  (*Id.*)  Monetary relief was not the focus of these meetings.  Instead, the parties discussed very specific and detailed changes in LexisNexis's business practices at a product by product level that they believed were necessary to address the issues raised in the complaint and to settle these claims.  Across these meetings, Plaintiffs' Counsel discussed with Defendants the business practice changes Counsel believed were necessary to resolve FCRA claims related to the Accurint database and delved painstakingly into each product offering in the Accurint suite, report by report, and, in some instances, data field by data field.  (*Id.*)

These discussions, which concluded without a resolution, laid the foundation supporting Plaintiffs' claims in this *Berry* action, which was filed in November 2011.  (*Id.* ¶ 40.)  Briefing and arguments regarding LexisNexis' Rule 12(c) motion in *Adams* also substantially informed the parties' positions in *Berry*.  (*Id.*)  The Parties began settlement talks in the *Berry* case in 2012, with an initial phone conference with Judge Lauck and another face-to-face meeting, this time in Houston, to discuss settlement.  (*Id.*)  The Parties then agreed to mediate the case with the assistance of Randall Wulff, chosen because of his experience mediating complex cases, and especially because of his FCRA expertise.  (*Id.*)  After substantive presentations of both sides' positions with Mr. Wulff on May 10, 2012, and consultation with Mr. Wulff and Judge Dohnal no settlement was reached.  (*Id.*)  The Parties did agree, however, to reserve three additional mediation dates with Mr. Wulff and to retain Judge Dohnal to further assist with the mediation process. (*Id.*)

Through additional telephone conversations, the Parties began to craft the parameters of a settlement on behalf of consumers who may have been and likely would be the subjects of Accurint reports sold to debt collectors.  (*Id.* ¶ 41.)  These discussions culminated in a July 18, 2012 letter in which LexisNexis proposed radical modifications to its reporting business with respect to debt collectors, including the implementation of certain FCRA-like rights connected to reports that ordinarily would not have such rights.  (*Id.*)  With these proposed business changes as the starting point, the Parties again mediated with Mr. Wulff in Oakland, California on July 30, and August 21–22.  (*Id.*)  This final session again consisted of substantive presentations and exchange of documents setting forth the Parties' litigation positions and ended with the Parties' agreement to the general outline of the Settlement presented here.  (*Id.*)

Because the injunctive relief involved a restructuring of LexisNexis's core business practices, it was complex to design and negotiate, requiring significant time and skill. (*See* Prof. Miller Decl. ¶ 28(c).)  Even once the broad outlines of the injunctive relief had been agreed Plaintiffs' Counsel continued to offer suggested improvements to LexisNexis's proposed business changes. (*Id.*)  On September 18, 2012, the Parties met face-to-face in Houston, and on October 5, 2012, they again met in Fort Lauderdale to further define the proposed settlement and discuss the changes necessary for LexisNexis to implement the injunctive relief. (*Id.*)  The Fort Lauderdale meeting included a presentation of the actual Internet portal that LexisNexis' customers would use with the Contact & Locate and Collections Decisioning products, as well as proposed outputs that users would receive for each product. (*Id.*)

While the mediations were ongoing, the Parties continued to conduct discovery and litigate the case, adhering to the dual-track approach until the final mediation sessions with Mr. Wulff approached a resolution. (*Id.* ¶ 43.)  Even after the Settlement had been agreed upon, Plaintiffs' Counsel needed to remain involved in the process to ensure that the final products created by LexisNexis adequately protected consumers and met the Settlement's agreed upon parameters. (*Id.*)

Given this long and complex history, the far-reaching nature of the relief sought, and the difficulty of the issues involved, the hours Plaintiffs' Counsel expended on this case were eminently reasonable. (Prof. Miller Decl. ¶ 27 ("The 6,811.8 total hours incurred by counsel appears reasonable under the circumstances.")

### 2.     Plaintiffs' Counsel's hourly rates are reasonable.

Plaintiffs' Counsel include the nation's leading experts on FCRA class action litigation. (*See* Plts.' Mem. in Supp. of Mot. For Final Approval, filed concurrently herewith, at 21–22.) Their hourly rates are consistent with market rates for attorneys of similar skill and experience.

