```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        RICHMOND DIVISION

 3    ------------------------------------------

 4    GREGORY THOMAS BERRY, et al.,

 5
                                    Plaintiffs;
 6    v.                                    Criminal Action

 7                                      3:11CV754

 8    LEXISNEXIS RISK & INFORMATION
      ANALYTICS GROUP, INC., et al,
 9

10                                  Defendants.

11    ------------------------------------------

12                       December 10, 2013
                         Richmond, Virginia
13                          10:00 a.m.

14                       FAIRNESS HEARING

15    BEFORE:        HONORABLE JAMES R. SPENCER
                     United States District Judge
16

17    APPEARANCES:   LEONARD A. BENNETT, ESQ.
                     MICHAEL A. CADDELL, ESQ.
18                   JAMES A. FRANCIS, ESQ.
                     DALE W. PITTMAN, ESQ.
19                   CYNTHIA B. CHAPMAN, ESQ.
                     MATTHEW J. ERAUSQUIN, ESQ.
20                        Counsel for Plaintiffs;

21                   RONALD I. RAETHER, JR., ESQ.
                     JAMES F. McCABE, ESQ.
22                   DAVID N. ANTHONY, ESQ.
                          Counsel for Defendants.
23    ALSO PRESENT:  ADAM E. SCHULMAN, ESQ.; CHARLES B. MOLSTER,
      III, ESQ.; KIMBALL R. ANDERSON, ESQ.; EDWARD W. COCHRAN,
24    ESQ.
                       JEFFREY B. KULL
25                  OFFICIAL COURT REPORTER
```

1          P-R-O-C-E-E-D-I-N-G-S

2          THE CLERK:  Case Number 3:11CV754:  Gregory

3    Thomas Berry, et al. versus LexisNexis Risk Information

4    Analytics Group, Inc., et al.  The plaintiffs are

5    represented by Leonard Bennett, Matthew Erausquin, Dale

6    Pittman, David Searles, Cynthia Chapman, James Francis,

7    and Michael Caddell.  The defendants are represented by

8    David Anthony, James McCabe, and Ronald Raether, Jr.

9    Objectors are Adam Schulman, appearing pro se, and Megan

10   Christina Aaron, et al., represented by Charles Molster,

11   III and Kimball Anderson.  Are counsel ready to proceed?

12          MR. ANTHONY:  We are, Your Honor.

13          (All counsel responded in the affirmative.)

14          THE COURT:  All right.  We will hear from

15   plaintiffs.

16          MR. CADDELL:  Yes, Your Honor.  Mike Caddell,

17   Your Honor, for the class.  Your Honor, I think it is

18   important, there has been a lot of paper filed with the

19   Court, and some serious accusations laid against class

20   counsel with respect to this settlement.  And so I want to

21   go through, I want to make sure that we have an adequate

22   record for the Court and for any appellate court that may

23   look at this, so we have prepared a PowerPoint to go

24   through these points.

25          First, Your Honor, the injunctive relief class

1    is defined as all persons about whom information was in

2    the Accurint database from November 14th, 2006 to the date

3    when the Court entered its Preliminary Approval Order.  So

4    the Court understands, that represents about 200 million,

5    give or take, adult Americans.  Virtually everyone who

6    applied for a credit card, who had a transaction, a credit

7    transaction of any kind.

8            We retained a privacy expert, Neil Richards.  He

9    consults, he is the advisor to the ALI's Privacy Law

10   Project.  He was a Law Clerk to Chief Justice Rehnquist

11   and Judge Niemeyer on the Fourth Circuit.  He was a UVA

12   Law graduate.  He has looked at this.  And this is, so the

13   Court appreciates, this is the only evidence.  There's a

14   lot of argument, but this is the only evidence that's

15   before the Court from an outside expert or anyone else.

16   Actually, there's some other evidence that I will put

17   before the Court, but this is the evidence that

18   demonstrates the value of the injunctive relief that's

19   being obtained by this settlement.

20           The Court may recall at the preliminary approval

21   hearing and from the presentation we made to Magistrate

22   Judge Lauck, this injunctive relief has been described by

23   the defendant as a massive earthquake, as a sea change.

24   And you will see that one of the problems that the

25   objectors make is in likening this case to other cases

1    where, frankly, injunctive relief was of little value.  We

2    will get to that in just a minute.  But in this case, what

3    we obtained for the class, and again, this is a class

4    comprised of almost all adults in the United States, are

5    the protections of the Fair Credit Reporting Act to things

6    like a report called Contact & Locate, which would not be

7    obtainable under the Fair Credit Reporting Act.  So we are

8    actually getting more rights for people in some

9    instances -- and we've got a concrete demonstration of how

10   that's valuable -- than they could get even under the Fair

11   Credit Reporting Act.

12           The proposed injunctive relief squarely remedies

13   conduct targeted in this litigation and two prior related

14   cases by providing a full range of Fair Credit Reporting

15   Act protections for Accurint reports in the collections

16   arena.  This settlement will affect about 20 million

17   consumer reports a year.  Every year, Accurint is the

18   industry leader in issuing collections reports.  They do

19   about 20 million a year.  And this settlement will

20   dramatically change those -- the way they handle those

21   credit reports and the rights that consumers have with

22   respect to those reports.

23           As Mr. Richards, Professor Richards noted, they

24   also incorporate into this settlement what are called

25   information privacy principles, transparency, security,

1    things of that nature that are sort of best practices in

2    the area of data compilation and data use.  The Court is

3    aware that there is so much information out

4    in -- available about all of us.  And I know that it is

5    critical to the class that these protections be afforded.

6            One of the criticisms we have been -- that have

7    been asserted by the objectors is that they are

8    complaining that injunctive relief is not available under

9    the Fair Credit Reporting Act to private litigants.  There

10   is actually a split of authority.  Clearly, the great

11   weight of authority agrees with that position.  There are

12   some cases that are contra to that.  The truth is, the

13   Fair Credit Reporting Act is silent on the issue of

14   whether a private litigant can obtain injunctive relief.

15   For that reason, some courts have held, many courts have

16   held that that's not available.

17           This is not actually, though, a criticism of the

18   settlement, but in fact, it should be something to be

19   applauded.  Because what we have obtained through this

20   settlement is something that, if the objectors are right,

21   we could never have obtained through litigation.  So we

22   have obtained something better than what they could have

23   obtained through litigation.  Again, this is Professor

24   Richards's assessment of the value of the injunctive

25   relief.  He valued the injunctive relief in various ways.

1    One value that he placed on it was that it was worth as

2    much as $2.2 billion to the class.  Another way he valued

3    it, he said even if you assigned an unreasonably low value

4    of just a dollar per report, you are talking about the

5    value of the settlement being over $20 million a year

6    every year.

7            Let's look at some of the specifics, the

8    overview for the collections.  What we have to know, Your

9    Honor, and we will show you in a minute, if you go on the

10   LexisNexis Accurint website today, if you did it right

11   this minute in the courtroom, what you would see is that

12   LexisNexis says, "We are not a credit reporting agency,

13   and our reports are not subject to the Fair Credit

14   Reporting Act."  And therefore, you are not going to get

15   any rights.  They don't say this last part, but the

16   reality is, because they take the position that they are

17   not subject to the Fair Credit Reporting Act, then of

18   course they don't provide consumers the rights afforded

19   them under the Fair Credit Reporting Act.

20           So what we are obtaining for consumers with

21   respect to these collections reports, which is the bulk of

22   what LexisNexis does, the Accurint Division, we are giving

23   them full Fair Credit Reporting Act coverage and the

24   rights, including reasonable procedures, to assure maximum

25   possible accuracy, the restriction of the use of the

1    reports to only permissible purposes, full file access and

2    disclosure at no charge, and investigation and correction

3    of inaccurate information.  And we are doing all of this

4    and still allowing class members to sue LexisNexis for

5    actual damages in individual lawsuits.

6            Contact & Locate, which will be a stripped-down

7    report, which will exclude most of what are called seven

8    characteristics data -- seven characteristics, the Fair

9    Credit Reporting Act identifies seven characteristics such

10   as credit, credit standing or mode of living, employment,

11   things of that nature.  The Fair Credit Reporting Act

12   identifies seven characteristics which it says help you

13   determine whether a report is in fact a consumer report.

14   The Contact & Locate, the new Contact & Locate Report that

15   is going to be utilized by Accurint if the Court approves

16   this settlement will strip out most of that data.  And

17   yet, the consumer will still be able to get a free copy of

18   the report, which is not something that the consumer is

19   entitled to if the report is not covered by the Fair

20   Credit Reporting Act.  So this is a right that we are

21   getting for consumers that they would not have under the

22   Fair Credit Reporting Act, and we are giving the right for

23   the consumer to correct information belonging to another

24   consumer through a 100-word statement.  And I'll talk a

25   little bit more about that in a minute.

1    But still, class members can still sue

2    LexisNexis with respect to Contact & Locate Reports for

3    actual damages in individual lawsuits.

4    So going through these item by item, you can see

5    these are provisions of the Fair Credit Reporting Act.

6    These are rights that consumers now have or will have, I

7    should say, if the Court approves this settlement because

8    of this settlement.  Use of reports restricted to

9    permissible purposes, that's 1681b, aged information is

10   excluded from reports, 1681c.  Implementation of

11   reasonable procedures to ensure maximum possible accuracy.

12   That's 1681e.  Free full file disclosure upon request,

13   including not just the file, but also, an identification

14   of everyone who has asked for your file, and all end users

15   of a report.  That's the 1681g and 1681i claims.

16   The right to dispute.  Consumers now, and you

17   will see, again, consumers don't have the right to dispute

18   information in their file right now.  With this

19   settlement, they will.  And they can have it corrected if

20   it is inaccurate information.  And then actual damages for

21   negligent FCRA violations.  Statutory and punitive damages

22   for willful violations.  And you will see that this

23   settlement actually establishes a standard now against

24   which a willful violation can be judged, which is

25   something we did not have before.  And the right again to

1    correct information belonging to another consumer, a right

2    that's not available under the FCRA at all.

3            Now, you've got an objection, and sort of the

4    overview, Your Honor, you have one objection and only 18

5    opt-outs from the roughly 31,000 persons who were sent

6    individual notice for the 23(b)(2) -- 23(b)(3), the

7    monetary relief class.  That one objection was very

8    revealing.  If I might hand this up to the Court through

9    the Clerk, Your Honor, this is the objection of Mr. and

10   Ms. Nix, JoAnn Nix, to the (b)(3) class.  And the great

11   thing about this objection is, and this is in the Court's

12   file, this is evidence of the value of the (b)(2)

13   settlement, the injunctive relief settlement.

14           So what does Ms. Nix say?  She says, first

15   sentence of her letter, her objection:  "I see no response

16   to the problem herein described in the class action

17   settlement involving consumer reporting as referenced

18   above."  Now, she is talking about the monetary relief

19   settlement.  She is talking about the roughly $325 that

20   she will get a check for.  She doesn't realize that there

21   is an injunctive relief settlement that is going to solve

22   the problem.  She goes on to say:  "The resolution I seek

23   is for LexisNexis to stop giving out incorrect information

24   and refusing to correct their mistake."  That's what this

25   case is about.  The monetary relief is important, and I'll

1    explain why in just a minute, but the thrust of this case

2    was to correct a practice that affects or results in 20

3    million reports a year, that has the potential to affect

4    every adult in the country.

5           And if you continue this objection, the next

6    paragraph, she says:  "I constantly receive harassing

7    calls from debt collectors for a person I have never heard

8    of.  That person is Alaine Nix.  Attached are records of

9    at least 16 calls going back to 2008."

10          If the Court turns to the third page of

11   Ms. Nix's objection, you can see she has handwritten notes

12   identifying calls going back to 2008, call after call

13   after call, with respect to debt collectors.

14          Now, apparently at some point, she found out

15   that these calls were originating because of a report

16   issued by LexisNexis for collections.  So she called

17   LexisNexis.  And what did they tell her?  She said, at the

18   bottom of the page, you can see, "We gave up on stopping

19   the calls..."  You can see the last paragraph.  She says,

20   "We gave up on stopping the calls after receiving the

21   attached letter from Accurint.  The letter is very

22   confusing and is intended to sound very intimidating

23   legally.  However, in the fourth paragraph is where I base

24   my objection.  I quote:  'We do not examine or verify our

25   data, nor is it possible for our computers to correct or

1    change data that is incorrect.  Accurint can provide only

2    the data that was provided to us."

3           Then on the next page, you can see, Your Honor,

4    in the second paragraph, she says:  "The resolution I want

5    is for these above-referenced calls to stop.  At least two

6    of the calls told us they get their information from

7    LexisNexis."

8           If you look at the next page in the exhibit, it

9    says Accurint, and this is the letter she got from

10   Accurint, September 2nd, 2011.  Look at the third

11   paragraph, Your Honor:  "Kindly be advised that Accurint

12   is NOT -- NOT is in all caps and bold -- a consumer

13   reporting agency.  And as such, Accurint is not governed

14   by the Fair Credit Reporting Act.  Accurint data is not

15   permitted to be used to grant or deny credit."

16          That's the point of this settlement, to help

17   someone like Ms. Nix.  She now will have, because of this

18   settlement, she now will have a remedy.  She now will have

19   the ability to not only correct any information in her

20   file, but, and as you can see the second bullet point

21   here, she will actually get to put a 100-word statement in

22   the file of another consumer.  And the Court has had this

23   issue before it in the past in the INTELIUS case where the

24   Court recognized that the Fair Credit Reporting Act

25   doesn't give a consumer the right to contest information

1   in another consumer's file.  After this settlement, with

2   respect to LexisNexis and Accurint, a consumer will have

3   that right.  They will get the right to put a 100-word

4   statement in the file of someone, a consumer whose file

5   has been linked to theirs.  These calls will stop for

6   Ms. Nix because of this settlement unless the objectors

7   get their way.

8              MR. BENNETT:  Your Honor, would it assist the

9   Court to have a hard copy of the PowerPoint?

10             THE COURT:  Sure, I'll take it.

11             MR. BENNETT:  We can do a copy for each counsel.

12  This morning we were at Mr. Anthony's office.  He was kind

13  enough to print these, the updated version, but there will

14  be maybe one or two instances in which there is a new

15  slide and Mr. Caddell will point that out, Judge.

16             MR. CADDELL:  Your Honor, I'm on Slide 11 right

17  now.

18             This settlement is a sea change.  This

19  settlement is an earthquake.  This is not some warning

20  about diaper rash.  We will get to that in a minute.

21             Not only is this settlement an earthquake for

22  consumers in terms of their rights.  All of a sudden,

23  people will get notice when action is taken with respect

24  to these reports.  People will have the right to get their

25  reports from LexisNexis, their complete file.  People will

1    have the right to contest that information.  LexisNexis is

2    spending a lot of money to make this happen.  They are

3    spending out of pocket about $6 million to overhaul its

4    products sold to debt collectors.

5            One of the objectors belittled the fact, sort of

6    made it sound facetious, that LexisNexis, one of the costs

7    is they are going to have to train their personnel.  Of

8    course they are going to have to train their personnel.

9    They have never done this before.  They never gave people

10   rights.  When people called, all a LexisNexis employee had

11   to know to say is, "We are not a consumer reporting

12   agency, we are not bound by the FCRA, end of story, we are

13   done and we will send you a form letter."  Now these

14   people have to be trained that the rights of consumers are

15   to receive a file, that they can contest information in

16   their file, they have to do investigations.  Of course it

17   is going to take training.  Of course they have to

18   completely refigure, reconfigure their computers.  They

19   are reconfiguring their products.  So we initially

20   estimated, LexisNexis initially estimated it would cost

21   about three to four million.  And in fact, that's the

22   number we used with Judge Lauck about a year ago when we

23   first -- when we went through the settlement with her as

24   part of the settlement, the mediation process.  It now

25   turned out that it cost more.  I'm sure the Court is

1    familiar with that, too.  Unfortunately, it seems like

2    everything costs more than it was originally estimated to

3    cost.  And so it actually cost about $6 million.  That's

4    before the Court in an affidavit, a Declaration from a

5    LexisNexis operations personnel.

6              LexisNexis has also estimated that it will

7    suffer a negative business impact as a result of these

8    changes of about $5 million.  Here is the reality.  This

9    is not good for business.  People want to use reports that

10   make it easy for them not to give notice to consumers, not

11   to have to worry about somebody contesting the accuracy of

12   the information.  They would prefer to use a report that

13   is not subject to the Fair Credit Reporting Act because

14   the Fair Credit Reporting Act gives people rights.  So of

15   course LexisNexis is concerned, and rightly so, and they

16   will, they are a business leader, and the business leader

17   in this area, and they believe, their estimate is that it

18   is going to cost them about $5 million in lost business.

19   So just the out-of-pocket costs alone, out-of-pocket and

20   lost business, is going to be about $11 million.  And from

21   this point forward, LexisNexis will now be fully exposed

22   for Fair Credit Reporting Act claims if the information is

23   furnished without full privacy and accuracy protections.

24             So what release are we giving up in exchange for

25   this very valuable right?  We are giving up a release of

1    the 1681n claims for willful non-compliance and related

2    remedies and giving up the use of the class device.  I'll

3    talk about both of those in more detail.  But basically,

4    the willful non-compliance is the leverage that we have

5    used to obtain this earthquake, this sea change in

6    business practices.  The use of class device is only

7    valuable in the Fair Credit Reporting Act context with

8    respect to a statutory claim.  I'll explain that in

9    greater detail.  We are not releasing any individual

10   violations of statutes.  We are not releasing individual

11   claims for actual damages.

12           Your Honor, you know, this Court knows, and the

13   judges in this courthouse know, that hundreds of Fair

14   Credit Reporting Act cases are pursued on an individual

15   basis for actual damages.  And in fact, the actual damages

16   can be substantial.  This Court is perhaps better situated

17   than any court in the country to assess the likelihood

18   that individual claims for Fair Credit Reporting Act

19   violations will be pursued and pursued successfully.  So

20   these claims are being preserved.  We are not surrendering

21   those claims.  Those are not being released.  In fact, for

22   example, Ms. Nix:  Who knows?  Maybe she had a claim.  Her

23   claim is not going to be released.  And then any claims

24   unrelated to Accurint.  So any claim.  So this is not an

25   overly broad release in the sense that we are releasing

1    everything that anyone might have against LexisNexis.  We

2    are only releasing the statutory, willful non-compliance

3    claim and the use of the class device with respect to

4    Accurint.

5             And then we are agreeing contractually that

6    Contact & Locate is not a consumer report under the

7    limited circumstances of the settlement.  By that, I mean

8    what we are doing is we are taking one report, a

9    comprehensive collections report, and we are splitting it

10   into two parts.  The collections part, which will have all

11   the old data, or pretty much all the old data, will be

12   subject to all of the Fair Credit Reporting Act.  The

13   Contact & Locate Report, and the Court is aware, I'm sure,

14   if you are just publishing a name and an address, and even

15   a Social Security Number, you are not subject to the Fair

16   Credit Reporting Act.  The case law is pretty clear that

17   as to those, that type of information, it does not bear on

18   the seven characteristics.  And so therefore, it is not a

19   credit report or consumer report under the Fair Credit

20   Reporting Act.

21            So limiting it to that, we have agreed that it

22   is not a consumer report.  But we are still getting the

23   rights that I just described, even with respect to those

24   reports.  So we are doing actually something better than

25   the Fair Credit Reporting Act would provide.

1        The injunctive relief settlement, Your Honor, it

2   is not required, notice is not required for a (b)(2)

3   settlement.  But we did it anyway.  There was a notion

4   raised by one of the objectors that alternate notice was

5   available.  In fact, that's not true.  While there is this

6   notion that there is a file maintained on roughly 200

7   million people, you don't know who had inquiries issued

8   with respect to them, you don't know, you've got mixed

9   file problems, you've got multiple address problems.  So

10  we provided published notice, website, toll-free telephone

11  number, banner advertisements on the Internet, search

12  engine keyword, and sponsorship.  We did have publications

13  in national media.  And we submitted a report from our

14  notice provider that the notice reached about 75 percent

15  of the potential class.  Now, that's 75 percent of 200

16  million adults in the U.S.

17       Now, let's turn briefly to the monetary relief

18  class.  That's basically everyone about whom

19  LexisNexis -- who requested a copy of their report or

20  submitted a dispute with respect to their report.  We

21  thought these people are the ones most likely to have been

22  affected by the reports that LexisNexis had been issuing

23  in the past.  The Nix objection is a perfect example of

24  that.  Ms. Nix is going to get a great benefit from this

25  settlement.  And yet she is someone who was affected by

1    this problem, and she found out that it was LexisNexis and

2    their Accurint report, and she contacted them and they

3    wouldn't help her.  So that's an example of how we picked

4    correctly the people who are most likely to have some

5    claim of actual damages.

6           Now, Ms. Nix could opt out of that class if she

7    wished to do so, and she could retain a cause of action if

8    she wished to pursue it for her 16 calls.  You can see,

9    however, what Ms. Nix really wants is the injunctive

10   relief.  She wants the calls to stop.  If the calls stop,

11   her objection is satisfied.  And that's what the

12   injunctive relief does.  For the monetary relief class, it

13   is a $13.5 million fund.  Payments are made pro rata.  The

14   service awards are capped at $5,000 per named plaintiff.

15   Class members don't have to take any action to receive

16   their share of the settlement fund.  And on a pro rata

17   basis, given the likelihood, the reality is, out of 31,000

18   people, some people for whatever reason will never cash

19   the check.  It just happens we know this from past

20   experience.  The reality is probably 85 to 90 percent of

21   the checks will be cashed.  There will be -- the monies

22   will go back out to people.  There will not be any

23   reversion to LexisNexis.  And so at the end of the day,

24   class members should receive at least $325 per person net,

25   net of any attorneys' fees.

1          Direct mail notice was sent to the (b)(3) class.

2   It reached 88 percent of the class.  This settlement does

3   release claims under the Fair Credit Reporting Act and

4   comparable state laws.

5          Now, in the context of this settlement, there is

6   a presumption of fairness for a mediated settlement.

7   Where you have a settlement that's reached through arm's

8   length bargaining, investigation and discovery are

9   sufficient to allow counsel and the Court to act

10   intelligently.  Counsel is experienced in similar

11   litigation.  And the percentage of objectors is small.  We

12   meet all four of those criteria.

13          There have been multiple mediation sessions,

14   some nine or ten, over the last four years.  Judge Dohnal,

15   I remember being here in this courthouse back in 2010

16   where Judge Dohnal for the first time saw, and we put on

17   the laptop in one of the conference rooms here, the

18   settlement conference rooms with Judge Dohnal, the

19   Accurint report, collections report, and said, "Judge,

20   this has got to be covered by the Fair Credit Reporting

21   Act."  It was that occasion where I met Mr. McCabe for the

22   first time.  We had Randy Wulff in Oakland,

23   California conduct four in-person mediation sessions.

24   Mr. Wulff was selected in 2002 after a nationwide search.

25   He was selected to mediate all of the 9-11 World Trade

1    Center commercial claims arising out of the 9-11 tragedy.

2    He spent three years in New York doing it.  He is one of

3    the most highly respected mediators in the country.  Then

4    we, about a year ago, went before Judge Lauck, had a three

5    or four-hour presentation, walked through things with her.

6    At the end of that, Judge Lauck, well, in fact we will get

7    to that.  We appeared before her January 14th, 2013.  So

8    as I said, about a year ago.  We went through with

9    specific screenshots showing her what the new products

10   from LexisNexis would look like, what the new collections

11   decisioning product would look like, what the new Contact

12   & Locate product would look like, what rights would be

13   afforded consumers.  We gave her extensive detail.  The

14   hearing lasted, as I said, several hours.  And at the end

15   of that, her comment:  "I do think it is a sea change and

16   a good one and a thoughtfully conducted one."  It goes on

17   to say, "This does strike me both as a set of

18   circumstances where you all have worked hard to see what's

19   fair, to give up on some things you may not wish to have

20   given up on, but then also sort of seeing the high

21   horizon, the common sensible approach that's going to have

22   to come at one point or another."