(Caddell Decl. ¶¶ 56–57 (showing that Caddell & Chapman's rates have been approved by multiple courts); Francis Decl. ¶ 17 (showing that Francis & Mailman rates are "reasonable and within the range of the appropriate market rates charged by attorneys with comparable experience levels for litigation of a similar nature."); Bennett Decl. ¶¶ 37–38 (showing that counsel's rates are consistent with prevailing hourly rates for FCRA class-action practitioners in Richmond); Pittman Decl. ¶¶ 20–21; Prof. Miller Decl. ¶¶ 31–34 (showing that counsel's rates are consistent with rates charged for similar litigation.).) The rates of lawyers at Consumer Litigation Associates are based on prevailing fees for national class-action work. (Bennett Decl. ¶ 38.) Caddell & Chapman and Francis & Mailman have had the rates upon which they base their fee request here approved—without reduction—in class-action cases across the country. (Caddell Decl. ¶¶ 56–57, Francis Decl. ¶ 18.) These rates are also in line with the publicly available information regarding rates charged by lawyers on both the plaintiff and defense sides, as compiled from public filings establishing attorneys' billing rates. (Prof. Miller Decl. ¶¶ 31–34 (setting out these rates and their sources, and concluding Class Counsel's rates here "are appropriate and reasonable").)

### 3. The requested multiplier is reasonable in light of the results achieved.

Multiplying the hours reasonably expended by Counsel's hourly rates, Plaintiffs' Counsel's lodestar is $3,349,379.95, of which approximately 80% was allocated to efforts to achieve injunctive relief. (Caddell Decl. ¶ 51; Bennett Decl. ¶ 28; Prof. Miller Decl. ¶ 28 (finding that the 80% allocation is reasonable and consistent with the relative magnitude of the relief obtained, the relative complexity of the matters at issue, and documents showing that injunctive relief was the "center of gravity" of the parties' settlement discussions).) The requested $5,333,188.21 fee thus represents a 1.99 multiplier on the value of the time spent. This multiplier is well-within the range of multipliers awarded in similar cases. (Prof. Miller

Decl. ¶¶ 37–38 (citing multiple examples of other class actions in which courts awarded multipliers greater than 2).

Particularly in light of the result achieved, the requested fee is a reasonable, appropriate award for this case. The reasonableness determination is informed by the following factors:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Robinson v. Equifax Info. Servs.*, 560 F.3d 235, 243–44 (4th Cir.2009). As shown above, Counsel here expended large amounts of time and labor, demonstrated skill commensurate with their preeminent reputations, and achieved an excellent result in this exceptionally large and complex action. (*See supra* Section II.B.1; *see also* Prof. Miller Decl. ¶ 39.) Particularly salient here is the 8th factor—the amount in controversy and the results obtained. Despite LexisNexis's defenses, Plaintiffs here achieved relief that provides substantial benefits for over 100 million consumers, making the requested fee more than reasonable. (Prof. Miller Decl. ¶ 39(e) (observing that "the changes proposed for Defendants' business practices indicate that the requested fee is small in relation to the benefits conferred").)

The Settlement provides important privacy protections to a class potentially comprising any adult in the United States who has access to consumer credit. Before this litigation, consumers whose personal information was sold to debt collectors frequently were not even aware that LexisNexis was selling information about them. If the information was inaccurate, consumers had no way to correct it. (Prof. Richards Decl. ¶ 13 (observing that the data broker

industry is currently "subject to minimal regulation in its treatment of personal data").  Now, consumers will be able to access and dispute the accuracy of Accurint information about them, giving over 100 million people a measure of control over sensitive information that they previously would have had to pay to access, if they had been able to access it at all.  (Prof. Richards Decl. ¶ 43.) Furthermore, if LexisNexis fails to comply with the FCRA's regulatory strictures with regard to its "Collection Decisioning" Product, consumers will have available the full range of FCRA remedies, including actual or statutory damages and attorneys' fees.  (*Id.* ¶ 32.) These changes constitute a "significant shift in the practices of the data broker industry," (*id.* ¶ 13), implementing principles that privacy experts consider "best practices."  (*Id.* ¶ 41; *see also* Prof. Miller Decl. ¶ 39(f) ("The injunctive relief obtained in this settlement offers clear public policy benefits for millions of consumers whose personal information might be included in Defendants' reports going forward.")