23         Now, in this Circuit, JIFFY LUBE is the

24   analytical model for considering the fairness of a

25   settlement.  There are four fairness factors, and there

1   are four adequacy factors.  The fairness factors are the

2   posture of the case, the extent of discovery, the

3   circumstances surrounding negotiations, and the class

4   action experience of counsel.  We have pursued these

5   claims since 2008.  We first recognized that there might

6   be a claim back in 2006 when we had another case against

7   LexisNexis involving another product, not the Accurint

8   product.  And we began thinking, "This Accurint product

9   really should be covered by the Fair Credit Reporting

10  Act."  It was not part of that settlement or that

11  litigation.  But after that litigation was resolved, we

12  agreed to pursue the Accurint claims because, again, they

13  represented such a huge number of reports every year that

14  consumers had no idea were being issued.

15          The first settlement meeting concerning this

16  case, this litigation, occurred in Mr. Bennett's office

17  after the WILLIAMS case was resolved, but before any other

18  Virginia action.

19          In the ADAMS case -- so the Court will have

20  heard about three cases.  There were two cases that were

21  competing with one another to some extent, although they

22  were at different points and slightly different

23  perspective.  The ADAMS case was proceeding in New Jersey

24  before District Judge Bump.  That was Mr. Francis's case.

25  In that case, they defeated a Rule 12(c) motion for

1    judgment.  In the GRAHAM case, which was here in this

2    Court, originally before Judge Williams and then

3    transferred to Your Honor, Judge Spencer, that was the

4    case where Judge Dohnal moderated a settlement conference.

5    We fully briefed a motion to dismiss for lack of subject

6    matter jurisdiction in the GRAHAM case.  We conducted

7    discovery in all three cases.  Discovery is near complete.

8    There really isn't anything we don't know about this

9    particular issue.  We have had written discovery,

10   thousands of pages of document productions.  There were

11   depositions of five LexisNexis employees and class

12   representatives.  We have had face-to-face meetings with

13   LexisNexis technical personnel.  You know, sometimes, Your

14   Honor, in cases like this where a lot of this data, in

15   fact all of it, I think the number, I may be wrong,

16   LexisNexis says they have 38 billion pieces of information

17   about consumers in the United States.  38 billion pieces

18   of information.  They issue some 20 million reports a year

19   with respect to collections.  This is a highly technical

20   area.  And so sometimes the lawyers have to either get

21   educated or they have to speak directly to the technical

22   personnel to see what's possible.  And we had to do that.

23   I think that's one reason why LexisNexis originally

24   estimated that the cost of implementing these changes

25   would be three to four million.  It has turned out to be 6

1    million.  It is an expensive proposition to change, to

2    make a massive change like they are making in this case.

3            Circumstances surrounding the negotiation he is,

4    I referenced this just a minute ago.  The reality is, this

5    was a hotly contested, at times hotly argued case.  We had

6    some moments where tempers were frayed.  We worked closely

7    with, as I said, several mediators, several third parties.

8    There was never any discussion of service awards or

9    attorneys' fees until after the settlement was reached.

10   And I will tell you, with respect to that, the objectors,

11   particularly, I guess, Mr. Schulman, argues that, well,

12   there is sort of a wink-wink, nod-nod.  "Everybody knows,

13   you are just going to do this settlement and it is not

14   going to be that big a deal, and then you are just going

15   to get this big wad of money."  I can tell you that when

16   we did get to the discussion of attorneys' fees, that was

17   still just as hotly contested and hotly argued as the rest

18   of the settlement.

19           Experience of counsel:  It is interesting, this

20   is an element which the objectors misrepresent.  In JIFFY

21   LUBE, what they say is, "What are the opinions?  Are the

22   counsel advocating the settlement experienced in this

23   particular area of the law?"  They parse out just the part

24   about counsel advocating the settlement.  And they say,

25   "Well, of course, the lawyers that reach the settlement

1    are going to advocate for the settlement, so that doesn't

2    mean a whole lot."  If that were the test, I might agree

3    with them.  That's not the test.  The test is, are counsel

4    experienced in this area?  Frankly, Your Honor, it means

5    something when I've been practicing 34 years, I'm a UVA

6    Law graduate.  I have collected billions of dollars in

7    class actions.  I have done 15, 20 Fair Credit Reporting

8    Act cases.  Frankly, when I tell you this is a good

9    settlement, that means more coming from me than it does

10   from Mr. Schulman, for example, who is a third year

11   lawyer, who near as we can tell has never Done a Fair

12   Credit Reporting Act case, has never served as class

13   counsel in any significant case.  That's the key.  You've

14   got assembled in this room at this table the lawyers who

15   have tried more Fair Credit Reporting Act cases to verdict

16   than any other lawyers in the country.  You've got the

17   lawyers in this room that have obtained the largest

18   individual Fair Credit Reporting Act recoveries.  And I

19   use the term "recovery" advisedly.  I never like lawyers

20   who put on their website their verdicts, because often,

21   when you get into investigating those verdicts, you find

22   out they didn't result in any recovery of any money.  So

23   recoveries are what count.  My clients are really

24   interested in "How much money am I going to get at the end

25   of the day?"  These lawyers have gotten the best

1    recoveries in Fair Credit Reporting Act cases in the

2    country.  They have made more for their clients.  They

3    have recovered more in damages for their clients than

4    anyone else in the country.  They have litigated more Fair

5    Credit Reporting Act cases than anyone in the history of

6    the statute.  The statute is some 40 years old.  But

7    frankly, it really wasn't until people like Len Bennett

8    and Jim Francis came along and began using that statute to

9    pursue rights for consumers that it became the valuable

10   tool that it is today for people, that it really, they

11   vindicate people's rights on a daily basis.  These lawyers

12   have had, Mr. Bennett has had substantial Fair Credit

13   Reporting Act appellate success, including five of six

14   cases in the Fourth Circuit.

15           Our team is collectively responsible for four of

16   the top five class action recoveries in history.  My firm,

17   me personally, we have been lead or co-lead in over two

18   billion in class action recoveries.  We've got team

19   members with extensive trial and class trial experience.

20           So the fairness factors are met in spades.  Then

21   we get to the adequacy factors:  Is the substance of the

22   settlement reasonable given the risk of litigation?  And

23   again, there are four JIFFY LUBE factors:  Relative

24   strength of plaintiffs' case on the merits; existence of

25   difficulties of proof or strong defenses; the solvency of

1   the defendant and likelihood of recovery; and degree of

2   opposition to the settlement.

3           Your Honor, we are not here arguing that we

4   don't think Accurint's collections reports qualify as

5   consumer reports under the Fair Credit Reporting Act.  We

6   believe strongly that they qualify as consumer reports.

7   Unfortunately, no Court has ever said that.  No Court, nor

8   the FTC, has ever said that the Accurint for Collections

9   identity reports qualify as consumer reports under the

10  Fair Credit Reporting Act.  The closest was in ADAMS, when

11  Mr. Francis's firm defeated a Rule 12(c) motion for

12  judgment that was arguing the contrary.

13          Now, as the Court knows -- I'll get to that in

14  just a minute.

15          In GRAHAM, we briefed a motion to dismiss for

16  lack of subject matter jurisdiction.  Had we gone forward

17  in GRAHAM, I feel confident that we would have won that

18  motion.  We didn't go forward in GRAHAM because as we

19  began to refine our thinking about the litigation, and

20  actually, in conversations with Mr. McCabe, we realized

21  that we might not have class representatives that

22  met -- that were actually the subject of the reports.  You

23  know, that's one of the pernicious problems of not making

24  people subject or not making reports subject to the Fair

25  Credit Reporting Act, is reports are issued about you,

1    actions are taken in reliance on those reports, and you

2    never know.  You are never given any notice.  Notice, in

3    my mind, is the single most important right under the Fair

4    Credit Reporting Act.  Because if you give notice to

5    someone of an adverse action taken as a result of a

6    report, then they can take steps to correct it.  They can

7    figure out what is in their file.

8         For years, LexisNexis has issued these Accurint

9    collections reports and bill collectors have made

10   decisions based on those reports and no one has ever

11   issued a notice to a consumer about that.  It is not

12   unless you are someone like Ms. Nix, who gets 16 calls

13   over five years, and she follows up and she says, "Where

14   are you getting this information?  I'm not Alaine Nix."

15   And they say, apparently two people said, "Well, we get it

16   from LexisNexis."

17        In the Berry case, in this case, we argued that

18   the ADAMS decision triggered the willfulness threshold for

19   statutory damages.  Here is the problem:  Before this

20   Court, there was a case, the FISCELLA v. INTELIUS case,

21   where the Court said, "Consumer cannot on these facts

22   claim that Intelius created an FCA-governed file."  And

23   went on to say, "The consumer does not have the statutory

24   right to request Intelius to reinvestigate any consumer's

25   file.  The report he purchased or the information at

1    Intelius is not collectively a file on this plaintiff."

2    It is ironic that the objectors say we are just getting

3    LexisNexis to follow the law.  Boy, they sure make it

4    sound easy, don't they?  None of them have ever tried to

5    do anything like that.  They have never pursued one of

6    these cases.  They have never once tried to take a report

7    that's treated as not under the Fair Credit Reporting Act

8    and have it subject to the strictures of the Fair Credit

9    Reporting Act.  We have tried, and we haven't always been

10   successful.  So there is that risk.

11           The majority of cases, we agree, here is the

12   existence of difficulties of proof or strong defenses.

13   The majority of cases do find that there is no private

14   cause of action for injunctive relief, even though that's

15   what we really want and have wanted from the beginning.

16   The reality is the majority of cases find there is no

17   private cause of action for injunctive relief.  Class

18   actions for actual damages are unprecedented.  There are

19   too many individual issues.  The only real viable class

20   claim is for statutory damages.

21           Here is the problem with that:  Statutory

22   damages require a finding of willfulness.  Now, the Court

23   has heard this before in other cases.  The U.S. Supreme

24   Court's decision in SAFECO held that unless there was, I

25   think the term they used was unless it was clear, if the

1    language in question was less than pellucid, then it would

2    be necessary for the consumer reporting agency or the

3    defendant to be put on notice, to have some notice that

4    its position was unreasonable as a matter of law.

5           Now, we argued that the ADAMS decision placed

6    LexisNexis on notice that their position was unreasonable.

7    The reality is, a Rule 12(c) motion is determined on a

8    very low threshold.  And the Court made some statements,

9    Judge Bump did, which did not give us a lot of confidence

10   in our ability to go forward and obtain a finding on

11   willfulness in that case.  And it is true that the FTC did

12   issue an opinion, and the FTC opinions are issued by a

13   vote, and this was a four to zero vote, that characterized

14   the Accurint collections reports as not credit reports.

15   And in SAFECO, which dealt with the Fair Credit Reporting

16   Act, one of the specific instances or examples that the

17   U.S. Supreme Court gave where you could attest to

18   willfulness is if there was an instruction or opinion from

19   the FTC.  And in this case, we had the opposite.

20          This is the FTC letter, July of 2008.  There was

21   a complaint about a procedure and they wanted the FTC to

22   treat LexisNexis and Accurint in the same manner that it

23   did ChoicePoint.  In the footnote, where the FTC declined

24   to take that action, it notes civil penalties were

25   included in the Commission's settlement with ChoicePoint.

The ChoicePoint case involved credit reports, and thus alleged violations of the Fair Credit Reporting Act, which authorizes civil penalties.  Unlike that case, the current matters do not involve credit reports.

Now, if that's, if LexisNexis could rely on that, and I don't know why they couldn't, then there is no willfulness.  Now, we would argue that the ADAMS decision came after the FTC letter.  But it is not a strong case, or put it another way, it is a strong defense as to willfulness.

So let me parse this out just a little bit, Your Honor.  I think that LexisNexis settled this case and is agreeing to pay millions of dollars and is agreeing to spend millions of dollars to initiate these changes because LexisNexis knew that, based on the history of this litigation, which we have been pursuing collectively since 2008, they knew we weren't going to go away.  They knew that, frankly, we are not, you know, people who have no Fair Credit Reporting Act experience.  They know that this is something we do and that we pursue and we pursue until we are successful.  And I think they believed that ultimately, we would get an opinion from a court that said that these reports are in fact consumer reports under the Fair Credit Reporting Act.

Now, would that make LexisNexis liable for

1    statutory damages?  No.  It wouldn't.  That's just the

2    first step.  In fact, one of the objectors, they said all

3    of the -- the monetary relief class and the statutory

4    damages claims and the injunctive relief all turn on one

5    issue: whether these reports are in fact consumer reports.

6    That is so wrong.  It just demonstrates their inexperience

7    with the Fair Credit Reporting Act.

8             As to the monetary relief class, if those people

9    have suffered actual damages they don't have to have

10   willfulness.  They can prevail on a negligence standard.

11   But as to the statutory damages class, they must prove

12   willfulness.  So it is a two-part test.  They have to

13   prove, first, the consumer report, and second, they have

14   to prove willfulness.

15            Now, the next JIFFY LUBE factor:  Solvency of

16   the defendant and the likelihood of recovery.  This is

17   where we get into, frankly, Your Honor, fantasy for the

18   objectors.  There are 200 million potential class members.

19   The minimum FCRA statutory damage claim is $100.  So at

20   the minimum level, if we were successful, that would be

21   $20 billion.  There is no way that we would ever, ever,

22   ever, ever, ever recover even the minimum statutory

23   damages for this case.  They don't have it.  The whole

24   company doesn't have it, much less just the Accurint

25   Division, which is a separate subsidiary.  And in the

1   MURRAY case, which has been cited for other issues in this
2   litigation, the Seventh Circuit noted that in a statutory
3   damages situation where there might be damages greater
4   than the defendant could pay, or that might exceed what
5   would be reasonable or be disproportionate, that those
6   damages would be reduced.  So if we got some big verdict,
7   it would be reduced way, way, way down.
8           The Watts Guerra objectors reference proposed
9   release of tens of billions of dollars in monetary claims.
10  Those are -- they don't exist, except in their minds,
11  perhaps.  There is no tens of billions of dollars in
12  monetary claims being released here.  They never were real
13  to begin with.
14          Let me give you the sense of the size of the
15  company.  LexisNexis was purchased by Reed Elsevier in
16  1994 for $1.5 billion.  This particular LexisNexis
17  subsidiary, Accurint, is only one of several separate
18  subsidiaries.  So that 1.5 billion, let's say it has
19  doubled in value since then.  I don't know that.  I don't
20  have any information that would lead me to believe that
21  one way or the other.  But let's say it did.  Even so, the
22  Accurint Division is much smaller than that.
23          Reed Elsevier itself is headquartered in London
24  and Amsterdam.  It would be difficult if not impossible,
25  and I think closer to impossible than difficult, to make a

1    recovery against Reed Elsevier.  Again, the notion of tens

2    of billions of dollars is just pure fantasy.

3         And look at it another way:  Let's say you

4    recovered $200 million for the class in this case for

5    monetary relief.  What are you going to do?  Are you going

6    to send a dollar to every adult in the U.S. who benefits

7    from that?  What they want, what people want, what Ms. Nix

8    said is, her exact words:  "I see no resolution.  The

9    resolution I seek is for LexisNexis to stop giving out

10   incorrect information and refusing to correct their

11   mistake."  That's what people want.  They don't want a

12   dollar, or $10.  They want to fix the problem.  And that's

13   what we did.

14        Degree of opposition to the settlement:  Since

15   the passage of the Class Action Fairness Act, of course,

16   as you know, in class actions, we give notice to the

17   United States Justice Department, we give notice to the

18   Attorneys General of all 50 states and the U.S.

19   territories.  There is not a single objection to this

20   settlement.  Not a one.  And I've been in cases, not as

21   the -- actually, I have had one where we had a state

22   Attorney General, I guess Texas, and we resolved it.  So

23   these people, there are actually people who read these

24   settlements and they look at them and they decide is this

25   a bad settlement; is this a settlement that takes

1    advantage of the class; is this a settlement that creates

2    a problem?  And they will file an objection.  There was

3    only one objection.  That's Ms. Nix, to the monetary

4    relief settlement.  There were only 18 opt-outs out of

5    31,000, roughly, in the monetary settlement.  There were

6    only seven objections.  Two of those were mass solicited

7    by the Watts Guerra Group and Ed Cochran, and the rest

8    were pro se, including Mr. Schulman.  The relative paucity

9    of objections recommends approval.  Again, the objectors

10   say, "Well, don't worry about that because nobody objects

11   to class action settlements."  Actually, the truth is,

12   you've got people sitting in offices whose job it is to

13   object to class action settlements that are abusive.

14   That's their job.  That's what they do.  They look at

15   class action settlements all day long at 50 states, the

16   U.S. territories, and the U.S. Justice Department, and if

17   they think a settlement is bad, they will file an

18   objection.  And not a single one did in this case.

19          The quality of opposition to the settlement.  I

20   guess Ed is not here.  Oh, here he is.  This is

21   Mr. Cochran, Your Honor, sitting in the first row here.

22   I've known Mr. Cochran for a lot of years.  He has

23   objected to a lot of my settlements through the years.

24   Mr. Cochran is a nice guy, as you could converse with him,

25   and very polite and courteous.  His business model is to

```
 1   object to settlements.  And he does it, and if he can
 2   delay a settlement by taking an appeal, then often times
 3   somebody will pay him off.  You know, 50 grand, 60 grand,
 4   something like that.  That's his business model.  Judge
 5   Rosenbaum in Minneapolis -- I don't know if you know Chief
 6   Judge Rosenbaum.  He is since retired.
 7            THE COURT:  I know him.
 8            MR. CADDELL:  He characterized Mr. Cochran as a
 9   remora, a suckerfish attached to a big fish like a shark
10   and it gains transportation and food that way.  Different
11   from a leech, interestingly enough, or a lamprey.  But he
12   just sort of rides along, gets a ride.  In the TRANSUNION
13   settlement that we had, a $75 million settlement, I'll
14   talk a little bit more about that, Mr. Cochran came in,
15   did nothing to create the settlement fund, but he did file
16   claims on a lot of individual class members
17   post-settlement.  It was a unique settlement.  I'll
18   explain a little bit about it in a minute.  And he got a
19   40 percent fee.  He got, I don't know how much, couple
20   million dollars probably, something like that.
21            MR. COCHRAN:  A little bit less.
22            MR. CADDELL:  Okay.  I don't think he even filed
23   a lawsuit.  He just wrote a letter, right?
24            MR. COCHRAN:  Filed about 18,000 claims.
25            MR. CADDELL:  Filed the claims, but you didn't
```

1    file them in a lawsuit, did you?

2            MR. COCHRAN:  We weren't permitted to file a

3    lawsuit.

4            THE COURT:  Let's direct your comments to the

5    Bench.

6            MR. CADDELL:  I'm sorry, Your Honor.  The Watts

7    Guerra Group, objector Aaron, is also a remora in this

8    case.  They did the same thing, mass solicited claims in

9    TRANSUNION.  Judge Posner of the Seventh Circuit in an

10    opinion noted that Watts Guerra, though it did nothing to

11    create the fund, stands to receive 10 to 15 million

12    dollars in fees.  In TRANSUNION, Watts Guerra secured over

13    50 percent of the monies it recovered for itself.  That's

14    what's really motivating the Watts Guerra Group.  We are

15    not here for justice.

16            Now, there is a big distinction, and this is

17    really important, and I was lead or -- I was co-lead

18    counsel in both cases, Your Honor.  In the TRANSUNION

19    case, willfulness was a given.  What happened in

20    TRANSUNION was, all three of the credit reporting

21    agencies, the big CRA's, TransUnion, Equifax, and Experian

22    had a particular practice.  I don't need to go into detail

23    as to what it was.  The FTC thought this practice violated

24    the Fair Credit Reporting Act, and they issued notice to

25    the three, sort of a cease and desist order to the three

1    CRA's.  And Experian and Equifax stopped.  They stopped

2    doing it.  TransUnion didn't.  TransUnion refused to.  And

3    so the FTC then initiated litigation against TransUnion.

4    Ultimately, they obtained a judgment, an injunction

5    against TransUnion to stop this particular practice.

6    TransUnion appealed the injunction all the way to the U.S.

7    Supreme Court, and in the meantime, TransUnion continued

8    to do the same practice.  There could be no better

9    definition of willfulness under SAFECO or any other

10   standard.  We don't have that in this case.  There is

11   nothing like that in this case.  The closest we have in

12   this case is, of course, the ADAMS decision on a 12(c)

13   motion, and in fact, we have the contrary, we have an FTC

14   letter which in passing says, "Oh, by the way, these

15   aren't credit reports anyway."  So we have a very

16   difficult row to hoe with respect to willfulness.  In

17   TRANSUNION, it was a given.

18           Now, what really happened in TRANSUNION:  Watts

19   Guerra took over 45 percent of the money that they got in

20   that case.  I'm not going to read these, Your Honor, but

21   the reality is, this is not -- these are not lawyers who

22   are pursuing the rights of affected class members.  These

23   are lawyers who got a quick killing in the TRANSUNION

24   litigation.  I don't want to go into too much detail.  I

25   don't need to go into more detail.  It was a different

1   case.  We set up a fund.  Lawyers could make a claim

2   against the fund.  They did.  They got paid a lot of money

3   to do it.  They never had to take a deposition, they never

4   had to deal with a substantive motion on willfulness or

5   anything else.  They basically fought over the ability to

6   bring the claim, but ultimately they got a lot of money.

7   This is not that case.  But what they want to do is, they

8   want this to be TRANSUNION redux.  And you can see in

9   TRANSUNION, of course, they got more than 50 percent of

10   the money from their clients.  Maybe that's why they are

11   not objecting to our attorneys' fees in this case.

12          You can see, I received $194 of my $443

13   settlement.  By the way, you should contrast what happened

14   there with what's happening to our monetary relief class

15   because our monetary relief class, they are going to get

16   more than 50 percent of the money.  We are asking for a 25

17   percent fee.  Even though the settlement agreement

18   permitted a 30 percent fee, we are only asking for 25

19   percent.

20          Actually, this one, sort of interesting:  One of

21   these actually is, on the Internet, people are seeking

22   lawyers to sue Watts Guerra for misrepresenting them and

23   for taking all the money and for not handling these claims

24   properly.  They are trying to do the same thing in this

25   case.  In this case, in their fee agreement, they have a

1    45 percent gross recovery fee agreement.  That's in

2    addition to recovering any expenses they have.

3            In addition, and this is a pretty interesting

4    feature of their fee agreement, the fee agreement, if you

5    sign the fee agreement with Watts Guerra, you

6    automatically authorize settlement for $443.  Now, that

7    $443, the class member may get 200.  They will get the

8    rest.  But the real interesting aspect to that is, there

9    is no settlement authority for any changes in the

10   practice.  It is just money.  That's all it is.  They just

11   want money.  They don't want to fix the problem, they

12   don't want to change the practice at all.  They just want

13   to get the money.  If they wanted practice changes, it

14   wouldn't be in their -- if LexisNexis wanted to just pay

15   them off, they could.  And they wouldn't have to change a

16   thing for the Watts Guerra Group, because all they would

17   have to do is say, "Okay, we will give you $443," and

18   every one of their people has already agreed to that.  And

19   they would take that and LexisNexis wouldn't have to

20   change a single thing about the settlement and these

21   people would go away.  And that just makes it clear, they

22   are not after meaningful relief for the class, they are

23   not after justice.  They just want the money.