Moreover, the Settlement reached here provides genuine relief to Class Members without the need for them to prove actual harm, and despite the fact that—because the claims involve a lack of proper notice under the FCRA—many Class Members (if not all) were not aware of their claims until reading the published notice or receiving their postcard notice.  Even with regard to the "Contact & Locate" product, for which FCRA rights are arguably not required, consumers will be able to receive a free copy of their reports.  (Dkt. No. 63-6 ¶ 33 (observing that the right to free copy of such reports "empowers consumers against the companies that collect, use, and disclose their financial and other personal information").)  While the monetary value of these privacy protections may be difficult to quantify precisely, on a class-wide basis, it ranges into the billions of dollars, dwarfing the requested $5.3 million fee award.  (Dkt. 63-6 ¶ 43 ("[I]f I were to estimate the monetary value of the settlement to consumers, it would be in the billions of

15

dollars.").) Counsel should rightly be compensated for creating this value for the Class.  (*See* Prof. Miller Decl. ¶ 36 ("[I]t is obvious that a multiplier is required if counsel are to have adequate incentives to bring litigation of this sort.").)

Moreover, the fee requested here, including the multiplier, is well within the range of awards in similar cases.  (Prof. Miller Decl. ¶¶ 37–38 (collecting examples of larger multipliers awarded in class litigation).)  Courts nationwide have—many times over—approved multipliers larger than the one Class Counsel requests here, sometimes in cases in which much less work was completed.  *See, e.g.*, *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) (finding that requested fee amount with a lodestar multiplier of 7.89 was not unreasonable "[g]iven the outstanding settlement in this case and the noticeable skill of counsel"); *In re Charger Commc'n, Inc., Sec. Litig.*, No. MDL 1506, 4:02CV1186CAS, 2005 WL 4045741, at *1, *18 (E.D. Mo. June 20, 2005) (approving lodestar multiplier of 5.61); *In re Excel Energy, Inc., Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 989 (D. Minn. 2005) (approving a multiplier of 4.7 in a case that only involved document review, and was resolved without any depositions after two days of mediation); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (awarding lodestar multiplier of 6.96 despite the fact that the parties engaged mostly in informal discovery and took no depositions); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y 2002) (describing multiplier of 4.65 as "modest" in a case in which plaintiffs conducted no depositions, only interviews, and confirmatory discovery consisted of tens of thousands of pages of documents); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding 3.97 multiplier, reasoning that multipliers between 3 and 4.5 were common); *DiGiacomo v. Plains All Am. Pipeline*, Nos. Civ. H-994137, Civ. H-99-4212, 2001 WL 34633373, at *3, *11 (S.D. Tex. Dec.

19, 2001) (endorsing multiplier of 5.3 despite the fact no depositions were taken and most of the discovery was informal or document review); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (affirming multiplier of 3.65 to compensate class counsel for risk of taking the case); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197–98 (S.D.N.Y. 1997) (approving multiplier of 5.5 in what the court described as risky and hard fought litigation); *In re Interpublic Sec. Litig.*, No. 02 Civ.6527(DLC), 03 Civ.1194(DLC), 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004) (awarding multiplier of 3.96); *In re WorldCom, Inc., Sec. Litig.*, 388 F. Supp. 2d 319, 353 (S.D.N.Y. 2005) (awarding multiplier of 4).   Thus, the Court should approve the requested fee award.

### 4. The Court should also award Counsel's reasonably incurred expenses of litigation.

LexisNexis has also agreed to reimburse Counsel's reasonably incurred expenses, with the total awards for fees and expenses not to exceed the agreed amounts.   (*See* Settlement Agreement, Ex. A to Caddell Decl., ¶¶ 4.4.1, 5.5.) Counsel here request expense awards of $41,702.95 in connection with the Rule 23(b)(3) fee and $166,811.79 in connection with the Rule 23(b)(2) fee.   Courts regularly award litigation expenses in addition to attorneys' fees in class-action cases.   *Kabore v. Anchor Staffing, Inc.*, No. L-10-3204, 2012 WL 5077636, at *10 (D. Md. Oct.17, 2012) ("It is well-established that plaintiffs who are entitled to recover attorneys' fees are also entitled to recover reasonable litigation-related expenses as part of their overall award.").   The Fourth Circuit has explained that such costs and expenses may include "those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." *Spell v. McDaniel*, 852 F.2d 762, 771 (4th Cir. 1988) (internal quotations omitted).   Fourth Circuit courts have awarded costs such

as "necessary travel, depositions and transcripts, computer research, postage, court costs, and photocopying." *Singleton*, 2013 WL 5506027, at *17 (D. Md. Oct. 2, 2013).