24           There are other problems with their fee

25   agreement.  They waive ethical conflicts for Winston &

1    Strawn.   That was a first for me, to see an advance waiver

2    of ethical conflicts.   They waive fee forfeiture for

3    breach of fiduciary duty by attorneys.   Ironically, one of

4    the things that they complain about in our settlement is

5    that, and they are wrong to complain about it and I'll

6    explain why in a minute, is that there is a class action

7    waiver, and they say, "Hey, nobody can bring a claim under

8    the Fair Credit Reporting Act unless they bring it as a

9    class."   That again shows they have no experience in the

10   Fair Credit Reporting Act.   But in their own fee

11   agreement, they have a class action waiver and a joint

12   claims waiver.   So their own clients, for whom they are

13   only trying to get 400 bucks, they can't bring a claim

14   against them except in arbitration and can't even bring a

15   class claim in arbitration.   Then another thing that's

16   interesting is, they exclude persons who requested their

17   report or disputed information.   Those are the people who

18   may have actually suffered some harm from this practice.

19          The attorneys who have objected were not aware

20   of any experience in the Fair Credit Reporting Act for

21   these lawyers.   We can't find even one Fair Credit

22   Reporting Act case filed by any of them not related to the

23   TRANSUNION settlement.   We can't find any consumer class

24   action experience by Watts Guerra or the Winston & Strawn

25   attorneys involved in the case.   They are not connected to

```
1    any consumer protection or advocacy.  There is no
2    connection to NACA, the National Association of Consumer
3    Attorneys, NCLC, National Consumer Law Center, Public
4    Justice.  Mr. Bennett and Mr. Francis have testified
5    before Congress about the Fair Credit Reporting Act.  They
6    have dealt regularly with the FTC.  Just the other day,
7    Mr. Francis was meeting with the CFPB, the Consumer
8    Financial Protection Bureau, which has just been
9    established at the federal government.
10              Mr. Schulman is different.  And I think
11   Mr. Schulman is a nice guy.  I have just congratulated
12   him.  He got married recently.  The Court may recall that
13   we are having the hearing today so he could complete his
14   honeymoon.  Turns out it may not have been the best
15   honeymoon -- I don't want that on the record so I take
16   that back.  I'm sorry.  It had nothing to do with
17   Mr. Schulman or his wife, so don't misunderstand me.  I
18   don't want there to be any misunderstanding.  Mr. Schulman
19   is a nice guy, I think.  He is someone who I think has
20   good intentions.  He is not motivated by money.  But he is
21   a third-year lawyer and representing himself.  And
22   sometimes we make mistakes.  The old saw, "A lawyer who
23   represents himself has a fool for a client."  If you
24   look -- and Mr. Schulman has had, he had, I think, a
25   significant win in a DRY MAX PAMPERS case, although I
```

1    think that was not a great case.  And then he had less

2    than an unqualified win in the L'OREAL case.  But if you

3    look at the objections in the briefs, and I've pulled the

4    briefs, I have briefs he filed in all three cases, they

5    are basically the same objection every time.  And he made

6    the same objections to this case that he made in the DRY

7    MAX PAMPERS case and the L'OREAL case.

8            Now, there is nothing wrong with reusing work

9    that you have done before.  We all cut and paste

10   sometimes.  But the danger is that you sometimes miss the

11   differences between cases.  You only see the similarities.

12   Now, Ted Frank heads up the Center for Class Action

13   Fairness.  Oh, by the way, I put this on the slide,

14   Mr. Schulman is not acting as the lawyer from the Center

15   for Class Action Fairness on behalf of a client.

16   Mr. Schulman is a lawyer at the Center for Class Action

17   Fairness, but he is representing himself pro se.  So there

18   is a distinction.  He doesn't have a client.  If he had

19   had a client, he might have asked his client, "Hey, what

20   do you think of this injunctive relief?"  If he

21   represented Ms. Nix, he darn sure would have said, "Gosh,

22   this is a great settlement because Ms. Nix's problems are

23   going to be solved."

24           Now, to show sometimes how you can get bad

25   information, Mr. Frank, who heads up the Center for Class

1    Action Fairness, has a blog.  And he blogged this about

2    the Berry settlement, this settlement which is before the

3    Court.  "CCAF attorney Adam Schulman filed an objection to

4    the horrendous settlement in BERRY v. LEXISNEXIS, which is

5    like DRY MAX PAMPERS, but far worse, with a large class

6    and the attorneys asking for $5.5 million.  This merits a

7    longer post but we were honored that a passel of very

8    highly-paid attorneys representing a competing class

9    action and their objectors saw fit to adopt so many of our

10   arguments."

11            Now, this tells you sort of garbage in, garbage

12   out.  Mr. Frank had to get this information from

13   Mr. Schulman, and it is just wrong.  He says the Berry

14   settlement is far worse than DRY MAX PAMPERS.  We will go

15   through that very quickly.  Then he says they are very

16   highly-paid attorneys representing a competing class

17   action.  There is no competing class action.  He can only

18   be referring to Mr. Kimball Anderson and Mr. Molster

19   there, the Winston & Strawn lawyers, who have been hired

20   by Watts Guerra to come in and argue this objection and

21   presumably take an appeal.  But there is no competing

22   class action.  In fact, the fee agreement that Watts

23   Guerra has with all of its clients says, "We are not going

24   to do anything until we see what happens with this

25   objection."  They have never filed a lawsuit.  They don't

1    intend to.  They are hoping, what they were really hoping

2    for, I'm sure, was that LexisNexis would come in and say,

3    "Oh, we will pay you off."  That's what they really

4    wanted.  They wanted to open a dialogue and get some money

5    and go away.  And it didn't happen.  So there is no

6    competing class action.  There is no one out there

7    pursuing these claims except for the lawyers here who have

8    been pursuing them for five years.

9              Now, Berry is no PAMPERS or L'OREAL.  The

10   PAMPERS and L'OREAL cases, the reason I spend a little

11   time on this, Your Honor, is because these are sort of the

12   white horse cases that are cited to the Court in the

13   objectors's briefs.  So they are relying on these cases.

14   They are telling you that Berry is just like PAMPERS and

15   L'OREAL.  And nothing could be further from the truth.

16   PAMPERS and L'OREAL were consumer class actions.  They

17   involved the sale of low-cost products.  PAMPERS obviously

18   involved diapers; the L'OREAL case involved shampoo.  Each

19   settled shortly after filing with no discovery.  In fact,

20   the PAMPERS Court said, and by the way, Mr. Schulman,

21   complimenting him, he did, I'm sure he did the lion's

22   share of the work on the objection.  Mr. Schulman argued

23   that case to the Sixth Circuit and won a terrific victory

24   for him as a young lawyer.  I'm sure there will be many

25   more.  The PAMPERS Court said:  "Counsel did not take a

1    single deposition, serve a single request for written

2    discovery, or even file a response to P&G's motion to

3    dismiss."  The L'OREAL Court noted that the motion for

4    preliminary approval of settlement was filed soon after

5    filing the case.  In fact it was filed about a month after

6    filing the case.

7              Both PAMPERS and L'OREAL proposed class

8    certification of past purchasers' classes.  It is really

9    unclear where prospective injunctive relief would benefit

10   class members.  For example, in the PAMPERS case, which

11   dealt with diapers and an issue of diaper rash, it went

12   back to diapers that were sold beginning in 2008.  There

13   aren't many kids that are in diapers for longer than a

14   couple years, three or four years, something like that.

15   So by the time the PAMPERS settlement came along in 2010

16   or 2011, most of the people that were buying those diapers

17   no longer needed them.  Then of course there is the

18   question of whether they would ever need them again.  They

19   would have to have another kid.  There was a real question

20   about whether prospective injunctive relief would benefit

21   class members.  That's not this case.  In Berry, of

22   course, there is no question that virtually every adult in

23   the United States at some point will benefit from the

24   relief afforded by this settlement, because there are 20

25   million reports issued a year by LexisNexis with respect

1    to collections.  Sooner or later, many, many, many adults

2    in the United States, tens of millions, will be the

3    subject of those reports and will get the benefits of this

4    settlement.

5          Similarly, PAMPERS and L'OREAL both involved

6    small-dollar actual damage claims, only viable in a class

7    action.  In fact, the L'OREAL Court in an opinion issued

8    just last month said they were trivial individual damages.

9    Big distinction between that class and this case.  Again,

10    in this case, actual damages can run into the hundreds of

11    thousands of dollars.  There is one verdict for $18

12    million.  Both of these cases effectively released

13    non-incidental monetary claims in a 23(b)(2) class

14    settlement.  The PAMPERS case explicitly released

15    non-monetary -- non-incidental claims.  They released

16    rescission and restitution, which the courts have found

17    are individualized claims, claims for actual damages, and

18    are not subject to being released in a (b)(2) class.  The

19    L'OREAL Court, there was a release of the -- there was a

20    waiver of the class action mechanism, similar to this

21    case.  The distinction is, however, that in L'OREAL, you

22    only had trivial individual damages.  So if you waived the

23    class action device in L'OREAL, you had nothing.

24          In this case, waiving the class action device

25    does nothing with respect to actual damages claims for two

1    reasons.  One, under the FCRA, I'm not aware of any FCRA

2    class action which pursued successfully actual damages.

3    They are too highly individualized to be pursued in a

4    class action.  And two, the big distinction, actual

5    damages claims in an FCRA case are in fact often brought

6    or often big enough, you are not talking about a bottle of

7    shampoo.  You are talking about somebody's damage to their

8    reputation.  You are talking about the inability to get a

9    job, the inability to buy a house.  Those are big claims,

10   and routinely result in five and six figure settlements.

11            Also, in PAMPERS and L'OREAL, they were, the

12   only changes were label changes.  Literally, in the

13   PAMPERS case, it was they were going to put a little

14   reference on the diaper box about diaper rash.  And they

15   were going to put something on the website about "If you

16   get diaper rash, talk to your doctor."  It was

17   meaningless.  In the L'OREAL case, the L'OREAL case was

18   about shampoo that said, "Sold in salons only," and it was

19   being sold elsewhere.  So they were for a period of years

20   going to take off the "Sold in salons only."  That's it.

21   That was the only change they were going to make.  The

22   courts in both cases, the PAMPERS Court said it was nearly

23   worthless injunctive relief, illusory.  The L'OREAL Court

24   said, "injunction of limited value."

25            There was no sea change, there was no earthquake

1    in those cases.  Neither case involved a limited-damages
2    statutory claim like that under the FCRA.  Another
3    important distinction.
4              So in both of those cases you were only talking
5    about actual damage claims.
6              Actually, and I recommend to the Court the
7    L'OREAL opinion.  The L'OREAL opinion actually supports
8    the Berry settlement.  If you read the case, first, the
9    Judge in the L'OREAL case, it is clear, felt he wanted to
10   approve that settlement.  There are four or five times
11   where the Court said, "On this record, I cannot do it.  On
12   the record before me, I cannot do this."  That sort of
13   thing.  So he is sympathetic.  But he goes on to say, and
14   he looks at the WAL-MART v. DUKES case, and he makes the
15   analysis that this Court can make and should make with
16   respect to the Berry case.  In WAL-MART, the Court held
17   that claims for monetary relief may not be certified under
18   (b)(2) where the monetary relief sought is not incidental
19   to the injunctive or declaratory relief.  Rule 23(b)(2)
20   does not authorize class certification when each class
21   member would be entitled to an individualized award of
22   monetary damages.
23             The only claim that is being released in this
24   case, the statutory damages claim -- so the only claim
25   that's being released, I'm at Slide 60, Your Honor, the

1    only claim that's being released here is a statutory

2    damages claim.  We are not releasing claims for actual

3    damages.  The statutory damages claim, as you have seen,

4    is dependent on a single finding: willfulness.  And if

5    willfulness is established, then it is established for the

6    entire class.  It is established for everyone.

7    Conversely, if it is not established, it is not

8    established for anyone.  So there is no individualized

9    inquiry by the Court in this case with respect to the

10   statutory claim that's being released.  And it goes on on

11   the next slide, the L'OREAL opinion again, the Court

12   characterizes the distinction between incidental claims

13   and when damages predominate.  Damages claims are

14   incidental when class members would automatically be

15   entitled to damages once liability to the class or

16   sub-class as a whole is established.

17          If we went through this case and we were somehow

18   able to -- somehow able to obtain a finding of willfulness

19   and we could sustain that on appeal and obtain a judgment,

20   any damages recovered would automatically go to every

21   member of the class.  There is no member of the class that

22   would not be entitled to that damage on a pro rata basis.

23   As the Court goes on, he says:  "In contrast, damages

24   predominate when the damages that class members could

25   recover would be dependent on the intangible, subjective

1    differences of each class member's circumstances and would

2    entail complex, individualized determinations."

3         Now, that's Ms. Nix's case, by the way.  That's

4    the mixed file case.  That's the case where you've got

5    actual damages.  And as the Court would know from these

6    Fair Credit Reporting Act cases, you have to look at the

7    consumer's credit standing, you have to look at their

8    history, you have to look at whether in fact the credit

9    report was a factor in a decision to deny employment or to

10   deny housing, things of that nature.  They are highly

11   individualized, highly fact-intensive inquiries.  That's

12   not the case with respect to the claim that we are

13   releasing in this case, which is simply the statutory

14   damages claim of the willfulness.

15        Again, the next slide, the L'OREAL opinion in

16   fact, and Mr. Schulman, the objectors didn't point this

17   out, in fact, the Court goes to great length in L'OREAL to

18   say, "I'm not saying here that you can't have a case where

19   you could settle class action damages and leave individual

20   damages intact under Rule 23(b)(2)."  He says that.  "It

21   is not necessary here to determine whether permitting

22   plaintiffs to settle the class action damages claim while

23   leaving individual damages claims intact can ever be

24   proper under Rule 23(b)."  He goes on to say, "on this

25   record."  And that was the problem in that case.

1           In this case, Berry is no PAMPERS or L'OREAL.

2    The release is only of an incidental statutory claim under

3    the Fair Credit Reporting Act.  We have proffered

4    Professor Mullenix's analysis on that.  More on Professor

5    Mullenix in a minute.  The actual damages claims are fully

6    preserved.  The actual damages claims under the Fair

7    Credit Reporting Act are individualized and not

8    susceptible to class treatment.  And they are routinely

9    asserted and successfully litigated.

10          Next slide:  The injunctive relief here is a sea

11    change.  It is an earthquake.  It affects roughly 200

12    million adult Americans.  One point, by the way, that the

13    objectors make that is just again wrong and demonstrates

14    lack of familiarity with the Fair Credit Reporting Act:

15    They claim that only a hundred million objectors would

16    have a claim, and therefore, we've got this intra-class

17    conflict between the 100 million who have reports issued

18    about them and the other 100 million who had their

19    information in the files at LexisNexis Accurint, but

20    didn't have reports actually issued.  That's not true.

21    You've got many rights under the Fair Credit Reporting Act

22    with respect to information that is maintained in your

23    file irrespective of whether a report is issued.  For

24    example, you've got the right to obtain a copy of your

25    file.  You've got the right to correct or dispute

1    information in your file.  So these are rights that every

2    person whose name was in the files at LexisNexis Accurint

3    had that are being resolved by this settlement.  So there

4    is no intra-class conflict.

5            As we pointed out, the cost of implementation:

6    Lost business alone for LexisNexis totals about $11

7    million.  About 20 million reports per year will be

8    affected.

9            Mr. Schulman made some egregious mistakes.

10   Again, he is young, he is smart, he is a good lawyer, he

11   is going to get better.  So I don't mean to be pejorative

12   about this.  I was a third-year lawyer once, I made

13   mistakes, I still make mistakes, so I'm not pointing the

14   finger at him.  But I think it is important for the Court

15   to recognize that when he says something that's wrong, the

16   Court needs to, we need to clarify the record on that.

17           Mr. Schulman made a mistake.  He didn't read

18   Professor Richards's Declaration in which Professor

19   Richards, and this was filed with our initial papers, our

20   moving papers, he said, "This is tremendous.  It is a sea

21   change."  He said, "This is of tremendous value to

22   consumers."  Here we go.  We are back on the computer

23   here, Your Honor.  So in his objection, he said, "So far

24   as I am aware, there has been no attempt to quantify the

25   injunctive relief package.  There is an absence of

1  evidence that the injunctive relief benefits class

2  members."

3          Now, part of the problem was, Mr. Schulman came

4  at this in the context of PAMPERS and in the context of

5  L'OREAL, and he says, "Okay, here is another settlement

6  where the lawyers get money and the class gets nothing."

7  And so, you know, and he didn't even read Professor

8  Richards's Declaration.

9          Once we pointed that out in our response to the

10 objections, Mr. Schulman, shortly before Thanksgiving,

11 about two weeks ago, filed his objection to attorneys'

12 fees.  Nominally about attorneys' fees.  The truth is,

13 about half of it was rearguing his objection as to the

14 settlement as a whole.  We didn't file anything with

15 respect to that.  But he says in a footnote, so kind of

16 buries it, "I apologize to Professor Richards for not

17 realizing that he had filed a Declaration to the value of

18 the injunctive relief."  He goes on to say:  "However, the

19 entire injunctive package cannot be accurately ascertained

20 and thus cannot be included in the fund valuation."  So it

21 is sort of like, "I don't like what he said so you can

22 disregard it."  Professor Richards makes his life, he is a

23 very bright guy, makes his life dealing with privacy law,

24 data information, the Fair Credit Reporting Act, and he

25 attests to the value of this settlement.  And to say all

1    of a sudden it is zero because we can't accurately

2    ascertain it is, as the Court knows, just not true.  We

3    routinely assess value for things that cannot be

4    accurately ascertained.  Just because it can't be precise

5    doesn't mean that it doesn't have value.  You don't want

6    to tell a jury, "Oh, well, don't worry about pain and

7    suffering, we can't accurately ascertain pain and

8    suffering so we are not going to assess it.  You don't

9    want to worry about loss of consortium.  You lost your

10   wife, you lost your husband.  You lost that ability to be

11   with them.  But we are not going to assess it because it

12   can't be accurately ascertained."  Courts do that every

13   day.

14         The problem Mr. Schulman found himself in was,

15   in his initial brief, his opening brief, he had said that

16   if the injunctive relief was worth $16.5 million, then the

17   fee, the $5.5 million fee that was requested would be

18   proportionate, would be reasonable.  He went on a 25

19   percent benchmark.  He said that.  He said, "Supposing

20   putative class counsel seek the entire $5.5 million.  To

21   reach the appropriate ratio, the class benefit would have

22   to be valued at $16.5 million."

23         The truth is, as you practice longer, I've

24   learned that one of the most valuable things you can do in

25   terms of maintaining your credibility with a court is to,

1   when you are wrong or make a mistake, just acknowledge it.

2   Say, "I'm sorry.  I apologize, my bad.  I didn't see it.

3   I see it now."  But he didn't do that.

4            Professor Richards valued the injunctive relief

5   to be in the billions of dollars.  You can understand why,

6   Your Honor.  If you've got rights that on a statutory

7   claims basis could be worth $100 to $1,000 and you have 20

8   million reports issued every year, these are valuable

9   rights.  And all of a sudden, people are going to get

10  these rights when they hadn't gotten them before.  So

11  Professor Richards said:  "To be in the billions of

12  dollars, by another measure to be approximately $160

13  billion annually, another method produces a figure of $2.2

14  billion."  And then he concludes, "Even at a nominal and

15  unreasonably low amount of $1 per consumer, the value of

16  the settlement to consumers is still in the range of at

17  least tens of millions of dollars per year."  And this is

18  a seven-year commitment on the injunction.  And the Court

19  knows, big companies are like cruiseliners.  They don't

20  turn very quickly.  And the reality is, the changes we are

21  making with this settlement are going to continue.  And I

22  predict once this happens, other data brokers who do the

23  same thing as LexisNexis will make the same changes.  They

24  will have to, because we are going to sue them.

25            The truth is, the only evidence in the record

1    before this Court, you know how in the L'OREAL Court the

2    Judge kept saying "on this record," "on this record."

3    Well, on this record, the evidence you've got is that the

4    injunctive relief is worth tens of millions if not

5    billions of dollars to the class.  There is zero evidence,

6    nothing presented -- Mr. Schulman could have hired his own

7    expert.  The Watts Guerra objectors could have hired an

8    expert if they had wanted to and contested our valuation

9    of the injunctive relief.  They didn't do so.  So the only

10   evidence you have from anyone qualified to speak on this

11   issue is from Professor Richards.

12           Mr. Schulman argued that injunctive relief was

13   inappropriate in the settlement per se.  I don't want to

14   linger on this.  Even the Watts Guerra objectors agree,

15   don't agree with him and say that class counsel's position

16   on this issue is unremarkable.  Plaintiffs argue at length

17   that a settlement may include injunctive relief even where

18   the underlying statute does not afford a right to such

19   relief.  Even the Watts Guerra objectors don't dispute

20   that.

21           You know, this is a little, I thought,

22   discourteous.  Mr. Schulman, he is the one that brought up

23   Professor Mullenix and he cited to some work that she had

24   done at four different places in his objection and he

25   said, "This violates this and violates this and that."  So

1    we went to Professor Mullenix and said, "Did you really

2    mean this?"  She says, "No.  Mr. Schulman misinterpreted

3    my thesis."  We misspelled Mr. Schulman's name there.  It

4    was not intentional.  "Mr. Schulman misinterpreted my

5    thesis, quoted me out of context, and plucked selective

6    sentences to support his argument, with which I do not

7    agree."  And Mr. Schulman, rather than acknowledging the

8    error, he simply said, "Well, pay no attention to her."

9    He was the one that proffered her position to the Court.

10   So she certainly should be allowed to correct the record

11   and make it clear.  Her position is, the waiver the

12   statutory damage provision and the class action waiver

13   provision in Berry are supported by existing precedents

14   and do not constitute violations of the due process rights

15   of class members.  In effect, she found that these were

16   incidental to the injunctive relief in the settlement.

17          This is a mistake that both Mr. Schulman makes

18   and the Watts Guerra objectors make.  They treat all FCRA

19   statutory damages claims as the same.  They don't -- I

20   really attribute this more to lack of experience with the

21   FCRA -- they don't to any analysis of the circumstances at

22   issue.  They don't do any discussion of the willfulness

23   issue.  Zero.  Zero.  And that's the whole issue.  The

24   whole issue in this case with respect to statutory damages

25   is willfulness.  And they don't address that at all.  And

1    yet, without willfulness, you can't get a statutory

2    damages recovery in this case.  And as you have seen, that

3    is a significant if not fatal problem for the plaintiffs

4    in this case.

5         There was no -- well, I won't repeat that.

6    Again, the vast majority of damage claims under the FCRA

7    for mixed files, failure to delete aged information,

8    failure to update account status in which the proof is

9    individualized, these claims are all preserved by the

10   settlement.  We recently settled a case with Mr. Bennett

11   in Georgia, in Atlanta, before the federal judge there,

12   and we got a recovery for our individual clients,

13   $200,000.  That was an actual -- single actual damages

14   claim.  I mean, these claims are valuable.  And they are

15   not being released by this settlement.

16        Mr. Schulman opined it is likely that the

17   lawyers obtained some compensation for themselves in the

18   ADAMS and GRAHAM actions.  In the ADAMS case, the fees

19   that were compensated were excluded.  In the GRAHAM case,

20   if Mr. Schulman had looked at PACER, he would have seen

21   the claims were dismissed against LexisNexis and there was

22   no settlement.  We didn't get anything.  We dismissed it

23   because we recognized that GRAHAM was not the proper

24   vehicle for these claims, and we waited.  We dismissed the

25   case voluntarily, and then went and pursued this case, the

1    Berry case, with different class representatives.

2            Again, Watts Guerra, they try to liken this

3    settlement to L'OREAL.  The important language here is, in

4    the middle, where it says "Preserving," this is a quote

5    from L'OREAL, "Preserving individual damages claims here

6    does not help plaintiffs.  In consumer actions such as

7    this, damages are typically far too low for a rational

8    plaintiff to pursue an individual action, greatly

9    increasing the value of the aggregation procedure in Rule

10   23.  The class action claim is essentially the only way

11   absent class members could ever recover any damages here."