Counsel's expenses here, totaling $208,514.74, all fall into these categories, and were all reasonably incurred in pursuing this litigation.  (Bennett Decl. ¶ 36; Caddell Decl. ¶ 56 and Ex. C. thereto; Francis Decl. ¶ 21; Pittman Decl. ¶ 39.)  Counsel has allocated those expenses in the same manner as fees—20% for the Rule 23(b)(3) Class, and 80% for the Rule 23(b)(2) Class—in light of the fact that the injunctive relief was the focus of this litigation.  (Caddell Decl. ¶ 56; Bennett Decl. ¶ 28; *see* Prof. Miller Decl. ¶ 28(d) (noting both parties treated the "injunctive relief as the 'center of gravity' of this litigation").)  Counsel's expenses were reasonable and necessary to litigate this case, and the Court should therefore award them. *Singleton*, 2013 WL 5506027, at *17 (awarding expenses that the court deemed were "reasonable and typical").

### C.    The Reaction of Class Members Also Favors Granting the Requested Fee.

Apart from the manufactured opposition of the Aaron Objectors,[2] there have been few genuine objections to the Settlement, and only two Class Members have objected to the proposed fee award.[3]  Schulman (and professional objector Cochran, by incorporation) argue that the injunctive relief fee is excessive and signals a collusive agreement with LexisNexis, because they contend that the fee is not properly proportionate to the value of the relief.  (Dkt. No. 71 at 31–

---

[2]  *See* Plaintiffs' Responses to Objections, filed concurrently herewith, at 1 n.1.

[3]  While the Aaron Objectors complain that the briefing schedule only allows three days for responses to Counsel's fee request and that Counsel will make its fee request after the date for objections has passed, such dissent is without merit.  (Dkt. No. 72 at 20–21.) The Classes were informed of the amount of attorneys' fees that Plaintiffs' Counsel would request in both the published and mailed notices (Dkt. No. 63-5 at 53, 64, 69), so there was certainly adequate opportunity to object to the fee request in advance of the deadline for objections.  The Court should conclude Aaron's (and anyone else's) failure to timely object to Counsel's fee results in waiver of those objections.

32.)  First, as Professor Miller notes, LexisNexis had every incentive to bargain aggressively on attorneys' fees, because the Parties did not discuss the amount of attorneys' fees until after the terms of the Settlement had been agreed.  (Prof. Miller Decl. ¶ 22(b).)  Second, the value of the injunctive relief easily justifies the fee requested here.  Schulman argues that, for the $5.5 million fee to meet the 25% benchmark for common-fund awards, the injunctive relief should be worth $16.5 million.  (*Id.*)  This argument not only uses an incorrect method of determining fees, it overlooks the fact that the injunctive relief has value ranging into the billions of dollars.  (Dkt. 63-6 at 43.)

Initially, Schulman bases his complaint on the incorrect assumption that the injunctive relief fee should be calculated as a percentage of the value, as though the injunctive relief is a common fund.  (*See* Dkt. No. 71 at 31–32.)  As Professor Miller explains, the lodestar method is more appropriate:

> The documents I have reviewed reveal that the bulk of counsel's efforts, both on the plaintiff side and the defense side, were devoted to the injunctive component of this settlement, and for good reason.  Many millions of consumers can benefit from Defendants' promises to comprehensively reform their business practices, in what is essentially a fundamental reform to an important part of the debt collection industry in the United States.  While the value of the injunctive relief cannot readily be calculated, it is *clearly substantial.*
>
> * * *
>
> [T]he relief obtained by Class Counsel's efforts has significant value.  It is difficult, however, to estimate that value with precision because of the fact that the relief obtained is injunctive rather than pecuniary in nature.  In light of these uncertainties, *it is more instructive to calculate the fee for the injunctive component of this settlement based on the lodestar analysis.*

(Prof. Miller Decl. ¶¶ 19(b), 24 (emphasis added).).