12           That's not this case.  The actual damages claims

13   that are not being released in this case are very valuable

14   and can be pursued.  But, interestingly enough, and this

15   is, I think, important for the Court to note:  In its

16   history, Accurint has been sued only a handful of times

17   over its reports.  Now, you might ask why.  Maybe they

18   just do such a great job.  And I'm sure that's what they

19   would tell you.  But it may also be because people don't

20   even know they are out there.  Because they don't follow

21   the Fair Credit Reporting Act, people don't get notice,

22   people have no idea.  Like Ms. Nix.  Ms. Nix was lucky

23   enough to get a couple bill collectors to say, "Hey, we

24   got your name from Accurint."  So she called Accurint.

25   But most people don't even know.  So there is not

1    some -- I don't want the Court to think there is some

2    avalanche of litigation that we are releasing in this

3    case.  In its history, LexisNexis has only been sued a

4    handful of times, less than a handful.  But now, going

5    forward, people will have notice, people will have rights.

6    Going forward, those rights become much more meaningful.

7    And damages will be significant.

8              Again, recoveries are routinely 5 to 6 figures.

9    There was a verdict in Washington State against, I want to

10   say it was Experian --

11             MR. BENNETT:  It was OREGON v. EQUIFAX.

12             MR. CADDELL:  A lot of that was for punitive

13   damages but it was for $18 million for a single person.

14   These are not claims that need the class action device.

15   As I noted and as the Court is aware, there have been

16   hundreds of FCRA accuracy and reinvestigation claims

17   prosecuted in this district and in this division alone.

18             There were objections to the (b)(2) settlement

19   by the supposed -- there was a claim that because we are

20   expanding the class, we somehow have a problem with

21   adequacy.  The reality is, the class was expanded to

22   comprise everyone who will benefit from the settlement and

23   explanations are not prohibited.  And they don't cite any

24   authority to the contrary.

25             Basically, what they cite, and Mr. Schulman does

1  a good job of this, basically what he cites are cases that

2  stand for the proposition that if you settle a case

3  pre-class certification, pre-litigated class

4  certification, the Court needs to undertake its

5  responsibility seriously to examine it to make sure that

6  the settlement is adequate and fair.  And I know the Court

7  will do that.  So I don't have a quarrel with that.  He

8  also cites cases for the proposition that if you have

9  injunctive relief, so that the class is receiving no

10  money, direct money, and the lawyers are getting

11  substantial fees, you need to look at that very carefully.

12  I don't disagree with that, either.  I think he is dead-on

13  on that.  I've argued the same thing in other cases.

14          So we don't have a problem with the approach.

15  We have a problem with the lack of, frankly, the

16  follow-through.  And so in this case, the people who are

17  in the class are the people who are going to benefit from

18  the settlement.

19          Your Honor, it is clear that injunctive relief

20  is available to private parties under the FCRA by consent.

21  That's been established some 30 years.  It is the parties'

22  agreement that serves as the source of the Court's

23  authority to enter any judgment at all.

24          I'll put it a different way.  Parties can

25  contract.  In this case, what you have before you are

1    effectively two private parties.  You have LexisNexis

2    Accurint, and you have the class.  And we have contracted

3    for injunctive relief.  Now, the Court has a duty to

4    supervise that settlement and to ensure that the class is

5    protected.  The Court is the guardian of the class.  And

6    that's absolutely what the Court should be doing.  But it

7    is, if the Court determines that it is fair, there is

8    nothing to preclude the Court's approval of a settlement

9    which provides for injunctive relief irrespective of the

10   fact that even if the Court believed that the Fair Credit

11   Reporting Act itself did not afford that right.  We can

12   still privately contract for that.

13          By the way, there are cases which do not agree

14   that the FCRA does not afford or precludes my possibility

15   of injunctive relief for private litigants.  The HARRIS

16   case, which went up on 23(f) review and the Fourth Circuit

17   denied it, the Court concluded it had not been divested of

18   authority to issue injunctive relief in the case.

19   "Precise fashioning of that injunctive relief, should the

20   Court decide such relief is appropriate, will await

21   further proceedings."  So it is not as clear as they would

22   make it seem.  We have many cases, our firm, Mr. Bennett,

23   Mr. Francis, the same thing.  These are just a brief

24   selection.  These are cases where we are either seeking

25   injunctive relief or where we obtained injunctive relief.

1   As you can see, all over the country:  North Carolina,

2   Wisconsin, Georgia, Nevada, Virginia, California.  This is

3   not novel.

4           Now, there is also an argument that our

5   complaint does not include a claim for injunctive relief.

6   Well, of course, injunctive relief is a remedy.  It is not

7   a claim per se.  Your claim is under the Fair Credit

8   Reporting Act.  Injunctive relief is a remedy for your

9   claim.  Rule 54(c) makes it very clear that, and this is,

10  by the way, when it says, "Every other final judgment,"

11  what that's a reference to is in a default judgment under

12  Rule 54(c).  In a default judgment, of course, the Court's

13  judgment has to conform to the pleadings.  But "In every

14  other final judgment, the Court should grant the relief to

15  which the party is entitled, even if the party has not

16  demanded that relief in its pleadings."  So the Court is

17  not bound by the pleadings in this case.  Now, having said

18  that, we did file an amended complaint which does state a

19  claim for injunctive relief.

20          MR. BENNETT:  Your Honor, that was one of the

21  slides that we inserted this morning.

22          THE COURT:  I see that.

23          MR. CADDELL:  Sorry, Your Honor.  Amendments are

24  routinely allowed:  There is a plethora of cases where

25  amendments conforming requested relief to the settlement

1    agreement are filed contemporaneously with the settlement

2    agreement.  This is an example, the IN RE: CURRENCY

3    CONVERSION case out of New York.  These are cases where we

4    have done it.  Most recently, for example, in the second

5    case there, the IN RE: NAVISTAR case, Judge Kennelly, Matt

6    Kennelly out of Chicago, we had a national class, over a

7    million Ford diesel engines, a very successful case.  We

8    filed an amended complaint when we filed the settlement to

9    conform the pleadings to the settlement.  These are other

10   cases, other examples of that.

11          Here is the question to ask the objectors:  What

12   are you going to tell Ms. Nix; how are you going to help

13   her with her problem?  The $300, she is getting more money

14   than the Watts Guerra objectors have settlement authority

15   for.  She is going to net $325 or more, which is $100 more

16   than the Watts Guerra people got in TRANSUNION.  The 443

17   that they have agreed to or that they've gotten settlement

18   authorization, if they got that, they get 45 percent of

19   that.  Their clients would only get $200.  She has already

20   said, "That's not enough.  I don't want the money.  I want

21   the problem fixed.  This settlement, I want my phone to

22   stop ringing.  I want to stop receiving calls for a person

23   I've never heard of.  I want LexisNexis to stop giving out

24   incorrect information and refusing to correct their

25   mistake."  That's what this case is about.  That $100 or

1   $200, that's not going to make a meaningful difference to

2   people who are harassed by bill collectors, who have

3   inaccurate information in a credit report that's being

4   issued about them.  Where decisions are being made.

5   That's what they want.  They want this fixed.  This is a

6   screenshot, Your Honor, of the LexisNexis website

7   yesterday.  I guarantee you, if the Court called it up

8   today, it would say exactly the same thing.  You can see

9   what we've got.  "Accurint for Collections does not

10  constitute a consumer report as that term is defined in

11  the Federal Fair Credit Reporting Act.  Accordingly,

12  Accurint for Collections may not be used in whole or in

13  part as a factor in determining eligibility for credit,

14  insurance, employment, or another permissible purpose

15  under the FCRA."

16          The problem is, when it says it does not

17  constitute a consumer report, that means you don't get any

18  of the rights under the fair Fair Credit Reporting Act.

19  And if this settlement is not approved, that won't change.

20  And the people who have been affected by this practice all

21  these years will continue to be affected without a remedy.

22  This is not a warning about diaper rash or taking "Salon

23  Only" off a bottle or something like that.  This is a

24  massive change for people.  And it will have a meaningful

25  impact on millions of people across this country.

1            I'm not going to spend a long time on attorneys'

2    fees, Your Honor.  There is no objection as to the

3    percentage of the monetary relief fund, which actually,

4    the agreement provided we could seek up to 30 percent.  We

5    are only seeking 25 percent.  There is no objection to

6    that.  Only Mr. Schulman has filed an objection to the

7    $5.5 million in fees for the prevailing party with respect

8    to the injunctive relief settlement.  Our focus has always

9    been on injunctive relief.  I think you can tell from my

10   presentation today, that's what the thrust of the case has

11   been about.  We used statutory damages as a lever to

12   achieve the injunctive relief.  That's what people want.

13   And that was our goal from the beginning.  Again, there is

14   no amount of money that we could recover for a class the

15   size of 100 million or 200 million that would be

16   meaningful.  The most meaningful thing we could do for

17   people would be to obtain for them injunctive relief.  So

18   at least 80 percent of our time was dedicated to

19   injunctive relief.  Mr. Schulman said in his objection,

20   one of the things he said was, in fact, this is in his

21   supplemental objection, he said, "There is no attempt to

22   quantify how much time was spent, no independent basis on

23   which to quantify how much time was spent on seeking

24   injunctive relief versus the monetary relief."  Well, in

25   fact, Professor Miller did just that.  He looked not only

1    or listened not only to what we told him, but he looked at

2    the pleadings, he looked at the -- by pleadings, I mean

3    the briefs we submitted back and forth in the cases.  He

4    looked at our mediation briefs.  He looked at the

5    mediation presentation.  He looked at the presentation

6    made to Magistrate Lauck a year ago.  And it was clear

7    from looking at all of that that the focus of the

8    litigation was on injunctive relief, not on the monetary

9    relief.  And it should be.  The injunctive relief affects

10   tens of millions of people.  The monetary relief affects

11   31,000.

12          In fact, we didn't really discuss in any

13   meaningful way, other than sort of a placeholder, "By the

14   way, we think some monetary relief is needed," we didn't

15   really negotiate monetary relief until we finished

16   negotiating or had an agreement in principle or an

17   understanding on the business practice changes.  That was

18   where we spent virtually all of our time until we got that

19   part of the puzzle solved, which was huge and was only

20   accomplished by the, maybe the second session or middle of

21   the third session with Randy Wulff, with Mediator Wulff in

22   Oakland.  Again, this is more of the same.  We have always

23   been focused on injunctive relief, Your Honor.

24          Mr. Schulman argues that the common fund is only

25   $5.5 million.  Again, you only get there if you totally

1    ignore the value of the injunctive relief.

2            We submitted expert opinions.  We submitted

3    declarations to support the reasonableness of our hourly

4    rates.  The Fourth Circuit has specifically found that was

5    appropriate.  Our rates have been approved -- by our

6    rates, I mean Caddell & Chapman -- our rates have been

7    approved by the U.S. Department of Justice, by judges all

8    across the country, federal district judges all across the

9    country.  A little over a month ago, in a fairness

10   hearing, final fairness hearing before Judge Margaret

11   Morrow out of Los Angeles in a national class, against

12   Honda, they issued a tentative approving rates of $875 for

13   me, $675 for Ms. Chapman, and specifically found that

14   class counsel had many years of experience in consumer

15   class action litigation, and the specific causes of action

16   asserted in this case.

17           Similarly, the U.S. Department of Justice

18   approved the rates that we are seeking in this case.

19           Our rates are reasonable for complex class

20   action litigation.  They are higher rights.  Complex class

21   action litigation is not the same as doing a consumer

22   litigation on a case-by-case basis.  These cases take a

23   lot of resources, both financial and in terms of lawyers.

24   They take a lot of experience.  I've been doing this, I've

25   been doing national class actions now for 20 years.  And

1    it is amazing what I have learned.  In our firm the

2    learning curve has been tremendous over the last 20 years.

3            In this district, and this is a counter to, we

4    saw Mr. Schulman's filing about two weeks ago --

5            MR. BENNETT:  This is a new slide, also.

6            MR. CADDELL:  This is a new slide.  And we are

7    going to provide copies.  We just did it this morning, so

8    we will provide copies to Mr. Schulman and Watts Guerra

9    and to the Court.  But the reality is, and I've got -- in

10   fact, we've got copies of these we could -- don't we have

11   copies of these?

12           MR. BENNETT:  We do.

13           MR. CADDELL:  Your Honor, we have two

14   declarations that were filed in the Eastern District by

15   attorneys.

16           MR. BENNETT:  I gave the other side copies

17   before the hearing.

18           MR. CADDELL:  You did.  Good.  These are

19   declarations that were filed.  I was gratified to see, by

20   the way, that both of these lawyers, Mr. Reilly and Mr.

21   Angle, are UVA graduates.  But these, the first, in the IN

22   RE: MILLS case, this is a -- well, no, this is a separate

23   case.  The IN RE: MILLS case, Judge O'Grady approved

24   counsel rates ranging from $440 to $825 per hour.  That

25   was four years ago.  In the SUNTRUST case, Judge Payne

1  approved counsel rates of $695 an hour.  In these cases,

2  the declarations submitted by Mr. Reilly and Mr. Angle

3  support the rates as high as $820 an hour for Mr. Reilly,

4  and this was several years ago, and for Mr. Angle, and by

5  the way, that $820 an hour for Mr. Reilly was for a lawyer

6  with 20-plus years of experience.  I've got 34 years of

7  experience.  And then Mr. Angle was submitting some rates

8  that were as high as $848 an hour to the Court.

9          So there is ample support for the rates

10  submitted in this case and sought by class counsel.

11          Mr. Schulman relies on the PERDUE case for a

12  good part of his objection.  We have looked at the PERDUE

13  case.  In fact, if we go back just a second, in this qui

14  tam case against DAVITA that we had and settled and was

15  resolved last year, the Department of Justice, we were

16  getting a multiplier on our fee in that case, the DAVITA

17  case.  The Department of Justice came back and said, "Hey,

18  wait a minute, what about PERDUE?"  We went through an

19  analysis with the Department of Justice over PERDUE, and

20  ultimately they agreed that PERDUE did not preclude in

21  that DAVITA case our receiving a multiplier for our

22  efforts on our lodestar.  And part of it is what the

23  analysis we laid out here.  Part of what was motivating

24  the PERDUE Court, the U.S. Supreme Court in PERDUE, was,

25  and this is a quote, "Fees are paid in effect by state and

1     local taxpayers."  That's not the case here.  Defendants

2     are going to pay all the fees in this case.  In PERDUE,

3     the PERDUE case involved a contested fee.  It was a

4     Georgia case brought against a municipal regulatory

5     agency, and it was contested.  In this case, the fee is

6     agreed to by the defendants.  The fee-shifting statute was

7     the only basis for fees in PERDUE.  In this case, common

8     benefit provides an alternative basis for the fee.  You

9     can see we referenced the CLARK v. EXPERIAN case.  We can

10    provide a copy of that opinion if the Court would like to

11    see it.  It awarded fees in a Fair Credit Reporting Act

12    case as a percentage of common fund.  That was Judge

13    Currie, Cam Currie, in South Carolina.  She did a lengthy

14    analysis, and in fact, in that case, the issue of fee

15    shifting statutes and whether that would limit the

16    multiplier was expressly raised with her and expressly

17    dealt with in her opinion.

18            And I would point out, ironically, when it says,

19    "Common benefit provides alternative basis for fees,"

20    Mr. Schulman in his initial brief argued that we should

21    really not look at the lodestar, we should look at the

22    common benefit.  And you may recall a few minutes ago I

23    showed you the slide where Mr. Schulman said if we want

24    $5.5 million, then the value of the injunctive relief has

25    to be at least $16.5 million.  Well, guess what?  It is a

1   lot more than that.  It is many multiples of that.  So

2   there is an alternate basis for awarding the fees other

3   than lodestar.

4           Even if you followed PERDUE, PERDUE allows

5   enhancement for superior results.  This is a direct quote:

6   "We reject any contention that a fee determined by the

7   lodestar method may not be enhanced in any situation.  The

8   lodestar method was never intended to be conclusive in all

9   circumstances."

10          The Fourth Circuit post-PERDUE has said, "After

11  the lodestar is calculated, however, the Court or agency

12  adjudicator may adjust that figure based on other

13  factors."  Again, that's in a litigated context, not in a

14  settlement context, which I propose makes a significant

15  difference.

16          Last couple of points, Your Honor.  Sub-classing

17  is unnecessary because every class member is going to get

18  the identical relief.  And the service awards, Mr. Otten,

19  for example, they are reasonable compared to the relief

20  provided to class members --

21          THE COURT:  Let me ask you a question before you

22  go on.  You just said that you thought in a settlement

23  circumstance, that the Court's ability to deal with the

24  reasonableness of a multiplier in the fee is somehow

25  different or changed.  What's your point there?  Because I

1    have actually been thinking about that.  I would like to

2    hear your --

3              MR. CADDELL:  My point is that if you have a

4    settlement and the defendant has agreed to pay a certain

5    fee, and I think it is important that that fee be

6    negotiated after release for the class was negotiated, and

7    it is also important to recognize that that fee is going

8    to be paid by a private litigant, not by a governmental

9    agency, where there is an issue about the taxpayers being

10   on the hook for that fee later on.  I think in that

11   circumstance, the Court has more leeway, frankly.  I don't

12   think the Court -- I think parts of the PERDUE analysis

13   simply don't apply.  Part of what was driving PERDUE was

14   that this was a litigated fee.  It was contested.  And so

15   if you've got a contested fee, you have to sort of sort

16   through who is right and who is wrong.

17             Your Honor, we have already had a contested fee

18   with LexisNexis.  You weren't there.  Mr. Wulff was.

19   Because it came at the end of the mediation process.  But

20   we were quite vigorous in our disagreements over what

21   would be an appropriate fee.  And LexisNexis looked at the

22   work that was done.  We had specific discussions of the

23   items that this Court would look at, that Mr. Schulman is

24   talking about, the work performed, the rates, whether we

25   should be allowed to consider the work done in the ADAMS

1    case or in the GRAHAM case.  All of these issues were

2    aired.  All of these issues were discussed and negotiated,

3    sometimes with great heat.  And ultimately, we reached an

4    agreement.  And the problem is, of course if at some point

5    the Court concluded that the amount that was agreed upon

6    was way out of proportion to the relief that was being

7    obtained, or if the Court believed that there was some

8    collusion going on, then the Court has a duty to

9    investigate and to make changes, to address that issue.

10   But in the absence of collusion, and in a situation where

11   class relief was determined before any discussion of fees,

12   and in a situation where the class relief is in fact a

13   many-times multiple of the fees sought, I think for the

14   Court then to do a PERDUE analysis on the fees really puts

15   the Court in a position of second guessing the parties.

16   Because it is a private negotiation just like any other

17   negotiation.

18          And so believe me, Your Honor, we didn't start

19   at $5.5 million.  LexisNexis didn't start at $5.5 million,

20   either.  So my point is, that was, it has already been

21   vigorously contested, and all of these issues have been

22   aired, and this was at the end of the day something that

23   was agreed upon and does not affect in any way the relief

24   to the class.  And again, I think the Court -- so I think

25   for the Court, the real questions are, is there any chance

1    of collusion; is this relief disproportionate to the

2    relief being given -- I mean are these fees

3    disproportionate to the relief being given to the class;

4    were the fees negotiated after the relief to the class was

5    determined.

6            THE COURT:  All right.  Thank you.

7            MR. CADDELL:  Thank you, Your Honor.  Your

8    Honor, I wanted to see, if I may check with my co-counsel

9    just a second.

10        (Counsel conferring with co-counsel.)

11           MR. CADDELL:  Your Honor, a couple of minor

12   points to clean up.  One, I would refer the Court to

13   docket 103-1, that's the Declaration of Professor Jeff

14   Miller from NYU.  Mr. Miller actually was cited, I think,

15   by both objectors, but I know at least by Mr. Schulman, I

16   believe, and he did a report on fees and multipliers and

17   in his Declaration, Paragraph 36 through 40 he goes

18   through in great detail and justifies the multiplier

19   that's being sought in this case.

20           I would go back and looking at the value of the

21   settlement on a very simplistic level, we are talking

22   about 20 million reports a year.  Consumers, because of

23   this settlement, will have the right to a free copy of

24   their credit report on an annual basis from Accurint.  And

25   not just the Accurint for Collections report, but also the

1   Accurint Contact & Locate Report.  Those typically cost,

2   if you buy your credit report, it typically costs $10 to

3   $11.  About ten percent of consumers request their credit

4   reports on an annual basis, because they want to know

5   what's out there about them.  If you just did the math on

6   that alone, you could pick almost any number, 2 million,

7   10 million, 5 million, the value on an annual basis to

8   this class of the rights that are being afforded by the

9   injunctive relief are many, many times multiple of the

10  fees being sought in this case.

11          And I would emphasize in that regard, again, the

12  difference between this case and the PAMPERS and L'OREAL

13  cases.  If you look at those cases, they were filed and

14  settled very quickly.  Again, the PAMPERS case, no

15  discovery.  They didn't even issue a single written

16  discovery request.  No depositions.  We have been pursuing

17  this litigation for five years, since 2008.  We have

18  believed for five years that this was a huge problem for

19  people that was under the radar because LexisNexis took

20  the position that this product was not subject to the Fair

21  Credit Reporting Act.  And this settlement will bring that

22  to the light of day and provide millions of consumers,

23  tens of millions of consumers with rights that they never

24  had before.  Thank you, Your Honor.

25          THE COURT:  All right.  Thank you.

```
1            MR. CADDELL:  Your Honor, I would like to, if I
2    could, I know we have tendered it, but we do have a couple
3    of extra slides that we did this morning that we need to
4    make copies of to give to the Court.  I'd like to give the
5    Court one copy that's complete if I could, and of course
6    we will make that available to the objectors as well.
7            THE COURT:  Sure.
8            MR. CADDELL:  And then we already handed the
9    Court, I don't know if the Court, just for ease of the
10   record, could we mark these as exhibits?  I guess what I
11   would do is mark four documents as exhibits.  The
12   PowerPoint as Exhibit 1; the Nix objection as Exhibit 2;
13   and then the Reilly Declaration as Exhibit 3; and the
14   Angle Declaration as Exhibit 4.
15           THE COURT:  All right.
16           MR. CADDELL:  Then we will provide everyone a
17   copy of the slides that were not -- that were added just
18   this morning.
19           MR. BENNETT:  Your Honor, we will give the court
20   reporter copies informally.
21           THE COURT:  The most important person is the
22   Clerk needs copies of these identified exhibits.  All
23   right, let's do this:  Let's take about a 15-minute break.
24   We will come back in and finish whatever you want to add,
25   and then we will take luncheon recess and come back and
```

1    finish up.

2                  (Recess taken from 12:18 p.m. to 12:35 p.m.)

3                  THE COURT:  All right.

4                  MR. CADDELL:  If I might just correct one thing.

5    I misspoke.  I said Mr. Francis and Mr. Bennett had both

6    testified before Congress with respect to the Fair Credit

7    Reporting Act.  Mr. Francis has not.  He has testified to

8    the Consumer Financial Protection Bureau, but not to

9    Congress.  Mr. Bennett has testified to Congress.

10                 THE COURT:  All right.

11                 MR. CADDELL:  Just a housekeeping matter, Your

12   Honor, if you wondered, I didn't want it to be a

13   distraction, but I fell at my daughter's school last week.

14   We served burgers to the kids, about 600 kids and

15   students, and so last week I fell and cut myself, so I

16   don't really have -- that's not normally the way I look.

17   But I didn't want it to be a distraction.

18                 THE COURT:  I didn't notice at all.

19                 MR. CADDELL:  Thank you.

20                 THE COURT:  Defendants?

21                 MR. McCABE:  Good afternoon, Your Honor.  I'm

22   Jim McCabe representing defendant LexisNexis in this

23   matter.