Furthermore, contrary to Schulman's statement that he is unaware of any attempt to quantify the value of the injunctive relief, the record shows that Neil Richards did so at the

preliminary approval stage.   (Dkt. 63-6 ¶ 43.) Professor Richards set out at great length the genuine, valuable benefits that the injunctive relief will provide consumers and further explained that if he "were to estimate the monetary value of the settlement to consumers, it would be in the billions of dollars."  (Dkt. No. 63-6 ¶¶ 31–37, 43.)  In addition, Professor Richards notes that the free Accurint reports provided to consumers alone would save them approximately $160 million per year. (*Id.* ¶ 43.)  Thus, even without considering all of the Settlement's other benefits, this one benefit alone is worth 10 times what Schulman suggests should be the minimum to justify the requested fee award.  (Dkt. No. 71 at 31–32.) Considering all of the benefits together, the value of the injunctive relief is easily many multiples of the requested fee award, confirming the reasonableness of the requested fee.

Aside from Schulman's poorly taken objection, which Cochran incorporates by reference, no class members have objected to the requested fee award, indicating that the Class overwhelmingly supports the Settlement.  *In re Wachovia Corp. ERISA Litig.*, No. 3:09cv262, 2011 WL 7787962, at *4 (W.D.N.C. Oct. 24, 2011) (finding class members implicitly approved settlement, including attorneys' fee term, where four of 150,000 class members filed formal objections); *Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 763 (S.D. W. Va. 2009) (approving award of attorneys' fees where one class member objected to settlement, and finding "the Class Members to have demonstrated approval of the instant fee request and agreement to pay such an amount"); *see also Stoetzner v. United States Steel Corp.*, 897 F.2d 115, 118–19 (3d Cir. 1990) (concluding that when "only" 29 members of a 281 person class (10% of the class) objected, the response of the class as a whole "strongly favors [the] settlement"); *Elkins v. Equitable Life Ins. of Iowa*, No. CIVA96-296-CIV-7-17B, 1998 WL 133741, at *28 (M.D. Fla. Jan. 27, 1998) ("[t]here have been only six objections received from a Class of approximately

109,000 policy owners, which is a de minimus number" relative to the size of the class).  In short, Class Member reaction to the Settlement, including the fee request, has been positive, further confirming the reasonableness of the requested fee.

> **D.    The Court Should Award the Agreed-Upon Service Awards to the Class Representatives.**

Courts generally recognize that "[i]ncentive or service awards reward representative plaintiffs' work in support of the class, as well as their promotion of the public interest." *Deem*, 2013 WL 2285972, at *6 (citing *Jones*, 601 F. Supp. 2d at 767).  Plaintiffs request, and the Defendants do not oppose, an incentive award of $5,000 each for their service as Class Representatives.  (Settlement Agreement, Ex. A to Caddell Decl., ¶ 5.6.) LexisNexis will pay the incentive awards separately, so the amount will not reduce the settlement payments to Class Members.  (*Id.*) In this case, the Plaintiffs chose to serve as the Named Plaintiffs in this lawsuit after Class Counsel explained to them the responsibilities required.  (Exs. 5–10 Declarations of Gregory T. Berry, Rickey Millen, Shamoon Saeed, Arthur B. Hernandez, Erika A. Godfrey, and Timothy Otten (collectively, "Class Rep. Decls.") ¶ 5.) Cognizant of those responsibilities, Plaintiffs began this lawsuit with the intent to vigorously pursue it, for themselves and the benefit of the Class Members they represent.  (*Id.*) The Class Representatives understand the theories of this lawsuit, kept abreast of the case's status, reviewed documents provided to them by their Counsel, and discussed with their Counsel aspects of the case, discovery issues, and settlement negotiations.  (Class Rep. Decls. ¶¶ 6–8.)  Service awards have been regularly approved by judges in the Eastern District of Virginia in cases such as this one where the class representative took a role in prosecuting the claims on behalf of the class.  *Cappetta v. GC Servs. LP*, No. 3:08cv288-JRS (E.D. Va. April 27, 2011) (Judge Spencer approved a $5,000 service award to each named plaintiff); *Henderson v. Verifications Inc.*, No. 3:11cv514 (E.D. Va. Mar. 13, 2013)