24                 I want to, I hope my remarks will be brief.  I

25   want to focus on one half of one of the issues that the

1    Court must address in ruling on the motion before it.

2    What the Supreme Court has said about the motion to

3    approve a class action settlement is that the courts judge

4    the fairness of a proposed compromise by weighing the

5    plaintiffs' likelihood of success on the merits against

6    the amount and form of the relief offered in the

7    settlement.  That's the CARSON v. AMERICAN BRANDS case,

8    450 U.S. 79.  What I want to focus on here is the

9    likelihood of success on the merits, because the value of

10   the settlement, I believe, is adequately covered by the

11   submissions of the parties and will be dealt with by

12   others this afternoon.

13          This case asserts only claims for willful

14   violation of the Fair Credit Reporting Act.  That's the

15   only claim in the case.  Willful violation of the Fair

16   Credit Reporting Act in the sale of Accurint reports.  One

17   specific report, one law.

18          To prevail on those claims, as Mr. Caddell said

19   earlier, the plaintiffs would have to prove two things.

20   They would have to prove, first, that Accurint is a

21   consumer report within the meaning of the Fair Credit

22   Reporting Act.  That's number one.  That's not enough.

23   They would have to also prove that at the time of the

24   sales that were complained of, it had been clearly

25   established as a matter of law that Accurint was in fact a

1    consumer report.  That's the willfulness element of the

2    case.  That comes from the Supreme Court's decision in

3    SAFECO INSURANCE COMPANY v. BURR, a case which is not

4    discussed by either of the objectors to the settlement.

5          Without establishing both of those points, the

6    plaintiffs would have no recovery here.  And were this

7    case litigated, the likelihood of success on the merits,

8    were this case litigated, the plaintiffs could not

9    establish either one of those points.  They could not

10   establish that Accurint was a consumer report.  Consumer

11   report is defined in the Fair Credit Reporting Act, it is

12   in 15 U.S.C. 1681(a)(D).  That's a very long, I believe it

13   is a 90-word sentence with six dependent clauses.  It is

14   circular.  It has uncertain internal references, one to

15   another.  It is, quite frankly, a mess.  It is not a clear

16   statute.  And that's significant for the SAFECO analysis.

17         We can, however, understand enough of it to know

18   that consumer report embraces reports of certain kinds of

19   information, what Mr. Caddell referred to as seven factor

20   information, reports of certain kinds of information that

21   are intended to be used by users to make certain kinds of

22   eligibility decisions.  Reports that are intended to

23   inform decisions on eligibility for credit.  It is a

24   credit report.  Equifax, TransUnion, Experian.  They

25   prepare reports so lenders can make decisions about loans.

1    Those are consumer reports because they concern

2    eligibility for credit.

3            Eligibility for insurance is another qualifying

4    definition, qualifying element of the consumer report

5    definition.  An underwriting report that may be procured

6    by an insurance company before deciding to how much to

7    charge someone for insurance, that is a consumer report

8    within the meaning of the FCRA.  A background screening

9    report, eligibility for employment, qualifies as a

10   consumer report under the Fair Credit Reporting Act.  But

11   the hallmark of the consumer report definition is that the

12   report must contain seven factor information and it must

13   be prepared for the purpose of determining a consumer's

14   eligibility for something that the consumer wants.

15   Eligibility for a benefit.  Credit, insurance, employment,

16   and certain other benefits that are mentioned in the

17   statute.

18           Accurint reports are not prepared for

19   eligibility determinations.  Accurint report users have to

20   agree that they won't use Accurint reports to make

21   eligibility determinations.  It is part of the deal.  And

22   you can see that deal reflected in the slide that I showed

23   marked Number 86 that Mr. Caddell used earlier.  88 on the

24   current Declaration.  You see that in the highlighted

25   portion, it says, "Accurint for Collections may not be

1    used in whole or in part as a factor in determining

2    eligibility for credit, insurance, employment, or another

3    impermissible purpose under the FCRA."  That's the whole

4    point.  LN goes out of its way to make sure that its users

5    do not use Accurint reports to make eligibility

6    determinations.  That in and of itself establishes that

7    they are not consumer reports.

8              We are confident that if this issue were

9    litigated, the plaintiffs would not be able to establish

10   the first of the two essential elements they would have to

11   establish in order to obtain any recovery in this case at

12   all.

13             But even if they could win on that consumer

14   report characterization, they could not win on the

15   willfulness point.  And the willfulness is established in

16   the SAFECO INSURANCE COMPANY v. BURR case, 2007, United

17   States Supreme Court.  In that case, the Supreme Court

18   established a kind of a threshold for the kinds of

19   violations of the Fair Credit Reporting Act for which

20   willfulness remedies may be available.  And in

21   establishing that threshold, it looked to qualified

22   immunity case law under Section 1983, 42 U.S.C. 1983, to

23   draw the line between conduct that may be wrong but hasn't

24   been fully examined, and conduct that clearly violates the

25   Constitution.  In the 1983 context, a government actor can

1    be liable for the violation of a clearly established

2    constitutional right.  They can't be held liable for the

3    violation of a right if it is not clearly established.

4    The goal there is to permit government actors a wide range

5    of latitude in the conduct of their affairs, but to say

6    once this conduct has been clearly established as wrong,

7    you can't do it, you can be held liable.  You no longer

8    have immunity.  The FCRA has a similar taxonomy of

9    violations.  If a requirement of the Fair Credit Reporting

10   Act is clearly established, willfulness penalties are

11   available.  If it is not, plaintiffs can still get damages

12   but they can't get statutory damages, they can't get

13   punitive damages, they can't establish a willful violation

14   of the Fair Credit Reporting Act.

15           And the Court in SAFECO described how it is an

16   FCRA actor can know what they are supposed to do, what

17   kinds of obligations are clearly established and what are

18   not.  You could have a crystal clear statute.  That

19   obviously would be good enough.  But what the Court says,

20   and it does this really by negative inference here, it

21   says that this is not a case in which the business subject

22   to the Act had the benefit of guidance from the courts of

23   appeals or the Federal Trade Commission that might have

24   warned it away from the view it took.  In other words,

25   with an unclear statute, if a Court of Appeals interprets

1    it and says this is what is required, and the actor then

2    goes ahead and violates what the Court of Appeals says is

3    required, they can be liable for willfulness remedies

4    under the Fair Credit Reporting Act.  But in the absence

5    of that kind of guidance, in the absence of Court of

6    Appeals guidance, in the absence of FTC guidance, with an

7    unclear statute, the actor simply cannot be liable for

8    willfulness remedies under the FCRA.  It is stated here in

9    the text of the opinion and it is stated in Footnote 20 of

10   the the SAFECO opinion as well.

11           Now, in this case, there is no court of appeal

12   anywhere that has said that Accurint is a consumer report.

13   No court of appeal anywhere.  There is no agency.  The FTC

14   has never said Accurint is a consumer report.  So to this

15   day, even if Accurint is a consumer report and LN fails to

16   afford some of the rights to consumers that would be

17   required by the Fair Credit Reporting Act, they could be

18   liable for damages, but they can't be liable for the

19   willfulness remedies, because the law has not as yet been

20   clearly established.  And it is actually, from the defense

21   perspective, it is far better than that.  The FTC has not

22   been silent on Accurint.  It has not simply failed to say

23   that Accurint is a consumer report.  The FTC has

24   affirmatively said that Accurint is not a consumer report.

25   And it did so in circumstances that we have described in

1    our papers, but I'll recount them for you briefly.  In

2    2005, there was an incident in which hackers gained access

3    to the computer systems of some of the Accurint

4    subscribers, and they got logons and passwords and they

5    logged in and started to obtain Accurint reports.  Some of

6    these were police departments, law firms, debt collectors,

7    all kinds of folks.  And eventually, Lexis figured out

8    what was going on and reported this to the FTC to tell

9    them that this had been happening.  The FTC started an

10   investigation, because it could, it had the ability to

11   enforce the FTC Act with respect to Seisent as that unit

12   was then called.  And at the end of the day, they gathered

13   some facts and filed a complaint against Seisent and

14   LexisNexis, Seisent and REIT, and they filed a consent

15   order on the same day.  It was a package deal after their

16   investigation.  What they learned in their investigation,

17   they got very familiar with what was going on at Seisent.

18   They knew exactly what the products were, what Accurint

19   consisted of, knew exactly who they sold it to.  They said

20   in the complaint, "Seisent has been in the business of

21   collecting, maintaining and selling information about

22   consumers.  Among other things, Seisent sells products

23   that customers use to locate assets and people,

24   authenticate identities, and verify credentials, collect,

25   verification products."  This is referring to Accurint.

1    And the FTC knew exactly to whom Seisent was selling

2    Accurint reports.  It said in the complaint, "Respondent

3    Seisent sells verification products under its Accurint

4    trade name, collectively Accurint Verification Products.

5    Accurint Verification Products customers include insurance

6    companies, debt collectors, employers, landlords, law

7    firms, and law enforcement and other government agencies."

8              So in 2008 when this complaint was filed by the

9    FTC, they knew what was in Accurint, they had been

10   investigating it, they knew exactly who it was sold to,

11   they knew it was sold to debt collectors, which are the

12   very facts that the plaintiffs contended here give rise to

13   the consumer report characterization.  They say, "Because

14   you are selling seven factor information to debt

15   collectors who may use it to decide who to collect from,

16   that's a consumer report."  That's their argument.  FTC

17   heard the same facts.  FTC at this time was the agency

18   principally charged with the enforcement of the Fair

19   Credit Reporting Act.  They were the boss.  They came in,

20   filed a complaint about Seisent's conduct, and they

21   published their consent decree in the Federal Register for

22   comment by the public.  Well, the consent decree did not

23   obtain any civil penalties at all.  It asserted only a

24   claim for violation of the FTC Act, Section 5 of the FTC

25   Act.  So it drew a comment.  The Epic Electronic Privacy

1   Information Center, public interest group out of

2   Washington, D.C., filed a letter, a comment on the

3   settlement criticizing it, saying, "Look, FTC, you settled

4   with this data broker and you didn't get any penalties out

5   of them."  And Epic compared the settlement with Seisent

6   to a prior settlement with a consumer reporting agency

7   where the FTC had obtained penalties.  They said, "Look,

8   in the ChoicePoint matter, you got penalties but in this

9   case you didn't.  You should revise the settlement to

10  obtain penalties."

11          And the Commission wrote back.  This is a formal

12  comment.  The Commission as a part of its process had to

13  consider and determine what to do about the comments with

14  resect to the consent order, the proposed consent order.

15  The Commission sent a letter back in July of 2008 saying,

16  "Your comment notes that civil penalties were included in

17  the Commission's settlement with ChoicePoint, Inc.  The

18  ChoicePoint case involved credit reports and thus alleged

19  violations of the Fair Credit Reporting Act which

20  authorizes civil penalties.  Unlike that case, the current

21  matters do not involve credit reports.  In other words,

22  Accurint is not a credit report.  And because Accurint is

23  not a credit report, we can't get an FCRA penalty."

24          Now, this is not some idle speculation from a

25  clerk in the basement of the Federal Trade Commission.

1   This is a letter which was issued by the Commission

2   following a vote of the Commission, a four to zero vote of

3   the Commission.  It could not be more authoritative.  The

4   agency that was principally charged with the enforcement

5   of the Fair Credit Reporting Act in July of 2008 responded

6   to criticism of a settlement by publishing in the Federal

7   Register a statement authorized by the Commission stating

8   that Accurint is not a consumer report.

9           So it is not simply the case that there is no

10  statement that Accurint is a consumer report.  There is an

11  affirmative statement that Accurint isn't a consumer

12  report and it comes from an agency that is entitled to

13  deference in its interpretation of the Fair Credit

14  Reporting Act.

15          Now, there has been some talk about the ADAMS

16  case in 2010 and the fact that the District of New Jersey,

17  Judge Bump, the Judge in the District of New Jersey,

18  denied a motion for judgment on the pleadings in that case

19  that was directed at the question of whether Accurint

20  consisted of a consumer report.  It has been widely

21  misinterpreted by, at various times by the plaintiffs in

22  this case and most recently by the objectors.  After Judge

23  Bump denied the motion, denied the motion for judgment on

24  the pleadings, we brought a motion for reconsideration

25  because she had relied on a case that had been vacated by

1   the Supreme Court.  We went back and saw Judge Bump again.

2   There was a long argument in her courtroom in Camden where

3   we argued that in fact, Accurint was not a consumer

4   report.  And having been very patient, as patient as the

5   Court has been with me today, Judge Bump interrupted me

6   and said, "Okay, listen, it is going to come as a surprise

7   to you, but I agree with you on this."  She explained that

8   the reason she had denied the 12(c) motion was that she

9   was uncertain that the July, 2008 letter from the FTC was

10  the FTC's last word on the topic.  She thought discovery

11  should be permitted to be sure the plaintiffs could

12  discover any subsequent statement by the FTC that might

13  have contradicted the July, 2008 statement.  She said,

14  this is set out in our brief, Docket Number 99 at Page 21,

15  there is a long quote there from the transcript of that

16  hearing.  She said, "What if discovery," and this was her

17  concern, "What if discovery shows that the FTC, I forget

18  what it was called, statement, let's just call it a

19  statement, that the defendants relied upon, let's just

20  pretend that the FTC statement was overruled by the FTC a

21  month later.  I don't know.  And the Court is not in a

22  position at a judgment on the pleadings stage to question

23  the averment."  She goes on to say:  "At the end of the

24  day, if what you say is so, that there is no other

25  contrary authority to the FTC statement, then it seems to

1  me summary judgment will be entered in the defendants'

2  favor."

3          ADAMS doesn't help the objectors here.  Didn't

4  help the plaintiffs, and doesn't help the objectors.  It

5  has not been conclusively established that Accurint is a

6  consumer report.  And so the failure to treat it as a

7  consumer report is not a willfulness remedy-eligible

8  violation of the FCRA.

9          Now, I can tell you, Your Honor, that this was a

10 point of contention.  We raised this point with the

11 plaintiffs in the settlement negotiations and we advised

12 them at that time that had we not settled the matter we

13 would have filed a summary judgment motion within a matter

14 of days following conclusion of that negotiation.  And we

15 would not do that lightly, we would not do it unless

16 Mr. Anthony and Mr. Raether and I all were convinced that

17 the Court would grant that motion, that the Fourth Circuit

18 would affirm the Court's grant of that motion.  So when we

19 come to looking at the merits of the case, we can say, as

20 the plaintiffs have demonstrated, the value of this

21 settlement is really quite substantial.  But it far

22 outweighs the value of the claims, which is virtually nil.

23 So this is a good deal for consumers.  They frankly have

24 gotten far more than the case was worth with this

25 settlement.  Thank you, Your Honor.

1              THE COURT:  All right.

2              MR. RAETHER:  Your Honor, Ron Raether for

3     defendant LexisNexis.  I'm just going to take a few

4     moments of your time, Your Honor, to summarize, I think, a

5     few points that we want to highlight in terms of the one

6     JIFFY LUBE factor that Mr. McCabe's argument, I think,

7     relates to as well as the points that I intend to make.

8     And that is the circumstances surrounding the litigation.

9     Where was the litigation, where were the parties at the

10    time that we were engaging in this contentious mediation

11    that resulted in the settlement that's being considered by

12    the Court today.

13             Your Honor, you have to realize that we were

14    really dealing with three issues at the time that we were

15    looking at mediation and possible settlement of this case.

16    The first two Mr. McCabe has discussed at length.  The

17    first one being is Accurint, does it meet the definition

18    of consumer report.  The second issue being, even if it

19    did, were plaintiffs able or are plaintiffs able to

20    establish a willful violation of the FCRA?  In other

21    words, was our client's interpretation of the Fair Credit

22    Reporting Act as to not being inclusive of products like

23    Accurint objectively unreasonable.

24             And Mr. McCabe has done an excellent job of

25    explaining to the Court, reiterating, I think, a lot of

1    arguments we made in our papers as to why the plaintiffs

2    had a tremendous amount of weakness, I think, with respect

3    to both of those issues.  In fact, Your Honor, I can tell

4    you that during the presentation today, as well as during

5    the preliminary approval hearing, I had to restrain myself

6    not to stand up and object a couple times in terms of

7    plaintiffs' continued characterization that Accurint

8    somehow meets the definition of consumer report.  And I

9    say that because that was an issue that was divisive in

10   the mediation and the settlement.

11          I think that if you were to have a bug in the

12   room listening at the time, you would find that even when

13   we, at the end of the day, came to terms on the settlement

14   agreement, we obviously have not come to agreement in

15   terms of what is meant by the definition of consumer

16   report.  That was an issue of contention in the mediation.

17   It obviously was a point that we were trying to wrestle

18   through and work out.  How do you settle a case like this

19   where there is this unresolved issue, where for the last

20   four years, in essence, our client has had to defend at

21   least in three cases the legal question as to whether

22   Accurint met the definition of consumer report.

23          And from our position, Your Honor, we would say

24   that we succeeded in ADAMS, we succeeded in the case

25   brought before this Court, and we thought we would succeed

1    in Berry as well.  But, of course, there is the

2    possibility and likelihood that there will be -- would be

3    a fourth case filed.  And so if you think about

4    settlements, Your Honor, and you think about those facts

5    that I just explained, what is LexisNexis, what was it

6    looking for in terms of a settlement?  It was looking for

7    finality, finality on this issue in terms of whether

8    Accurint meets the definition of consumer report.

9            So the third issue that we were struggling with,

10   at least one, I think, I think it is safe to say on both

11   sides of this case, how do you settle a case with

12   approximately 100 to 200 million people when you have this

13   lack of certainty, when you have this dispute, when you

14   have this possibility of this issue going on and on and

15   on.  That's essentially what we were negotiating over in

16   the mediation.  So when it was said earlier that we spent

17   three days talking about the injunctive relief, how it is

18   that we would address this issue and do so in a way that

19   provides finality for my client, but also provides the

20   protections that plaintiffs' counsel intended and wanted

21   to achieve through the filing of this litigation, when you

22   took those two competing interests, and they rammed

23   against each other in the mediation process with the

24   supervision of judges, the supervision of a

25   nationally-known mediator, when those two competing

1    thoughts, when they collided, that was the result.  That

2    ended up creating the injunctive relief that Your Honor is

3    now considering.

4            And I think that's important, because the

5    objectors want to suggest that this is something that

6    LexisNexis presented to the plaintiffs and said, "Take it

7    or leave it."  That's not the case, Your Honor.  I think

8    that if you look at the injunctive relief, and I'm not

9    going to go over it again in length, we did for Magistrate

10   Judge Lauck, I think plaintiffs' counsel did a good job of

11   explaining what we are accomplishing in the injunctive

12   relief.  But just take one little segment of that.  And I

13   think that Mr. Caddell did a good job in identifying JoAnn

14   Nix, this is the objector to the (b)(3) case, because I

15   really do believe that that is exemplary of what we were

16   trying to accomplish, you know, of what is accomplished by

17   this injunctive relief.  That being solving the issue that

18   was raised in the complaint, solving the issue that I

19   think just mere compliance with the FCRA would not

20   achieve.

21           The other thing I want to address real quickly

22   is the suggestion that implementing this injunctive relief

23   is not burdensome on my client.  And I think quite to the

24   contrary, if you looked at the Declaration, again, the

25   only evidence in the record, from Tom Sizer, a

1   businessperson at LexisNexis, he estimated that the costs

2   of implementing the injunctive relief would be

3   approximately $6 million.  And also, Your Honor, he stated

4   the fact that it will cause some disruption to the

5   business of LexisNexis.

6           Even if you are not familiar with information

7   technology, and it is not something that you do on a

8   day-to-day basis, I think four points make it easy to

9   reach the same conclusion as Mr. Sizer, that this is going

10  to be burdensome and expensive and not merely just a

11  flipping of a switch or putting something on a website

12  like with the PAMPERS litigation, or putting a little

13  disclosure on a box of PAMPERS.  This is something

14  substantially more significant.  In changing the solution,

15  meaning the Accurint that existed prior to the settlement,

16  the Accurint that's contemplated in the injunctive relief,

17  there are billions of fields of information that are going

18  to have to be sorted, analyzed, categorized, and then put

19  in the right place in terms of the system configuration.

20  Then somebody has to go through and figure out what

21  systems can touch which elements of data.  That's a fairly

22  complex architectural, technological design.  It is

23  significant.

24          Likewise, frankly, Your Honor, people are

25  resistant to change.  And that holds true not just for me,

1    but it holds true for my client's customers as well.  So

2    there's going to be a lot of resources that my client is

3    going to have to put at its disposal to get customers that

4    have been used to using Accurint for ten-plus years in a

5    certain way, with certain regulations, to accept a new

6    paradigm.  And that's what we are doing in this injunctive

7    relief, Your Honor.  We are implementing a new paradigm.

8    And it is our hope as well as plaintiffs' hope that people

9    recognize the value of that new paradigm.

10                I want to go back to the point of finality,

11   because I think it is important, Your Honor.  You know,

12   the objectors have taken elements of the settlement

13   agreement and they want to pull those elements out and

14   want to attack those elements in isolation.  They want to

15   say that the class action waiver, that's improper.  Or

16   they want to say that the release of the statutory damages

17   claim, that's improper.  I think for Your Honor in looking

18   at the JIFFY LUBE factors and looking at the fairness and

19   reasonableness of this settlement, you have to look at it

20   in its entirety.  Because when those two competing

21   interests in the mediation, when they converged and they

22   fought, the consequence of that was the settlement and it

23   was the entirety of the settlement, each and all of those

24   elements.

25                And the finality, again, it is this question of

1    whether Accurint is a consumer report or not.  So why is

2    the class action waiver important?  Why is the release of

3    statutory damages important?  And the reason being, Your

4    Honor, is that in those cases, the issue to be litigated

5    for willfulness, for example, in statutory damages, is

6    whether Accurint is a consumer report or not and was our

7    opinion objectively reasonable or not.  Precisely the

8    issue that's at the core of this case and that we want to

9    settle.  So without that element, we don't get finality,

10   either of those two elements.

11        Finally, there is some discussion about whether

12   this settlement is appropriate for (b)(2), and should the

13   objectors or other class members be permitted to opt out.

14   And then I think ancillary to that is the issue of notice.

15        I bring that up in the context of my

16   presentation because an opt-out right would be

17   inconsistent with this notion of finality, but more

18   importantly, it would gut the settlement in its entirety.

19   Why is that so?  The injunctive relief that's being

20   offered here is the complete reworking of a product.

21   Billions of fields that are being recoded, removed,

22   solutions that are being developed.  It cannot be

23   customized for a single consumer.  So to say it plainly,

24   Your Honor, if somebody were allowed to opt out, they

25   would get the benefit of the injunctive relief, of the

1    consideration negotiated by plaintiffs' counsel, and

2    defendant would get none of its consideration.  Because by

3    opting out, those class members could still bring the

4    suits, still challenge whether Accurint is a consumer

5    report or not, and yet they would still receive the

6    benefit of the injunctive relief.

7            So if you look at the case law, Your Honor, in

8    terms of why is a (b)(2) different from a (b)(3), and I

9    think this was referenced somewhat in Mr. Caddell's

10   presentation, it is these issues of homogeneity, of

11   indivisibility, of whether the damages are individualized,

12   whether the monetary claims are individualized.  And what

13   I would say to Your Honor is that the class is

14   homogeneous.  It is the individuals whose information is

15   in the database, the Accurint database.  They have the

16   rights to request a copy of the report.  If there is a

17   report issued on them in the future, they will have those

18   rights.  In terms of the statutory damages, those are not

19   individualized, and I think Mr. Caddell and our papers

20   speak to that at length and do a good job of it.

21           But I think more importantly, Your Honor, there

22   has to be some difference between (b)(2) and (b)(3).  And

23   I think Professor Mullenix goes at length in her

24   Declaration as well as in her papers to make that point.

25   And by allowing opt-out here, you have essentially

1   eliminated the distinction between (b)(2) and (b)(3).