(Judge Payne approved a $5,000 service award to named plaintiff); *Pitt v. Kmart Corp., et al.*, No. 3:11cv697 (E.D. Va. May 24, 2013) (Judge Gibney approved a $5,000 service award to the class representative); *Conley, et al. v. First Tennessee Bank, N.A.*, No. 1:10cv1247 (E.D. Va. Aug. 18, 2011) (Judge Ellis awarded a $5,000 service award to each named plaintiff); *Ryals, Jr. et al. v. HireRight Solutions, Inc.*, No. 3:09cv625 (E.D. Va. Dec. 22, 2011) (Judge Gibney approved an service award to each class representative in the amount of $10,000).  Here, the Named Plaintiffs amply fulfilled their duties as Class Representatives, making the modest $5,000 service award to each appropriate.

## III.   CONCLUSION

For the reasons set forth above, the Court should grant attorneys' fees of $3,333,297.05 and expenses of $41,702.95, totaling $3.375 million, in compensation for the benefit conferred on the Rule 23(b)(3) class and attorneys fees of $5,333,188.21 and expenses of $166,811.79 totaling $5.5 million, in compensation for the benefit conferred on the Rule 23(b)(2) class and grant the Class Representatives service awards of $5,000 each.

November 22, 2013

Respectfully submitted,

_____/s/ Leonard A. Bennett_____
Leonard A. Bennett
Matthew J. Erausquin
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J Clyde Morris Blvd., Suite 1A
Newport News VA 23601

Michael A. Caddell
Cynthia B. Chapman
Craig C. Marchiando
**CADDELL & CHAPMAN**
1331 Lamar St., Suite 1070
Houston TX 77010

James A. Francis
David A. Searles
John J. Soumilas
**FRANCIS & MAILMAN PC**
Land Title Building
100 S. Broad Street, 19th Floor
Philadelphia PA 19110

Dale W. Pittman
**THE LAW OFFICE OF DALE W. PITTMAN, P.C.**
112-A W. Tabb St.
Petersburg VA  23803-3212

***Attorneys for Plaintiffs Gregory Thomas Berry,
Summer Darbonne, Rickey Millen, Shamoon
Saeed, Arthur B. Hernandez, Erika A. Godfrey
and Timothy Otten***

## CERTIFICATE OF SERVICE

I certify that on the 22nd day of November, 2013, I electronically filed the foregoing Plaintiffs' Memorandum in Support of Motion For Attorneys' Fees, Expenses, and Service Awards with the Clerk of Courts using the CM/ECF system, which will send notification of such filing to CM/ECF participants, and I hereby certify that I will mail by United States Postal Service the document to the non-CM/ECF participants:

James Francis McCabe
MORRISON & FOERSTER LLP
425 Market Street
San Francisco CA 94105-2482
(415) 268-7011
jmccabe@mofo.com

Ronald Irvin Raether , Jr.
FARUKI IRELAND & COX PLL
500 Courthouse Plaza SW
10 N Ludlow Street
Dayton OH 45402
(937) 227-3733
rraether@ficlaw.com

David Neal Anthony
TROUTMAN SANDERS LLP
Troutman Sanders Bldg
1001 Haxall Point
PO Box 1122
Richmond VA 23219
(804) 697-5410
david.anthony@troutmansanders.com

***Attorneys for Defendants***

Charles B. Molster, III
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington DC 20006
(202) 282-5000 (phone)
(202) 282-5100 (fax)
cmolster@winston.com

***Attorney for Objector, Megan
Christina Aaron, et al.***

24

I further certify that on November 25, 2013, I caused the Plaintiffs' Memorandum in Support of Motion for Attorneys' Fees, Expenses, and Service Awards to be mailed by United States First Class Mail to the following individuals:

Adam E. Schulman
Center for Class Action Fairness
1718 M. Street NW #236
Washington DC 20036

David Brown
1717 Market Street
Tacoma WA 98402

Jeanne Giles
260 Gooseberry Drive
Reno NV 89523

JoAnn Nix
151 Gaddis Road NW
Cartersville GA 30120-4612

Edward W. Cochran
20030 Marchmont Rd.
Shaker Heights OH 44122


           /s/ Leonard A. Bennett
           Leonard A. Bennett