2   Your Honor, this is a settlement, and I think that is the

3   proper focus of what you ought to look at, is what was

4   settled, what is the consideration, what is being included

5   in the settlement itself, as opposed to looking at the

6   complaint.  We filed a brief, there is a brief in the

7   record, Your Honor, that talks about why you ought to

8   focus on what's currently before the Court and not look at

9   the complaint.

10         But this settlement is about injunctive relief.

11   It is about a homogeneous class that has

12   non-individualized statutory damages that's being

13   released, and most importantly, Your Honor, the injunctive

14   relief is indivisible.  If you allowed people to opt out,

15   they would get the benefit of the settlement without

16   having to provide the finality and the consideration that

17   defendant negotiated as part of this settlement.

18         Unless there's any further questions, Your

19   Honor, thank you.

20         THE COURT:  All right, thank you very much.  All

21   right, we are going to stop here for lunch.  It is about

22   ten minutes after one.  If you could come back at 2:15, we

23   will get started with the afternoon session.

24         (Luncheon recess taken from 1:10 p.m. to 2:15

25   p.m.)

```
 1              THE COURT:  All right.
 2              MR. MOLSTER:  Good afternoon.  Are you ready for
 3   the Aaron objectors?
 4              THE COURT:  Absolutely.
 5              MR. MOLSTER:  I'd like to introduce Kimball
 6   Anderson, practicing at Winston & Strawn for 36 years,
 7   admitted pro hac vice by this Court on November 7th of
 8   2013.
 9              THE COURT:  Glad to have you.
10              MR. ANDERSON:  May it please the Court, and
11   thank you, Judge, for the privilege of appearing here pro
12   hac vice.  I appreciate it.
13              As Mr. Molster mentioned, I am a partner at
14   Winston & Strawn.  I've been practicing there continuously
15   since 1977.  And I am not a remora, Your Honor.  Contrary
16   to what you may have heard or read in the parties'
17   submissions, I am not a professional objector.  Although I
18   have appeared in dozens and dozens of class actions
19   throughout my practice, this is the first time that I have
20   ever stood up and objected to a class settlement.  And I
21   was persuaded to do it in this case, Your Honor, because
22   the proposed settlement before you reflects an
23   unprecedented and in our view unlawful use of Rule 23(b)
24   to discharge substantial and viable damage claims
25   belonging to parties who have not had their day in Court.
```

1    Someone had to speak up, and we chose to do so.

2            So what I plan to do today is address the

3    critical, and I think dispositive, issue of whether Rule

4    23(b) allows for the discharge or release of money damages

5    as the parties propose to do here.

6            I do not intend to dwell on the, or even respond

7    to the ad hominem attacks that Mr. Caddell made on

8    Mr. Schulman and Mr. Molster and I.  I just hope that

9    those kind of ad hominem attacks, the kind of

10   self-righteous finger wagging, have no proper place in

11   this courtroom.  We went through slide after slide where

12   Mr. Caddell labeled us inexperienced, ignorant, in one

13   case, unethical.  I'm not going to respond to that other

14   than to say I hope we have heard the last of it and I hope

15   it has no proper place in this Court.

16           What this Court should be focused on, I

17   respectfully suggest, is the threshold issue of whether

18   Federal Rule of Civil Procedure 23(b)(2) allows for the

19   disposition, the discharge, the release of money damage

20   claims without proper notice and without a right to opt

21   out.  And we respectfully suggest, and as I will explain

22   in more detail, that the rule does not allow it and one

23   need look no further than the WAL-MART STORES v. DUKES

24   case, which I will get to in a moment.

25           Rule 23(b)(2), Your Honor, is, of course, the

1    proper procedural vehicle for certifying class actions

2    where the relief sought consists solely of declaratory or

3    injunctive relief.  Rule 23(b) cannot under the

4    post-WAL-MART jurisprudence be used to certify and dispose

5    of class claims seeking viable money damage claims.  Those

6    claims are certifiable under Rule 23(b)(3).

7            Let's back up with the procedural history here.

8    There was a complaint filed on behalf of a wide-ranging

9    class, a class that includes my clients.  My clients are

10   over 20,000 real people throughout the United States.  We

11   have done a little bit of a count.  Over 250 of them live

12   in Virginia.  They have all signed engagement letters with

13   my firm.  Each is a victim of Fair Credit Reporting Act

14   misconduct.  We served them with a questionnaire.  We know

15   they are real people with real credit problems, real

16   grievances against the defendants, and with real damages,

17   and my clients, over 20,000 in number, is a very, very

18   substantial number.  And despite the disparaging remarks

19   that you heard from Mr. Caddell, I hope that you will

20   accept that these are real people with real injuries and

21   with real money damage claims, and their claims are being

22   thrown under the bus here.  So we have a complaint filed.

23   The complaint seeks money damages for Fair Credit

24   Reporting Act violations.

25           The complaint, the operative complaint before

1    Your Honor does not even seek injunctive relief.  Frankly,

2    that made sense to us, because the Fair Credit Reporting

3    Act does not mention injunctive relief as available

4    relief.  Accordingly, most courts have said that private

5    parties do not even have standing to seek injunctive

6    relief under the Fair Credit Reporting Act.  That issue

7    has not, of course, been resolved definitively by the

8    Supreme Court.  But the Supreme Court has said in other

9    statutory construction cases that the Court is not going

10   to infer standing or a private right of action unless

11   Congress has been pretty darn express about it.  Here,

12   Congress has not.  In any event, we had a complaint on

13   file, an operative complaint, that doesn't mention

14   injunctive relief.  It doesn't mention Rule 23(b) at all.

15   So so far, so good.

16           The case proceeds on, apparently, for several

17   years.  But now we have an impending train wreck.  And I

18   don't use that term lightly.  But the train wreck is that

19   my clients under this proposed settlement receive no money

20   damages; they are required to release their claims for

21   statutory and punitive damages, which the courts have

22   repeatedly recognized provide the only practical way of

23   obtaining money damages in these kind of cases.  Their

24   right to compensatory damages has been severely crippled

25   because the parties propose to strip from my clients the

1   right to assert their compensatory damage claims in a mass

2   action or in a class action.  And numerous district courts

3   have recognized, this kind of crippling of the right to

4   seek compensatory damages effectively deprives many, many

5   consumers of a practical remedy, because oftentimes the

6   amounts are de minimis and no one can afford to or will

7   file a lawsuit for compensatory damages.  Some people do.

8   But the courts have recognized that for the vast majority,

9   it is impractical to seek a claim for compensatory damages

10  without the right to seek it in a mass action or in a

11  class action.

12          The District Court in the District of Columbia

13  in that L'OREAL case just came down earlier in the month

14  of December of 2013.  That Court does a very good job of

15  reviewing the authorities and discussing why stripping

16  consumers of their right to pursue compensatory damages,

17  stripping them of the right to do so via a mass action or

18  a class action, is indefensible in these kinds of cases.

19  So in any event, now we have a complaint on file from my

20  clients that is seeking compensatory, statutory, and

21  punitive damages, and we have -- and it doesn't mention

22  injunctive relief, doesn't mention Rule 23(b), but now we

23  have a settlement that proposed to suddenly convert this

24  into a Rule 23(b) case and to strip my clients of all

25  effective monetary damage claims.

1    Analytically, I'd like to suggest to the Court a

2  two-step approach.  The first threshold issue is the one

3  I've mentioned.  Can this class in its present form even

4  be certified under Rule 23(b)(2)?  The second issue

5  analytically is, if it can be certified under Rule

6  23(b)(2), is the settlement fair.  You heard this morning

7  from counsel two, maybe three hours of argument on the

8  second issue, the fairness issue.  But I'd like to

9  respectfully suggest to the Court that you need not even

10  get to the fairness issue if you determine as a threshold

11  matter that this class cannot as a matter of law be

12  certified under Rule 23(b).  If this settlement, if this

13  Rule 23(b) settlement cannot be certified, then the Court

14  need not be concerned with whether the proposed injunction

15  is a sea change, revolutionary, or worthless.  You have

16  considerable views that have been expressed by

17  Mr. Schulman and by my clients that the injunctive relief

18  is virtually worthless.  But you don't need to decide

19  that.  That's a fairness issue.  You don't need to decide

20  that if you determine as a threshold matter that this

21  settlement cannot be certified as a matter of law under

22  Rule 23(b)(2).

23    Similarly, whether counsel is adequate, whether

24  they worked really hard with the finest mediators to

25  effect this settlement, all of that is irrelevant if the

1    threshold issue is not joined and met.  And these counsel

2    for parties, for the parties, in their three-hour

3    presentation, conspicuously avoided talking about this

4    threshold issue, and they conspicuously avoided grappling

5    with the United States Supreme Court's decision in

6    WAL-MART STORES v. DUKES.

7              So let's apply WAL-MART STORES v. DUKES to this

8    case.  To do that, we have to start with the complaint

9    allegations, Your Honor.  These parties would suggest that

10   this Court should start with the settlement agreement.

11   But that is a proposition that puts the cart before the

12   horse.  That is a proposition that has been rejected

13   unanimously by the courts.  The courts say that the

14   starting point in the analysis of whether to certify a

15   class is you look at the complaint allegations.  And here,

16   the complaint identifies three sub-classes of plaintiffs

17   that the plaintiffs say are certifiable under Rule

18   23(b)(3), not (b)(2).  They are here on (b)(2) now, but

19   the complaint identifies three sub-classes.  The first

20   sub-class is a class they call impermissible use class.

21   This is a class of persons.  It is a very large class,

22   apparently, for which the defendants allegedly sold credit

23   reports for an impermissible purpose.  And if those

24   allegations are proven, that is a violation of the Fair

25   Credit Reporting Act.

1          The second sub-class alleged in the complaint is

2     a class of persons who apparently requested and copied

3     their credit reports.  And the third class is a class of

4     people who apparently disputed the contents of their

5     credit reports.  I'm gathering that Ms. Nix is in the

6     third category.  In any event, it is only the second and

7     third category of people that this proposed settlement

8     gives any money to.  But again, getting back to that

9     complaint, no mention is made in rule -- in the complaint

10    or Rule 23(b), in no mention of injunctive relief, and I

11    think for good reason.  Now, for the first time, we hear

12    in open court Mr. Caddell say, "Well, gee, the focus of

13    the case all along has been injunctive relief."  I

14    question the credibility of that.  Because if injunctive

15    relief has been the focus of this case all along, why

16    hasn't it been in the operative pleadings since the

17    beginning of the case?  Why isn't it in the complaint?

18    Why hasn't there been motions for preliminary injunction

19    or even a permanent injunction?

20          And if injunctive relief has seriously been the

21    focus of this case since the inception, then that

22    seriously calls into question the adequacy of counsel who

23    failed to plead it and failed to pursue it in any

24    operative pleading in this Court.

25          I think what's going on here is rather

1    transparent.  I think that injunctive relief did not

2    become the focus of the plaintiffs' counsel until they

3    figured out that it could be a hook, a procedural hook for

4    discharging massive, viable money damage claims and for

5    getting $9 million in legal fees.  And, of course, that is

6    the hook that we now see these plaintiffs arguing.  And

7    I'm going to address that hook in more detail in a minute.

8    Because it has to deal with this entire notion that

9    statutory and punitive damages are now somehow incidental

10   to the injunctive relief that they have thrown into the

11   case at the last minute and, therefore can be discharged

12   without notice and without a right to opt out.

13           But first, a few more comments about the

14   complaint.  The operative pleading before the Court also

15   alleges that certain plaintiffs are in a post-ADAMS

16   sub-class and apparently a pre-ADAMS sub-class.  And as

17   you have heard today and as you know from the papers, the

18   reference to ADAMS is, of course, a reference to the

19   decision of the United States District Court for the

20   District of New Jersey in the ADAMS v. LEXISNEXIS case.

21   And the Court there entered a decision on May 12th, 2010.

22   And in that decision, the Court held that if the

23   plaintiffs' allegations were proven, that the defendants'

24   reports, which are apparently much the same reports that

25   are issued in this case, might very well be consumer

1    reports within the meaning of the Fair Credit Reporting

2    Act, and the New Jersey District Court further held that

3    plaintiff Adams had stated a viable claim for compensatory

4    and statutory damages under the Act.  Accordingly, the

5    District Court denied the defendants' motion, 12(b)(3)

6    motion for judgment on the pleadings.

7            I heard counsel before lunch break declaring

8    that ADAMS was a big win for them.  But I've reviewed the

9    docket.  They lost their motion to dismiss; they lost

10   their motion to reconsider.  If they had a slam dunk

11   motion for summary judgment, they sure didn't bring it.

12   And if these claims are so frivolous, and they want

13   finality for their notion that the accused credit reports

14   are not offensive under the Act, then why don't they just

15   move for summary judgment?  Why are they afraid of giving

16   my clients the right to opt out and to go their own way?

17   Why are they afraid of proper notice and due process that

18   should be available to them under Rule 23(b)(3), but is

19   being deprived from them because they are trying to fit

20   this round peg into this square hole under Rule 23(b)(2)?

21           So now we know what the complaint says.  The

22   complaint alleges multiple sub-classes, classes with

23   differing interests, differing rights.  I'll add one other

24   thing:  Their allegations are that different products were

25   sold to different people.  So our analysis starts with the

1  complaint, because it is ultimately the complaint that

2  drives the issue or determines the issue of whether a

3  class is certifiable under either Rule 23(b)(2) or (b)(3).

4  Again, it is not the settlement agreement.  If it were the

5  settlement agreement, Your Honor, then counsel,

6  experienced counsel, clever counsel, mischievous counsel,

7  could draft a settlement agreement that would avoid the

8  protections of Rule 23(b)(2).  Clever drafting.  We say,

9  "Oh, we just want an injunction and those damages we asked

10 for the last four years, the millions of dollars in

11 damages, the statutory, the punitive, the compensatory,

12 pay no mind, you are either being stripped of those, the

13 right to pursue those at all, or we will give you

14 compensatory damages, but you can only file those one at a

15 time, no class actions, no mass actions."

16        Well, I'm not going to cite a lot of

17 authorities, but the authorities for the proposition that

18 the complaint allegations drive the class certification

19 decision are set forth in our response, our brief.  It is

20 docket Number 110 at Pages 3 through 5.  Anyway.

21        So now we know what's been pled, what's been

22 alleged, what's been sought on behalf of my clients.  Now

23 let's look at WAL-MART v. DUKES to see whether or not my

24 clients' rights to money damages can be eviscerated under

25 Rule 23(b)(2).  And the good news, Judge, is that I don't

1    have 120 slides today, I don't have 80 slides.  I don't

2    even have eight.  I have one.  And I'd like to now put my

3    one slide up on the screen.  This is a quote from the

4    majority portion of the WAL-MART v. DUKES decision, 11

5    Supreme Court at page 2559.  In this decision, the Supreme

6    Court concludes, unequivocally, that Rule 23(b) is a

7    vehicle for certifying classes in complaints that seek

8    injunctive or declaratory relief.  Rule 23(b)(3) is a

9    procedural device for certifying money damage claims.

10   And, of course, Rule 23(b), because you are affecting

11   citizens' right to a jury trial, a right to due process,

12   Rule 23(b)(3) has a right to opt out.  It has a right to

13   notice.  And so the Supreme Court says unmistakably in

14   WAL-MART v. DUKES that you cannot discharge money damage

15   claims in a Rule 23(b)(2) certification.

16          And here, it is the quote that goes to the heart

17   of what the parties here are trying to do.  I'm just going

18   to read into the record the quote, although the Judge,

19   Your Honor, you can obviously read it yourself.  But the

20   Court said that "The mere predominance of a proper

21   injunctive claim does nothing to justify elimination of

22   Rule 23(b)(3)'s procedural protections:  It neither

23   establishes the superority of class adjudications over

24   individual adjudication nor cures the notice and opt-out

25   problems.  We fail to see why the rule should be read to

1    nullify those protections whenever a plaintiff class, at

2    its option, combines its monetary claims with a

3    request-even a predominating request-for an injunction."

4    End quote.

5           That ruling drives a stake in the heart of this

6    proposed settlement, because this proposed settlement at

7    bottom is seeking to nullify the procedural protections

8    that the rules and the Due Process Clause of the United

9    States Supreme Court afford absent class members who have

10   viable damage claims.  And the Court is saying here and

11   throughout the decision that you cannot, I don't say you,

12   I say the parties, no parties can nullify those

13   protections just by combining monetary claims with a

14   request for injunction, even a predominating request for

15   an injunction.

16          I'm not going to give you even that there is a

17   predominating request for injunction in this case, because

18   the complaint didn't ask for an injunction, and the vast

19   majority of courts have said that injunctive relief is not

20   even available under the Fair Credit Reporting Act.  But

21   assuming for purposes of argument that an injunctive

22   relief claim could be made, even one that is

23   predominating, it cannot vitiate Rule 23(b)(3)'s

24   protections over my clients, my absent clients' right to

25   money damages.

1          And here, I address why injunctive relief came

2    up so late in this case.  I think it is pretty

3    transparent.  I think the parties, these counsel, they

4    knew they could not vitiate money damage claims under Rule

5    23(b)(2) without notice and a right to opt out unless they

6    attempted to attach it to an injunction, and then say that

7    those damages are incidental to the injunction.  What's

8    the law on that?  I hope that Your Honor is already

9    familiar with WAL-MART v. DUKES, and I'm not going to

10   belabor it.  But WAL-MART v. DUKES does not decide but

11   casts grave doubt on the proposition that any kind of

12   damages, even incidental damages, can be discharged in a

13   Rule 23(b)(2) settlement or class certification.  Grave

14   doubt on that subject.  And since then, many of the lower

15   courts have recognized that grave doubt and refused to go

16   there.

17          But let's just assume for purposes of argument

18   today that the door has been left open a crack for

19   discharging what the courts have called incidental

20   damages.  Under no possible stretch of the imagination,

21   Your Honor, are my clients' damages incidental.  First of

22   all, they have to be incidental to something.  They have

23   to be incidental to a viable claim for injunctive or

24   declaratory relief.  There isn't a viable claim for

25   injunctive or declaratory relief even available under the

1    Act.  But even if there were, incidental damages are those

2    damages that require no individualized determination and

3    can be calculated with a computer.  Those are not my

4    words, those are Judge Posner's words in, I think, the

5    JOHNSON decision.

6              In other words, it is automatic.  Now let's look

7    analytically and candidly about whether my clients'

8    damages are individualized or automatic.  What does the

9    statute say?  The statute says that if we prove

10   willfulness or deliberate indifference by the defendants

11   to the laws, to the statutory requirements, that we are

12   entitled to statutory damages.  The statutory damage, Your

13   Honor, is individualized.  It can range from $100 in the

14   case of a minor violation to $1,000.  And each of those

15   ranges, from $100 to $1,000, Your Honor, applies for every

16   violation.  So what are the individualized determinations?

17   You don't have to look any further than the complaint to

18   see what they are.  There is a class alleged in the

19   complaint of pre-ADAMS consumers.  They are going to have,

20   presumably, at least if you believe the complaint, a more

21   difficult time proving knowledge.

22             There is a sub-class of post-ADAMS consumers.

23   They've got a better case for showing knowledge because at

24   least at the point of the ADAMS decision, you've got a

25   United States District Court decision saying that these

1    defendants' reports, as alleged, could very well be

2    consumer reports, and they might very well be entitled to

3    statutory damages.  So you've got a knowledge issue that's

4    going to have to be litigated on an individual basis.  You

5    don't have to look any further than the complaint, also,

6    to see that there are many different kinds of offending

7    products sold by the defendants.  Maybe some are clearer

8    cases of violations of the Act.  Maybe there are others

9    which are not.

10           And then you look at the magnitude of the money

11   at issue here.  You know, I don't know whether it is a

12   million or a billion, but I know that the amounts that are

13   being discharged under this proposed settlement are hardly

14   incidental.  They are hardly immaterial.  It is a lot of

15   money under any definition.  And under no definition can

16   the money damage claims at issue here be declared

17   incidental with a wave of the hand and with no authority

18   whatsoever.  And we review the cases in our briefs.  And I

19   have studied them carefully myself.  No court has ever

20   held that statutory and punitive damage claims under the

21   Fair Credit Reporting Act are incidental.  No court.  So

22   if you were to do that, you would be in uncharted waters.

23           It is simply not a formulaic, computer-driven

24   decision.  There is a good example, I think it is the

25   JOHNSON case out of the Seventh Circuit, where the Court

1    in dicta talks about what might be an incidental claim.

2    The incidental claim in that case involved a pension plan

3    where the parties were seeking declaratory relief to

4    construe the meaning of the pension plan.  Once the

5    meaning of the pension plan was construed, then there was

6    a formula in the pension plan.  You just pushed the

7    computer and the computer spit out a three percent annual

8    cost of living raise or a four percent annual cost of

9    living raise.  It was formulaic.  It was computer-driven.

10   That might be an example of incidental damages where

11   there's no individual determinations.  But here, get going

12   into the face of the complaint, the operative pleading,

13   everything about these claims screams individual

14   determinations:  What product did you buy?  When did you

15   buy it?  How many times was your report abused?  How many

16   impermissible uses were there?

17        And similarly, damages:  Everybody's

18   compensatory damages are going to be variable.  The

19   parties would say, "Well, Judge, we are not making them

20   waive their compensatory damages."  That is technically

21   true.  But they are crippling it, crippling it by

22   stripping a right to pursue compensatory damages,

23   stripping from that right to pursue compensatory damages,

24   stripping from a Seventh Amendment right to a jury trial

25   on compensatory damages, stripping it by taking away the

1    right to pursue those damages via a mass action or a class

2    action.  And that is an abomination, Your Honor.

3              Now, to be sure, there are cases that have

4    upheld class waivers.  But not in this context.  The cases

5    that have upheld class waivers are those where the parties

6    have freely and voluntarily entered into a contract, a

7    contract that is not unconscionable, a contract that does

8    not have oppressive terms, a contract where each side has

9    been represented, they are not widows and orphans, and

10   they have a fair opportunity to bargain their Rule 23

11   rights away.  But that's not the case here.  This isn't a

12   case of some consumer contract or commercial contract

13   where the parties have entered into a contract that waives

14   a class action right.  This is a case where the parties

15   are trying to cram that down the throats of my clients,

16   who are not a party to any such contract, who don't agree

17   to it, haven't consented to it.  And I'm not aware of any

18   court that has allowed that kind of cram-down in the

19   context of Rule 23(b)(2).

20             My clients have damage claims that are the

21   quintessential types of damage claims that can be

22   certified, if at all, under Rule 23(b) 23(b)(3).  And of

23   course, (b)(3) allows for notice and a right to opt out.

24   And as the DUKES case says, the Supreme Court said in

25   WAL-MART v. DUKES, "Plaintiffs who have individual

1    monetary claims must have, quote, the right to decide for

2    themselves whether to tie their fates to the class

3    representatives or go it alone.  A choice Rule 23(b) does

4    not ensure that they have, end quote."  And that quote can

5    be found at Page 2559 of the Supreme Court Reporter, 131

6    Supreme Court.  But here, the proposed settlement does

7    exactly that.  It strips my clients of their right to go

8    it alone.  They get no money.  Apparently the few class

9    members that requested and disputed the reports are going

10   to get a few hundred dollars each.

11          And that raises a very interesting issue:  Those

12   plaintiffs like Ms. Nix, who apparently complained about

13   their report, she is going to get some money, I think, but

14   anyway, that's the class, the people who requested and

15   disputed reports, they are going to get some money

16   apparently under (b)(3), but that class of Fair Credit

17   Reporting Act claims, Your Honor, their claims are no

18   better or no worse than my clients', who may not have

19   disputed their report.  The talisman of a Fair Credit

20   Reporting Act violation is not disputing your report.

21   Your entitlement to damages has nothing to do with whether

22   you dispute the report.  Your entitlement to damages, both

23   compensatory and statutory and punitive, under the statute

24   turns on whether the operative document is in fact a

25   consumer report and whether it was used for an

1   impermissible purpose.  Those are my clients, 20,000, that

2   are the victims of the impermissible use of consumer

3   reports, where the defendants created, allegedly created

4   consumer reports and sold them for improper purposes under

5   the Act.

6          My clients have exactly the same viable claims,

7   if there are Fair Credit Act claims that are viable at all

8   here.  The viability of my clients are just as good as the

9   class of people who are going to get some money under this

10  (b)(3) settlement, and they get it because apparently they

11  disputed their report or they requested a copy of it.  But

12  that, if you look at the Act, that doesn't make their

13  claims worth more.  And then you look at the Act and then

14  you have to ask why do my clients, who have equally viable

15  claims as those who have requested and disputed the

16  reports, get no money for their Federal Credit Reporting

17  Act claims?  Why do the plaintiffs' lawyers get up to $9

18  million when my clients get no money?  Why are my clients

19  stripped not only of the right to statutory damages, but

20  their right apparently to also challenge the future

21  conduct of the defendants, no matter how egregious?  And

22  why are my clients, whose claims are just as good as the

23  people who are getting money, stripped of their right to

24  pursue class relief for compensatory damages?

25          There are no good answers to these questions.

1    You can read the parties' briefs until the cows come home

2    and you will not see a good answer to these questions.

3    And that, frankly, is why for the first time in 36 years

4    of practice I'm standing up here and objecting, because

5    this proposed settlement should not and cannot survive

6    judicial scrutiny under DUKES and its progeny.

7              Mr. Caddell said, "Well, these lawyers over

8    here, they are just inexperienced.  They don't know

9    anything about the Fair Credit Reporting Act."  I'm not

10   going to dive in the gutter with him.  But I will point

11   out that I was involved in the TRANSUNION case that

12   Mr. Caddell mentioned.  And what Mr. Caddell forgot to

13   mention is that the District Court and ultimately the

14   Seventh Circuit flatly and unequivocally rejected

15   Mr. Caddell's efforts to throw a large portion of that

16   class in that case under the bus.  And at the end of the

17   day, the District Court and the Seventh Circuit sustained

18   everything that I was trying to do on behalf of my

19   clients, which is preserve their right to pursue

20   individual actions against the defendant, TRANSUNION in

21   that case.  Mr. Caddell forgot to mention that.  And I

22   wouldn't have brought it up except that he did.

23             With your permission, I'd like to spend a moment

24   on another important topic, which is whether the

25   settlement can be saved.  And I have a suggestion.  But

```
 1    first of all, let me say that the settlement is not saved

 2    by any of the machinations that have been attempted here,

 3    carving out releases for compensatory damages, but

 4    preventing them from being asserted by class action.  As I

 5    said, the L'OREAL case nixes that idea, as have other

 6    courts.

 7              But I think the settlement could be saved, Your

 8    Honor, simply by including an opt-out right in the Rule

 9    23(b) settlement.  Rule 23(b)(2), of course, does not

10    require notice or the right to opt out.  And here the

11    parties want to deny that.  But the Court can condition

12    approval of the (b)(2) settlement on proper notice and the

13    right to opt out.  There is certainly substantial judicial

14    precedent for doing so.  Two cases that have approved

15    providing a notice and right to opt out in a (b)(2)

16    settlement are the JEFFERSON v. INGERSOLL INTERNATIONAL

17    case, Seventh Circuit decision, 195 F.3d 894.  There is

18    another decision out of the Seventh Circuit called

19    WILLIAMS v. BURLINGTON NORTHERN, 832 F.2d 100.  Those

20    decisions review the jurisprudence in this area and find

21    that courts can save these kinds of settlements by

22    allowing a right of opt-out for a proposed (b)(2)

23    settlement.  You basically convert it to a (b)(3)

24    settlement that affords the important procedural and due

25    process rights that have been sustained unequivocally by
```

1    the United States Supreme Court in the WAL-MART v. DUKES

2    case.

3              So I think the Court has discretion to do that.

4    And you would be on solid ground.  I respectfully suggest,

5    however, that the Court has no discretion whatsoever to

6    certify a Rule 23(b)(2) class as presented.  And again,

7    this is not me speaking.  There are many cases, but a good

8    example is the BOLIN v. SEARS ROEBUCK decision out of the

9    Fifth Circuit, 231 F.3d 970.  There, the Court said that

10   the unavailability of injunctive relief under a statute

11   would automatically make (b)(2) certification an abuse of

12   discretion.

13             Here, I think we have discussed ad nauseam that

14   injunctive relief isn't available.  It wasn't even pled.

15   We have seen yet another interesting procedural maneuver

16   this morning at about 2:30 a.m.  Mr. Caddell and his

17   cohorts filed an amended complaint.  And the amended

18   complaint now for the first time seeks to add a claim for

19   injunctive relief.  And I haven't frankly had much time to

20   study it because I was not up at 2:30 a.m. when it

21   apparently came in on the electronic file.  But I did try

22   to look at it briefly before we came to Court.  And they

23   say that they are filing it as an exercise of caution.

24   But it seems to me to be more an act of desperation.  They

25   are not asking for injunctive relief based on anything in

1    the Fair Credit Reporting Act.  Instead, they appear to be

2    relying on some inherent judicial equitable powers, which

3    seems to me to be a huge stretch.  But it raises this

4    last-minute amendment which, by the way, we object to.

5           It raises, just opens a Pandora's Box of other

6    problems.  Because now they want to file, apparently with

7    the consent of the defendants, an amended complaint.

8    Their amended complaint now seeks injunctive relief for

9    the first time.  It changes completely the definition of

10   the classes that were pled in the original complaint.  And

11   it continues to seek money damages, which are being, for

12   my clients, are being thrown completely under the bus.

13          But here is the host of other problems that this

14   creates.  Notice has already gone out to the class.  No

15   members of the class have received notice of a settlement

16   of the terms of the amended complaint.  They met with the

17   amended classes, the amended claims for relief, the

18   rejiggering of the whole operative pleadings to try to fit

19   this round peg or square peg into a round hole after

20   notice has gone out, after the defendants' and the

21   plaintiffs' counsel have joined hands and are singing

22   Kumbaya.  I have never heard or never seen amending a

23   complaint after notice has gone out to the class.  The

24   class would have no idea that there is a whole new

25   operative pleading upon which their rights are being

1    vitiated.

2         It is just unimaginable and it raises a whole

3    host of new notice problems.  And it just seems to me to

4    be what I said earlier, a transparent attempt to fit this

5    round peg into a square hole.  They are just transparently

6    trying to erect some kind of injunctive relief claim so

7    that they can argue, incorrectly, that the millions, the

8    tens of millions of dollars of damages that they are

9    wiping out, you know, without notice, without a right to

10   opt out, without a Seventh Amendment, they are going to

11   wipe it out under the argument that now they are suddenly

12   incidental to this last-minute claim for injunctive

13   relief, that no class member has ever seen in any

14   operative complaint.  It just has a smell to it, Your

15   Honor.  And I hope that the Court will see it for what it

16   is.

17        So I think you can save this by providing for a

18   right to opt out.  And I would ask this question,

19   particularly to the defendants, whose counsel stood up

20   here and said, "Oh, our claim, you know, that there has

21   been no violation of the Fair Credit Reporting Act is rock

22   solid."  It is summary judgment stuff.  "Boy, and if we

23   hadn't settled this case after four years we were going to

24   file a motion for summary judgment.  If we had not lost

25   our motion on the pleadings in the ADAMS case, and if we

```
 1    had not lost our motion for reconsideration, we would have
 2    been right there with a slam dunk summary judgment
 3    motion."  Well, I say have at it.  If their claims are so
 4    conclusive, file a Rule 56 motion.  But do not come into
 5    Court and file one, or ask that one be granted effectively
 6    against my clients without my clients' opportunity to even
 7    brief the issue, to brief whether there are contested
 8    issues of fact as to whether there are violations of the
 9    Act here.  Do not come in here and ask for judgment as a
10    matter of law without affording my clients their Seventh
11    Amendment right to a jury trial.  If you've got a summary
12    judgment claim, bring it on.  And if it is ironclad as you
13    say, why are we releasing it?  Why are you demanding a
14    release?  Why are you so afraid of the procedural
15    protections of Rule 23(b)(3)?  If these claims are
16    frivolous, why be afraid?  Why try a cram-down that
17    eviscerates my clients' rights.
18            Sure they want finality, but the way you get
19    finality is that you go to trial, you get a judgment, you
20    file Rule 56 motion for summary judgment, or you properly
21    follow Rule 23.  And there, you can get finality if you
22    give people the right to opt out.  And I suspect if they
23    give people the right to opt out, they are going to get
24    massive finality.  There's going to be some who are going
25    to opt out to go their own way, as the Supreme Court said.
```

1    But many will not.  And they are going to get some

2    finality that way.  But you don't get finality by running

3    roughshod over the procedural protections in Rule

4    23(b)(3).  You don't get finality by trying to jam a

5    release of tens of millions if not hundreds of millions of

6    dollars of statutory and monetary damage claims into a

7    Rule 23(b)(2) certification.  That's not how you get

8    finality.  That's how you get reversible error.

9              I think I've said enough at this point, Your

10   Honor.  And perhaps I'll just leave you with perhaps a bad

11   analogy to Star Trek, that famous saying about "Going

12   where no man has gone before."  These parties are

13   attempting to lead this Court to a place where no Court

14   has gone before, at least post-DUKES and WAL-MART.  But

15   this should not be an uncharted space exploration.  The

16   chart here has been drawn quite clearly by the United

17   States Supreme Court, and so I'm going to end with where I

18   started, with this quote from WAL-MART v. DUKES.  The

19   Court said:  "We fail to see why the protections of the

20   rule should be read to nullify those protections whenever

21   a plaintiff class, at its option, combines its monetary

22   claims with a request-even a predominating request-for an

23   injunction."  End quote.  That is exactly what these

24   plaintiffs have done.  They have combined their monetary

25   claim with a last-minute request for an injunction, and

1    then they have thrown the monetary claim under the bus.

2    And that is illegal under Rule 23(b), Your Honor.  Thank

3    you for your attention.

4              THE COURT:  All right.  Thank you.

5              MR. SCHULMAN:  Good afternoon, Your Honor.  Adam

6    Schulman on behalf of myself.  Preliminarily, I wanted to

7    seek the Court's forgiveness for the fact that my

8    supplemental fee objection was docketed one day after the

9    November 26th deadline set by the Scheduling Order.  The

10   plaintiffs' papers were filed late on the evening of the

11   22nd, then I spent the following Saturday and Sunday

12   digesting the filings and writing my response.  But as a

13   non-ECF filer, I had to have the objection mailed via

14   FedEx overnight to the Court on the 25th, which I did,

15   intending for it to be received and docketed on the 26th.

16             MR. BENNETT:  We do not object, Your Honor.

17             MR. SCHULMAN:  Okay.

18             THE COURT:  All right.

19             MR. SCHULMAN:  Well, with that, that's dispensed

20   of.  But as a member of the proposed (b)(2) class, I have

21   objected to the certification of the class, to the terms

22   of the settlement itself, to the class notice, to the

23   request for attorneys' fees, and to some of the expert

24   testimony submitted by the plaintiffs.  To these I would

25   like to now add objection to the filing of the amended

1   complaint late last night for many of the reasons stated

2   by Mr. Anderson, most notably the lack of notice to class

3   members, any notice whatsoever, let alone reasonable

4   notice required by Rule 23(e).  And as well, an objection

5   to the Declarations filed in support of the fee motion

6   late last night and the reply in support of the fee motion

7   as violations of Rule 23(h), which also requires notice to

8   the class of all the motion papers.  And I would request

9   that the Court strike or at the very least disregard all

10  those papers.

11        Substantively, if the Court has any pressing

12  areas it would like me to address, I would be glad to

13  begin there.  If not, what I would like to do is address

14  both the plaintiffs' and defendants' responses to my

15  objections.  And please feel welcome to divert me at any

16  time to any issues or questions the Court may have.

17        Starting with the certification issue, the

18  settlement class as proposed violates both 23(a)(4) and

19  23(b)(2).  As could be expected, the plaintiffs maintain

20  that a (b)(2) certification is proper because of what the

21  settlement obtains, that is, unitary injunctive relief.

22  They attempt to reframe the WAL-MART v. DUKES decision as

23  being concerned with obtaining indivisible relief.  That

24  was one concern of WAL-MART v. DUKES, but it was not the

25  only concern.  In reality, while it is certainly one

 1     necessary pre-condition of a (b)(2) settlement,

 2     certification, it is far from the only pre-condition.

 3     WAL-MART indicated dismay that, quote, about half the

 4     members of the class approved by the Ninth Circuit had no

 5     claim for injunctive or declaratory relief at all.  That's

 6     131 Supreme Court at 2560.  Here, of course, because of

 7     the FCRA and its terms, no class members have claims for

 8     final injunctive relief, much less half the class that was

 9     reversed in WAL-MART.  WAL-MART also clearly expressed

10     concerns about preclusion of absent class members' damage

11     claims, quote, by litigation that they had no power to

12     hold themselves apart from, end quote.  And that's 131

13     Supreme Court at 2559.

14            What is more, the plaintiffs -- if the

15     plaintiffs are correct that all that is necessary is

16     obtaining injunctive relief, then the Second Circuit was

17     wrong in HECHT, the Seventh Circuit was wrong in CRAWFORD,

18     the Sixth Circuit was wrong in TELECTRONICS PACING SYSTEM,

19     and the Fifth Circuit was wrong in BOLIN.  But each of

20     those decisions was exactly correct.  (b)(2) certification

21     requires more than just obtaining injunctive relief.  It

22     requires a cause of action that allows injunctive relief,

23     a complaint that seeks injunctive relief, and most

24     importantly, a waiver that only releases claims for

25     injunctive relief.

1    Most recently, the District of D.C. in a

2    thoughtful opinion rejected a (b)(2) certification in the

3    RICHARDSON v. L'OREAL settlement last month.  RICHARDSON

4    involved allegations that L'OREAL's labeling on hair

5    products deceived consumers by asserting that the products

6    were sold exclusively in salons, while they were in fact

7    also sold in retail mass market stores.  The parties

8    attempted to settle the case for the defendants' agreement

9    to remove the offending representations, prototypical

10   prospective injunctive relief, and might I add, relief

11   that satisfied the totality of what the complaint was

12   asking for.  In fact, full relief is what they were

13   claiming in that case.

14   Judge Bates refused to certify the class under

15   (b)(2) for two reasons, each equally applicable here.

16   First, Judge Bates found that the settlement's release,

17   which released no more than absent class members' right to

18   bring class actions for damages, was inconsistent with

19   (b)(2) and Supreme Court jurisprudence.  Here, of course,

20   the release is even broader than that.  It releases not

21   only the right to bring class actions for damages, but

22   also, the right to bring willful non-compliance claims in

23   an individual capacity.

24   Second:  Judge Bates rejected the (b)(2)

25   certification because there was an intra-class conflict

1    between those who purchased the L'Oreal products in salons

2    and those who purchased the products in big box retail

3    stores.  This mirrors the division within the (b)(2) class

4    in this settlement.  Those members of the (b)(2) class who

5    constituted the initial impermissible use class have much

6    stronger claims than those whose information is possessed

7    by LexisNexis but about whom no consumer report has ever

8    been issued.  The case law is pretty clear on that.

9            As the RICHARDSON Court found, where class

10   members possess claims of divergent strength, just as the

11   class members in this settlement do, that eliminates the

12   necessary cohesiveness of a (b)(2) class.  And further,

13   for the reasons given in my objection, it also eliminates

14   the adequacy of representation required by Rule 23(a)(4).

15           Mr. Caddell now says there is no intra-class

16   conflict because the FCRA allows some rights to all class

17   members.  But the intra-class conflict is found not in the

18   fact that the FCRA doesn't allow any rights to all class

19   members, but rather, in the fact that to bring certain

20   claims for damages under the FCRA, a report has to have

21   been issued.

22           And yet, there are more reasons than just the

23   two in L'OREAL to reject the (b)(2) settlement here.

24           THE COURT:  Could you slow down a little?  You

25   are going to kill my court reporter.  Slow it down a

little bit for me.

MR. SCHULMAN:  There are more reasons than just the two in L'OREAL to reject the (b)(2) settlement here. Claims under the FCRA do not permit injunctive relief. That is enough to demonstrate the certification is improper, as Mr. Anderson referred to.  The BOLIN case out the Fifth Circuit says specifically, stands specifically for that proposition; that if relief is not available under statute, it cannot be -- if injunctive relief is not available under statute the class cannot be certified as (b)(2).  That was also a settled, Your Honor, not a litigated class.  That was an attempted settlement class certification.

But the plaintiffs say that doesn't matter, because they are permitted to settle for relief outside that available under the FCRA.  Under the CLEVELAND FIREFIGHTERS case, it is true as a general matter that the parties may obtain relief outside that available under statute.  But that case has no bearing on whether (b)(2) certification is appropriate.  Rather, the case law firmly holds that FCRA cases may not be certified under (b)(2), and this is not altered in the context of a settlement, where the requirements of certification demand undiluted, even heightened attention.  That's from the Supreme Court's opinion in AMCHEM.

1    The plaintiffs seek to have this Court reimpose

2  exactly what WAL-MART repudiated.  Namely, the subjective

3  standard on whether the named plaintiffs and class counsel

4  think that injunctive relief is important.  That is not

5  the law any longer.  If WAL-MART did one thing, it was to

6  reject that very standard for (b)(2) certification.

7    I think I should mention, I wasn't planning to,

8  but since it came up, I would like to mention why

9  Professor Mullenix in her Declaration is incorrect, even

10  though I do think that that testimony is impermissible as

11  opining on a legal issue.  I would like to address it on

12  its merits.  When she says that this case cannot be a

13  (b)(2) sell-out because there is a (b)(3) settlement on

14  the side, the fact that she is overlooking is that the

15  (b)(3) settlement class is only 31,000 class members,

16  whereas the (b)(2) class is 200 million class members.  Or

17  100 million.  There has been a bit of wishy-washy in the

18  papers about it, but I think 200 million may be the right

19  figure, but at least 100 million.  So it is very little

20  solace for the 99 million plus that get no money damages

21  and it is difficult to see how it can't be a sell-out just

22  because there is a small segment of (b)(3) class on the

23  side that's actually getting money, valuable money

24  damages.

25    But I would say that I think that the proposed

1    (b)(2) settlement appears to be an attempt, a legally

2    futile one at that, to avoid the individual notice

3    requirements to class members guaranteed by the

4    Constitution's Due Process Clause.  Despite the

5    plaintiffs' contentions, however, the standard for notice

6    of a class action settlement is not that anything more

7    than a mere gesture suffices.  Instead, the seminal

8    MULLANE Supreme Court decision sets the standard, and

9    specifically states that where the names and Post Office

10   addresses of those affected by a proceeding are at hand,

11   the reasons disappear for resort to means less likely than

12   the mails to apprise them of its pendency.  That was

13   before (b)(3) came into existence.  It was before 1966 in

14   the modern class action era.  But this is the standard for

15   settlement notice, Your Honor.  And it applies in this

16   case.  The Constitution didn't change when (b)(3) and

17   (b)(2) were enacted in 1966.  It applies to (b)(2) and

18   (b)(3) suits alike.

19            There is no dispute -- and it is sort of ironic

20   that Mr. Caddell just stood up and argued that the notice

21   is the most important right under the FCRA, given that

22   they managed to deprive millions upon millions of class

23   members of due notice in this settlement.  There is no

24   dispute that the defendant possesses class members'

25   contact information.  After all, alleged misuse of that

1   information is what this very case is about.  Approving

2   any settlement without direct notice in this case would

3   violate the Constitution.

4           Now I'd like to discuss the fairness of the

5   settlement terms for a moment.  There are two over-arching

6   components of the (b)(2) settlement.  There is a cash

7   component of just over $5.5 million.  As we know from the

8   DRY MAX PAMPERS decision and other cases cited in my

9   objection, this is a real component of the settlement,

10  even though it was normally segregated from class relief,

11  even though it was negotiated after class relief.  Because

12  the class settlement had not been approved at the time.  A

13  hundred percent of this cash component is going to class

14  counsel and the named representatives.  Then there is the

15  injunctive component.  Lexis will agree that certain

16  programs are covered by the FCRA and the class will agree

17  that other practices and products are exempt from FCRA

18  liability for seven years.  Plaintiffs submitted the

19  Declarations of Professor Richards where he candidly

20  acknowledges that one cannot precisely value the relief,

21  but still maintains that the relief is worth at least 160

22  million, and likely upwards of billions of dollars if

23  measured by the amount of statutory damages saved.

24          In their response papers, plaintiffs suggest a

25  more modest value of $23 million if just two percent of a

1    hundred-million-person class requests the free report.

2    Given that claims rates around the country in class

3    settlements generally don't exceed even half of one

4    percent, the two percent suggested rate is very, very

5    generous, especially in light of the fact that everyone

6    knows they can get annual free credit reports from other

7    credit rating agencies.

8            A 2 million person claimed estimate also flies

9    in the face of the fact that there have been less than

10   200,000 visits to the (b)(2) settlement website according

11   to the Settlement Administrator's Declaration.  Moreover,

12   valuing the free report at a hypothetical $23 million, or

13   even worse, at $160 million, would violate the Class

14   Action Fairness Act, codified at 28 U.S.C. Section 1712.

15   Section 1712 forbids courts from valuing coupons at any

16   amount hypothetically estimated.  Instead, it requires

17   courts to value the relief based on the value actually

18   obtained by class members.  The legislative history of

19   1712 and case law demonstrate how that statute applies

20   equally to coupons for a free product like a free credit

21   report as well as coupons that only provide for a

22   discount.  So I would now like to register my objection to

23   the parties' invitation to violate the Class Action

24   Fairness Act.

25           More importantly, though, all these numbers that

1    the plaintiffs and their experts throw out for the

2    supposed value of the injunctive relief, whether it is 23

3    million, 160 million, 2.2 billion, they all only consider

4    half of the equation.  They ignore entirely the future

5    concessions that the settlement makes on behalf of

6    non-consenting absent class members.  The settlement

7    waives class members' rights to assert FCRA liability for

8    both Collect Once, Use Twice data practices, and other

9    post-settlement products for all claims accruing before

10   2020.  The settlement effectuates an agreement that

11   Contact & Locate products, which haven't been developed

12   yet, are not consumer reports under the FCRA.  Whatever

13   benefit exists on the plus side of the equation is offset

14   by these concessions that the class is giving up, which

15   the parties seek to have the Court memorialize through the

16   injunctive relief order and the methodology asserted by

17   all the experts and the plaintiffs in their evaluations,

18   for them not to even consider that half of the equation

19   makes that methodology facially unreliable.

20           At base and for good reason, the law doesn't

21   authorize class action attorneys to impose these future

22   costs on absent class members, especially on class members

23   who are not even permitted to opt out of the agreement.

24   The law doesn't allow parties to prospectively overwrite

25   the statutory text of the FCRA and bind absent class

1   members to the parties' conception of what the legislative

2   scheme should look like.  But it is even worse to pretend

3   that when valuing the settlement, that these costs and

4   concessions are not part of the arrangement when they

5   clearly are.  That, Your Honor, is why you see two

6   attorneys up here for LexisNexis arguing strenuously in

7   favor of the settlement, because on average, in fact, it

8   is possible that it could be a negative value settlement

9   for class members and a positive value settlement for the

10  defendants.

11          We can't know how great these costs will be, the

12  ones imposed on class members.  Because no one knows what

13  products will be rolled out by Lexis in five years, and

14  whether they will be compliant with the FCRA or not.  If

15  Lexis is released from large-scale liability based on

16  future conduct, it is entirely possible that this is a

17  negative value settlement for the (b)(2) class members.

18  Such settlements are also prohibited by the Class Action

19  Fairness Act, this time by Section 1713.

20          Another fundamental problem with attributing

21  this vast value to the settlement agreement is that

22  fundamentally, LexisNexis is in the driver's seat.

23  Because of the nature of private enterprise, Lexis

24  dictates its future course of conduct.  There is nothing

25  unreasonable about that.  But because of that, prospective

1    agreements like this are tantamount to a game of chess,

2    where the defendant is always playing as white.  A class

3    member who believes Lexis is failing to satisfy its

4    obligations cannot go straight to Court but is subject to

5    the limited remedial mechanisms allowed by the settlement

6    agreement.  A fine-toothed reading of the settlement

7    agreement reveals loopholes that may allow Lexis to escape

8    having to provide any benefit to absent class members.  As

9    just one example here, Settlement Section 4.34 allows

10   Lexis to walk away from its injunctive obligation under a

11   number of conditions, including quote/unquote inconsistent

12   judicial ruling.  Does that mean that if a court later

13   deems a program akin to the collections decisioning

14   program, to fall outside of the FCRA coverage, then Lexis

15   can walk away from the agreement entirely?  It is not

16   clear.  But what is clear is that the class isn't allowed

17   to reciprocally walk away under such circumstances.

18   What's clear is that Lexis is in the driver's seat.

19          To put this another way, the terms of the

20   prospective agreement are way overreaching by releasing

21   future conduct class members' claims that the parties have

22   no right to release, and yet, at the same time, the

23   agreement is not detailed enough by permitting wiggle room

24   that could prevent the class from attaining the benefit of

25   the bargain.  I don't say this to impugn the competence of

1    the attorneys for the settling parties in ironing out the

2    particular terms.  Rather, I mean to say that the error

3    was even in trying to come to this type of future-looking

4    agreement in the first place.  This is not the type of

5    agreement fit for settlement of a class action lawsuit

6    pending before an Article III tribunal.  It is more like a

7    consent decree that the FCC or FTC might reach in an

8    enforcement action.

9            One case I didn't cite on this point in my

10   papers, but that I encourage the Court to look at, is

11   Judge Chin's decision in AUTHORS' GUILD v. GOOGLE, INC.,

12   where he rejected a similar settlement with respect to the

13   Google Books copyright lawsuit up in New York.  That 2011

14   decision is reported at 770 F.Supp.2d 666.

15           Fundamentally, there is a misconception about

16   the role of class counsel that is present here.  Class

17   counsel are fiduciaries and trustees for absent class

18   members.  Class counsel are not mediators of a prospective

19   business agreement between absent class members and the

20   defendant, nor are they, to use the terms of Mr. Raether,

21   authorized to establish a new paradigm for which they

22   entitle themselves to a $5.5 million brokerage fee.  In a

23   class settlement, parties often stress the importance of

24   compromise, and there is definitely something to that

25   notion.  But a valid compromise is arriving at some

1    settlement between the amount sought in the complaint,

2    here, tens or hundreds of billions of dollars in damages,

3    and the amount that would be received if the case was

4    wholly unsuccessful, zero dollars.  Never, never, ever

5    should the class be put at risk of being worse off than

6    they would be if the suit was never filed.

7            Yet the concessions in the settlement agreement,

8    most namely the waiver of future accruing claims, risks

9    just this, and the law must not permit it.

10           And I would like to address -- Mr. Caddell asked

11   what I would say to Ms. Nix, somebody who wanted

12   injunctive relief as the remedy.  Here is what I would

13   tell her.  I would say that under the statute, the proper

14   remedy is monetary relief.  And if the claims are viable

15   and can be pursued successfully, then the defendants will

16   change their practices of their own volition to avoid

17   having to pay future damages in the future.  That's how

18   the Article III process should work.

19           Thank you, unless you have further questions.

20           THE COURT:  Thank you.

21           MR. CADDELL:  May we have a brief rebuttal?

22           THE COURT:  I'm just making sure everybody over

23   here is satisfied.  You have said as much as you want to

24   say?  Okay.

25           MR. CADDELL:  Mr. Bennett had a couple comments

1    and then I'll have a couple.

2              THE COURT:  Sure.

3              MR. BENNETT:  Good afternoon, Your Honor.  We do

4    have some bit to say as to our own WAL-MART v. DUKES text

5    and the arguments regarding the use of Rule 23(b)(2).  But

6    I'm standing in place of my more senior co-counsel to

7    respond more specifically to the implication, because

8    there wasn't any evidence, it is just simply implication

9    or insinuation, I think that counsel's words were that he

10   questions the credibility of our claim that this case was

11   about injunctive relief all along.

12             Now, we are in the Eastern District of Virginia,

13   where I for 19 years have litigated.  And I'm respectful

14   in all courts, but in this one more particularly as to the

15   courtesy as to opponents that are opposite one another.

16   But this Court has had me practice, has seen me practice.

17   And the suggestion that this group of attorneys,

18   Mr. Anthony, who is my most common adversary, and the

19   all-star cast of Fair Credit Reporting Act from our

20   perspective, may be villains, but defense opponents, that

21   we would have represented on our law license, made

22   statements to the Court as to the concocting the idea that

23   injunctive relief was an afterthought, I think, is itself

24   what defies credibility.

25             We presented both in briefing and in the slides

1    a discussion at a high level as to we were discussing

2    injunctive relief.  Professor Miller examined the time,

3    the time records, the pleadings, the work.  You have

4    evidence that is already there and you have no evidence to

5    the contrary.  But let me tell you, if the Court please,

6    may I respectfully explain what it meant to focus on

7    injunctive relief.  The first meeting was in my office in

8    2009.  Ms. Nash, who is an in-house litigation attorney

9    for LexisNexis, and then the General Counsel, flew to our

10   princely offices in little Newport News, Virginia, where

11   we had a PowerPoint presentation, and in my office, while

12   I was similarly technologically inept, we looked at a

13   laptop.  That was almost entirely on practice changes.

14          The next meeting in person was in Philadelphia,

15   Mr. Francis's office.  Mr. McCabe came in.  We wore

16   bluejeans and we had danishes and the like.  That was

17   entirely on practice changes.  We then followed up --

18          MR. ANDERSON:  I apologize for interrupting.

19   None of this is of record and Mr. Bennett is making

20   himself a fact witness in this case and I have to object.

21   It is with respect.  But none of this is in the record.

22          THE COURT:  The objection is overruled.  You

23   know, you attacked the credibility of somebody.  They get

24   an opportunity to respond.  That's all this is.  I didn't

25   give it much weight to begin with, Mr. Bennett, if you

1 want to save your breath.  But if somebody says something

2 that personal in nature about another lawyer, he doubted

3 his credibility when he told me and they told me they were

4 discussing it, you can make that point without that kind

5 of attack.  Your point is a strong one.  I'm not saying

6 anything about the point that you made.  But the fact that

7 they say this was a discussion that was predominant, I

8 have no reason to doubt that.  It is not going to move the

9 case one way or another.  So your objection is overruled.

10    MR. ANDERSON:  My point is, it isn't in the

11 pleadings.

12    THE COURT:  I understand your point.  I heard

13 you.

14    MR. ANDERSON:  Okay.

15    THE COURT:  Just have a seat.

16    MR. BENNETT:  Judge, now, the second and only

17 other issue is in the assessment, the continued

18 discussion, we challenged the defendant.  It wasn't

19 pleasant to hear other lawyers say to lawyers across the

20 courtroom, "You don't know anything about the Fair Credit

21 Reporting Act.  You have not litigated, you have not

22 filed, you have not tried these," and I expect that

23 everyone in a context like this would challenge one

24 another.  But that is an unrebutted truth.  And you know

25 it, because you aren't considering a competing class

1    action, like they often exist.  Objectors, it is unusual

2    in my case, as the Court is aware, but you are not

3    considering the argument that we are going to collapse or

4    release the claims of all these individuals on whose

5    behalf Watts Guerra, respectfully, Judge, who isn't even

6    here, or its hired counsel, have filed.  And you know that

7    the strategy is not to litigate or prosecute them, because

8    you hear at the end of the argument what you would have

9    always heard from professional objectors.  They don't want

10   to litigate separate cases.  They want to keep the case

11   that we, that others, that I have been working on, and

12   find a way to profit from it.  And that's okay.  That's

13   the system, that's the rules.

14            But the suggestion that we have an opportunity

15   for you, Judge, could be translated as, "Your Honor, here

16   is a solution.  Why don't you put this on hold and force

17   the parties to come speak with us to negotiate a back

18   deal."  And we have not done that.

19            Judge, we have been litigating this, the Court

20   is aware we have been litigating it.  The credibility, I

21   appreciate, is I think apparent from the papers, from the

22   record evidence.  And Mr. Caddell will answer questions

23   regarding the WAL-MART and the incidental nature of the

24   relief.

25            THE COURT:  Thank you.

1          MR. CADDELL:  My co-counsel have passed me, I

2    can promise you, more notes than I intend to address.

3    I'll be brief.

4          First, I was struck by Mr. Anderson's claim

5    that, quote, we conspicuously avoided talking about

6    WAL-MART STORES.  In fact, if the Court recalls, and you

7    can look at slide, I think it is Slide 61 in our

8    presentation, we actually quote and reference specifically

9    WAL-MART STORES and that case, because in fact the Supreme

10   Court expressly said that they were not deciding that a

11   (b)(2) class, which released incidental damages, was

12   inappropriate.  And I specifically pointed to the L'OREAL

13   Court, and we had a slide where the L'OREAL Court analyzed

14   Wal-Mart and said, "I'm not saying that you can't do this,

15   but they need to be incidental."  And then of course we

16   showed the slide where the L'OREAL Court said, "Incidental

17   damages are those that accrue to the class as a whole,

18   that can be --" and that WAL-MART quote is, in WAL-MART,

19   they said it could be done by a computer program,

20   something of that nature.  That's precisely the kind of

21   damages that Mr. Anderson was referring to or describing

22   when he talks about his clients' claims.

23          That was another interesting thing he said.  He

24   said, "We have real damages against the defendant, real

25   money damage claims."  What are they?  He never told you.

1    Ms. Nix has real damage claims.  Ms. Nix was harassed

2    sixteen times by debt collectors over five years for debts

3    belonging to another person, and she had no recourse.

4    Those are real money damages.  That's something that could

5    be pursued.  And that's not a statutory damages claim

6    limited to $100, to a thousand dollars, or something of

7    that nature.

8            The claims that Mr. Anderson is talking about

9    all depend on the issue of willfulness.  I've sat here for

10   an hour and twenty minutes, and both Mr. Anderson and

11   Mr. Schulman, and I listened very carefully, and I never

12   once heard either one of them tell you how they would

13   overcome a willfulness defense.  They didn't.  They ignore

14   it.  They blow past it.  They dismiss it.  But the reality

15   is, the Supreme Court in the SAFECO case made it very

16   clear, that is a formidable defense.  And as Mr. McCabe

17   pointed out, these circumstances make it a very formidable

18   defense.

19           Then I think the last point -- oh, couple other

20   points.  Most of the cases, Your Honor, that were cited to

21   you, in fact, the JEFFERSON v. INGERSOLL and the

22   BURLINGTON NORTHERN case that Mr. Anderson cited to you,

23   both Seventh Circuit cases where Mr. Anderson is from, of

24   course, Chicago, he would be familiar with those cases, I

25   am as well, those both involve the release of actual

1   damages, not a statutory damage, limited statutory damage

2   claim, which is what we have here.  And again, in this

3   case, all actual damages are preserved.  They are not

4   being released.  And I don't think I heard from either

5   Mr. Schulman or Mr. Anderson any convincing explanation,

6   in fact, I didn't really hear any explanation at all, as

7   to why people who have the kind of actual damage claims

8   against LexisNexis could not pursue those after this

9   settlement.

10          As this Court knows, there is case after case

11  after case brought under the Fair Credit Reporting Act on

12  an individual basis where settlements are routinely

13  25,000, 50,000, 100,000, levels at which this Court or

14  others have said routinely do not lend themselves to a

15  class action.  These claims are not appropriate for class

16  action treatment, and they have been preserved.  And they

17  can be pursued after this settlement.

18          I would point out that at the end of this whole

19  process, there has not been one objection raised by the

20  objectors to Professor Richards's Declaration valuing the

21  injunctive relief.  So the record that you have before you

22  is bereft of any objection as to his conclusions.  Now,

23  Mr.  --

24          MR. SCHULMAN:  Your Honor --

25          MR. CADDELL:  Excuse me, Mr. Schulman, if you

1    will let me finish.  Mr. Schulman says in his brief

2    because it is not precise, he says because it is not an

3    ascertainable calculation or valuation, you have to

4    disregard it.  That's not the same as saying he lacks

5    credentials.  It is not the same as saying he doesn't have

6    a valid basis for stating his opinion.  And he didn't ask

7    that it be disregarded in the same way that he asked that

8    the Declarations of Miller, Professor Miller and Professor

9    Mullenix be disregarded.  If you have a place to point to

10   in your objection where you asked for that --

11           MR. SCHULMAN:  I said it was facially unreliable

12   because it didn't consider half of the equation.  So it is

13   basically unreliable and should not be admissible for that

14   purpose under the DAUBERT decision.

15           MR. CADDELL:  Okay.  I think that's not an

16   objection, Your Honor.  I think it is a criticism, but not

17   an objection.  He made a very clear objection to the

18   Declarations of Miller and Mullenix asking that they be

19   disregarded and stricken.  He has not done so, and

20   frankly, it may be because the time for his objection had

21   passed before he knew that Professor Richards had even

22   filed a Declaration.

23           But in any event, that is in the record, and it

24   is unrebutted.

25           Finally, Your Honor, I would refer the Court to

1    Document 104, which is the plaintiffs' responses to

2    objections to the class action settlement, Pages 2 through

3    10, where the plaintiffs not only quote WAL-MART v. DUKES,

4    but actually discuss in detail the entitlement to a (b)(2)

5    class which releases incidental damages.

6              THE COURT:  Let me ask you a question:  I'd like

7    to hear your response to Mr. Anderson's argument regarding

8    the statutory damages not being automatic and

9    computer-driven, and therefore, not incidental, in that

10   the range from 100 to 1,000, you've got different facts

11   that lead to different results.  So what's your response

12   to that?

13             MR. CADDELL:  Your Honor, in this case, there

14   would be no different facts for any class member to make

15   in a statutory damages claim.  The statutory damages

16   claims advanced in a class action in this case would in

17   fact be driven by one fact, and that would be the

18   defendants' conduct, not by any information peculiar to

19   the individual plaintiffs.  And that, I think I can

20   demonstrate that by, I don't know, do we have the

21   questionnaire in the record?  I think we may have filed

22   this with respect to the motion that was before the Court

23   about the website that at least initially misrepresented

24   the settlement.  The Watts Guerra, and you saw

25   Mr. Anderson, he talked about the questionnaire that they

1    had.  They were screening people and they knew these

2    people had claims.  Ironically, what they did was, they

3    eliminated people that had claims.  On their

4    questionnaire, it is a one-page questionnaire and it is a

5    little misleading, because you may think you are just

6    answering a questionnaire when you actually are signing an

7    agreement.  But on the first page, it says:

8    "Claim-related information."  Item Number 1 says:  "Have

9    you ever requested a copy of your Accurint report from

10   LexisNexis?"  Then in parenthesis underneath, it says, "If

11   yes, then you are ineligible for our representation.  We

12   don't want to represent you if you have ever requested a

13   copy of your file from Accurint."  Then the second

14   question is, "Have you ever disputed any of the

15   information contained in your Accurint report?"  Again, it

16   says, "If yes, then you are ineligible for our

17   representation."  Actually, those are the people that

18   would have individual claims, because those people would

19   have taken it upon themselves to contact LexisNexis and

20   either request a copy of their file or dispute some of the

21   information on their file.  As to everyone else, their

22   relationship with LexisNexis would be the same.

23            We don't know, Mr. Anderson said, well, there

24   are different products and they are different inquiries

25   and some people may have had some reports pulled on them

1    and other people may have had other reports on them.  The

2    reality is, because they didn't maintain their records

3    under the Fair Credit Reporting Act, we don't have records

4    of inquiries and of the reports that were issued in these

5    cases.  So the information that you have as to class

6    members would be virtually the same for every class

7    member.  So there would be no individualized inquiry under

8    the statutory damages claim.  The statutory damages claim

9    would be simply was it a consumer report, and then was it

10   willful, and then you would assess the damages for the

11   individuals and it would be the same for every individual

12   times however many individuals you had.

13          So it is almost the -- it is the very definition

14   of incidental in that respect.  There would never be an

15   instance where anyone would be called to testify as to

16   their mental anguish, like Ms. Niles.  I mean Ms. Nix.

17   "I've been getting calls from bill collectors and I've

18   been trying to get them to quit calling me and harassing

19   me."  That would never happen with these statutory damage

20   claims.

21          Now, Ms. Nix on an individual basis, an

22   individual can still bring the statutory damage claim or

23   an actual damage claim.  There was a slight

24   misrepresentation by Mr. Anderson.  He says the statutory

25   damages statute says you can get $100 to $1,000.

1   Actually, what it says is you can get $1 to $100 for your

2   actual damages.  So on an individual basis you can still

3   bring a claim for statutory damages with respect to

4   violations, but you can bring your claim for actual

5   damages.  So the reality is, what's being released in this

6   case is only the claim that could be made against

7   LexisNexis for refusing to treat these reports as being

8   consumer reports under the Fair Credit Reporting Act.

9   That's about it.  And that would be brought on a class

10  basis, and it would be incidental to the injunctive

11  relief, because it would be the same answer for every

12  member of the class.

13            THE COURT:  All right.

14            MR. CADDELL:  I think that's it.

15            MR. BENNETT:  To answer on that point directly,

16  the Fourth Circuit has considered what you look at in

17  individualized -- I mean in a calculation of the 100 to

18  1,000 and determined how individualized it is.  In

19  STILLMOCK v. WEIS MARKETS.  And I apologize, I don't have

20  the F.2d or F.3d number, but it is easy enough.  It was

21  decided in 2010.  And in STILLMOCK, a denial of class

22  certification out of the District of Maryland was reversed

23  and the argument below had been how individualized the

24  calculation of statutory damages would be, how therefore

25  they would predominate, and thus it was ineffective as a

1    class.  And the second argument that's relevant here was

2    that there were alternatives.  You don't need a class

3    action because individuals could prosecute their statutory

4    damage claims because there's attorneys' fees, so you

5    don't need a class action remedy.  Both of those are

6    relevant.  The STILLMOCK case, the denial of class

7    certification was reversed.  The analysis was, sure, the

8    variation, there could be a variation for one consumer of

9    the 100 to 1,000, but it is not individualized in the form

10   of the back pay like in the WAL-MART calculation.

11   Instead, it is the number of violations.  So if, for

12   example, there was any way to determine, and I represent,

13   no one has discovered a way to prove whether or not any of

14   these errant objectors actually had a report issued on

15   them in a way they could prove in Court.  But if they

16   wanted to prove it and they didn't have actuals and they

17   went with statutory damages, it is exactly as counsel

18   said, a computer calculation.  Number of times that the

19   report, the Accurint report was sold, number of

20   violations.  It is clearly, while there could be a

21   variation like a computer variation between one consumer

22   and the other, STILLMOCK would clearly find that it isn't

23   a calculation that is individualized like the back pay

24   issue.  You could simply, the number of violations, two

25   reports were sold versus three reports, and that's it.

1    Which is, if you look at the text that's cited in our

2    briefing and if you reread the WAL-MART case, it is

3    exactly that type of issue.

4            The second issue in STILLMOCK, Judge, that would

5    be relevant, in STILLMOCK, the Fourth Circuit rejected the

6    idea that there was any value to being able to have an

7    individual statutory damage claim that you could then take

8    off on your own and litigate.  Different posture.  In

9    STILLMOCK, the question was whether or not the District

10   Court of the District of Maryland was correct in saying

11   you don't need a class action, it is not a superior

12   device, because you can always take these strong statutory

13   damage cases with an attorneys' fee remedy and run off to

14   Court and litigate them on your own.  And the Fourth

15   Circuit said that's not viable.  That's not certainly

16   superior because there is no indication that people could

17   actually do that.  And so in this context, that same

18   reasoning would apply.  That is, the question of what is

19   incidental is in part how individualized the determination

20   is.  Is it more than simply number of violations, and it

21   is not, and the second question would be are you giving

22   anything up, was this a material, core claim as opposed to

23   an incidental one.  And it clearly is not.  There have not

24   been any such statutory damage claims prosecuted by

25   anyone, and no one filed any of these causes other than

1    our folks to any extent I'm aware of, and the actual

2    damages that would have the value or not impacted.  But

3    the STILLMOCK case, it is a Fourth Circuit decision, and

4    it provides the only analysis out there as to what

5    elements you would use in a Fair Credit Reporting Act

6    calculation of where between 100 to 1,000, and it is

7    mechanical, as the Fourth Circuit explained.

8              THE COURT:  All right.  Mr. Anderson, I'll let

9    you have the last word on that issue.

10             MR. ANDERSON:  I'll be brief.  With all due

11   respect, the remarks you heard are wrong legally and

12   factually.  Let's start with the law.  Fortunately, we

13   have guidance right out of the Fourth Circuit, SOUTTER v.

14   EQUIFAX INFO SERVICES LLC, 498 Federal Appendix 260, Page

15   Number 265, a 2012 decision.  There the Court at that jump

16   cite says that "Statutory damages typically require an

17   individualized inquiry," end of quote.  That's the law.

18             And now let's apply that law to the facts of

19   this case.  We have a statute that says depending upon the

20   defendants' culpability, the defendants' state of mind,

21   statutory damages can range from $100 to $1,000 per

22   violation.  That range is going to be determined by the

23   defendants' culpability at particular points in time.  And

24   again, we don't have to, this isn't Kimball talking, this

25   is their complaint talking.  They in their complaint, the

1    plaintiffs in the complaint on our behalf pointed out that

2    the defendants' culpability, state of mind, should be

3    assessed in terms of pre-ADAMS class and post-ADAMS

4    sub-class.  Now they have abandoned that.  Okay.  The

5    plaintiffs themselves in the complaint filed on behalf of

6    our clients alleged that there were different products,

7    that there were different types of reports.  And those

8    different types of products and those different types of

9    reports are probative of the statutory damage issues.

10           Judge, computers don't weigh the knowledge of a

11   defendant.  Computers don't decide the culpability of a

12   defendant over a period of many years.  Computers don't

13   decide whether the right amount of statutory damages, one

14   that is fair and equitable, is $100, $200, $800, or a

15   thousand dollars.  Juries do that, Judge.  That's a

16   Seventh Amendment right to a jury trial.  And that is the

17   epitome of an individualized damage determination.  And

18   that is what every Court that has looked at these kinds of

19   statutory damages has held.  I thank you for your kind

20   attention today.

21           THE COURT:  All right.  Thank you all very much.

22   Just like you all, you took the time to bombard me with

23   all of this paper, I will take the time to resolve it.

24   I'll do it as swiftly as I can, but I'm not making any

25   promises.

1            I think I've got enough here.  I have my

2    information.  And we will resolve it as quickly as we can.

3    Thank you all again.

4            (Proceedings adjourned at 3:55 p.m.)

5            CERTIFICATE OF REPORTER

6       I, Jeffrey B. Kull, Official Reporter, certify that

7    the foregoing is a correct transcript from the record of

8    proceedings in the above-entitled matter.

9

10

11   _____/s/_____

12   Jeffrey B. Kull,
     Official Federal Reporter

13

14   _____/s/_____

15   Date

16

17

18

19

20

21

22

23

24

25